707.   Upon information and belief, Putnam Managed High Yield Trust is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

708.   Upon information and belief, Putnam Strategic Income Fund is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

709.   Upon information and belief, Quadrangle Master Funding Ltd. is an investment company engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

710.   Upon information and belief, Rabobank International, New York Branch is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

711.   Upon information and belief, Raintree Trading LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt.  This entity acquired

201

pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

712.   Upon information and belief, Raven Credit Opportunities Master Fund, Ltd. is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

713.   Upon information and belief, Regents of the University of California is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

714.   Upon information and belief, Resolution Master Fund LP is a limited partnership engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

715.   Upon information and belief, Reynolds American Defined Benefit Master Trust is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt

202

was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

716.    Upon information and belief, Ritchie Special Credit Investments is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

717.    Upon information and belief, Riviera Funding LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

718.    Upon information and belief, Royal Bank of Canada is a banking association organized under the laws of Canada, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

719.    Upon information and belief, Royal Bank of Scotland, plc is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

720.    Upon information and belief, Royalton Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

721.    Upon information and belief, Sagamore Hill Hub Fund Ltd. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

722.    Upon information and belief, Citigroup Financial Products, Inc. (f/k/a Salomon Brothers Holding Co., Inc.) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

723.    Upon information and belief, Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

204

724.    Upon information and belief, Sandler Associates, LP is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

725.    Upon information and belief, Sandler Communications Offshore Fund, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

726.    Upon information and belief, Sankaty High Yield Asset Partners, L.P. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

727.    Upon information and belief, Sankaty High Yield Partners III, L.P. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

728.    Upon information and belief, Saratoga CLO I Limited is an investment company organized under the laws of the Cayman Islands, engaged in the business of, among other things,

205

acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

729.    Upon information and belief, Satellite Senior Income Fund II, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

730.    Upon information and belief, Security Income Fund - Income Opportunity Series is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

731.    Upon information and belief, Sei Institutional Investments Trust is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

732.    Upon information and belief, Sei Institutional Managed Trust is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

206

incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

733.    Upon information and belief, Seminole Funding LLC is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

734.    Upon information and belief, Senior Loan Fund 2 is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

735.    Upon information and belief, Silver Oak Capital LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HCC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

736.    Upon information and belief, Smoky River CDO, L.P. (f/k/a Indosuez Capital Funding IV) is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

737.    Upon information and belief, Smoky River CDO, LP is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

738.    Upon information and belief, Société Générale, S.A. is a banking association organized under the laws of France, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

739.    Upon information and belief, SOL Loan Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

740.    Upon information and belief, SPCP Group, L.L.C. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

741.    Upon information and belief, Spectrum Investment Partners LP is a limited partnership engaged in the business of, among other things, acquiring bank debt. This entity

208

acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

742.    Upon information and belief, SRF Trading, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

743.    Upon information and belief, SRI Fund is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

744.    Upon information and belief, Stanwich Loan Fund LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

745.    Upon information and belief, Highland Floating Rate Fund Limited Liability Company (f/k/a Stein Roe Floating Rate Limited Liability Company) is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

746.   Upon information and belief, Strand Funding is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

747.   Upon information and belief, Strategic Managed Loan Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

748.   Upon information and belief, Sumitomo Mitsui Banking Corporation (f/k/a The Sumitomo Bank, Limited) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

749.   Upon information and belief, Sumitomo Mitsui Banking Corporation is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

210

750.    Upon information and belief, The Sumitomo Trust & Banking Co., Ltd. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

751.    Upon information and belief, The Sumitomo Trust & Banking Co., Ltd., New York Branch is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

752.    Upon information and belief, SunAmerica, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

753.    Upon information and belief, SunAmerica Life Insurance Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

754.    Upon information and belief, SunTrust Bank is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an

211

assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

755.    Upon information and belief, Swiss Life US Rainbow Limited is a banking association engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

756.    Upon information and belief, T Rowe Price High Yield is an investment company engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

757.    Upon information and belief, T Rowe Price Institutional High Yield is an investment company engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

758.    Upon information and belief, Thales Holdings Ltd. Inc. is a corporation engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the

212

Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

759.    Upon information and belief, Third Avenue Value Fund Series is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

760.    Upon information and belief, Toronto Dominion (Texas), Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

761.    Upon information and belief, Total Return Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

762.    Upon information and belief, Legg Mason Partners Variable Portfolios III, Inc. (f/k/a Travelers Series Fund, Inc.) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

213

763. Upon information and belief, Travelers Series Fund, Inc.-Putnam is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

764. Upon information and belief, Trigon Healthcare, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

765. Upon information and belief, Trilogy Portfolio Company LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

766. Upon information and belief, TRS Callisto LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

767. Upon information and belief, TRS Elara LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired

214

pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

768.   Upon information and belief, TRS IO LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

769.   Upon information and belief, TRS Plainfield LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

770.   Upon information and belief, TRS Thebe LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

771.   Upon information and belief, U.S. Bank National Association is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

215

incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

772.   Upon information and belief, UBS AG is a banking association organized under the laws of Switzerland, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

773.   Upon information and belief, UBS AG Stamford Branch is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

774.   Upon information and belief, United of Omaha Life Insurance Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

775.   Upon information and belief, Van Kampen Senior Loan Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

216

776.    Upon information and belief, Variable Insurance Products Fund II is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

777.    Upon information and belief, Variable Insurance Products Fund II: Asset Manager: Growth Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

778.    Upon information and belief, Variable Insurance Products Fund II: Asset Manager Portfolio (222) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

779.    Upon information and belief, Variable Insurance Products Fund: High Income Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

780.    Upon information and belief, Variable Insurance Products Fund: VIP High Income Portfolio is a banking association engaged in the business of, among other things,

217

acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

781.    Upon information and belief, Wachovia Bank, National Association is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

782.    Upon information and belief, Waterville Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

783.    Upon information and belief, WB Loan Funding 3 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

784.    Upon information and belief, WBNA is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the

UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

785.   Upon information and belief, Webster Bank is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

786.   Upon information and belief, WellPoint Health Networks, Inc. (f/k/a Blue Cross of California) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

787.   Upon information and belief, Whippoorwill Distressed Opportunity Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

788.   Upon information and belief, Whippoorwill Offshore Distressed Opportunity is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

789.   Upon information and belief, York Capital Management LP is a limited partnership engaged in the business of, among other things, acquiring bank debt.  This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

790.   The true names, identities and capacities of the Defendants sued herein as John Doe Nos. 1-100; and John Doe, Inc., Nos. 1-100 are unknown to Plaintiff.  These fictitiously named Defendants hold, or at one time held, some or all of the right, title and interest in one or more of the Co-Borrowing and Non-Co-Borrowing Credit Facilities described herein.  As and when the names, identities and capacities of these fictitiously named Defendants become known, Plaintiff will amend this Complaint to set forth these Defendants' true names, identities and capacities and otherwise proceed against them as if they had been named as parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure.

791.   The parties identified in paragraphs 157 through 790, above, are collectively referred to herein as the "Assignees."

**The Rigas Family Entities**

792.   Upon information and belief, Hilton Head Communications, L.P. ("Hilton Head") was a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

793.    Upon information and belief, Highland Prestige of Georgia, Inc. ("Highland Prestige") was a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

794.    Upon information and belief, Highland Video Associates, L.P. ("Highland Video") was a limited partnership organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

795.    Upon information and belief, Highland Communications LLC ("Highland Communications") was a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

796.    Upon information and belief, Highland Preferred Communications LLC ("Highland Preferred") was a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

797.    Upon information and belief, Highland Holdings ("Highland Holdings") was a general partnership organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

798.    Upon information and belief, Coudersport Cable and Television Company ("CCT") was a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

799.    Hilton Head, Highland Prestige, Highland Video, Highland Communications, Highland Preferred, Highland Holdings, CCT and other entities wholly-owned by the Rigas Family are collectively referred to herein as the "RFEs." At all times material to the allegations herein, none of the Adelphia entities owned any beneficial interest in any of the RFEs.

## FACTS

**A.    The Rigas Family's Ownership And Control Of Adelphia.**

800.    In or about 1952, John Rigas entered the cable business by acquiring a small cable system located in Coudersport, Pennsylvania. Over the next fifty years, this company, known as ACC, became the sixth largest cable provider in the United States.

801.    At all relevant times, members of the Rigas family, principally John Rigas and his three sons, Timothy, Michael and James Rigas (hereinafter, the term "Rigas Family" refers to John, Timothy and Michael Rigas), with substantial assistance from two senior ACC executives, James Brown ("Brown") and Michael Mulcahey ("Mulcahey"), held all of the most senior executive positions of Adelphia, subject to the oversight and control of the Adelphia Board of Directors. John Rigas was ACC's President and Chief Executive Officer; Timothy Rigas was ACC's Executive Vice-President, Chief Financial Officer, Chief Accounting Officer and Treasurer; Michael Rigas was ACC's Executive Vice-President in charge of operations; and

James Rigas was ACC's Executive Vice-President in Charge of Strategic Planning. Subject to the oversight of Adelphia's Board of Directors, the Rigas Family managed the operations of each of ACC's direct and indirect subsidiaries and made, or approved of, the major business decisions on behalf of Adelphia. The Rigas Family caused Adelphia to engage in all acts or omissions alleged herein to have been made by Adelphia, with the assistance of Brown, Mulcahey and other senior executives of Adelphia who were complicit in the fraud. The Rigas Family also controlled the operations of the RFEs.

802.   The Rigas Family also maintained a majority of the voting power of ACC's shares through its ownership of nearly all of ACC's issued and outstanding Class B shares of common stock, each share of which carried ten times the voting power of an ACC Class A share. At all relevant times, ACC's Class A stock and debt securities (along with certain debt securities issued by indirect ACC subsidiaries) were publicly traded and listed on one or more national exchanges.

803.   Prior to each of their forced resignations in May 2002, members of the Rigas Family had a majority of the seats on ACC's Board of Directors (except for six months from November 1999 to May 2000 when they held five of the Board's ten seats) and occupied all of its senior management positions. John Rigas was Chairman of the Board of ACC, and Michael, Timothy and James Rigas each were directors of ACC. A relative of the Rigas Family, Peter Venetis, also was a director and under the control of the Rigas Family. The remaining seats on the Board were occupied at all relevant times by independent outside directors who were not members of ACC's management (the "Independent Directors"). The Independent Directors on the Board were Perry Patterson from 1986 until May 2000, Pete Metros from November 1986 through June 2002, Dennis Coyle from September 1995 through December 2003, Erland

Kailbourne from November 1999 through December 2003, and Leslie Gelber from November 1999 through May 2003.

804.   Controlling corporate law and provisions in the controlling credit agreements and indentures for various debt and equity instruments required Adelphia to obtain the separate approval of the Independent Directors before entering into material transactions with affiliated companies.  These limitations on affiliated transactions, imposed by law and contract, restricted the ability of the Rigas Family to abuse their shareholder and board majorities to use ACC's assets for their own personal benefit and for the benefit of their wholly owned RFEs.  The Rigas Family owed a fiduciary duty to Adelphia to seek and obtain the approval of the Board of Directors and the Independent Directors before entering into affiliated transactions and to ensure that such affiliated transactions complied with these legal obligations, whether they arose from law or contract.  The Co-Borrowing Lenders were aware of the Rigas Family's fiduciary duties at the time that the Co-Borrowing Lenders entered into the Co-Borrowing Facilities.  The Co-Borrowing Lenders and the Investment Banks knew that the Co-Borrowing Facilities in the form that the Rigas Family, the Agent Banks, and the Investment Banks had structured them did not satisfy those fiduciary duties and that the Independent Directors would not have approved the Co-Borrowing Facilities unless that approval was based on material misrepresentations concerning the Co-Borrowing Facilities or unless material and necessary information was withheld from them.

805.   The Rigas Family abused its ubiquitous position within ACC to conceal the nature and extent of its fraudulent conduct from the Independent Directors, creditors (other than Defendants) and other constituents.  Adelphia's Independent Directors or officers could have and

224

would have acted to stop the fraud had it been disclosed to them prior to 2002. Instead, the Rigas Family and their accomplices made numerous misrepresentations and omissions of material facts to the Independent Directors that concealed the Rigas Family's fraud in connection with the Co-Borrowing Facilities.

806.    Indeed, when the fraud was disclosed to the Independent Directors in March 2002, they acted swiftly and decisively: they investigated and promptly terminated the fraudulent borrowing activities; forced the Rigas Family and other faithless officers off the Board and out of their management positions at Adelphia; cooperated with federal authorities, including the Department of Justice and the Securities and Exchange Commission in the investigations conducted by those agencies; engaged independent counsel and new auditors to commence an internal investigation of Adelphia's prior business activities while under the Rigas Family's management; and identified and put in place new members of management and directors of Adelphia to conduct Adelphia's business going forward. The Independent Directors at that time were Messrs. Coyle, Gelber, Kailbourne, and Metros.

**B.    Adelphia's Credit Facilities.**

807.    Beginning in 1998, the Rigas Family found themselves without access to sufficient cash or credit that they needed to maintain their lifestyles and achieve their personal business endeavors. The Rigas Family worked closely with the Agent Banks and the Investment Banks to devise a scheme to use Adelphia's credit to obtain access to funds that the Rigas Family could use for their personal benefit. With the assistance of the Agent Banks and the Investment Banks, the Rigas Family secretly diverted billions of dollars of proceeds of the co-borrowing facilities, for which Adelphia was fully responsible, to their own personal use, including the

225

expansion of their privately owned cable business.  The debt facilities Adelphia incurred during this period, including bank debt facilities, most of which were outstanding as of the Petition Date, are identified in section B.2 below.  The Co-Borrowing Facilities that made up a substantial part of these debt facilities greatly benefited the Rigas Family's personal interests but provided no benefit to Adelphia.

1.      **The Publicly-Traded Debt.**

808.    From 1993 through 2001, the Rigas Family caused ACC and certain of its affiliated entities to issue senior and subordinated notes in the aggregate principal amount of some $9.38 billion, all of which was outstanding on the Petition Date.  These notes were offered to investors through no less than twenty-eight public offerings.

809.    Each of the public debt offerings was transacted pursuant to indentures that contained provisions designed to protect Adelphia, public investors, and other lenders.  The safeguards in the indentures included provisions that prohibited non-arms' length transactions between Adelphia bond-issuing entities and affiliated entities that were on terms more favorable than those available to the affiliates with third parties, and consequently not in the Adelphia bond-issuing entities' best interests or the best interests of the investors holding the notes.  These safeguards also arose independently by virtue of statutory and common-law fiduciary duty obligations.  As described more fully below, the Rigas Family, with the assistance of the Agent Banks and the Investment Banks, circumvented these safeguards, to the detriment of Adelphia and its creditors (other than defendants).

810.    An Indenture dated as of October 7, 1996, relating to the issuance of notes by ACC subsidiaries FrontierVision Operating Partners, L.P. and FrontierVision Capital

226

Corporation contained such a safeguard that imposed limits on transactions between the issuers and their affiliates.  That Indenture provided in pertinent part:

> SECTION 4.03. Limitation on Transactions with Affiliates and Related Persons.
>
> The Company will not, and will not permit, cause or suffer any Restricted Subsidiary to, directly or indirectly, conduct any business or enter into any transaction (or series of related transactions) with or for the benefit of any of their respective Affiliates or any beneficial holder of 10% or more of the Equity Interests of the Company or any officer, director or employee of the Company or any Restricted Subsidiary (each an "Affiliate Transaction"), unless (a) such Affiliate Transaction is on terms which are no less favorable to the Company or such Restricted Subsidiary, as the case may be, than would be available in a comparable transaction with an unaffiliated third party, (b) if such Affiliate Transaction (or series of related Affiliate Transactions) involves aggregate payments or other consideration having a Fair Market Value in excess of $5.0 million, a majority of the disinterested members of the Board of Directors of FV Inc. shall have approved such transaction and determined that such transaction complies with the foregoing provisions and (c) if such Affiliate Transaction (or series of related Affiliate Transactions) involves aggregate payments or other consideration having a Fair Market Value of $25.0 million or more, the Company shall have obtained a written opinion from an Independent Financial Advisor stating that the terms of such Affiliate Transaction are fair to the Company or the Restricted Subsidiary, as the case may be, from a financial point of view.

811.    The Fifth Supplemental Indenture Dated as of January 23, 1997, relating to the issuance of senior notes by the ACC subsidiary known as Arahova Communications (f/k/a Century Communications) contained a similar provision limiting transactions with affiliates, providing in pertinent part:

> SECTION 11.12.  Limitation on Transactions with Affiliates.
>
> Neither the Company nor any Subsidiary may engage in any transaction with an Affiliate of the Company (other than a

227

> Restricted Subsidiary), or any director, officer or employee of the
> Company or any Subsidiary, on terms less favorable to the
> Company or such Subsidiary than would be obtainable at the time
> in comparable transactions of the Company or such Subsidiary
> with Persons which are not Affiliates[.]

812.    Similarly, the indenture dated as of July 2, 1998, relating to the issuance of senior

notes by ACC, contained a provision limiting transactions with affiliates, providing, in pertinent

part:

> Section 4.04.    Limitation on Transactions with Affiliates.
>
>     The Company shall not, and shall not permit any
> Restricted Subsidiary to, engage in any transaction with any
> Affiliate upon terms which would be any less favorable than those
> obtainable by the Company or a Restricted Subsidiary in a
> comparable arm's-length transaction with a Person which is not an
> Affiliate. The Company shall not, and shall not permit any
> Restricted Subsidiary to, engage in any transaction (or series of
> related transactions) involving in the aggregate $1,000,000 or more
> with any Affiliate except for (i) the making of any Restricted
> Payment, (ii) any transaction or series of transactions between the
> Company and one or more of its Restricted Subsidiaries or
> between two or more of its Restricted Subsidiaries (provided that
> no more than 5% of the equity interest in any of its Restricted
> Subsidiaries is owned by an Affiliate), and (iii) the payment of
> compensation (including, without limitation, amounts paid
> pursuant to employee benefit plans) for the personal services of
> officers, directors and employees of the Company or any of its
> Restricted Subsidiaries, so long as the Board of Directors of the
> Company in good faith shall have approved the terms thereof and
> deemed the services theretofore or thereafter to be performed for
> such compensation or fees to be fair consideration therefor; and
> provided further that for any Asset Sale, or a sale, transfer or other
> disposition (other than to the Company or any of its Restricted
> Subsidiaries) of an interest in a Restricted Investment, involving an
> amount greater than $25,000,000, such Asset Sale or transfer of
> interest in a Restricted Investment is for fair value as determined
> by an opinion of a nationally recognized investment banking firm
> filed with the Trustee. Notwithstanding the foregoing, this
> provision shall not prohibit any such transaction which is
> determined by the independent members of the Board of Directors
> of the Company, in their reasonable, good faith judgment (as

228

> evidenced by a Board Resolution filed with the Trustee) to be (a)
> in the best interests of the Company or such Restricted Subsidiary,
> and (b) upon terms which would be obtainable by the Company or
> a Restricted Subsidiary in a comparable arm's-length transaction
> with a Person which is not an Affiliate.

813.    The indentures relating to the other note offerings of Adelphia entities contained similar safeguards regarding transactions with affiliates and requiring resolutions by the Independent Directors approving such transactions.

814.    These provisions relating to affiliate transactions were publicly disclosed.  The Agent Banks, the Investment Banks, and the other Co-Borrowing Lenders involved in the Co-Borrowing Facilities (defined and discussed below) were aware of the indentures and the existence of the safeguards contained therein at the time they entered into the Co-Borrowing Facilities.  The Agent Banks, the Investment Banks, and the other Co-Borrowing Lenders were also aware at the time they entered into the Co-Borrowing Facilities that Adelphia's Articles of Incorporation and statutory and common law imposed similar safeguards on Adelphia's Board of Directors.  Despite this knowledge, the Agent Banks and their affiliated Investment Banks substantially assisted the Rigas Family in circumventing these safeguards.

2.    **Bank Debt.**

a.    **The Non-Co-Borrowing Facilities.**

815.    Certain of ACC's subsidiaries were borrowers in three bank credit facilities: the FrontierVision Credit Facility, the Parnassos Credit Facility, and the Century TCI Credit Facility (each of which is defined and described in further detail below and referred to herein collectively as the "Non-Co-Borrowing Facilities.").

229

(i)     The FrontierVision Credit Facility.

816.     Pursuant to a Second Amended and Restated Credit Agreement, dated as of December 19, 1997 (as amended on October 7, 1998, July 15, 1999 and March 2, 2001, the "FrontierVision Credit Agreement"), an ACC indirect subsidiary -- FrontierVision Operating Partners, L.P. -- entered into an $800 million facility with various lenders, comprising two separate term loans of $250 million each and a $300 million revolving line of credit.  Other indirect subsidiaries of ACC, including FrontierVision Capital Corporation, FrontierVision Cable New England, Inc., Adelphia Communications of California III, LLC, FOP Indiana, L.P., and The Maine Internetworks, Inc.,[2] guaranteed the repayment of funds drawn under the facility pursuant to a Subsidiary Guaranty Agreement, dated as of December 19, 1997  (collectively, the "FrontierVision Guaranty Agreements").  FrontierVision Operating Partners, L.P., pledged all of its assets (including the stock of its subsidiaries) to secure repayment pursuant to a Security Agreement, as amended, dated as of December 19, 1997 (the "FrontierVision Security Agreement").  Other ACC indirect subsidiaries, including FrontierVision Holdings, L.P. and FrontierVision Operating Partners, LLC, guaranteed the repayment of funds drawn under the facility, and pledged their respective partnership interests in FrontierVision Operating Partners, L.P. to secure repayment pursuant to a Partner Pledge Agreement, as amended, dated as of December 19, 1997 (the "FrontierVision Partner Pledge Agreements").  FrontierVision Holdings, L.P., also pledged its holdings in its subsidiary, FrontierVision Operating Partners, LLC, to secure repayment pursuant to a Stock Pledge Agreement, as amended, dated as of December 19, 1997 (the "FrontierVision Stock Pledge Agreement," and together with the FrontierVision Credit Agreement, the FrontierVision Security Agreement, the FrontierVision

---

[2]     Each of the Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the FrontierVision Facility are referred to herein as the "FrontierVision Debtors."

Guaranty Agreements, the FrontierVision Partner Pledge Agreements and all related agreements, the "FrontierVision Credit Facility").

817.    Chase acted as Administrative Agent, J.P. Morgan Securities, Inc. acted as Syndication Agent, and CIBC acted as Documentation Agent under the FrontierVision Credit Facility.  Other defendants participating in the FrontierVision Credit Facility include Morgan Guaranty, BMO, FNBC, Wachovia, Long-Term Credit, UBC, Fleet, Rabobank, ABN AMRO, BankBoston, BONY, Dresdner Bank, Credit Lyonnais, Mellon Bank, Bank Paribas, PNC Bank, Royal Bank of Canada, CBRI, BNP, U.S. Bank, First Hawaiian, The Fuji Bank, Industrial Bank of Japan, Mitsubishi Trust, Sumitomo, SunTrust, Natexis, KZH Holding, Van Kampen Trust, ING Trust, Merrill Lynch Floating Rate Fund, Octagon, Travelers, CAI, PFL Life, Royalton, and one or more of the Assignees.[3]

818.    As of the Petition Date, approximately $617 million was outstanding under the FrontierVision Credit Facility.

### (ii)    The Parnassos Credit Facility.

819.    Pursuant to a Credit Agreement, dated as of December 30, 1998 (the "Parnassos Credit Agreement"), Parnassos, L.P., an ACC subsidiary, entered into a $700 million facility with various lenders, comprising a $350 million term loan and a $350 million revolving line of credit.  Other indirect ACC subsidiaries, including Parnassos Communications, L.P. and Parnassos Holdings, L.L.C.,[4] pledged their respective partnership interests in Parnassos, L.P. to

---

[3]    The lenders in the FrontierVision Facility are referred to herein collectively as the "FrontierVision Lenders."

[4]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the Parnassos Facility are referred to herein collectively as the "Parnassos Debtors."

secure repayment pursuant to a Partners Pledge Agreement, dated as of December 30, 1998 (the "Parnassos Pledge Agreement," and together with the Parnassos Credit Agreement and all related agreements, the "Parnassos Credit Facility").

820.   BNS acted as Administrative Agent, BofA acted as Documentation Agent, and TD Securities acted as Syndication Agent for the Parnassos Credit Facility.  In addition, (i) each of the following acted as Managing Agent:  BMO, Barclays, CIBC, Credit Lyonnais, CSFB, Wachovia, Fleet, PNC Bank, Rabobank and SBHC; and (ii) each of the following acted as Co-Agent:  BHV, Dresdner Bank, MeesPierson, BONY and Lehman Brothers.  Other Defendants participating in the Parnassos Credit Facility include BNP, SunTrust, First Hawaiian, FNBM, GSLP, MTTC, U.S. Trust, and one or more of the Assignees.[5]

821.   As of the Petition Date, approximately $623 million was outstanding under the Parnassos Credit Facility.

**(iii)   The Century-TCI Credit Facility.**

822.   Pursuant to a Credit Agreement, dated as of December 3, 1999 (the "Century-TCI Credit Agreement"), Century-TCI California, L.P., an ACC subsidiary, entered into a $1 billion credit agreement with various lenders, comprising a $500 million term loan and a $500 million revolving line of credit.  Other indirect ACC subsidiaries, including Century-TCI California Communications, L.P. and Century-TCI Holdings, LLC,[6] pledged their partnership interests in Century-TCI California, L.P. to secure repayment pursuant to a Pledge Agreement, dated as of

---

[5]   Each of the lenders participating in the Parnassos Facility are referred to herein collectively as the "Parnassos Lenders."

[6]   The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the Century-TCI Facility are referred to collectively as the "Century-TCI Debtors."

December 3, 1999 (the "Century-TCI Pledge Agreement," and together with the Century-TCI Credit Agreement and all related agreements, the "Century-TCI Credit Facility").[7]

823.    Citibank acted as Administrative Agent, Société Générale and Deutsche Bank Securities were Co-Syndication Agents, SSB was Lead Arranger and Sole Book Manager, and Mellon Bank was Documentation Agent for the Century-TCI Credit Facility.  Other defendants participating in the Century-TCI Credit Facility include BofA, BONY, BNS, Bank One, Chase, CIBC, Credit Lyonnais, Dai-Ichi Kangyo, Mitsubishi Trust, TDI, BMO, Barclays, Credit Locale, Wachovia, Industrial Bank of Japan, PNC Bank, Webster Bank, and one or more of the Assignees.[8]

824.    As of the Petition Date, approximately $1 billion was outstanding under the Century-TCI Credit Facility.

**b.    The Co-Borrowing Facilities.**

      **(i)    The Unprecedented Structure Of The Co-Borrowing Facilities.**

825.    The three Co-Borrowing Facilities that remained outstanding as of the Petition Date – the UCA/HHC Co-Borrowing Facility, the CCH Co-Borrowing Facility and the Olympus Co-Borrowing Facility (each of which is defined and described below and all of which are referred to collectively as the "Co-Borrowing Facilities") – were at the heart of the fraud perpetrated by the Rigas Family with the substantial assistance of the Agent Banks and the Investment Banks.

---

[7]    The FrontierVision, Parnassos and Century-TCI Credit Facilities are referred to herein collectively as the "Non-Co-Borrowing Facilities."  The lenders in the Non-Co-Borrowing Facilities are referred to herein collectively as the "Non-Co-Borrowing Lenders."

[8]    The lenders in the Century-TCI Credit Facility are referred to herein collectively as the "Century-TCI Lenders."

826.   Pursuant to each of the Co-Borrowing Facilities, each member of the borrowing group in the facility (a "co-borrower") – whether a subsidiary of ACC or an entity owned by the Rigas Family – could borrow up to the entire amount of the applicable Co-Borrowing Facility. Each co-borrower was jointly and severally liable for all amounts borrowed by any of the other co-borrowers regardless of whether it received any benefit from such borrowings. The provision of billions of dollars of co-borrowing loans under these circumstances to privately owned entities that were insufficiently collateralized was unprecedented. The Agent Banks, Investment Banks, and Syndicate Lenders all knew that permitting the RFEs to borrow substantial amounts – that they clearly could not repay – against the credit of the Adelphia co-borrowers served no legitimate corporate purpose for Adelphia and provided no benefit to Adelphia.

827.   The Rigas Family and certain of the Agent Banks and Investment Banks purposefully structured each of the Co-Borrowing Facilities to leverage Adelphia's credit to provide the Rigas Family with access to billions of dollars for their personal use while protecting the Co-Borrowing Lenders' ability to recover payment on their loans. Without Adelphia's credit support, the Rigas Family could not have obtained loans of this magnitude. Indeed, upon information and belief, the first of the relevant Co-Borrowing Facilities – the UCA/HHC Credit Agreement – was put into place because the Rigas Family had exhausted its own borrowing capacity under several credit facilities and margin loan accounts held at BofA, SSB, and other defendants. Moreover, each of the Agent Banks, Co-Borrowing Lenders and Investment Banks knew that the Co-Borrowing Facilities were intended to finance the Rigas Family's personal asset acquisitions, to pay off loans to the Rigas Family, and for other personal uses by the Rigas Family.

234

828.    The money that the RFE co-borrowers drew down pursuant to the Co-Borrowing Facilities conferred no benefit on Adelphia and, indeed, substantially harmed Adelphia. From the outset, it was clear to the Rigas Family, the Agent Banks, the Investment Banks, and the Co-Borrowing Lenders that Adelphia would not receive any benefit from billions of dollars taken by the RFEs from the Co-Borrowing Facilities. It was the intention of the Rigas Family at all times to benefit themselves rather than to provide any benefit to Adelphia.

829.    The RFEs were overwhelmingly less creditworthy than the Adelphia co-borrowers. Defendants knew that the RFEs were far less creditworthy than Adelphia. The creditworthiness of cable providers such as Adelphia and the cable operator RFEs -- and hence their borrowing capacity -- is measured principally by the cash flow generated by their respective subscriber bases. One of the standard valuation methodologies used in the cable industry is a multiple of the number of a company's subscribers. Prior to the closing of each of the Co-Borrowing Facilities, the Agent Banks, the Co-Borrowing Lenders, and the Investment Banks knew that the RFE co-borrowers had insufficient assets (*i.e.*, subscribers) to repay their respective share of the amounts they knew would be initially drawn and were likely to be drawn thereafter for the benefit of the Rigas Family.

830.    The RFEs contributed on average well under 10% of the subscribers to each of the Co-Borrowing Facilities despite being entitled to borrow all of the funds thereunder and despite ultimately drawing nearly 60% of the funds available under those facilities.

### (ii)    The 1996 HVA/TALP/Global Credit Facility Sets The Stage.

831.    In 1996, Adelphia entered into the first co-borrowing facility with an RFE (hereafter, the "1996 HVA/TALP/Global Facility"). Unlike the three Co-Borrowing Facilities

235

that followed, the 1996 HVA/TALP/Global Facility was in Adelphia's corporate interests and the terms of this facility contained safeguards and protections that were notably absent from the future Co-Borrowing Facilities.

832.    The 1996 HVA/TALP/Global Facility involved one Adelphia entity – Telesat Acquisition Limited Partnership ("TALP") – and two RFEs – Highland Video Associates, L.P. ("HVA") and Global Acquisition Partners, L.P. ("Global"). The 1996 HVA/TALP/Global Facility closed March 29, 1996.

833.    The 1996 HVA/TALP/Global Facility was created shortly after the closing of a Rigas Family credit facility (the "HVA Facility"). The HVA Facility closed February 28, 1996 and made available to HVA loans in the maximum aggregate principal amount of $200 million. HVA obtained the HVA Facility based entirely on its own creditworthiness and its own assets, which were sufficient to support the entire $200 million facility.

834.    Shortly after the HVA Facility was established, Adelphia became interested in acquiring the Telesat cable system in a short time frame. To allow ACC to consummate the Telesat acquisition, the HVA Facility was amended to include TALP and Global as additional borrowers, resulting in the 1996 HVA/TALP/Global Facility. HVA provided approximately two-thirds of the total cable asset collateral of 99,330 cable subscribers that the borrowers together pledged for the 1996 HVA/TALP/Global Facility. As discussed below, the converse was true with respect to the later Co-Borrowing Facilities, in which the RFEs contributed a disproportionately small collateral contribution relative to their total borrowings.

835.    Under the 1996 HVA/TALP/Global Facility, there were limits on the total amount that each of the borrowers was allowed to draw. Each of the borrowers (HVA, Global, and

236

TALP) was permitted to draw loans in a maximum aggregate principal amount not to exceed the lesser of (i) the "Applicable Commitment Amount" for such borrower and (ii) in the aggregate for all borrowers, $200 million.

836.    As used in the 1996 HVA/TALP/Global Facility, the term "Applicable Commitment Amount" meant:

>    (a)    with respect to HVA (a RFE) , $200 million;
>    (b)    with respect to Global (a RFE), $84 million; and
>    (c)    with respect to TALP (an Adelphia entity), $39.5 million.

837.    Pursuant to the 1996 HVA/TALP/Global Facility credit agreement, TALP was permitted to draw down $39.5 million for the express purpose of repaying a $39.5 million loan from its general partner, Olympus Communications, L.P. in connection with the Telesat acquisition.

838.    The 1996 HVA/TALP/Global Facility permitted Adelphia's subsidiary TALP to borrow funds in an amount and with a speed that it could not achieve through a credit facility of its own and HVA had put up most of the collateral securing the facility.  These features and the limitation on the amounts each borrower could draw down were absent from the Co-Borrowing Facilities that followed.

839.    The RFE borrowers in the subsequent Co-Borrowing Facilities were expressly permitted to draw down the entire amount of those facilities even though they had contributed only a de minimis amount of collateral.  There was no benefit to Adelphia from including the RFEs in those Co-Borrowing Facilities.  Notwithstanding these critical distinctions, the Rigas Family thereafter misled the Independent Directors into believing that each of the subsequent

Co-Borrowing Facilities was structured similarly to the 1996 HVA/TALP/Global Facility and was not antithetical to Adelphia's interests. The Agent Banks and Investment Banks substantially assisted the Rigas Family in accomplishing their deception and knew or consciously avoided the fact that the Rigas Family misled the Independent Directors to accomplish their fraud and breach their duties to Adelphia.

840.    BNS was a lender and acted as the Administrative Agent for the other lenders participating in the 1996 HVA/TALP/Global Facility. Chemical Bank was a lender and acted as the Documentation Agent. BMO was a lender and acted as Syndication Agent. Other defendants participating in the 1996 HVA/TALP/Global Facility included CoreStates Bank, N.A. (now Wachovia), CIBC, Sumitomo, NationsBank (now BofA), Toronto Dominion and Fleet.

### (iii)    The UCA/HHC Co-Borrowing Facility.

841.    By the end of 1998, the Rigas Family and the RFEs had exhausted their sources of cash and credit and they turned to Adelphia. With the active assistance and participation of the Agent Banks and the Investment Banks, the Rigas Family embarked on a scheme by which the Rigas Family and the RFEs could exploit Adelphia's credit to obtain access to funds that they otherwise could not have obtained. In 1999, the Rigas Family and certain of the Agent Banks and Investment Banks (identified below) set up a new Co-Borrowing Facility – the UCA/HHC Facility – to implement the fraudulent scheme. The UCA/HHC Facility was different in material ways from the 1996 HVA/TALP/Global Facility. The UCA/HHC Facility was intended to be – and was – an instrumentality of simple theft for the benefit of the Rigas Family.

842.    Pursuant to a Credit Agreement, dated as of May 6, 1999 (the "UCA/HHC Credit Agreement"), six indirect subsidiaries of ACC -- UCA Corp., UCA LLC, National Cable

238

Acquisition Associates, L.P., Grand Island Cable, Inc., Tele-Media Company of Hopewell-Prince George, and SVHH Cable Acquisition, L.P. -- and one RFE -- Hilton Head -- entered into an $850 million Co-Borrowing Facility with various lenders, comprising a $600 million revolving credit loan and a $250 million term loan.  Other indirect ACC subsidiaries, including Ultracom of Montgomery County, Inc., Multi-Channel T.V. Cable Company of Virginia, Van Buren County Cablevision, Inc., Valley Cablevision, Inc., Western Reserve Cablevision, Inc., Huntingdon Television Cable Co., Tele-Media Investment Partnership, L.P., and one RFE, Ionian Communications, L.P., guaranteed the repayment of funds drawn under the UCA/HHC Co-Borrowing Facility pursuant to a Subsidiary Guaranty, dated as of May 6, 1999 (the "UCA/HHC Guaranty Agreement").  In addition, to secure repayment of the UCA/HHC Credit Agreement, (i) ACC pledged the stock of its indirect subsidiaries UCA Corp. and Grand Island Cable, Inc., (ii) ACC subsidiary ACC Operations, Inc. pledged its holdings in its subsidiary UCA LLC, (iii) indirect ACC subsidiaries UCA Corp., UltraCom of Montgomery County, Inc., UCA LLC, SVHH Holdings, Inc., SHHH Acquisition Corp., Eastern Virginia Cablevision Holdings, LLC, Eastern Virginia Cablevision, L.P., Olympus Communications, L.P., Olympus Communications Holdings, LLC and National Cable Acquisition Associates, L.P. pledged the stock of their direct subsidiaries, (iv) RFEs NCAA Holdings, Inc. and Doris Holdings, L.P. pledged their respective holdings in Hilton Head, and (v) RFEs Iliad Holdings, Inc. and Hilton Head pledged their partnership interests in Ionian Communications, L.P., pursuant to an Obligor Pledge Agreement, dated as of May 6, 1999 (the "UCA/HHC Pledge Agreement," and together with the UCA/HHC Credit Agreement, the UCA/HHC Guaranty and all related agreements, the "UCA/HHC Co-Borrowing Facility").  On April 25, 2002, indirect ACC subsidiaries Southwest Virginia Cable, Inc., Adelphia Cablevision of Santa Ana, LLC, Adelphia Cablevision of Simi

239

Valley, LLC and Adelphia Central Pennsylvania, LLC became guarantors under the UCA/HHC Guaranty and pledged their membership interests under the UCA/HCC Pledge Agreement.[9]

843.    Wachovia was a lender and acted as the Administrative Agent for the other lenders participating in the UCA/HHC Co-Borrowing Facility.    BMO was a lender and acted as the Documentation Agent.  PNC Bank was a lender and acted as the Syndication Agent. Wachovia, BMO and PNC Bank were also Arranging Agents and Joint Book Runners.[10]

844.    Upon information and belief, each of the UCA/HHC Agent Banks conducted significant due diligence on Adelphia's businesses prior to closing of the UCA/HHC Co-Borrowing Facility.  The UCA/HHC Agent Banks also prepared an offering memorandum, with the assistance of Adelphia employees under the direction of the Rigas Family, to solicit other lenders to participate in the facility.  Each of the UCA/HHC Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the amounts outstanding under the facility and providing information concerning the statements by the borrowers that they were in compliance with the UCA/HHC Credit Agreement.  Upon information and belief, the UCA/HHC Agent Banks were required to, and, in fact, did transmit this information to each of the UCA/HHC Lenders in the ordinary course of business.

845.    Other defendants participating in the UCA/HHC Facility as Syndicate Banks include: BofA, ABN AMRO, BONY, BNS, Barclays, Chase, CIBC, Rabobank, Credit Lyonnais,

---

[9]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Debtors" or the "UCA/HHC Co-Borrowing Debtors."

[10]    The lenders named as agents in the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Agent Banks."  The lenders in the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Lenders" or the "UCA/HHC Co-Borrowing Lenders."

CSFB, FMB, SBHC, Franklin Trust, Industrial Bank of Japan, MeesPierson, NCBP, Royal Bank

of Canada, and one or more of the Assignees.

846.   The UCA/HHC Co-Borrowing Facility constituted an affiliate transaction, as

defined in the various public debt offerings.  Adelphia needed the approval of Adelphia's Board

of Directors and the separate approval of the Independent Directors in order to participate in the

UCA/HHC Co-Borrowing Facility.

847.   Wachovia (then known as First Union) worked closely with the Rigas Family and

James Brown to prepare a term sheet describing the terms of the UCA/HHC Co-Borrowing

Facility (the "UCA/HHC Term Sheet").  The UCA/HHC Term Sheet was incomplete and

misleading and was used to mislead the Independent Directors about the terms of the UCA/HHC

Co-Borrowing Facility.

848.   The Rigas Family sought and obtained the approval of the Independent Directors

for the UCA/HHC Co-Borrowing Facility at a meeting of the ACC Board of Directors on April

22, 1999.  Present at this meeting either in person or by telephone were directors John Rigas,

Michael Rigas, Timothy Rigas, James Rigas and Independent Directors Pete Metros, Perry

Patterson and Dennis Coyle.  James Brown was also present.

849.   At the meeting, Timothy Rigas and James Brown made verbal representations to

the Independent Directors regarding the structure, size and terms of the UCA/HHC Co-

Borrowing Facility and the identities of the various Adelphia entities and the RFE that were to

participate as co-borrowers.  Timothy Rigas and James Brown also presented the Independent

Directors with the UCA/HHC Term Sheet prepared jointly by First Union (now known as

241

Wachovia) and the Rigas Family that purported to describe the terms of the proposed UCA/HHC Co-Borrowing Facility.

850.    The Independent Directors approved the UCA/HHC Co-Borrowing Facility based on material misrepresentations and omissions in the oral presentation by Timothy Rigas and James Brown and in the written presentation contained in the UCA/HHC Term Sheet.

851.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the UCA/HHC Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

852.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the UCA/HHC Term Sheet misled the Independent Directors into believing that the terms and conditions of the UCA/HHC Co-Borrowing Facility were in the best interests of Adelphia, when in fact they were not.

853.    The UCA/HHC Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that the proceeds of the facility would "be used to (i) repay existing indebtedness at Closing, (ii) to make distributions and (iii) fund working capital and general partnership purposes."

854.    The UCA/HHC Term Sheet described a series of provisions that would restrict affiliate transactions, including transactions with RFEs, such as loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

855.   In particular, the UCA/HHC Term Sheet presented to the Independent Directors provided that the UCA/HHC Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained from those with third parties:

> No Borrower shall enter into any transaction with any Affiliate except in the ordinary course of business under terms and conditions no less favorable than those in a third party transaction. Notwithstanding the above limitation, the Borrower shall be permitted to enter into a management agreement with the manager subject to the limitations upon Management Fees.

856.   The UCA/HHC Term Sheet presented to the Independent Directors provided that the UCA/HHC Co-Borrowing Facility would contain a "Restricted Investments" clause that would prohibit any of the Adelphia borrowers under that facility from making investments in any of the RFEs. That provision read:

> No Borrower shall make any investments except:
> 1.   in the ordinary course of business;
> 2.   in securities having one of the two highest ratings by Moody's or S & P;
> 3.   in short-term commercial paper rated A-1 or P-1, obligations of the United State or an agency, and certificates of deposit of any financial institution having one of the two highest ratings by S & P or Moody's; or
> 4.   Restricted Investments as permitted herein.

857.   In turn, the referenced Restricted Investments section placed substantial limits on affiliated transactions, reading:

> No Restricted Borrower, nor its restricted subsidiaries, shall pay any dividends, make any distributions, Restricted Investments or payments of principal and interest on Affiliate Indebtedness (other than payment-in-kind of interest) or make any loans and/or advances to, equity contributions to, or redemptions of equity interests in, unrestricted subsidiaries ("Restricted Payments").

Notwithstanding the foregoing, each Borrower and the restricted subsidiaries will be permitted to make Restricted Payments if (i) no default or event of default under the Credit Facilities exists before and after giving effect thereto and (ii) the ratio of Senior Debt to Annualized Operating Cash Flow is less than 5.0:1 (after giving effect to the Restricted Payment). Notwithstanding the foregoing, each Borrower and the restricted subsidiaries will be permitted to make Restricted Payments in an amount not to exceed the amount of Capital Contributions made into the Borrowers and their restricted subsidiaries and Affiliate Indebtedness incurred by the Borrowers and their restricted subsidiaries, subsequent to the Closing Date, provided, that (i) no default or event of default is continuing or would, on a pro forma basis, cause a default or event of default, (ii) Restricted Payments of cash may only be made to the extent of cash Capital Contributions and Affiliate Indebtedness and (iii) Restricted Payments of assets may only be made to the extent of Capital Contributions. . . .

858.    Despite these provisions in the UCA/HHC Term Sheet, the Rigas Family, Brown, and the UCA/HHC Term Sheet deliberately failed to disclose all material facts to the Independent Directors concerning the UCA/HHC Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFEs intended to put the funds they drew down from the facility.

859.    The UCA/HHC Term Sheet deliberately failed to disclose to the Independent Directors that the UCA/HHC Co-Borrowing Facility would not contain any borrowing limits upon the amount of proceeds that the Hilton Head RFE could draw down and failed to disclose that Hilton Head would, in fact, be permitted to draw down up to the entire amount available under the facility without regard to Hilton Head's financial condition or the relatively small amount of collateral pledged by Hilton Head in connection with the facility.

860.    Based on the misrepresentations by James Brown and Timothy Rigas, and in reliance on the restrictions on affiliate transactions set forth in the UCA/HHC Term Sheet

244

presented to the Independent Directors and the UCA/HHC Term Sheet's failure to disclose the
maximum amounts each co-borrower could draw down from the proposed facility, the
Independent Directors believed that Hilton Head would not be permitted to borrow amounts that
were out of proportion with the collateral that Hilton Head had pledged or that could not be
supported by Hilton Head's financial condition.

861.    Despite the limitations in the UCA/HHC Term Sheet and the restrictions on
affiliate transactions in pre-existing indentures and credit agreements, the Rigas Family and the
UCA/HHC Agent Banks and their affiliated Investment Banks knew at the time they provided
the UCA/HHC Term Sheet to the Independent Directors that the Rigas Family intended to
engage in conduct and affiliate transactions that violated those restrictions.

862.    Prior to presenting the UCA/HHC Term Sheet to the Independent Directors, the
Rigas Family and the UCA/HHC Agent Banks and their affiliated Investment Banks had
expressly agreed that the Rigas Family would draw down approximately $250 million from the
UCA/HHC Co-Borrowing Facility and that the Rigas Family would put those funds to their
personal use by purchasing ACC securities at an upcoming offering and that Hilton Head would
draw down $350 million to pay off its own pre-existing credit facility.  The Rigas Family
advised the UCA/HHC Agent Banks and their affiliated Investment Banks of these intended uses
of the funds in or about February 1999 in a request for proposal that they sent to the Agent Banks
and to 25 to 30 other banks seeking to participate in this facility, including but not limited to
NationsBank, Bank of America, NationsBanc Montgomery Securities LLC, CSFB, BMO, Chase,
Barclays, TD Bank, PNC Bank, Chemical Bank, Fleet Bank, Lehman Brothers, Credit Lyonnais,
SSB, BONY, BNS, and CIBC.  The Rigas Family did not advise the Independent Directors of

245

the Rigas Family's intended uses of the funds and did not provide the Independent Directors with a copy of the request for proposal.

863.    Shortly after sending the request for proposal and two months prior to the April 22, 1999 Board of Directors meeting, ACC's Director of Finance, Dean Marshall, explicitly advised  Mark Misenheimer of First Union National Bank (now Wachovia), in an e-mail dated February 23, 1999:  **"We specifically intend a portion of the [UCA/HHC Co-Borrowing Facility] to be distributed to the Rigas Family for purposes of participating in the upcoming equity offering we discussed."**  In addition, a February 23, 1999 internal memorandum at NationsBank (now Bank of America) acknowledged that this facility would be used "to provide  for a $250 million distribution to the Rigas family . . . to purchase additional equity in the follow-on equity offering planned for March" and to provide $350 million to repay an existing Hilton Head credit facility.  The Rigas Family never conveyed this information to the Independent Directors at the April 22, 1999 Board of Directors Meeting or at any other time. Nor did the UCA/HHC Agent Banks convey this information to the Independent Directors, whether in the UCA/HHC Term Sheet or otherwise.

864.    The UCA/HHC Agent Banks and their affiliated Investment Banks intentionally failed to disclose in the UCA/HHC Term Sheet that the Rigas Family intended to take approximately $600 million of the proceeds for their own personal use and to pay off a credit facility incurred by an RFE.

865.    The Rigas Family's plans to use $600 million of the proceeds from the $850 million UCA/HHC Co-Borrowing Facility was in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause

246

regarding Restricted Investments.  This use of proceeds also violated statutory and common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures and in the 1996 HVA/TALP/Global Facility.  The Rigas Family and the Agent Banks and their affiliated Investment Banks involved in the UCA/HHC Co-Borrowing Facility knew that the Rigas Family's intention to draw down excess funds and use $600 million in this manner violated the restrictive clauses and the Rigas Family's fiduciary duties.

866.    The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the UCA/HHC Co-Borrowing Facility.

867.    Had the Independent Directors been aware that Hilton Head -- the RFE co-borrower -- could draw down up to the entire amount available under the UCA/HHC Co-Borrowing Facility with no regard to Hilton Head's collateral contribution or its financial condition and the Adelphia entities would be jointly and severally liable for that loan, the Independent Directors would have rejected the proposed UCA/HHC Co-Borrowing Facility.

868.    Had the Independent Directors been aware that the Rigas Family intended to take $600 million of the $850 million proceeds available under the UCA/HHC Co-Borrowing Facility – a loan for which ACC itself, through its subsidiaries, was jointly and severally liable – for their personal benefit, the Independent Directors would have rejected the proposed UCA/HHC Co-Borrowing Facility.

869.    Instead, the Independent Directors voted to approve the UCA/HHC Co-Borrowing Facility because the UCA/HHC Term Sheet contained provisions restricting affiliate transactions and prohibiting investments outside the ordinary course of business, which should have operated to protect Adelphia's interests but which the UCA/HHC Agent Banks and their

247

affiliated Investment Banks knew that the Rigas Family intended to violate; because the

UCA/HHC Term Sheet was misleading in that it was designed to obscure the fact that any co-

borrower could draw down up to the entire amount available under the UCA/HHC Co-

Borrowing Facility once in place; and because the Rigas Family and James Brown induced the

Independent Directors, through misstatements and omissions, to conclude that the UCA/HHC

Co-Borrowing Facility would be similar in structure to the 1996 HVA/TALP/Global Facility (in

which the RFE co-borrowers had contributed most of the collateral securing the facility and the

use of funds – at least with regard to TALP – was strictly limited).

870.    The Independent Directors' approval of the UCA/HHC Co-Borrowing Facility

was obtained under false pretenses. The UCA/HHC Agent Banks and their affiliated Investment

Banks knew or consciously avoided that fact.

871.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that the

UCA/HHC Term Sheet given to the Independent Directors was misleading by omitting the fact

that any co-borrower could draw down up to the entire amount available under the facility

regardless of its financial condition and that all co-borrowers would be jointly and severally

liable for the full amount regardless of whether they drew down any of the funds.

872.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that the

Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public

debt provisions, pursuant to the proposed terms of the UCA/HHC Co-Borrowing Facility, and

pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those

transactions that were in the best interests of Adelphia and that satisfied limits on affiliate

transactions. The Agent Banks and their affiliated Investment Banks knew that the Rigas

248

Family's intended use of the co-borrowed funds provided no benefit to Adelphia and was not in Adelphia's interests. The UCA/HHC Agent Banks and their affiliated Investment Banks knew or consciously avoided knowledge that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

873.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent and actual liabilities arising from the UCA/HHC Co-Borrowing Facility and the Rigas Family's use of funds from the UCA/HHC Co-Borrowing Facility for which Adelphia was directly liable. The UCA/HHC Agent Banks and their affiliated Investment Banks also knew that ACC's Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

874.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the true liabilities arising from the UCA/HHC Co-Borrowing Facility and the Rigas Family's personal use of funds from the UCA/HHC Co-Borrowing Facility for their own benefit.

875.    At no time prior to March 27, 2002 did ACC publicly disclose the enormous contingent liabilities it had amassed as a result of the RFE's draws from the UCA/HHC Co-Borrowing Facility.

876.    The UCA/HHC Agent Banks and their affiliated Investment Banks were aware that ACC had assumed enormous contingent liabilities as a result of its participation in the UCA/HHC Co-Borrowing Facility. The Agent Banks knew, or consciously avoided, the fact that

ACC's Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

877.    As of the Petition Date, approximately $831 million was outstanding under the UCA/HHC Co-Borrowing Facility.

### (iv)    The CCH Co-Borrowing Facility.

878.    Shortly after entering into the UCA/HHC Co-Borrowing Facility, the Rigas Family embarked on another scheme to expand the Rigas Family's personal empire by acquiring more than $700 million in cable assets for themselves. Having diverted most of the UCA/HHC Facility for their own personal use and benefit, there was insufficient borrowing capacity under existing facilities to fund this expansion. The Rigas Family did not have the assets or borrowing ability to finance the $700 million in acquisitions by the RFEs on their own. Once again, the Rigas Family made use of Adelphia's access to bank debt and the public capital markets for their own benefit. The Rigas Family worked with the Agent Banks and their affiliated Investment Banks to copy the UCA/HHC blueprint to create a new fraudulent co-borrowing facility.

879.    Pursuant to a Credit Agreement, dated as of April 14, 2000 (the "CCH Credit Agreement"), two ACC indirect subsidiaries -- Century Cable Holdings, LLC and Ft. Meyers Cablevision, LLC -- and one RFE -- Highland Prestige -- entered into a $2.25 billion Co-Borrowing Facility with various defendants, comprising a $1.5 billion revolving credit facility and a $750 million term loan. An additional $500 million term loan was funded on September 28, 2000 bringing the total amount available under the facility to $2.75 billion. Other indirect ACC subsidiaries guaranteed repayment of funds drawn under this facility pursuant to a Guaranty Agreement, dated as of April 14, 2000 (the "CCH Guaranty Agreement") including the