following: Adelphia Cleveland, LLC, Adelphia Prestige Cablevision, LLC, Fort Myers/Gateway, LLC, Tri-States, LLC, Wellsville Cablevision, LLC, Century Colorado Springs Partnership, CMA Cablevision Associates VII, L.P., CMA Cablevision Associates XI, Limited Partnership, Eastern Virginia Cablevision, L.P., Martha's Vineyard Cablevision, L.P., Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Blacksburg/Salem Cablevision, Inc., Brazas Communications, Inc., CDA Cable, Inc., Century Alabama Corp., Century Alabama Holding Corp., Century Berkshire Cable Corp., Century Cable Management Corporation, Century Carolina Corp., Century Cullman Corp., Century Enterprise Cable, Corp., Century Huntington Company, Century Indiana Corp., Century Island Associates, Inc., Century Island Cable Television, Inc., Century Kansas Cable Television Corp., Century Lykens Cable Corp., Century Mendocino Cable Television, Inc., Century Mississippi Corp., Century Mountain Corp.,  Century New Mexico Cable Television Corp., Century Norwich Corp., Century Ohio Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Trinidad Cable Television Corp., Century Virginia Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Century Wyoming Cable Television, Inc., Century Wyoming Cable Television, Corp., Clear Cablevision, Inc., Cowlitz Cablevision, Inc., DVD Marketing Company, Inc., E&E Cable Service , Inc., Enchanted Cable Corporation, Grafton Cable Company, Huntington CATV, Inc., Imperial Valley Cablevision, Inc., Kootenai Cable, Inc., Louisa Cablevision, Inc., Manchester Cablevision, Inc., Mickelson Media, Inc., Mickelson Media of Florida, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Paragon Cablevision Construction Corporation, Paragon Cablevision Management Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., Sentinel Communications of Muncie, Indiana, Inc., Southwest Colorado Cable, Inc., S/T Cable

Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, TMC Holdings Corporation, Valley Video, Inc., Warrick Cablevision, Inc., The Westover T.V. Cable Co., Incorporated, Wilderness Cable Company and Yuma Cablevision, Inc. In addition, Prestige Communications, Inc., an RFE, guaranteed repayment of funds drawn under this facility pursuant to a CCH Guaranty Agreement, dated as of September 27, 2000.[11]

880.    In addition, other indirect subsidiaries of ACC pledged the stock of their direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a Pledge Agreement, dated April 14, 2000 (the "CCH Pledge Agreement," and together with the CCH Credit Agreement, the CCH Guaranty Agreement, and related agreement, the "CCH Co-Borrowing Facility"), including the following:  Tri-States, LLC, Wellsville Cablevision, LLC, Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Brazas Communications, Inc., Century Cable Holding Corp., Century Alabama Holding Corp., Century Huntington Company, Century Indiana Corp., Century Island Cable Television, Inc., Century New Mexico Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Ft. Myers Acquisition Limited Partnership, Mickelson Media, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., S/T Cable Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, and TMC Holdings Corporation.  Highland Prestige, an RFE, and each of John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Ellen Rigas also pledged certain of their

---

[11]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the CCH Co-Borrowing Facility are referred to collectively as the "CCH Debtors" or the "CCH Co-Borrowing Debtors."

interests in direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a separate CCH Pledge Agreement, dated September 27, 2001.

881.    BofA and Chase were lenders and acted as Co-Administrative Agents for the other lenders participating in the CCH Co-Borrowing Facility.  TDI was a lender and acted as Syndication Agent under the facility.  Barclays was a lender and acted as Arranging Agent. BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais, CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, Rabobank, and SunTrust were lenders and acted as Managing Agents.  BAS and Chase Securities acted as Lead Arrangers and Joint Book Managers under the facility.  CIBC Securities acted as Documentation Agent.[12]

882.    Upon information and belief, each of the CCH Agent Banks and their affiliated Investment Banks conducted significant due diligence on Adelphia's businesses prior to closing the CCH Co-Borrowing Facility.  The CCH Agent Banks also prepared an offering memorandum, with the  assistance of Adelphia employees under the direction of the Rigas Family, to solicit other Co-Borrowing Lenders to participate in the facility.  Each of the CCH Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the amounts outstanding under the facility and providing information concerning statements by the borrowers that they were in compliance with the CCH Credit Agreement.  Upon information and belief, the CCH Agent Banks were required to and, in fact, did transmit this information to each of the CCH Lenders in the ordinary course of business.

---

[12]    The lenders named as agents in the CCH Co-Borrowing Facility are referred to collectively as the "CCH Agent Banks."  The lenders in the CCH Co-Borrowing Facility are referred to collectively as the "CCH Lenders" or the "CCH C0-Borrowing Lenders."

883.    Other Defendants participating in the CCH Co-Borrowing Facility as Syndicate

Banks include: CIBC, BLG, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, Fifth

Third, First Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper

Fund, KZH III, KZH CypressTree, KZH ING, KZH Langdale, KZH Pondview, KZH Shoshone,

KZH Waterside, Liberty-Stein, MeesPierson, Mellon Bank, Natexis, NCBP, CypressTree

Floating Rate Fund, Olympic Funding, Oppenheimer, Pinehurst, Principal Life, Société

Générale, Stein Roe, U.S. Bank, United of Omaha, and one or more of the Assignees.

884.    The CCH Co-Borrowing Facility constituted an affiliate transaction as defined in

the various public debt offerings, the 1996 HVA/TALP/Global Facility, and the UCA/HHC Co-

Borrowing Facility.  Adelphia needed the approval of Adelphia's Board of Directors and the

separate approval of the Independent Directors in order to participate in the CCH Co-Borrowing

Facility.

885.    The CCH Agent Banks and their affiliated Investment Banks worked closely with

the Rigas Family and James Brown to prepare a term sheet describing the terms of the CCH Co-

Borrowing Facility (the "CCH Term Sheet").

886.    The Rigas Family sought and obtained the approval of the Independent Directors

for the CCH Co-Borrowing Facility at a meeting of the ACC Board of Directors on March 9,

2000.  Present at this meeting either in person or by telephone were directors John Rigas,

Michael Rigas, Timothy Rigas, James Rigas, and Peter Venetis, and Independent Directors Perry

Patterson, Pete Metros, Dennis Coyle, Erland Kailbourne and Leslie Gelber.  Mr. Kailbourne and

Mr. Gelber both had joined the Board as Independent Directors in November 1999.  Also present

were Colin Higgin and James Brown of Adelphia.

887.    At the meeting, Timothy Rigas and James Brown made verbal representations to the Independent Directors regarding the structure, size and terms of the CCH Co-Borrowing Facility and the identities of the various ACC entities and the RFE that were to participate as co-borrowers. Timothy Rigas and James Brown also presented the Independent Directors with the CCH Term Sheet prepared jointly by the CCH Agent Banks and their affiliated Investment Banks and the Rigas Family that purported to describe the terms of the proposed CCH Co-Borrowing Facility.

888.    The Independent Directors approved the CCH Co-Borrowing Facility based on material misrepresentations and omissions in the oral presentation by Timothy Rigas and James Brown and in the written presentation contained in the CCH Term Sheet.

889.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the CCH Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

890.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the CCH Term Sheet misled the Independent Directors into believing that the terms and conditions of the CCH Co-Borrowing Facility were in the best interests of Adelphia, when in fact they were not.

891.    The CCH Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that the proceeds of the facility "shall be used to (i) acquire the Cablevision Cleveland cable system and the Prestige Cable systems, (ii) and for working capital and general limited liability company, partnership and corporate purposes."

255

892.    The CCH Term Sheet described a series of provisions that would restrict affiliate transactions, including with RFEs, including loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

893.    In particular, the CCH Term Sheet presented to the Independent Directors provided that the CCH Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained in transactions with third parties:

> No Borrower shall enter into any transaction with any Affiliate except in the ordinary course of business under terms and conditions no less favorable than those in a third party transaction. Notwithstanding the above limitation, the Borrower shall be permitted to enter into a management agreement with the manager subject to the limitations upon Management Fees.

894.    The CCH Term Sheet presented to the Independent Directors provided that the CCH Co-Borrowing Facility would contain a "Restricted Investments" clause that would prohibit any of the Adelphia borrowers under that facility from making investments in any of the RFEs.  That provision read:

> No Borrower shall make any investments except:
> 1.    in the ordinary course of business;
> 2.    in securities having one of the two highest ratings by Moody's or S & P;
> 3.    in short-term commercial paper rated A-1 or P-1, obligations of the United States or an agency, and certificates of deposit of any financial institution having one of the two highest ratings by S & P or Moody's; or
> 4.    Restricted Investments as permitted herein including without limitation those permitted under the Restricted Payments section.

895.    In turn, the referenced Restricted Investments section placed substantial limits on affiliated transactions, reading:

> No Restricted Borrower, nor its restricted subsidiaries, shall pay any dividends, make any distributions, Restricted Investments or payments of principal and interest on Affiliate Indebtedness (other than payment-in-kind of interest) or make loans and/or advances to, equity contributions to, or redemptions of equity interests in, unrestricted subsidiaries, nor shall there be any draws under the Faculties by any Unrestricted Borrower ("Restricted Payments"). Notwithstanding the foregoing, each Restricted Borrower and its restricted subsidiaries may make Restricted Payments if (i) no default or event of default under the Credit Facilities exists before and after giving effect thereto and (ii) the ratio of Senior Debt to Annualized Operating Cash Flow is less than 5.5:1 (after giving effect to the Restricted Payment). Notwithstanding the foregoing, each Restricted Borrower and its restricted subsidiaries will be permitted to make Restricted Payments in an amount not to exceed the amount of Capital Contributions made into the Restricted Borrowers and their restricted subsidiaries and Affiliate Indebtedness incurred by the Restricted Borrowers and their restricted subsidiaries, subsequent to the Closing Date, provided, that no default or event of default is continuing or would, on a pro forma basis, cause a default or event of default.

896.    The CCH Term Sheet presented to the Independent Directors also provided that "The Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels for each specified period," and then set forth a chart of periods and corresponding applicable leverage ratios. The CCH Term Sheet presented to the Independent Directors did not define "Leverage Ratio" as it actually was used in the CCH Co-Borrowing Facility.

897.    Despite these provisions in the CCH Term Sheet, the Rigas Family and the CCH Term Sheet prepared with the CCH Agent Banks and their affiliated Investment Banks deliberately failed to disclose all material facts to the Independent Directors concerning the CCH Co-Borrowing Facility and intentionally provided the Independent Directors with false and

257

misleading information regarding the terms and conditions of the facility and the uses to which the RFE intended to put the funds it drew down from the facility.

898.   Timothy Rigas and James Brown advised the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets.  The Rigas Family knew that this statement was false when made.  The Rigas Family had agreed previously with the CCH Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition.

899.   The CCH Term Sheet presented to the Independent Directors did not contain a definition of "leverage ratio" and did not state that the leverage ratios to be used in connection with the CCH Co-Borrowing Facility would be a single combined leverage ratio calculated in the aggregate for all participating co-borrowers.  This was a material omission.

900.   Based on the misleading information pertaining to leverage ratios in the CCH Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the CCH Co-Borrowing Facility proposed at the March 9, 2000 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with that particular co-borrower's individual leverage ratio.

901.   The CCH Credit Agreement was finalized after the Independent Directors' approval had been obtained.  The CCH Credit Agreement was created and agreed to by the Rigas Family, the CCH Agent Banks and their affiliated Investment Banks, and the CCH Co-

Borrowing Lenders. That Agreement defined "Leverage Ratio" as follows: *"Leverage Ratio* means, **with respect to the Companies on a combined basis,** at any date of determination thereof, the ratio of (a) the Total Debt outstanding on such date to (b) Annualized Operating Cash Flow" (emphasis supplied). The CCH Credit Agreement provision regarding Leverage Ratio differed materially from the CCH Term Sheet and the statements made by Timothy Rigas and James Brown at the time the Independent Directors were asked to approve the CCH Co-Borrowing Facility.

902.    The Rigas Family and the CCH Term Sheet presented to the Independent Directors also failed to disclose the amount of collateral to be put up by each co-borrower to secure the CCH Co-Borrowing Facility. This was a material omission and rendered the oral presentation and the CCH Term Sheet materially misleading.

903.    Based on the material misstatements and omissions in the CCH Term Sheet presented to the Independent Directors, and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the CCH Co-Borrowing Facility proposed at the March 9, 2000 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with the collateral that particular co-borrower had put up to secure the facility.

904.    The Rigas Family and the CCH Term Sheet deliberately failed to disclose to the Independent Directors that the CCH Co-Borrowing Facility would not contain any limits upon the amount of proceeds that Highland Prestige, the participating RFE, could draw down and failed to disclose that Highland Prestige would, in fact, be permitted to draw down the entire

amount available under the facility without regard to the relatively small amount of collateral that Highland Prestige pledged in connection with the facility.

905.   The CCH Agent Banks and their affiliated Investment Banks knew differently. The CCH Agent Banks and their affiliated Investment Banks prepared and sent to the CCH Lender Banks a Confidential Information Memorandum in March 2000, after the Independent Directors approved the CCH Co-Borrowing Facility, describing the terms of the CCH Co-Borrowing Facility and the CCH Credit Agreement. As the March 2000 Confidential Information Memorandum made clear, the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by Highland Prestige. The March 2000 Confidential Information Memorandum explicitly stated that the collateral contributions of ACC co-borrowers Century Holdings, LLC and Ft. Myers Acquisition LP would be based on revenues from a combined total of 1,476,983 cable television subscribers, whereas RFE co-borrower Highland Prestige's collateral contribution would be based on revenues from 55,831 cable television subscribers. Nonetheless, Highland Prestige was permitted to draw down up to the full amount of the CCH Co-Borrowing Facility. This information was not stated in the CCH Term Sheet presented to the Independent Directors and was not disclosed to them at the March 9, 2000 Board of Directors Meeting.

906.   In reliance on the restrictions on affiliate transactions set forth in the CCH Term Sheet presented to the Independent Directors and the misleading nature of the CCH Term Sheet with regard to the fact that any co-borrower would be able to draw down the entire amount available under the proposed facility, the Independent Directors believed that Highland Prestige

260

would not be permitted to borrow amounts that were out of proportion with Highland Prestige's leverage ratio or collateral contribution.

907.    Borrowings by Highland Prestige under the CCH Co-Borrowing Facility in excess of the amounts that Highland Prestige could have borrowed based on the collateral it had pledged and based on its own leverage ratio, for which the Adelphia borrowers would be jointly and severally liable, would be an affiliate transaction that would not be in the ordinary course of business on commercially reasonable terms and would not be in Adelphia's best interests. Therefore, such transactions would be in direct contravention of the CCH Term Sheet clause restricting affiliate transactions. Such transactions would also violate statutory and common law duties that the Rigas Family owed to Adelphia.

908.    Despite the limitations in the CCH Term Sheet and the restrictions on affiliate transactions in pre-existing indentures, credit agreements, and statutory and common law, the Rigas Family and the CCH Agent Banks and their affiliated Investment Banks knew at the time they provided the CCH Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions.

909.    The Rigas Family knew at the time the Independent Directors approved the CCH Co-Borrowing Facility that they would use a large portion of the proceeds from the CCH Co-Borrowing Facility for their own personal use and benefit.

910.    The Rigas Family's plans to use proceeds from the CCH Co-Borrowing Facility for their own personal use and benefit were in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause regarding Restricted Investments. This intended use of proceeds also violated statutory and

common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the Rigas Family's fiduciary duties.

911.    The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the CCH Co-Borrowing Facility.

912.    Had the Independent Directors been aware that Highland Prestige, the RFE co-borrower, could draw down up to the entire amount available under the CCH Co-Borrowing Facility with no regard to Highland Prestige's leverage ratio or collateral contribution and that the Adelphia entities would be jointly and severally liable for that loan, the Independent Directors would have rejected the proposed CCH Co-Borrowing Facility.

913.    Had the Independent Directors been aware that the Rigas Family intended to take a portion of the proceeds available under the CCH Co-Borrowing Facility – a loan for which ACC itself, through its subsidiaries, was jointly and severally liable – and use it for their own personal benefit, the Independent Directors would have rejected the proposed CCH Co-Borrowing Facility.

914.    Instead, the Independent Directors voted to approve the CCH Co-Borrowing Facility because the CCH Term Sheet contained provisions restricting affiliate transactions, which should have operated to protect Adelphia's interests but which the CCH Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to violate; because the CCH Term Sheet was misleading with regard to the calculation of the Leverage Ratio and the fact that any co-borrower could draw down the entire amount available under the CCH Co-Borrowing Facility once in place; and because the Rigas Family and James Brown induced the

262

Independent Directors, through misstatements and omissions, to conclude that the CCH Co-Borrowing Facility would be similar to the 1996 HVA/TALP/Global Facility (in which the RFE co-borrowers had contributed collateral commensurate with the amount of proceeds they were permitted to draw down from the facility).

915.    The Independent Directors' approval of the CCH Co-Borrowing Facility was obtained under false pretenses. The CCH Agent Banks and their affiliated Investment Banks knew or consciously avoided that fact.

916.    The CCH Agent Banks knew that the CCH Term Sheet given to the Independent Directors was misleading with respect to the fact that any co-borrower could draw down the entire amount available under the facility regardless of its financial condition and assets.

917.    The CCH Agent Banks and their affiliated Investment Banks knew that the Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public debt provisions, pursuant to the proposed terms of the CCH Co-Borrowing Facility, and pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions. In contrast, the true terms and conditions of the CCH Co-Borrowing Facility provided no benefit to Adelphia and were not in Adelphia's interests. The CCH Agent Banks and their affiliated Investment Banks knew or consciously avoided that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

918.    The CCH Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent

263

and actual liabilities arising from the CCH Co-Borrowing Facility. The CCH Agent Banks also knew that ACC's Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

919.    At the time the CCH Agent Banks and their affiliated Investment Banks became involved in the CCH Co-Borrowing Facility, the CCH Agent Banks and their affiliated Investment Banks knew that Adelphia's SEC filings and proxy statements failed to disclose the true extent of Adelphia's liabilities already existing as a result of Adelphia's participation in the prior UCA/HHC Co-Borrowing Facility.

920.    At no time prior to March 27, 2002 did ACC publicly disclose the enormous contingent liabilities it had amassed as a result of Highland Prestige's draws from the CCH Co-Borrowing Facility.

921.    The CCH Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the true liabilities arising from the CCH Co-Borrowing Facility.

922.    The CCH Agent Banks and their affiliated Investment Banks were aware that Adelphia had assumed enormous contingent liabilities as a result of its participation in the CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility. Moreover, the CCH Agent Banks knew, or consciously avoided, the fact that ACC's Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

923.     As of the Petition Date, approximately $2.5 billion was outstanding under the CCH Co-Borrowing Facility.

### (v)     The Olympus Co-Borrowing Facility.

924.     In early 2001, the Rigas Family's continuing need for access to credit arose again. In connection with another Adelphia facility in early 2001, the Rigas Family had assumed an obligation to invest more than $800 million in Adelphia.  In addition, the RFE Highland Video's obligations under the 1996 HVA/TALP/Global Facility were coming due at or around the same time.  The Rigas Family did not have sufficient assets or borrowing capacity to fulfill these contractual obligations.  Therefore, the Rigas Family turned again to its lending and investment banks to craft a third fraudulent co-borrowing facility.

925.     Pursuant to a Credit Agreement, dated as of September 28, 2001 (the "Olympus Credit Agreement"), three indirect ACC subsidiaries -- Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, and Adelphia Holdings 2001, LLC -- and two RFEs -- Highland Video and CCT -- entered into a $2.03 billion Co-Borrowing Facility with various Defendants, comprising a $765 million revolving credit facility, a $765 million term loan, and a $500 million term loan.  Other ACC indirect subsidiaries, including ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Media VA, Inc., Adelphia Cable Partners, L.P., Adelphia Cablevision Associates, L.P., Adelphia Cablevision of New York, Inc., Adelphia GS Cable, LLC, Arahova Holdings, LLC, Better TV Inc. of Bennington, CCC-III, Inc., CDA Cable, Inc. Century Alabama Corp., Century Alabama Holding Corp., Century Cable Management Corporation, Century Carolina Corp., Century Cullman, Corp., Century Enterprise Cable Corp., Century Huntington Company, Century Kansas Cable Television Corp., Century

Lykens Cable Corp., Century Mississippi Corp., Century Norwich Corp., Century Shasta Cable

Television Corp., Century Washington Cable Television, Inc., Chelsea Communications, Inc.,

Chelsea Communications, LLC, Cowlitz Cablevision, Inc., Genesis Cable Communications

Subsidiary, LLC, GS Cable, LLC, Imperial Valley Cablevision, Inc., Kalamazoo County

Cablevision, Inc., Key Biscayne Cablevision, Kootenai Cable, Inc., Mickelson Media of Florida,

Mountain Cable Communications Corporation, Mountain Cable Company, L.P., Mt. Lebanon

Cablevision, Inc., Multi-Channel T.V. Cable Company, Olympus Cable Holdings LLC, Pericles

Communication Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc.,

Richmond Cable Television Corporation, Rigpal Communications, Inc., Southeast Florida Cable,

Inc., Telesat Acquisition, LLC, Three Rivers Cable Associates, L.P., Timotheus

Communications, L.P., Upper St. Clair Cablevision, Inc., Valley Video, Inc. Warrick

Cablevision, Inc., Warrick Indiana, L.P., West Boca Acquisition Limited Partnership, Wilderness

Cable Company, and Yuma Cablevision, Inc., guaranteed repayment of funds drawn under the

Olympus Co-Borrowing Facility pursuant to a Guaranty, dated as of September 28, 2001 (the

"Olympus Guaranty Agreement"). Each of the following RFEs also signed an Olympus

Guaranty Agreement: Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna

Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision

Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II,

LLC, Highland Video and Montgomery Cablevision Associates, L.P.

926.    In addition, (i) an indirect Adelphia subsidiary, ACC Operations, Inc., pledged its

holdings in Adelphia Cable Partners, L.P., and (ii) other indirect Adelphia subsidiaries, including

ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Holdings II,

LLC, ACC Media VA, Inc., Adelphia Cable Partners, L.P., Adelphia GS Cable, LLC, Arahova

Holdings, LLC, CCCIII, Inc., Century Alabama Holding Corp., Century Shasta Cable Television Corp., Century Washington Cable Television, Inc., Chelsea Communications, Inc., Chelsea Communications, LLC, Kalamazoo County Cablevision, Inc., Mountain Cable Communications Corporation, Mt. Lebanon Cablevision, Inc., Olympus Cable Holdings LLC, Olympus Cable Holdings LLC, Olympus Communications Holdings, LLC, Olympus Subsidiary, LLC, Pericles Communication Corporation, Rigpal Communications, Inc., Three Rivers Cable Associates, L.P., TMC Holdings LLC, Upper St. Clair Cablevision, Inc., Warrick Cablevision, Inc., and West Boca Acquisition Limited Partnership, pledged the stock of their direct subsidiaries to secure repayment pursuant to a Pledge Agreement, dated as of September 28, 2001 (the "Olympus Pledge Agreement," and together with the Olympus Credit Agreement, the Olympus Guaranty Agreement, and related agreements, the "Olympus Co-Borrowing Facility").[13] Later, each of the following RFEs also signed an Olympus Pledge Agreement:  Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II, LLC, Highland Holdings, Highland Video and Montgomery Cablevision Associates, L.P.

927.    BMO was a lender and acted as the Administrative Agent for the other lenders participating in the Olympus Co-Borrowing Facility.  Wachovia and BNS were lenders and acted as Syndication Agents.  Fleet and BONY were lenders and acted as Documentation Agents. BofA, Bankers Trust Company, Citicorp, TDI, Chase, Deutsche Bank, CSFB, Credit Lyonnais, Royal Bank of Scotland, Société Générale, and Fuji Bank were lenders and acted as Managing

---

[13]    The Adelphia entities that were obligors, pledgors or guarantors of indebtedness under the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Debtors" or the "Olympus Co-Borrowing Debtors."  The UCA/HHC Debtors, the CCH Debtors and the Olympus Debtors are referred to herein collectively as the "Co-Borrowing Debtors."

Agents. Wachovia Securities and BNS acted as Lead Arrangers and Joint Book Managers under the facility.[14]

928.   Upon information and belief, each of the Olympus Agent Banks and their affiliated Investment Banks conducted significant due diligence on Adelphia's businesses prior to closing the Olympus Co-Borrowing Facility. The Olympus Agent Banks and their affiliated Investment Banks also prepared an offering memorandum, with the Rigas Family's assistance, to solicit other Co-Borrowing Lenders to participate in the facility. Each of the Olympus Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the amounts outstanding under the facility and providing information concerning statements by the borrowers that they were in compliance with the Olympus Credit Agreement. Upon information and belief, the Olympus Agent Banks were required to, and, in fact, did transmit this information to each of the Olympus Lenders in the ordinary course of business.

929.   Other Defendants participating in the Olympus Co-Borrowing Facility as Syndicate Banks include: CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding, Stanwich, Sumitomo, Toronto Dominion, and one or more of the Assignees.

930.   The Olympus Co-Borrowing Facility constituted an affiliated transaction as defined in the various public debt offerings, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the CCH Co-Borrowing Facility. Adelphia needed the

---

[14]   The lenders named as agents in the Olympus Co-Borrowing Facility are referred to herein collectively as the "Olympus Agent Banks." The lenders in the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Lenders" or the "Olympus Co-Borrowing Lenders." The UCA/HHC Lenders, the CCH Lenders and the Olympus Lenders are referred to herein collectively as the "Co-Borrowing Lenders."

approval of Adelphia's Board of Directors and the separate approval of the Independent

Directors then sitting on the Board in order to participate in the Olympus Co-Borrowing Facility.

931.   The Olympus Agent Banks and their affiliated Investment Banks worked closely

with the Rigas Family and James Brown to prepare a term sheet describing the terms of the

Olympus Co-Borrowing Facility (the "Olympus Term Sheet").

932.   The Rigas Family sought and obtained the approval of the Independent Directors

for the Olympus Co-Borrowing Facility at a meeting of the ACC Board of Directors on August

7, 2001.  Present at this meeting were directors John Rigas, Michael Rigas, Timothy Rigas,

James Rigas, and Peter Venetis, and Independent Directors Pete Metros, Dennis Coyle, Erland

Kailbourne, and Leslie Gelber.  Also present were Colin Higgin, James Brown, Ann

Montgomery, Randy Fisher, Mike Brady, and Ed Hartman of ACC.

933.   At the meeting, Timothy Rigas and James Brown made verbal representations to

the Independent Directors regarding the structure, size and terms of the Olympus Co-Borrowing

Facility and the identities of the various ACC entities and RFEs that were to participate as co-

borrowers.  Timothy Rigas and James Brown also presented the Independent Directors with the

Olympus Term Sheet prepared jointly by the Olympus Agent Banks and their affiliated

Investment Banks and the Rigas Family that purported to describe the terms of the proposed

Olympus Co-Borrowing Facility.

934.   The Independent Directors approved the Olympus Co-Borrowing Facility based

on material misrepresentations and omissions in the oral presentation by Timothy Rigas and

James Brown and in the written presentation contained in the Olympus Term Sheet.

269

935.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the Olympus Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

936.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the Olympus Term Sheet misled the Independent Directors into believing that the terms and conditions of the Olympus Co-Borrowing Facility provided a benefit to and were in the best interests of Adelphia, when in fact they were not.

937.    The Olympus Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that "the proceeds of the Facilities shall be used to (i) acquire approximately 155,000 subscribers, (ii) refinance existing indebtedness, and (iii) for working capital and general limited liability company, partnership and corporate purposes."

938.    The Olympus Term Sheet described a series of provisions that would restrict affiliate transactions, including with RFEs, including loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

939.    In particular, the Olympus Term Sheet presented to the Independent Directors provided that the Olympus Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained in transactions with third parties:

> No Restricted Borrower, nor any restricted subsidiary, shall enter into any transaction with any Affiliate except in the ordinary

270

course of business under terms and conditions no less favorable
than those available in a third party transaction.  Notwithstanding
the above limitation, each Restricted Borrower and its restricted
subsidiaries shall be permitted to enter into a management
agreement with the manager subject to the limitations upon
Management Fees.

940.   The Olympus Term Sheet presented to the Independent Directors provided that

the Olympus Co-Borrowing Facility would contain a "Restricted Investments" clause that would

prohibit any of the Adelphia borrowers under that facility from making investments in any of the

RFEs.  That provision read:

No Restricted Borrower, nor its restricted subsidiaries, shall make
any investments except:
1.   in the ordinary course of business;
2.   in securities having one of the two highest ratings
     by Moody's or S & P;
3.   in short-term commercial paper rated A-1 or P-1,
     obligations of the United States or an agency, and
     certificates of deposit of any financial institution
     having one of the two highest ratings by S & P or
     Moody's; or
4.   Restricted Investments as permitted herein
     including without limitation those permitted under
     the Restricted Payments section;
5.   Investments in any restricted subsidiary by and
     Restricted Borrower; or
6.   Loans among Restricted Borrowers and restricted
     subsidiaries.

941.   In turn, the referenced Restricted Investments section placed substantial limits on

affiliated transactions, reading:

No Restricted Borrower, nor its restricted subsidiaries, shall pay
any dividends or make distributions (other than dividends or
distributions from a restricted subsidiary to another restricted
subsidiary or to a Restricted Borrower), make Restricted
Investments of the type described in item 4 under the "Restricted
Investments" section above, make payments of principal under
Affiliate Indebtedness, make any loans and/or advances to
Affiliates, make equity contributions to unrestricted subsidiaries,

271

or make redemptions of equity interests in unrestricted subsidiaries, nor shall there be any draws under the Facilities by an Unrestricted Borrower ("Restricted Payments"). Notwithstanding the foregoing, each Restricted Borrower and its restricted subsidiaries may make Restricted Payments, and an Unrestricted Borrower may make draws under the Facilities, if (i) no default or event of default under the Credit Facilities exists before and after giving effect thereto and (ii) the ratio of Senior Debt to Annualized Operating Cash Flow is less than 5.5:1 (after giving effect to the Restricted Payment). Notwithstanding the foregoing, each Restricted Borrower and its restricted subsidiaries will be permitted to make Restricted Payments, and an Unrestricted Borrower may make draws under the Facilities, in an amount not to exceed the amount of Capital Contributions made into the Restricted Borrowers and their restricted subsidiaries and Affiliate Indebtedness incurred by the Restricted Borrowers and their restricted subsidiaries, subsequent to the Closing Date, provided, that no default or event of default is continuing or such Restricted Payment would, on a pro forma basis, cause a default or event of default.

942.   The Olympus Term Sheet presented to the Independent Directors also provided that "The Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels determined at the end of the applicable quarter," and then set forth a chart of periods and corresponding applicable leverage ratios. The Olympus Term Sheet presented to the Independent Directors did not define "Leverage Ratio" as it was actually used in the Olympus Co-Borrowing Facility.

943.   Despite these provisions in the Olympus Term Sheet, the Rigas Family and the Olympus Term Sheet deliberately failed to disclose all material facts to the Independent Directors concerning the Olympus Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFEs intended to put the funds they drew down from the facility.

944.    Timothy Rigas and James Brown advised the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets.  The Rigas Family knew that this statement was false when made.  The Rigas Family had agreed with the Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition.

945.    The Olympus Term Sheet presented to the Independent Directors did not contain a definition of "leverage ratio" and did not state that the leverage ratios to be used in connection with the Olympus Co-Borrowing Facility would be a single combined leverage ratio calculated in the aggregate for all participating co-borrowers.  This was a material omission.

946.    Based on the misleading information pertaining to leverage ratios in the Olympus Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the Olympus Co-Borrowing Facility proposed at the August 7, 2001 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with that particular co-borrower's individual leverage ratio.

947.    The Olympus Credit Agreement was finalized after the Independent Directors' approval had been obtained.  The Olympus Credit Agreement was created and agreed to by the Rigas Family, the Olympus Agent Banks and their affiliated Investment Banks, and the Olympus Co-Borrowing Lenders.  That Agreement defined "Leverage Ratio" as follows: "*Leverage Ratio* means, **with respect to the Companies on a combined basis,** at any date of determination

273

thereof, the ratio of (a) the Total Debt outstanding on such date to (b) Annualized Operating Cash Flow" (emphasis supplied). The Olympus Credit Agreement provision regarding Leverage Ratio differed materially from the Olympus Term Sheet and the statements made by Timothy Rigas and James Brown at the time the Independent Directors were asked to approve the Olympus Co-Borrowing Facility.

948.    The Rigas Family and the Olympus Term Sheet presented to the Independent Directors also failed to disclose the amount of collateral to be put up by each co-borrower to secure the Olympus Co-Borrowing Facility.  This was a material omission and rendered the oral presentation and the Olympus Term Sheet materially misleading.

949.    Based on the material misstatements and omissions in the Olympus Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the Olympus Co-Borrowing Facility proposed at the August 7, 2001 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with the collateral that particular co-borrower had put up to secure the facility.

950.    The Rigas Family and the Olympus Term Sheet deliberately failed to disclose to the Independent Directors that the Olympus Co-Borrowing Facility would not contain any limits upon the amount of proceeds that the participating RFEs could draw down and failed to disclose that the RFEs would, in fact, be permitted to draw down the entire amount available under the facility without regard to the relatively small amount of collateral pledged by the RFEs in connection with the facility.

274

951.    The Olympus Agent Banks and their affiliated Investment Banks knew

differently.  The Olympus Agent Banks and their affiliated Investment Banks prepared and sent

to the Olympus Lender Banks a Confidential Information Memorandum in August 2001, after

the Independent Directors approved the Olympus Co-Borrowing Facility, describing the terms of

the Olympus Co-Borrowing Facility and the Olympus Credit Agreement.  As the August 2001

Confidential Information Memorandum made clear, the collateral put up by the ACC co-

borrowers was significantly greater than the collateral put up by the RFE co-borrowers.

952.    The August 2001 Confidential Information Memorandum explicitly stated that the

collateral contributions of ACC co-borrowers Olympus Cable Holdings, LLC and Adelphia

Company of Western Connecticut would be based on revenues from a combined total of

1,505,512 cable television subscribers, whereas RFE co-borrowers Highland Video Associates,

LP and Coudersport Television Cable Company's combined collateral contribution would be

based on revenues from a combined total of 61,335 cable television subscribers.  Nonetheless,

the RFE co-borrowers were permitted to draw down the full amount of the Olympus Co-

Borrowing Facility.  This information was not stated in the Olympus Term Sheet presented to the

Independent Directors and not disclosed to them at the August 7, 2001 Board of Directors

Meeting.

953.    In reliance on the restrictions on affiliate transactions set forth in the Olympus

Term Sheet presented to the Independent Directors and the misleading nature of the Olympus

Term Sheet with regard to the fact that any co-borrower would be able to draw down the entire

amount available under the proposed facility, the Independent Directors believed that the RFEs

would not be permitted to borrow amounts that were out of proportion with the RFEs' leverage ratios or collateral contributions.

954.    Despite the limitations in the Olympus Term Sheet and the restrictions on affiliate transactions in pre-existing indentures and credit agreements and statutory and common law, the Rigas Family and the Olympus Agent Banks and their affiliated Investment Banks knew at the time they provided the Olympus Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions.

955.    The Rigas Family and the Olympus Banks and their affiliated Investment Banks knew that the Rigas Family in fact intended to use large portions of the funds available under the Olympus Co-Borrowing Facility to pay down Rigas Family and RFE debt, including, without limitation, debt incurred by the RFEs under the 1996 HVA/TALP/Global Facility.  The Olympus Term Sheet did not disclose this planned use of funds.  The Rigas Family never disclosed to the Independent Directors this planned use of funds.

956.    The Rigas Family's plans to use proceeds from the Olympus Co-Borrowing Facility for their own personal benefit and to pay down RFE debts would be in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause regarding Restricted Investments.  This use of proceeds would also be in clear violation of statutory and common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the CCH Co-Borrowing Facility.

276

957.    The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the Olympus Co-Borrowing Facility.

958.    Had the Independent Directors been aware that the RFE co-borrowers could draw down up to the entire amount available under the Olympus Co-Borrowing Facility with no regard to the leverage ratios or collateral contributions attributable to the participating RFEs and that the Adelphia entities would be jointly and severally liable for the RFEs' loans, the Independent Directors would have rejected the proposed Olympus Co-Borrowing Facility.

959.    Had the Independent Directors been aware that the Rigas Family intended to take a portion of the proceeds available under the Olympus Co-Borrowing Facility – a loan for which ACC itself, through its subsidiaries, was jointly and severally liable – and use it to pay off RFE debts and for the personal benefit of the Rigas Family, the Independent Directors would have rejected the proposed Olympus Co-Borrowing Facility.

960.    Instead, the Independent Directors voted to approve the Olympus Co-Borrowing Facility because the Olympus Term Sheet contained the provision restricting affiliate transactions, which should have operated to protect Adelphia's interests but which the Olympus Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to violate; because the Olympus Term Sheet was misleading with respect to the calculation of the Leverage Ratio and the fact that any co-borrower could draw down the entire amount of proceeds available under the Olympus Co-Borrowing Facility once in place regardless of its financial condition; and because the Rigas Family and James Brown induced the Independent Directors, through misstatements and omissions, to conclude that the Olympus Co-Borrowing Facility would be similar to the 1996 HVA/TALP/Global Facility (in which the RFE co-

277

borrower had contributed collateral commensurate with the amount of proceeds it was permitted to draw down from the facility and the use of funds was strictly limited).

961.    The Independent Directors' approval of the Olympus Co-Borrowing Facility was obtained under false pretenses.  The Olympus Agent Banks and their affiliated Investment Banks knew or consciously avoided that fact.

962.    The Olympus Agent Banks and their affiliated Investment Banks knew that the Olympus Term Sheet was misleading with respect to the fact that any co-borrower could draw down the entire amount available under the facility regardless of its financial condition.

963.    The Olympus Agent Banks and their affiliated Investment Banks knew that the Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public debt provisions, pursuant to the proposed terms of the Olympus Co-Borrowing Facility, and pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions.  In contrast, the true terms and conditions of the Olympus Co-Borrowing Facility provided no benefit to Adelphia and were not in Adelphia's interests.  The Olympus Agent Banks and their affiliated Investment Banks  knew or consciously avoided the fact that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

964.    The Olympus Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent and actual liabilities arising from the Olympus Co-Borrowing Facility.  The Olympus

278

Agent Banks and their affiliated Investment Banks also knew that the Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

965.   At the time the Olympus Agent Banks and their affiliated Investment Banks became involved in the Olympus Co-Borrowing Facility, the Olympus Agent Banks and their affiliated Investment Banks knew that Adelphia's SEC filings and proxy statements failed to disclose the true extent of Adelphia's liabilities already existing as a result of Adelphia's participation in the prior CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility.

966.   At no time prior to March 27, 2002 did Adelphia publicly disclose the enormous contingent liabilities it had amassed as a result of the RFEs' draws from the Co-Borrowing Facilities.

967.   The Olympus Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the liabilities arising from the Olympus Co-Borrowing Facility.

968.   The Olympus Agent Banks and their affiliated Investment Banks were aware that ACC had assumed enormous contingent liabilities as a result of its participation in the Olympus Co-Borrowing Facility, the prior CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility.  Moreover, the Olympus Agent Banks and their affiliated Investment Banks knew, or consciously avoided, the fact that the Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

969.     As of the Petition Date, approximately $1.3 billion was outstanding under the

Olympus Co-Borrowing Facility.

### 3.     The Rigas Family Intended That The Co-Borrowing Facilities Would Be Used For Fraudulent Purposes.

#### a.     UCA/HHC.

970.     The Rigas Family did not hide from the Agent Banks, Co-Borrowing Lenders,

and Investment Banks their intention to use the UCA/HHC Co-Borrowing Facility to defraud

Adelphia and its other creditors.  To the contrary, the Rigas Family disclosed its fraudulent intent

to the UCA/HHC Lenders.  Discussing the UCA/HHC Co-Borrowing Facility before closing, the

Rigas Family informed certain of the Agent Banks that they "specifically intended a portion of

the facility to be distributed to the Rigas Family for purposes of participating in the upcoming

[Adelphia] equity offering" and that they intended to use a substantial portion to pay off existing

RFE debt (emphasis added).

971.     The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment

Banks informed the other Co-Borrowing Lenders of this intention before closing.  Thus, the

UCA/HHC Lenders acknowledged and agreed that $250 million of the $850 million of the initial

proceeds from the facility would be used by the Rigas Family to purchase equity securities from

ACC for their personal account and that $350 million would be used by the Rigas Family to pay

down RFE debt.  The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment

Banks also disclosed that the RFE co-borrower under the UCA/HHC Co-Borrowing Facility was

not owned by Adelphia.  The UCA/HHC Lenders knew that Adelphia received no benefit from

loans to the Rigas Family or the RFEs.  The UCA/HHC Lenders knew that such loans to the

Rigas Family and the RFEs breached the provisions of the UCA/HHC Term Sheet presented to

the Independent Directors. The UCA/HHC Lenders participated in the UCA/HHC Co-Borrowing Facility with knowledge of these breaches.

972.    Prior to the closing of the UCA/HHC Co-Borrowing Facility, the Rigas Family also disclosed to the UCA/HHC Lenders that the assets of the RFE participating in the facility were disproportionately small compared to those of the UCA/HHC Debtors. Of the 395,000 subscribers owned by the borrowers participating in the UCA/HHC Co-Borrowing Facility, the sole RFE member of the borrowing group, Hilton Head, contributed just 72,000 subscribers, or approximately 18%.

973.    As of the Petition Date, Hilton Head, an RFE, had drawn approximately $642 million of the $831 million outstanding under the UCA/HHC Co-Borrowing Facility, or 77% of the amount borrowed. No prudent lender would have lent Hilton Head $642 million (or more) without Adelphia's credit support. The UCA/HHC Lenders knew or consciously avoided the facts, which were readily apparent to them, that the terms of the UCA/HHC Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family stood to benefit enormously from their participation in the UCA/HHC Co-Borrowing Facility, at the expense of Adelphia.

974.    The Rigas Family determined to enter into the UCA/HHC Facility in order to benefit themselves and the RFEs. The UCA/HHC Facility did not benefit Adelphia. None of the amounts drawn by, or on behalf of, Hilton Head benefited Adelphia. The UCA/HHC Lenders knew this.

b.    **CCH.**

975.    The Rigas Family advised the CCH Lenders of its intention to use the CCH Co-

Borrowing Facility to defraud Adelphia.  The Rigas Family and their cohorts expressly advised

the CCH Agent Banks that they intended to use the proceeds from the CCH Co-Borrowing

Facility to acquire assets for the personal account of the Rigas Family.  In a written invitation to

the CCH Agent Banks to participate in the CCH Co-Borrowing Facility dated February 17, 2000,

ACC executive James Brown stated:

> The use of proceeds for this facility will be primarily to fund
> Adelphia's purchase of the Cleveland, Ohio cable system from
> Cablevision Systems Corporation ($990 mm), to fund Adelphia's
> purchase of certain cable assets from Prestige Communications
> ($700mm) and to fund the Rigas families [sic] purchase of certain
> cable assets from Prestige Communications ($400 mm).

Thus, from the outset, the CCH Agent Banks knew that the Rigas Family intended to draw

hundreds of millions of dollars from the facility at closing for the sole benefit of the RFE co-

borrower.

976.    Upon information and belief, the Rigas Family also disclosed to each of the other

CCH Lenders that (i) the RFE co-borrower was privately owned by the Rigas Family, and (ii) the

Rigas Family intended to use a portion of the funds under the CCH Co-Borrowing Facility to

fund the Rigas Family's personal acquisition of the Prestige Systems.

977.    Based on the substantial participation of CCH Lenders that had participated in the

UCA/HHC Co-Borrowing Facility, the CCH Lenders also knew that the Rigas Family had been

using the proceeds of other co-borrowing loans for fraudulent purposes.  The CCH Lenders knew

that the Independent Directors were never advised of such activities.

978.    The offering memorandum for the CCH Co-Borrowing Facility that the CCH

Agent Banks and their affiliated Investment Banks prepared and circulated to the CCH Lenders

after the Independent Directors approved of the facility informed the CCH Lenders that the

number of cable subscribers owned by the RFE co-borrower was disproportionately small

compared to the number of subscribers owned by the CCH Debtors and patently insufficient to

support repayment of the loans. Of the 1,532,814 subscribers owned by the CCH Co-Borrowing

Facility borrowing group, the sole RFE member, Highland Prestige, contributed just 55,831

subscribers, or approximately 3.6% of the total assets supporting the loan.

979.    Nonetheless, as of the Petition Date, Highland Prestige had drawn approximately

$1.66 billion of the $2.48 billion outstanding under the CCH Co-Borrowing Facility, or 67% of

the amount borrowed. No prudent lender would have lent Highland Prestige $1.66 billion (or

more) without the credit support of Adelphia. The CCH Lenders knew or consciously avoided

the facts, which were readily apparent to them, that the terms of the CCH Co-Borrowing Facility

were significantly less favorable to Adelphia than terms that would have been available from

third parties in arm's-length transactions, and that Highland Prestige and the Rigas Family

benefited enormously and personally from their participation in the CCH Co-Borrowing Facility,

at the expense of Adelphia.

980.    The Rigas Family determined to enter into the CCH Facility in order to benefit

themselves and the RFEs. The CCH Facility did not benefit Adelphia. None of the amounts

drawn by, or on behalf of, Highland Prestige benefited Adelphia. The CCH Lenders knew this.

c.    **Olympus.**

981.    The Rigas Family advised the Olympus Lenders of its intention to use the Olympus Co-Borrowing Facility for its personal benefit. The offering memorandum distributed to the Olympus Lenders specifically stated that: (i) the initial proceeds would be used to pay at least $152 million of indebtedness owed by RFEs, and (ii) the RFEs were privately owned by the Rigas Family.

982.    The information that the Rigas Family intended to use $152 million of funds available under the Olympus Co-Borrowing Facility to pay down RFEs' debt, a transaction that would not benefit Adelphia, was not contained in the Olympus Term Sheet presented to the Independent Directors and was not otherwise disclosed to them at the August 7, 2001 Board Meeting at which the Independent Directors adopted a resolution approving the Olympus Co-Borrowing Facility.

983.    Based on the substantial overlapping participation of lenders from the UCA/HHC and CCH Co-Borrowing Facilities, the Olympus Lenders knew that the Rigas Family had been misappropriating the proceeds of other Co-Borrowing Facilities for their own personal purposes, to the detriment of Adelphia, as more fully described above. The Olympus Lenders knew that the Independent Directors were never advised of such activities.

984.    The offering memorandum for the Olympus Co-Borrowing Facility that the Olympus Agent Banks prepared and circulated to the Olympus Lenders (created after the Independent Directors' approval of the facility had been obtained) advised the Olympus Lenders that the number of cable subscribers owned by the RFE co-borrowers was disproportionately small compared to the Olympus Debtors and patently insufficient to support repayment of the

284

loans. Of the 1,566,847 subscribers contributed to the Olympus Co-Borrowing Facility borrowing group as collateral, the two RFE members of the borrowing group, Highland Video and CCT, contributed just 61,335 subscribers, or approximately 3.9% of the total assets supporting the loan.

985.    Nonetheless, as of the Petition Date, Highland Video and CCT had drawn approximately $751.5 million of the $1.27 billion outstanding under the Olympus Co-Borrowing Facility, or 59% of the amount borrowed. No prudent lender would have lent Highland Video and CCT $751 million (or more) without Adelphia's credit support. The Olympus Lenders knew or consciously disregarded the facts, which were readily apparent to them, that the terms of the Olympus Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family benefited enormously and personally from their participation in the Olympus Co-Borrowing Facility, at the expense of Adelphia.

986.    The Rigas Family determined to enter into the Olympus Facility in order to benefit themselves and the RFEs. The Olympus Facility did not benefit Adelphia. None of the amounts drawn by, or on behalf of, Highland Video and CCT benefited any of the Adelphia entities. The Olympus Lenders knew this.

### 4.    The Fraudulent Uses Of The Co-Borrowing Facilities By The Rigas Family.

##### a.    The Rigas Family's Purchase Of $1.9 Billion Of ACC Securities.

987.    From late 1998 until their forced resignations in May 2002, the Rigas Family engaged in at least eleven transactions for the purchase of approximately $1.9 billion in

285

securities issued by ACC, including common stock and convertible bonds. The Rigas Family funded many of these transactions directly from the proceeds of the Co-Borrowing Facilities. Each of these transactions was fraudulent because, as discussed infra, Adelphia received no consideration. The Rigas Family used this money for their own personal benefit and self-interest to maintain their stock position within Adelphia in order to ensure their continued management of Adelphia and their continued access to Adelphia's credit support and facilities. This use of the Co-Borrowing Facilities and Adelphia's assets was improper and did not benefit Adelphia.

988.    Although the Rigas Family intended to, and did, use large portions of the funds available under the Co-Borrowing Facilities in this improper and self-interested manner, such intentions and activities were never disclosed to the Independent Directors, either in the UCA/HHC Term Sheet, the CCH Term Sheet, the Olympus Term Sheet or in verbal and other representations made by Timothy Rigas and/or James Brown to the Independent Directors before and after the Co-Borrowing Facilities were approved. These securities purchases with co-borrowed funds violated the Term Sheets, the public debt indentures, the bank credit agreements, and applicable statutory and common law. The Agent Banks and the Investment Banks knew that such securities purchases violated the Rigas Family's fiduciary duties and existing indentures and credit agreements.

989.    Had the Independent Directors known that the Rigas Family intended to use, and did use, the Co-Borrowing Facilities in this improper manner, which was contrary to the interests of Adelphia, they would have rejected the Co-Borrowing Facilities and would have taken action to prevent the Rigas Family from using the Co-Borrowing Facilities for this purpose.

**b.    Adelphia's Payment Of Approximately $351 Million Of Margin Loans On Behalf Of The Rigas Family.**

990.    From March 2000 until May 2002, the Rigas Family used in excess of $351 million from the Co-Borrowing Facilities to make payments on margin loans owed by the members of the Rigas Family on personal margin accounts maintained at defendants BofA, SSB, Deutsche Bank Securities, and Goldman Sachs (the "Margin Lenders").

991.    At the time that the Rigas Family incurred the margin loan obligations, the Margin Lenders knew that the Rigas Family had access to the funds available under the Co-Borrowing Facilities. At the time that the Rigas Family incurred the margin loan obligations, the Margin Lenders also knew that the Rigas Family did not have significant funds or independent access to credit to satisfy all of their credit obligations while still paying off their margin loans. A significant amount of the margin payments made by the Rigas Family with funds drawn from the Co-Borrowing Facilities -- approximately $194 million -- occurred after March 27, 2002, the date on which the Rigas Family first disclosed its fraudulent concealment of the true amount of ACC's liability under the Co-Borrowing Facilities to the public and the Independent Directors.

992.    Prior to March 27, 2002, the four Margin Lenders had received a total of approximately $157 million in payments to the margin loan accounts paid out of the Co-Borrowing Facilities. In the days and weeks after the March 27, 2002 disclosure, these four Margin Lenders received approximately $194 million in margin loan repayments paid out of the Co-Borrowing Facilities: Bank of America received $41 million on April 1, 2002; SSB received $72 million in April and May 2002; Goldman Sachs received $30 million in April and May 2002; and Deutsche Bank received $50 million on March 28 and April 3, 2002.

287

993.    The Margin Lenders (or their affiliates) that were Co-Borrowing Lenders knew prior to their receipt of the margin payments for the personal benefit of the Rigas Family that such payments came from Co-Borrowing Facilities.   The Margin Lenders knew that use of the Co-Borrowing Facilities to pay down Rigas Family margin loans violated existing indentures and credit agreements and applicable statutory and common law.   Defendants Bank of America, SSB, and Deutsche Bank were each Agent Banks or affiliated with an Agent Bank, at the same time they were margin lenders.   These margin loan repayments thus benefited these defendants by converting their unpaid margin loans, that were substantially undersecured due to the plummeting value of the Rigas Family's Adelphia securities holdings, into senior credit obligations under the Co-Borrowing Facilities secured by all of the assets of the Adelphia entities that were parties to those facilities.

994.    Although the Rigas Family intended to, and did, use large portions of the funds available under the Co-Borrowing Facilities to pay down private margin loans, such intentions and activities were never disclosed to the Independent Directors, either in the UCA/HHC Term Sheet, the CCH Term Sheet, the Olympus Term Sheet or in verbal and other representations made by John Rigas, Timothy Rigas, and/or James Brown to the Independent Directors before and after the Co-Borrowing Facilities were approved.

995.    Had  the Independent Directors known that the Rigas Family intended to use, and did use, the Co-Borrowing Facilities to pay down private margin loans, they would have rejected the Co-Borrowing Facilities and would have taken action to prevent the Rigas Family from using the Co-Borrowing Facilities for this purpose.  After the disclosures on March 27, 2002, members of the Special Committee created by the Independent Directors to investigate and remedy the

288

Rigas Family's misconduct took steps to inquire as to any outstanding obligations, including margin loans, that might still be subject to payment out of the Co-Borrowing Facilities. In particular, Leslie Gelber asked various banks at a meeting in April 2002 at the offices of Citibank whether such obligations existed. Representatives of Citibank and SSB, among others, denied knowledge of such obligations at that time. Nor did co-borrowing lenders Deutsche Bank or Bank of America advise the Independent Directors that they were continuing to receive margin loan payments from Adelphia on behalf of the Rigas Family after March 27, 2002. At the same time, SSB and the other Margin Lenders were receiving payments on the outstanding margin loans from the Co-Borrowing Facilities. The Independent Directors did not learn of these margin loan repayments until after they occurred.

### c.    The Rigas Family's Purchase Of $710 Million Of Cable Systems.

996.    On or about July 5, 2000, Highland Prestige, an RFE, acquired various cable systems in Georgia owned by Prestige Communications, Inc. (the "Prestige Acquisition"). The Prestige Acquisition involved various transfers of funds and other assets by which the Rigas Family, through Highland Prestige, consummated the Prestige Acquisition using as much as $365 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable.

997.    On or about July 2, 2001, Highland Prestige also acquired various cable systems from the Estate of Bill Daniels (the "Daniels Acquisition"). The Daniels Acquisition also involved various transfers of funds and other assets by which the Rigas Family, through Highland Prestige, consummated the Daniels Acquisition with approximately $345 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable.

### d.   Other Uses By The Rigas Family Of Funds From The Co-Borrowing Facilities.

998.   The Rigas Family also used funds from the Co-Borrowing Facilities to finance certain non-Adelphia related ventures and to cause Adelphia entities to enter into other fraudulent transactions with RFEs.

999.   For example, the Rigas Family used at least a portion of the Co-Borrowing Facilities to fund expenditures relating to the development of a golf course at Wending Creek Farms on Rigas Family land, and used funds from the CMS to fund expenses for Niagara Frontier Hockey, L.P., a Rigas Family controlled entity that owned the Buffalo Sabres professional hockey team.

1000.   The Rigas Family also caused ACC to use at least a portion of the Co-Borrowing Facilities to purchase in non-arms length transactions approximately $40 million in furniture and to purchase timber rights from RFEs.

1001.   As of the Petition Date, the Rigas Family fraudulently had used at least $3.4 billion of the $5.6 billion available under the Co-Borrowing Facilities for their own personal enrichment, to the detriment of Adelphia and its other creditors.  As more fully discussed herein, the Co-Borrowing Lenders knew of or consciously avoided knowledge of the Rigas Family's personal use of these funds.

1002.   The Rigas Family never disclosed to the Independent Directors the Rigas Family's intention to use funds available under the Co-Borrowing Facilities for the aforementioned non-Adelphia-related ventures, none of which benefited, and none of which were in the best interests of, Adelphia.

1003.   Had the Independent Directors been informed that the Rigas Family intended to use proceeds from the Co-Borrowing Facilities to fund such non-Adelphia-related ventures, and had they understood that Adelphia would become wholly liable for such ventures, the Independent Directors would have taken action to prevent the Rigas Family from entering into and using the Co-Borrowing Facilities for these purposes.  As a result of the extraordinary burdens placed on Adelphia for the funds that the Rigas Family looted through the Co-Borrowing Facilities, Adelphia received no benefit at all from those facilities.

### 5.   The Rigas Family's Fraudulent Use Of The Century-TCI Non-Co-Borrowing Facility.

1004.   The Rigas Family's fraudulent use of Adelphia's credit facilities was not limited to the Co-Borrowing Facilities.  The Rigas Family used at least one of Adelphia's Non-Co-Borrowing Credit Facilities to fund personal expenses.  In contrast to the Co-Borrowing Facilities, however, these other credit facilities did not explicitly authorize RFEs to access such credit.

1005.   The Century-TCI Lenders knew, or consciously avoided, the fact that the proceeds of their loans were being used to illegally shift value from Adelphia to the Rigas Family without consideration.  In this regard, on October 30, 2001, October 31, 2001, and November 1, 2001, the Rigas Family caused Adelphia to draw a total of $490 million from the Century-TCI Facility (a Non-Co-Borrowing Credit Facility); upon information and belief, the Rigas Family used these proceeds to pay for purchases of common stock and convertible notes for $408 million in October and November 2001.  At or about that time, the Co-Borrowing Facilities were fully drawn.  Adelphia therefore requested from Citibank, as the administrative agent for the Century-TCI Credit Facility, a previously unplanned $350 million draw; Adelphia

291

also drew from Century-TCI another $60 million on October 31, and another $80 million on November 1.

1006.   Although the Rigas Family acquired $408 million of ACC securities in October and November 2001, in reality, the Rigas Family did not pay $408 million or any other amount to ACC.  Instead, the Rigas Family merely recycled Century-TCI funds to consummate this stock purchase rather than contributing fresh capital.  The Century-TCI Lenders knew or consciously avoided the fact that the $408 million draw from the Century-TCI Facility and other draws were used by the Rigas Family for their personal benefit and fraudulent purposes and without any benefit to Adelphia.

**C.   The Rigas Family Concealed From Creditors Other Than Defendants The True Amount Outstanding Under The Co-Borrowing Facilities.**

1007.   The Rigas Family's intent to defraud Adelphia, its Independent Directors, and its other creditors is evidenced by their concealment of the true amounts outstanding under the Co-Borrowing Facilities.  In 2000, Adelphia's debt burden caused significant reductions in Adelphia's credit ratings, thereby jeopardizing the Rigas Family's ability to take advantage of Adelphia's access to the capital markets.  In August 2000, Moody's observed that Adelphia desperately needed a "deleveraging" event.  Consequently, the Rigas Family -- with Defendants' knowledge or reckless disregard or conscious avoidance -- concocted a ploy to convince the public that Adelphia was deleveraging when its actual debt load was increasing because of the Rigas Family's illicit uses of the Co-Borrowing Facilities.  As more fully explained below, while ACC -- acting by and through the Rigas Family -- concealed the true extent of Adelphia's debt as a result of the RFEs' Co-Borrowing Facility borrowings from other creditors and from the Independent Directors, the Co-Borrowing Lenders knew the correct amounts all along.

292

1.   **Adelphia Simply Omitted The RFE Uses Of
The Co-Borrowing Facilities And Other Amounts
From Its Balance Sheets.**

1008.   At no time prior to March 27, 2002 did Adelphia disclose the true extent of its

liabilities under the Co-Borrowing Facilities in filings with the Securities and Exchange

Commission ("SEC").  Since May 1999 -- the date the UCA/HHC Co-Borrowing Facility closed

-- Adelphia's SEC filings have understated the amount owed under the Co-Borrowing Facilities

by billions of dollars.  Moreover, ACC and its indirect subsidiaries Arahova Communications,

Inc. and Olympus Communications, L.P. each had publicly-traded debt securities.  The Rigas

Family also caused the SEC filings of these indirect ACC subsidiaries to understate the billions

of dollars outstanding under the Co-Borrowing Facilities.

1009.   The Rigas Family withheld from the Independent Directors critical information

regarding Adelphia's true financial condition in order fraudulently to induce the Independent

Directors to sign Adelphia's SEC filings.

1010.   The Rigas Family consistently caused Adelphia to omit from its publicly filed

financial statements amounts drawn from the Co-Borrowing Facilities (and the Non-Co-

Borrowing Facilities) for the personal benefit of the Rigas Family and the RFEs.  The Rigas

Family and Defendants knew at the time that Adelphia was required to disclose the entire

amount of debt it was obligated to pay, including all of the draws under the Co-Borrowing

Facilities.

2.    **The Fraudulent Use Of The CMS.**

1011.   Until May 2002, when the Rigas Family was forced to relinquish management control of Adelphia, the Rigas Family used Adelphia's cash management system ("CMS") to control cash transactions involving Adelphia and the RFEs.  The CMS was a key instrumentality of the fraud.  The use of a central cash management system to commingle funds belonging to both a public company and privately owned entities was unprecedented.  Defendants knew or consciously avoided knowledge of the structure and fraudulent use of the CMS.  Indeed, it was yet another red flag that they ignored.

1012.   Defendant Wachovia -- an agent bank or lender in all of Adelphia's credit facilities -- maintained the CMS at all relevant times and the Rigas Family controlled its operations.  The CMS was a central depository (in reality, the Rigas Family's personal piggy bank) for cash generated or obtained by Adelphia from all sources (including borrowings under each of the Co-Borrowing Facilities, the Non-Co-Borrowing Facilities, the proceeds from Adelphia's debt and equity securities offerings, and Adelphia's operations).  Adelphia commingled all of its cash with that of the RFEs in the CMS.  After Adelphia deposited cash into the CMS, "ownership" of the cash could be transferred through simple journal entries to any RFE.  The cash also could be transferred from the CMS to any of a number of bank accounts held in the name of the RFEs.

1013.   Wachovia's internal policies, guidelines, and procedures prohibited this type of cash management account which included companies that were not a common legal entity or which included parents and subsidiaries that were not 100% owned by the parents.  Wachovia's

294

policies prohibited commingling funds among public and private corporate entities that were not deemed to be a common legal entity. The Adelphia CMS violated Wachovia's internal policies.

1014.  The CMS constituted an Affiliated Transaction as defined under the various public indentures and credit agreements set forth in this complaint. Because the RFEs were allowed to withdraw substantial sums of money from the CMS for purposes that were not for the benefit of Adelphia, including funds deposited from the Co-Borrowing Facilities, while leaving Adelphia responsible for re-paying the full amount drawn down, these were affiliated transactions that required approval of the Independent Directors under existing agreements as well as statutory and common law. The Rigas Family, Wachovia, and the other Agent Banks never informed the Independent Directors of the structure and uses of the CMS or that the funds of Adelphia and the RFEs were commingled in the CMS. Wachovia did not ask for or obtain any proof that the Independent Directors had approved the CMS. Wachovia and the Agent Banks knew or consciously avoided knowledge that the Rigas Family had never obtained the Independent Directors' approval to use the CMS to commingle Adelphia's funds with the RFEs' funds. Wachovia's management of the CMS in this manner, without any corporate authorization from Adelphia, not only violated its own internal policies but substantially assisted the Rigas Family in accomplishing their fraudulent looting of Adelphia's accounts.

1015.  Through the CMS, the Rigas Family misappropriated over $3.4 billion from the Co-Borrowing Facilities for its own benefit. Adelphia's banking and wire transfer records reflect that the Rigas Family obtained funds from the Co-Borrowing Facilities by transferring funds from the CMS to an account maintained at Wachovia by Highland Holdings or some other RFE, followed by a transfer from the RFE either directly to individual members of the Rigas Family or

to other RFEs, many of which also maintained accounts at Wachovia. Typically, these transfers occurred on the same business day. Thus, on any given business day in which an RFE received cash transfers from Adelphia, the RFE's account balance at Wachovia would fluctuate from zero, to the amount transferred in from Adelphia, and back to zero after the RFE funneled those funds out to the Rigas Family. Defendant Wachovia, an agent bank or lender under each of Adelphia's credit facilities (including the Co-Borrowing Facilities), thus was in a unique position to observe the fraudulent transfer of funds from Adelphia to the Rigas Family. In accordance with its role as an Agent Bank, Wachovia, upon information and belief, shared its knowledge of these transactions with other Co-Borrowing and Non-Co-Borrowing Lenders.

**3.     The Rigas Family Created The False Appearance Of "Deleveraging".**

1016.   The Rigas Family was not content with merely concealing the amounts borrowed by the RFEs under the Co-Borrowing Facilities. With the assistance of the Agent Banks and the Investment Banks, the Rigas Family schemed to give the false appearance that Adelphia was affirmatively decreasing its debt load when, in fact, Adelphia's debt load was soaring to new heights as a result of the Rigas Family's misappropriation of Adelphia's credit facilities. To create this illusion, the Rigas Family caused Adelphia to offer stock to the public as a means of raising capital that could be used to pay off Adelphia's debt. The Rigas Family publicly announced that it would be purchasing ACC stock to assist Adelphia in reducing its debt.

1017.   At all relevant times, these statements about reducing Adelphia's debt load were false because Adelphia's debt was actually increasing due to the Rigas Family's improper use of Adelphia's credit facilities. The Rigas Family was not helping to decrease Adelphia's debt

because the Rigas Family used Adelphia's credit facilities to pay for the Adelphia stock it was buying.

1018.   The Rigas Family did not disclose to the Independent Directors that they were undermining Board policy to reduce Adelphia's debt load by continuing to misappropriate funds from Adelphia's credit facilities and were using those facilities to pay for the Adelphia stock they were buying.  The Rigas Family advised the Independent Directors that they were buying Adelphia securities with the Rigas Family's private funds.  The effect of this deception was to increase Adelphia's debt load – not decrease it.

1019.   Defendants knew of and participated in this scheme through their approval of Co-Borrowing Facility draws to fund the Rigas Family's acquisitions of ACC's securities, through their underwriting of debt and equity offerings in which the fraudulent purchases occurred, and through their knowledge and disregard that the purported deleveraging was a sham.

1020.   The basic structure of these bogus securities purchase transactions involved:

- a draw down under a Co-Borrowing Facility in the amount of the purchase price of the securities to be purchased;

- a transfer from the co-borrower to an RFE that was not a co-borrower;

- a transfer from the non-co-borrowing RFE to Adelphia;

- ACC's issuance of securities to the non-co-borrowing RFE -- i.e., the Rigas Family; and

- Adelphia's use of proceeds of the Rigas Family's securities purchase to pay down outstanding debt under the Co-Borrowing Facilities.

1021.   As a result of these transactions, Adelphia booked an increase in a shareholders' equity account in the amount it had received from the RFE, and recorded a correlating decrease

in the debt outstanding under one or more of the Co-Borrowing Facilities. The decrease, however, was fraudulent and illusory because Adelphia still remained liable for the co-borrowing funds siphoned away by the RFEs to purchase Adelphia securities.

1022. From 1999 through 2001, the Investment Banks, by and through analysts, published a series of reports announcing the Rigas Family's purported campaign to delever Adelphia. These reports facilitated the fraud by disseminating the Rigas Family's misleading intentions and actions and giving those plans credibility. The Investment Banks knew or consciously avoided knowledge that the Rigas Family made bogus equity contributions to ACC, concealed the actual level of debt and misrepresented their efforts to delever Adelphia.

1023. After each of these equity offerings, Adelphia released a 10-K or 10-Q filing with the SEC in which it reported the net cash proceeds of the securities offering. The SEC filings indicated that the Rigas Family had acquired its securities for cash. The Agent Banks and the Investment Banks knew that these reports were misleading in that they failed to disclose that the Rigas Family used the Co-Borrowing Facilities to provide the funds for their securities purchases. The Agent Banks and the Investment Banks knew that the Rigas Family were damaging Adelphia and deceiving its stakeholders (other than Defendants) by making these materially misleading reports.

## D.    Defendants Knew Of Or Consciously Avoided Knowledge Of The Fraud.

### 1.    The Rigas Family Specifically Informed Defendants Of Their Fraudulent Activities.

1024. Although the Rigas Family concealed their fraud from the public, the Independent Directors and Adelphia's creditors other than Defendants, the Rigas Family did not conceal it

from Defendants.  To the contrary, the Rigas Family could not have accomplished this massive fraud on Adelphia and its other creditors without Defendants' substantial and knowing assistance.

1025.  As set forth above, the Rigas Family disclosed to each of the Co-Borrowing Lenders and their affiliated Investment Banks (prior to closing and thereafter), but not to the Independent Directors, that a substantial portion of the proceeds would be used for purposes benefiting solely the Rigas Family and the RFEs.  This disclosure -- along with the structure of the Co-Borrowing Facilities, which the Co-Borrowing Lenders and their affiliated Investment Banks had approved and participated in creating -- gave Defendants actual notice of the misconduct by the Rigas Family for the reasons set forth above.  And, as more fully described below, many of the Defendants had a much more substantial relationship with Adelphia and the Rigas Family that provided them with significantly more information about the fraud. And breaches of fiduciary duty

### 2.   Defendants Knew That The Rigas Family Concealed Adelphia's Co-Borrowing Debt.

1026.  The Co-Borrowing Lenders and their affiliated Investment Banks knew or consciously avoided the fact that Adelphia's filings with the SEC consistently concealed the true amount of their co-borrowing liability.  The Co-Borrowing Lenders and their affiliated Investment Banks knew the amount owing under the Co-Borrowing Facilities in which they participated.  In addition, since Wachovia and BMO were Agent Banks or lenders under all of the Co-Borrowing and Non-Co-Borrowing Facilities, these institutions also knew the outstanding balances of all of Adelphia's bank debt (as did other lenders participating in the Co-Borrowing and Non-Co-Borrowing Facilities).  All of the Co-Borrowing Lenders regularly received

compliance certificates from Adelphia evidencing the true amounts outstanding under Adelphia's credit facilities.

1027.   Upon information and belief, the Co-Borrowing Lenders performed periodic analyses demonstrating Adelphia's concealment, as caused by the Rigas Family, of billions of dollars under the Co-Borrowing Facilities from Adelphia's balance sheet.  For example, on or about March 29, 2001, Defendant Wachovia performed an analysis of Adelphia's total outstanding "bank debt" at the subsidiary level, as of September 30, 2000, under the two Co-Borrowing Facilities then outstanding -- UCA/HHC and CCH -- and under six Non-Co-Borrowing Facilities then outstanding -- Parnassos, Chelsea Communications, Adelphia Cable Partners, Harron Communications, FrontierVision and Century-TCI.  Wachovia determined that Adelphia's total "bank debt" as of September 30, 2000 was approximately $5.2 billion.

1028.   Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt, as of September 30, 2000, was approximately $3.8 billion.  Wachovia did not need any "special" access to Adelphia to obtain this information. All of the Co-Borrowing Lenders could have made this calculation based on information readily accessible to them as lenders. Wachovia's analysis demonstrates that many, if not all, Defendants knew or consciously avoided knowing that Adelphia was understating its total bank debt in 2000 by approximately $1.4 billion and that Adelphia's leverage was not being reduced as represented.

1029.   Moreover, upon information and belief, in early 2002, each of the Agent Banks performed an analysis of Adelphia's total outstanding bank debt, as of September 30, 2001, under the Co-Borrowing and Non-Co-Borrowing Facilities.  Based on the information available to

300