them (and which had been available since 1999), each of the Agent Banks determined that Adelphia's total bank debt was between $6.8 billion and $7.3 billion.

1030.  Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt as of September 30, 2001, was approximately $5.4 billion, which included amounts borrowed by an Adelphia subsidiary, Adelphia Business Solutions, Inc. ("ABIZ"), that the Agent Banks did not include in their calculations.  Thus, even including the amounts borrowed by ABIZ, Defendants knew or consciously avoided the fact that Adelphia understated their total bank debt by at least $1.4 billion.  Yet the concealment went much further.  Because the SEC filing included significant ABIZ bank debt -- which the Co-Borrowing Agent Banks' analyses excluded -- Adelphia's amounts concealed much more than $1.4 billion.

1031.  In addition to the information the Agent Banks received as lenders, including but not limited to the due diligence they conducted at the time they entered into the Co-Borrowing Facilities, the Agent Banks and the Investment Banks had additional and ample opportunities to learn all material aspects of Adelphia's business and finances.  As more fully set forth below, each of the Agent Banks and the Investment Banks, as Adelphia's and the Rigas Family's long-time lenders, investment bankers, underwriters, financial analysts, financial advisors and strategic partners, had access to and possession of significant non-public information concerning the financial affairs of Adelphia, the RFEs and the Rigas Family.  Moreover, the Investment Banks had a legal obligation to conduct extensive due diligence in connection with the securities offerings they underwrote.

3.  **Defendants Knew That The Rigas Family
    Was Using The CMS To Facilitate The Fraud.**

1032.  Most of the bank accounts through which the Rigas Family caused Adelphia to fraudulently divert the co-borrowing funds -- principally the CMS and the Rigas Family's personal accounts -- were maintained at Defendant Wachovia. In many instances, Wachovia funded, or otherwise was aware of, massive draw downs by an Adelphia subsidiary under the Co-Borrowing Facilities on the same day that the Rigas Family deposited or transferred significant amounts, which, in some instances, matched the amounts drawn down under a Co-Borrowing Facility the very same day. As such, Wachovia knew or consciously avoided knowledge of the Rigas Family's fraudulent conduct. Upon information and belief, other Co-Borrowing Agent Banks knew of the fraudulent use of Co-Borrowing Facilities and the misappropriation of funds via the CMS.

1033.  In this regard, records of Adelphia, BofA and Wachovia reflect that, on July 3, 2000, Highland Prestige, an RFE co-borrower, drew $145 million under the CCH Co-Borrowing Facility. The money was transferred directly from BofA, the administrative agent under the CCH Co-Borrowing Facility, to a Highland Prestige bank account at Wachovia. That same day, Highland Prestige transferred approximately $145 million from the same account to the account of another RFE (not a co-borrower), which used the funds to acquire shares of ACC Class B Common Stock.

1034.  Upon information and belief, before each of the Co-Borrowing Facilities closed, all of the Co-Borrowing Lenders obtained summaries, reports and other information relating to the CMS. Thus, Defendants knew of, or consciously avoided, the existence of the CMS, the commingling of funds in the CMS, and the fraudulent use, diversion, and misappropriation by

302

the Rigas Family of funds within the CMS. In particular, Wachovia, by virtue of its oversight of the CMS, Highland Holdings accounts and other Rigas Family accounts that received transfers from the CMS, knew or consciously avoided the fraudulent nature of the transfers between Adelphia and the RFEs via the CMS.

1035.  By contrast, Adelphia, at the direction of the Rigas Family, never informed other creditors, including the holders of public debt securities issued by Adelphia that the CMS included commingled cash from Adelphia and the RFEs that was being fraudulently diverted from Adelphia for the benefit of the Rigas Family. Nor did the Rigas Family ever inform the Independent Directors of these misuses of the CMS.

### 4.   Defendants Knew That The Proceeds Of The Non-Co-Borrowing Facilities Were Used For Fraudulent Purposes.

1036.  After May 1999, each of the Co-Borrowing Lenders and the Investment Banks knew that (i) Adelphia and the RFEs were commingling cash, (ii) the Co-Borrowing Debtors had agreed to be liable for co-borrowing funds drawn by the RFEs, and (iii) the Rigas Family was using the Co-Borrowing Facilities for personal expenses, including, but not limited to, the purchase of securities issued by ACC. The composition of the lenders in the Co-Borrowing Facilities and the Non-Co-Borrowing Facilities substantially overlapped. Once they had indisputable notice of the fraud, the Co-Borrowing Lenders participating in the Non-Co-Borrowing Facilities knew or should have known that the Rigas Family was using the proceeds of the Non-Co-Borrowing Facilities in furtherance of the fraud.

**E.     Many Defendants Assisted In, Or Consciously Ignored,
The Rigas Family's Fraud To Benefit Themselves.**

    **1.     The Unity Of Interest Between Each Agent
Bank And Its Affiliated Investment Bank.**

    1037.   Substantially all of the Agent Banks had Investment Bank affiliates that rendered significant loan and securities underwriting, loan syndication, investment banking, and other advisory services to Adelphia.  The following is a chart setting forth the applicable Defendant Agent Bank and its Defendant Investment Bank affiliate:

| Agent Bank | Investment Bank Affiliate |
|---|---|
| BofA | BAS |
| BMO | BMO NB |
| Wachovia | Wachovia Securities |
| Citibank | SSB |
| ABN AMRO | ABN AMRO Securities |
| BONY | BNY Capital Markets |
| BNS | Scotia Capital |
| Barclays | Barclays Capital |
| CIBC | CIBC Securities |
| Chase | Chase Securities |
| Credit Lyonnais | Credit Lyonnais Securities |
| CSFB | CSFB Securities |
| Deutsche Bank | Deutsche Bank Securities |
| DLJ | DLJ Securities |

| Agent Bank | Investment<br>Bank Affiliate |
|---|---|
| Fleet | Fleet Securities |
| Merrill Lynch | Merrill Lynch Securities |
| Morgan Stanley | Morgan Stanley Securities |
| PNC Bank | PNC Capital Markets |
| Royal Bank of Scotland | Royal Bank of Scotland |
| Société Générale | SG Cowen |
| SunTrust | SunTrust Securities |
| TDI | TD Securities |

1038.  Each Agent Bank shared a unity of interest, conspired, and acted in concert with its affiliated Investment Bank with respect to transactions related to Adelphia and the Rigas Family.  Each of the Investment Banks, among other things, underwrote numerous Adelphia securities offerings and credit facilities, syndicated such credit facilities, advised the Rigas Family on structuring various financing transactions for Adelphia and the Rigas Family, and had its purportedly independent analysts issue overly optimistic reports on Adelphia's securities to inflate or maintain the market value of the Rigas Family's stock holdings.  While each Agent Bank and its Investment Bank affiliate should have made independent judgments about whether to lend to Adelphia and to underwrite ACC securities, no such independent judgments or decisions were made.  Instead, each of the Agent Banks and Investment Banks made decisions based solely on the fee income that would be generated and the opportunity to provide substantial loans to the Rigas Family tied  together with the investment advisory business while

305

protecting themselves from credit risk by assuring that the Rigas Family's obligations would be paid for by Adelphia.

1039.   The Investment Banks and affiliated Agent Banks shared all material information about Adelphia's businesses and finances.  Indeed, upon information and belief, each of the underwriting agreements between the Investment Banks and Adelphia expressly authorized information-sharing between the Investment Banks and their Agent Bank affiliates.  One of these underwriting agreements provided that:

> The Investment Banks may . . . share any Offering Document, the Information and any other information or matters relating to Company, any assets to be acquired or the transactions contemplated hereby with Bank of America, N.A. ("BofA") and Citibank, N.A. (together with SSBI, "Citi/SSB") and BofA and Citi/SSB affiliates may likewise share information relating to Company, such assets or such transaction with the Investment Banks.

1040.   Not only did the Agent Banks and Investment Banks share information, each of the institutions worked as a team with its affiliate to ensure that they extracted maximum fee income from Adelphia.  For example, BAS "deal teams" for many Adelphia securities offerings included employees of both BAS and BofA.  The December 21, 2000 agreement pursuant to which Adelphia retained BAS to act as, among other things, its investment advisor, states:  "For purposes of this engagement letter, 'BAS' shall mean Banc of America Securities LLC and/or any affiliate thereof, including BofA, as BAS shall determine to be appropriate to provide the services contemplated herein[.]"  Moreover, BofA ultimately approved the Co-Borrowing Facilities based on the fees received by BAS, and BofA substantially relied upon information provided by BAS in approving each of the Co-Borrowing Facilities.

1041.    Similarly, in performing the acts described herein, Citibank, Citicorp, SSB, SBHC, and their affiliates (the "Citigroup Defendants") acted together in pursuit of a common plan, such that each acted on behalf of, and as the agent for, the others.  Among other things, the Citigroup Defendants shared information and worked as a "team" to obtain investment bank engagements and to extend credit to Adelphia, including presenting themselves to Adelphia as a single provider of financing and related services and products.  As part of this approach, the Citigroup Defendants at times conditioned the extension of credit by one or more of them to Adelphia and the Rigas Family on Adelphia's engaging another of them to provide investment banking services, and *vice versa.*

1042.    BMO and BMO NB, Wachovia and Wachovia Securities and, upon information and belief, the other Agent Banks and their Investment Bank affiliates, also ignored any real distinction between lending and investment banking divisions in their dealing with Adelphia and the Rigas Family.  Adelphia deal teams for these entities also included employees from both lending and investment banking groups, and each Agent Bank approved participation in the Co-Borrowing Facilities based primarily upon the fees being earned by its affiliated Investment Bank and their understanding that their otherwise risky loans to the Rigas Family and the RFEs would be satisfied by the stronger credit and collateral of Adelphia.

### 2.    The Agent Banks' And Investment Banks' Close Relationship With Adelphia And The Rigas Family.

1043.    The Agent Banks' and Investment Banks' close relationship with Adelphia and the Rigas Family began long before the Co-Borrowing Facilities.  In 1986, ACC became a publicly-traded company through an initial public offering ("IPO") of its common stock.

1044.   Shortly after ACC's IPO, Adelphia, through the Rigas Family, began to establish significant relationships with, upon information and belief, each of the Agent Banks and the Investment Banks and, upon information and belief, other lenders.   Over the next sixteen years, many of the Agent Banks and their affiliated Investment Banks provided significant debt and equity financing and underwriting, investment banking advice and other financial services to Adelphia, to certain of the RFEs, and directly to members of the Rigas Family.   Indeed, the Agent Banks and Investment Banks were intimately involved, on a non-arm's-length basis, in Adelphia's financial affairs.

1045.   The following chart sets forth some of the Adelphia and Rigas Family-related transactions in which certain lead Agent Banks and their affiliated Investment Banks participated:

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| Adelphia Cable Partners Financing | X | X | X | |
| Chelsea Communications Financing | X | X | X | |
| Highland Video (Rigas Family) Financing | | X | X | |
| Hilton Head Communications (Rigas Family) Financing | | | X | |
| $329M Hyperion 13% Discount Notes Offering 2/1996 | X | | | |
| $200M FrontierVision 11% Senior Subordinated Notes 10/7/1996 | | | X | |
| $300M ACC Senior Notes & Preferred Stock 7/1/1997 | X | | | X |
| $145M FrontierVision Discount Notes 9/19/1997 | | | X | |
| $237.65M 11 7/8% Senior Discount Notes 12/12/1997 | | | X | |

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| $800M FrontierVision Credit Facility 12/19/1997 | | X | X | |
| $300M Hyperion Initial Public Offering 5/8/1998 | X | | | X |
| $262M Class A Common Stock Offering 8/1998 | X | | | X |
| $700M Parnassos Credit Facility 12/1998 | X | X | X | |
| Harron Credit Facility 1999 | X | X | X | |
| $372M Class A Common Stock Offering 1/1999 | X | | | |
| $400M Senior Notes Offering 1/8/1999 | X | | | X |
| $494M Class A common 4/1999 | X | | | X |
| $500M Convertible Preferred Offering 4/99 | X | | | X |
| $850M UCA/HHC Co-Borrowing Credit Facility 5/6/1999 | X | X | X | X |
| $350M 7 7/8% Adelphia Senior Notes Offering 6/15/1999 | | X | | X |
| $342 Class A Common Stock Offering 9/30/1999 | X | | X | X |
| November 1999 Hyperion $262.5 Million Common Stock Follow On Offering. | | | | X |
| $500M 9 3/8% Adelphia Bond Offering 11/16/1999 | | X | | X |
| $500M 5 1/2% Convertible Preferred Offering 1999 | X | | | |
| $1.0B Century/TCI Credit Facility 12/1999 | X | X | X | X |
| $2.25B CCH Co-Borrowing Facility 4/14/2000 | X | X | X | X |
| $750M ACC Senior Bonds Offering | X | | | X |

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| 9/15/2000 | | | | |
| $500M Add-On To CCH Co-Borrowing Facility 9/2000 | X | X | X | X |
| $1.3B Arahova Bridge Loan 1/3/2001 | X | | | X |
| M&A Advisory Services 2/2001 | X | | | X |
| $863M 6% Convertible Notes Offering 1/18/2001 | X | | | X |
| $821M Class A Common Stock Offering 1/18/2001 | X | | | X |
| $575M 3 ¼% Convertible Subordinated Notes Offering 4/20/2001 | X | X | | X |
| $1.0B 10 1/4% Senior Notes Offering 6/7/2001 | X | X | | X |
| $2.03B Olympus Co-Borrowing Facility 9/28/2001 | X | X | X | X |
| $500M 10 1/4% Senior Notes Offering 10/19/2001 | | X | | |
| Rigas Family Private Banking/Broker | X | | X | X |

1046.   The other Investment Banks also participated in numerous Adelphia-related financings.  For example:

- ABN AMRO Securities underwrote Adelphia's September 2000 offering of senior notes;

- Barclays Capital underwrote Adelphia's June 1998 offering of senior notes, Adelphia's November 1998 offering of senior notes, Adelphia's January 1998 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- BNY Capital Markets underwrote Adelphia's November 1999 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- Chase Securities underwrote ABIZ's December 1996 offering of senior notes and warrants, Adelphia's November 1999 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- CIBC Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, and Adelphia's October 2001 offering of senior notes;

- Credit Lyonnais Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, ABIZ's November 1999 offering of Class A common stock, Adelphia's September 2000 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- CSFB Securities underwrote Adelphia's August 1998 offering of Class A common stock, Adelphia's November 1998 offering of senior notes, Adelphia's January 1999 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, Adelphia's October 1999 offering of senior notes, Adelphia's November 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, Adelphia's January 2001 offering of Class A common stock, and Adelphia's October 2001 offering of senior notes;

- Deutsche Bank Securities underwrote Adelphia's October 1999 offering of limited partnership interests in Century-TCI, Adelphia's October 1999 offering of senior notes, and Adelphia's November 2001 offering of Class A common stock;

- DLJ Securities underwrote Adelphia's May 1992 offering of Class A common stock, Adelphia's October 1999 offering of Class A common stock, and ABIZ's November 1999 offering of Class A common stock;

- Fleet Securities underwrote Adelphia's September 2000 offering of senior notes, and Adelphia's October 2001 offering of senior notes;

- Merrill Lynch Securities underwrote ABIZ's 1996 offering of Class A common stock, and Adelphia's October 1999 offering of Class A common stock;

- Morgan Stanley Securities underwrote Adelphia's October 1999 offering of Class A common stock, Adelphia's September 2000 offering of senior notes,

311

Adelphia's January 2001 offering of Class A common stock, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's November 2001 offering of Class A common stock;

- PNC Capital Markets underwrote Adelphia's November 1999 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- Royal Bank of Scotland underwrote Adelphia's October 2001 offering of senior notes;

- Scotia Capital underwrote Adelphia's November 1998 offering of senior notes, Adelphia's November 1999 offering of senior notes, Adelphia's September 2000 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- SG Cowen underwrote Adelphia's October 1999 offering of Class A common stock, Adelphia's October 1999 offering of limited partnership interests in Century-TCI, Adelphia's September 2000 offering of senior notes, and Adelphia's April 2001 offering of convertible subordinated notes;

- SunTrust Securities underwrote Adelphia's September 2000 offering of senior notes; and

- TD Securities underwrote Adelphia's July 1997 offering of senior notes and Series A preferred stock, Adelphia's August 1998 offering of Class A common stock, Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of senior notes, Adelphia's November 1999 offering of senior notes, Adelphia's September 2000 offering of senior notes, and Adelphia's October 2001 offering of senior notes.

1047.   The Agent Banks -- acting in concert with their Investment Bank affiliates -- did much more than just lend money to Adelphia on a purportedly arm's-length basis.  In addition to offering substantial advice to assist Adelphia and the Rigas Family in accessing the commercial lending and capital markets, certain of the Agent Banks, including BofA, BMO and Citibank, participated in structuring the Co-Borrowing Facilities and other credit facilities for Adelphia in a manner that enabled the Rigas Family to strip assets from Adelphia.

1048.   Moreover, in addition to their underwriting services, certain of the Investment Banks participated in structuring the co-borrowing facilities, rendered substantial financial

312

advisory services to Adelphia and, after reviewing Adelphia's confidential and proprietary information, advised Adelphia on financing acquisitions and their business plans. For example, BAS and SSB acted as mergers and acquisitions advisors to Adelphia for various acquisitions of cable systems around the country. In connection with those services, BAS, SSB and other Investment Banks had their Agent Bank affiliates offer bridge loans to finance Adelphia's acquisitions.

1049. By providing their lending, underwriting and financial advisory services as one unit -- without recognizing a distinction between their lending and capital markets groups -- the Agent Banks and their affiliated Investment Banks provided "one-stop shopping" for all of Adelphia's financial needs. As a result, the Investment Banks and the Agent Banks, together, became Adelphia's trusted financial advisors and fiduciaries.

1050. Moreover, the Agent Banks and the Investment Banks made no meaningful distinction between Adelphia, the Rigas Family, and the RFEs. Indeed, they realized that the key to doing business with Adelphia was to satisfy the personal financial desires of the Rigas Family. Internal documents of each of the Agent Banks and the Investment Banks reflect that their relationship with Adelphia was in reality a relationship with the Rigas Family. For example, BofA and BAS and BMO and BMO NB often referred to their business with Adelphia and the Rigas Family as part of a "Rigas Family" connection, and the Citigroup Defendants often referred to Adelphia and the Rigas Family interchangeably.

1051. As a direct result of the Agent Banks' and their affiliated Investment Banks' intimate relationship with the Rigas Family and the sweetheart deals they made -- i.e., the provision of loans under the Co-Borrowing Facilities as part of a package that included

313

exorbitant investment banking fees -- the Co-Borrowing Facilities were not "arms-length" lending transactions.  In addition to working jointly with the Rigas Family to create the fraudulent structure of the Co-Borrowing Facilities, the Agent Banks acquiesced to lending terms (duration, interest rates, etc.) that were not the result of arm's-length negotiations, but were agreed to between the Rigas Family and the Agent Banks as part of a package that included Adelphia acquiring investment advisory services at prices that more than compensated for the banking fees.

1052.  The Agent Banks acceded to these terms because they required the Rigas Family to cause Adelphia to engage in other transactions with their affiliated Investment Banks, which carried the promise of lucrative fees to the Investment Banks and helped to eliminate any credit risk from the loan transactions, which was their primary motivation in their dealings with Adelphia. The "Rigas Family" connection was extremely lucrative for each of the Agent Banks and the Investment Banks.  Upon information and belief, the lead Agent Banks and Investment Banks under the Co-Borrowing Facilities -- BofA, BAS, Wachovia, Wachovia Securities, BMO, BMO NB, Citibank and SSB -- earned hundreds of millions of dollars in investment banking and other fees from Adelphia primarily since the first Co-Borrowing Facility closed.

1053.  This fee income provided the Agent Banks and Investment Banks with a compelling motivation to assist the Rigas Family in their fraudulent activities or to turn a blind eye to them.  Each Agent Bank and its affiliated Investment Bank tied their participation in the Co-Borrowing Facilities to Adelphia's agreement to acquire investment advisory services at exorbitant rates.

1054.  Thus, many of the Agent Banks approved the Co-Borrowing Facilities even though their total credit exposure to Adelphia and the Rigas Family exceeded lending policy limits.  In almost every instance when this occurred, each of the Agent Banks approved a special exception to the exposure limit principally based on the fees to be earned by their affiliated Investment Bank.  For example, Defendant BMO approved its participation in the Olympus Co-Borrowing Facility despite exceeding its house exposure limit for Adelphia and the Rigas Family by more than $200 million.  BMO approved this enormous exposure limit exception based upon, among other things, its frustration at being excluded from a $1.3 billion bridge loan to an Adelphia subsidiary and related securities offerings -- which went to Defendants BofA/BAS, Citibank/SSB and others -- and by its desire to obtain a lead role for BMO NB in underwriting future Adelphia securities offerings.

1055.  Wachovia and Citibank also authorized exposure exceptions in connection with their approval of the Olympus Co-Borrowing Facility and justified those exceptions based upon "future capital markets opportunities."  SSB authorized margin loans for the Rigas Family that were outside house limits with a similar motive.

1056.  The Rigas Family clearly recognized that offering the opportunity to receive investment banking fees would lead the Agent Banks to participate in the Co-Borrowing Facilities.  The Agent Banks advised the Rigas Family that they would not agree to enter into the credit facilities, which were less lucrative to them, unless they were assured that the Rigas Family would cause Adelphia to retain their affiliated Investment Banks for upcoming securities advice and transactions.  In his February 17, 2000 letter to the Agent Banks regarding the CCH Co-Borrowing Facility, James Brown stated that:

> All of the lead managers and co-managers of each of these credit
> facilities are expected to have an opportunity to play <u>a meaningful
> role in either the ADLAC or ABIZ public security offerings.</u>

(emphasis added).  Thus, by agreeing to participate in the CCH Co-Borrowing Facility, among

others, the Agent Banks insured that their affiliated Investment Banks would garner substantial

fees.

**F.**     **<u>Defendants Rewarded The Rigas Family With Extensive Margin Loans.</u>**

1057.  One of the most significant and consistent demands made by the Rigas Family --

and enticements offered by the Agent Banks and Investment Banks to win business -- was the

provision of margin loans to finance the Rigas Family's purchase of Adelphia securities.  The

substantial margin loans provided by Defendants Citigroup, BofA and Deutsche Bank Securities

also provided a strong motive for their participation in the Co-Borrowing Facilities:  they would

always have a second, secured source of repayment if the Rigas Family defaulted on the margin

loans.

1058.  The margin loans -- much like the Rigas Family's use of the Co-Borrowing

Facilities -- were pivotal to enable the Rigas Family to retain management control over Adelphia

during a period of rapid growth through acquisitions.  As Adelphia issued additional stock in

connection with these acquisitions, the Rigas Family needed additional cash to purchase

Adelphia stock to avoid dilution of their equity interest.  If the Rigas Family were not able to

maintain management control over Adelphia, they risked exposure of their looting and breaches

of fiduciary duty.  Citigroup, BofA, Deutsche Bank Securities and other defendants knew that

the Rigas Family used the margin loans and the Co-Borrowing Facilities to ensure their

continued management of Adelphia.

**G.** **The Investment Banks' Fraudulent Solicitation Of Adelphia's Notes.**

1059.   At all relevant times, each of the Investment Banks had affiliates that were Co-Borrowing and Non-Co-Borrowing Lenders.

1060.   Since May 1999, when the UCA/HHC Co-Borrowing Facility closed, the Investment Banks have underwritten the following public offerings of debt securities:

| Debt Security | Issuer | Date | Underwriters |
|---|---|---|---|
| $500 million 9.375% Senior Notes due 11/15/09 | Adelphia | 11/1999 | CSFB Securities, SSB, BNY Capital Markets, Chase Securities, BMO NB, PNC Capital Markets, Scotia Capital, TD Securities |
| $745 million 10.875% Senior Notes due 10/1/10 | Adelphia | 9/2000 | SSB, BAS, Chase Securities, Morgan Stanley Securities, Scotia Capital, TD Securities, ABN AMRO Securities, Barclays Capital, Credit Lyonnais Securities, Fleet Securities, PNC Capital Markets, SG Cowen, SunTrust Securities |
| $1.0 billion 6.0% Convertible Subordinated Notes due 2/15/06 | Adelphia | 1/2001 | SSB, BAS |
| $975 million 3.25% Convertible Subordinated Notes due 5/1/21 | Adelphia | 4/2001 | SSB, BAS, BMO NB, Wachovia Securities, Morgan Stanley Securities, BNY Capital Markets, Credit Lyonnais Securities, Chase Securities, Scotia Capital, SG Cowen |
| $1.0 billion 10.250% Senior Notes due 6/15/11 | Adelphia | 6/2001 | SSB, BAS, BMO NB, CIBC Securities, CSFB Securities, Deutsche Bank Securities, Chase Securities, TD Securities |
| $500 million 10.250% Senior Notes due 11/1/06 | Adelphia | 10/2001 | CSFB Securities, BMO NB, BNY Capital Markets, CIBC Securities, Credit Lyonnais Securities, Fleet Securities, Mizuho International plc, Scotia Capital, SG Cowen, TD Securities, Royal Bank of Scotland |

1061.   None of the prospectuses for the debt securities noted above contained accurate disclosures with respect to the amounts outstanding under the Co-Borrowing Facilities.  Indeed,

the standard practice in these offerings was simply to incorporate by reference Adelphia's most recent SEC filings. The Investment Banks knew or consciously avoided knowledge that these filings grossly understated the amount outstanding under the Co-Borrowing Facilities. Nonetheless, the Investment Banks circulated to prospective investors offering materials that they knew or consciously avoided knowing were false and materially misleading, thereby substantially assisting the Rigas Family in covering up their fraudulent conduct in connection with the Co-Borrowing Facilities and the Rigas Family's looting of the funds under those facilities.

1062.   The Investment Banks focused significantly more effort on generating fee income than ensuring appropriate disclosure of the Co-Borrowing Facilities. At all relevant times, the Investment Banks and their Agent Bank affiliates shared all material information and due diligence regarding Adelphia, the RFEs and the Rigas Family. The Investment Banks and Agent Banks did not properly maintain the "information walls" that would prohibit the sharing of such information. To the contrary, the Investment Banks and Agent Banks needed to and, in fact, did share information to maximize their ability to garner additional fees. Thus, uncovering the fraud was as simple as requesting from Adelphia -- or from their own Agent Bank affiliates -- the amounts outstanding under Adelphia's credit facilities and comparing those amounts with Adelphia's SEC filings. The Investment Banks either obtained this information from their affiliated lenders (which would have provided actual notice of the fraud) or the Investment Banks consciously avoided doing so.

1063.   The debt securities solicited by the Investment Banks were issued on a structurally subordinated basis to the Co-Borrowing Facilities. The structurally subordinated

debt securities ensured that the Co-Borrowing Lenders would have more credit support to ensure repayment of their loans.

## H.    The Fraud Is Disclosed.

1064.    On or about March 27, 2002, members of the Rigas Family announced that they had concealed from the public approximately $2.3 billion of the Co-Borrowing debt. Later, that amount was increased to approximately $3.4 billion. On or about April 1, 2002, ACC failed to file its Annual Reports on Form 10-K with the SEC as required by applicable regulations. The failure timely to file the 10-K triggered an Event of Default under the Co-Borrowing Facilities.

1065.    Notwithstanding the Rigas Family's concealment of $3.4 billion of debt and the default under the Co-Borrowing Facilities, the Co-Borrowing Lenders, and in particular BofA, Citibank and/or Citicorp, and Deutsche Bank -- each being, upon information and belief, acutely aware of the Rigas Family's significant liabilities with respect to their margin accounts at BofA, SSB, and Deutsche Bank Securities -- continued to approve borrowing requests under the Co-Borrowing Facilities. Worse still, the Co-Borrowing Lenders knew that Adelphia would use most, if not all, of the post-disclosure, post-default borrowings to fund margin payments owed by the Rigas Family and the RFEs to the Margin Lenders. Thus, the Co-Borrowing Lenders allowed the Rigas Family to borrow funds under the senior Co-Borrowing Facilities -- on which Adelphia was obligated -- to pay off the junior margin loans -- on which only the Rigas Family was obligated.

1066.    Faced with the harshly critical public reaction to the disclosure of the fraud at Adelphia, BofA, BMO, Wachovia, the Citigroup Defendants and their respective affiliates issued internal status reports. None of the status reports expressed any shock -- let alone surprise --

319

about the situation at Adelphia.  To the contrary, <u>each of these institutions acknowledged that</u> <u>they had always known all the material (and previously undisclosed) facts about the Co-</u> <u>Borrowing Facilities</u>.  Indeed, the Agent Banks viewed the disclosure and the negative public reaction as an opportunity to earn additional fees through restructuring services and bankruptcy financing.

## I.      **The Inevitable Result Of The Fraud:  Adelphia Files Chapter 11.**

1067.   Saddled with the massive debt burden of loans that were intended to benefit only the Rigas Family (and which, in fact, did only benefit the Rigas Family), on June 25, 2002 Adelphia filed petitions pursuant to Chapter 11 of the Bankruptcy Code in this Court.

1068.   During the course of the bankruptcy proceeding, Adelphia continued to make payments on its secured debt in the form of adequate protection, pursuant to an order of the bankruptcy court.  Pursuant to that order, all such payments were subject to disgorgement.  The bankruptcy court directed that all Co-Borrowing Lenders, including any Assignees of any Co-Borrowing Lenders, that received such adequate protection payments were required to acknowledge that they (i) consent to the personal jurisdiction of the District Court for the Southern District of New York in connection with a proceeding to recover or otherwise impose any legal or equitable remedy regarding those payments, (ii) agree to accept service of any complaint in such a proceeding, and (iii) agree to provide notice to any subsequent assignee that the instruments transferred are subject to all claims or defenses of Adelphia to the same extent as Adelphia had against the assignor.

**J.    Indictment Of The Rigas Family.**

1069.   On July 24, 2002, John Rigas, Timothy Rigas, and Michael Rigas, along with
Brown and Mulcahey, were arrested in connection with a criminal complaint filed by the United
States Attorney for the Southern District of New York and were charged with nine counts of
bank, securities and wire fraud.  On September 23, 2002, each of them was indicted.

1070.   The criminal complaint against these members of the Rigas Family alleged,
among other things, that they "looted Adelphia on a massive scale, using the company as the
Rigas Family's personal piggy bank, at the expense of public investors and creditors," and that
the Rigas Family "fraudulently concealed [their] self-dealing from the public."  The criminal
complaint also alleged that the Rigas Family concealed their self-dealing by, among other things,
failing to accurately disclose Adelphia's liabilities under the Co-Borrowing Facilities and using
co-borrowing funds -- for which the Co-Borrowing Debtors remained liable -- to acquire
Adelphia securities to mislead the public into believing that Adelphia was reducing its
consolidated leverage.

1071.   Brown and another former ACC executive, Timothy Werth, pleaded guilty to
charges resulting from their participation in the Rigas Family's fraud.  In July 2004, John and
Timothy Rigas were convicted of fraud following a lengthy jury trial.  Michael Rigas
subsequently pleaded guilty to one count of filing a false instrument in connection with the fraud.
In August 2007, John and Timothy Rigas began serving sentences of 15 and 20 years,
respectively, in federal prison.

**K.**    **Litigation Against The Rigas Family And The Plan of Reorganization.**

1072.   In June 2002 and February 2005, ACC commenced civil proceedings against members of the Rigas Family seeking damages for fraud and breach of fiduciary duty and for the return of certain property, along with other related claims.  Also in June 2002, the Securities and Exchange Commission commenced a civil action against ACC and John, Timothy, Michael, and James Rigas.

1073.   On or about April 2005, the Rigas Family entered into a settlement with Adelphia (the "Adelphia-Rigas Settlement") and a separate settlement agreement with the United States Attorney's Office for the Southern District of New York (the "Government Settlement"), which together resolved, *inter alia*, the civil suits brought by ACC and the United States Government against the Rigas Family.

1074.   Pursuant to the Government Settlement, the Rigas Family and their affiliated RFEs agreed to forfeit all securities and other interests in ACC and its subsidiaries, that any proceeds of any of the Rigas Family's forfeited assets would be placed in a Victims' Fund to be administered by the government, and not to make any claim against the forfeited assets or the Victims' Fund.

1075.   Pursuant to the Adelphia-Rigas Settlement, the Rigas Family agreed that all claims that any of them had against Adelphia would be expunged and that they would not file any future claims against Adelphia.

1076.   Pursuant to the Plan of Reorganization, fifty percent of the first $230 million of any net recovery by the ART will go the Victims' Fund to benefit innocent holders of Adelphia's

322

securities and the other fifty percent together with any further recovery will be distributed pursuant to the Plan of Reorganization to other classes of claimants that are innocent creditors of Adelphia.

1077.   The Rigas Family will not share in any recovery obtained in this case because they no longer have any interests in Adelphia and they have forfeited any and all rights to make any claims against the assets of the estate.

1078.   The Plan of Reorganization provided that if this litigation results in a compromise, settlement, judgment or order that provides for a full or partial waiver, subordination or disallowance of a defendant's claim, then such defendant shall be required to disgorge any or all of the payments it received on its claim.   Any funds disgorged by the defendants in this action shall be paid to the Plaintiff Adelphia Recovery Trust for distribution to creditors pursuant to the Plan of Reorganization.   No such payments can be made to members of the Rigas Family or their affiliates.

## FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

1079.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1080.   The UCA/HHC Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the UCA/HHC Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility (the "UCA/HHC Co-Borrowing Obligations").

323

1081.   To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed liens, security interests, mortgages, and pledges of their respective property to the UCA/HHC Co-Borrowing Lenders (the "UCA/HHC Co-Borrowing Security Interests").

1082.   With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family.  A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1083.   The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1084.   In incurring the UCA/HHC Co-Borrowing Obligations and granting the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

1085.   At the time the UCA/HHC Co-Borrowing Obligations were incurred and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Debtors knew or consciously avoided the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility.  The RFEs contributed

324

a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1086.   In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the UCA/HHC Debtors' leverage was being reduced when, in fact, the UCA/HHC Debtors' debts under the UCA/HHC Co-Borrowing Facility were increasing.

1087.   The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1088.   The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

1089.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $400 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or

within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

1090.   Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully set forth herein.

1091.   The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

1092.   To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors granted the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

1093.   With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1094.   The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1095.   When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1096.   The UCA/HHC Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs.  The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs.  Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.  The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.  The UCA/HHC Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1097.   The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the

327

UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1098.   The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

1099.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $400 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRD CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)**

1100.   Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully set forth herein.

328

1101.   The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

1102.   To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

1103.   At least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1104.   The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1105.   The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1106.   The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs.  Each of The UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder.  At the time the UCA/HHC Co-Borrowing Obligations were incurred

and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Debtors knew or consciously avoided the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility.

1107.    The UCA/HHC Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1108.    In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility from the public and creditors other than the UCA/HHC Co-Borrowing Lenders.  Thus, the UCA/HHC Co-Borrowing Debtors knew that the incurrence of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests would severely inhibit the UCA/HHC Co-Borrowing Debtors' ability to repay other creditors.

1109.    The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, conscious avoidance, and/or consent.

1110.    The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with

330

full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

1111.  At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1112.  By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FOURTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)**

1113.   Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully set forth herein.

1114.   The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

1115.   To secure the repayment of the UCA/HHC Co-Borrowing Facility, the UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests.

1116.   The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1117.   When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1118.   With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs.  Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

1119.   The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1120.   The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.    The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1121.   The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

1122.   At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing

Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1123.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FIFTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)**

1124.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1125.  The CCH Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the CCH Co-Borrowing Lenders in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility (the "CCH Co-Borrowing Obligations").

1126.  To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the CCH Co-Borrowing Lenders (the "CCH Co-Borrowing Security Interests").

1127.  With the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1128.  The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1129.  In incurring the CCH Co-Borrowing Obligations and granting the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1130.  At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact that the CCH Co-Borrowing Debtors would receive no benefit from the

amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1131.   In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the CCH Debtors' leverage was being reduced when, in fact, the CCH Debtors' debts under the CCH Co-Borrowing Facility were increasing.

1132.   The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1133.   The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

1134.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $600 million, should be avoided, recovered, and preserved for the benefit of

336

Plaintiff, as successor in interest to the Debtors' estates; and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SIXTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)**

1135.   Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully set forth herein.

1136.   The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1137.   To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors granted the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing Lenders.

1138.   With each of the CCH Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the CCH Co-Borrowing Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. A substantial portion of this amount was incurred by paid in the year preceding the Petition Date.

337

1139.   The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1140.   When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1141.   The CCH Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs.  The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs.  Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.  The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.  The CCH Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1142.   The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the CCH Co-

338

Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1143.   The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests.  All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

1144.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is not less than $600 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SEVENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)**

1145.   Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully set forth herein.

339

1146.   The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1147.   To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing Lenders.

1148.   At least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1149.   The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1150.   The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

1151.   The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs.  Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility and both would be jointly and severally liable for all borrowings thereunder.  At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact

340

that the CCH Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility.

1152.   The CCH Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1153.   In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility from the public and creditors other than the CCH Co-Borrowing Lenders.  Thus, the CCH Co-Borrowing Debtors knew that the incurrence of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests would severely inhibit the CCH Co-Borrowing Debtors' ability to repay other creditors.

1154.   The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1155.   The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests.  All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

341

1156.   At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1157.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code,  (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## EIGHTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)

1158.   Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully set forth herein.

342

1159.   The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1160.   To secure the repayment of the CCH Co-Borrowing Facility, the CCH Co-Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests.

1161.   The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1162.   When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1163.   With each of the CCH Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs.  Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

1164.  The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1165.  The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1166.  The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests.  All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

1167.  At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1168.  By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations should be

avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## NINTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)

1169.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1170.   The Olympus Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the Olympus Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the Olympus Co-Borrowing Facility (the "Olympus Co-Borrowing Obligations").

1171.   To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the Olympus Co-Borrowing Lenders (the "Olympus Co-Borrowing Security Interests").

1172.   With the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the Olympus Co-

Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1173. The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1174. In incurring the Olympus Co-Borrowing Obligations and granting the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1175. At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1176. In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the Olympus Debtors' leverage was being reduced when, in fact, the Olympus Debtors' debts under the Olympus Co-Borrowing Facility were increasing.

346

1177.   The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1178.   The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

1179.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $500 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

347

## TENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)**

1180.   Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully set forth herein.

1181.   The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

1182.   To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors granted the Olympus Co-Borrowing Security Interests to the Olympus Co-Borrowing Lenders.

1183.   With each of the Olympus Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Olympus Co-Borrowing Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1184.   The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1185.   When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-

348

Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged, or were about to engage in business or a transaction for which any property remaining with the Olympus Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1186.   The Olympus Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs.  The Olympus Co-Borrowing Credit Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs.  Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.  The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.  The Olympus Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1187.   The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1188.   The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-

Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

1189.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $500 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## ELEVENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)

1190.   Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully set forth herein.

1191.   The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

1192.   To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests to the Olympus Co-Borrowing Lenders.

350