1193.   At least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1194.   The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1195.   The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1196.   The Olympus Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs.  Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder.  At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility.

351

1197.   The Olympus Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1198.   In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility from the public and creditors other than the Olympus Co-Borrowing Lenders.  Thus, the Olympus Co-Borrowing Debtors knew that the incurrence of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests would severely inhibit the Olympus Co-Borrowing Debtors' ability to repay other creditors.

1199.   The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1200.   The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

1201.   At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations

352

and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1202.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code,  (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## TWELFTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)

1203.   Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully set forth herein.

1204.   The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

1205.   To secure the repayment of the Olympus Co-Borrowing Facility, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests.

1206.   The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1207.   When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Olympus Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1208.   With each of the Olympus Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  The Olympus Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs.  Each of the Olympus Co-Borrowing Debtors and the RFEs

could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

1209. The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1210. The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1211. The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests. All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

1212. At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

355

1213.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## THIRTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Century-TCI Lenders)

1214.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1215.   The Century-TCI Debtors borrowed from, and incurred the obligation to pay indebtedness to, the Century-TCI Lenders in the approximate amount of $1 billion pursuant to the Century-TCI Facility (the "Century-TCI Obligations").

1216.   To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed security interests and pledges in their respective property to the Century-TCI Lenders (the "Century-TCI Security Interests").

356

1217.  With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $408 million from the Century-TCI Credit Facility was used by the Rigas Family to purchase common stock and convertible notes (the "Century-TCI Securities Transfer") in the year preceding the Petition Date.

1218.  In consummating the Century-TCI Securities Transfer, the Debtors intended to delay, hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or after the date that the Century-TCI Securities Transfer was incurred or the Century-TCI Security Interests for the Century-TCI Securities Transfer were granted.  The Century-TCI Debtors knew that the Century-TCI Securities Transfer would benefit solely the Rigas Family.

1219.  The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash.  The Century-TCI  Lenders had no reasonable basis to believe that the Century-TCI Facility would not be used in furtherance of the fraud.

1220.  The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests in property of the Debtors.

1221.  By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all

Century-TCI Security Interests securing the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FOURTEENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the Century-TCI Lenders)**

1222.   Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1223.   The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1224.   To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors granted the Century-TCI Security Interests.

1225.   With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $490 million from the Century-TCI Credit Facility was used to consummate the Century-TCI Securities Transfer in the year preceding the Petition Date.

1226.   The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling

358

the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1227.    The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1228.    When the Century-TCI Securities Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1229.    The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer. All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer with full knowledge of the facts relating to such transfers.

1230.    By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FIFTEENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders)**

1231.   Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1232.   The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1233.   To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

1234.   With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $408 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.  In addition, the Rigas Family caused Adelphia to draw down at least $100 million from the Century-TCI Facility in July 2000 in order to fund Highland Prestige's purchase of Prestige Communications in the Prestige Acquisition (the "Century-TCI Prestige Transfer").

1235.   In consummating the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, the Century-TCI Debtors intended to delay, hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.  The Century-TCI Debtors knew or recklessly disregarded the fact that the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer would benefit solely the Rigas Family.

1236.   The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash.  The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1237.   The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1238.   The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and of the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer.  All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer with full knowledge of the facts relating to such transfers.

1239.   At all times relevant hereto, there were actual creditors of the Century-TCI Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors, among others, have the right to void the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-

361

TCI Prestige Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1240.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SIXTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders)

1241.   Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1242.   The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1243.   To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

1244.   With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $508 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.

362

1245.   When the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1246.   The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash.  The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1247.   The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1248.   The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer.  All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer with full knowledge of the facts relating to such transfers.

363

1249. At all times relevant hereto, there were actual creditors of the applicable Debtors holding unsecured claims allowable against the Century-TCI Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1250. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SEVENTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)

1251. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1252. From June 14, 1999 to May 1, 2002, Sabres, Inc., a subsidiary of ACC, and/or one or more of the Adelphia entities, made transfers (the "Fleet Payments") to Fleet (individually and/or as agent for other banks). The Fleet Payments were made in order to (i) purchase certain pre-petition loans between Fleet (individually and/or as agent for other banks), on the one hand,

364

and Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition loans that Fleet (individually and/or as agent for other banks) made to Niagara Frontier Hockey, L.P. and/or its affiliates (the "Fleet Niagara Frontier Loans"). The Fleet Payments were made for the benefit of John Rigas and Niagara Frontier Hockey, L.P.. Niagara Frontier Hockey, L.P. became an RFE in July 2000.

1253.   The Fleet Payments were made on the following dates and in the following amounts:

| Date | Amount |
| --- | --- |
| 06/14/99 | $157,505.17 |
| 06/14/99 | $161,913.29 |
| 06/30/99 | $21,303.81 |
| 06/30/99 | $202,258.54 |
| 07/09/99 | $156,679.11 |
| 07/09/99 | $162,739.35 |
| 08/03/99 | $139,021.81 |
| 08/03/99 | $180,396.65 |
| 09/01/99 | $152,269.48 |
| 09/01/99 | $167,148.98 |
| 10/01/99 | $148,602.59 |
| 10/01/99 | $170,815.87 |
| 11/01/99 | $143,095.63 |
| 11/01/99 | $176,322.83 |
| 12/01/99 | $44,015.73 |
| 12/01/99 | $149,398.61 |
| 12/01/99 | $170,019.85 |
| 12/01/99 | $405,965.93 |
| 01/03/00 | $125,103.83 |
| 01/03/00 | $194,314.63 |
| 01/31/00 | $188,569.70 |
| 01/31/00 | $200,325.63 |
| 03/01/00 | $111,827.33 |
| 03/01/00 | $177,068.00 |
| 03/22/00 | $18,583,541.96 |
| 03/31/00 | $160,614.20 |
| 03/31/00 | $178,281.13 |

365

| Date | Amount |
|------|--------|
| 05/01/00 | $150,472.40 |
| 05/01/00 | $188,422.93 |
| 05/31/00 | $156,388.61 |
| 05/31/00 | $182,506.72 |
| 07/03/00 | $147,528.03 |
| 07/03/00 | $191,367.30 |
| 07/31/00 | $146,882.85 |
| 07/31/00 | $180,774.81 |
| 08/31/00 | $149,454.86 |
| 08/31/00 | $178,202.80 |
| 09/29/00 | $161,869.22 |
| 09/29/00 | $165,788.44 |
| 10/30/00 | $151,483.11 |
| 10/30/00 | $176,174.55 |
| 11/29/00 | $158,142.17 |
| 11/29/00 | $169,515.49 |
| 12/29/00 | $159,229.30 |
| 12/29/00 | $168,428.36 |
| 01/26/01 | $156,692.54 |
| 01/26/01 | $171,225.39 |
| 02/26/01 | $152,129.31 |
| 02/26/01 | $175,788.62 |
| 03/28/01 | $141,651.85 |
| 03/28/01 | $186,266.08 |
| 04/27/01 | $197,456.04 |
| 04/27/01 | $130,461.89 |
| 05/25/01 | $108,915.30 |
| 05/25/01 | $219,002.63 |
| 06/25/01 | $111,426.03 |
| 06/25/01 | $216,491.90 |
| 07/26/01 | $104,317.12 |
| 07/26/01 | $183,726.12 |
| 08/28/01 | $109,979.92 |
| 08/28/01 | $178,063.32 |
| 09/28/01 | $98,005.49 |
| 09/28/01 | $190,037.75 |
| 10/30/01 | $80,309.15 |
| 10/30/01 | $207,734.09 |
| 11/30/01 | $217,426.50 |
| 11/30/01 | $70,616.74 |
| 12/31/01 | $64,275.98 |
| 12/31/01 | $223,767.26 |
| 01/31/02 | $205,635.55 |
| 01/31/02 | $60,581.08 |
| 03/01/02 | $54,269.61 |

366

| Date | Amount |
|------|--------|
| 03/01/02 | $211,947.02 |
| 04/01/02 | $58,308.49 |
| 04/01/02 | $207,908.14 |
| 05/01/02 | $56,198.30 |
| 05/01/02 | $210,018.33 |
| **Total** | $30,572,385.13 |

1254.  Adelphia made the Fleet Payments to purchase and pay principal and interest on the Fleet Niagara Frontier Loans.  The cost to purchase the Fleet Niagara Frontier Loans was far greater than and not reasonably equivalent to the value of the Fleet Niagara Frontier Loans to Adelphia.  The cost of paying the principal and interest on the Fleet Niagara Frontier Loans was far greater than and not reasonably equivalent to the value Adelphia received for paying the principal and interest on the Fleet Niagara Frontier Loans.

1255.  Upon information and belief, the purchase of the Fleet Niagara Frontier Loans and the payment of interest and principal on the Fleet Niagara Frontier Loans were made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent.  Alternatively, upon information and belief, the purchase of the Fleet Niagara Frontier Loans and the payment of interest and principal on the Fleet Niagara Frontier Loans rendered Sabres, Inc. and/or other of the Adelphia entities insolvent.

1256.  Sabres, Inc. and/or other Adelphia entities made the Fleet Payments with intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of Fleet, on or after the date that the Fleet Payments were made.  Adelphia received no consideration for the Fleet Payments.  The Fleet Payments were made to Fleet, which was not a good faith transferee and which, in return, did not provide

367

Adelphia with reasonably equivalent value.  The Fleet Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more of the RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1257.   The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1258.   Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1259.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the Fleet Payments.  These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1260.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## EIGHTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)

1261.   Plaintiff reallege paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1262.   Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier

Hockey, L.P. The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres. The Fleet Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans.

1263. The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1264. Sabres, Inc. and/or one of the Adelphia entities, made the Fleet Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1265. Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1266. At all times relevant hereto, there were actual creditors of the applicable Adelphia entities holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

369

1267.  By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## NINETEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against Fleet)

1268.  Plaintiff reallege paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1269.  Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres.  At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

1270.  The Fleet Payments were made to purchase the Fleet Niagara Frontier Loans and to pay principal and interest on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres.  The Fleet Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet  Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans.

1271.  The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

370

1272.   Sabres, Inc. and/or the other Adelphia entities made the Fleet Payments with the intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of Fleet, on or after the date that the Fleet Payments were made.  Adelphia received no consideration for the Fleet Payments.  The Fleet Payments were made to Fleet, which was not a good faith transferee and which, in return, did not provide Adelphia with reasonably equivalent value.  The Fleet Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1273.   Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1274.   By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTIETH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 548 And 550 Against Fleet)**

1275.   Plaintiff realleges paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1276.   Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres.  The Fleet Payments

371

were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans.  At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

1277.   The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1278.   Sabres, Inc. and/or one of the Adelphia entities, made the Fleet Payments when they:  (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1279.   Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1280.   By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

1281.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1282.  From June 28, 1999 to March 22, 2000, Sabres, Inc. and/or one or more of the
Adelphia entities made transfers (the "HSBC Payments") to HSBC (individually and/or as agent
for other banks).  The HSBC Payments were made in order to (i) purchase certain pre-petition
loans between HSBC (individually and/or as agent for other banks), on the one hand, and
Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or
its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition
loans that HSBC (individually and/or as agent for other banks) made to Niagara Frontier
Hockey, L.P. and/or its affiliates (the "HSBC Niagara Frontier Loans").   Adelphia made the
HSBC Payments for the benefit of John Rigas and Niagara Frontier Hockey, L.P.

1283.  Adelphia made the HSBC Payments on the following dates and in the following
amounts:

| Date | Amount |
|---|---|
| 06/28/99 | $306,503.02 |
| 06/28/99 | $32,278.50 |
| 12/01/99 | $615,085.56 |
| 12/01/99 | $66,690.50 |
| 03/22/00 | $769,264.25 |
| 03/22/00 | $10,826,133.67 |
| **Total** | $12,615,955.50 |

1284.  Adelphia made the HSBC Payments to purchase and pay principal and interest on
the HSBC Niagara Frontier Loans.  The cost to purchase the HSBC Niagara Frontier Loans was
far greater than and not reasonably equivalent to the value to Adelphia of the HSBC Niagara
Frontier Loans.  The cost of paying the principal and interest on the HSBC Niagara Frontier
Loans was far greater than and not reasonably equivalent to the value Adelphia received for
paying principal and interest on the HSBC Niagara Frontier Loans.

373

1285.   Upon information and belief, the purchase of the HSBC Niagara Frontier Loans and the payment of interest and principal on the HSBC Niagara Frontier Loans were made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent.  Alternatively, upon information and belief, the purchase of the HSBC Niagara Frontier Loans and the payment of interest and principal on the HSBC Niagara Frontier Loans rendered Sabres, Inc. and/or other of the Adelphia entities insolvent.

1286.   The HSBC Payments were made with intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of HSBC, on or after the date that the HSBC Payments were made.  Adelphia received no consideration for the HSBC Payments.  The HSBC Payments were made to HSBC, which was a non-good faith transferee and which, in return, did not provide Adelphia with reasonably equivalent value.  The HSBC Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1287.   The HSBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1288.   HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

1289.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the HSBC Payments.  These creditors have the right to void the HSBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

374

1290.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

1291.   Plaintiff realleges paragraphs 1 through 1078 and 1283 as if fully set forth herein.

1292.   Sabres, Inc. and/or one or more of the Adelphia entities made the HSBC Payments to purchase the HSBC Niagara Frontier Loans and to make principal and interest payments on the HSBC Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the HSBC Niagara Frontier Loans and the payment of principal and interest on the HSBC Niagara Frontier Loans related to the Buffalo Sabres.  The HSBC Payments were earmarked by Sabres, Inc. and/or Adelphia to pay HSBC for the purchase of the HSBC Niagara Frontier Loans and the payment of principal and interest on the HSBC Niagara Frontier Loans.

1293.   The HSBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1294.   Sabres, Inc. and/or one of the Adelphia entities, made the HSBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

375

1295.   HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

1296.   At all times relevant hereto, there were actual creditors of the applicable Adelphia entities holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code.  These creditors have the right to void the HSBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1297.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-THIRD CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Key Bank)

1298.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1299.   From June 28, 1999 to March 22, 2000, Sabres, Inc. and/or one or more of the Adelphia entities made transfers (the "Key Bank Payments") to Key Bank (individually and/or as agent for other banks).  The Key Bank Payments were made in order to (i) purchase certain pre-petition loans between Key Bank (individually and/or as agent for other banks), on the one hand, and Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition loans made to Niagara Frontier Hockey, L.P. and/or its affiliates (the "Key Bank Niagara

Frontier Loans"). Adelphia made the Key Bank Payments for the benefit of John Rigas and

Niagara Frontier Hockey, L.P..

1300. Adelphia made the Key Bank Payments on the following dates and in the

following amounts:

| Date | Amount |
|---|---|
| 06/28/99 | $104,433.13 |
| 06/28/99 | $176,870.26 |
| 06/28/99 | $93,650.81 |
| 06/28/99 | $10,739.75 |
| 12/01/99 | $91,040.39 |
| 12/01/99 | $171,809.80 |
| 12/01/99 | $205,016.85 |
| 12/01/99 | $22,189.42 |
| 03/22/00 | $3,902,444.49 |
| **Total** | $4,778,194.90 |

1301. Adelphia made the Key Bank Payments to purchase and pay principal and interest

on the Key Bank Niagara Frontier Loans. The cost to purchase the Key Bank Niagara Frontier

Loans was far greater than and not reasonably equivalent to the value to Adelphia of the Key

Bank Niagara Frontier Loans. The cost of paying the principal and interest on the Key Bank

Niagara Frontier Loans was far greater than and not reasonably equivalent to the value Adelphia

received for paying principal and interest on the Key Bank Niagara Frontier Loans.

1302. Upon information and belief, the purchase of the Key Bank Niagara Frontier

Loans and the payment of interest and principal on the Key Bank Niagara Frontier Loans were

made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent.

Alternatively, upon information and belief, the purchase of the Key Bank Niagara Frontier Loans

377

and the payments of interest and principal on the Key Bank Niagara Frontier Loans rendered

Sabres, Inc. and/or other of the Adelphia entities insolvent.

1303. The Key Bank Payments were made with intent to hinder, delay or defraud any

entity to which Adelphia was or became indebted, with the knowing participation, knowledge

and acquiescence of Key Bank, on or after the date that the Key Bank Payments were made.

Adelphia received no consideration for the Key Bank Payments. The Key Bank Payments were

made to Key Bank, which was not a good faith transferee and which, in return, did not provide

Adelphia with reasonably equivalent value. The Key Bank Payments were made by Sabres, Inc.

and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or

more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1304. The Key Bank Payments were transfers of an interest of one or more of the

Adelphia entities in property.

1305. Key Bank was the initial and/or immediate or mediate transferee of the Key Bank

Payments.

1306. At all times relevant hereto, there were actual creditors of the Adelphia entities

that made the Key Bank Payments. These creditors have the right to void the Key Bank

Payments under applicable law, including, but not limited to, the laws of the Commonwealth of

Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1307. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy

Code, the Key Bank Payments should be avoided, recovered, and preserved for the benefit of

Plaintiff, as successor in interest to the Debtors' estates.

378

## TWENTY-FOURTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 against Key Bank)**

1308.   Plaintiff realleges paragraphs 1 through 1078 and 1300 as if fully set forth herein.

1309.   Sabres, Inc. and/or one or more of the Adelphia entities made the Key Bank Payments to purchase the Key Bank Niagara Frontier Loans and to pay principal and interest on the Key Bank Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the Key Bank Niagara Frontier Loans and the payment of principal and interest on the Key Bank Niagara Frontier Loans related to the Buffalo Sabres. The Key Bank Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Key Bank for the purchase of the Key Bank Niagara Frontier Loans and the payment of principal and interest on the Key Bank Niagara Frontier Loans.

1310.   The Key Bank Payments were transfers of an interest of one or more of the Adelphia entities in property.

1311.   Adelphia made the Key Bank Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1312.   Key Bank was the initial and/or immediate or mediate transferee of the Key Bank Payments.

379

1313.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the Key Bank Payments. These creditors have the right to void the Key Bank Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1314.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Key Bank Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTY-FIFTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against BNS)**

1315.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1316.   One or more of the Adelphia entities made the following payments to BNS, individually and/or as agent for certain other banks (the "BNS Payments"):

| Date | Amount |
|------|--------|
| 01/29/99 | $915,711.27 |
| 03/01/99 | $50,000.00 |
| 03/31/99 | $2,059,232.18 |
| 03/31/99 | $5,000,000.00 |
| 04/30/99 | $1,490,402.98 |
| 04/30/99 | $190,000,000.00 |
| 06/30/99 | $119,075.34 |
| 07/02/99 | $185,000,000.00 |
| 09/30/99 | $78,561.64 |
| 09/30/99 | $171,061.63 |
| 10/08/99 | $245,200.00 |
| 10/08/99 | $180,000,000.00 |
| 12/31/99 | $133,150.68 |
| 02/16/00 | $1,609,190.63 |
| 03/03/00 | $50,000.00 |
| 03/31/00 | $5,000,000.00 |

| Date | Amount |
|---|---|
| 03/31/00 | $701,079.17 |
| 05/15/00 | $2,310,609.38 |
| 06/30/00 | $621,959.72 |
| 06/30/00 | $6,250,000.00 |
| 07/17/00 | $1,735,551.56 |
| 09/22/00 | $12,306.25 |
| 10/02/00 | $565,272.92 |
| 10/02/00 | $6,250,000.00 |
| 10/16/00 | $2,553,829.69 |
| 12/15/00 | $1,662,750.00 |
| 12/29/00 | $115,576.39 |
| 12/29/00 | $6,250,000.00 |
| 01/02/01 | $314,157.64 |
| 03/12/01 | $2,391,412.50 |
| 04/20/01 | $50,000.00 |
| 04/02/01 | $293,058.59 |
| 04/02/01 | $6,250,000.00 |
| 05/02/01 | $48,572.92 |
| 06/12/01 | $2,011,760.25 |
| 06/29/01 | $72,389.24 |
| 06/29/01 | $8,750,000.00 |
| 09/12/01 | $1,624,546.45 |
| **Total** | $622,756,419.02 |

1317.  Adelphia made the BNS Payments on account of debts owed by one or more RFEs.  The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1318.  The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1319.  Adelphia made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the BNS Payments were made.  Adelphia received no consideration for the BNS Payments.  Instead, the BNS Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

381

1320.   BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1321.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the BNS Payments.  These creditors have the right to void the BNS Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1322.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTY-SIXTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b) and 550 Against BNS)**

1323.   Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1324.   The BNS Payments were made on account of debts owed by one or more RFEs. The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1325.   The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1326.   Adelphia made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1327.   BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1328.   At all times relevant hereto, there were actual creditors of Adelphia that made the BNS Payments.  These creditors have the right to void the BNS Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1329.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code,  the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-SEVENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS)**

1330.   Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1331.   One or more of the Adelphia entities made the BNS Payments.  At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date.  The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1332.   The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1333.   Adelphia made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the BNS Payments were made.  Adelphia received no consideration for the BNS Payments.  Instead, the

BNS Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

1334.   BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1335.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, at least $10,446,935.69 of the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-EIGHTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS)

1336.   Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1337.   One or more of the Adelphia entities made the BNS Payments.  At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date.  The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1338.   The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1339.   Adelphia made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1340.   BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

384

1341.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy

Code, at least $10,446,935.69 of the BNS Payments should be avoided, recovered, and preserved

for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTY-NINTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)**

1342.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1343.   One or more of the Adelphia entities made the following payments to CIBC,

individually and as agent for certain other banks (the "CIBC Payments"):

| Date | Amount |
|------|--------|
| 01/04/99 | $386,511.67 |
| 01/04/99 | $222,000,000.00 |
| 01/19/99 | $103,000,000.00 |
| 03/15/99 | $207,333.33 |
| 03/15/99 | $100,000,000.00 |
| 03/31/99 | $134,794.52 |
| 03/31/99 | $245,029.11 |
| 04/07/99 | $315,947.92 |
| 04/07/99 | $262,500,000.00 |
| 04/29/99 | $62,029.11 |
| 05/06/99 | $110,609.05 |
| 05/06/99 | $16,181.51 |
| **Total** | $688,978,436.22 |

1344.   The CIBC Payments were on account of a debt of Hilton Head, an RFE.  The

CIBC Payments were earmarked by Adelphia to pay CIBC in respect of such debt.

1345.   The CIBC Payments were transfers of an interest of one or more of the Adelphia

entities in property.

385

1346.   Adelphia made the CIBC Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the CIBC Payments were made.  Adelphia received no consideration for the CIBC Payments.  Instead, the CIBC Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

1347.   CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

1348.   At all times relevant hereto, there were actual creditors of Adelphia that made the CIBC Payments.  These creditors have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1349.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRTIETH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)

1350.   Plaintiff realleges paragraphs 1 through 1078 and 1343 as if fully set forth herein.

1351.   The CIBC Payments were made on account of debts owed by Hilton Head, an RFE.  The CIBC Payments were earmarked by Adelphia to pay CIBC in respect of such debt.

386

1352.   The CIBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1353.   Adelphia made the CIBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1354.   CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

1355.   At all times relevant hereto, there were actual creditors of Adelphia that made the CIBC Payments.  These creditors, among others, have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1356.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRTY-FIRST CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 548 and 550 Against the Margin Lenders)**

1357.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

387

1358.   The Rigas Family and/or the RFEs incurred certain margin loans (the "Margin Loans") to the Margin Lenders.  The Margin Loans were secured by stock and other securities owned by the Rigas Family, including securities issued by Adelphia.

1359.   In the year preceding the Petition Date, Adelphia made the following payments to the Margin Lenders in respect of the Margin Loans in the following amounts (the "Margin Loan Payments"):

| Transferee | Date | Amount |
|---|---|---|
| SSB | 07/12/01 | $1,373,414.95 |
| SSB | 09/26/01 | $6,121,277.47 |
| SSB | 10/03/01 | $1,165,173.09 |
| SSB | 10/03/01 | $6,380,378.00 |
| SSB | 10/09/01 | $1,829,412.00 |
| SSB | 10/11/01 | $1,963,150.00 |
| SSB | 10/15/01 | $610,501.00 |
| SSB | 10/15/01 | $17,000,000.00 |
| SSB | 10/17/01 | $8,522,889.00 |
| SSB | 10/19/01 | $1,162,960.00 |
| SSB | 11/02/01 | $357,891.00 |
| SSB | 11/02/01 | $5,000,000.00 |
| SSB | 11/05/01 | $3,488,580.00 |
| SSB | 11/05/01 | $14,000,000.00 |
| SSB | 11/15/01 | $31,000,000.00 |
| SSB | 11/16/01 | $4,127,767.00 |
| SSB | 2/22/02 | $3,000,000.00 |
| SSB | 03/28/02 | $2,994,394.00 |
| SSB | 4/01/02 | $25,000,000.00 |
| SSB | 04/03/02 | $10,678,982.02 |
| SSB | 04/04/02 | $48,401.00 |
| SSB | 04/05/02 | $5,232,869.00 |
| SSB | 04/08/02 | $5,174,727.00 |
| SSB | 04/09/02 | $3,750,223.00 |
| SSB | 04/10/02 | $2,296,648.00 |
| SSB | 04/12/02 | $145,358.00 |
| SSB | 04/17/02 | $203,500.00 |
| SSB | 04/18/02 | $5,494,214.00 |
| SSB | 04/19/02 | $2,936,520.00 |
| SSB | 04/24/02 | $959,360.00 |
| SSB | 04/26/02 | $1,409,463.00 |

388

| Transferee | Date | Amount |
|---|---|---|
| SSB | 04/29/02 | $755,859.00 |
| SSB | 05/10/02 | $5,000,000.00 |
| | Subtotal | $179,183,911.53 |
| | | |
| BofA | 07/31/01 | $714,277.78 |
| BofA | 10/05/01 | $2,920,211.35 |
| BofA | 10/31/01 | $622,441.93 |
| BofA | 01/28/02 | $410,692.69 |
| BofA | 01/28/02 | $1,764.29 |
| BofA | 02/22/02 | $6,056,078.54 |
| BofA | 04/01/02 | $232,551.14 |
| BofA | 04/01/02 | $3,381.00 |
| BofA | 04/01/02 | $41,023,710.11 |
| | Subtotal | $51,985,108.83 |
| Goldman Sachs | 08/17/01 | $1,700,000.00 |
| Goldman Sachs | 08/23/01 | $2,700,000.00 |
| Goldman Sachs | 08/29/01 | $2,100,000.00 |
| Goldman Sachs | 09/18/01 | $5,000,000.00 |
| Goldman Sachs | 09/20/01 | $500,000.00 |
| Goldman Sachs | 09/21/01 | $5,000,000.00 |
| Goldman Sachs | 09/25/01 | $350,000.00 |
| Goldman Sachs | 09/25/01 | $(350,000.00) |
| Goldman Sachs | 09/25/01 | $3,500,000.00 |
| Goldman Sachs | 09/27/01 | $1,750,000.00 |
| Goldman Sachs | 10/01/01 | $4,500,000.00 |
| Goldman Sachs | 10/03/01 | $2,500,000.00 |
| Goldman Sachs | 11/15/01 | $150,000.00 |
| Goldman Sachs | 11/19/01 | $75,000.00 |
| Goldman Sachs | 02/21/02 | $2,352,592.00 |
| Goldman Sachs | 02/22/02 | $798,926.00 |
| Goldman Sachs | 03/28/02 | $6,359,647.00 |
| Goldman Sachs | 03/29/02 | $3,886,669.00 |
| Goldman Sachs | 04/02/02 | $3,934,629.00 |
| Goldman Sachs | 04/03/02 | $2,786,446.00 |
| Goldman Sachs | 04/04/02 | $1,705,815.00 |
| Goldman Sachs | 04/05/02 | $2,245,631.00 |
| Goldman Sachs | 04/12/02 | $4,296,928.00 |
| Goldman Sachs | 04/15/02 | $2,180,853.00 |
| Goldman Sachs | 04/22/02 | $1,554,668.00 |
| Goldman Sachs | 04/23/02 | $971,667.00 |
| Goldman Sachs | 04/29/02 | $43,185.00 |
| Goldman Sachs | 05/09/02 | $266,522.00 |
| | Subtotal | $62,859,178.00 |

389

| Transferee | Date | Amount |
|------------|------|--------|
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 04/03/02 | $264,793.11 |
| Deutsche Bank | 04/03/02 | $20,391.66 |
| | Subtotal | $50,285,184.77 |
| | **Grand Total** | $344,313,383.13 |

1360.   In making the Margin Loan Payments, Adelphia intended to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that such payments were made.  The Debtors received no consideration for the Margin Loan Payments. To the contrary, the Margin Loan Payments were made for the sole purpose of benefiting the Rigas Family.

1361.   The Margin Lenders knew or consciously avoided the fact that the Rigas Family intended to cause Adelphia to repay the Margin Loans and that Adelphia and its creditors received no consideration from the Margin Loan Payments.

1362.   By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, all Margin Loan Payments made on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### THIRTY-SECOND CLAIM FOR RELIEF

**(Violation of the Bank Holding Company Act Against
the Agent Banks and the Investment Banks)**

1363.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

390

1364.   Each of the Agent Banks is engaged in the business of making commercial loans and is either or both of the following: (a) an insured bank as defined in section 1813(h) of title 12 of the United States Code, or (b) an institution organized under the laws of the United States, a State, the District of Columbia or any territory of the United States which both accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others.

1365.   Each of the Agent Banks is a "bank" within the meaning of sections 1841(c) and 1971 of title 12 of the United States Code.

1366.   Each of the Investment Banks and its affiliated Agent Bank is a subsidiary of the same bank holding company. Each of the Investment Banks acted in concert with its affiliated Agent Bank in connection with its dealings with Adelphia, as described in this complaint.

1367.   The Agent Banks and Investment Banks, acting in concert as a single unit, extended credit and/or furnished services to Adelphia, and/or fixed or varied the consideration for the extension of credit and/or the provision of services, on the condition or requirement that Adelphia also obtain some additional credit, property, and/or service from a subsidiary of the bank holding company of such bank, including the Agent Banks and/or the Investment Banks.

1368.   As a result of the activities of the Agent Banks, Adelphia suffered damage.

1369.   Pursuant to section 1975 of title 12 of the United States Code, the ART, as successor in interest to Adelphia, is entitled to recover an amount that is three times the amount of the damages sustained in an amount to be determined at trial, plus costs and attorneys' fees.

391

## THIRTY-THIRD CLAIM FOR RELIEF

**(Equitable Disallowance of Defendants' Claims or, Alternatively, Equitable
Subordination Under 11 U.S.C. § 510(c) Against all Defendants)**

1370.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1371.   As alleged herein, each of the Co-Borrowing Lenders and each of the Investment

Banks engaged in wrongful conduct directed towards Adelphia and its arm's-length creditors.

1372.   Each of the Co-Borrowing Lenders entered into the Co-Borrowing Facilities and

authorized funding thereunder despite actual knowledge, reckless disregard, or conscious

avoidance, of the fact that the Co-Borrowing Facilities were fraudulently structured to give the

Rigas Family access to billions of dollars (for which the Co-Borrowing Debtors would remain

liable), that the Rigas Family intended to, and did, use those funds for their own benefit, and that

the Rigas Family caused Adelphia to conceal the true extent of its liabilities under the Co-

Borrowing Facilities.  The Co-Borrowing Lenders were similarly aware of the fraudulent uses of

the Non-Co-Borrowing Facilities as alleged herein.

1373.   Prior to the consummation of the Co-Borrowing Facilities, each of the Agent

Banks conducted extensive due diligence on behalf of themselves and the other Co-Borrowing

Lenders.  Similarly, the Agent Banks obtained extensive due diligence about Adelphia from the

Investment Banks that underwrote one or more securities offerings on behalf of Adelphia.  After

each of the Co-Borrowing Facilities closed, the Agent Banks and the other Co-Borrowing

Lenders obtained compliance certificates from Adelphia as required by the Co-Borrowing

Agreements.  Upon information and belief, the Agent Banks were authorized to obtain

compliance certificates and other information on behalf of the other Co-Borrowing Lenders as

well.  Upon information and belief, the Agent Banks were obligated to, and did, transmit to the other Co-Borrowing Lenders compliance certificates and other information about the Co-Borrowing Debtors' borrowings under the Co-Borrowing Facilities and other indebtedness.  To the extent that any of the Co-Borrowing Lenders or the Non-Co-Borrowing Lenders did not know of, or consciously avoided knowledge of, or recklessly disregarded, the massive fraud at Adelphia perpetrated by the Rigas Family, the knowledge and wrongful conduct of the Agent Banks should be imputed to each of the other Co-Borrowing Lenders and the Non-Co-Borrowing Lenders by virtue of the agency relationship among them.

1374.  For their part, the Investment Banks earned hundreds of millions of dollars of fees providing structured finance advice to Adelphia and underwriting and marketing Adelphia's securities.  In the process, each of the Investment Banks induced purchasers of those securities to rely on various offering materials that these Investment Banks knew were materially misleading.

1375.  Indeed, at all times during the marketing of Adelphia's securities, each of the Investment Banks either knew, recklessly disregarded, or consciously avoided knowledge of the fact that the offering materials contained material misrepresentations and omissions regarding the business and financial condition of Adelphia, including, without limitation, the extent of Adelphia's leverage.  Indeed, none of the offering materials made any disclosure of the extensive fraud the Rigas Family was perpetrating at Adelphia, including the failure to disclose the true amounts outstanding under the Co-Borrowing Facilities.  The Investment Banks induced investors to rely on those false and deceptive representations about Adelphia's financial condition in making their decisions to extend credit to Adelphia by purchasing debt securities.

1376.   Moreover, many of the Investment Banks had their purportedly independent analysts issue knowingly or recklessly misleading reports on Adelphia's securities to inflate the market value of the Rigas Family's holdings, the bonds issued by Adelphia and its direct and indirect subsidiaries, and the portion of Adelphia's credit facilities that their affiliated Agent Banks were selling in the secondary loan market.

1377.   Thus, with respect to the wrongful conduct directed at Adelphia and its arm's-length creditors, each Investment Bank and its affiliated Agent Bank acted as a single unit. Indeed, many of the Investment Banks and the Agent Banks held themselves out to Adelphia as unitary organizations offering underwriting and related financial advisory services, along with traditional credit banking services.

1378.   Each of the Co-Borrowing Lenders acted callously and with reckless disregard or conscious avoidance of the consequences of its inequitable conduct.  Each of the Co-Borrowing Lenders intended to syndicate all or a substantial portion of its interest in the Co-Borrowing Facilities to other institutions.  By and through the syndication, each of the Co-Borrowing Lenders attempted to eliminate the significant risk of exposure to the continuing fraud being perpetrated by the Rigas Family.  The Co-Borrowing Lenders and the Investment Banks further, and knowingly, improved their positions by using the equity and debt offerings to bring in additional funds that would be junior to their secured debt obligations and would give a misleading impression of Adelphia's financial health.

1379.   Moreover, the Co-Borrowing Lenders and the Investment Banks assisted the Rigas Family in creating the fraudulent structure of the Co-Borrowing Facilities or ratified this

394

fraudulent structure through their participation in the Co-Borrowing Facilities, and took advantage of the fraudulent structure for their own personal gain.

1380.  At all relevant times, Adelphia had significant obligations to make principal and interest payments to the holders of public debt securities issued by Adelphia and certain of its direct and indirect subsidiaries.  As a holding company, Adelphia relied almost exclusively on the cash flow generated from cable subscribers at its indirect operating subsidiaries to fulfill those payment obligations.

1381.  Upon information and belief, with the assistance of certain of the Co-Borrowing Lenders and the Investment Banks, the Rigas Family caused Adelphia to structure each of Adelphia's credit facilities, including the Co-Borrowing Facilities, so that all borrowings would be made by ACC's indirect operating subsidiaries, not the parent holding company ACC.  In this way, all revenues generated by Adelphia's operations -- revenues that Adelphia's bondholders relied upon for payment of principal and interest -- would first be available to Adelphia's lenders, including Defendants.

1382.  Because the Rigas Family intended to use the Co-Borrowing Debtors' credit to access billions of dollars from the Co-Borrowing Facilities, and knew that the Co-Borrowing Lenders would only give them such access if an ACC-related entity remained liable for amounts used by the Rigas Family, the Rigas Family gave the Co-Borrowing Lenders priority over creditors of ACC's indirect holding company subsidiaries for repayment of the obligations fraudulently incurred by the Rigas Family under the Co-Borrowing Facilities by structuring the Co-Borrowing Facilities so that all borrowings occurred at the operating subsidiary level.

1383.  Each of the Co-Borrowing Lenders and the Investment Banks knew of the fraudulent manner in which the Rigas Family structured the Co-Borrowing Debtors' participation in the Co-Borrowing Facilities.  Indeed, upon information and belief, in light of Adelphia's significant public debt, the Co-Borrowing Lenders would not have approved the Co-Borrowing Facilities absent the purported priority afforded to them by the fraudulent structuring of such facilities.  Each of the Co-Borrowing Lenders approved each of the Co-Borrowing Facilities, and their participation in other Adelphia-related credit facilities, based upon, among other things, the structural priority that the Co-Borrowing Lenders purportedly would have over Adelphia's bondholders for repayment of the loans.

1384.  Defendants' misconduct similarly has damaged all of Adelphia's arm's-length unsecured creditors, who extended credit without knowledge of Defendants' actions and who, unlike Defendants, played no role in damaging Adelphia.  Indeed, without the Defendants' inequitable conduct, Adelphia's arm's-length unsecured creditors would not have acquired ACC's securities or extended credit to Adelphia.

1385.  If the Co-Borrowing Lenders' claims for payment were allowed, those claims would consume a substantial portion of the value of Adelphia's estates, while Adelphia's arm's-length creditors -- who invested pursuant to false and deceptive offering materials -- and other unsecured claims, will receive a substantially smaller distribution.

1386.  The Investment Banks' involvement in structuring the Co-Borrowing Facilities, the deceptive marketing of Adelphia's securities and the Co-Borrowing Lenders' consummation of the Co-Borrowing Facilities at a senior level to the interests of Adelphia's arm's-length

creditors constituted inequitable conduct and reduced those creditors' chances of being repaid in full, or in substantial part, on their claims.

1387.   The Co-Borrowing Lenders received an unfair advantage over Adelphia's arm's-length creditors by virtue of their misconduct.  The Co-Borrowing Lenders agreed to provide the Co-Borrowing Facilities to Adelphia and the RFEs on the condition that the Investment Banks receive lucrative underwriting engagements from Adelphia.  The Co-Borrowing Lenders made loans pursuant to the Co-Borrowing Facilities knowing that Adelphia's arm's-length creditors would be the first to incur losses from any expected deterioration in Adelphia's value.  The Co-Borrowing Lenders' favorable treatment is a result of the inequitable conduct of the Defendants. Therefore, if the Co-Borrowing Lenders' claims are not disallowed or equitably subordinated to those of Adelphia's arm's-length creditors, the Co-Borrowing Lenders will be unjustly enriched and Adelphia's arm's-length creditors will be financially damaged.

1388.   There were substantial assets of Adelphia including, but not limited to, equipment, accounts receivable, human resources, contract rights, avoidance actions and derivative actions that could have been used to satisfy the claims of unsecured creditors if the Co-Borrowing Lenders' claims were equitably disallowed or subordinated.

1389.   Equitable subordination of each of the Co-Borrowing Lender's claims is consistent with the Bankruptcy Code.

1390.   By reason of the foregoing, (a) Plaintiff is entitled to judgment equitably disallowing the Investment Banks' and the Co-Borrowing Lenders' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, Plaintiff is entitled to judgment (i) subordinating the Investment Banks' and the Co-Borrowing Lenders' claims to the

prior payment in full of the claims of unsecured creditors of Adelphia, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of Adelphia.

## THIRTY-FOURTH CLAIM FOR RELIEF

### (Recharacterization of Debt as Equity Against the Co-Borrowing Lenders)

**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1391.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1392.   At least $2 billion of the proceeds of the Co-Borrowing Facilities were used by the Rigas Family to finance the purchases of ACC's common and preferred stock and to maintain voting control over Adelphia (the "Co-Borrowing Stock Purchases"). Most, if not all, of the Co-Borrowing Stock Purchases were disclosed to the public as equity contributions by the Rigas Family. In economic reality, the Co-Borrowing Stock Purchases were sham transactions because the Rigas Family used the Co-Borrowing Facilities to finance the purchases rather than contributing new capital to the enterprise.

1393.   At the time of the Co-Borrowing Stock Purchases, the Co-Borrowing Lenders knew or recklessly disregarded the fact that Adelphia was undercapitalized. Adelphia lacked sufficient capital to conduct their businesses and operations in the ordinary course of business.

1394.   The Co-Borrowing Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Co-Borrowing Facilities for the Co-Borrowing Stock Purchases with the ultimate purpose of maintaining voting control. In connection with these

398

purchases, the Rigas Family would fraudulently record an increase in shareholders' equity on ACC's financial statements and a decrease in the amount of Adelphia's indebtedness under the Co-Borrowing Facilities. The indebtedness from such uses of the Co-Borrowing Facilities would be shifted to an RFE, notwithstanding the fact that Adelphia remained liable for all draw downs under the Co-Borrowing Facilities. The Co-Borrowing Lenders knew of or recklessly disregarded this course of conduct.

1395.   Because of their consent to the Co-Borrowing Stock Purchases and the misrepresentations to third parties about the economic reality of these transactions, the Co-Borrowing Lenders should be estopped from claiming that the Co-Borrowing Stock Purchases by the Rigas Family were anything other than what the Rigas Family and Adelphia characterized them to be: equity contributions to ACC.

1396.   By virtue of the foregoing, the Court should recharacterize that portion of the Co-Borrowing Facilities used for the purchase of stock as an equity contribution to ACC, which portion Plaintiff believes is at least $2 billion.

### THIRTY-FIFTH CLAIM FOR RELIEF

**(Recharacterization of Debt as Equity Against the Century-TCI Lenders)**
**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1397.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1398.   In October and November 2001, at least $400 million of the proceeds of the Century-TCI Facility were used by the Rigas Family to finance the close of the Rigas Family's

399

purchases of Adelphia's common stock and convertible bonds to maintain voting control over the Debtors (the "Century-TCI Purchases"). Adelphia and the Rigas Family mischaracterized the Century-TCI Purchases in their public disclosures as equity contributions by the Rigas Family. In economic reality, the Century-TCI Purchases were sham transactions because the Rigas Family used the Century-TCI Facility to finance the purchases rather than contributing new capital to the enterprise.

1399.   At the time of the closing of the Century-TCI Purchases, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors were undercapitalized. At that time, the Debtors lacked sufficient capital to conduct their businesses and operations in the ordinary course of business.

1400.   In connection with the Century-TCI Purchases, in January 2001 the Rigas Family recorded an increase in shareholders' equity on the Debtors' financial statements and a corresponding receivable of equal amount owing to the Debtors from the RFE purchaser of the securities. The Rigas Family at that time intended to close this transaction (i.e., pay the receivable when it came due in October 2001) with co-borrowed funds.

1401.   In October 2001, however, the Co-Borrowing Facilities had reached their limits, and no liquidity was available to close the transaction. Consequently, the Rigas Family caused the Debtors instead to draw on the liquidity available under the Century-TCI Facility to extinguish the receivable and close the Century-TCI Purchases. Citibank and the other Century-TCI Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Century-TCI Facility for the Century-TCI Purchases.