KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 680-8400
Facsimile:      (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin Brady (*pro hac vice motion pending*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELPHIA RECOVERY TRUST, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF AMERICA, N.A., *et al.*, <br><br> Defendants. | No. 05-CV-9050 (LMM) |

## THE CCH NON-AGENT LENDERS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS COUNTS 5, 6, 7, 8, 33, 41, AND 50
## OF PLAINTIFFS'[1] AMENDED COMPLAINT

### (Non-Agent Lenders' Motion to Dismiss No. 1 of 6)

---

[1]    The Adelphia Recovery Trust (the "ART") represents the separate and unique interests of more than 250 individual Adelphia entities in this litigation.  Because these entities' interests in this lawsuit are, indeed, separate — and not consolidated — the CCH Non-Agent Lenders refer to the ART as "Plaintiffs" rather than "Plaintiff" throughout this Motion.

TABLE OF CONTENTS

Page(s)

INTRODUCTION ...................................................................................................1

I.    BACKGROUND FACTS......................................................................5

    A.    The CCH Credit Facility And Indemnity Provisions.....................5

    B.    The CCH Debtors' Confirmed Plan Of Reorganization And Indemnity Provisions ...................................................................7

    C.    The Amended Complaint And Absence of Any Alleged Wrongdoing By The CCH Non-Agent Lenders .........................10

        1.    Plaintiffs' conflicting and confusing "definitions" help demonstrate the absence of factual allegations of "bad acts" against the CCH Non-Agent Lenders. ...........................11

        2.    Plaintiffs' allegations regarding the CCH Credit Facility also reveal that the CCH Non-Agent Lenders played no role in the wrongdoing at Adelphia. ...............................12

    D.    Allegations Regarding The Rigases' Use Of The Cash Management System Also Do Not Involve The CCH Non-Agent Lenders...................................................................................18

II.    LEGAL STANDARDS FOR ASSESSING THE CCH NON-AGENT LENDERS' MOTION TO DISMISS ...................................................19

III.    PURSUANT TO THE PLAN AND CONFIRMATION ORDER, THIS COURT MUST DISMISS ALL COUNTS AGAINST THE CCH NON-AGENT LENDERS BECAUSE ALL CLAIMS WOULD BE INDEMNIFIED UNDER THE CCH CREDIT AGREEMENT. .........................20

    A.    In Both The CCH Credit Agreement And Again In The Confirmed Plan, Plaintiffs Agreed To Indemnify The CCH Non-Agent Lenders For The Claims Asserted In The Amended Complaint...............22

    B.    Because None Of Plaintiffs' Theories Of The Rigases' Fraud Requires Or Alleges That The Non-Agent Lenders Acted With Gross Negligence Or Willful Misconduct, There Is No Exception To Plaintiffs' Indemnity Obligations To The Non-Agent Lenders. ..........23

        1.    Plaintiffs make no factual allegations that the CCH Non-Agent Lenders assisted in the creation of the CMS or knew that the Rigases misappropriated money through the CMS..........23

        2.    Plaintiffs make no factual allegations that the CCH Non-Agent Lenders created the CCH Credit Facility, or knew of the alleged deception of the Independent Directors.....................24

C.      None Of The Individual Claims Against The CCH Non-Agent
        Lenders Contains Allegations Of Gross Negligence Or Willful
        Misconduct That Could Excuse Plaintiffs' Indemnity Obligations...........25

D.      Plaintiffs' Anticipated Reliance On The *Enron* "Tainted Claim"
        Theory Does Not Relieve The CCH Debtors Of Their Indemnity
        Obligations.................................................................................28

IV.     THE BANKRUPTCY CLAIMS AGAINST THE CCH NON-AGENT
        LENDERS MUST BE DISMISSED BECAUSE THE CCH DEBTORS
        DO NOT HAVE STANDING TO BRING THEM.............................................30

A.      The CCH Debtors Do Not Have Standing To Pursue The
        Bankruptcy Claims...................................................................30

        1.      Plaintiffs do not have standing to prosecute their
                bankruptcy claims because none of the CCH Debtors'
                creditors suffered a "personal injury."...........................................32

                a.      None of the CCH Debtors' creditors were injured
                        on account of the allegations Plaintiffs make in their
                        Amended Complaint.......................................................32

                b.      Plaintiffs cannot manufacture creditors to establish
                        standing.............................................................................35

        2.      Plaintiffs do not have standing to prosecute the CCH
                Debtors' bankruptcy claims because the requested relief
                cannot redress the CCH Debtors' creditors' injuries....................37

                a.      Where creditors of the CCH Debtors have no
                        interest in the recovery from this lawsuit, Plaintiffs
                        cannot pursue bankruptcy claims on their behalf.............37

                b.      The fact that the CCH Debtors themselves could
                        benefit from avoidance of their obligations under
                        the CCH Credit Facility does not invest Plaintiffs
                        with standing..................................................................37

                        i.      Plaintiffs cannot avoid the CCH Debtors'
                                contractual obligations so as to redress
                                injuries that the CCH Debtors — as opposed
                                to their creditors — suffered..................................37

                        ii.     In fact, if there are no creditors to benefit
                                from avoidance of a contractual obligation,
                                the Court must enforce the contract or
                                transfer at issue. ....................................................39

                c.      The fact that affiliated debtor entities — and their
                        creditors — could benefit from avoidance of the
                        CCH Debtors' obligations under the CCH Credit
                        Facility does not invest Plaintiffs with standing...............39

          d.     The operation of section 502(h) of the Bankruptcy Code reaffirms that the Plaintiffs do not have standing to bring their avoidance claims because the requested relief will not redress the CCH Debtors' creditors injuries.................................................................41

          e.     Even if Plaintiffs succeed on their equitable subordination claims, their success will not redress any creditor injury.............................................................42

   B.     The Bankruptcy Code Does Not Provide An Exception To The Standing Requirements ..................................................................43

V.     THE COURT SHOULD DISMISS PLAINTIFFS' EQUITABLE SUBORDINATION AND EQUITABLE DISALLOWANCE CLAIMS BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED ..............................................................48

   A.     Plaintiffs Equitable Subordination Claims Against The Non-Agent Lenders Must Be Dismissed. ....................................................48

          1.     The Amended Complaint fails to allege plausible liability for equitable subordination because Plaintiffs' allegations make clear that the necessary vehicle for the alleged fraud was the Rigas and Adelphia established CMS, not the co-borrowing facilities. ....................................................50

          2.     The Amended Complaint fails to allege plausible liability for the equitable subordination of the CCH Non-Agent Lenders' claims because Plaintiffs make no factual allegations of gross and egregious conduct on the part of the CCH Non Agent Lenders.........................................51

   B.     Plaintiffs' Equitable Disallowance Claims Against The Non-Agent Lenders Must Also Be Dismissed.............................................54

CONCLUSION......................................................................................56

TABLE OF AUTHORITIES

Page(s)

**Cases**

*718 Arch Street Assocs. v. Blatstein* (*In re Blastein*),
   260 B.R. 698 (E.D. Pa. 2001) ...................................................................... 32

*80 Nassau Assoc. v. Crossland Fed. Sav. Bank*,
   169 B.R. 832 (Bankr. S.D.N.Y. 1994) ......................................................... 48

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*),
   365 B.R. 24 (Bankr. S.D.N.Y. 2007) ...................................................... 5, 48

*Allen v. Wright*,
   468 U.S. 737 (1984) ....................................................................................... 30

*Am. Nat'l Bank of Austin v. Mortgage Am. Corp* (*In re Mortgage Am. Corp.*),
   714 F.2d 1266 (5th Cir. 1983) ...................................................................... 33

*Associated Gen'l Contractors of Cal. Inc. v. Carpenters*,
   459 U.S. 519 (1983) ....................................................................................... 19

*Balaber-Strauss v. Town of Harrison* (*In re Murphy*),
   331 B.R. 107 (Bankr. S.D.N.Y. 2005) ....................................... 32, 33, 38, 39

*Bartang Bank and Trust Co. v. Caiola*,
   No. 04 Civ. 2402, 2006 WL 2708453 (S.D.N.Y. Sept. 18, 2006) ................ 20

*Bear, Stearns Sec. Corp. v. Gredd*,
   275 B.R. 190 (S.D.N.Y. 2002) ..................................................... 32, 33, 34, 38

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ............................................................................ 19, 49

*Bennett v. Spear*,
   520 U.S. 154 (1997) ....................................................................................... 47

*Bondi v. Bank of Am. Corp.* (*In re Parmalat*),
   383 F. Supp. 2d 587 (S.D.N.Y. 2005) .......................................................... 33

*Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd.*,
   182 B.R. 493 (Bankr. S.D. Tex. 1994) ........................................................... 7

*City Nat. Bank & Trust Co. v. Oliver*,
   230 F.2d 686 (10th Cir. 1956) ...................................................................... 46

*Coated Sales, Inc. v. First E. Bank, N.A.* (*In re Coated Sales, Inc.*),
   119 B.R. 452, (Bankr. S.D.N.Y. 1990) ......................................................... 27

*Cohen v. KB Mezzanine Fund II., LP*,
   291 B.R. 314 (D. Del. 2003) ......................................................................... 49

*Coleman v. Comm. Trust Bank (In re Coleman),*
    426 F.3d 719 (4th Cir. 2005) .................................................................................. passim

*Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*,
    243 B.R. 620 (S.D.N.Y. 2000) ........................................................................................ 7

*Consol. Pet Foods, Inc. v. Millard Refrigerated Servs., Inc. (In re S&D Foods, Inc.),*
    110 B.R. 36 (Bankr. D. Colo. 1990) ........................................................................ 40, 43

*Corporate Food Mgt., Inc. v. Suffolk Cmty. College,*
    223 B.R. 635 (Bankr. E.D.N.Y. 1998) ........................................................................... 7

*Cortec Indus., Inc. v. Sum Holding, L.P.*,
    949 F.2d 42 (2d Cir. 1991) .............................................................................................. 5

*DaimlerChrysler Corp. v. Cuno,*
    126 S. Ct. 1854 (2006) .................................................................................... 30, 31, 32

*Daventree Ltd. v. Republic of Azerbaijan,*
    349 F. Supp. 2d 736 (S.D.N.Y. 2004) .......................................................................... 53

*DeJesus v. Sears, Roebuck & Co., Inc.,*
    87 F.3d 65 (2d Cir. 1996) ....................................................................................... 19, 53

*Dewsnup v. Timm,*
    502 U.S. 410 (1992) ..................................................................................................... 46

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ..................................................................................................... 19

*Eaves v. Snyder,*
    84 A.2d 195, 197 (Pa. 1951) ................................................................................... 38, 40

*Enron Corp. v. Ave. Special Situations Fund II, L.P.,*
    333 B.R. 205 (Bankr. S.D.N.Y. 2005) ..................................................................... 28, 29

*Esoimeme v. United Airlines, Inc.*,
    369 B.R. 531 (N.D. Cal. 2007) ....................................................................................... 7

*F.D.I.C. v. Colonial Realty Co.,*
    966 F.2d 57 (2d Cir. 1992) .............................................................................................. 8

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.),*
    375 F.3d 51, 62 (1st Cir. 2004) .................................................................................... 42

*Fragoso v. Romano,*
    702 N.Y.S.2d 333 (App. Div. 2000) ............................................................................. 26

*Global Entm't Inc. v. N.Y. Tel. Co.,*
    No. 00 Civ. 2959, 2000 WL 1672327 (S.D.N.Y. Nov. 6, 2000) ..................................... 53

*Hartford Ins. Co. v. Holmes Prot. Group,*
    673 N.Y.S.2d 132 (App. Div. 1998) ............................................................................. 22

*Hawkins Home Groups, Inc. v. S. Energy Homes, Inc.*,
    714 N.Y.S.2d 539 (App. Div. 2000) ................................................................ 20, 28

*Holt v. Fed. Deposit Ins. Corp.*,
    868 F.2d 146 (5th Cir.1989) ........................................................................... 49

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
    No. 03 MD 1529, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ...................... 19

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................... 31

*In re Asia Global Crossing, Ltd.*,
    344 B.R. 247 (Bankr. S.D.N.Y. 2006) ........................................................... 38

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
    238 B.R. 25 (Bankr. S.D.N.Y. 1999) ........................................................ 38, 40

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994) ............................................................. 38

*In re Crowthers McCall Pattern, Inc.*,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ........................................................... 33

*In re Forte*,
    234 B.R. 607 (Bankr. E.D.N.Y. 1999) ............................................................ 7

*In re Glanz*,
    205 B.R. 750 (Bankr. D. Md. 1997) .............................................................. 43

*In re Gurley*,
    311 B.R. 910 (Bankr. M.D. Fla. 2001) .......................................................... 41

*In re J.C. Winship Co.*,
    120 F. 93 (7th Cir. 1903) .............................................................................. 45

*In re Martin Custom Made Tires Corp.*,
    108 F.2d 172 (2d Cir. 1939) .......................................................................... 45

*In re Oceana Int'l, Inc.*,
    376 F. Supp. 956 (D.C.N.Y. 1974) ............................................................... 36

*In re Parkwood, Inc.*,
    461 F.2d 158 (D.C. Cir. 1971) ...................................................................... 46

*Le Cafe Creme, Ltd. v. Le Roux*,
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ........................................................... 48

*Matter of Schwab*,
    613 F.2d 1279 (5th Cir. 1980) ...................................................................... 46

*Maung Ng We v. Merrill Lynch & Co., Inc.*,
    No. 99 Civ. 9687, 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000) ..................... 53

*Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*,
    600 N.Y.S.2d 212  (App. Div. 1993) .................................................................. 22

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) ........................................................................... 19

*Moore v. Bay*,
    284 U.S. 4 (1931) ........................................................................................... 45

*Nazarenus v. J.F. Daley Int'l, Ltd.*,
    714 F. Supp. 361 (N.D. Ill. 1989) .................................................................. 15

*Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*,
    277 B.R. 20 (S.D.N.Y. 2002) ................................................................... 34, 37

*Official Comm. of Unsec. Creditors of Enron Corp. v. Martin (In re Enron Creditors*
    *Recovery Corp.)*,
    376 B.R. 442 (Bankr. S.D.N.Y. 2007) ........................................................... 41

*Official Comm. of Unsec. Creds. of Lois/USA, Inc., v. Conseco Fin. Serv. Crop.*,
    264 B.R. 69 (Bankr. S.D.N.Y. 2001) ............................................................. 48

*Official Comm. of Unsec. Creds. of Radnor Holdings Corp. v. Tennenbaum Capital*
    *Partners, LLC*,
    353 B.R. 820 (Bankr. D. Del. 2006) .............................................................. 49

*Official Comm. of Unsec. Creds. of Sunbeam Corp. v. Morgan Stanley & Co.  (In re*
    *Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) ..................................................... 48, 49

*Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P.* (*In*
    *re AppliedTheory Corp*),
    345 B.R. 56 (S.D.N.Y. 2006), *aff'd,* 493 F.3d 82 (2d Cir. 2007) .................... 33

*Olin Corp. v. Consol. Aluminum Corp.*,
    5 F.3d 10 (2d Cir. 1993) ................................................................................. 20

*Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*,
    86 N.Y.2d 685 (1995) ..................................................................................... 20

*Peak v. United States*,
    353 U.S. 43 (1957) ......................................................................................... 15

*People v. Williams*,
    668 N.Y.S.2d 305 (Sup. Ct. 1997) ................................................................. 21

*Pepper v. Litton*,
    308 U.S. 295 (1939) ........................................................................... 33, 54, 55

*Raines v. Byrd*,
    521 U.S. 811 (1997) ....................................................................................... 30

*Raleigh v. Illinois Dept. of Revenue*,
    530 U.S. 15 (2000) ......................................................................................... 33

*Rent Stabilization Ass'n of N.Y. v. Dinkins,*
    5 F.3d 591 (2d Cir. 1993) ............................................................................... 19

*Rodriguez v. Citibank F.S.B.* (*In re Nowicki*),
    202 B.R. 729 (Bankr. N.D. Ill. 1996) .......................................................... 33

*Rosenberg v. XO Commc'ns, Inc.,*
    330 B.R. 394 (Bankr. S.D.N.Y. 2005) ............................................................ 7

*Sharrer v. Sandles,*
    477 N.Y.S.2d 897 (App. Div. 1984) ............................................................. 39

*Siler v. N. Trust Co.,*
    80 F. Supp. 2d 906 (N.D. Ill. 2000) ............................................................. 20

*Simon v. E. Ky. Welfare Rights Org.,*
    426 U.S. 26 (1976) ........................................................................................ 30

*Southgate Owners Corp. v. Pub. Serv. Mut. Ins. Co.,*
    660 N.Y.S.2d 129 (App. Div. 1997) ............................................................. 20

*Springfield Assocs., L.L.C. v. Enron Corp.,*
    Nos. 06 Civ. 7828, 07 Civ. 1957, 2007 WL 2446498 (S.D.N.Y. Aug. 27, 2007) 28, 29, 30

*State v. Barclays Bank of New York, N.A.,*
    563 N.E.2d 11 (N.Y. 1990) ........................................................................... 20

*Stewart v. Kearney,*
    6 Watts 453 (Pa. 1837) ................................................................................. 38

*Thompson v. County of Franklin,*
    15 F.3d 245 (2d Cir. 1994) ...................................................................... 19, 20

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.,*
    860 F.2d 515 (2d Cir. 1988) ......................................................................... 35

*United Capital Corp. v. Sapolin Paints, Inc.,*
    11 B.R. 930 (Bankr. E.D.N.Y. 1981) ........................................................... 40

*Vintero Corp. v. Corporacion Venezolana de Fomento,*
    735 F.2d 740 (2d Cir. 1984) .............................................................. 34, 39, 45

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................................... 40

*Waslow v. MNC Commercial Corp.*
    161 B.R. 107 (E.D.Pa.1993) ......................................................................... 49

*Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y. City,*
    179 F.2d 582  (2d Cir. 1950)............................................................. 34, 37, 45

## Statutes

11 U.S.C. § 101(31) ............................................................................................. 55

11 U.S.C. § 502(d) ........................................................................... 29

11 U.S.C. § 502(h) ........................................................................... 41

11 U.S.C. § 510(c) ..................................................................... 26, 40

11 U.S.C. § 544(b)(1) ...................................................................... 44

11 U.S.C. § 547(b) ........................................................................... 26

11 U.S.C. § 547(b)(5) ...................................................................... 34

11 U.S.C. § 548(a)(1)(A). ............................................................... 26

11 U.S.C. § 548(a)(1)(B) ................................................................. 26

11 U.S.C. § 550(a) ........................................................................... 44

28 U.S.C. 2201 ................................................................................. 26

**Rules**

5 Lawrence King, *Collier on Bankruptcy* ¶ 544.09 (15th ed. rev. 1999) ...................................... 34

Dan Schechter, *Debtor May Completely Avoid Lien As Fraudulent Transfer Based on
    Debtor's Own Fraudulent Intent, and Bankruptcy Court Cannot Limit Scope of
    Debtor's Recovery*, 2005 Comm. Fin. News. 84, 84 (2005) ............................................. 47

Ralph Brubaker, *Lien Avoidance "for the Benefit of the Estate": Textualism, Equitable
    Powers, and Code Common Law*,
    26 No. 1 Bankruptcy Law Letter (2006)......................................................................... 46

William L. Prosser, *Torts* § 34 (4th ed. 1971) ........................................................................... 22

## INTRODUCTION

This Court should dismiss all claims against the CCH Non-Agent Lenders,[2] who had no role in negotiating or establishing the CCH Credit Facility or in the alleged misconduct that is central to the Amended Complaint, for at least two reasons.  ***First***, the indemnification provisions incorporated into the now final Adelphia Plan of Reorganization require dismissal unless the individual CCH Non-Agent Lenders acted with gross negligence or willful misconduct.  Plaintiffs, however, never allege that the CCH Non-Agent Lenders engaged in such "bad" acts, so there is no exception to the indemnity obligations that require dismissal of all claims.  ***Second***, Plaintiffs do not have standing to bring the "bankruptcy claims" (such as fraudulent transfer, preference, equitable subordination, and equitable disallowance) because such claims require the existence of unpaid creditors who would benefit from a recovery in this lawsuit, and each individual Adelphia corporate debtor that might have otherwise asserted such bankruptcy claims against the CCH Non-Agent Lenders has paid all of its creditors in full.

***Dismissal Based on Indemnity***:  The Plan's indemnification provisions — which expressly adopt as new the lender-indemnity provisions contained in the CCH Credit Agreement — bar Plaintiffs from pursuing their claims against the CCH Non-Agent Lenders.  Specifically, the Plan requires this Court to dismiss against a CCH Non-Agent Lender any and all claims that would have been indemnifiable under the CCH Credit Agreement.  The CCH Credit Agreement, in turn, requires the CCH Debtors to indemnify their lenders against all claims involving the CCH Credit Facility, provided that those claims do not arise from the lenders' individual gross negligence or willful misconduct.  While the Amended Complaint contains allegations of

---

[2]   For purposes of this brief, the Non-Agent Lenders or CCH Non-Agent Lenders movants are those defendants represented by Kirkland & Ellis LLP and sued in their capacity as "Syndicate Banks" or "Assignees" in relation to the CCH Credit Facility.  To the extent that any Kirkland & Ellis LLP represented defendant is alleged to be a "John Doe" lender in the CCH Credit Facility, that defendant is also a moving party here.  A list of Kirkland & Ellis LLP represented defendants in all credit facilities appears as Exhibit 22 to the Request for Judicial Notice and Joint Appendix of Exhibits, filed concurrently.  Kirkland & Ellis LLP represents approximately 400 Non-Agent Lenders across all six credit facilities, who received payments of approximately $4.1 billion in relation to the Adelphia debt paper.

wrongdoing as to the Agent Banks and Investment Banks, it contains no such allegations against the CCH Non-Agent Lenders.  Absent factual allegations that the CCH Non-Agent Lenders engaged in specific acts of  gross negligence or willful misconduct, the Plan's indemnity obligation must be enforced.  Accordingly, the Plan requires this Court to dismiss the Amended Complaint as to the CCH Non-Agent Lenders.

With no specific factual allegations against the CCH Non-Agent Lenders, Plaintiffs instead try to tie the CCH Non-Agent Lenders to the alleged "bad acts" or fraudulent conduct of other defendants by employing a "slide" tactic.  For example, Plaintiffs first allege some specific fact against the Agent and/or Investment Banks having to do with the Rigas Family's activities in defrauding Adelphia, or a supposition of knowledge of the same.  Then, through the misleading use of overbroad and inexact definitions, other lenders ("Syndicate" Lenders or "Assignee" Lenders) are swept into a definition of a larger group such as "CCH Lenders" or "Co-Borrowing Lenders" or just "Lenders."   Finally, Plaintiffs make a summary allegation, with no new supporting or specific facts, that "slides" the bad acts specifically alleged against the Agent Banks and/or Investment Banks onto "all Banks" or "all Lenders."   In reality, there is not a single factual allegation that the CCH Non-Agent Lenders knew or could have known anything not also known to Adelphia and its independent directors, nor is there a single factual allegation that the CCH Non-Agent Lenders were involved in or participated in the alleged fraud.  In short, because Plaintiffs do not allege gross negligence or willful misconduct on the part of any of the CCH Non-Agent Lenders, the Plan's indemnity provisions mandate dismissal of all claims against the CCH Non-Agent Lenders.

***Dismissal Based on Lack of Standing***:  To establish standing, Plaintiffs must be able to show that the CCH Non-Agent Lenders (either by wrongful acts or receipt of preferential or fraudulent transfers) injured at least one bona-fide creditor of a CCH Debtor, and that this lawsuit can redress that injury.  Plaintiffs cannot do that.  First, no bona-fide creditor of a CCH Debtor was injured on account of the allegations in the Amended Complaint.  Rather, the CCH Debtors have paid (or have reserved amounts sufficient to pay) all of their bona-fide creditors in

full.  Second, even if the CCH Debtors had not paid their creditors in full, this lawsuit would do nothing to redress any injury their creditors may have suffered as a result.  The Plan provides that only holders of so-called "CVV Interests," interests that the Plan distributed to certain creditor groups, have a right to share in any recovery Plaintiffs receive from this action.  The CCH Debtors and their creditors do not hold any "CVV Interests."  Thus, even if Plaintiffs prevailed on the substance of the alleged bankruptcy claims, the creditors of the CCH Debtors — the real parties in interest whose injuries must be redressed — will receive nothing.  Accordingly, Plaintiffs do not have standing to assert the bankruptcy claims, and those claims must therefore be dismissed.

In an attempt to avoid this fatal standing defect, the Amended Complaint is drafted to create an illusion in which the legally separate and distinct Adelphia operating subsidiaries that issued the CCH Credit Facility's secured debt are miraculously transformed and combined with all of the other separate and distinct Adelphia Debtor entities into one giant, rolled up agglomerated entity called "Adelphia."  While such an agglomeration is possible under certain rare circumstances through a legal process called "substantive consolidation" — where the assets and debts of multiple entities in related bankruptcies may be pooled and distributed — none of the more than 250 separate Adelphia-related entities sought substantive consolidation in the bankruptcy case.  Indeed, the Plan — which is the final word in the Adelphia bankruptcy cases — specifically provides that each Adelphia entity will remain a separate legal entity.  With that Plan now substantially consummated, it is too late for Plaintiffs or any individual Adelphia entity to seek substantive consolidation.

Notwithstanding this, the Amended Complaint tries to create the illusion of substantive consolidation with wordsmithing, combining all of the legally separate and distinct operating subsidiaries, along with their parent, sister, brother, aunt, uncle and grandparent corporations, into an agglomerated "Adelphia."  This "pseudo" substantive consolidation is a fundamentally flawed predicate to the Amended Complaint, by which the ART, as the holder of the claims of remote shareholders of shareholders of CCH Debtors, seeks to assert the bankruptcy claims.

Absent a bona fide creditor of the CCH Debtors whose claims have not been paid in full (i.e. who suffered an injury) and who would actually benefit from this action (i.e. whose injury would actually be redressed), there is no party with standing to assert the bankruptcy claims. No such creditor exists. As such, the bankruptcy claims against the CCH Non-Agent Lenders must be dismissed.

***Other Grounds for Dismissal***:   There are at least two more reasons for this Court to dismiss the Amended Complaint as to the CCH Non-Agent Lenders. First, Plaintiffs have not alleged adequate facts to sustain their claim for equitable subordination against the CCH Non-Agent Lenders. To state such a claim against the CCH Non-Agent Lenders — who are not alleged to be insiders or fiduciaries — Plaintiffs must allege facts that the CCH Non-Agent Lenders engaged in gross and egregious conduct that is tantamount to fraud, misrepresentation, overreaching, spoliation or conduct involving moral turpitude. As Plaintiffs fail to allege even one bad act against the CCH Non-Agent Lenders, Plaintiffs fall woefully short of this requirement, and the equitable subordination claim should be dismissed on this separate and independent ground.

Finally, Plaintiffs have not stated a claim for equitable disallowance against the CCH Non-Agent Lenders. As an initial matter, no cause of action for equitable disallowance exists. Moreover, even if this Court were to find that such a cause of action exists, equitable disallowance is a far more severe sanction than equitable subordination, and when applied (in the rare case) historically, was generally reserved only for insider misconduct. Plaintiffs, who fail to plead facts sufficient to state an equitable subordination claim, also fail to meet the more rigorous pleading requirements necessary to state a purported claim for equitable disallowance. Thus, this Court should also dismiss Plaintiffs' equitable disallowance claim against the CCH Non-Agent Lenders.

## I.      BACKGROUND FACTS

### A.      The CCH Credit Facility And Indemnity Provisions

Pursuant to a Credit Agreement dated April 14, 2000 (the "CCH Credit Agreement"), two Adelphia entities and one Rigas Family Entity ("RFE") entered into a $2.25 billion Co-Borrowing Facility with various lenders, comprising a $1.5 billion revolving credit facility, and a $750 million term loan.  Am. Compl. ¶ 879.  The CCH Credit Facility lenders later funded an additional $500 million term loan, bringing the total amount available under the facility to $2.75 billion.  *See id.*   The two Adelphia borrowers were CCH Cable Holdings, LLC, and Ft. Meyers Cablevision, LLC (the "CCH Debtors"), while the one RFE borrower was Highland Prestige (the "CCH RFE Borrower") (collectively, the "CCH Borrowers").[3]   *See id.*   The CCH Credit Agreement, along with any related agreements, are referred to as the "CCH Credit Facility."  As of the Petition Date, approximately $2.5 billion was outstanding under the CCH Credit Facility. *Id.* ¶ 923.   Of that amount, Plaintiffs allege that the CCH RFE Borrower had drawn down approximately $1.66 billion.  *Id.* ¶ 979.

As part of the CCH Credit Agreement, the CCH Borrowers agreed that, unless a lender thereto (including a Non-Agent Lender) acted with gross negligence or intentional misconduct, the CCH Borrowers would indemnify and defend that lender from and against all claims, damages, losses, and expenses, arising out of, or in connection with, or by reason of any investigation, litigation or proceeding related to the CCH Credit Facility.  *See* Joint App., Ex. 1 § 11.12 (CCH Credit Agreement);[4] *see also id.* § 13.12(b) (extending Lender status under the

---

[3]   The CCH Borrowers and their subsidiaries guaranteed payment and performance.  Am. Compl. ¶¶ 879-80.  In addition, "other indirect subsidiaries of ACC pledged the stock of their direct subsidiaries to secure repayment under the CCH Credit Agreement."  *Id.* ¶ 880.

[4]   "[O]n a motion to dismiss, a court may consider certain documents in addition to the complaint, including the contents of any documents attached to the complaint or incorporated by reference[.]"  *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 34 (Bankr. S.D.N.Y. 2007); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992).  All Exhibits referenced herein are attached to the Request for Judicial Notice and Joint Appendix of Exhibits ("Joint App."), filed concurrently.

Agreement to Non-Agent Lenders who purchase the debt in the secondary market).  Section

11.12 of the CCH Credit Agreement states, in relevant part:

> Each Borrower . . . agrees, jointly and severally, to indemnify and hold harmless each Agent, Arranger, and ***each Lender*** and each of their respective affiliates and their respective officers, directors, employees, agents, attorneys, and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities, . . . costs, and expenses (including, without limitation, reasonable attorneys' fees) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation, or proceeding or preparation of defense in connection therewith) the Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Borrowings (including any of the foregoing arising from the negligence of the Indemnified Party), except to the extent such claim, damage, loss, liability, cost, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted ***from such Indemnified Party's gross negligence or willful misconduct***.

*Id.* 1 § 11.12 (emphasis added).

The CCH Borrowers also agreed to the same indemnification obligations for each

purchaser of the CCH debt in the secondary market, upon such purchaser's execution of an

Assignment and Acceptance agreement like the one attached as Exhibit F to the CCH Credit

Agreement.  Section 13.12(b) states, in relevant part, "[u]pon execution, delivery, acceptance,

and recordation of such Assignment and Acceptance Agreement, the assignee thereunder shall be

a party hereto and, to the extent of such assignment, have the obligations, Rights, and benefits of

a Lender under the Loan Documents. . . ."  *Id.* § 13.12(b).  All indemnity rights that the CCH

Borrower owed to the individual Lenders, including those who purchased the debt in the

secondary market, survive any assignment and termination of the CCH Credit Agreement.

*See id.* § 13.5.

While the CCH Credit Agreement affirmatively creates an indemnity relationship

between the CCH Borrowers and the Lenders to the CCH Facility, it expressly denies the

creation of any fiduciary relationship between the Non-Agent Lenders and the Agents.  *See id.*

§ 12.5(a) (stating that no Agent has a fiduciary relationship with any Lender); *see also id.*

§ 12.1(c) (stating that the Administrative Agent has no fiduciary duty to the CCH Borrowers or

the Lenders).  In fact, the CCH Credit Agreement specifically provides that no Agent or Lender shall incur any liability to any other Person for any act or omission of any other Lender or Agent. *Id.* § 12.7.

**B.**      **The CCH Debtors' Confirmed Plan Of Reorganization And Indemnity Provisions**

The CCH Debtors filed voluntary Chapter 11 bankruptcy cases in the Southern District of New York on June 25, 2002.  Am. Compl. ¶ 1067.  The Bankruptcy Court jointly administered the CCH Debtors' bankruptcy cases with those of other Adelphia entities, who had also filed for bankruptcy.  *See* Joint App., Ex. 7 (Joint Administration Order).

After years of failed plan proposals, the CCH Debtors and other Adelphia affiliates agreed upon the terms of a joint plan of reorganization embodied in the First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors (the "Plan"), which Plan the Bankruptcy Court confirmed in January 2007.[5] *See* Joint App., Ex. 8 at DSS2-6 (Second Disclosure Statement Supplement) (recounting history of the negotiations); *see also* Joint App., Ex. 9 (Confirmation Order).  The Plan effectuates a release between and among all Adelphia entities (including the CCH Debtors) of any and all intercompany claims they may have held against one another.  *See* Joint App., Ex. 10 § 2.3 (Plan).  It also called for the creation of a Contingent Value Vehicle (the "CVV"), from which certain Adelphia creditor groups could receive distributions if, among other things, the claims

---

[5]   Courts routinely take judicial notice of bankruptcy court dockets, and pleadings filed therein, including plans of reorganization.  *See, e.g.*, *Esoimeme v. United Airlines, Inc.*, 369 B.R. 531, 533 n. 2 (N.D. Cal. 2007) (taking judicial notice of the bankruptcy petition and various bankruptcy court orders); *Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*, 243 B.R. 620, 622 n.2 (S.D.N.Y. 2000) (taking judicial notice of the confirmation order, plan of reorganization and the related trust instrument); *Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*, 330 B.R. 394, 418 (Bankr. S.D.N.Y. 2005) (taking judicial notice of the debtor's disclosure statement); *In re Forte*, 234 B.R. 607, 613 n.11 (Bankr. E.D.N.Y. 1999) (taking judicial notice of the schedules to determine who owned the relevant property); *Corporate Food Mgt., Inc. v. Suffolk Cmty. College (In re Corporate Food Mgt., Inc.)*, 223 B.R. 635, 646 (Bankr. E.D.N.Y. 1998) (taking judicial notice of the Debtor's bankruptcy schedules and concluding therefrom that the unsecured creditors "would have received less than a one hundred percent distribution at the time the Debtor converted the involuntary Chapter 7 bankruptcy proceeding to a case under Chapter 11"); *Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd.* (*In re Buttes Gas & Oil, Co.*), 182 B.R. 493, 494 (Bankr. S.D. Tex. 1994) (taking judicial notice of the docket sheet and Bankruptcy Court file, and concluding therefrom that all of the debtor's creditors are being paid pursuant to the plan).

Plaintiffs assert in this lawsuit generate a recovery.  *See id.* § 9.  The Plan does not give the CCH Debtors' creditors a right to receive any distributions from the CVV.  Rather, that right is given to creditors of the CCH Debtors' corporate great grandparent and great-great grandparent and their respective creditors.  *See* Joint App., Ex. 11 (Adelphia Corporate Organization Chart).

Notably, the Plan does not effectuate a merger or so-called "substantive consolidation" of the Adelphia entities.[6]  Rather, the Plan provides that each Adelphia entity remains a ***separate legal entity*** and that the estates are ***not*** substantively consolidated.  *See* Joint App., Ex. 10 § 2.2 (Plan); *see also* Joint App., Ex. 11 (Adelphia Corporate Organization Chart).  This lawsuit does not and cannot change that fact.  Each of the CCH Debtors is responsible only for satisfying its own creditors' claims — no more, no less.  *See* Joint App., Ex. 10 § 2.2 (Plan).

And, in fact, the CCH Debtors have had ample funds to satisfy in full their respective creditors' claims.  *See* Joint App., Ex. 12 (Status Report).  The following chart summarizes the Plan's treatment of the various classes of the CCH Debtors' creditors (all classified as "Subsidiary" creditors) and shows that the Debtors have paid all of their creditors in full.

---

[6]   Substantive consolidation occurs when the assets and liabilities of two or more distinct, bankruptcy entities are combined in a single pool and treated as if they belong to one entity.  Therefore, substantive consolidation generally results in the satisfaction of liabilities from the resulting common fund of assets and also the elimination of intercompany claims between and among the substantively consolidated entities.  *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 58-59 (2d Cir. 1992).

| Class of Claims | Treatment Under The Plan | Actual Treatment[7] |
|---|---|---|
| Subsidiary Priority Claims | An amount equal to payment in full, in cash.  (Joint App., Ex. 8 at DSS2-26 (Second Disclosure Statement Supplement); Joint App., Ex. 10 § 5.2(a) (Plan)) | Paid In Full. |
| Subsidiary Secured Claims | Paid in full, in cash, with postpetition interest.  (Joint App., Ex. 8 at DSS2-26 - DSS2-27 (Second Disclosure Statement Supplement); Joint App., Ex. 10 § 5.2(b) (Plan)) | Paid In Full. |
| Subsidiary Bank Claims | An amount equal to payment in full, in cash, with postpetition interest (but subject to disgorgement).  (Joint App., Ex. 8 at DSS2-26 - DSS2-27 (Second Disclosure Statement Supplement); Joint App., Ex. 10 § 5.2(c)(A) (Plan)) | Paid In Full. |
| Subsidiary Trade Claims | An amount equal to payment in full, in cash or stock in TWC, with postpetition interest (except for agreed-upon give ups).  (Joint App., Ex. 8 at DSS2-30 (Second Disclosure Statement Supplement); Joint App., Ex. 10 § 5.2(d) (Plan)) | Paid In Full. |
| Subsidiary Other Unsecured Claims | An amount equal to payment in full, in cash or stock in TWC, with postpetition interest (except for agreed-upon give ups).  (Joint App., Ex. 8 at DSS2-30 (Second Disclosure Statement Supplement); Joint App., Ex. 10 § 5.2(e) (Plan)) | Paid In Full. |

In addition to requiring the CCH Debtors to pay their creditors in full, the Plan also cancels and extinguishes the CCH Credit Facility as it relates to the CCH Debtors (Joint App., Ex. 10 § 8.6(a) (Plan)), with one important caveat.  The Plan expressly obligates the CCH

---

[7]   *See* Joint App., Ex. 12 (Status Report).

Debtors to indemnify each of their Non-Agent Lenders on virtually the same terms as were contained in the now extinguished CCH Credit Agreement.[8]  It does this through the definition of "Dismissed Bank Actions," which provides in relevant part:

> Dismissed Bank Actions means the Bank Actions [which term includes this litigation] or one or more Claims asserted therein, if any: . . . (ii) with respect to a particular defendant as to which there is a determination by a court of competent jurisdiction pursuant to a Final Order that such defendant as to such Bank Actions, is (or would be, but for any limitation on indemnification or contribution pursuant to this Plan) entitled to indemnification or contribution (*whether under a Prepetition Credit Agreement* or under another agreement or principle of law), either by a Debtor or by a Person who is (or would be, but for any limitation on indemnification or contribution pursuant to the Plan) entitled to indemnification or contribution by a Debtor, but only to the extent of such indemnification or contribution. . . .

*Id.* at A-17 (Plan) (citing Prepetition Credit Agreement indemnification language as the basis for finding indemnification under the Plan) (emphasis added).  The Confirmation Order incorporates the CCH Debtors and lenders' agreement regarding Dismissed Bank Actions, stating:

> all Dismissed Bank Actions, if any, shall, with respect to the Debtor Parties only, be dismissed with prejudice and without costs, and the Debtor Parties shall be deemed to release the Bank Lenders, Investment Banks and/or other defendants with respect to the Dismissed Bank Actions, effective as of the Effective Date.

Joint App., Ex. 9 ¶ II (Confirmation Order).  Thus, under the Plan and Confirmation Order, each Non-Agent Lender who participated in the CCH Credit Facility is entitled to dismissal of the claims alleged against it to the extent the CCH Borrowers would have been required to indemnify the CCH Non-Agent Lenders under the now extinguished CCH Credit Facility.

### C.   The Amended Complaint And Absence of Any Alleged Wrongdoing By The CCH Non-Agent Lenders

Plaintiffs filed their almost 500-page Amended Complaint on October 31, 2007, more than seven months after the Plan's effective date.  They assert, on the CCH Debtors' behalf, five causes of action against the CCH Non-Agent Lenders, including avoidance and subordination

---

[8]   The one change in the CCH Debtors' indemnity obligation under the Plan is that the CCH Non-Agent Lenders may no longer seek money damages under the indemnification clauses.  See Joint App., Ex. 10 § 9.2(b) (Plan).

claims.  *See* Am. Compl. ¶¶ 1124-1144 (fraudulent conveyance pursuant to federal law), 1145-1168 (fraudulent conveyance pursuant to state law), 1370-1390 (equitable disallowance or equitable subordination), 1452-1457 (declaratory judgment), 1514-1519 (preferences).  Despite the length of the Amended Complaint and the more than four years it took to be produced, Plaintiffs do not allege any facts indicating that the CCH Non-Agent Lenders committed any "bad acts" that would nullify the indemnity provision set forth in the Plan and the Confirmation Order.  In fact, with the exception of Plaintiffs' claims for intentional fraudulent conveyance, equitable subordination and, to the extent it exists, equitable disallowance, the claims Plaintiffs assert against the CCH Non-Agent Lenders do not require Plaintiffs to plead or prove any such "bad acts" at all.

          **1.**     **Plaintiffs' conflicting and confusing "definitions" help demonstrate the absence of factual allegations of "bad acts" against the CCH Non-Agent Lenders.**

In the Amended Complaint, Plaintiffs define different "types" of lender defendants that participated in the credit facilities, including the CCH Credit Facility.  For example, Plaintiffs place all Agents — the Administrative Agent and the Nominal Agents — in one group known as "Agent Banks," and define that group as those banks that participated in arranging, structuring and managing the Co-Borrowing Facilities.[9]  *See* Am. Compl. ¶ 24.  "Investment Banks" are defined as each being affiliated with one of the Agent Banks, and which "assisted their affiliate Agent Banks and the Rigas Family in structuring the Co-Borrowing Facilities and provided services and advice to Adelphia in connection with a series of debt and equity offerings issued during the same time period that the Co-Borrowing Facilities were created."  *Id.* ¶ 25.

When it comes to the Non-Agent Lenders, however, Plaintiffs' definitions are inconsistent.  For example, Plaintiffs identify two "types" of defendants that would include the

---

[9]   Although Plaintiffs' definition of "Agent Banks" may be concise, it is far from clear.  As can be seen from the plain text of the CCH Credit Agreement, the Administrative Agent had rights and obligations distinct from any other lender, including the Nominal Agents.  Joint App., Ex. 1 § 12 (CCH Credit Agreement).

Non-Agent Lenders:  "Syndicate Banks" and "Assignees."[10]   Plaintiffs initially define "Syndicate Banks" as banks to whom the Co-Borrowing Facilities were syndicated, who agreed to lend Adelphia money under the Co-Borrowing Facilities, and who were therefore "original co-borrowing lenders."  *See id.* ¶¶ 74, 75.  Plaintiffs then define "Assignees" to be those lenders that received a transfer of rights from an "original Co-Borrowing Lender" (*i.e.* a Syndicate Bank or an Agent Bank) under one of the Co-Borrowing Facilities.  *See id.* ¶ 146.  Plaintiffs then combine the definitions, stating that the CCH Syndicate Banks include "one or more of the Assignees."  *Id.* ¶ 883.

Plaintiffs' conflation of these terms (such that Syndicate Banks include all Non-Agent Lenders, whether original syndicate members or secondary purchasers in the market) is confusing and suggests a lack of any principled difference in Plaintiffs' distinctions between "Syndicate Banks" and "Assignees."  Nevertheless, this conflation does not change the fact that Plaintiffs make few, if any, factual allegations against the CCH Non-Agent Lenders, none of which assert that the CCH Non-Agent Lenders did anything wrong.  Instead, Plaintiffs abandon the definitions that relate solely to Non-Agent Lenders and replace them with broader terms designed to encompass the Agent Banks and/or lenders to other credit facilities (i.e., "CCH Lenders," "CCH Co-Borrowing Lenders," or broader still, the "Co-Borrowing Lenders") to create the illusion that the CCH Non-Agent Lenders are part of their story.

> **2.     Plaintiffs' allegations regarding the CCH Credit Facility also reveal that the CCH Non-Agent Lenders played no role in the wrongdoing at Adelphia.**

Plaintiffs prefer to eschew using definitions that focus solely on the Non-Agent Lenders because the Non-Agent Lenders play no role in Plaintiffs' story of wrongdoing at Adelphia. Instead, as described below, the CCH Non-Agent Lenders appear simply as investors in a CCH Credit Facility that was approved by Adelphia's Independent Directors.

---

[10]   Capitalized terms that are not otherwise defined in the Motion have the same meaning as in the Amended Complaint.  Such usage does not indicate agreement with Plaintiffs' definitions or characterizations and the Non-Agent Lenders reserve the right to challenge Plaintiffs' definitions and characterizations.

Plaintiffs allege that the CCH Credit Facility arose because the Rigas Family needed to access credit to finance acquisitions by the RFEs.  *See* Am. Compl. ¶ 878.  The Agent and Investment Banks, Plaintiffs allege, conducted significant due diligence prior to closing the CCH Facility, and worked with the Rigas Family to prepare an offering memorandum to solicit other lenders (*i.e.* Non-Agent Lenders) to participate in the facility.  *See id.* ¶ 882.  Plaintiffs allege that because the CCH Co-Borrowing Facility constituted an affiliated transaction,  "Adelphia needed the approval of Adelphia's Board of Directors and the separate approval of the Independent Directors to participate in the CCH Co-Borrowing Facility[,]" and that the Rigas Family sought and obtained that approval at a meeting of the Adelphia Board of Directors on March 9, 2000.  *Id.* ¶¶ 884, 886.  There is no allegation that any CCH Lender, Agent or Non-Agent, was present at this meeting.  *See id.* ¶ 886.

To obtain the Independent Directors' approval, Plaintiffs allege that "CCH Agent Banks and their affiliated Investment Banks worked closely with the Rigas Family and James Brown to prepare a term sheet describing the terms of the CCH Co-Borrowing Facility" (the "CCH Term Sheet"), which the Rigas Family presented to the Independent Directors at the meeting.  *Id.* ¶¶ 885, 887.  Plaintiffs further allege that "the Rigas Family and the CCH Term Sheet prepared with the CCH Agents Banks and their affiliated Investment Banks deliberately failed to disclose all material facts to the Independent Directors concerning the CCH Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFE intended to put the funds it drew down from the facility."  *Id.* ¶ 897.

Plaintiffs allege that the CCH Term Sheet stated that the CCH Credit Facility would contain protective clauses barring certain affiliate transactions.  *See id.* ¶¶ 892-95.  Plaintiffs further allege that "the Rigas Family and the CCH Agent Banks and their affiliated Investment Banks knew at the time they provided the CCH Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions."  *Id.* ¶ 908.

Plaintiffs also allege that the CCH Term sheet provided that "[t]he Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels" but failed to include a definition of "Leverage Ratio," which omission Plaintiffs allege was material. *Id.* ¶¶ 896, 899. Timothy Rigas and James Brown, Plaintiffs allege, informed "the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets[,]" although the Rigas Family knew this statement was false when made. *Id.* ¶ 898. "The Rigas Family had agreed previously with the CCH Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition." *Id.*

In addition to the CCH Term Sheet's alleged misrepresentations, Plaintiffs also allege that Timothy Rigas and James Brown verbally misrepresented to the Independent Directors that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral the co-borrower provided, when in fact the CCH Credit Facility contained no limits on the amounts that each co-borrower could borrow. *See id.* ¶¶ 889, 906. Due to the Rigases' "verbal misrepresentations and the incomplete and/or inaccurate information set forth in the CCH Term Sheet[,]" Plaintiffs allege that the Independent Directors were misled into believing that the terms and conditions of the CCH Credit Facility were in the best interests of Adelphia, when they were not. *See id.* ¶ 890. There is no allegation that any of the CCH Non-Agent Lenders were involved in preparing, or even saw, the CCH Term Sheet.

After the Independent Directors approved the CCH Credit Facility, Plaintiffs allege that the CCH Agent Banks and their affiliated Investment Banks prepared and sent to the CCH Non-Agent Lenders a Confidential Information Memorandum ("CCH Confidential Memo"), which described the terms of the CCH Credit Facility and made clear that "the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by Highland Prestige." *Id.* ¶ 905. Plaintiffs further allege that the CCH Confidential Memo "explicitly stated that the

collateral contributions of ACC co-borrowers Century Holdings, LLC and Ft. Myers Acquisition LP would be based on revenues from a combined total of 1,476,983 cable television subscribers, whereas RFE co-borrower Highland Prestige's collateral contribution would be based on revenues from 55,831 cable television subscribers." *Id.* This information, Plaintiffs allege, was neither in the CCH Term Sheet nor disclosed to the Independent Directors.[11] *Id.*

Plaintiffs also allege that the CCH Agent Banks and Investment Banks knew that the Independent Directors had a duty to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions. *See id.* ¶ 917. The true terms of the CCH Credit Facility, Plaintiffs allege, were not in Adelphia's best interests. *See id.* "The CCH Agent Banks and their affiliated Investment Banks knew or consciously avoided the fact that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts." *Id.*

Finally, Plaintiffs allege that Adelphia did not publicly disclose, prior to March 27, 2002, the contingent liabilities incurred as a result of RFE Highland Prestige's draws on the CCH Facility, and that "the CCH Agent Banks knew, or consciously avoided, the fact that ACC's Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded." *Id.* ¶¶ 920, 922.

Noticeably absent from Plaintiffs' factual allegations of wrongdoing in relation to the CCH Credit Facility is any mention of the CCH Non-Agent Lenders. Instead, Plaintiffs use their

---

[11]   Plaintiffs' story that the Rigases made verbal representations regarding the terms of CCH Credit Facility, and that the CCH Term Sheet lacked relevant information, and that therefore the Independent Directors were deceived about the actual terms of the CCH Credit Agreement, actually defies common sense. *See Nazarenus v. J.F. Daley Int'l, Ltd.*, 714 F. Supp. 361, 362 (N.D. Ill. 1989) ("Notice pleading does not require the suspension of common sense."); *see generally Peak v. United States*, 353 U.S. 43, 46 (1957) (noting that "common sense often makes good law"). Plaintiffs allege that the CCH Confidential Memo contained the relevant information the Independent Directors allegedly did not receive, but never explain how it is that the Independent Directors did not ask for or obtain copies of this CCH Confidential Memo, which contained a cover letter from Adelphia confirming that the information in the CCH Confidential Memo was accurate. *See* Joint App., Ex. 13 at 1664-00762930 (CCH Confidential Memo). Even less plausible is the implied allegation that the Independent Directors of a multi-billion dollar family of entities never obtained or read the actual CCH Credit Agreement before approving the transaction.

overly-broad definitions to give completely unsupported allegations against the CCH Non-Agent Lenders the false appearance of being tied to facts alleged against other defendants.  Plaintiffs' most common tactic is to use an allegation that originated with a reference to a particular lender or the group of Agent Banks, but then recast the allegation — without adding any new or supporting factual allegations — using a broader term like "CCH Lenders" in an attempt to slide the specific allegations against one defendant onto defendants against which no specific allegations have been made.

Examples of Plaintiffs' "slide tactic" include:

- "The CCH Credit Agreement was created and agreed to by the Rigas Family, the CCH Agent Banks and their affiliated Investment Banks, **and the CCH Co-Borrowing Lenders**." *Id.* ¶ 901 (emphasis added).

(But there are no factual allegations that any of the CCH Non-Agent Lenders created the Credit Agreement, and to the extent that the "CCH Co-Borrowing Lenders" includes Assignees, it is factually impossible for the downstream purchasing Non-Agent Lenders to have "created" the CCH Credit Agreement.)

- "The three Co-Borrowing Facilities that remained outstanding as of the Petition Date – the UCA/HHC Co-Borrowing Facility, the CCH Co-Borrowing Facility and the Olympus Co-Borrowing Facility . . . were at the heart of the fraud perpetrated by the Rigas Family with the substantial assistance of the Agent Banks and the Investment Banks. . . . The Agent Banks, Investment Banks, and **Syndicate Lenders** all knew that permitting the RFEs to borrow substantial amounts – that they clearly could not repay – against the credit of the Adelphia co-borrowers served no legitimate corporate purpose for Adelphia and provided no benefit to Adelphia." *Id.* ¶¶ 825, 826 (emphasis added).

(But there are no factual allegations that any CCH Non-Agent Lenders knew this nor that the CCH Non-Agent Lenders had any duty to second guess Adelphia's business judgment.)

- "Based on substantial participation of CCH Lenders that had participated in the UCA/HHC Co-Borrowing Facility, **the CCH Lenders** also knew that the Rigas Family had been using the proceeds of other co-borrowing loans for fraudulent purposes.  **The CCH Lenders** knew that the Independent Directors were never advised of such activities." *Id.* ¶ 977 (emphases added).

(But there are no factual allegations that any of the CCH Non-Agent Lenders knew of the misappropriation or what the Independent Directors had been told or knew.)

- "Nonetheless, as of the Petition Date, Highland Prestige had drawn approximately $1.66 billion of the $2.48 billion outstanding under the CCH Co-Borrowing Facility, or 67% of the amount borrowed. No prudent lender would have lent Highland Prestige $1.66 billion (or more) without the credit support of Adelphia. *The CCH Lenders* knew or consciously avoided the facts, which were readily apparent to them, that the terms of the CCH Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that Highland Prestige and the Rigas Family benefited enormously and personally from their participation in the CCH Co-Borrowing Facility, at the expense of Adelphia." *Id.* ¶ 979 (emphasis added).

(But there are no factual allegations that any of the CCH Non-Agent Lenders knew that the Independent Directors had allegedly been deceived, nor that the Non-Agent Lenders had any duty to second guess the business judgment of the Independent Directors in entering into the CCH Co-Borrowing Facility.)

- "Upon information and belief, *the Co-Borrowing Lenders* performed periodic analyses demonstrating Adelphia's concealment, as caused by the Rigas Family, of billions of dollars under the Co-Borrowing Facilities from Adelphia's balance sheet. For example, on or about March 29, 2001, Defendant Wachovia performed an analysis of Adelphia's total outstanding 'bank debt' at the subsidiary level, as of September 30, 2000, under the two Co-Borrowing Facilities then outstanding — UCA/HHC and CCH — and under six Non-Co-Borrowing Facilities then outstanding — Parnassos, Chelsea Communications, Adelphia Cable Partners, Harron Communications, FrontierVision and Century-TCI. Wachovia determined that Adelphia's total 'bank debt' as of September 30, 2000 was approximately $5.2 billion. Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt, as of September 30, 2000, was approximately $3.8 billion. Wachovia did not need any 'special' access to Adelphia to obtain this information…. Wachovia's analysis demonstrates that many, if not all, *Defendants* knew or consciously avoided knowing that Adelphia was understating its total bank debt in 2000 by approximately $1.4 billion and that Adelphia's leverage was not being reduced as represented." *Id.* ¶¶ 1027-28 (emphases added).

(But there are no factual allegations that any of the CCH Non-Agent Lenders performed this calculation, had a duty to perform this calculation, or were in a position to perform this calculation.)

Plaintiffs' factual allegations of wrongdoing in relation to the CCH Credit Facility never include the CCH Non-Agent Lenders.

### D. Allegations Regarding The Rigases' Use Of The Cash Management System Also Do Not Involve The CCH Non-Agent Lenders.

Despite Plaintiffs' theory that the Co-Borrowing Facilities were the linchpin of Adelphia's fraud, Plaintiffs also allege that the Rigases had adequate means to perpetrate their alleged fraud with the Adelphia Cash Management System ("CMS") regardless of whether the credit facilities into which Adelphia entered were co-borrowing facilities or non-co-borrowing facilities. Although the CMS story contradicts the story that Adelphia could not accomplish its fraud without the co-borrowing facilities, both theories nevertheless share one thing in common: neither alleges that the CCH Non-Agent Lenders did anything improper.

With respect to the CMS theory, Plaintiffs allege that the CMS "was a key instrumentality of the fraud," and that "[t]hrough the CMS, the Rigas Family misappropriated over $3.4 billion from the Co-Borrowing Facilities for its own benefit." *Id.* ¶¶ 1011, 1015. Accordingly, the CMS, and not the Co-Borrowing structure, was the *sine qua non* of the alleged Rigas/Adelphia fraud:

> The CMS was a central depository (in reality, the **Rigas Family's personal piggy bank**) for cash generated or obtained by Adelphia from all sources (including borrowings under each of the Co-Borrowing Facilities, the Non-Co-Borrowing Facilities, the proceeds from Adelphia's debt and equity securities offerings, and Adelphia's operations). Adelphia commingled all of its cash with that of the RFEs in the CMS. After Adelphia deposited cash into the CMS, "ownership" of the cash could be transferred through simple journal entries to any RFE. The cash also could be transferred from the CMS to any of a number of bank accounts held in the name of the RFEs.

*Id.* ¶ 1012. Plaintiffs allege that the Rigases manipulated funds — co-borrowing and non-co-borrowing funds alike — in and out of the CMS for their personal benefit. For instance, Plaintiffs allege that the Rigases used funds from Century-TCI — a non-co-borrowing facility — for fraudulent purposes. According to Plaintiffs, the Rigases caused Adelphia to make multiple draws on the Century-TCI Facility and then used the CMS to transfer the money it obtained from that facility to Rigas Family accounts. *Id.* ¶¶ 1005. Additionally, Plaintiffs allege that the Rigas Family "used funds from the CMS to fund expenses for Niagara Frontier Hockey, L.P., a Rigas Family controlled entity that owned the Buffalo Sabres professional hockey team." *Id.* ¶ 999.

Thus, the Rigas Family, using the CMS, could steal, at will, funds lent under a Non-Co-Borrowing Facility, making it irrelevant which type of credit facility Adelphia set up.

Nonetheless, regardless of the theory Plaintiffs ultimately adopt, no theory of liability asserted in the Amended Complaint involves any participation or wrongdoing by the CCH Non-Agent Lenders.  In this regard, the Amended Complaint is conspicuously silent.

## II.   LEGAL STANDARDS FOR ASSESSING THE CCH NON-AGENT LENDERS' MOTION TO DISMISS

In assessing a Rule 12 motion to dismiss, the Court must accept as true a complaint's factual allegations and draw all inferences in plaintiff's favor.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  But a complaint must "provide 'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support them."  *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03 MD 1529, 2007 WL 2615928, at *1 (S.D.N.Y. Sept. 10, 2007) (McKenna, J.) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  Courts should not assume that plaintiffs can prove facts they have not alleged.  *See Associated Gen'l Contractors of Cal. Inc. v. Carpenters*, 459 U.S. 519, 526 (1983); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (finding amended complaint legally insufficient for failure to adequately allege facts).  Factually unsupported and conclusory allegations are not enough to state a claim.  *See DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir. 1996).  Accordingly, to state a claim against the CCH Non-Agent Lenders, Plaintiffs' allegations against the CCH Non-Agent Lenders must be factual, not just conclusory.  *See Twombly*, 127 S. Ct. at 1966 n.5.  Legal conclusions resting on other unsupported allegations do not meet this standard.  *See id.* at 1970.

Rule 12 motions to dismiss are also the proper avenue for challenging a plaintiff's standing to sue.  *See Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993) (noting that courts in the Second Circuit have dismissed claims for lack of standing under both Rule 12(b)(1) and Rule 12(b)(6)); *Thompson v. County of Franklin,* 15 F.3d 245, 247 (2d Cir. 1994) (same). "[L]ike other jurisdictional inquiries, [standing] cannot be inferred argumentatively from averments in the pleadings, but rather must appear affirmatively in the

record, so that, on a motion to dismiss, it is the burden of the party asserting standing to sue clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Bartang Bank and Trust Co. v. Caiola*, No. 04 Civ. 2402, 2006 WL 2708453, at *4 (S.D.N.Y. Sept. 18, 2006) (quoting *Thompson*, 15 F.3d at 249) (internal punctuation omitted). Here, if after considering all relevant materials, this Court cannot discern a basis for Plaintiffs' standing, the Amended Complaint must be dismissed. *See Thompson*, 15 F.3d at 249.

**III.   PURSUANT TO THE PLAN AND CONFIRMATION ORDER, THIS COURT MUST DISMISS ALL COUNTS AGAINST THE CCH NON-AGENT LENDERS BECAUSE ALL CLAIMS WOULD BE INDEMNIFIED UNDER THE CCH CREDIT AGREEMENT.**

In interpreting indemnification clauses, New York courts[12] "first look to the express contract language used" to effectuate the intention of the parties. *Hawkins Home Groups, Inc. v. S. Energy Homes, Inc.*, 714 N.Y.S.2d 539, 540 (App. Div. 2000). "[W]here the language of a contract is clear and unambiguous, the court will construe and discern that intent from the document itself as a matter of law." *Id.*; *see also Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 16 (2d Cir. 1993). And "in the absence of countervailing public policy concerns there is no reason to relieve [sophisticated parties] of the consequences of their bargain. If they are dissatisfied with the consequences of their agreement, 'the time to say so [was] at the bargaining table.'" *Southgate Owners Corp. v. Pub. Serv. Mut. Ins. Co.*, 660 N.Y.S.2d 129, 131 (App. Div. 1997) (quoting *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995)).

In addition, futile indemnification actions have long been disfavored by courts. *See State v. Barclays Bank of New York, N.A.*, 563 N.E.2d 11, 14 (N.Y. 1990) (reasoning that a particular course of action would avoid circuity of action); *see also Siler v. N. Trust Co.*, 80 F. Supp. 2d 906, 908 (N.D. Ill. 2000) ("A circuitry of obligation will defeat a plaintiff's claim as a matter of law. A circuitry is created when, by virtue of pre-existing indemnity agreements or obligations,

---

[12]   The CCH Credit Agreement is governed by New York law. *See* Joint App., Ex. 1 § 13.6 (CCH Credit Agreement).

the plaintiff is in effect obligated to indemnify the defendants for claims including the plaintiff's own claim."). Moreover, courts seek to avoid parties undertaking vain or useless acts. *See People v. Williams*, 668 N.Y.S.2d 305, 306 (Sup. Ct. 1997) (denying a hearing because the law does not compel one to do "vain or useless" things).

Here, Plaintiffs' stories of alleged fraud and other wrongdoing at Adelphia contain no factual allegations of bad acts by any Non-Agent Lenders. Instead, the Amended Complaint establishes the Non-Agent Lenders as innocent, passive investors in the CCH Credit Facility. *See* Background Facts, *supra* Part I. Indeed, Plaintiffs have previously admitted to the Bankruptcy Court that they do not allege that the Non-Agent Lenders did anything improper because the Non-Agents were mere downstream purchasers of the CCH Credit Facility (either purchasing as Syndicate Banks based on syndication materials provided by Adelphia and the Agents Banks, or purchasing in the secondary market as "Assignees" under the facility).[13]

Yet, despite admitting that they do not allege that the Non-Agent Lenders did anything wrong, Plaintiffs use their "slide tactic" throughout the Amended Complaint to try to avoid the consequences of their obligations to indemnify the CCH Non-Agent Lenders. But the CCH Borrowers are sophisticated parties who understood their indemnity obligation when they undertook it. Plaintiffs cannot now avoid the consequences of the CCH Debtors' bargain with clever pleading tactics.

In the end, and for the reasons discussed more fully herein, this action against the Non-Agent Lenders will be circuitous and wasteful of the Court's and the parties' time because each of the CCH Non-Agent Lenders is indemnified for all counts alleged against them. This Court

---

[13]   *See* Joint App., Ex. 14 ¶ 8 (Estimation Mot.) (stating that "In the Bank Action, ***there is no allegation that the Syndicate Banks*** individually did anything improper. Rather, the only issue specific to the Syndicate Banks is whether as 'after-market' holders of Bank Claims under the Prepetition Credit Facilities, their debt may be 'tainted' by the torts and other wrongful conduct of the Banks from whom they purchased that debt.") (emphasis added); *id.* ¶ 40 ("[T]he complaint in the Bank Action ***does not allege that the Syndicate Banks individually committed wrongdoing*** . . . .") (emphasis added); *id.* ¶ 67 ("In the Bank Action, there are ***no claims that*** any of the 'after-market' ***Syndicate Banks individually did anything improper***. In fact, most, if not all of the Syndicate Banks are not even banks.") (emphasis added).

should honor the Plan's indemnity provisions and dismiss all counts alleged against the CCH Non-Agent Lenders.

> **A.    In Both The CCH Credit Agreement And Again In The Confirmed Plan, Plaintiffs Agreed To Indemnify The CCH Non-Agent Lenders For The Claims Asserted In The Amended Complaint.**

The CCH Credit Facility obligated the CCH Borrowers (a discrete subset of Plaintiffs) to indemnify each Non-Agent Lender from all claims, damages, costs and expenses arising out of or in connection with the CCH Credit Facility.  *See* Background Facts, *supra* Part I.  The only exception to the CCH Borrowers' indemnity agreement was the extent to which an individual Non-Agent Lender acted with gross negligence or willful misconduct.  *See id.*; *see also* Joint App., Ex. 1 § 11.12 (CCH Credit Agreement).  Gross negligence requires acting in a manner that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing.  *See, e.g., Hartford Ins. Co. v. Holmes Prot. Group*, 673 N.Y.S.2d 132, 133 (App. Div. 1998).  Willful misconduct requires intentionally committing an act of an unreasonable character in disregard of a risk known or obvious and so great as to make it highly probable that harm would follow.  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 600 N.Y.S.2d 212, 216 (App. Div. 1993) (citing William L. Prosser, *Torts* § 34 (4th ed. 1971)).  Said another way, unless a CCH Non-Agent Lender seeking indemnification itself committed "bad acts" (*i.e.* gross negligence or willful misconduct), the CCH Borrowers must indemnify that Non-Agent Lender against all claims and losses arising out of, in connection with, or by reason of, the CCH Credit Facility.

Having already agreed to indemnify the CCH Non-Agent Lenders in the Credit Agreement, the CCH Debtors agreed to indemnify the CCH Non-Agent Lenders a second time in the Plan.  Although the Plan cancels and extinguishes the CCH Credit Agreement with respect to the CCH Debtors, the Plan expressly provides for the CCH Debtors to indemnify the CCH Non-Agent Lenders on virtually the same terms as in the CCH Credit Agreement.  *See* Background Facts, *supra* Part I; *see also* Joint App., Ex. 10 at A-16-17 (Plan) (stating that one criterion of Dismissed Bank Actions is whether the party would be entitled to indemnification "under a Prepetition Credit Agreement").  The one change in the CCH Debtors' indemnity obligation

Case 1:05-cv-09050-LMM -RLE   Document 177   Filed 12/21/07   Page 33 of 66

under the Plan is that the CCH Non-Agent Lenders may no longer seek money damages under the indemnification clauses. *See* Joint App., Ex. 10 § 9.2(b) (Plan). Instead, upon establishing their right to indemnification from the CCH Borrowers in "a court of competent jurisdiction," any indemnified claims against the CCH Non-Agent Lenders must be dismissed. *See id.* at A-17.

Dismissing the claims against the CCH Non-Agent Lenders would complete the circuit contemplated in the Plan and Confirmation Order. Plaintiffs have not alleged any bad conduct by the CCH Non-Agent Lenders, and the CCH Non-Agent Lenders are herein invoking their indemnification rights under the Plan and Confirmation Order. As a matter of law, the CCH Non-Agent Lenders are indemnified for all counts alleged against them in the Amended Complaint, and therefore are entitled to dismissal.

**B.     Because None Of Plaintiffs' Theories Of The Rigases' Fraud Requires Or Alleges That The Non-Agent Lenders Acted With Gross Negligence Or Willful Misconduct, There Is No Exception To Plaintiffs' Indemnity Obligations To The Non-Agent Lenders.**

Before getting to the individual claims alleged against the CCH Non-Agent Lenders, it is important to look at Plaintiffs' overarching theories of their case and determine whether any exception to Plaintiffs' indemnity obligations is asserted. As outlined in the Background Facts (*supra* Part I), Plaintiffs allege two stories of how the fraud at Adelphia occurred: (1) through the Rigases' establishment and use of the CMS; or (2) through the Rigases' establishment of the Co-Borrowing Credit Facilities with the Agent and Investment Banks. Neither of Plaintiffs' theories requires nor contains any factual allegations of gross negligence or willful misconduct by the Non-Agent Lenders.

**1.     Plaintiffs make no factual allegations that the CCH Non-Agent Lenders assisted in the creation of the CMS or knew that the Rigases misappropriated money through the CMS.**

Plaintiffs make numerous allegations about the Rigases' fraudulent use of the CMS. *See* Background Facts, *supra* Part I. None of them involves the CCH Non-Agent Lenders. Indeed, the CMS story of fraud at Adelphia does not require the CCH Non-Agent Lenders to have engaged in improper conduct, and Plaintiffs allege no facts that they did. In fact, Plaintiffs do not allege any facts indicating that the CCH Non-Agent Lenders even knew of illicit transfers via

-23-

the CMS.  As such, Plaintiffs' CMS story actually reinforces the role of the Non-Agent Lenders as passive investors in a CCH Credit Facility from which the Rigas Family allegedly misappropriated funds.  As passive investors in an arms-length financial transaction, the CCH Non-Agent Lenders did not act with and are not alleged to have acted with gross negligence or willful misconduct.  Therefore, the CMS theory does not provide an exception to Plaintiffs' indemnity obligations to the CCH Non-Agent Lenders.

> ### 2.   Plaintiffs make no factual allegations that the CCH Non-Agent Lenders created the CCH Credit Facility, or knew of the alleged deception of the Independent Directors.

Plaintiffs also allege that the Co-Borrowing Facilities were the "principal tools" of the Rigases' fraud, and that the Agent and Investment Banks worked with the Rigas Family to create and establish these "tools."  Am. Compl. ¶¶ 3-4; *see also* Background Facts, *supra* Part I.  A key element to the alleged fraud, Plaintiffs allege, is that although Adelphia's Independent Directors in fact approved the CCH Credit Facility, such approval resulted from the verbal misrepresentations of the Rigas Family "and the incomplete and/or inaccurate information set forth in the CCH Term Sheet."[14]  Am. Compl. ¶ 890.  The CCH Term Sheet, Plaintiffs allege, arose from work among the  Rigas Family, James Brown, and the CCH Agent and Investment Banks.  *Id.* ¶ 885.

Like the CMS story, the Co-Borrowing structure story of fraud at Adelphia does not require that the CCH Non-Agent Lenders engaged in any bad acts, and Plaintiffs never allege that any of the CCH Non-Agent Lenders did anything improper regarding the creation of the CCH Credit Facility or the alleged deception of the Independent Directors.  Specifically, Plaintiffs do not allege any facts that (1) any CCH Non-Agent Lender participated in the creation

---

[14]   Plaintiffs' allegations regarding what the Independent Directors could and could not learn from the CCH Term Sheet, again, are illogical.  The very first sentence of the CCH Term Sheet states that all of the borrowers will be jointly and severally liable and specifically names an RFE as one of the borrowers.  *See* Joint App., Ex. 15 at 1 (CCH Term Sheet) ("Century Holdings, LLC, Ft. Meyers Acquisition Limited Partnership and Highland Prestige Georgia, LLC to be jointly and severally liable.").  It is not rational to believe that Independent Directors of Adelphia, who knew that the CCH Borrowers would be jointly and severally liable for all borrowings, would not obtain and read a copy of the CCH Confidential Memo and the credit agreement itself.

of the CCH Credit Facility, (2) any CCH Non-Agent Lender helped prepare the CCH Term sheet, (3) any CCH Non-Agent Lender was present at the meeting at which the alleged misrepresentations occurred, or (4) any CCH Non-Agent Lenders knew about the alleged misrepresentations to the Independent Directors.  And Plaintiffs do not allege that the CCH Non-Agent Lenders had any duty to question the business judgment of the Independent Directors in approving the CCH Credit Facility, nor could they, since no such duty exists.

Indeed, Plaintiffs' own allegations establish that the CCH Non-Agent Lenders were investors who (1) received information about a CCH Credit Facility, which facility Adelphia's Board, including the Independent Directors, had approved, and (2) decided to purchase portions of that facility, either at inception or on the secondary market.  Such actions are not, and are not alleged to be, grossly negligent nor actions of willful misconduct.  Thus, because Plaintiffs' stories of fraud establish that the CCH Non-Agent Lenders are not alleged to have engaged in gross negligence or willful misconduct, no exception to the CCH Debtors' indemnity agreement exists.

### C.   None Of The Individual Claims Against The CCH Non-Agent Lenders Contains Allegations Of Gross Negligence Or Willful Misconduct That Could Excuse Plaintiffs' Indemnity Obligations.

Plaintiffs allege five causes of action, in seven counts, against the CCH Non-Agent Lenders.  But Plaintiffs never allege facts that the CCH Non-Agent Lenders were grossly negligent nor involved in willful misconduct in relation to any of the individual causes of action alleged against them.  In fact, four of the five causes of action alleged against the CCH Non-Agent Lenders do not even require factual allegations of bad acts by the Non-Agent Lenders in order to state a claim, because bad acts are not elements of these claims.  The Court should not endorse Plaintiffs' decision to plead claims against the CCH Non-Agent Lenders that are unsupported (or unsupportable) by factual allegations of bad acts, and then to use the "slide tactic" to try to avoid the CCH Debtors' indemnification obligations.

The causes of action alleged against the CCH Non-Agent Lenders, and the legal elements of these claims, are as follows:

|  | **Description** | **Elements** |
|---|---|---|
| 5th & 7th | Avoidance and Recovery of Intentionally Fraudulent Transfers | The debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]"  11 U.S.C. § 548(a)(1)(A). |
| 6th & 8th | Avoidance and Recovery of Constructively Fraudulent Transfers | Transfer or obligation incurred for "less than reasonably equivalent value" and Debtors were insolvent or became insolvent, had unreasonably small remaining capital, did not intend to repay, or made transfer to benefit insider, not in ordinary course of business.. 11 U.S.C. § 548(a)(1)(B). |
| 33rd | Equitable Subordination | The court may "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c). |
| 41st | Declaratory Judgment | Seeks interpretation of Section 9.6 of Credit Agreement (maximum amount of obligation for which Restricted Borrower is liable limited to amount that would not render such obligations subject to avoidance).  Pursuant to New York law, "[i]n order to maintain an action for declaratory judgment, a party must present a concrete, actual controversy for adjudication." *Fragoso v. Romano*, 702 N.Y.S.2d 333, 333 (App. Div. 2000) (citations omitted); *see also* 28 U.S.C. § 2201 (stating that under the Federal Declaratory Judgment Act, an "actual controversy" is similarly required). |
| 50th | Avoidance and Recovery of Voidable Preferences | Debtor must establish (1) a transfer of debtor's interest in property, (2) to or for the benefit of a creditor, (3) for or on account of antecedent debt, (4) made while debtor was insolvent, (5) made on or within 90 days prior to petition date, (6) that enabled creditor to receive more than this creditor would have received in Chapter 7 liquidation.  11 U.S.C. § 547(b). |

As shown, Plaintiffs' preference and declaratory judgment claims[15] do not require any bad acts at all on the part of any of the parties, plaintiffs or defendants, much less gross negligence or willful misconduct.  Plaintiffs' constructively fraudulent transfer claims similarly do not require gross negligence or willful misconduct on the part of either Plaintiffs or the CCH Non-Agent Lenders.  Intentionally fraudulent transfer claims, in contrast, do require bad acts in order to state a claim — but the relevant bad actors are the **CCH Debtors**, not the Non-Agent Lenders.  *See Coated Sales, Inc. v. First E. Bank, N.A.* (*In re Coated Sales, Inc.*), 119 B.R. 452, 456 n.4 (Bankr. S.D.N.Y. 1990) ("The focus of fraudulent conveyance law is on the ***intent of the debtor-transferor*** . . . .") (emphasis added).[16]  Plaintiffs do not make any factual allegations that the Non-Agent Lenders were grossly negligent or involved in willful misconduct in relation to the CCH Credit Facility with respect to any of these claims.

Plaintiffs' claim for equitable subordination or equitable disallowance (to the extent it exists) does require allegations of some inequitable or bad act by the Non-Agent Lenders in order for Plaintiffs to state a claim.  However, Plaintiffs completely fail to make any such factual allegations.  *See infra* Part V (analyzing Plaintiffs' failure to plead facts to support the count for equitable subordination/disallowance).  Plaintiffs' failure to plead the required element of the Non-Agent Lenders' inequitable conduct dooms this claim and mandates dismissal.

In sum, Plaintiffs twice entered into binding agreements to indemnify each CCH Non-Agent Lender in relation to the CCH Credit Facility, except in cases where the particular CCH Non-Agent Lender seeking indemnification was grossly negligent or was involved in willful misconduct.  Plaintiffs' Amended Complaint and the claims alleged against the CCH Non-Agent

---

[15]    Additionally, Plaintiffs' count for Declaratory Judgment requires Plaintiffs to demonstrate that an actual controversy exists.  Here, Plaintiffs baldly assert that the parties dispute the meaning of this paragraph in the now extinguished Credit Agreement, but offer no allegations at all supporting the existence of a controversy over the meaning of this language.  Moreover, they fail to explain why they seek declaratory relief to interpret a provision of an extinguished agreement.

[16]    And Plaintiffs allege in some detail the bad acts and fraudulent intentions of the Rigas Family.  *See* Background Facts, *supra* Part I.

Lenders therein contain no factual allegations of gross negligence or willful misconduct on the part of any of the CCH Non-Agent Lenders.  Because no exception to Plaintiffs' indemnity obligation exists, this Court should hold Plaintiffs to their bargain, find that the CCH Non-Agent Lenders are indemnified for all counts pleaded against them, and dismiss all such counts as against the CCH Non-Agent Lenders.

### D. Plaintiffs' Anticipated Reliance On The *Enron* "Tainted Claim" Theory Does Not Relieve The CCH Debtors Of Their Indemnity Obligations.

As they have in the past, Plaintiffs will likely maintain that they need not plead that the CCH Non-Agent Lenders did anything wrong to support their claims in order to avoid their indemnity obligations.  *See* Joint App., Ex. 14 ¶ 67 (Estimation Mot.) (citing *Enron Corp. v. Ave. Special Situations Fund II, L.P. (Enron I)*, 333 B.R. 205, 210 (Bankr. S.D.N.Y. 2005) (*Enron I*)).[17]  Plaintiffs have previously argued that, as a matter of law, a "claim in the hands of the acquirer remains subject to challenge based upon the conduct of its predecessor, even though the acquirer did not personally participate in the wrongdoing."  *Id.*  They rely on the Bankruptcy Court's decision in *Enron* to make this argument.  This reliance on *Enron* to support their theory is misplaced for at least three reasons.  First, the novel *Enron* analysis, decided against a very different legal and factual background than exists with Adelphia, is not binding on this Court.  *See Hawkins v. Steingut*, 829 F.2d 317, 321 (2d Cir. 1987) (recognizing that a district court decision does not clearly establish the law even within its own circuit).  Second, the District Court's subsequent appellate decision is admittedly narrow and applies (if at all) only to equitable subordination claims in a case where there are unpaid creditors.  *See Enron II*, 2007 WL 2446498 at *8.  Finally, both the Bankruptcy Court's and District Court's *Enron* decisions

---

[17]   A consolidated interlocutory appeal was granted by the District Court on the question of whether equitable subordination and disallowance applied to claims held by a transferee based on alleged acts or omissions on the part of the transferor.  *See Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*, Nos. 06 Civ. 7828, 07 Civ. 1957, 2007 WL 2446498, at *2 (S.D.N.Y. Aug. 27, 2007) (*Enron II*).  The District Court concluded that equitable subordination and disallowance are personal disabilities which do not inhere in the claim, but that they may travel to a transferee if the claims were transferred by way of pure assignment as opposed to purchase.  *Id.* at *16.  Thus, the Court vacated the Bankruptcy Court's order and remanded the matter to decide the motions to dismiss in accordance with the decision.  *Id.*

make clear that sophisticated parties, like those in this action, may contract around the impact of any "taint" through the adoption of indemnification clauses, which is exactly what the parties here have done.

While Plaintiffs may ask this Court to apply the questionable *Enron* analysis to each of their many causes of action, the District Court's appellate decision in *Enron II* is applicable, if at all, only to Plaintiffs' equitable subordination claims against Non-Agent Lenders who acquired debt in a "tainted" chain. [18]  *See id.* at *1 (noting that the opinions of the Bankruptcy Court overreached, and stating that its "conclusions of law cleave tightly to the facts presented").[19] Neither the *Enron II* Court, nor any other District Court in this or any other Circuit, has adopted Plaintiffs' theory that claims held by an innocent transferee are subject to *any* challenge that could be made against the transferor based on that party's conduct, as it would require an unwarranted expansion of even the broadest view of the *Enron* theory to have it applicable to other claims such as the fraudulent transfer and preference claims at issue here.  This Court should likewise decline to adopt this theory.

Even if this Court is persuaded by the *Enron II* Court's narrow holding that an innocent transferee may in some circumstances have his claim equitably subordinated, both the Bankruptcy Court and the District Court made clear that bargained for indemnification rights can offer protection to such transferees.  *See Enron I*, 333 B.R. at 229 ("in order to protect the interests of both transferors and transferees, the industry has promulgated standardized provisions relating to transferred rights, assumed obligations, buyer's rights and remedies");

---

[18]  Although Plaintiffs prefer to ignore the logical consequences of their reliance on their *Enron* taint theory, application of this theory necessarily means that some of the Adelphia debt at issue here is *untainted*.  Plaintiffs allege that there were Non-Agent Lenders who participated in the Co-Borrowing Facilities at inception ("Syndicate Banks").  Am. Compl. ¶ 74.  Plaintiffs make no factual allegations as against the Syndicate Banks that differ from the allegations against the rest of the Non-Agent Lenders—aside from the fact that the Syndicate Banks are original lenders.  As Plaintiffs allege no facts supporting bad acts by the Non-Agent Lenders at all, each loan line originating with a Syndicate Bank is an untainted loan line, and under Plaintiffs' theory, all Non-Agent Lenders named due to purchases of the untainted loan lines should be dismissed.

[19]  The *Enron II* Court also considered disallowance under 11 U.S.C. § 502(d), but no such claims are brought by Plaintiffs in this action.

*Enron II*, 2007 WL 2446498 at *10 (noting that even parties to an assignment "can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee").  Such negotiation around risk is exactly what these parties have done, not only in the original credit agreements, but also in the Plan which requires that indemnified claims be released. Any application of the *Enron II* decision should include the Court's recognition of the validity of, and protection offered by, indemnity provisions such as those included in the original agreements and the Plan and Confirmation Order.

## IV.   THE BANKRUPTCY CLAIMS AGAINST THE CCH NON-AGENT LENDERS MUST BE DISMISSED BECAUSE THE CCH DEBTORS DO NOT HAVE STANDING TO BRING THEM.

### A.   The CCH Debtors Do Not Have Standing To Pursue The Bankruptcy Claims.

The Court should also dismiss Plaintiffs bankruptcy claim because they have no standing to bring them.  "'No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.'"  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)).  To establish an actual case or controversy, a litigant seeking relief in the federal courts "must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and *likely to be redressed* by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1861 (2006) (emphasis added) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  A litigant's failure to allege these fundamental elements leaves the federal courts without subject matter jurisdiction.  *Simon*, 426 U.S. at 37-38.  That is just what Plaintiffs have done here.

Plaintiffs (under the guise of a non-existent, agglomerated "Adelphia") assert various bankruptcy claims — preference, fraudulent conveyance, equitable subordination, and equitable disallowance — on behalf of and for the benefit of the CCH Debtors' respective creditors.[20]  To

---

[20]   In earlier motions filed in this case, Plaintiffs have asserted that all payments they seek to avoid "were funneled through one debtor entity, Adelphia Communications LLC, also known as the 'Bank of Adelphia,'" and that the

(Continued…)

establish their standing to maintain these claims, they must establish both that the CCH Debtors' creditors were injured on account of the Non-Agents' alleged unlawful acts and that the relief they seek can redress those injuries. *DaimlerChrysler Corp.*, 126 S. Ct. at 1861 (noting that it is the plaintiff's burden to establish constitutional standing). The CCH Debtors cannot meet this burden.

**First**, none of the CCH Debtors' creditors were injured on account of the allegations Plaintiffs make in their Amended Complaint. In fact, the CCH Debtors satisfied each and every one of their respective creditors (or reserved amounts sufficient to do so), with value to spare. **Second**, even if the CCH Debtors had not been able to satisfy all of their creditors — thus, hypothetically, giving rise to a creditor injury — this lawsuit simply cannot redress that hypothetical injury. Instead, under the Plan, any recovery Plaintiffs receive in this action will flow directly to the beneficiaries of the CVV (none of whom are creditors of the CCH Debtors). Accordingly, the CCH Debtors' creditors — the real parties with the hypothetical injury — have absolutely no stake in the resolution of these matters.[21] In short, the Plaintiffs do not have standing to assert and maintain their bankruptcy claims on behalf of the CCH Debtors' creditors, and, as a result, the claims must be dismissed.

---

Bank of Adelphia "had extensive obligations to other Adelphia debtors that remained unpaid." *See* Pls.' Opp'n to Motions for Leave to Appeal at 36, Docket No. 60 in Case No. 05 Civ. 9050 (S.D.N.Y.). That assertion is contrary to the Complaint. As an initial matter, there is no Debtor known as "Adelphia Communications LLC." But to the extent the Plaintiffs may have meant "Adelphia Cablevision, LLC," which Judge Gerber identified as the "Bank of Adelphia" in his confirmation decision, *see In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 151 (Bankr. S.D.N.Y. 2007), the Amended Complaint fails to allege that Adelphia Cablevision, LLC made any of the payments Plaintiffs seek to avoid. *See* Background Facts, *supra* Part I. In any event, Adelphia Cablevision, LLC, like the CCH Debtors, has no unpaid creditor that would benefit from the avoidance of any such payments. Adelphia Cablevision, LLC is one of the "Subsidiary Debtors" under the Joint Plan, whose creditors (if any) were paid in full and are not beneficiaries of the CVV. *See* Joint App., Ex. 8 at Schedule II (Second Disclosure Statement Supplement ).

[21]    As previously discussed, the more than 250 individual Adelphia bankruptcy estates are not substantively consolidated. Rather, all of the various debtor and respective creditor bodies remain separate and can only recover if they can individually establish standing. *See* Joint App., Ex. 10 § 2.2 (Plan) (recognizing that "all Debtors shall continue to exist as separate legal entities"). As a result, the Court must separately assess the standing of each debtor entity or representative to sue on behalf of its creditors.

1.   **Plaintiffs do not have standing to prosecute their bankruptcy claims because none of the CCH Debtors' creditors suffered a "personal injury."**

a.   **None of the CCH Debtors' creditors were injured on account of the allegations Plaintiffs make in their Amended Complaint.**

The Court should dismiss the various bankruptcy claims because the CCH Non-Agent Lenders' alleged wrongdoing did not injure any creditor of the CCH Debtors. Instead, the Plan, the Disclosure Statement and the October 15, 2007 Status Report all show that the CCH Debtors have fully satisfied each and every one of their creditors under the terms of the Plan. The Amended Complaint does not allege otherwise.[22]

The fact that the CCH Debtors have satisfied all of their creditors' claims is dispositive of the standing question. The CCH Debtors' bankruptcy claims — preference, fraudulent conveyance, equitable subordination and, to the extent it exists, equitable disallowance — are each creditor remedies fashioned to prevent one creditor from improperly receiving a benefit to the detriment of others. Specifically, fraudulent conveyance and preference claims are intended to remedy the injuries *creditors* suffer when a debtor improperly transfers the property necessary to satisfy their claims. *Balaber-Strauss v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005) (noting that courts have consistently held that avoidance actions can only be pursued if there is some benefit to creditors and may not be pursued if they would only benefit the debtor); *Bear, Stearns Sec. Corp. v. Gredd*, 275 B.R. 190, 194 (S.D.N.Y. 2002) (finding that the purpose of preference and fraudulent conveyance actions is to ensure that transfers that have harmed creditors may be avoided).[23] Similarly, equitable subordination and

---

[22]   Notably, the CCH Debtors do not allege that they have any unpaid creditors. *See* Am. Compl. ¶¶ 1124-1168, 1370-1390, 1452-1457, 1514-1519. As it is their burden to allege and, ultimately, prove the existence of unpaid creditors to maintain standing with respect to the bankruptcy claims, the bankruptcy claims must be dismissed. *See DaimlerChrysler Corp.*, 126 S. Ct. at 1861.

[23]   It is unclear which state's law applies to the fraudulent conveyance claims Plaintiffs assert under Bankruptcy Code Section 544. However, the Plaintiffs allege that the laws of Pennsylvania, New York, Texas, North Carolina and Illinois could apply. *See* Am. Compl. ¶¶ 1156, 1167. All five of these jurisdictions recognize that avoidance actions are intended to benefit creditors. *See In re Murphy*, 331 B.R. at 127 (stating that under New York law, a "fraudulent transfer is voidable by creditors only") (citation omitted); *718 Arch St. Assocs. v. Blatstein (In re Blatstein*), 260 B.R. 698, 712 (E.D. Pa. 2001) (recognizing that actions under the Pennsylvania Uniform Fraudulent Conveyance Act are intended to redress creditor harm); *Rodriguez v. Citibank F.S.B. (In re Nowicki*), 202 B.R. 729,

(Continued…)

(to the extent they exist) equitable disallowance claims are intended to remedy the injury *creditors* suffer when one creditor engages in wrongdoing that negatively impacts the debtor's ability to satisfy its other creditors' claims. *Official Comm. of Unsecured Creditors of AppliedTheory Corp. v. Halifax Fund, L.P.* (*In re AppliedTheory Corp*)., 345 B.R. 56, 59 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors."); *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 24-25 (2000) (recognizing that bankruptcy courts can reorder distributions to the extent necessary to ensure fair creditor distribution, but cannot disturb the ultimate validity of a claim); *Pepper v. Litton*, 308 U.S. 295, 310-313 (1939) (disallowing insider's claim when the insider's claim was a sham created to put himself in front of bona-fide creditors); *see also supra* Part V.B.

In light of the purpose underlying these causes of action — ensuring that all creditors receive a fair distribution — courts in this circuit are clear that trustees or other estate representatives can only assert bankruptcy claims when one creditor benefits at the expense of other creditors. *See Bear, Stearns Sec. Corp.*, 275 B.R. at 194-95 (holding that a debtor does not have standing to bring avoidance claims if all creditors are paid); *In re Murphy*, 331 B.R. at 124 (recognizing that "[t]he purpose of fraudulent conveyance law 'is to protect a debtor's unsecured creditors from unfair reductions in the debtor's estate to which creditors usually look for security'") (citations omitted); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) (finding that "a transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors").

---

736 (Bankr. N.D. Ill. 1996) (holding that under Illinois law, which adopts the Uniform Fraudulent Transfer Act, a fraudulent transfer is only voidable "to the extent necessary to satisfy the claims of creditors"), *Am. Nat'l Bank of Austin v. Mortgage Am. Corp. (In re Mortgage Am. Corp.)*, 714 F.2d 1266, 1272 (5th Cir. 1983) (stating that pursuant to the Texas Fraudulent Transfer Act, a fraudulent transfer is pursued for the benefit of creditors); *Bondi v. Bank of Am. Corp.* (*In re Parmalat*), 383 F. Supp. 2d 587, 601 (S.D.N.Y. 2005) (demonstrating that North Carolina's fraudulent transfer law "assigns the remedies for a fraudulent transfer to creditors").

Where all creditors are paid in full, a debtor's payment to one creditor cannot be said to have impaired its other creditors' ability to recover on their claims.  In such a case, no creditor is injured within the scope of the law, and as a result, no party has standing to assert any creditor claims.  *Vintero Corp. v. Corporacion Venezolana de Fomento* (*Matter of Vintero Corp.*), 735 F.2d 740, 742 (2d Cir. 1984), *cert. denied*, 469 U.S. 1087 (1984) (holding that the debtor in possession had the right to avoid in order to protect its other creditors but "not to create a windfall" for the debtor itself); 11 U.S.C. § 547(b)(5) (2006) (a trustee can pursue a preference action against a creditor only when a preferential payment allowed the creditor to receive more than it would have in a Chapter 7 liquidation, thus precluding preference actions in bankruptcy cases where all creditors are paid in full); *Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y. City*, 179 F.2d 582, 584 (2d Cir. 1950) (holding that the debtor could not avoid the lien of a creditor where creditors would obtain no benefit from avoidance); *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 29 (S.D.N.Y. 2002) (recognizing that a trustee is "powerless to act under section 544(b)" unless there are "creditors against whom the transfer is voidable under applicable law" that would benefit from the avoidance) (quoting 5 Lawrence King, *Collier on Bankruptcy* ¶ 544.09 (15th ed. rev. 1999)); *Bear, Stearns Sec. Corp.*, 275 B.R. at 195 (noting that "[a]t its core, fraudulent transfer law is a debt-collection device and not a revenue generating tool; its mission is to prevent unjust diminution of the debtor's estate") (citation omitted).

Under this well-developed body of law, Plaintiffs do not have standing to maintain bankruptcy claims on behalf of the CCH Debtors' creditors.  The Plan, Disclosure Statement and subsequent October 15, 2007 Status Report — all documents of which the Court may take judicial notice — make it clear that no creditors of the CCH Debtors were injured on account of the CCH Non-Agent Lenders' alleged wrongful conduct.  *See* Joint App., Ex. 8 at DSS2-26-DSS2-30 (Disclosure Statement); Ex. 9 § 5.2 (Plan); Ex. 12 (Status Report).  Instead, each and every creditor of the CCH Debtors' estates has been paid in full under the Plan — without even a single cent of recovery from the various bankruptcy claims.  Because none of these creditors has

suffered the type of injury bankruptcy claims were designed to remedy, the underlying claims must be dismissed as a matter of law.

      **b.**      **Plaintiffs cannot manufacture creditors to establish standing.**

Because the CCH Debtors have no injured creditors, Plaintiffs attempt to manufacture creditors on behalf of whom they may assert the CCH Debtors' bankruptcy claims. They do this — in both their Amended Complaint and in motions defending their initial complaint — in two ways. First, they pretend that the more than 250 individual Adelphia entities are really one and the same, depicting a scenario in which the CCH Debtors not only have to satisfy their own creditors, but must also satisfy their corporate great-great grandparents' creditors as well. Joint App., Ex. 11 (Adelphia Corporate Organization Chart). Second, they invoke the existence of alleged intercompany claims, arguing that various Adelphia affiliates have claims against the CCH Debtors. Pls.' Opp'n to Motions for Leave to Appeal at 35, Docket No. 60 in Case No. 05 Civ. 9050 (S.D.N.Y.) ("[T]here are numerous inter-company claims that were not paid under the Plan."). These imaginings are ineffective to "create" creditors where none exist.[24]

First, the more than 250 Adelphia entities are not one and the same. Rather, the Bankruptcy Court has already ruled that each Adelphia entity is a separate legal entity, with its own assets, liabilities and creditors. Joint App., Ex. 9 (Confirmation Order). In fact, the court-approved Plan provides that the "Subsidiary Debtors" — among whom are the CCH Debtors — must pay only those claims asserted against their respective estates.[25] Joint App., Ex. 10 § 2.2 (Plan); Joint App., Ex. 8 at Schedule II (Second Disclosure Statement Supplement). The Plan does not permit, much less obligate, the CCH Debtors to pay claims asserted against their parent

---

[24]  Notably, the two theories are mutually exclusive. If the estates were substantively consolidated, the assets and liabilities of each of the more than 250 individual Adelphia entities would be combined, making the existence of intercompany claims an impossibility. *See Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2d Cir. 1988) ("Substantive consolidation usually results in . . . eliminating inter-company claims . . .") (citation omitted).

[25]  The Plan further specified that its terms "shall not affect any Debtor's status as a separate legal entity, . . . cause a merger or consolidation of any legal entities, nor cause the transfer of any assets." Joint App., Ex. 10 § 2.2 (Plan).

entities.  If the Adelphia entities hoped to merge or "substantively consolidate" their estates, pooling their collective assets to satisfy their collective creditors, they were required to seek court approval of such consolidation before they distributed even one dime to their respective creditors.  They did not.  Accordingly, the CCH Debtors must satisfy their own creditors — no more, no less.

Additionally, there are no unresolved intercompany claims pending against the CCH Debtors.[26]  On this point, the Plan is clear:  when the Plan becomes effective, all "Intercompany Claims shall be deemed resolved," and, as a result, the holders of such claims "shall not be entitled to . . . receive any Plan Distributions or other allocations of value."  *Id.* §§ 2.3, 5.3.  The fact that the Plan resolved these claims pursuant to a release and compromise, rather than by requiring payment in full, does not change the reality that the holders of those resolved claims are no longer creditors of the CCH Debtors' estates.[27]  *In re Oceana Int'l, Inc.*, 376 F. Supp. 956, 962 (D.C.N.Y. 1974) (in a case where creditors' recoveries were capped at ten percent and where the plan does not provide for "any retained interest for the benefit of creditors in the proceeds of a recovery [from an avoidance claim]," the court had no jurisdiction over the claims).  There are no intercompany creditors.  And without creditors — intercompany or otherwise — Plaintiffs do not have standing to bring the CCH Debtors' bankruptcy claims.  Accordingly, Plaintiffs' bankruptcy claims must be dismissed.

---

[26]  Plaintiffs have alleged in prior pleadings, but not in the Amended Complaint, that intercompany claims exist against the Bank of Adelphia (i.e., Adelphia Cablevision, LLC), the entity that it claims made loan repayments to CCH Debtors.  *See, e.g.*, Pls.' Opp'n to Motions for Leave to Appeal at 35, Docket No. 60 in Case No. 05 Civ. 9050 (S.D.N.Y.) ("[T]here are numerous inter-company claims that were not paid under the Plan.").  This is irrelevant as the Plan released all intercompany claims. Joint App., Ex. 10 § 2.2 (Plan); Joint App., Ex. 8 at Schedule II (Second Disclosure Statement Supplement).  As a result, the discussion in this section applies equally to both Adelphia Cablevision, LLC and the CCH Debtors.

[27]  Additionally, as part of the Plan, the creditors of the CCH Debtors agreed to contribute certain funds toward a global settlement agreement.  As a result, their creditors' recoveries are capped at the amount agreed upon in that settlement, and the possibility that they might have recovered more absent the global settlement contained in the Plan is irrelevant to their ability to recover in this lawsuit.  *In re Oceana Int'l, Inc.*, 376 F. Supp. at 962.

2.      **Plaintiffs do not have standing to prosecute the CCH Debtors' bankruptcy claims because the requested relief cannot redress the CCH Debtors' creditors' injuries.**

a.      **Where creditors of the CCH Debtors have no interest in the recovery from this lawsuit, Plaintiffs cannot pursue bankruptcy claims on their behalf.**

Even assuming that the Plaintiffs could show that the CCH Debtors' creditors suffered an actual injury (i.e., that the CCH Debtors could not satisfy their creditors' claims) as a result of the acts they allege in the Amended Complaint, they still would not be able to show that their prosecution of the bankruptcy claims would remedy that creditor injury. Pursuant to the Plan, any and all proceeds of this litigation will inure to the benefit of parties with an interest in the CVV. *See* Joint App., Ex. 10 §§ 9.2 - 9.3 (Plan) (explaining that beneficiaries of the CVV will be entitled to the proceeds from this and other lawsuits). Creditors of the CCH Debtors, however, are not beneficiaries of the CVV and, as a result, will never realize any recovery on account of the bankruptcy claims Plaintiffs assert in this action. As a result, even assuming that creditors of the CCH Debtors were injured, the bankruptcy claims they assert in this lawsuit cannot serve to redress their injuries. Plaintiffs therefore have no standing to bring their bankruptcy claims. *Whiteford Plastics Co.*, 179 F.2d at 584 (holding that the debtor could not avoid the lien of a creditor where creditors would obtain no benefit from avoidance); *Official Comm. of Asbestos Claimants of G-I Holdings, Inc. v. Heyman*, 277 B.R. at 20 (recognizing that a debtor is "powerless to act under section 544(b)" unless there are "creditors against whom the transfer is voidable under applicable law" that would benefit from the avoidance).

b.      **The fact that the CCH Debtors themselves could benefit from avoidance of their obligations under the CCH Credit Facility does not invest Plaintiffs with standing.**

i.      **Plaintiffs cannot avoid the CCH Debtors' contractual obligations so as to redress injuries that the CCH Debtors — as opposed to their creditors — suffered.**

Moreover, Plaintiffs do not have standing to use fraudulent transfer law for the benefit of the CCH Debtors. "Fraudulent conveyance statutes were not intended to protect transferors from their own generosity, stupidity or improvidence, and there is no federal bankruptcy interest in disrupting any legally binding state property relationships to the extent that creditors or

administrative creditors are not harmed under Section 548." *In re Murphy*, 331 B.R. at 126; *see also Bear, Stearns Sec. Corp.*, 275 B.R. at 194 (noting the purpose of preference and fraudulent conveyance actions is to ensure that transfers that have harmed creditors may be avoided).  In fact, where the principles underlying fraudulent conveyance law are not implicated — where there is no creditor harm — a court will "not concern itself with the relative value of what the parties exchanged, and will enforce a bad bargain." *In re Asia Global Crossing, Ltd.*, 344 B.R. 247, 252 (Bankr. S.D.N.Y. 2006).  Thus, even assuming that the CCH Debtors struck a bad deal in agreeing to the CCH Credit Agreement, because no ***creditor*** suffered any harm that could be remedied by the pursuit of this action, the avoidance claims must be dismissed as a matter of law.

In fact, permitting Plaintiffs to avoid the CCH Debtors' obligations under the CCH Credit Agreement simply because they filed bankruptcy is flatly prohibited.  "The Bankruptcy Code will not be interpreted to allow debtors [or their representatives] to avoid the state property law consequences of their actions except to the extent necessary to serve a valid bankruptcy purpose."  *In re Murphy*, 331 B.R. at 126.  Accordingly, once creditors' claims have been satisfied, the transaction remains valid and enforceable as between the transferor and transferee. *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 55 (Bankr. S.D.N.Y. 1999), *aff'd* 275 B.R. 699 (S.D.N.Y. 2002) ("a transfer, avoidable as fraudulent by a creditor, is considered valid as between the grantor and grantee"); *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994), *appeal dismissed*, 168 B.R. 35 (S.D.N.Y. 1995), *aff'd*, 177 B.R. 791 (2d Cir. 1995) ("Because the fraudulent transfer is voidable by creditors only, it is not remarkable that, as between the parties to the transfer, the law regards the transfer as real and binding.").[28]  Here, the

---

[28]    State law also holds that as between the CCH Debtors and the CCH Non-Agent Lenders, the loan is valid and not subject to a fraudulent transfer claim.  *See, e.g.*, *Eaves v. Snyder*, 84 A.2d 195, 197 (Pa. 1951) ("It is well settled that a deed intended to defraud creditors, although void as against creditors, yet is valid as against the grantor, or those claiming under him . . . ."); *Stewart v. Kearney*, 6 Watts 453, 1837 WL 3105 (Pa. 1837) (finding a party who sells property in fraud of creditors is not entitled to have the Court void his obligation because the "action is maintainable in the name of the administrator, as a trustee for the creditors . . . only so far as the property in contest may be needed for payment of debts, whose existence the plaintiff would be bound to show.").  *Sharrer v. Sandles,*

(Continued…)

CCH Non-Agent Lenders have a valid state law property interest in the CCH Debtors' obligation to repay their loans, and in the absence of harmed creditors, neither sections 544 nor 548 can be used to avoid those obligations.

ii.     **In fact, if there are no creditors to benefit from avoidance of a contractual obligation, the Court must enforce the contract or transfer at issue.**

Indeed, courts must "give effect to state law . . . and . . . recognize state law property interests to the extent they do not conflict with a federal interest."  *In re Murphy*, 331 B.R. at 122-23 (citations omitted).  With respect to transfers subject to fraudulent conveyance law, the federal bankruptcy interest in avoiding improper transfers ends when all creditors recover in full. At that point, state law governs the relationship between the transferor and transferee.  Congress did not — and could not — intend fraudulent conveyance law to give debtors a "do over."  *Id.* at 125 ("Congress could not have intended Section 548 to abrogate state law obligations and allow debtors to avoid the state law consequences of their actions and to reap a 'windfall merely by reason of the happenstance of bankruptcy,'" where their creditors suffered no injury); *In re Vintero Corp.*, 735 F.2d at 742 (finding that a creditor could avoid a security interest to protect creditors, but "not to create a windfall [for the debtor] itself").  A debtor cannot reap a windfall as a result of a Chapter 11 proceeding, even if it hopes to give that windfall to what it views as a deserving third party.

c.     **The fact that affiliated debtor entities — and their creditors — could benefit from avoidance of the CCH Debtors' obligations under the CCH Credit Facility does not invest Plaintiffs with standing.**

Plaintiffs may argue that the beneficiaries of the CVV will benefit from recovery on the CCH Debtors' bankruptcy claims.  But because no creditor of the CCH Debtors is a CVV beneficiary, this is irrelevant.

---

477 N.Y.S.2d 897, 899 (App. Div. 1984) (stating that "the transaction between [the parties] may be legally binding as to them, but ineffectual as to. . . creditors").

As discussed, the bankruptcy claims raised in this lawsuit are creditors' remedies, intended solely for the benefit of creditors.  As a result, a debtor or trustee may not avoid obligations, subordinate claims or disallow claims for the benefit of third parties.  *See Warth v. Seldin,* 422 U.S. 490, 500 (1975) (standing "exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally"); *In re Bd. of Dirs. of Hopewell*, 238 B.R. at 55 ("There is no need to recover assets in order to ensure equality of distribution when there is a large enough roast in the oven to feed all the hungry mouths.  For this reason . . . a trustee's or debtor in possession's avoidance powers can only be exercised for the benefit of creditors"); *United Capital Corp. v. Sapolin Paints, Inc.* (*In re Sapolin Paints, Inc.*), 11 B.R. 930, 938 (Bankr. E.D.N.Y. 1981) (stating that a third party purchaser, to whom the debtor had assigned its right to pursue preference claims, attempted "to stand the law of preferences on its head" in seeking to avoid those transfers for its own benefit (as opposed to that of the debtor's general creditors)); *Consol. Pet Foods, Inc. v. Millard Refrigerated Servs., Inc.* (*In re S&D Foods, Inc.*), 110 B.R. 34, 36 (Bankr. D. Colo. 1990) (finding that "[e]quitable subordination is available only to subordinate 'all or part of an allowed claim to all or part of another allowed claim'") (quoting 11 U.S.C. § 510(c)); *Eaves v. Snyder*, 84 A.2d 195, 197 (Pa. 1951) "It is well settled that a deed intended to defraud creditors, although void as against creditors, yet is valid as against the grantor, or those claiming under him . . . ."). This is true regardless of whether a third party was somehow injured as a result of the allegations made in the action.  Simply put, if there are no injured *creditors*, there is no standing to sue.

Here, there is no dispute that the only parties who will benefit from this action are the beneficiaries of the CVV, none of whom are creditors of the CCH Debtors.  Despite the Plaintiffs' painstaking efforts to create the illusion that the more than 250 individual Adelphia entities are really one and the same, creating a pool of needy "Adelphia" creditors, they are not. The Plan does not effectuate a substantive consolidation of the Adelphia entities.  Instead, it is clear that "all Debtors shall continue to exist as separate legal entities."  *See* Joint App., Ex. 10 § 2.2 (Plan); *see also* Joint App., Ex. 11 (Adelphia Corporate Organization Chart).  And, to the

extent that Plaintiffs seek to assert claims on behalf of a particular debtor's creditor constituency, they must show that that particular debtor's creditors — not some other, amorphous "Adelphia" creditors — suffered an injury that the lawsuit can redress.  Where, as here, they cannot, they do not have standing to maintain their claims.

> **d.     The operation of section 502(h) of the Bankruptcy Code reaffirms that the Plaintiffs do not have standing to bring their avoidance claims because the requested relief will not redress the CCH Debtors' creditors injuries.**

If the CCH Debtors were to prevail on their avoidance (i.e., fraudulent conveyance and preference) claims, they would have the right to recover from the CCH Non-Agent Lenders on account thereof.  That right, however, does not exist in a vacuum.  Instead, if the CCH Debtors receive any recovery from the CCH Non-Agent Lenders, section 502(h) of the Bankruptcy Code will allow the CCH Non-Agent Lenders to assert their own corresponding claims against the CCH Debtors for the amounts they recover.[29]  In other words, the CCH Non-Agent Lenders will have a claim against the CCH Debtors for whatever value the CCH Debtors obtain from them in this lawsuit.   The Plan, as well as section 502(h) of the Bankruptcy Code, specifically contemplate this result.  *See* Plan § 5.1(c)(iv) ("[U]nless otherwise provided [in a settlement, order or judgment, a bank whose claim is subject to disgorgement] shall retain its pro rata right to a distribution of any transfer avoided, if any, under section 502(h) of the Bankruptcy Code pursuant and subject to the Plan and shall be entitled to net such claim against any amounts to be paid under a Disgorgement Order"); *see also Official Comm. of Unsec. Creditors of Enron Corp. v. Martin* (*In re Enron Creditors Recovery Corp.*), 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007) ("When a preferential payment is avoided, '[t]he obligation for which the payment was made is revived and may be asserted against the debtor's estate because the creditor has lost the value of the payment received.'") (quoting *In re Gurley,* 311 B.R. 910, 918 (Bankr. M.D. Fla. 2001));

---

[29]    Pursuant to section 502(h) of the Bankruptcy Code, "[a] claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. § 502(h) (2006).

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 62 (1st Cir. 2004) (creditor "entitled to pursue whatever claim it may have had in the avoided sum against the debtor" pursuant to section 502(h)).

With these corresponding 502(h) claims, the CCH Non-Agent Lenders will be entitled to payment from the CCH Debtors' estates in an amount equal to the Plaintiffs' recovery in this lawsuit.  As already discussed, each of the CCH Debtors has already satisfied (or reserved amounts significant to satisfy) all of its respective creditors.  With no existing creditors to satisfy — and given the Bankruptcy Code's absolute priority rule that debtors must pay creditors before equity holders — the CCH Non-Agent Lenders' 502(h) claims will be the first (and only) claims in line for payment from the proceeds of Plaintiffs' recovery from the CCH Non-Agent Lenders.  Simply put, Plaintiffs will have to use any recovery from the CCH Non-Agent Lenders to satisfy the CCH Non-Agent Lenders' resultant claims.

Thus, Plaintiffs' pursuit of the CCH Debtors' avoidance claims is utterly pointless.  *In re Bankvest Capital Corp.*, 375 F.3d at 71 (holding avoidance actions are "pointless" where a creditor "would be entitled to receive exactly what it would be forced to return through avoidance" pursuant to section 502(h)).  After spending what will undoubtedly be a significant amount of time and money pursuing these actions (particularly given the sheer number of defendants they have elected to pursue), even if Plaintiffs win, they will simply have to turn around and give their spoils back to the CCH Non-Agent Lenders.  There is no reason for the Plaintiffs to waste the estates' assets or, for that matter, the CCH Non-Agent Lenders' money on this senseless, circular endeavor.  The Court should dismiss the preference and fraudulent conveyance claims.

> **e.    Even if Plaintiffs succeed on their equitable subordination claims, their success will not redress any creditor injury.**

Similarly, even if Plaintiffs win their equitable subordination claim, their success will not inure to the benefit of any of the CCH Debtors' creditors.  Again, the CCH Debtors have already satisfied their creditors in full *without subordinating* the CCH Non-Agent Lenders' claims.  And even if the CCH Non-Agent Lenders' claims were subordinated (to non-existent claims), their

claims must still be paid before equity interests.  Plaintiffs concede as much.  *See* Appellee's Opp'n Br. at 51, Docket No. 127 in Case No. 05 Civ. 9050 (S.D.N.Y.) ("[T]he remedy of equitable subordination may not help the creditors at the parent company level since the defendants may remain superior by reason of their structural priority.").  Accordingly, even if Plaintiffs succeed in moving the CCH Non-Agent Lenders' claims to the back of the creditor line, no party (including the CCH Debtors' corporate great grandparents) will receive any additional recovery as a result.  *In re S&D Foods, Inc.*, 110 B.R. at 36 (finding that equitable subordination would be a "frivolous exercise" where all unsecured creditors will receive the same amount regardless of whether the defendants' claims were equitably subordinated).  The Court should therefore dismiss this futile claim.

### B.    The Bankruptcy Code Does Not Provide An Exception To The Standing Requirements

Relying predominantly on the Fourth Circuit's decision in *Coleman v. Comm. Trust Bank (In re Coleman)*, 426 F.3d 719 (4th Cir. 2005), Plaintiffs have in the past attempted to draw a distinction between the Bankruptcy Code's avoidance provisions (sections 544, 547 and 548) and its recovery provision (section 550) to argue that they need not establish creditor injury — or the ability of their avoidance claims to redress such injury — to bring their claims.  *Coleman* considered whether a Chapter 11 debtor could avoid a nonrecourse mortgage lien, conveyed in fraud of creditors, in an amount greater than that necessary for it to pay its creditors' claims in full.  Relying on a single phrase in section 550 — "for the benefit of the estate" — the court concluded that it could.  *Id.* at 725-26; *cf. In re Glanz*, 205 B.R. 750, 758 (Bankr. D. Md. 1997) (finding that the Bankruptcy Code does not preclude a debtor from avoiding fraudulent conveyances even if avoidance will not benefit the estate, but that equitable principles may be applied to bar a lien avoidance action where avoidance does not accrue to benefit creditors, but instead creates a windfall for the debtor).  The *Coleman* court misinterprets the Bankruptcy

Code, and in doing so ignores more than one hundred years of case law establishing that avoidance is a **creditor remedy** intended solely to redress creditor injury.[30]

In *Coleman*, the debtor argued that the plain language of Bankruptcy Code section 544(b)(1), which authorizes avoidance of any transfer that a creditor could avoid under applicable state law, allowed her to completely avoid her bank's lien even when just a partial avoidance would have allowed her to satisfy her prepetition and administrative creditors' claims. *In re Coleman*, 426 F.3d at 725. The bank, on the other hand, argued that the phrase "for the benefit of the estate" contained in Bankruptcy Code section 550(a) — the provision governing a trustee's right to recover an avoided transfer — only permitted the debtor to avoid the bank's liens to the extent necessary to benefit her creditors. *Id.* The remainder of the security interest, the bank argued, should remain in favor of the bank as transferee. *Id.* The Fourth Circuit ultimately turned the bank's argument on its head, holding not only that section 550(a)'s "for the benefit of the estate" language did not limit a trustee's right to fully avoid a transfer where only partial avoidance was necessary to satisfy creditors, but also that Congress' choice not to include the phrase "for the benefit of the estate" in section 544 indicated Congress' intent to allow complete avoidance even when that avoidance would only partially inure to creditors' benefit.[31] *In re Coleman*, 426 F.3d at 725-26 ("[T]he presence of the phrase 'for the benefit of the estate' in § 550 merely highlights the fact that Congress knew how to include such a limitation when it wanted to.").

---

[30]   Notably, the debtor in *Coleman* did have creditors that would benefit from avoidance (even though the full proceeds of avoidance were not necessary to satisfy those creditors' claims). Here, however, the CCH Debtors do not have even one creditor that could benefit from a recovery in this case. Instead, any recovery the Plaintiffs receive will flow to creditors of the CCH Debtors' corporate great grandparent. This alone makes *Coleman* — and the Plaintiffs' reliance thereon — inapplicable to this case.

[31]   *See* 11 U.S.C. § 544(b)(1) (2006) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."); 11 U.S.C. § 550(a) (2006) ("(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the **benefit of the estate**, the property transferred, or, if the court so orders, the value of such property . . . . ) (emphasis added).

As an initial matter, *Coleman* is contrary to the established law in this Circuit.  In fact, courts in this Circuit have consistently held that a trustee cannot avoid a transfer unless there are creditors that will benefit from the avoidance.  *Matter of Vintero Corp.*, 735 F.2d at 742.

Moreover, the Fourth Circuit's analysis in *Coleman* is just wrong.[32]  The purpose of avoidance actions — to redress creditor injuries caused when a debtor's transfer of property benefits one creditor to the detriment of other creditors — has been deeply embedded in bankruptcy common law (including the Second Circuit common law this Court is bound to follow) since the time of the 1898 Bankruptcy Act, more than 100 years ago.  *See In re J.C. Winship Co.*, 120 F. 93, 96 (7th Cir. 1903) ("It would be mockery of justice to say that the alleged bankrupt may claim through and in the right of creditors whose debts have been paid and discharged; that he may avoid a transaction, valid as to himself but voidable as to creditors, in the right of nonexisting creditors. . . . The court of bankruptcy is a court of equity."); *see also Matter of Vintero Corp.*, 735 F.2d at 741-742 (demonstrating that the trustee had the ability to act on behalf of creditors); *Whiteford Plastics Co.*, 179 F.2d at 585 ("In our opinion the bank, which had a good secured claim as against the debtor, can still hold it where the petition to avoid the sale is not in the interest of the general creditors."); *In re Martin Custom Made Tires Corp.*, 108 F.2d 172, 173 (2d Cir. 1939) (noting that a "debtor in possession holds its powers in trust for the benefit of the creditors," and thus, "the debtor in possession may move to have the mortgage held invalid as to creditors," but "in the unlikely event that, after creditors have been satisfied

---

[32]   The facts of *Coleman* are analogous to those of *Moore v. Bay*, 284 U.S. 4 (1931), yet *Coleman* (by employing its forced statutory analysis) erroneously goes further than *Moore*.  In *Moore*, the trustee sought to avoid a transfer standing in the shoes of a creditor that existed at the time of the transfer, and to use the proceeds of that avoidance to satisfy all creditors, *i.e.*, those that existed both at the time of and after the avoided transfer.  The Supreme Court held that the trustee could avoid a fraudulent conveyance to the extent necessary to benefit the estate, and thus that all creditors, including those whose claims arose subsequent to the time of the avoidable transfer, could share in that recovery.  *Id.* at 5.  *Moore*, however, said nothing about the proper disposition of an avoided transfer to the extent that there are proceeds beyond those necessary to satisfy all creditors in full.  In *Coleman*, there were both prepetition and administrative creditors that stood to benefit from avoidance.  Under *Moore*, the debtor would have been permitted to avoid the transfer to the extent necessary to satisfy all prepetition and administrative creditors.  The court in *Coleman*, however, went beyond the holding of *Moore*, and held that the debtor could avoid the subject lien beyond the extent necessary to satisfy all creditors in full, and thus provide a benefit to the debtor on account of the avoidance at the expense of the lien counterparty.  This was an error.

accordingly, some of the mortgaged property should be left unaffected by the plan and some part of the debt due the [mortgagee] should remain," then "whatever security the [mortgagee] may have under the mortgage is left for determination."); *Matter of Schwab*, 613 F.2d 1279, 1281 n.2 (5th Cir. 1980) (holding that the court may void lien for benefit of creditors); *In re Parkwood, Inc.*, 461 F.2d 158, 162-163 (D.C. Cir. 1971) (accord); *City Nat. Bank & Trust Co. v. Oliver*, 230 F.2d 686, 689-90 (10th Cir. 1956) (accord).

The Supreme Court has repeatedly held that, in the absence of clear statutory language or legislative history to the contrary, bankruptcy common law established under the pre-Code 1898 Bankruptcy Act retains its validity under the Bankruptcy Code. *See Dewsnup v. Timm*, 502 U.S. 410, 419-420 (1992) (stating that "[w]hen Congress amends the bankruptcy laws, it does not write 'on a clean slate,'" and also that the Supreme Court "has been reluctant to accept arguments that would interpret the [Bankruptcy] Code . . . to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history" except in circumstances where the language of the Bankruptcy Code is "unambiguous") (citations omitted).

Here, Congress' enactment of the Bankruptcy Code does nothing to invalidate this time-honored precedent. Neither the legislative history nor inclusion of the phrase "for the benefit of creditors" in the recovery section of the Code indicates Congress' clear intent to abrogate avoidance common law. In fact, the legislative history behind section 550 reveals that Congress enacted this recovery provision — a then-novel concept in bankruptcy law — predominantly to address the difficulties trustees encountered in recovering avoided transfers from subsequent, as opposed to initial, transferees. Ralph Brubaker, *Lien Avoidance "for the Benefit of the Estate": Textualism, Equitable Powers, and Code Common Law*, 26 No. 1 Bankruptcy Law Letter (2006) (citing S. Rep. No. 95-989, at 90 (1978); H.R. Rep. No. 95-595, at 376 (1977)). The legislative history says nothing at all to suggest that Congress had a secondary goal of sanctioning avoidance — but barring recovery — when the transferor has no existing creditors that will benefit from avoidance.

In fact, the statute itself suggests just the opposite.  Section 550 sets up a two-step process for avoiding and recovering transfers:  a trustee must first successfully avoid a transfer under the Bankruptcy Code's avoidance provisions, and only then may it sue to recover the value of the avoided transfer from an initial or subsequent transferee.  In other words, the trustee's ability to avoid is a necessary prerequisite to (and, in fact, is itself a limitation on) its ability to recover.  A trustee cannot recover what it cannot first avoid.  And because the common law — common law that sections 544, 547 and 548 of the Bankruptcy Code have not abrogated — is clear that a trustee can only bring an avoidance action when it will inure to the benefit of creditors, the creditor-benefit limitation that courts and commentators have read into section 550 actually derives not from the statute itself, but rather from avoidance common law.  The limitation is one and the same.  *Coleman's* statutory interpretation misses the point.[33]

Plaintiffs take *Coleman's* erroneous statutory interpretation to an extreme, arguing that Congress' enactment of sections 544 and 550 of the Bankruptcy Code altogether negates the jurisdictional requirement of standing in avoidance actions.  This, they argue, allows a trustee to avoid a transfer even when the debtor's creditors — the real parties in interest — were not injured by the transfer and, therefore, cannot benefit from avoidance thereof.  Of course, Congress simply does not have the power to modify or abrogate the jurisdictional requirements of standing.  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (recognizing that Congress cannot abrogate the immutable requirement of constitutional standing).  And again, there is no evidence in the Bankruptcy Code or legislative history that it actually intended to do so.

---

[33]   As one law professor has disdainfully described the *Coleman* result:  "[T]he debtor obtains the loan proceeds, the debtor fraudulently grants a lien to the bank, and then the debtor herself (following the bankruptcy filing) successfully attacks the lien as having been fraudulently granted (by herself), thus resulting in a possible surplus for the debtor's own benefit, while depriving the bank of its lien. . . . With a little doctoring, this plot line could make a great screenplay: a scam artist intentionally engages in a fraudulent transfer (preferably with an innocent victim as the transferee), files bankruptcy, pays off the creditors for pennies on the dollar, and then recovers the entire fraudulent transfer from the hapless transferee.  Only in bankruptcy could such a bizarre result occur."   Dan Schechter, *Debtor May Completely Avoid Lien As Fraudulent Transfer Based on Debtor's Own Fraudulent Intent, and Bankruptcy Court Cannot Limit Scope of Debtor's Recovery*, 2005 Comm. Fin. News. 84, 84 (2005).

Despite the Fourth Circuit's misguided decision in *Coleman*, the law remains now as it did back in 1903:  avoidance is a creditor remedy that can only be exercised to redress injuries fraudulent or preferential transfers cause to the transferor's creditors.  As a result, because the CCH Debtors have no injured creditors to benefit from avoidance, Plaintiffs have no standing to raise their avoidance claims.  They must be dismissed.

## V.   THE COURT SHOULD DISMISS PLAINTIFFS' EQUITABLE SUBORDINATION AND EQUITABLE DISALLOWANCE CLAIMS BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

### A.   Plaintiffs Equitable Subordination Claims Against The Non-Agent Lenders Must Be Dismissed.

The Court may also dismiss Plaintiffs' equitable subordination claim because they have failed to state a claim against the CCH Non-Agent Lenders.  Equitable subordination[34] is an unusual remedy that should be applied only in limited circumstances, none of which have been alleged against the Non-Agent Lenders.  *See Le Cafe Creme, Ltd. v. Le Roux (In re Le Cafe Creme, Ltd.)*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000);[35]  *see also Official Comm. of Unsec.*

---

[34]  As discussed in Part V.B of this brief, an action for equitable disallowance does not exist under the Bankruptcy Code.  In the event that the Court holds otherwise, and finds that the Bankruptcy Code does allow actions for equitable disallowance, the CCH Non-Agent Lenders note that what little case law discusses equitable disallowance at all indicates that the standards for obtaining equitable disallowance would be higher and more difficult to satisfy than the standards for equitable subordination.  *See, e.g.*, *In re Adelphia Commc'ns Corp*, 365 B.R. at 73 (finding that equitable subordination and equitable disallowance are not equally appropriate alternatives and that disallowance plainly "is more draconian, and would be appropriate in just a few circumstances").  As such, the Non-Agent Lender's arguments regarding equitable subordination apply with even more force to Plaintiffs' claim for equitable disallowance.

[35]  Although the *Le Cafe Creme* Court eventually found that plaintiffs could equitably subordinate defendants' claims, the defendants in *Le Cafe Creme* were insiders.  In our case, the CCH Non-Agent Lenders are not alleged to be insiders or fiduciaries.  Courts have held that equitable subordination for non-insiders is even more rare.  *See, e.g.*, *Official Comm. of Unsec. Creds. of Sunbeam Corp. v. Morgan Stanley & Co.  (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002) ("Few cases find that non-insider, non-fiduciary claims meet this standard [for equitable subordination].");  *80 Nassau Assoc. v. Crossland Fed. Sav. Bank, (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838 (Bankr. S.D.N.Y. 1994) ("[C]ases subordinating the claims of creditors that dealt at arm's length with the debtor are few and far between.") (citation omitted).  It is more difficult for courts to equitably subordinate non-insiders' claims because "[i]n the case of non-insider claims, the proponent always bears the burden of proof" and there are "fewer traditional grounds available" for equitable subordination.  *Id.* at 839-840 n.5 (citations omitted).  Some courts even state a "higher level of proof is required to equitably subordinate the claim of a party that is neither an insider of the debtor, nor a fiduciary to the debtor or other creditors."  *In re Sunbeam Corp.*, 284 B.R. at 363-64 (citations omitted).  *Cf. Official Comm. of Unsec. Creds. of Lois/USA, Inc., v. Conseco Fin. Serv. Crop., (In re Lois/USA, Inc.)*, 264 B.R. 69, 135 (Bankr. S.D.N.Y. 2001) (citation omitted).

*Creds. of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC* (*In re Radnor Holdings Corp.*), 353 B.R. 820, 840 (Bankr. D. Del. 2006) ("[E]quitable subordination is a 'drastic' and 'unusual' remedy.") (citation omitted); *Cohen v. KB Mezzanine Fund II., LP* (*In re SubMicron Sys. Corp*), 291 B.R. 314, 327 (D. Del. 2003) ("Courts have recognized that equitable subordination is an unusual remedy which should be applied only in limited circumstances." (citing *Holt v. Fed. Deposit Ins. Corp.,* 868 F.2d 146, 148-49 (5th Cir.1989)); *Waslow v. MNC Commercial Corp.* (*In re M. Paolella & Sons, Inc.*), 161 B.R. 107, 117 (E.D.Pa.1993) ("[E]quitable subordination is an extraordinary departure from the 'usual principles of equality of distribution and preference for secured creditors'") (citation omitted)).  In order to state a claim for equitable subordination against the CCH Non-Agent Lenders — which lenders are not alleged to be insiders or fiduciaries — Plaintiffs must allege facts that the CCH Non-Agent Lenders engaged in gross and egregious conduct that is tantamount to fraud, misrepresentation, overreaching, spoliation or conduct involving moral turpitude.[36]  *See, In re Sunbeam Corp.*, 284 B.R. at 355, 364 (Bankr. S.D.N.Y. 2002).  Plaintiffs must allege facts that establish plausible grounds for the claim that the CCH Non-Agent Lenders "committed fraud or some other illegal action, or that the [CCH Non-Agent Lenders] breached some legal duty that [they] owed to the debtor or its creditors."  *Id.*; *see also Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  The Court may not assume that Plaintiffs will prove facts they have not pleaded, and conclusory allegations are not adequate.  *See Twombly*, 127 S. Ct. at 1966 n.5; 1969 n.8.  As the Amended

---

[36]  Plaintiffs have previously admitted in pleadings before the Bankruptcy Court that Plaintiffs are not alleging gross and egregious conduct by the CCH Non-Agent Lenders.  *See*, *supra* n.13.  Instead Plaintiffs rely on a "tainted debt" theory, the gist of which is that if one lender in the chain of transfers engages in any gross and egregious conduct, then any lenders in the chain of transfers leading from that "bad" lender, are subject to equitable subordination to the same extent as the "bad" lender.  *See* Joint App., Ex. 14 ¶ 8 (Estimation Mot.) (stating that "[i]n the Bank Action, there is no allegation that the Syndicate Banks individually did anything improper.  Rather, the only issue specific to the Syndicate Banks is whether as 'after-market' holders of Bank Claims under the Prepetition Credit Facilities, their debt may be 'tainted' by the torts and other wrongful conduct of the Banks from whom they purchased that debt.").  *See also id.* ¶ 40 ("[T]he complaint in the Bank Action does not allege that the Syndicate Banks individually committed wrongdoing . . . ."); *id.* ¶ 67 ("In the Bank Action, there are no claims that any of the 'after-market' Syndicate Banks individually did anything improper.  In fact, most of the Syndicate Banks are not even banks.").  The CCH Non-Agent Lenders response to Plaintiffs' tainted debt theory appears in Part II.D of this brief.

Complaint factually alleges only that the CCH Non-Agent Lenders purchased debt in arms-length transactions with Adelphia and the Agents, Plaintiffs fail to meet this standard. The Court should dismiss the claim for equitable subordination against the Non-Agent Lenders.

> **1. The Amended Complaint fails to allege plausible liability for equitable subordination because Plaintiffs' allegations make clear that the necessary vehicle for the alleged fraud was the Rigas and Adelphia established CMS, not the co-borrowing facilities.**

Despite Plaintiffs "other" story of fraud at Adelphia via the co-borrowing facilities, Plaintiffs' pleadings make it clear that Adelphia's CMS was *the* instrumentality that allowed the Rigases to perpetrate their fraud. For example, Plaintiffs allege the CMS was the Rigas Family's personal piggy bank, and that the Rigas Family could, and did, change "ownership" of cash simply through journal entries. *See* Background Facts, *supra* Part I.D.; *see also* Am. Compl. ¶¶ 1005, 1012, 1234. Additionally, Plaintiffs allege that when the Rigas Family needed money, they borrowed it — but not necessarily through a co-borrowing facility. "Beginning in 1998, the Rigas Family found themselves without access to sufficient cash or credit that they needed to maintain their lifestyles and achieve their personal business endeavors. The Rigas Family worked closely with the Agent Banks and the Investment Banks to devise a scheme to use Adelphia's credit to obtain access to funds that the Rigas Family could use for their personal benefit." *Id.* ¶ 807. Although this allegation continues Plaintiffs' story-line of "bad" lenders scheming with the Rigases, the allegation shows that the Rigases did not need the Co-Borrowing Facilities to perpetrate their alleged fraud. For example, an alleged need in early 1998 by the Rigases for more credit, leveraged off of Adelphia, did not lead to the establishment of a Co-Borrowing Facility.[37] Instead, Adelphia, under the Rigases' control, entered into the Non-Co-Borrowing Parnassos Credit Facility in December of 1998. Subsequent to that, the Rigases and Adelphia entered into the UCA/HH Co-Borrowing Credit Facility in May of 1999, and then

---

[37]   As stated in the Credit Agreements, the initial dates for each of the Credit Facilities is as follows: FrontierVision, entered into on December 19, 1997; Parnassos, December 30, 1998; UCA/HHC, May 6, 1999; Century-TCI, December 3, 1999; Century, April 14, 2000; CCH, September 28, 2001.

Adelphia, still under Rigas control, entered into another non-coborrowing facility, Century-TCI, in December of 1999.  As Plaintiffs allege, any Rigas Family "need" for credit could be met through any credit facility, because "[a]ll of the funds drawn on Adelphia's credit facilities were deposited and co-mingled [sic] into Adelphia's cash management system."  *Id.* ¶ 16.

If, as Plaintiffs' Amended Complaint establishes, the CMS provided the Rigas Family with the necessary tool to conduct their alleged fraud, then the plausibility of Plaintiffs' allegations of a vast conspiracy between the Rigas Family and hundreds of the countries' top lending institutions falters.  This is particularly so as to the CCH Non-Agent Lenders, against whom the Amended Complaint alleges neither any special relationship with Adelphia or the Rigas Family nor any facts indicating their knowledge of any illicit CMS transfers or deception of the Independent Directors.  Plaintiffs' conclusory allegations against the Non-Agent Lenders do not establish plausible liability and  the Court should dismiss count 33 as against the Non-Agent Lenders.

  **2.**    **The Amended Complaint fails to allege plausible liability for the equitable subordination of the CCH Non-Agent Lenders' claims because Plaintiffs make no factual allegations of gross and egregious conduct on the part of the CCH Non Agent Lenders.**

In support of their claim for equitable subordination of the CCH Non-Agent Lenders' claims, Plaintiffs factually allege as follows:  (1) each of the Co-Borrowing Facilities was syndicated to a group of banks (the "Syndicate Banks" or Non-Agent Lenders) (*see* Am. Compl. ¶ 74), (2) Adelphia employees under the direction of the Rigases, and CCH Agent and Investment Banks prepared the CCH Confidential Memo to solicit Non-Agent Lenders to participate in the CCH Facility (*see id.* ¶ 882), (3) after the Independent Directors approved the CCH Facility, the Agent and Investment Banks sent the Non-Agent Lenders the CCH Confidential Memo in March 2000, which memorandum "made clear, the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by RFE co-borrower Highland Presitge" (*id.* ¶ 905), (4) the CCH Credit Agreement defined "leverage ratio" on a combined basis for all CCH Borrowers (*see id.* ¶ 901), and (5) the Agent and Non-Agent Lenders quarterly received compliance certificates from Adelphia, showing amounts outstanding under

the CCH Facility and stating that the borrowers were in compliance with the CCH Credit Agreement (*see id.* ¶¶ 882, 1026).  Plaintiffs thus factually allege only that some Non-Agent Lenders who participated in the CCH Credit Facility received information about the structure of the CCH Credit Facility before deciding to purchase a syndicated portion of the debt,[38] that the CCH Credit Facility was approved by the Independent Directors of Adelphia, that the Non-Agent Lenders knew that the credit-worthiness of the CCH Facility was based on a combined leverage ratio of all of the CCH Borrowers, and that the CCH Borrowers provided information to the Non-Agent Lenders, on a quarterly basis, stating the amount of the borrowings and informing the Non-Agent Lenders that the CCH Borrowers were in compliance with the requirements of the CCH Credit Facility.

Nowhere do Plaintiffs allege facts that the Non-Agent Lenders did anything other than receive general information on a debt offering — information approved by Adelphia — and then decide to participate in that debt paper.  Notably, Plaintiffs' lengthy allegations regarding the alleged deception of the Independent Directors do not allege facts showing CCH Non-Agent Lender participation in or knowledge of any such alleged deception.  To the arms-length CCH Non-Agent Lenders, the Adelphia Directors approved the structure and nature of the CCH Credit Facilities.  No duty existed on the part of the CCH Non-Agent Lenders who participated in the CCH Credit Facility to second guess the business judgment of the Adelphia Directors — and Plaintiffs do not even allege the existence of any such duty.

Plaintiffs make one additional unsupported allegation against the CCH Non-Agent Lenders in the text of Count 33 itself.  There, Plaintiffs allege that if any of the CCH Non-Agent Lenders did not know of or consciously avoided knowledge of the alleged fraud, then the alleged knowledge and wrongful conduct of the Agent Banks should be imputed to such Lenders "by virtue of the agency relationship among them."  *Id.* ¶ 1373.  This conclusory, legal allegation

---

[38]   Plaintiffs' allegations regarding the CCH Confidential Memo suggest that such information was allegedly provided only to the Syndicate Banks, and not the Assignees.

occurs on page 393 of Plaintiffs' 475 page Amended Complaint and represents the first and only mention of any alleged agency relationship between the Agent and Non-Agent Banks.   Such conclusory, legal statements "unsupported by factual assertions fail[] even the liberal standard of Rule 12(b)(6)."  *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir. 1996) (citation omitted).  *See also Maung Ng We v. Merrill Lynch & Co., Inc.*, No. 99 Civ. 9687, 2000 WL 1159835, at *6 (S.D.N.Y. Aug. 15, 2000) (holding that "plaintiffs' conclusory statements" that parties were agents of each other "do not allege an agency relationship sufficient to withstand dismissal under" Rule 12(b)(6)); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 763 (S.D.N.Y. 2004) (finding that plaintiff failed to allege facts sufficient to establish an agency relationship).   And in fact, the CCH Credit Facility itself is unambiguous in its repeated statements refuting the establishment of any such agency relationship.  *See Background Facts, supra* Part I; *see also Global Entm't Inc. v. N.Y. Tel. Co.*, No. 00 Civ. 2959, 2000 WL 1672327, at *6 (S.D.N.Y. Nov. 6, 2000) (finding that plaintiff did not sufficiently plead agency because contract between parties "negate[d] any control by one party over the other" and plaintiff also did not plead any other facts that supported allegation of an agency relationship.)

The CCH Non-Agent Lenders are lenders who purchased a portion of the CCH Credit Facility debt paper, in arms-length transactions, either at inception of the Facility or in the secondary market.  Plaintiffs' factual allegations do not suggest anything different.  As such, Plaintiffs have utterly failed to allege facts establishing plausible liability against the CCH Non-Agent Lenders to equitably subordinate their claims, and this Court should dismiss the equitable subordination claim.[39]

---

[39]   Additionally, certain of the CCH Non-Agent Lenders did not receive distributions on their claims under the Plan.  Instead, they sold their claims against the CCH Debtors before the Plan's effective date.  Because these CCH Non-Agent Lenders did not receive a Plan distribution on account of their now non-existent claims, they are not bound by the Plan's disgorgement provisions and, as a result, their claims (or rights to distribution thereon) cannot be equitably subordinated or, for that matter, equitably disallowed.

B.    **Plaintiffs' Equitable Disallowance Claims Against The Non-Agent Lenders Must Also Be Dismissed.**

Plaintiffs also assert against the CCH Non-Agent Lenders a claim for "equitable disallowance," a cause of action they claim the Supreme Court created in *Pepper v. Litton*, 308 U.S. 295 (1938).[40]  In *Pepper*, the Supreme Court disallowed an insider's sham claim on account of the insider's "planned and fraudulent scheme" to defraud creditors.  *Id.* at 311.  In discussing whether the insider's claim should be equitably disallowed on account of his wrongdoing, the Court analyzed the following factors:

- Whether the insider disregarded the corporate entity for his own purpose;

- Whether the insider breached the fiduciary standards of conduct he owed to the corporation, stockholders or creditors;

- Whether the insider used insider information and his strategic position for his own benefit; and

- Whether the insider used his power for personal advantage.

In applying these factors, the Court found that the insider's claim should be disallowed:[41]

> On such a test the action of the District Court in disallowing or subordinating Litton's claim was clearly correct. Litton allowed his salary claims to lie dormant for years and sought to enforce them only when his debtor corporation was in financial difficulty.  Then he used them *so that the rights of another creditor were impaired.*  Litton as an insider utilized his strategic position for *his own preferment to the damage of Pepper.* Litton as the dominant influence over Dixie Splint Coal Company used his power *not to deal fairly with the creditors of that company* but to manipulate its affairs in such a manner that when *one of its creditors* came to collect her just debt the bulk of the assets had disappeared into another Litton company.  Litton, though a fiduciary, was enabled by astute legal maneuvering to acquire most of the assets of the bankrupt not for cash or other consideration of value to creditors but for bookkeeping entries

---

[40]   Whether an "equitable disallowance" claim even exists at all has been extensively briefed before this Court.  *See* Joint App., Ex. 17 at 4-10 (Joint Appellant's Br. of Certain Lenders); *see also* Joint App., Ex. 18 at 1-7 (Joint Reply Br. of Certain Lender Appellants).  The CCH Non-Agent Lenders agree with those parties who have argued that neither *Pepper v. Litton* nor any subsequent case creates a cause of action for equitable disallowance and incorporates those arguments as if set forth fully herein.  That said, even if Plaintiffs' rendition of the claim exists, Plaintiffs simply cannot maintain it against the CCH Non-Agent Lenders because they have not alleged facts sufficient to state a cause of action against them.

[41]   Based on the facts as recited in *Litton*, it appears that regardless of whether the Court subordinated or disallowed Litton's claim, it would have led to the same result:  Litton would have received nothing.

> representing at best merely Litton's appraisal of the worth of Litton's
> services over the years.

*Id*. at 311-12 (emphasis added).  While the issue of whether *Pepper* creates a viable "equitable disallowance" claim is the subject of ongoing debate in this case, to the extent such a claim does exist, *Pepper* does make one thing clear:  equitable disallowance is an extraordinary remedy limited to situations where ***an insider*** engages in ***extreme wrongdoing*** to the detriment of a ***creditor***.  As a result, this claim cannot lie against the Non-Agent Lenders.

First, the Non-Agent Lenders simply are not insiders (nor are they alleged to have any special relationship with Adelphia).  The Bankruptcy Code defines an insider as officer, director, person in control, relative or partner of a debtor.  11 U.S.C. § 101(31).  The Non-Agent Lenders — banks or other funds that invested in the CCH Credit Facility — are none of the above.  Plaintiffs themselves concede as much.  *See generally* Am. Compl. ¶¶ 146-791 (identifying Non-Agent Lenders but failing to allege any insider relationship with the CCH Debtors).

Moreover, Plaintiffs do not allege any facts against the CCH Non-Agent Lenders that would rise to the level of wrongdoing necessary to invoke equitable disallowance.  In fact, Plaintiffs do not assert any allegations of wrongdoing against the CCH Non-Agent Lenders at all.  *See supra* Part V.1.  Accordingly, even if equitable disallowance does exist as a viable cause of action, Plaintiffs do not — and, given the CCH Non-Agent Lenders' peripheral role as syndicate lenders, cannot — allege the corporate control, deception and wrongdoing necessary to maintain the claim against the Non-Agent Lenders.

Finally, to the extent a claim for equitable disallowance exists, it exists for the benefit of ***creditors***.  As discussed extensively herein, the CCH Debtors do not have any creditors that would benefit if the court equitably disallowed the CCH Non-Agent Lenders' claims.  Because there are no creditors, Plaintiffs have no standing to bring their purported equitable disallowance claim.  The claim should be dismissed.

## CONCLUSION

For the foregoing reasons, the CCH Non-Agent Lenders respectfully request that the Court dismiss Counts 5, 6, 7, 8, 33, 41, and 50 of Plaintiffs' Amended Complaint as to the CCH Non-Agent Lenders without leave to amend.


Dated:  December 21, 2007

        ___/s/ Richard L. Wynne_____
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:      (213) 680-8400
Facsimile:       (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin Brady (*pro hac vice motion pending*)
Laura Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders