KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin Brady (*pro hac vice motion pending*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELPHIA RECOVERY TRUST,<br><br>                    Plaintiff,<br><br>          v.<br><br>BANK OF AMERICA, N.A., *et al*.,<br><br>                    Defendants. | No. 05-CV-9050 (LMM) |

## THE OLYMPUS NON-AGENT LENDERS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION TO DISMISS COUNTS 9, 10, 11, 12, 33, 42, AND 51
## OF PLAINTIFFS'[1] AMENDED COMPLAINT

### (Non-Agent Lenders' Motion to Dismiss No. 2 of 6)

---

[1]   The Adelphia Recovery Trust (the "ART") represents the separate and unique interests of more than 250 individual Adelphia entities in this litigation.  Because these entities' interests in this lawsuit are, indeed, separate — and not consolidated — the Olympus Non-Agent Lenders refer to the ART as "Plaintiffs" rather than "Plaintiff" throughout this Motion.

TABLE OF CONTENTS

Page(s)

INTRODUCTION ...........................................................................................................1

I.     BACKGROUND FACTS ...............................................................................1

     A.     The Olympus Credit Facility And Indemnity Provisions ............................1

     B.     The Olympus Debtors' Confirmed Plan Of Reorganization And
           Indemnity Provisions ...................................................................................4

     C.     The Amended Complaint And Absence Of Any Alleged
           Wrongdoing By The Olympus Non-Agent Lenders ...................................7

           1.     Plaintiffs' conflicting and confusing "definitions" help
                  demonstrate the absence of factual allegations against the
                  Olympus Non-Agent Lenders. ......................................................8

           2.     Plaintiffs' allegations regarding the Olympus Credit
                  Facility also reveal that the Olympus Non-Agent Lenders
                  played no role in the wrongdoing at Adelphia. ...............................9

     D.     Allegations Regarding The Rigas' Use Of The Cash Management
           System ("CMS") Also Do Not Involve The Olympus Non-Agent
           Lenders........................................................................................................14

II.     LEGAL STANDARDS FOR ASSESSING THE OLYMPUS NON-
     AGENT LENDERS' MOTION TO DISMISS......................................................15

III.     PURSUANT TO THE PLAN AND CONFIRMATION ORDER, THIS
     COURT MUST DISMISS ALL COUNTS AGAINST THE OLYMPUS
     NON-AGENT LENDERS BECAUSE ALL CLAIMS WOULD BE
     INDEMNIFIED UNDER THE OLYMPUS CREDIT AGREEMENT. ..............16

IV.     THE BANKRUPTCY CLAIMS AGAINST THE OLYMPUS NON-
     AGENT LENDERS MUST BE DISMISSED BECAUSE THE
     OLYMPUS DEBTORS DO NOT HAVE STANDING TO BRING
     THEM. ................................................................................................................17

V.     EVEN IF THE OLYMPUS DEBTORS HAVE STANDING TO RAISE
     THEIR EQUITABLE SUBORDINATION AND EQUITABLE
     DISALLOWANCE CLAIMS, THE COURT SHOULD DISMISS THEM
     BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH
     RELIEF CAN BE GRANTED. .........................................................................17

CONCLUSION............................................................................................................18

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adelphia Commc'ns Corp. v. Bank of Am., N.A.*,
    365 B.R. 24 (Bankr. S.D.N.Y. 2007) ............................................................................ 2

*Assoc'd. Gen'l Contractors of Cal. Inc. v. Carpenters*,
    459 U.S. 519 (1983) ...................................................................................................... 15

*Bartang Bank and Trust Co. v. Caiola*,
    No. 04 Civ. 2402, 2006 WL 2708453 (S.D.N.Y. Sept. 18, 2006) ................................. 16

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (2007) .................................................................................................. 15

*Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd.*,
    182 B.R. 493 (Bankr. S.D. Tex. 1994) ........................................................................... 4

*Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*,
    243 B.R. 620 (S.D.N.Y. 2000) ....................................................................................... 4

*Corporate Food Mgt., Inc. v. Suffolk Cmty. College*,
    223 B.R. 635 (Bankr. E.D.N.Y. 1998) ........................................................................... 4

*Cortec Indus., Inc. v. Sum Holding, L.P.*,
    949 F.2d 42 (2d Cir. 1991) ............................................................................................. 2

*DeJesus v. Sears, Roebuck & Co., Inc.*,
    87 F.3d 65 (2d Cir. 1996). ............................................................................................ 15

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ...................................................................................................... 15

*Esoimeme v. United Airlines, Inc.*,
    369 B.R. 531 (N.D. Cal. 2007) ....................................................................................... 4

*F.D.I.C. v. Colonial Realty Co.*,
    966 F.2d 57 (2d Cir. 1992) .............................................................................................. 5

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
    No. 03 MD 1529, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) ................................. 15

*In re Forte*,
    234 B.R. 607 (Bankr. E.D.N.Y. 1999) ........................................................................... 4

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993) .......................................................................................... 15

*Rent Stabilization Ass'n of N.Y. v. Dinkins*,
    5 F.3d 591 (2d Cir. 1993) ............................................................................... 16

*Rosenberg v. XO Commc'ns, Inc.*
    330 B.R. 394 (Bankr. S.D.N.Y. 2005) ............................................................. 4

*Thompson v. County of Franklin*,
    15 F.3d 245 (2d Cir. 1994) ............................................................................ 16

## INTRODUCTION

This Court should dismiss all claims against the Olympus Non-Agent Lenders, who had no role in negotiating or establishing the Olympus Credit Facility or in the alleged misconduct that is central to the Amended Complaint, for at least two reasons.  ***First***, the indemnification provisions in the now final Adelphia Plan of Reorganization require dismissal unless the individual Olympus Non-Agent Lenders acted with gross negligence or willful misconduct. Plaintiffs, however, never allege that the Olympus Non-Agent Lenders engaged in such "bad" acts, so there is no exception to the indemnity obligations that require dismissal of all claims. ***Second***, Plaintiffs do not have standing to bring the "bankruptcy claims" (fraudulent transfer, preference, equitable subordination, and equitable disallowance claims) because such claims require the existence of unpaid creditors, and each individual Adelphia corporate debtor that might have otherwise asserted such bankruptcy claims against the Olympus Non-Agent Lenders has paid all of its creditors in full.

In addition to lacking standing to assert the equitable subordination and equitable disallowance claims, Plaintiffs have not alleged adequate facts to sustain these claims against the Olympus Non-Agent Lenders.  Plaintiffs have not alleged any bad acts by the Olympus Non-Agent Lenders — none of whom are insiders — and thus have failed to allege against the Olympus Non-Agent Lenders facts that, if true, would establish the kind of gross and egregious conduct necessary to state a claim for equitable subordination against them.  And as to equitable disallowance, to the extent it exists, it is a far more severe sanction than equitable subordination, and historically was generally reserved only for insider misconduct.  Plaintiffs have failed to meet the even more vigorous standards to state a claim for equitable disallowance as well. Accordingly, both claims must be dismissed on this separate and independent ground.

## I.     BACKGROUND FACTS

### A.     The Olympus Credit Facility And Indemnity Provisions

Pursuant to a Credit Agreement, dated September 28, 2001 (the "Olympus Credit Agreement"), three Adelphia entities and two Rigas Family entities ("RFEs") entered into a

$2.03 billion Co-Borrowing Facility with various lenders, comprising a $765 million revolving credit facility, a $765 million term loan, and a $500 million term loan. Am. Compl. ¶ 925. The three Adelphia subsidiaries were Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, and Adelphia Holdings 2001, LLC (the "Olympus Debtors"), while the two RFEs were Highland Video Associates, L.P., and Coudersport Cable and Television Company (the "Olympus RFE Borrowers") (collectively, the "Olympus Borrowers").[2] *Id.* The Olympus Credit Agreement, along with all Guaranties, Pledge Agreements, and all related agreements are referred to as the "Olympus Credit Facility." As of the Petition Date, approximately $1.3 billion was outstanding under the Olympus Credit Facility. *Id.* ¶ 969. Of that amount, Plaintiffs allege that the Olympus RFE Borrowers had drawn down approximately $751.5 million. *Id.* ¶ 985.

As part of the Olympus Credit Agreement, the Olympus Borrowers agreed that, unless a claim against a lender thereto relating to the Olympus Credit Facility resulted from a lender acting with gross negligence or willful misconduct, the Olympus Borrowers would indemnify and defend that lender from and against all claims, damages, losses, and expenses arising out of, or in connection with, or by reason of any investigation, litigation or proceeding related to the Olympus Credit Facility. *See* Joint App., Ex. 4 § 11.12 (Olympus Credit Agreement);[3] *see also id.* § 13.12(b) (extending Lender status under the Olympus Credit Agreement to Non-Agent Lenders[4] who purchase the debt in the secondary market). Section 11.12 of the Olympus Credit Agreement states, in relevant part:

---

[2]   The Olympus Borrowers and their subsidiaries guaranteed payment and performance. *See* Am. Compl. ¶¶ 925-26. Performance and repayment were also secured by pledges of stock of the Olympus Borrowers. *See id.*

[3]   "[O]n a motion to dismiss, a court may consider certain documents in addition to the complaint, including the contents of any document attached to the complaint or incorporated by reference[.]" *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 34 (Bankr. S.D.N.Y. 2007); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992). All Exhibits referenced herein are attached to the Request for Judicial Notice and Joint Appendix of Exhibits ("Joint App.") filed concurrently.

[4]   For purposes of this brief, the Non-Agent Lenders or Olympus Non-Agent Lenders moving to dismiss are those defendants represented by Kirkland & Ellis LLP and sued in their capacity as "Syndicate Banks" or "Assignees" in relation to the Olympus Credit Facility. To the extent that any Kirkland & Ellis LLP represented defendant is

(Continued…)

> Each Borrower . . . agrees, jointly and severally, to indemnify and hold harmless each Agent, Joint Lead Arranger, and each Lender and each of their respective affiliates and their respective officers, directors, employees, agents, attorneys, and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities . . ., costs, and expenses (including reasonable attorneys' fees) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including in connection with any investigation, litigation, or proceeding or preparation of defense in connection therewith) the Loan Documents, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Borrowings (including any of the foregoing arising from the negligence of the Indemnified Party), except to the extent such claim, damage, loss, liability, cost, or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have **resulted from such Indemnified Party's gross negligence or willful misconduct**.

*Id.* § 11.12 (emphasis added).  The Olympus Borrowers also agreed to the same indemnification obligations for each purchaser of the Olympus debt in the secondary market, upon such purchaser's execution of an Assignment and Acceptance agreement like the one attached as Exhibit F to the Olympus Credit Agreement.  Section 13.12(b) states, in relevant part, "[u]pon execution, delivery, acceptance, and recordation of such Assignment and Acceptance Agreement, the assignee thereunder shall be a party hereto and, to the extent of such assignment, have the obligations, Rights, and benefits of a Lender . . . under the Loan Documents . . . ."  *Id.* § 13.12(b).  All indemnity rights owed by the Olympus Borrowers to the individual Lenders, including those who purchased the debt in the secondary market, survive any assignment and termination of the Olympus Credit Agreement.  *See id.* § 13.5.

While the Olympus Credit Agreement affirmatively creates an indemnity relationship between the Olympus Borrowers and the Lenders to the facility, it expressly denies the creation of any fiduciary relationship between the Olympus Non-Agent Lenders and the Agents.  *See id.* § 12.5(a) (stating that no Agent has a fiduciary relationship with any Lender); *see also id.* § 12.1(c)

---

alleged to be a "John Doe" lender in the Olympus Credit Facility, the defendant is also a moving party here.  A list of Kirkland & Ellis LLP represented defendants in all credit facilities appears at Joint App., Ex. 22.  Kirkland & Ellis LLP represents approximately 400 Non-Agent Lenders across all six credit facilities, who received payments of approximately $4.1 billion in relation to the Adelphia debt paper.

(stating that the Administrative Agent has no fiduciary duty to the Olympus Borrowers or the Lenders).  In fact, the Olympus Credit Agreement specifically provides that no Agent or Lender shall incur any liability to any other Person for any act or omission of any other Lender or Agent. *Id.* § 12.7.

### B. The Olympus Debtors' Confirmed Plan Of Reorganization And Indemnity Provisions

The Olympus Debtors filed voluntary Chapter 11 bankruptcy cases in the Southern District of New York on June 25, 2002.  Am. Compl. ¶ 1067.  The Bankruptcy Court jointly administered the Olympus Debtors' bankruptcy cases with those of other Adelphia entities, who had also filed for bankruptcy.  *See* Joint App., Ex. 7 (Joint Administration Order).

After years of failed plan proposals, the Olympus Debtors and other Adelphia affiliates agreed upon the terms of a joint plan of reorganization embodied in the First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors (the "Plan"), which Plan the Bankruptcy Court confirmed in January 2007.[5] *See* Joint App., Ex. 8 at DSS2-6 (Second Disclosure Statement Supplement); *see also* Joint App., Ex. 9 (Confirmation Order).  Pursuant to the Plan, all Adelphia entities (including the Olympus Debtors) released any and all intercompany claims they held against any other Adelphia entity. *See* Joint App., Ex. 10 § 2.3 (Plan).  The Plan also called for the creation of a Contingent Value

---

[5]  Courts routinely take judicial notice of bankruptcy court dockets, and pleadings filed therein, including plans of reorganization.  *See*, *e.g.*, *Esoimeme v. United Airlines, Inc.*, 369 B.R. 531, 533 n.2 (N.D. Cal. 2007) (taking judicial notice of the bankruptcy petition and various bankruptcy court orders); *Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*, 243 B.R. 620, 622 n.2 (S.D.N.Y. 2000) (taking judicial notice of the confirmation order, plan of reorganization and the related trust instrument); *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 418 (Bankr. S.D.N.Y. 2005) (taking judicial notice of the debtor's disclosure statement); *In re Forte*, 234 B.R. 607, 613 n.11 (Bankr. E.D.N.Y. 1999) (taking judicial notice of the schedules to determine who owned the relevant property); *Corporate Food Mgt., Inc. v. Suffolk Cmty. College* (*In re Corporate Food Mgt., Inc.*), 223 B.R. 635, 646 (Bankr. E.D.N.Y. 1998) (taking judicial notice of the Debtor's bankruptcy schedules and concluding therefrom that the unsecured creditors "would have received less than a one hundred percent distribution at the time the Debtor converted the involuntary Chapter 7 bankruptcy proceeding to a case under Chapter 11"); *Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd.* (*In re Buttes Gas & Oil, Co.*), 182 B.R. 493, 494 (Bankr. S.D. Tex. 1994) (taking judicial notice of the docket sheet and Bankruptcy Court file, and concluding therefrom that all of the debtor's creditors are being paid pursuant to the plan).

Vehicle (the "CVV"), from which certain Adelphia creditor groups would receive distributions if, among other things, the claims Plaintiffs assert in this lawsuit are successful. *See id.* § 9. The Plan does not give the Olympus Debtors' creditors a right to receive any distributions from the CVV. Instead, that right is given to the Olympus Debtors' corporate great-great grandparent.

Notably, the Plan does not effectuate a merger or so-called "substantive consolidation" of the Adelphia entities.[6] Rather, the Plan provides that each Adelphia entity remains a separate legal entity, and that the estates are ***not*** substantively consolidated. *Id.* § 2.2; *see also* Joint App., Ex. 11 (Adelphia Corporate Organization Chart). This lawsuit does not and cannot change that fact. Each of the Olympus Debtors is responsible only for satisfying its own creditors' claims — no more, no less. *See* Joint App., Ex. 10 § 2.2 (Plan).

And, in fact, the Olympus Debtors have had ample funds to satisfy their respective creditors' claims. *See* Joint App., Ex. 12 (Status Report). The following chart summarizes the Plan's treatment of the various classes of the Olympus Debtors' creditors (all classified as "Subsidiary" creditors) and shows that the Olympus Debtors have paid all of their creditors in full.

| Class of Claims | Treatment Under The Plan | Actual Treatment[7] |
|---|---|---|
| Subsidiary Priority Claims | An amount equal to payment in full, in cash. (Joint App., Ex. 8 at DSS2-26 (Second Disclosure Statement Supplement); Joint App., Ex. 10 §5.2(a) (Plan)) | Paid In Full. |
| Subsidiary Secured Claims | Paid in full, in cash, with postpetition interest. (Joint App., Ex. 8 at DSS2- | Paid In Full. |

---

[6]  Substantive consolidation occurs when the assets and liabilities of separate and distinct legal entities are combined in a single pool and treated as if they belong to one entity. Therefore, substantive consolidation generally results in the satisfaction of liabilities from the resulting common fund of assets and also the elimination of intercompany claims between and among substantively consolidated entities. *F.D.I.C. v. Colonial Realty Co.*, 966 F.2d 57, 58-59 (2d Cir. 1992).

[7]  *See* Joint App., Ex. 12 (Status Report).

| Class of Claims | Treatment Under The Plan | Actual Treatment[7] |
|---|---|---|
| | 26 (Second Disclosure Statement Supplement); Joint App., Ex. 10 §5.2(b) (Plan)) | |
| Subsidiary Bank Claims | An amount equal to payment in full, in cash, with postpetition interest (but subject to disgorgement).  (Joint App., Ex. 8 at DSS2-27-28 (Second Disclosure Statement Supplement); Joint App., Ex. 10 §5.2(c)(A) (Plan)) | Paid In Full. |
| Subsidiary Trade Claims | An amount equal to payment in full, in cash or stock in TWC, with postpetition interest (except for agreed-upon give ups).  (Joint App., Ex. 8 at DSS2-30 (Second Disclosure Statement Supplement); Joint App., Ex. 10 §5.2(d) (Plan)) | Paid In Full. |
| Subsidiary Other Unsecured Claims | An amount equal to payment in full, in cash or stock in TWC, with postpetition interest (except for agreed-upon give ups).  (Joint App., Ex. 8 at DSS2-30 (Second Disclosure Statement Supplement); Joint App., Ex. 10 §5.2(e) (Plan)) | Paid In Full. |

In addition to requiring the Olympus Debtors to pay their creditors in full, the Plan also cancels and extinguishes the Olympus Credit Facility as it relates to the Olympus Debtors (Joint App., Ex. 10 § 8.6(a) (Plan)), with one important caveat.  The Plan expressly obligates the Olympus Debtors to indemnify each of their Non-Agent Lenders on virtually the same terms as were contained in the now extinguished Olympus Credit Agreement.  It does this through the definition of "Dismissed Bank Actions," which provides in relevant part:

Dismissed Bank Actions means the Bank Actions [which term includes this litigation] or one or more Claims asserted therein, if any: . . . (ii) with respect to a particular defendant as to which there is a determination by a court of competent jurisdiction pursuant to a Final Order that such defendant as to such Bank Actions, is (or would be, but for any limitation on indemnification or contribution pursuant to this Plan) **entitled to indemnification or contribution** (whether under a Prepetition Credit Agreement or under another agreement or principle of law), either by a Debtor or by a Person who is (or would be, but for any limitation on indemnification or contribution pursuant to the Plan) entitled to indemnification or

> contribution by a Debtor, but only to the extent of such
> indemnification or contribution . . . .

*Id.* at A-17 (Plan) (citing Prepetition Credit Agreement indemnification language as the basis for finding indemnification under the Plan) (emphasis added).  The Confirmation Order incorporates the Olympus Debtors and lenders' agreement regarding Dismissed Bank Actions, stating:

> all Dismissed Bank Actions, if any, shall, with respect to the Debtor
> Parties only, be ***dismissed with prejudice*** and without costs, and the
> Debtor Parties shall be deemed to release the Bank Lenders, Investment
> Banks and/or other defendants with respect to the Dismissed Bank
> Actions, effective as of the Effective Date.

Joint App., Ex. 9 ¶ II (Confirmation Order) (emphasis added).  Thus, under the Plan and Confirmation Order, each Non-Agent Lender who participated in the Olympus Credit Facility is entitled to dismissal of the claims alleged against it to the extent the Olympus Borrowers would have been required to indemnify the Olympus Non-Agent Lenders under the now-extinguished Olympus Credit Facility.

      **C.**    **The Amended Complaint And Absence Of Any Alleged Wrongdoing By The Olympus Non-Agent Lenders**

Plaintiffs filed their almost 500-page Amended Complaint on October 31, 2007.  They assert on the Olympus Debtors' behalf five causes of action against the Olympus Non-Agent Lenders, including preference, fraudulent conveyance, equitable subordination, equitable disallowance and declaratory relief.  *See* Am. Compl. ¶¶ 1169-1189 (fraudulent conveyance pursuant to federal law), ¶¶ 1190-1213 (fraudulent conveyance pursuant to state law), 1370-1390 (equitable disallowance or equitable subordination), ¶¶ 1458-1463 (declaratory judgment), ¶¶ 1520-1527 (preferences).  Despite the length of the Amended Complaint and the more-than-four years it took to be produced, Plaintiffs do not allege any facts indicating that the Olympus Non-Agent Lenders committed any "bad acts" that would nullify the indemnity provisions set forth in the Plan and the Confirmation Order.  In fact, with the exception of Plaintiffs' claims for intentional fraudulent conveyance, equitable subordination and, to the extent it exists, equitable disallowance, the claims Plaintiffs assert against the Olympus Non-Agent Lenders do not require Plaintiffs to plead or prove any such "bad acts" at all.

**1.    Plaintiffs' conflicting and confusing "definitions" help demonstrate the absence of factual allegations against the Olympus Non-Agent Lenders.**

In the Amended Complaint, Plaintiffs define different "types" of lender defendants that participated in the credit facilities, including the Olympus Credit Facility.   For example, Plaintiffs place all Agents — the Administrative Agent and the Nominal Agents — in one group known as "Agent Banks," and define that group as those banks that participated in arranging, structuring and managing the Co-Borrowing Facilities.[8]  *See id.* ¶ 24.  "Investment Banks" are defined as each being affiliated with one of the Agent Banks, and which "assisted their affiliate Agent Banks and the Rigas Family in structuring the Co-Borrowing Facilities and provided services and advice to Adelphia in connection with a series of debt and equity offerings issued during the same time period that the Co-Borrowing Facilities were created."  *Id.* ¶ 25.

When it comes to the Non-Agent Lenders, however, Plaintiffs' definitions are inconsistent.  For example, Plaintiffs identify two "types" of defendants that would include the Non-Agent Lenders:  "Syndicate Banks" and "Assignees."[9]  Plaintiffs initially define "Syndicate Banks" as banks to whom the Co-Borrowing Facilities were syndicated, who agreed to lend Adelphia money under the Co-Borrowing Facilities, and who were therefore "original co-borrowing lenders."  *See id.* ¶¶ 74, 76.  Plaintiffs then define "Assignees" to be those lenders that received a transfer from an "original Co-Borrowing Lender" (*i.e.* a Syndicate Bank or an Agent Bank) of rights under one of the Co-Borrowing Facilities.  *See id.* ¶ 146.  Plaintiffs then combine the definitions, stating that the Olympus Syndicate Banks include "one or more of the Assignees."  *Id.* ¶ 930.

---

[8]   Although Plaintiffs' definition of "Agent Banks" may be concise, it is far from clear.  As can be seen from the plain text of the Olympus Credit Agreement, the Administrative Agent had rights and obligations distinct from any other lender, including the Nominal Agents.  Joint App., Ex. 4 § 12 (Olympus Credit Agreement).

[9]   Capitalized terms that are not otherwise defined in the Motion have the same meaning as in the Amended Complaint.  Such usage does not indicate agreement with Plaintiffs' definitions or characterizations, and the Non-Agent Lenders reserve the right to challenge Plaintiffs' definitions and characterizations.

Plaintiffs' conflation of these terms (such that Syndicate Banks include all Non-Agent Lenders, whether original syndicate members or secondary purchasers in the market) is confusing and suggests a lack of any principled difference in Plaintiffs' distinctions between "Syndicate Banks" and "Assignees." Nevertheless, this conflation does not change the fact that Plaintiffs make few, if any, factual allegations against the Olympus Non-Agent Lenders. And no factual allegations allege any bad acts by the Olympus Non-Agent Lenders. Instead, Plaintiffs abandon the definitions that relate solely to Non-Agent Lenders and replace them with broader terms designed to encompass the Agent Banks and/or lenders to other credit facilities (*i.e.*, "Olympus Lenders," "Olympus Co-Borrowing Lenders," or broader still, the "Co-Borrowing Lenders") to create the illusion that the Olympus Non-Agent Lenders are part of their story.

### 2. Plaintiffs' allegations regarding the Olympus Credit Facility also reveal that the Olympus Non-Agent Lenders played no role in the wrongdoing at Adelphia.

Plaintiffs prefer to eschew using definitions that focus solely on the Non-Agent Lenders because the Non-Agent Lenders play no role in Plaintiffs' story of wrongdoing at Adelphia. Instead, as described below, the Olympus Non-Agent Lenders appear simply as investors in an Olympus Credit Facility that was approved by Adelphia's Independent Directors.

Plaintiffs allege that the Olympus Credit Facility arose because the Rigas Family needed to access credit in early 2001. *See id.* ¶ 924. The Agent and Investment Banks, Plaintiffs allege, conducted significant due diligence prior to closing the Olympus Credit Facility, and worked with the Rigas Family to prepare an offering memorandum to solicit other lenders (i.e. Non-Agent Lenders) to participate in the facility. *See id.* ¶ 928. Plaintiffs allege that because the Olympus Co-Borrowing Facility constituted an affiliated transaction, that "Adelphia needed the approval of Adelphia's Board of Directors and the separate approval of the Independent Directors then sitting on the Board in order to participate in the Olympus Co-Borrowing Facility," and that the Rigas Family sought and obtained that approval at a meeting of the ACC Board of Directors on August 7, 2001. *Id.* ¶¶ 930, 932. There is no allegation that any Olympus Lender, Agent or Non-Agent, was present at this meeting. *See id.* ¶ 932.

To obtain the Independent Directors' approval, Plaintiffs allege that Olympus Agent Banks and their affiliated Investment Banks "worked closely with the Rigas Family and James Brown to prepare a term sheet describing the terms of the Olympus Co-Borrowing Facility" (the "Olympus Term Sheet"), which the Rigas Family presented to the Independent Directors at the meeting. *Id.* ¶¶ 931, 933. Plaintiffs further allege that "the Rigas Family and the Olympus Term Sheet deliberately failed to disclose all material facts to the Independent Directors concerning the Olympus Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFEs intended to put the funds they drew down from the facility." *Id.* ¶ 943.

Plaintiffs allege that the Olympus Term Sheet provided that the Olympus Credit Facility would contain protective clauses barring certain affiliate transactions. *See id.* ¶¶ 938-941. Plaintiffs further allege that "the Rigas Family and the Olympus Agent Banks and their affiliated Investment Banks knew at the time they provided the Olympus Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions." *Id.* ¶ 954.

Plaintiffs also allege that the Olympus Term sheet provided that "[t]he Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels," but that the Olympus Term Sheet did not contain a definition of "Leverage Ratio," which omission Plaintiffs allege was material. *Id.* ¶¶ 942, 945. Timothy Rigas and James Brown, Plaintiffs allege, informed "the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets," although the Rigas Family knew this statement was false when made. *Id.* ¶ 944. "The Rigas Family had agreed with the Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition." *Id.*

In addition to the Olympus Term Sheet's alleged misrepresentations, Plaintiffs also allege that Timothy Rigas and James Brown verbally misrepresented to the Independent Directors that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral the co-borrower provided, when in fact the Olympus Credit Facility contains no limits on the amounts that each co-borrower could borrow.  *See id.* ¶¶ 945, 949, 950.  Due to the Rigases' "verbal misrepresentations and the incomplete and/or inaccurate information set forth in the Olympus Term Sheet[,]" Plaintiffs allege that the Independent Directors were misled into believing that the terms and conditions of the Olympus Credit Facility were in the best interests of Adelphia, when they were not.  *See id.* ¶ 936.  There is no allegation that any of the Olympus Non-Agent Lenders were involved in preparing, or even saw, the Olympus Term Sheet.

After the Independent Directors approved the Olympus Credit Facility, Plaintiffs allege that the Olympus Agent Banks and their affiliated Investment Banks prepared and sent to the Olympus Non-Agent Banks a Confidential Information Memorandum, which described the terms of the Olympus Credit Facility, and which made clear that "the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by the RFE co-borrowers." *Id.* ¶ 951.  Plaintiffs further allege that the "Confidential Information Memorandum explicitly stated that the collateral contributions of ACC co-borrowers Olympus Cable Holdings, LLC and Adelphia Company of Western Connecticut would be based on revenues from a combined total of 1,505,512 cable television subscribers, whereas RFE co-borrowers Highland Video Associates, LP and Coudersport Television Cable Company's combined collateral contribution would be based on revenues from a combined total of 61,335 cable television subscribers." *Id.* ¶ 952.  This information, Plaintiffs allege, was neither in the Olympus Term Sheet nor disclosed to the Independent Directors.  *See id.*

Plaintiffs also allege that the Olympus Agent and Investment Banks knew that the Independent Directors had a duty to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions.  *See id.* ¶ 963.  The true terms of the Olympus Credit Facility, Plaintiffs allege, were not in Adelphia's best interests.  *See*

*id.*  "The Olympus Agent Banks and their affiliated Investment Banks  knew or consciously avoided the fact that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts."  *Id.*

Finally, Plaintiffs allege that Adelphia did not publicly disclose, prior to March 27, 2002, the contingent liabilities incurred as a result of the RFE's draws from the Co-Borrowing Facilities, and that "the Olympus Agent Banks and their affiliated Investment Banks knew, or consciously avoided, the fact that the Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded."  *See id.* ¶¶ 966, 968.

Noticeably absent from Plaintiffs' factual allegations of wrongdoing in relation to the Olympus Credit Facility is any mention of the Olympus Non-Agent Lenders.  Instead, Plaintiffs use their overly-broad definitions to give their completely unsupported allegations against the Olympus Non-Agent Lenders the false appearance of being tied to facts alleged against other defendants.  Plaintiffs' most common tactic is to use an allegation that originated with a reference to a particular lender or the group of Agent Banks, but then recast the allegation — without adding any new or supporting factual allegations — using a broader term like "Olympus Lenders" in an attempt to slide the specific allegations against one defendant onto defendants against whom no specific allegations have been made.

Examples of Plaintiffs' "slide tactic" include:

- "The Olympus Credit Agreement was created and agreed to by the Rigas Family, the Olympus Agent Banks and their affiliated Investment Banks, ***and the Olympus Co-Borrowing Lenders***."  *Id.* ¶ 947 (emphasis added).

(But there are no factual allegations that the Olympus Non-Agent Lenders created the Credit Agreement; moreover, to the extent that the "Olympus Co-Borrowing Lenders" includes Assignees, it is impossible for the downstream purchasing Olympus Non-Agent Lenders to have "created" the Olympus Credit Agreement.)

- "Based on substantial overlapping participation of lenders from the UCA/HHC and CCH Co-Borrowing Facilities, the ***Olympus Lenders*** knew that the Rigas Family had been misappropriating the proceeds of

> other Co-Borrowing Facilities for their own personal purposes, to the detriment of Adelphia, as more fully described above.  The ***Olympus Lenders*** knew that the Independent Directors were never advised of such activities." *Id.* ¶ 983 (emphases added).

(But there are no factual allegations that the Olympus Non-Agent Lenders knew of any misappropriations or what the Independent Directors had been told or not told.)

- > "Nonetheless, as of the Petition Date, Highland Video and CCT had drawn approximately $751.5 million of the $1.27 billion outstanding under the Olympus Co-Borrowing Facility, or 59% of the amount borrowed.  No prudent lender would have lent Highland Video and CCT $751 million (or more) without Adelphia's credit support.  The ***Olympus Lenders*** knew or consciously disregarded the facts, which were readily apparent to them, that the terms of the Olympus Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family benefited enormously and personally from their participation in the Olympus Co-Borrowing Facility, at the expense of Adelphia." *Id.* ¶ 985 (emphasis added).

(But there are no factual allegations that any of the Olympus Non-Agent Lenders knew of the alleged deception of the Independent Directors, nor that the Olympus Non-Agent Lenders had any duty to second guess the business judgment of the Independent Directors in entering into the Olympus Co-Borrowing Facility.)

- > "Upon information and belief, the ***Co-Borrowing Lenders*** performed periodic analyses demonstrating Adelphia's concealment, as caused by the Rigas Family, of billions of dollars under the Co-Borrowing Facilities from Adelphia's balance sheet.  For example, on or about March 29, 2001, Defendant Wachovia performed an analysis of Adelphia's total outstanding "bank debt" at the subsidiary level, as of September 30, 2000, under the two Co-Borrowing Facilities then outstanding — UCA/HHC and CCH — and under six Non-Co-Borrowing Facilities then outstanding — Parnassos, Chelsea Communications, Adelphia Cable Partners, Harron Communications, FrontierVision and Century-TCI.  Wachovia determined that Adelphia's total "bank debt" as of September 30, 2000 was approximately $5.2 billion.  Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt, as of September 30, 2000, was approximately $3.8 billion.  Wachovia did not need any "special" access to Adelphia to obtain this information. All of the Co-Borrowing Lenders could have made this calculation based on information readily accessible to them as lenders.  Wachovia's analysis demonstrates that many, if not all, ***Defendants*** knew or consciously avoided knowing that Adelphia was understating its total bank debt in 2000 by approximately $1.4 billion and that Adelphia's leverage was not being reduced as represented." *Id.* ¶¶ 1027-28 (emphases added).

(But there are no factual allegations that the Olympus Non-Agent Lenders performed this calculation.), had a duty to perform this calculations, or were in a position to perform this calculation.)

Plaintiffs' factual allegations of wrongdoing in relation to the Olympus Credit Facility never include the Olympus Non-Agent Lenders.

### D. Allegations Regarding The Rigas' Use Of The Cash Management System ("CMS") Also Do Not Involve The Olympus Non-Agent Lenders.

Despite Plaintiffs' theory that the Co-Borrowing Facilities were the linchpin of Adelphia's fraud, Plaintiffs also allege that the Rigases had adequate means to perpetrate their alleged fraud with the Adelphia CMS regardless of whether the credit facilities into which Adelphia entered were co-borrowing facilities or non-co-borrowing facilities.  Although the CMS story contradicts the story that Adelphia could not accomplish its fraud without the co-borrowing facilities, both theories nevertheless share one thing in common:  neither alleges that the Olympus Non-Agent Lenders did anything improper.

With respect to the CMS theory, Plaintiffs allege that the CMS "was a key instrumentality of the fraud," and that "[t]hrough the CMS, the Rigas Family misappropriated over $3.4 billion from the Co-Borrowing Facilities for its own benefit."  *Id.* ¶¶ 1011, 1015. Accordingly, the CMS, and not the Co-Borrowing structure, was the *sine qua non* of the alleged Rigas/Adelphia fraud:

> The *CMS* was a central depository (in reality, the *Rigas Family's personal piggy bank*) for cash generated or obtained by Adelphia from all sources (including borrowings under  each of the Co-Borrowing Facilities, the Non-Co-Borrowing Facilities, the proceeds from Adelphia's debt and equity securities offerings, and Adelphia's operations).  Adelphia commingled all of its cash with that of the RFEs in the CMS.  After Adelphia deposited cash into the CMS, "ownership" of the cash could be transferred through simple journal     entries to any RFE.  The cash also could be transferred from the CMS to any of a number of bank accounts held in the name of the RFEs.

*Id.* ¶ 1012 (emphases added).  Plaintiffs allege that the Rigases manipulated funds — co-borrowing and non-co-borrowing funds alike — in and out of the CMS for their personal benefit. For example, Plaintiffs allege that the Rigases used funds from Century-TCI — a Non-

Coborrowing Facility — for fraudulent purposes.  According to Plaintiffs, the Rigas Family caused Adelphia to make multiple draws on the Century-TCI Facility and then used the CMS to transfer the money it obtained from those draws to Rigas Family accounts.  *Id.* ¶ 1005. Additionally, Plaintiffs allege that the Rigas Family "used funds from the CMS to fund expenses for Niagara Frontier Hockey, L.P., a Rigas Family controlled entity that owned the Buffalo Sabres professional hockey team."  *Id.* ¶ 999.  Thus, the Rigas Family, using the CMS, could steal, at will, funds lent under a Non-Co-Borrowing Facility, making it irrelevant which type of facility Adelphia set up.

Nonetheless, regardless of the theory Plaintiffs ultimately adopt, no theory of liability asserted in the Amended Complaint involves any participation or wrongdoing by the Olympus Non-Agent Lenders.  In this regard, the Amended Complaint is conspicuously silent.

## II.   LEGAL STANDARDS FOR ASSESSING THE OLYMPUS NON-AGENT LENDERS' MOTION TO DISMISS

In assessing a Rule 12 motion to dismiss, the Court must accept as true a complaint's factual allegations and draw all inferences in plaintiff's favor.  *See Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993).  But, a complaint must "provide 'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that discovery will reveal evidence' to support them."  *In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03 MD 1529, 2007 WL 2615928, at *1 (S.D.N.Y. Sept, 10, 2007) (McKenna, J.) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)).  Courts should not assume that plaintiffs can prove facts they have not alleged.  *See Assoc'd. Gen'l Contractors of Cal. Inc. v. Carpenters*, 459 U.S. 519, 526 (1983); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (finding amended complaint legally insufficient for failure to adequately allege facts).  Factually unsupported and conclusory allegations are not enough to state a claim.  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996).  Accordingly, to state a claim against the Olympus Non-Agent Lenders, Plaintiffs' allegations against them must be factual, not just

conclusory.  *See Twombly*, 127 S. Ct. at 1966 n.5.  And legal conclusions resting on other unsupported allegations do not meet this standard.  *See id*. at 1970.

Rule 12 motions to dismiss are also the proper avenue for challenging a plaintiff's standing to sue.  *See Rent Stabilization Ass'n of N.Y. v. Dinkins*, 5 F.3d 591, 594 (2d Cir. 1993) (noting that courts in the Second Circuit have dismissed for lack of standing under both Rule 12(b)(1) and Rule 12(b)(6)); *Thompson v. County of Franklin*, 15 F.3d 245, 247 (2d Cir. 1994) (same).  "[L]ike other jurisdictional inquiries, [standing] cannot be inferred argumentatively from averments in the pleadings, but rather must appear affirmatively in the record, so that, on a motion to dismiss, it is the burden of the party asserting standing to sue clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute."  *Bartang Bank and Trust Co. v. Caiola*, No. 04 Civ. 2402, 2006 WL 2708453, at *4 (S.D.N.Y. Sept. 18, 2006) (quoting *Thompson*, 15 F.3d at 249) (internal punctuation omitted).  Here, if after considering all relevant materials this Court cannot discern a basis for Plaintiffs' standing, the Amended Complaint must be dismissed.  *See Thompson*, 15 F.3d at 249.

### III.   PURSUANT TO THE PLAN AND CONFIRMATION ORDER, THIS COURT MUST DISMISS ALL COUNTS AGAINST THE OLYMPUS NON-AGENT LENDERS BECAUSE ALL CLAIMS WOULD BE INDEMNIFIED UNDER THE OLYMPUS CREDIT AGREEMENT.

Plaintiffs, unequivocally sophisticated parties, agreed to indemnify the Olympus Non-Agent Lenders from and against all claims involving the Olympus Credit Facility, provided that those claims did not arise from the lenders' individual gross negligence or willful misconduct. Here, Plaintiffs' stories of alleged fraud and other bad acts at Adelphia contain no factual allegations of gross negligence or willful misconduct by any Non-Agent Lender.  The Olympus Non-Agent Lenders incorporate by reference, as if fully set forth herein, the legal argument in the CCH Non-Agent Lenders' Motion to Dismiss (Motion No. 1 of 6), Part III, which establishes that Plaintiffs' claims must be dismissed because all of the claims would be indemnified under the Olympus Credit Agreement.  Accordingly, as is required by the Plan, this Court should dismiss the Amended Complaint as to the Olympus Non-Agent Lenders.

IV.   **THE BANKRUPTCY CLAIMS AGAINST THE OLYMPUS NON-AGENT LENDERS MUST BE DISMISSED BECAUSE THE OLYMPUS DEBTORS DO NOT HAVE STANDING TO BRING THEM.**

Plaintiffs' epic Amended Complaint, which weaves a nearly 500-page story of fraud and other bad acts by parties other than the Olympus Non-Agent Lenders, cannot overcome the fatal fact that none of the alleged wrongdoing injured any creditor of the Olympus Debtors.  The Olympus Non-Agent Lenders incorporate by reference, as if fully set forth herein, the legal argument in the CCH Non-Agent Lenders' Motion to Dismiss (Motion No. 1 of 6), Part IV, which establishes that (1) no creditors of the Olympus debtors were injured on account of the allegations Plaintiffs make in their Amended Complaint, and (2) even if a creditor of the Olympus Debtors had been injured, this lawsuit cannot redress that injury because none of the Olympus Debtors' creditors have an interest in the proceeds of this lawsuit.  Accordingly, Plaintiffs do not have standing to maintain their bankruptcy claims.

V.   **EVEN IF THE OLYMPUS DEBTORS HAVE STANDING TO RAISE THEIR EQUITABLE SUBORDINATION AND EQUITABLE DISALLOWANCE CLAIMS, THE COURT SHOULD DISMISS THEM BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Given that Plaintiffs fail to allege ***even one bad act*** against the Olympus Non-Agent Lenders, Plaintiffs fall woefully short of alleging adequate facts to maintain an equitable subordination claim.   Moreover, in failing to plead facts sufficient to state an equitable subordination claim, Plaintiffs quite clearly fail to meet the more rigorous pleading requirements necessary for equitable disallowance, assuming such cause of action even exists.  The Olympus Non-Agent Lenders incorporate by reference, as if fully set forth herein, the legal argument in the CCH Non-Agent Lenders' Motion to Dismiss (Motion No. 1 of 6), Part V, which establishes that because Plaintiffs have completely failed to allege any facts that the Olympus Non-Agent Lenders engaged in gross and egregious conduct that is tantamount to fraud, misrepresentation, overreaching, spoliation or conduct involving moral turpitude, Plaintiffs' equitable subordination and equitable disallowance claims must be dismissed.

## CONCLUSION

For the foregoing reasons, the Olympus Non-Agent Lenders respectfully request that the Court dismiss Counts 9, 10, 11, 12, 33, 42, and 51 of Plaintiffs' Amended Complaint as to the Olympus Non-Agent Lenders without leave to amend.


Dated:  December 21, 2007


    /s/ Richard L. Wynne
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 680-8400
Facsimile:      (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin Brady (*pro hac vice motion pending*)
Laura Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders