UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
:::
ADELPHIA RECOVERY TRUST,          ::
:::
                    Plaintiff,     ::
                                   ::          No. 05 Civ. 9050 (LMM)
              -against-            ::
                                   ::
BANK OF AMERICA, N.A., et al.,     ::
                                   ::
                    Defendants.    ::
                                   ::
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION OF VARIOUS LENDERS TO DISMISS THE AVOIDANCE AND SUBORDINATION CLAIMS

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
*(Counsel to ABN AMRO Bank, N.V.)*

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
*(Counsel for The Bank of New York and The Bank of New York Mellon Corporation)*
*(Counsel for Morgan Stanley Senior Funding, Inc.)*

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
*(Attorneys for Barclays Bank PLC)*

WILMER CUTLER PICKERING HALE
  AND DORR LLP
399 Park Avenue
New York, NY 10022
*(Counsel to Credit Suisse, New York Branch, Credit Suisse Capital Funding, Inc., and The Royal Bank of Scotland plc)*

McKEE NELSON LLP
One Battery Park Plaza
New York, New York 10004
*(Attorneys for Deutsche Bank AG)*

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
*(Attorneys for The Fuji Bank Limited)*

WILLIAMS & CONNOLLY, LLP
725 – 12th Street, NW
Washington, D.C.  20005

BLANK ROME LLP
405 Lexington Avenue
New York, NY 10174
*(Attorneys for PNC Bank, NA)*

STITES & HARBISON PLLC
SunTrust Plaza
401 Commerce Street, Suite 800
Nashville, TN  37219
*(Attorneys for SunTrust Banks, Inc. and SunTrust Bank)*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 5

    A.    The ART's Bankruptcy Claims Seek to Avoid and Recover Obligations and Transfers Incurred and Made by the Obligor Debtors and to Subordinate the Banks' Claims Against Those Debtors to Claims of Creditors of Other Debtors ....................................................................... 6

        1.    Fraudulent Transfer Claims-Counts 1 to 16, 41 and 42 ............................ 6

        2.    Equitable Subordination Claim-Count 33 ................................................. 7

        3.    Preference Claims-Counts 43, 44, 49 to 52 ............................................ 7

    B.    The Creditors of the Obligor Debtors That Incurred the Loan Obligations Have Been Paid in Full and Have No Beneficial Interest in the ART ................. 8

        1.    All Third-Party Creditors of the Obligor Debtors Under the Co-Borrowing Facilities Have Been Paid in Full ............................................ 8

        2.    The Joint Plan Released Any Alleged Intercompany Claims Against the Obligor Debtors ...................................................................... 9

        3.    Avoiding the Loan Obligations Would Not Benefit Any Creditor of the Obligor Debtors .......................................................................... 11

        4.    The Creditors of the Obligor Debtors Under the Non-Co-Borrowing Facilities Likewise Hold No Beneficial Interests in the ART and Have Been Paid in Full ............................................................ 12

    C.    Only ACC and Other Parent Debtors Have Unpaid Creditors That Hold Beneficial Interests in the ART ...................................................................... 13

ARGUMENT ...................................................................................................... 14

I.    THE ART LACKS STANDING TO PROSECUTE THE AVOIDANCE CLAIMS BECAUSE NO CREDITOR OF THE OBLIGOR DEBTORS' ESTATES WOULD BENEFIT FROM THOSE CLAIMS ............................................ 14

    A.    The ART Lacks Standing to Assert Avoidance Claims That Will Not Benefit Creditors of the Obligor Debtors' Estates. ........................................ 15

i

1.      Sections 548 and 544 – Fraudulent Transfers and Obligations ............... 16

2.      Section 547—Preferences ........................................................................ 24

B.      The ART Lacks Standing To Recover Under Section 550 of the Bankruptcy Code Because the Recovery Will Not Benefit the Obligor Debtors' Estates. ................................................................................... 27

C.      Because No Creditor Of the Obligor Debtors' Estates Would Benefit From the Avoidance and Recovery Sought Through the ART's Avoidance Claims, the ART Lacks Standing To Assert Those Claims. ................................ 28

1.      The Alleged Unpaid Intercompany Claims Are Legally Irrelevant Because They Were Released Under the Joint Plan. .............................. 29

2.      The Unpaid Claims of the Creditors of ACC and the Other Parent Debtors Are Legally Irrelevant Because ACC and the Other Parent Debtors Did Not Incur the Loan Obligations and Their Estates Were Not Substantively Consolidated with the Obligor Debtors' Estates. ................................................................................................. 33

II.     THE ART CANNOT SEEK EQUITABLE SUBORDINATION OF THE LENDERS' CLAIMS AGAINST THE OBLIGOR DEBTORS FOR THE SOLE BENEFIT OF THE PARENT DEBTORS AND THEIR SEPARATE CREDITORS. ............................................................................................... 35

III.    THE BANKRUPTCY CLAIMS ARE "DISMISSED BANK ACTIONS" UNDER THE PLAN AND THEREFORE MUST BE DISMISSED. ............................ 38

CONCLUSION ............................................................................................... 39

# TABLE OF AUTHORITIES

## CASES

Page(s)

*1205-15 First Ave. Assocs., LLC v. McDonough*,
  7 A.D.3d 363, 775 N.Y.S.2d 856 (N.Y. App. Div. 2004) ................................................22

*A.P. Props. v. Goshinsky*,
  714 N.E.2d 519 (Ill. 1999) ..........................................................................................21

*Balaber-Strauss v. Town of Harrison (In re Murphy)*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005)................................................................18, 22, 27

*Barhold v. Rodriguez*,
  863 F.2d 233 (2d Cir. 1988)........................................................................................33

*Bear, Stearns Sec. Corp. v. Gredd*,
  275 B.R. 190 (S.D.N.Y. 2002)......................................................................................17

*Begier v. IRS*,
  496 U.S. 53 (1990).................................................................................................26-27

*Bell v. Wyatt*,
  No. 3225, 2005 WL 1522015 (Pa. Comm. Pl. Jun. 23, 2005), *aff'd*, 903 A.2d 39
  (Pa. Super. 2006)........................................................................................................21

*Butner v. United States*,
  440 U.S. 48 (1979)......................................................................................................23

*Corbett v. MacDonald Moving Servs.*,
  124 F.3d 82 (2d Cir. 1997)..........................................................................................30

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)............................................................................................4

*Drenis v. Haligiannis*,
  452 F. Supp. 2d 418 (S.D.N.Y. 2006)...........................................................................22

*Flores v. Ontiveros*,
  218 S.W.3d 98 (Tex. App. 2005), *rev'd on other grounds*, 218 S.W.3d 70 (Tex.
  2007) ..........................................................................................................................21

*Granfinanciera, S. A. v. Nordberg*,
  492 U.S. 33 (1989)......................................................................................................24

iii

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995)........................................................................22

*Harstad v. First Am. Bank*,
    39 F.3d 898 (8th Cir. 1994) ....................................................................28

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
    530 U.S. 1 (2000) ...................................................................................36

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)......................................................................4

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................... 9-10, 13, 14, 31, 35

*In re Amusements, LLC*,
    259 B.R. 523 (Bankr. D.R.I. 2001) ...........................................................37

*In re AppliedTheory Corp.*,
    345 B.R. 56 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82 (2d Cir. 2007)....................37

*In re Augie/Restivo Baking Co.*,
    860 F.2d 515 (2d Cir. 1988)....................................................................34

*In re Badger Freightways, Inc.*,
    106 B.R. 971 (Bankr. N.D. Ill. 1989) ........................................................37

*In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*,
    238 B.R. 25 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002)....................18

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995)....................23, 30

*In re Blatstein*,
    260 B.R. 698 (E.D. Pa. 2001) ..................................................................21

*In re Coleman*,
    426 F.3d 719 (4th Cir. 2005) ...................................................................20

*In re Crowthers McCall Pattern, Inc.*,
    120 B.R. 279 (Bankr. S.D.N.Y. 1990) ...................................................17, 22

*In re Currey*,
    154 B.R. 977 (Bankr. D. Idaho 1993) ........................................................26

*In re Emergency Monitoring Techs, Inc.*,
    366 B.R. 476 (Bankr.W.D.Pa. 2007) ..............................................................................37

*In re Enron Corp.*,
    No. 01-16034, Adv. No. 03-93172, 2006 WL 2400369 (Bankr. S.D.N.Y. May 11,
    2006) ...........................................................................................................................34

*In re Enron Corp.*,
    Nos. 06 Civ. 7828, 07 Civ. 1957, 2007 WL 2446498 (S.D.N.Y. Aug. 27, 2007)............37

*In re Enron Creditors Recovery Corp.*,
    376 B.R. 442 (Bankr. S.D.N.Y. 2007) .............................................................................26

*In re Estate of Cappetta*,
    733 N.E.2d 426 (Ill. App. Ct. 2000) ..............................................................................21

*In re FBN Food Servs.*,
    82 F.3d 1387 (7th Cir. 1996) ........................................................................................23

*In re Gurley*, 311 B.R. 910 (Bankr. M.D. Fla. 2001) ................................................................26

*In re Join-In Int'l (U.S.A.) Ltd.*, 56 B.R. 555 (Bankr. S.D.N.Y. 1986)....................................18, 28

*In re Lockwood*, 14 B.R. 374 (Bankr. E.D.N.Y. 1981)...............................................................37

*In re Mark Benskin & Co.*,
    161 B.R. 644 (Bankr. W.D. Tenn. 1993), *aff'd*, Nos. 94-5421/94-5422, 1995 U.S.
    App. LEXIS 16053 (6th Cir. June 26, 1995) ...................................................................24

*In re Owens Corning*,
    19 F.3d 195 (3d Cir. 2005), *cert. denied*, 547 U.S. 1123 (2006).......................................34

*In re P.A. Bergner & Co.*,
    140 F.3d 1111 (7th Cir. 1998) .......................................................................................27

*In re Pajaro Dunes Rental Agency, Inc.*,
    174 B.R. 557 (Bankr. N.D. Cal. 1994) ...........................................................................37

*In re RCM Global Long Term Capital Appreciation Fund*,
    200 B.R. 514 (Bankr. S.D.N.Y. 1996) ............................................................................18

*In re Regency Holdings (Cayman), Inc.*,
    216 B.R. 371 (Bankr. S.D.N.Y. 1998)............................................................................35

*In re Se. R.R. Contractors, Inc.*,
    235 B.R. 619 (Bankr. E.D. Tenn. 1996) ....................................................................26, 27

*In re W.T. Grant Co.*,
　4 B.R. 53 (Bankr. S.D.N.Y. 1980), *aff'd on other grounds*, 20 B.R. 186 (S.D.N.Y.
　1982), *aff'd*, 699 F.2d 599 (2d Cir. 1983) ..........................................................37

*Lewis v. Casey*,
　518 U.S. 343 (1996)................................................................................................33

*Lippe v. Bairnco Corp.*,
　225 B.R. 846 (S.D.N.Y. 1998)..............................................................................22

*Maloney v. Alliance Dev. Group, LLC*,
　No. 06-CVS-6776, 2006 WL 2787895 (N.C. Super. Sept. 18, 2006) ..............................22

*Mladenka v. Mladenka*,
　130 S.W.3d 397 (Tex. App. 2004)........................................................................21

*N.I.S. Corp. v. Hallahan*,
　936 F.2d 1496 (7th Cir. 1991) .............................................................................37

*Nat'l Loan Investors L.P. v. Robinson*,
　98 S.W.3d 781 (Tex. App. 2003) .........................................................................21

*Patterson v. Shumate*,
　504 U.S. 753 (1992)................................................................................................36

*Phillips v. Selig*,
　No. 1550, 2001 WL 1807951 (Pa. Comm. Pl. Sept. 19, 2001) ..........................................21

*Raleigh v. Ill. Dep't of Revenue*,
　530 U.S. 15 (2000)............................................................................................23, 37

*Roth v. Jennings*,
　489 F.3d 499 (2d Cir. 2007)....................................................................................4

*San Leandro Emergency Med. Plan v. Philip Morris*,
　75 F.3d 801 (2d Cir. 1996)......................................................................................4

*Southtrust Bank N.A. v. WCI Outdoor Prods. (In re Huntsville Small Engines, Inc.)*,
　228 B.R. 9 (Bankr. N.D. Ala. 1998) ....................................................................28

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
　948 F.2d 869 (2d Cir. 1991)....................................................................................30

*Triangle Bank v. Eatmon*,
　547 S.E.2d 92 (N.C. Ct. App. 2001) ....................................................................22

*Universal Church v. Geltzer*,
    463 F.3d 218 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 961 (2007) ....................................24

*Verco Indus. v. Spartan Plastics (In re Verco Indus.)*,
    704 F.2d 1134 (9th Cir. 1983) ................................................................................23

*Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero Corp.)*,
    735 F.2d 740 (2d Cir. 1984)...........................................................................19, 20

*Wellman v. Wellman*,
    933 F.2d 215 (4th Cir. 1991) ..................................................................................28

*Whiteford Plastics Co. v. Chase Nat'l Bank*,
    179 F.2d 582 (2d Cir. 1950)...........................................................................18, 20

## STATUTES AND RULES

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA"), §
1406(b), Pub. L. No. 109-8, 119 Stat. 23 ..............................................................16

740 Ill. Comp. Stat. Ann. 160/1 *et seq* ..................................................................21

N.C. Gen. Stat. Ann. § 39-23 (West 2007) ............................................................22

N.Y. Debt. & Cred. Law §§ 270-281 (McKinney 2007).......................................22

N.Y. Debt. & Cred. Law § 278(a)...........................................................................20

12 Pa. Cons. Stat. Ann. §§ 51.01 *et. seq* ..............................................................21

12 Pa. Cons. Stat. Ann. § 5107(a)...........................................................................20

Tex. Bus. & Com. Code Ann. §§ 24.001 *et seq* ....................................................21

11 U.S.C. § 101(5) ...................................................................................................36

11 U.S.C. § 502(h) .............................................................................................25, 26

11 U.S.C. § 510(c) .......................................................................................7, 15, 36, 37

11 U.S.C. § 544 ..............................................................17, 18, 19, 20, 22, 23, 39

11 U.S.C. § 547 .................................................................................24, 25, 26, 39

11 U.S.C. § 548 ...................................................................................................16, 39

11 U.S.C. § 550.................................................................................................................27, 39

11 U.S.C. § 551........................................................................................................................18

11 U.S.C. § 1141(a) .................................................................................................................30

## LEGISLATIVE MATERIALS

H.R. Rep. No. 95-595 (1977)...............................................................................................23, 25

*The Bankruptcy Reform Act: Hearings on S. 235 and S. 236 Before the Subcomm. on
Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 94th Cong.
981 (1975)................................................................................................................... 23-24

## OTHER AUTHORITIES

5 *Collier on Bankruptcy* ¶ 548.LH[1] ...................................................................................23

7 *Collier on Bankruptcy* ¶ 1122.03[2] ..................................................................................36

*Robert M. Zinman, James A. Houle, Alan J. Weiss, Fraudulent Transfers According To
Alden, Gross And Borowitz: A Tale Of Two Circuits,* 39 Bus. Law. 977 (1984) .........................24

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants ABN AMRO Bank, N.V., The Bank of New York, The Bank of New York Mellon Corporation (f/k/a The Bank of New York Company, Inc.), Barclays Bank PLC, Credit Suisse, New York Branch, Credit Suisse Capital Funding, Inc., Deutsche Bank AG, The Fuji Bank Limited, Morgan Stanley Senior Funding, Inc., PNC Bank, NA, The Royal Bank of Scotland plc, SunTrust Banks, Inc. and SunTrust Bank (collectively, the "Lenders") respectfully submit this memorandum of law in support of their motion to dismiss Counts 1 to 16, 33, 41 to 44, and 49 to 52 (the "Bankruptcy Claims") of the amended complaint (the "Amended Complaint"), filed on October 31, 2007, by the Adelphia Recovery Trust (the "ART" or "Plaintiff"), the successor-in-interest to Adelphia Communications Corporation ("ACC") and its affiliated debtors (collectively, the "Debtors") and to the Official Committee of Unsecured Creditors (the "Creditors' Committee") appointed in the Debtors' bankruptcy cases.

The Lenders are among the so-called "Nominal Agents"—agents in name only who expressly were given no authority under the Debtors' loan facilities, yet who have been sued in this action as "Agents." The Amended Complaint asserts both common law tort and statutory bankruptcy claims against them. The Lenders are moving separately to dismiss the tort claims; this brief addresses the claims arising under the Bankruptcy Code.

## PRELIMINARY STATEMENT

Through its Bankruptcy Claims, the ART requests two forms of extraordinary relief. First, it seeks to avoid and recover billions of dollars in loan obligations that were owed and repaid by various operating subsidiaries of ACC (the "Obligor Debtors") to the Lenders and other financial institutions (collectively, the "Banks"). Second, the ART asserts that, once it

recovers these payments, the Court should subordinate the then-unpaid secured claims of the Banks against the Obligor Debtors to the unpaid unsecured claims held by creditors of completely separate and distinct parent-company Debtors.

These claims fail as a matter of law.  Pursuant to the Debtors' two Chapter 11 plans of reorganization (the "Plans"), all claims of all third-party creditors against the Obligor Debtors have been paid in full, and any alleged intercompany claims have been released.  Accordingly, no creditor of the Obligor Debtors holds any interest in the ART, and none has any stake in this litigation.  The only parties that hold such interests are creditors of far-removed parent company Debtors.  As a result, the ART is acting in this litigation only for the benefit of these parent-level creditors, not for the benefit of any creditors of the Obligor Debtors.

These indisputable facts are fatal to the ART's Bankruptcy Claims.  It is black-letter law that avoidance and subordination are available to a debtor only to ensure an equitable allocation of value among its own creditors, not to benefit its shareholders and their separate creditors. Where applicable, the avoidance powers—fraudulent transfer and preference—enable an insolvent debtor to "undo" its pre-bankruptcy obligations and transfers so as to ensure that all of its creditors receive equal treatment.  Where permitted, equitable subordination reorders the otherwise lawful distribution priorities among creditors of the same debtor.  Avoidance and subordination are thus drastic remedies that impair the rights of third parties who acquired, from the relevant debtor, property interests or contract rights that, outside of bankruptcy, are fully enforceable.  A debtor may not seek such draconian relief where doing so would not benefit any creditor of the debtor, *i.e.*, where the very purpose of avoidance and subordination law would not be served.  Yet, that is precisely what the ART seeks to do here.  The Obligor Debtors do not

have a *single* creditor that would benefit at all from the avoidance, recovery and/or subordination of the Bank debt.  As a matter of law, the ART lacks standing to bring these claims.

Of course, the Obligor Debtors' ultimate parent company, ACC, and a handful of intermediate parent-company Debtors (collectively, with ACC, the "Parent Debtors") have not paid their creditors in full.  But that fact has no legal import.  The ART seeks to avoid and recover obligations and transfers made—not by the Parent Debtors—but by their indirect subsidiaries, the Obligor Debtors.  Yet, under the Plans, the only parties that the ART represents in this action are creditors of the Parent Debtors, not the Obligor Debtors.  This disconnect requires the dismissal of the ART's Bankruptcy Claims.  The ART is attempting to appropriate bankruptcy remedies designed for the benefit of a specific group of creditors—those of the specific Debtors that entered into the challenged transactions—for the sole benefit of creditors of separate companies.

The Parent Debtors were holding companies that sat at the top of the Adelphia corporate tree (a tree comprising more than 250 parent and subsidiary Debtors).  In contrast, the Obligor Debtors were the operating subsidiaries that owned Adelphia's valuable business assets—with which they paid all their creditors in full under the Plans—and that incurred the loan obligations to the Lenders and other Banks.  The Parent Debtors were thus shareholders (many times removed), not creditors, of the Obligor Debtors.  Indeed, the Plans specified that the Parent Debtors were "not . . . entitled" to any "distribution" or "value" in respect of any alleged intercompany claims they might otherwise assert against their subsidiaries, the Obligor Debtors.[1]

---

[1] *See* First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors (the "Joint Plan"), at §§ 2.3, 5.3, attached to the Anker Decl. (as defined below) as Exhibit 2.

- 3 -

The ART thus has no basis to claim that it is acting for the benefit of creditors of the Obligor Debtors.

As a matter of law, the only creditors the ART represents—creditors of the Parent Debtors—have no claims against the Obligor Debtors.  In only one circumstance would creditors of one Chapter 11 debtor have claims against another Chapter 11 debtor:  where the assets and liabilities of those debtors are "substantively consolidated" for purposes of a Chapter 11 plan of reorganization.  In this case, the Plans expressly disclaimed any substantive consolidation of the assets and liabilities of the Obligor Debtors with those of the Parent Debtors.  Accordingly, the creditors of the Parent Debtors are *not* creditors of the Obligor Debtors, and the ART cannot purport to assert the Bankruptcy Claims as if they were.

This motion can and should now be decided.  The ART's standing to assert the Bankruptcy Claims is not a question of fact.  It is a pure issue of law that turns solely on the terms of the Plans, which, like the provisions of any confirmed plan of reorganization, are binding on the ART under both the express terms of the Bankruptcy Code and basic principles of *res judicata*.[2]

The issue presented by this motion is therefore fundamentally different from that presented by the prior motions to dismiss in this case, which were filed by other defendants before the Plans were confirmed.  Those motions addressed whether the Obligor Debtors were

---

[2] For the convenience of the Court, annexed to the Declaration of Philip D. Anker ("Anker Decl."), filed herewith, are copies of the Plans and a handful of other bankruptcy filings and loan documents, which this Court may consider on a motion to dismiss because these materials are incorporated into the Amended Complaint, are public records of which this Court may take judicial notice, or are otherwise properly part of a 12(b) record.  *See, e.g.*, *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007); *San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801, 808-09 (2d Cir. 1996); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

- 4 -

insolvent *at the time they incurred the bank debt*.  Although Judge Gerber denied those motions

in light of the ART's allegation of insolvency (taken as true on a Rule 12 motion), he specifically

observed that "under the Debtors' recently confirmed (and now effective) reorganization plan, …

many classes of creditors of obligors in the co-borrowing facilities[] received payment of their

principal and interest in full" and the legal sufficiency of the fraudulent transfer claims therefore

"will require serious consideration in future proceedings."  *Decision and Order on Motions to*

*Dismiss*, June 11, 2007, Adv. No. 03-4942 (Bankr. S.D.N.Y.), Docket No. 463, at 10 n.28.

Those "future proceedings," now before this Court, have the potential to save enormous

judicial resources.  Granting this motion will obviate the need for the Court to address the

complicated insolvency and other factual issues that Judge Gerber identified in his decision

denying the motions to dismiss the bankruptcy claims in the original complaint.  *See id.*

Moreover, of the more than 750 named defendants, many of whom have just been added in the

Amended Complaint, more than 700 have been sued *only* on the Bankruptcy Claims.  Dismissing

the Bankruptcy Claims will thus free more than 90% of the defendants from this case altogether

and will allow the handful of remaining parties to move the case forward efficiently, undistracted

by protracted discovery on side-show issues having nothing to do with their own conduct.

The ART's Bankruptcy Claims should be dismissed.

### STATEMENT OF FACTS

On July 6, 2003, the Creditors' Committee filed its original complaint in this action (the

"Original Complaint").  Under stipulations approved by the Bankruptcy Court, the Lenders were

not required to respond to the Original Complaint until after the Bankruptcy Court had resolved

motions to dismiss that were filed by other defendants.  When Judge Gerber decided those

motions, granting them in part, the ART elected to file the Amended Complaint and agreed, by

further stipulation, that the Lenders should respond to that Amended Complaint, not the Original

Complaint.  This motion, and the Lenders' separate motion to dismiss the tort claims, are that

response.  It is the Lenders' first legal challenge to the sufficiency of either the Original or the

Amended Complaint.

A.  **The ART's Bankruptcy Claims Seek to Avoid and Recover Obligations and Transfers Incurred and Made by the Obligor Debtors and to Subordinate the Banks' Claims Against Those Debtors to Claims of Creditors of Other Debtors.**

1.  **Fraudulent Transfer Claims-Counts 1 to 16, 41 and 42**

The ART asserts fraudulent transfer claims pursuant to Sections 544, 548, 550 and 551 of

the Bankruptcy Code and applicable state law (the "Fraudulent Transfer Claims").  Am. Cpt.

Counts 1–16.  Alleging that approximately $3.4 billion in loan proceeds were used by the Rigas

family and related entities, not by the Obligor Debtors, the ART seeks to avoid and recover the

corresponding loan obligations incurred and security interests granted by those Debtors to the

Banks in connection with four Adelphia credit facilities: (1) the UCA/HHC Co-Borrowing

Facility; (2) the CCH Co-Borrowing Facility; (3) the Olympus Co-Borrowing Facility; and (4)

the Century-TCI Credit Facility.[3]  The ART similarly seeks a declaratory judgment that the

Obligor Debtors are not liable to repay loan obligations under the CCH and Olympus Co-

Borrowing Facilities to the extent those obligations are avoidable as fraudulent transfers.  Am.

Cpt. Counts 41–42.

---

[3] *See* Am. Cpt. ¶¶ 822, 842, 880, 926, 1082, 1089, 1093, 1099, 1103, 1112, 1118, 1123, 1127, 1134, 1138, 1144, 1148, 1157, 1163, 1168, 1172, 1179, 1183, 1189, 1193, 1202, 1208, 1213, 1217, 1221, 1225, 1230, 1234, 1240, 1244, 1250, which identify and quantify those facilities.  Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Amended Complaint.

### 2.    Equitable Subordination Claim-Count 33

Pursuant to Section 510(c) of the Bankruptcy Code, the ART also seeks to equitably subordinate the Lenders' claims against the Obligor Debtors arising from the three Co-Borrowing Credit Facilities to the claims of all other unsecured creditors against any of the Debtors, including ACC and the other Parent Debtors (the "Equitable Subordination Claims"). *See* Am. Cpt. ¶ 1390.  Like the Fraudulent Transfer Claims, the Equitable Subordination Claims are premised on the allegation that the Obligor Debtors received no benefit from those portions of the Co-Borrowing loan proceeds that were supposedly used by the Rigas family.  *See* Am. Cpt. ¶ 1386.[4]

### 3.    Preference Claims-Counts 43, 44, 49 to 52

Pursuant to Sections 547, 550 and 551 of the Bankruptcy Code (the "Preference Claims," and collectively with the Fraudulent Transfer Claims, the "Avoidance Claims"), the ART also seeks to avoid and recover certain pre-bankruptcy payments made to the Banks.  Specifically, the ART seeks to avoid and recover approximately $605 million in principal, interest and fees allegedly paid by the Obligor Debtors to the Lenders and other Banks during the 90-day period preceding the Chapter 11 filings.  *See* Am. Cpt. ¶¶ 1465, 1471, 1509, 1513, 1515, 1521–23, 1529–31.  Parroting the words of the statute, the ART avers that the pre-petition payments allowed the Lenders to receive more than they would have received had there been no such pre-

-------

[4] In the alternative, Count 33 seeks to "equitably disallow" the Lenders' and other defendants' claims arising from the three co-borrowing credit facilities.  *See* Am. Cpt. ¶ 1390.  Certain other Banks have appealed the Bankruptcy Court's denial of their motions to dismiss, and, as a result "the legal issue . . . whether the Bankruptcy Code permits equitable disallowance at all" is currently before the Court.  *See* Memorandum and Order, dated Sept. 5, 2007, Docket No. 79.  The Lenders agree that Count 33 must be dismissed because the Bankruptcy Code does not permit "equitable disallowance," but rather than repeat the appellant-Banks' arguments, they adopt and incorporate them by reference.

petition payments and had the Obligor Debtors instead paid the Lenders' claims in their

bankruptcy cases.  *See* Am. Cpt. ¶¶ 1468, 1474, 1518, 1526, 1534.

**B.      The Creditors of the Obligor Debtors That Incurred the Loan Obligations Have Been Paid in Full and Have No Beneficial Interest in the ART.**

**1.      All Third-Party Creditors of the Obligor Debtors Under the Co-Borrowing Facilities Have Been Paid in Full**

The ART acknowledges that the loan obligations, payments and liens it seeks to avoid

with respect to the three Co-Borrowing Facilities were incurred, made or granted by the Obligor

Debtors.  *See* Am. Cpt. ¶¶ 842, n.9, 879, 880, n.11, 925, 926, n.13, 1516, 1521, 1524, 1532.  In

January 2007, the Bankruptcy Court confirmed the Joint Plan, which applied to most of those

Debtors as well as the Parent Debtors.[5]  Recognizing that each Debtor had its own creditors,

assets and liabilities, the Joint Plan treated each of the Obligor Debtors and the Parent Debtors as

separate entities.  As to the former, the Joint Plan defined each of the Obligor Debtors as

"Subsidiary Debtors"[6] and provided that each Subsidiary Debtor would pay all of its creditors in

full with interest.[7]

_____

[5] *See* Order Confirming First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors, dated Jan. 5, 2007, attached to the Anker Decl. as Exhibit 1.  The other Plan, applicable to a smaller group of Obligor Debtors with respect to two non-co-borrowing loan facilities, and the ART's claims with respect thereto, are discussed in Section B.4, *infra*.

[6] *See* Joint Plan Ex. A (defining "Subsidiary Debtor" as the Debtors "listed on Schedule II to the Disclosure Statement"); Second Disclosure Statement Supplement Relating to Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors, dated Oct. 16, 2006 [hereinafter, "Second Disclosure Statement Supplement"], at Schedule II (listing 254 Debtors, including each of the Obligor Debtors).  Copies of the Joint Plan and the Second Disclosure Statement Supplement are attached to the Anker Decl. as Exhibits 2 and 3, respectively.

[7] *See* Joint Plan §§ 5.2(a), (b), (c), (d), (e); 6.2(e); 6.3.

The Joint Plan has been implemented in accordance with its terms.  As of September 30, 2007, the Debtors have paid more than $13 billion thereunder.[8]  As a result, *all unsecured claims* against the Obligor Debtors entitled to distributions under the Joint Plan *have been paid in full*, with post-petition interest.[9]

### 2. The Joint Plan Released Any Alleged Intercompany Claims Against the Obligor Debtors

The only claims alleged against the Obligor Debtors that have not been paid under the Joint Plan, alleged intercompany claims ("Intercompany Claims") held by other Debtors, have been released.  Specifically, the Joint Plan provides that all "Intercompany Claims shall be deemed resolved as a result of the settlement and compromise embodied in this Plan and therefore holders thereof shall not be entitled to vote on the Plan, or receive any Plan Distribution or other allocation of value."  Joint Plan § 2.3; *see also id.* § 5.3 (holders of Intercompany Claims "shall not be entitled to Plan Distributions").

This compromise disallowing the Intercompany Claims resolved perhaps the single most vexing issue in the Adelphia bankruptcy proceedings and paved the way for confirmation of the Joint Plan.  As Judge Gerber explained in his decision confirming the Joint Plan, that "Plan has as its cornerstone a settlement . . . of intercreditor disputes that have plagued the Adelphia cases for years (and that, if not settled, would continue to do so)."  *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 147 (Bankr. S.D.N.Y. 2007).  These "interdebtor and intercreditor disputes" had

_____

[8] *See* First Post-Confirmation Status Report, dated April 16, 2007, at 2, attached to the Anker Decl. as Exhibit 4; Second Post-Confirmation Status Report, dated July 16, 2007, at 2, attached to the Anker Decl. as Exhibit 5; Third Post-Confirmation Status Report, dated Oct. 15, 2007, at 2, attached to the Anker Decl. as Exhibit 6.

[9] *See* Third Post-Confirmation Status Report, Ex. A, attached to the Anker Decl. as Exhibit 6.

- 9 -

been the subject of extensive litigation in the Bankruptcy Court, known as the motion-in-aid or

"MIA" proceeding, among various bondholders and other unsecured creditors of different

Debtors.  *Id.* at 156–58.  The validity of the Intercompany Claims was hotly disputed.  The

principal proponents of the claims' supposed validity were bondholders of ACC (*i.e.*, the

ultimate parent company); the principal opponents were bondholders of certain of the

intermediate Parent Debtors.  *See id.* at 150–68, 182–219, 235–41.

      Having weighed all the evidence, the ART's predecessors (the Debtors and the Creditors'

Committee)—fiduciaries for all unsecured creditors of all Debtors and proponents of the Joint

Plan—concluded that it was a "dubious assumption that the Intercompany Claims actually

constitute valid Claims."[10]  In approving the Plan's settlement and denial of any distributions to

holders of Intercompany Claims, Judge Gerber agreed, terming the validity of the Intercompany

Claims "highly debatable."  *Id.* at 238.  He further observed that continued litigation of the

Intercompany Claims would involve "huge expense and delay," explaining:

> The MIA was and would continue to be extremely complex and
> expensive to litigate.  At the time it was suspended, it had already been
> tried for six weeks, and the litigants were still only in Phase II [out of 6].
> The effort remaining to be done was (and still is) *staggering*. . . . [T]he
> parties would still have to litigate the details of numerous extraordinarily
> complex claims.

*Id.* at 242, 246 (emphasis added).  Accordingly, Judge Gerber approved the Joint Plan's

resolution of the Intercompany Claims, including its provision that, in all events, no distributions

would ever be made to the holders of any such claims.

---

[10] *Mem. Law Supp. Confirmation Fifth Amended Joint Chapter 11 Plan*, filed by the Debtors and the
Official Committee of Unsecured Creditors, dated Dec. 4, 2006, Ch. 11 No. 02-41729 (Bankr. S.D.N.Y.),
Docket No. 12662, at 107 n.121, attached to the Anker Decl. as Exhibit 7.

### 3.     Avoiding the Loan Obligations Would Not Benefit Any Creditor of the Obligor Debtors

Thus, all third-party creditors of the Obligor Debtors have been paid in full, and any alleged Intercompany Claims held by any Parent Debtors against the Obligor Debtors have been released.  Not surprisingly, therefore, no creditors of the Obligor Debtors—whether third-party or intercompany—hold any interest in the ART or, derivatively, in the outcome of this litigation.  Rather, the Joint Plan provides that any recoveries the ART might obtain in this action and any other ART litigation will be distributed solely to the holders of beneficial interests in the ART, defined as the CVV Interests,[11] which were issued only to creditors of ACC and of a handful of other Parent Debtors.[12]

---

[11] The operative term under the Joint Plan is "CVV Interests," defined as beneficial interests in the liquidating trust established under the Joint Plan then known as the Contingent Value Vehicle or CVV, and later renamed the Adelphia Recovery Trust or the ART.  The Debtors transferred certain of their causes of action, including the claims in this action, to the ART, subject to all defenses to such claims. *See* Joint Plan § 9.7, Exhibit A at A-14; Notice of Adelphia Contingent Value Vehicle Name Change, Mar. 21, 2007, Ch. 11 No. 02-41729 (Bankr. S.D.N.Y.), Docket No. 13283; Joint Plan § 9.2(a)(i) (providing for transfer of the "Designated Litigation" to the Contingent Value Vehicle, subject to all "Defensive Claims" of the defendants); *id.* Exhibit A at A-16 (defining "Designated Litigation" to include the actions listed on Schedule Y to the Plan); *id.* Schedule Y (listing as a Designated Litigation this action, *Adelphia Commc'ns Corp., et al. v. Bank of Am., N.A. et al.,* Adv. Pro. No. 03-04942-reg); *id.* Exhibit A at A-14 (providing that "any amounts recovered through Causes of Action litigated by the CVV Trustees … shall be made available for distribution in respect of CVV Interests"); *id.* § 9.3 (providing that the "CVV Interests shall entitle holders to CVV Distributions").

[12] The Joint Plan provided for CVV Interests to be issued to creditors and equityholders of eight Parent Debtors:  ACC; ACC Investment Holdings, Inc.; U.S. Tele-Media Investment Company; Century Communications Corporation; Ft. Myers Acquisition Limited Partnership; FrontierVision Holdings, L.P.; Olympus Communications, L.P.; and Olympus Capital Corporation.  *See* Joint Plan § 5.1(c-i); § 5.2 (f)–(g), (i)–(j); § 8.5(c); § 9.3(a).

4.    **The Creditors of the Obligor Debtors Under the Non-Co-Borrowing Facilities Likewise Hold No Beneficial Interests in the ART and <u>Have Been Paid in Full</u>**

The ART also seeks to avoid certain loan obligations, security interests and pre-bankruptcy payments incurred or made to various Banks with respect to three Non-Co-Borrowing Facilities, Century-TCI, Parnassos and FrontierVision. *See supra* pp. 6-7.  Like the Obligor Debtors under the Co-Borrowing Facilities, the Obligor Debtors with respect to the Century-TCI and Parnassos facilities (the "JV Obligor Debtors") have paid all of their creditors in full in this case in accordance with a separate plan of reorganization confirmed by the Bankruptcy Court in June 2006 (the "JV Plan").  And, like the Joint Plan, the JV Plan provided that the creditors of the JV Obligor Debtors (i) would receive payment in full (as they now have) and (ii) therefore would not receive any CVV Interests (as, in fact, they did not).[13]  Similarly, the Obligor Debtors with respect to the FrontierVision facility paid their creditors in full in accordance with the Joint Plan described above.[14]

---

[13] *See* Third Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for the Century-TCI Debtors and Parnassos Debtors, as Confirmed, dated June 28, 2006 (the "JV Plan"), §§ 2.01, 2.03, 2.04, 4.01, 4.02, 4.03, 4.17, 4.18, 4.19, 4.22, 4.23, 4.24, attached to the Anker Decl. as Exhibit 8 (providing for payment in full of all creditor classes).  *See also id.* Schedules B, C (listing the 10 JV Debtors, including the Obligor Debtors allegedly obligated under the Century-TCI and Parnassos Credit Facilities).  Upon confirmation of the JV Plan, the Debtors acknowledged that, in accordance with its terms providing "that all creditors of the JV Debtors will receive payment, in full, in Cash of their allowed claims," the JV Plan had been "consummated, resulting in the repayment in full of, or funding of reserves for, approximately $1.7 billion of indebtedness of the JV Debtors."  *See* Second Disclosure Statement Supplement, at DSS2-9.

[14] *See* Am. Cpt. ¶ 816; *supra* notes 6-7.

**C.  Only ACC and Other Parent Debtors Have Unpaid Creditors That Hold Beneficial Interests in the ART.**

The only creditors still owed payments under the Plans are creditors of ACC and of a small number of other Parent Debtors.[15]  They hold CVV Interests and would benefit from potential ART recoveries in this litigation.[16]  But these creditors are not creditors of the Obligor Debtors.  Rather, they are creditors of only the ultimate parent company (ACC) and certain other intermediate Parent Debtors, which are distant shareholders of the Obligor Debtors.

A key aspect of both the Joint Plan and the JV Plan was that the corporate separateness of the Debtors would be maintained, so that each of the more than 250 separate Debtors would be treated as a distinct legal entity, with its own assets, liabilities and creditors.  In bankruptcy parlance, the Plans did not "substantively consolidate" the Obligor Debtors with ACC or any other Parent Debtors.  Indeed, the ACC creditors, who would have stood to gain from such consolidation, did not even argue for it.  As the Bankruptcy Court explained:

> [C]orporate identities [of each separate Debtor] were maintained, and records reflected exactly when and how money was spent, and for which entity's benefit … [T]he ACC Bondholder Group was plainly right … that substantive consolidation would be a highly unlikely result.

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 219 (Bankr. S.D.N.Y. 2007) (emphasis added).

Instead, the Joint Plan provided that claims against the Obligor Debtors would be satisfied from the Obligor Debtors' assets (which were sufficient to pay such claims in full), and that claims against the Parent Debtors would be satisfied from the Parent Debtors' assets (which

---

[15] As of August 31, 2007, all creditors entitled to distributions under the Joint Plan had been paid in full, except for some bondholders and other creditors of ACC and seven other Parent Debtors.  *See* Third Post-Confirmation Status Report, attached to the Anker Decl. as Exhibit 6.

[16] *See* Joint Plan § 5.1(c–g); § 5.2(f–g), (i–j).

- 13 -

have not been sufficient, to date, to pay such claims in full).  It further specified that the Joint

Plan's terms "shall not affect any Debtor's status as a *separate legal entity*, ... cause a merger or

consolidation of any legal entities, nor cause the transfer of any assets." (Joint Plan § 2.2

(emphasis added)).[17]  The Joint Plan thus expressly declined to treat the claims of the ACC

bondholders and other creditors of the *Parent Debtors* as claims against any of the *Obligor*

*Debtors*.

All classes of creditors, including the unsecured creditors of ACC and the other Parent

Debtors, voted to accept the Joint Plan.  So, too, did the Banks, in reliance on its terms.  The

Bankruptcy Court confirmed the Joint Plan as satisfying the requirements of the Bankruptcy

Code and as reflecting a reasonable resolution of the Intercompany Claims.[18]

## ARGUMENT

I. **THE ART LACKS STANDING TO PROSECUTE THE AVOIDANCE CLAIMS BECAUSE NO CREDITOR OF THE OBLIGOR DEBTORS' ESTATES WOULD BENEFIT FROM THOSE CLAIMS.**

The ART seeks to (i) avoid the loan obligations owed and liens granted to the Lenders

pursuant to Sections 544, 547 and 548 of the Bankruptcy Code; (ii) recover the payments made

to the Lenders pursuant to Sections 550 and 551 of the Bankruptcy Code; and (iii) equitably

---

[17] *See also* Joint Plan § 7.3 ("All votes on the Plan shall be tabulated on a *non-consolidated basis* by Class and *by Debtor* for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code.") (emphasis added); *id.* § 7.5 ("Except as otherwise specified herein, the Plan shall not be deemed to have been confirmed unless and until the Plan has been confirmed as to each of the Debtors.").

[18] *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007); Order Confirming Joint Plan, attached to the Anker Decl. as Exhibit 1.  The JV Plan provided that any Intercompany Claims against the JV Debtors were to be resolved in future proceedings, as they subsequently were under the Joint Plan, as noted above.  *See* JV Plan § 4.92.  The only appeal by creditors from the Bankruptcy Court's confirmation orders confirming either Plan—a minority dissident group of ACC bondholders—was dismissed as equitably moot in April 2007, and no further appeal was taken.  *See* Opinion and Order of U.S. District Court Judge Shira A. Scheindlin, signed on April 2, 2007, Docket No. 13460.

subordinate the Lenders' claims to those of creditors of the Parent Debtors pursuant to Section 510(c) of the Bankruptcy Code.

This relief would subvert the Bankruptcy Code and ignore basic corporate law. Sections 544, 547, 548, 550 and 510(c) bestow on the bankruptcy estate of *each particular debtor* the right to avoid and subordinate claims against *it* to ensure an equitable distribution of value among all of *its* creditors. They do not allow a *parent shareholder* to avoid or subordinate claims against its *subsidiary* for *the Parent's* own benefit or that of the *Parent's* own separate and distinct creditors.

As Judge Gerber observed some five months ago, the legal sufficiency of the ART's Bankruptcy Claims "will require serious consideration."[19] It is now indisputable, following confirmation and implementation of the Plans, that all of the creditors of the Obligor Debtors with allowed claims have been paid in full from the assets of the Obligor Debtors and have received no interests in the ART. As a result, the Obligor Debtors have no creditors who stand to benefit from the prosecution of the Bankruptcy Claims. Accordingly, they fail as a matter of law.

> **A.      The ART Lacks Standing to Assert Avoidance Claims That Will Not Benefit Creditors of the Obligor Debtors' Estates.**

The Bankruptcy Code is clear, the case law is clear, and the legislative history is clear: The avoidance provisions of the Bankruptcy Code may be exercised only to benefit creditors of the debtor that made the transfer or incurred the obligation in question. The ART does not stand

---

[19] *Decision and Order on Motions to Dismiss*, June 11, 2007, Adv. No. 03-4942 (Bankr. S.D.N.Y.), Docket No. 463, at 10 n.28.

in the shoes of any such creditor—no such creditor has any interest in the ART—and, therefore,

lacks standing to prosecute such claims.

### 1.     Sections 548 and 544 – Fraudulent Transfers and Obligations

By its terms, Section 548 focuses exclusively on transfers and obligations that harmed the

relevant debtor's creditors:

> (1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> > (A)     made such transfer or incurred such obligation *with actual intent to hinder, delay, or defraud any entity to which the debtor was or became*, on or after the date that such transfer was made or such obligation was incurred, *indebted*; or
> >
> > (B)     (i) *received less than a* reasonably *equivalent value* in exchange for such transfer or obligation; and
> >
> > (ii)     (I) *was insolvent* on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> >
> > (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which *any property remaining with the debtor was an unreasonably small capital*; or
> >
> > (III) intended to incur, or believed that the debtor would incur, *debts that would be beyond the debtor's ability to pay as such debts matured.*

11 U.S.C. § 548(a)(1) (emphasis added).[20]

This statutory language makes clear that a transfer or obligation may be avoided only if it

would benefit a *creditor* of *the particular debtor* that made the transfer or incurred the

obligation.  It provides that a transfer or obligation may be avoided only if it was in fraud of an

---

[20] The statute quoted in text is the version applicable to this action, which was filed in 2003, prior to the Bankruptcy Code's amendment in 2005.  *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA"), § 1406(b), Pub. L. No. 109-8, 119 Stat. 23 (2005 amendments to Section 548 do not apply to cases filed before the amendment).

"entity to which *the* debtor" (not a parent company of the debtor) "was or became . . . *indebted*,"

or only if that "debtor" received less than reasonably equivalent value while experiencing

financial distress.

Indeed, courts in this District have found that "the purpose of [Section] 548 is to protect

the estate itself for the benefit of all creditors" of the specific debtor that made the transfer or

incurred the obligation, and that, accordingly, that debtor's "*creditors* must actually be harmed in

order to avoid a fraudulent transfer under [Section 548]." *Bear, Stearns Sec. Corp. v. Gredd*, 275

B.R. 190, 194–95, 198 (S.D.N.Y. 2002) (emphasis added) (dismissing Section 548 claim where

"transfers at issue . . . did not harm a single creditor").

Similarly, Section 544(b) of the Bankruptcy Code, which incorporates state fraudulent

conveyance law, allows a debtor only to avoid transfers or obligations that could be avoided by a

creditor of that debtor holding an allowable unsecured claim:

> [T]he trustee may avoid any transfer of an interest of the debtor in
> property or any obligation incurred by the debtor *that is voidable under*
> *applicable law by a creditor holding an unsecured claim* that is
> allowable under section 502 of this title or that is not allowable only
> under section 502(e) of this title.

11 U.S.C. § 544(b) (emphasis added).  Thus, just as with Section 548, "a transaction can be

avoided under section 544(b) *only* to the extent the avoidance benefits unsecured creditors" of

the debtor that entered into the transaction.  *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279,

288 (Bankr. S.D.N.Y. 1990) (emphasis added).

As one court in this District has stressed:

> The purpose of fraudulent conveyance law, whether state or federal, and
> of Section 548 is to prevent harm to *creditors* . . . . Fraudulent
> conveyance laws were not designed to affect the legal relationship
> between the transferor and transferee. . . . There is no federal bankruptcy
> interest under Section 548 in upsetting state property interests where

- 17 -

> there is no resulting harm to prepetition or administrative creditors. . . .
> Congress could not have intended Section 548 to abrogate state law
> obligations and allow debtors to avoid the state law consequences of
> their actions and to reap "a windfall merely by reason of the
> happenstance of bankruptcy" when debtors cannot claim to have been
> legally harmed by the transfer.

*Balaber-Strauss v. Town of Harrison (In re Murphy),* 331 B.R. 107, 124–26 (Bankr. S.D.N.Y.

2005) (emphasis added).

Simply put, "where avoidance would benefit only the equity, the debtor in possession

lacks standing to maintain a fraudulent conveyance action."  *In re RCM Global Long Term*

*Capital Appreciation Fund*, 200 B.R. 514, 523 (Bankr. S.D.N.Y. 1996) (construing sections

544(b) and 548); *see also In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 55 (Bankr.

S.D.N.Y. 1999) ("[A]voidance powers can only be exercised for the benefit of creditors, and not

for the benefit of equity." (citation omitted)), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002); *In re Join-In*

*Int'l (U.S.A.) Ltd.*, 56 B.R. 555, 557, 561 (Bankr. S.D.N.Y. 1986) ("[I]f the recovery of the

alleged fraudulent conveyance [under Sections 544 and 548] will solely benefit the debtor it will

not be permitted to maintain the proceeding.").[21]  Thus, a debtor remains bound by its otherwise

valid state law obligations and cannot set aside any debts under Section 548 or Section 544 if

doing so would not benefit any unpaid creditors of that debtor.  *Murphy*, 331 B.R. at 126.

Indeed, this has been the law of this Circuit for more than fifty years.

*Whiteford Plastics Co. v. Chase Nat'l Bank,* 179 F.2d 582 (2d Cir. 1950), illustrates the

point.  There, the Second Circuit refused to allow a debtor to avoid a defectively recorded lien

---

[21] Section 551 of the Bankruptcy Code underscores that the Bankruptcy Code's avoidance remedies are
designed for the benefit, not of the debtor itself, but rather of its estate.  *See* 11 U.S.C. § 551 ("Any
transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) . . . is preserved for the benefit of
the estate . . . ").

under Section 70(c) of the former Bankruptcy Act—now Section 544(a) of the Bankruptcy

Code—because doing so would have benefited only the debtor, not the unsecured creditors of

that debtor, who would have received no distribution from such avoidance under the terms of the

debtor's confirmed plan.  *Id.* at 584 (noting the debtor had "never contributed or offered to

contribute this value [i.e., the voided lien] to the plan" and sought "to obtain it purely for its own

benefit").   The Second Circuit described the fundamental rule of law that bars the ART's

avoidance claims here as follows:

> In our opinion the bank, which had a good secured claim as against the
> debtor, can still hold it where the petition to avoid the sale is not in the
> interest of the general creditors. . . . It would be [a] mockery of justice to
> say that the alleged bankrupt may claim through and in the right of
> creditors whose debts have been paid and discharged; that he may avoid
> a transaction, valid as to himself but voidable as to creditors, in the right
> of non-existing creditors.

*Id.* at 584 (internal quotation omitted).

Three decades later, the Second Circuit reaffirmed that it would not tolerate such a

"mockery of justice" in *Vintero Corp. v. Corporacion Venezolana De Fomento (In re Vintero*

*Corp.)*, 735 F.2d 740 (2d Cir. 1984).  The Court of Appeals held that a debtor could avoid a

lender's unperfected security interest only for the benefit of the debtor's creditors (thereby

eliminating the lender's priority over those creditors), but that the avoided security interest would

remain fully enforceable against the debtor itself (permitting the lender to share in the

distribution of its collateral to all of the debtors' creditors).  *See id.* at 742–43 (applying Section

70(c) of the former Bankruptcy Act).  As the Second Circuit explained:

> [The debtor] was given the right to avoid CVF's security interest in order
> to protect such third parties, not to create a windfall for [the debtor]
> itself.  To the extent that other creditors of [the debtor] are not affected
> adversely by enforcement of CVF's security interest, there is no reason
> why such interest should not be enforced.

- 19 -

*Id.* at 742 (citation omitted).[22]

      The Second Circuit's analysis in *Whiteford Plastics* and *Vintero* is fully in accord with state fraudulent conveyance law incorporated by Section 544 of the Bankruptcy Code.  The law of the five states that the ART alleges are applicable with respect to its fraudulent conveyance claims under Section 544(b)—Pennsylvania, Texas, Illinois, North Carolina, and New York (*see, e.g.*, Am. Cpt. ¶¶ 1156, 1167, 1239, 1249)—unequivocally provides that only an unpaid creditor may avoid a transaction and, then, only to the extent necessary to satisfy that creditor's claim.  Each of these states has adopted, with only minor revisions, either the Uniform Fraudulent Transfer Act ("UFTA") or its predecessor the Uniform Fraudulent Conveyance Act ("UFCA").  The declared "purpose" of the UFTA, like the UFCA, is "*to protect unsecured creditors* against transfers and obligations injurious to their rights."  Unif. Fraudulent Transfer Act § 1 (1984), cmt. 3 (emphasis added).  Pennsylvania's enacted version of the UFTA, which is representative, provides in relevant part:

> In an action for relief against a transfer or obligation under this chapter, a *creditor* . . . may obtain . . . [a]voidance of the transfer or obligation *to the extent necessary to satisfy the creditor's claim*.

12 PA. CONS. STAT. ANN. § 5107(a) (emphasis added); *see also, e.g.*, N.Y. DEBT. & CRED. LAW § 278(a) ("Where a conveyance or obligation is fraudulent as to a creditor, *such creditor* . . . may

---

[22] *Whiteford Plastics* and *Vintero* represent the controlling law of this Circuit and are dispositive.  In this regard, the ART's reliance in prior proceedings on the Fourth Circuit's decision in *In re Coleman*, 426 F.3d 719 (4th Cir. 2005), is misplaced.  *Coleman* is distinguishable on its facts because in that case, unlike this one, the debtor that was seeking to avoid a lien had unpaid creditors that would benefit from avoidance of the lien.  *Id.* at 723–24.  In any event, to the extent that the Fourth Circuit reversed the lower court's ruling that the debtor could only avoid the lien "to the extent necessary to pay the creditors" but that the lien otherwise "remain[ed] in effect as between Debtor and the Bank," *id.* at 725–26, the Fourth Circuit's decision is directly contrary to the settled law of the Second Circuit, as set forth in *Whiteford Plastics*, *Vintero*, and their progeny.

. . . [h]ave the conveyance set aside or obligation annulled *to the extent necessary to satisfy his claim*[.]") (emphasis added).

In interpreting the applicable statutes, courts in each of these five states have held that a fraudulent conveyance action may be maintained only by, and thus only for the benefit of, an unpaid creditor of the debtor that made the transfer or incurred the obligation sought to be avoided:

- Pennsylvania:  Pennsylvania has adopted the UFTA, with minor changes.  12 PA. CONS. STAT. ANN. §§ 51.01 *et. seq.* (West 2007).  Pennsylvania's UFTA "grants remedies only to creditors," *Phillips v. Selig*, No. 1550, 2001 WL 1807951, at *7 (Pa. Comm. Pl. Sept. 19, 2001), and "is designed to protect creditors from debtors."  *Bell v. Wyatt*, No. 3225, 2005 WL 1522015, at *1 (Pa. Comm. Pl. Jun. 23, 2005), *aff'd*, 903 A.2d 39 (Pa. Super. 2006).  As such, non-creditors lack standing to bring an action under Pennsylvania's UFTA.  *See In re Blatstein*, 260 B.R. 698, 712 (E.D. Pa. 2001) (finding that a bankruptcy trustee had no right to payment and thus lacked standing as a creditor under Pennsylvania's UFTA).

- Texas:  Texas has also adopted the UFTA, with minor revisions.  TEX. BUS. & COM. CODE ANN. §§ 24.001 *et seq.* (Vernon 2007).  Like Pennsylvania's UFTA, "[t]he purpose of [Texas' UFTA] is to prevent debtors from defrauding creditors by placing assets beyond their reach."  *Mladenka v. Mladenka*, 130 S.W.3d 397, 404 (Tex. App. 2004).  Creditors are the intended beneficiaries of Texas's UFTA. *See, e.g., Nat'l Loan Investors L.P. v. Robinson*, 98 S.W.3d 781, 783 (Tex. App. 2003) ("Simply put, the beneficiaries of [fraudulent conveyance] laws are creditors for they help preserve the assets available to satisfy a debtor's liability.").  Indeed, creditors are the only party Texas fraudulent transfer law is designed to protect; "a party must achieve the status of a creditor" to recover under the statute.  *Flores v. Ontiveros*, 218 S.W.3d 98, 104 (Tex. App. 2005), *rev'd on other grounds*, 218 S.W.3d 70 (Tex. 2007).

- Illinois:  Like Texas and Pennsylvania, Illinois has also adopted the UFTA with minor changes.  740 ILL. COMP. STAT. ANN. 160/1 *et seq.* (West 2007).  As in those other jurisdictions, "only creditors may maintain actions to set aside fraudulent transfers" under Illinois's version of the UFTA.  *In re Estate of Cappetta*, 733 N.E.2d 426, 435 (Ill. App. Ct. 2000); *see also A.P. Props. v. Goshinsky*, 714 N.E.2d 519, 522 (Ill. 1999) ("Because A.P. was never a creditor of either the Goshinskys or the Fund, we must agree with both the trial and appellate courts that A.P. cannot sustain a cause of action under the Act . . . .").

- 21 -

- <u>North Carolina</u>: North Carolina has likewise adopted the UFTA, with minor changes. N.C. GEN. STAT. ANN. § 39–23 (West 2007). "Relief under [North Carolina's UFTA] is predicated on the plaintiff's status as a creditor of the defendant." *Maloney v. Alliance Dev. Group, LLC*, No. 06-CVS-6776, 2006 WL 2787895, at *5 (N.C. Super. Sept. 18, 2006); *see also Triangle Bank v. Eatmon*, 547 S.E.2d 92, 96 (N.C. Ct. App. 2001) (finding plaintiffs were creditors entitled to relief under the predecessor to North Carolina's UFTA).

- <u>New York</u>: New York has adopted the UFCA, with minor changes. N.Y. DEBT. & CRED. §§ 270-281 (McKinney 2007). The purpose of New York's fraudulent conveyance law "is . . . to aid specific creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995). As a result, "only creditors of the transferor are entitled to assert claims under [New York law] for fraudulent conveyances." *Lippe v. Bairnco Corp.*, 225 B.R. 846, 857 (S.D.N.Y. 1998); *see also, e.g., 1205-15 First Ave. Assocs., LLC v. McDonough*, 7 A.D.3d 363, 775 N.Y.S.2d 856, 857 (N.Y. App. Div. 2004) (affirming dismissal of plaintiff's complaint because "[p]laintiff was not a creditor entitled to relief under the Fraudulent Conveyance Act"); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 428 (S.D.N.Y. 2006) ("In order to bring a cause of action for fraudulent conveyance, the plaintiff must be a creditor of the transferor of the alleged fraudulent conveyance.").

Accordingly, the ART, which at most stands in the shoes of a distant shareholder of each Obligor Debtor, cannot seek to avoid the Lenders' claims under Sections 544 or 548 of the Bankruptcy Code and then treat such avoided debt obligations as unenforceable. Numerous cases—many from this District—hold that, unless one or more creditors of the debtor would benefit, a debt obligation valid under state law may not be avoided at all or, in the alternative, even if it can be, the underlying obligation remains fully enforceable as against the debtor. *See, e.g., Crowthers McCall Pattern*, 120 B.R. at 288 (holding that debtor could not use Section 544(b) to avoid a $35 million debt obligation owed to its lender for the debtor's own benefit and explaining that "[i]t is settled that even were the obligation avoided, that avoidance would be only for the benefit of creditors *and the obligation would still stand ahead of equity*" (emphasis added)); *In re Murphy*, 331 B.R. at 124 ("'Many cases interpreting state fraudulent conveyance law say that, once outside creditors have been satisfied, the transaction remains valid between the

- 22 -

transferor and transferee.'" (quoting *In re FBN Food Servs.*, 82 F.3d 1387, 1395 (7th Cir. 1996));

*In re Best Prods. Co.,* 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) (holding under Section 544(b)

and New York law that "[b]ecause the fraudulent transfer is voidable by creditors only, it is not

remarkable that, as between the parties to the transfer, the law regards the transfer as real and

binding"), *aff'd*, 68 F.3d 26 (2d Cir. 1995); *Verco Indus. v. Spartan Plastics (In re Verco Indus.),*

704 F.2d 1134, 1137 (9th Cir. 1983) (transfer that is void as to creditors is not void as to the

parties to the transaction who may maintain and enforce its terms).[23]

       While the clear statutory language and case law renders resort to legislative history

unnecessary, the history of Sections 544 and 548 (as well as its predecessor Section 67d of the

Bankruptcy Act) underscores that the avoidance powers exist only to benefit the creditors of the

relevant debtor.  The House Report on Section 544 explains that "recovery in such an action is

for the benefit of the class of creditors . . . on whose rights the trustee has based the action."

H.R. Rep. No. 95-595, at 370 (1977).  Likewise, the House Report states that Section 548

"permits the trustee to avoid transfers by the debtor in fraud of his creditors."  *See id.* at 381,

*reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6337; 5 *Collier on Bankruptcy* ¶ 548.LH[1] (Alan

N. Resnick et al. eds., 15th ed. rev. 2007).  The hearings before the Senate reinforced this point:

As Professor Countryman of Harvard Law School stated, the "avoiding powers of the trustee . . .

are exercised for the benefit of the entire estate, which is to say for all of the creditors."  *The*

---

[23]  These cases apply a fundamental principle of federalism recognized by the U.S. Supreme Court in its bankruptcy jurisprudence.  *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); *accord Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20 (2000).

*Bankruptcy Reform Act:  Hearings on S. 235 and S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 94th Cong. 981, 984 (1975).[24]

In short, the ART's avoidance claims fly in the face of the entire purpose of fraudulent conveyance law:  "[T]o protect the interests of creditors against fraudulent transfers."  *Universal Church v. Geltzer*, 463 F.3d 218, 228 (2d Cir. 2006), *cert. denied*, 127 S. Ct. 961 (2007); *see also In re Mark Benskin & Co.*, 161 B.R. 644, 653 (Bankr. W.D. Tenn. 1993) ("The Congressional policy is clear:  Upon the filing of a bankruptcy the avoidance powers are intended to benefit all creditors of the bankruptcy estate.") (citing Epstein, Nickles & White, Bankruptcy, § 6.2 at 499), *aff'd*, Nos. 94-5421/94-5422, 1995 U.S. App. LEXIS 16053 (6th Cir. June 26, 1995).  The ART lacks standing to seek to avoid obligations and transfers incurred by the Obligor Debtors because all creditors of those Debtors have been paid in full and none holds any interest in the ART.

### 2.   Section 547—Preferences

Actions to set aside a preferential payment to one creditor are likewise available only for the benefit of other, unpaid creditors of the debtor that made the transfer.  Section 547(b) of the Bankruptcy Code provides:

> [T]he trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;

---

[24]  Indeed, in adopting Section 67d, the predecessor to Section 548, Congress incorporated the substance and essential elements of the UFCA, which, as noted, permits only unpaid creditors to sue to avoid transfers or obligations, and then only to the extent necessary to satisfy their claims.  *See* Robert M. Zinman, James A. Houle, Alan J. Weiss, *Fraudulent Transfers According To Alden, Gross And Borowitz: A Tale Of Two Circuits*, 39 BUS. LAW. 977 (1984) ("[S]ection 67d of the Bankruptcy Act and [S]ection 548 of the Bankruptcy Code were intended to incorporate generally the fraudulent-conveyance law as codified in the [UFCA]."); *accord id.* at 991–92; *see also Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 60 (1989) (in enacting Section 548, "Congress simply reclassified a preexisting, common-law cause of action").

- 24 -

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) *that enables such creditor to receive more than such creditor would receive if*—

(A) *the case were a case under chapter 7 of this title;*

(B) *the transfer had not been made; and*

(C) *such creditor received payment of such debt to the extent provided by the provisions of this title*.

11 U.S.C. § 547(b) (emphasis added).   Thus, a debtor may avoid a pre-petition payment or other transfer to one of its creditors as a preference under Section 547 only if the transfer allowed the creditor to receive "*more*" than it would have received if that payment had not been made, and the debtor had instead paid the creditor's entire claim through the bankruptcy process.

Section 547 of the Bankruptcy Code promotes equality of distribution among unsecured creditors:  It prevents a debtor unable to pay all of its creditors in full from "preferring" one creditor by paying that creditor's claim 100 cents on the dollar on the eve of bankruptcy, while other creditors receive pennies on the dollar in the subsequent bankruptcy case.  *See* H.R. Rep. No. 95-595, at 177–78 (1977) ("the preference provisions facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor").   Preference law avoids the pre-petition payment so that the proceeds may be distributed equally among all creditors, including the preferred creditor, who is still entitled to payment of its claim in bankruptcy, but only at the same percentage paid to other creditors, not "more."   *See* 11 U.S.C. § 502(h) (permitting a creditor that repays a preference to file a claim to share in the estate for the amount repaid); Joint

- 25 -

Plan § 5.2(c)(iv) (expressly preserving Lenders' "right to a distribution of any transfer avoided . . . under section 502(h) of the Bankruptcy Code").

But a debtor cannot invoke Section 547 if it has paid all of its creditors in full.  By definition, a creditor paid before the bankruptcy cannot receive "more" than it would have received in the bankruptcy if all creditors are paid 100% of their claims in the bankruptcy. Indeed, avoiding and recovering a pre-petition payment in such circumstances could result only in a pointless round trip:  Since all other creditors would have already been paid in full and would not be entitled to further payment, the debtor would be required to pay back the avoided and recovered payment to the same party surrendering the preference in satisfaction of that party's claim under Section 502(h).  *See, e.g.*, *In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007) ("When a preferential payment is avoided, '[t]he obligation for which the payment was made is revived and may be asserted against the debtor's estate because the creditor has lost the value of the payment received.'" (quoting *In re Gurley*, 311 B.R. 910, 918 (Bankr. M.D. Fla. 2001))); *In re Currey*, 154 B.R. 977, 981 (Bankr. D. Idaho 1993) ("[T]he avoidance [under § 547] of the payments made by [the debtor] to [the creditor] . . . reinstated [the creditor]'s claim against [the debtor] in a like amount . . . . Section 502(h) of the Bankruptcy Code compels this result." (citations omitted)).

Accordingly, "before a preference can be recovered in a bankruptcy case, the trustee must show that creditors will not receive a 100% dividend from property of the estate."  *See In re Se. R.R. Contractors, Inc.*, 235 B.R. 619, 622 (Bankr. E.D. Tenn. 1996) (citing 11 U.S.C. § 547(b)(5)).  As a corollary to this rule, any preference recovery must be distributed to the unpaid creditors of the debtor; it cannot be distributed to the debtor itself or to its equity holders (and their separate estates), as the ART seeks to do here.  *See Begier v. IRS*, 496 U.S. 53, 58 (1990)

- 26 -

(the purpose of Section 547 is "to preserve . . . the property available for distribution to creditors"); *In re Se. R.R. Contractors, Inc.*, 235 B.R. at 622 ("a preference recovery by a trustee in a bankruptcy case . . . is . . . to be distributed only to the creditors in the case").

**B.   The ART Lacks Standing To Recover Under Section 550 of the Bankruptcy Code Because the Recovery Will Not Benefit the Obligor Debtors' Estates.**

In each of the Avoidance Claims (Counts 1–16, 41–44, and 49–52), the ART seeks not only to avoid the loan obligations and transfers as alleged fraudulent transfers or preferences under Sections 544, 547 or 548 of the Bankruptcy Code, but also to recover any such avoided transfers under Section 550 of the Bankruptcy Code. *See supra* pp. 6-7.  As explained above, the ART cannot avoid the obligations and transfers in the first place.  But even if it could, it most assuredly could not use Section 550 to recover any avoided payment or other transfer.

By its express terms, Section 550 permits a trustee to recover an avoided transfer only if doing so would benefit the estate of the debtor that made the transfer.  Specifically, Section 550(a) provides that "to the extent that a transfer is avoided under section 544, . . . , 547, 548, . . . of this title, the trustee may recover, *for the benefit of the estate*, the property transferred or, if the court so orders, the value of such property."  11 U.S.C. § 550(a) (emphasis added).

Applying the plain words of the statute, legions of cases hold that a trustee (or debtor-in-possession) cannot seek to recover a transfer under Section 550 if any such recovery would not increase the distribution to creditors of that debtor's estate, or would otherwise benefit only the debtor itself, not its creditors.  As the Seventh Circuit has explained:  "[B]enefit to creditors of the estate, rather than to the debtor alone, is necessary for recovery under § 550(a)."  *See In re P.A. Bergner & Co.,* 140 F.3d 1111, 1118 (7th Cir. 1998); *see also, e.g., In re Murphy,* 331 B.R. at 122 ("Courts have consistently held that an avoidance action can only be pursued if there is

- 27 -

some benefit to creditors and may not be pursued if it would only benefit the debtor"); *Join-In Int'l (U.S.A.) Ltd.*, 56 B.R. at 561 (debtor not permitted to maintain avoidance action if "recovery of the alleged fraudulent conveyance will solely benefit the debtor"); *Harstad v. First Am. Bank*, 39 F.3d 898, 905 (8th Cir. 1994) (affirming dismissal of preference claims and holding that debtor's argument that recovery of preference would make it easier for it to fulfill its obligations under the confirmed plan was insufficient to satisfy the benefit-of-the-estate requirement); *Wellman v. Wellman,* 933 F.2d 215, 218 (4th Cir. 1991) (holding that there can be no recovery "for the benefit of the estate" under § 550 "when the result is to benefit only the debtor rather than the estate"); *Southtrust Bank N.A. v. WCI Outdoor Prods. (In re Huntsville Small Engines, Inc.)*, 228 B.R. 9, 13 (Bankr. N.D. Ala. 1998) ("[W]here recovery will benefit an entity other than the estate, Section 550's requirement that recovery be for the benefit of the estate is not satisfied.").

The same reasoning applies here.  The estates of the Obligor Debtors could not conceivably benefit from any recovery in this action; their creditors have been paid in full and have received no interests in the ART.

   C.   **Because No Creditor Of the Obligor Debtors' Estates Would Benefit From the Avoidance and Recovery Sought Through the ART's Avoidance Claims, the ART Lacks Standing To Assert Those Claims.**

Under the Plans, all creditors of the Obligor Debtors have been paid in full (or are not entitled to any distributions), and none were granted any of the CVV Interests.  *See supra* pp. 8-11.  As a result, there simply are no aggrieved creditors with respect to the Obligor Debtors into whose shoes the ART can step to pursue the Avoidance Claims.

### 1. The Alleged Unpaid Intercompany Claims Are Legally Irrelevant Because They Were Released Under the Joint Plan.

The ART cannot overcome this fatal defect and base its standing on any unpaid Intercompany Claims that were allegedly held by the Parent Debtors against the Obligor Debtors. The Joint Plan could not be clearer:  All "Intercompany Claims shall be deemed resolved," and, as a result, the holders of Intercompany Claims "shall not be entitled to . . . receive any Plan Distributions or other allocations of value."  (Joint Plan § 2.3; § 5.3).  Indeed, under the Joint Plan, no CVV Interests were issued to any holders of alleged Intercompany Claims and, therefore, no such holder has any stake in any avoidance recovery the ART seeks to obtain in this action.  *See supra* at pp. 9-11 & notes 11-12.

The elimination of the alleged Intercompany Claims under the Joint Plan was the product of extensive litigation and considered judgment.  It reflected a careful determination, supported by the Creditors' Committee and the Bankruptcy Court, that the Intercompany Claims were of "dubious" validity and that their elimination was a "cornerstone" of the Joint Plan.  *See supra* p. 9.[25]

---

[25]  Even if the Intercompany Claims were valid and had been preserved in the Plan, they would have been worthless.  Long before the Debtors filed for bankruptcy, ACC and the other Parent Debtors agreed to subordinate any right of payment they might have on any Intercompany Claims to the prior payment in full of all of the Obligor Debtors' loan obligations to the Banks.  For example, ACC and the other Parent Debtors caused their subsidiaries, the Obligor Debtors, to execute the UCA Credit Agreement which provided, *inter alia*, that "[a]ll Obligations, including those to pay principal of and interest (including post-petition interest, whether or not allowed as a claim under bankruptcy or similar laws) on the Loans and Reimbursement Obligations, and fees and expenses in connection therewith, constitute 'Senior Indebtedness' . . . and all such Obligations are entitled to the benefits of the subordination" under the "subordination provisions of the Affiliate Indebtedness and Intercompany Indebtedness contained in the documents relating thereto" and that each Lender was "entering into this [Credit] Agreement and is extending its Commitments in reliance upon the subordination provisions of the Intercompany Subordination Agreement."  UCA Credit Agreement § 6.17; *accord* CCH Credit Agreement § 9.26; Olympus Credit Agreement §§ 7.1, 9.26, attached to the Anker Decl. as Exhibits 9, 10, and 11, respectively.  Fraudulent transfer law is designed to protect creditors from efforts by a debtor to remove

The Joint Plan's provisions regarding the Intercompany Claims are binding on the ART and are entitled to preclusive effect under both the express terms of the Bankruptcy Code and the fundamental doctrine of *res judicata*.  *See* 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor"); *Corbett v. MacDonald Moving Servs.*, 124 F.3d 82, 87, 92 (2d Cir. 1997) (terms of confirmed plan of reorganization given res judicata effect); *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (same).

Thus, even if any Intercompany Claims against the Obligor Debtors ever had any conceivable validity—an assumption that the Creditors' Committee itself (represented by the same law firm that represents the ART in this action) deemed "dubious" in pleadings it filed in its successful effort to obtain confirmation of the Joint Plan—it is too late now for the ART or its beneficiaries to so assert.  The ART's principal constituency, the ACC bondholders, extensively litigated the ACC's alleged Intercompany Claims in the Bankruptcy Court as part of their failed and then aborted challenge to confirmation of the Joint Plan.  The ACC creditors (like those of all other Parent Debtors) voted in the requisite number and amount to accept the Joint Plan, and the small dissident group that voted to reject the Joint Plan ultimately dropped its appeal from Judge Gerber's order confirming the Joint Plan.  *See supra* note 18.  Having already had one bite

---

from the creditors' reach assets that they could otherwise look to for repayment of their claims.  Where, as here, a creditor consents to a debtor's transfer of such assets or the assumption of an obligation with respect thereto—in this case, the Parent Debtors agreed to subordinate their Intercompany Claims against the Obligor Debtors to the Banks' claims against those same Obligor Debtors—the creditor cannot claim that it has been harmed by the transfer or obligation.  *See, e.g.*, *In re Best Prods.*, 168 B.R. at 57 ("A fraudulent transfer is not void, but voidable; thus, it can be ratified by a creditor who is then estopped from seeking its avoidance.").

at the apple, those bondholders and the other creditors of the Parent Debtors are not entitled to a second. They are bound by the terms of the confirmed Joint Plan, under which the Intercompany Claims have been conclusively "resolved" and given *no* value and provided *no* Plan consideration.

The ART's only response so far has been its belated attempt to re-write the Joint Plan. It has argued in prior submissions that "there are numerous inter-company claims that were not paid under the Plan," but rather were "settled for less than full payment with the express understanding that the inter-company creditors would benefit from any recovery against the bank defendants in this action."[26] But as noted, that is exactly the opposite of what the Joint Plan actually provides: It specifies that, no matter what, the holders of any Intercompany Claims "*shall not    . . . receive any Plan Distribution or other allocation of value*." Joint Plan § 2.3 (emphasis added).

Far from an "express understanding" that the Intercompany Claims would survive and their holders would share in ART recoveries, the sole provision in the Joint Plan concerning the effect of the resolution of the Intercompany Claims on this action merely provides that such

_____

[26] *See* Plffs.' Mem. Law Opp. Mots. Leave to Appeal, No. 05 Civ. 9050, Docket No. 60, at 35. In particular, the ART has recently asserted that all payments it seeks to avoid "were funneled through one debtor entity, Adelphia Communications LLC, also known as the 'Bank of Adelphia,'" and that the Bank of Adelphia "had extensive obligations to other Adelphia debtors that remained unpaid." *See id.* at 36. That assertion is contrary to the Amended Complaint. As an initial matter, there is no Debtor known as "Adelphia *Communications* LLC." But to the extent the ART may have meant "Adelphia *Cablevision*, LLC," which Judge Gerber identified as the "Bank of Adelphia" in his confirmation decision, *see* 368 B.R. at 151, the Amended Complaint fails to allege that Adelphia Cablevision, LLC made any of the payments the ART seeks to avoid. *See supra* at pp. 6-7. In any event, Adelphia Cablevision, LLC, like the Obligor Debtors, has no unpaid creditor that would benefit from the avoidance of any such payments. Adelphia Cablevision, LLC is one of the "Subsidiary Debtors" under the Joint Plan, whose third party creditors (if any) were paid in full and received no CVV Interests. *See* Joint Plan Ex. A (definition of "Subsidiary Debtor"); Second Disclosure Statement Supplement at Schedule II; *supra* at p. 8 & notes 6-7. And, as discussed above, the Joint Plan provides for no distribution to the holder of any Intercompany Claim against any Debtor, including any such Claim held by Adelphia Cablevision, LLC.

resolution does not, in and of itself, release the ART's claims against the Banks (or, for that matter, the Banks' defenses and counterclaims thereto).  *See* Joint Plan § 8.5(a) ("[A]ll Persons shall be barred and enjoined from initiating and shall be deemed to have waived and released any Cause of Action, Administrative Claim or Claim to determine any issue which is the subject of the Inter-Creditor Dispute [defined to include the Intercompany Claims] . . . ; provided, however, that entry of the Resolution Order and the Inter-Creditor Dispute Resolution shall not prejudice, diminish, affect, or impair the Bank Actions, Bank Third Party Claims, Investment Bank Third Party Claims, Defensive Claims or Estate Bank Defenses.").[27]  Nothing in that language remotely alters the simple, indisputable fact that, under the Joint Plan, the holders of any Intercompany Claims will never be entitled to any distributions and do not hold any interests in the ART, making it legally impossible for the ART to base its standing on those alleged claims.

Indeed, if anything, Section 8.5(a) works against the ART.  It specifies that all "Defensive Claims"—defined under the Joint Plan to include any and all defenses the Banks might have to the ART's claims[28]—are fully preserved.  *Accord* Joint Plan § 9.2(b) ("Defensive Claims shall be fully preserved and may be asserted in response to the Bank Actions . . . .").

---

[27] *See also* Joint Plan Ex. A (defining "Inter-Creditor Dispute" to include "any and all issues and all disputes (whether known, unknown, contingent, liquidated, unasserted, or asserted directly by the Debtors or derivatively) relating to the intercompany relationships between and among the Debtors, the JV Debtors, their estates and any other Affiliates existing as of and at any time prior to the Effective Date, including without limitation the resolution of the Intercompany Claims"); *id.* (defining "Resolution Order" to mean "the order, which may be the Confirmation Order . . . , entered by the Bankruptcy Court resolving the Inter-Creditor Dispute"); *id.* (defining "Inter-Creditor Dispute Resolution" to mean "the resolution of the Inter-Creditor dispute in accordance with the terms of a compromise or settlement embodied in this Plan upon entry of the Resolution Order by the Bankruptcy Court"); *id.* (defining "Bank Actions" to include this action).

[28] *See* Joint Plan Ex. A (defining "Defensive Claims" to include "any and all defenses . . . of any defendant that may be asserted . . . in connection with the Bank Actions" and "any Claims or Causes of Action in favor of any defendant . . . that may be asserted . . . in connection with the Bank Actions").

Lack of standing is, of course, such a defense, and because it goes to the Court's subject-matter

jurisdiction, it could not have been waived under the Plans in any event.[29]

> ### 2. The Unpaid Claims of the Creditors of ACC and the Other Parent Debtors Are Legally Irrelevant Because ACC and the Other Parent Debtors Did Not Incur the Loan Obligations and Their Estates Were Not Substantively Consolidated with the Obligor Debtors' Estates.

Similarly, the unpaid debt owed to the creditors of the Parent Debtors is legally

irrelevant.  None of the Parent Debtors incurred any of the loan obligations.  Rather, the Parent

Debtors were merely *shareholders* (many times removed) of the Obligor Debtors that incurred

those obligations.[30]

It is elementary that only the specific debtor that incurred a debt or made a transfer can

seek to avoid that debt or transfer, for the benefit of its own creditors, under the Bankruptcy

---

[29] *See Barhold v. Rodriguez*, 863 F.2d 233, 234 (2d Cir. 1988) ("Standing is a jurisdictional matter; the defendants are mistaken in their notion that a defense of lack of standing can be 'withdrawn.' To the contrary, insofar as standing is an article III requirement for jurisdiction, the parties do not have the power to confer such jurisdiction upon the Court by conceding the standing of certain plaintiffs."); *Lewis v. Casey*, 518 U.S. 343, 349 n.1 (1996) (standing "is jurisdictional and not subject to waiver").

[30] The only possible exceptions are certain equity pledges the ART alleges that Olympus Communications, L.P. and Ft. Myers Acquisition Limited Partnership made with respect to certain of their subsidiaries to secure repayment of the UCA/HHC Credit Agreement and the CCH Credit Agreement, respectively.  *See* Am. Cpt. ¶¶ 842, 880.  Avoiding the Parent Debtors' alleged stock pledges would not, however, benefit any of their creditors.  The pledged stock consisted of shares in subsidiaries that were themselves obligors under the credit facilities.  The loans were paid in full under the Joint Plan by the subsidiaries from their own assets.  Thus, even if the stock pledges were avoided, the economic result would be the same and no creditor of the Parent Debtors would benefit from the avoidance.  The ART also alleges that ACC pledged the stock of its "indirect subsidiaries," Grand Island Cable, Inc. and UCA Corp., to secure the UCA/HHC Credit Agreement.  *See id.* ¶ 842.  As indirect subsidiaries of ACC, the pledged stock presumably was owned by a subsidiary of ACC, and thus was not an asset of ACC itself.  In any event, Grand Island Cable, Inc. and UCA Corp. were both borrowers directly indebted to the Lenders under the UCA/HHC Credit Agreement, *see id.*, and therefore avoidance of such stock pledges likewise would not benefit any creditor of ACC.  Finally, the ART alleges that FrontierVision Holdings, L.P. issued a guaranty and pledge to secure the FrontierVision facility, but the ART does not specifically allege that any of the payments it seeks to avoid in its sole Avoidance Claim with respect to the FrontierVision facility (a preference claim) were made by FrontierVision Holdings, L.P.  *Id.* ¶¶ 816, 1509, 1510 (alleging only that the interest payments were made by the "FrontierVision Debtors" as a whole, a group alleged to include at least eight separate Debtors).

Code's avoidance provisions. *See, e.g., In re Enron Corp.*, No. 01-16034, Adv. No. 03-93172, 2006 WL 2400369, at *6–*8 (Bankr. S.D.N.Y. May 11, 2006) ("*Enron I*") (in non-substantively consolidated cases, dismissing the fraudulent transfer claims of Enron's subsidiary, NEPCO, because Enron, not NEPCO, owned and controlled the property that was transferred). Likewise, only the specific debtor whose funds were paid preferentially can seek to avoid that payment as a preference under Section 547 of the Bankruptcy Code. *Id.* at *8–*9.

This rule of law dooms the ART's Avoidance Claims. The ART cannot treat claims belonging exclusively to the Obligor Debtors' bankruptcy estates as available for the benefit of the estates of the separate Parent Debtors. The bankruptcy estates of the Obligor Debtors were not substantively consolidated with those of ACC and the other Parent Debtors.[31] Indeed, recognizing, in Judge Gerber's words, that "substantive consolidation would be a highly unlikely

---

[31] Where ordered, substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities . . . . The result is that claims of creditors against separate debtors morph to claims against the consolidated survivor." *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005) (citations omitted), *cert. denied*, 547 U.S. 1123 (2006). Substantive consolidation is an extraordinary and rarely-granted remedy precisely because creditors typically rely upon the separate creditworthiness of the entity with which they transact. *See In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518–19 (2d Cir. 1988) ("[C]reditors who make loans on the basis of the financial status of a separate entity expect to be able to look to the assets of their particular borrower for satisfaction of that loan. Such lenders structure their loans according to their expectations regarding that borrower and do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets. Such expectations create significant equities."); *Owens Corning*, 419 F.3d at 211 ("[R]especting entity separateness is a fundamental ground rule[ ] . . . [and] the general expectation of state law and of the Bankruptcy Code, and thus of commercial markets, is that courts respect entity separateness."). Accordingly, courts have justified the use of substantive consolidation in only the rarest of circumstances, in recognition of the severe harm it can cause creditors of a particular debtor—such as diluting those creditors' recovery against a solvent subsidiary by forcing such creditors to share their recovery with the separate creditors of a distinct, insolvent parent company. *See Augie/Restivo Baking Co.*, 860 F.2d at 518–19  (substantive consolidation is justified, if ever, only where (1) creditors "did not rely on [the debtors'] separate identity in extending credit," or (2) "untangling the debtors' separate assets and liabilities "is either impossible or so costly as to consume the assets").

- 34 -

result" in this case, *In re Adelphia Commc'ns Corp.*, 368 B.R. at 219, the ACC bondholders and

other Parent Debtor creditors did not even ask for it.  Instead, they voted to accept the Joint Plan

which treated each of the more than 250 Adelphia Debtors, including each of ACC, the other

Parent Debtors and the Obligor Debtors, as a separate and distinct legal entity.  (Joint Plan, § 2.2

(providing "all Debtors shall continue to exist as separate legal entities")); *In re Adelphia*

*Commc'ns Corp.*, 368 B.R. 140, 219 (Bankr. S.D.N.Y. 2007); *supra* at pp. 13-14.

Because there has been no substantive consolidation, Adelphia's various parent and

subsidiary corporations are, and remain, separate entities, each with its own assets and liabilities

and its own specific creditors.  As a result, "*the parent's creditors have no claim to the*

*subsidiary's assets, and vice versa.*"  *In re Regency Holdings (Cayman), Inc.*, 216 B.R. 371, 375

(Bankr. S.D.N.Y. 1998) (emphasis added).  And, as noted above, the provisions of the Joint Plan,

confirmed long ago by the Bankruptcy Court, are entitled to preclusive effect under both the

express terms of the Bankruptcy Code and basic tenets of res judicata.  *See supra* at pp. 30.

Yet, the ART seeks to do exactly what the law and the Joint Plan forbids:  transform the

unpaid creditors of ACC and the Parent Debtors into creditors of the Obligor Debtors, and set

aside the Obligor Debtors' loan obligations for the sole benefit of these creditors of the Parent

Debtors.  This it cannot do.  The ART's Avoidance Claims should be dismissed.

## II.     THE ART CANNOT SEEK EQUITABLE SUBORDINATION OF THE LENDERS' CLAIMS AGAINST THE OBLIGOR DEBTORS FOR THE SOLE BENEFIT OF THE PARENT DEBTORS AND THEIR SEPARATE CREDITORS.

Claim 33 of the ART's Amended Complaint (the "Subordination Claim") seeks equitable

subordination of the claims of the Lenders and other Banks under the Co-Borrowing facilities.

Am. Cpt. ¶¶ 1370–1390.  This Count must be dismissed for the same reasons as the Avoidance

Claims:  the Subordination Claim cannot benefit any other creditors of the Obligor Debtors—

they have all already been paid in full—and hence fails as a matter of law.

The words of the statute are controlling.[32]  Section 510(c) of the Bankruptcy Code

permits, on "equitable" grounds, *the subordination of a claim* against a particular debtor only *to

another claim against that same debtor*, not to an equity interest in that debtor:

> [A]fter notice and a hearing, the court may –
>
> (1)  under principles of equitable subordination, subordinate for purposes
> of distribution all or part of an allowed claim *to all or part of another
> allowed claim* or all or part of an allowed interest to all or part of another
> allowed interest ….

11 U.S.C. § 510(c) (emphasis added).[33]  Thus, under the plain language of the statute, a "claim"

may be subordinated to another "claim," but a "claim" may not be subordinated to an "interest"

(only an "interest" may be subordinated to another "interest").

As Section 510(c) makes clear, equitable subordination serves only to shift distribution

priorities among creditors of the same debtor.  It does not permit the subordination of a creditor's

claim against a subsidiary to equity interests held by a shareholder (or to the claims of separate

creditors against that shareholder).  Even if a creditor's claim is subordinated, the subordinated

creditor must still receive payment in full *prior* to any distribution to a shareholder, let alone to

---

[32] The Bankruptcy Code, like any other statute, must be construed in accordance with its plain meaning. *See, e.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (construing the Bankruptcy Code; "Congress says in a statute what it means and means in a statute what it says there."); *Patterson v. Shumate*, 504 U.S. 753, 757 (1992) ("[T]he plain language of the Bankruptcy Code . . . is our determinant.").

[33] The Bankruptcy Code distinguishes between "claims" and "interests," corresponding to the distinction between creditors and equityholders.  11 U.S.C. § 101(5) (defining "claim" as a right to payment or a remedy for breach giving rise to a right of payment); 7 *Collier on Bankruptcy* ¶ 1122.03[2] (Alan N. Resnick et al. eds., 15th ed. Rev. 2007) ("interest" means an equity interest).

creditors of a shareholder.  The case law so confirms:  "The language of § 510(c) distinguishes between 'claims' and 'interests.'  Section 510(c) authorizes the subordination of one claim to another in appropriate circumstances, *but not the subordination of a claim to an interest.*"  *In re Badger Freightways, Inc.*, 106 B.R. 971, 980 (Bankr. N.D. Ill. 1989); *accord In re Lockwood*, 14 B.R. 374, 381 n.13 (Bankr. E.D.N.Y. 1981); *In re Emergency Monitoring Techs, Inc.*, 366 B.R. 476, 504 (Bankr.W.D.Pa. 2007); *In re Amusements, LLC*, 259 B.R. 523, 529 (Bankr. D.R.I. 2001); *In re Pajaro Dunes Rental Agency, Inc.*, 174 B.R. 557, 597 (Bankr. N.D. Cal. 1994); *see also Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 24–25 (2000) (§ 510(c) only authorizes courts to "adjust rights between creditors" of a debtor by "reorder[ing] distributions from the bankruptcy estate" of that debtor, but not to depart from the "underlying law controlling the validity of creditors' entitlements" to that debtor's assets); *In re AppliedTheory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006) ("The purpose of equitable subordination is to undo wrongdoing by an individual creditor in the interest of the other creditors."), *aff'd*, 493 F.3d 82 (2d Cir. 2007).

This rule of law is fatal to the ART's Subordination Claim.[34]  Indeed, the ART  concedes as much in its recent appeal brief to this Court.  Since equitable *subordination* would merely

---

[34] Dismissal of the ART's equitable subordination claim based on this simple, straightforward rule of law will avoid the need for extensive discovery on ancillary issues, and potentially a lengthy trial.  It is well established that "because . . . equitable subordination is not available to creditors who suffered no injury, creditors who acquired their claims post-petition and after the alleged misconduct that forms the basis for the equitable subordination may not be entitled to that remedy."  *In re Enron Corp.*, Nos. 06 Civ. 7828, 07 Civ. 1957, 2007 WL 2446498 at *7 (S.D.N.Y. Aug. 27, 2007); *see also In re W.T. Grant Co.*, 4 B.R. 53, 78 (Bankr. S.D.N.Y. 1980), *aff'd on other grounds*, 20 B.R. 186 (S.D.N.Y. 1982), *aff'd*, 699 F.2d 599 (2d Cir. 1983).  Thus, if the ART's equitable subordination claim were not dismissed, discovery would be required to establish the extent to which the current (or subsequent) holders of the CVV interests acquired those interests post-petition or even pre-petition, but after the public disclosure of the Adelphia fraud.  And if the claim for equitable relief were ultimately to go to trial, the Court would need to preside.  *See, e.g., N.I.S. Corp. v. Hallahan*, 936 F.2d 1496, 1505 (7th Cir. 1991) (debtor had no right to trial by jury on its claim that its debt was dischargeable in bankruptcy because the claim was equitable in nature).

subordinate the Lenders' claims to other creditors of the Obligor Debtors, but not to equity interests in the Obligor Debtors, the ART urges this Court to fashion a novel (and impermissible) remedy of equitable *disallowance*.  It argues that the Court should legislate in favor of equitable disallowance precisely because "the remedy of equitable subordination may not help the creditors at the parent company level since the defendants may remain superior by reason of their structural priority."  (Appellee's Opposition Brief, at 51.)

In short, because equitable subordination of the Lenders' claims would not benefit any creditor of the Obligor Debtors, the equitable subordination claim, like the Avoidance Claims, fails as a matter of law.

## III.    THE BANKRUPTCY CLAIMS ARE "DISMISSED BANK ACTIONS" UNDER THE PLAN AND THEREFORE MUST BE DISMISSED.

The Bankruptcy Claims must also be dismissed because the terms of the Joint Plan mandate that result.  The Joint Plan requires the ART to dismiss any claim for which the Lenders would be entitled to indemnification from the Debtors under the terms of the relevant credit agreements.  *See* Joint Plan § 8.5(b); *id.* Ex. A (definition of "Dismissed Bank Action").  In turn, those agreements require the Debtors to indemnify the Lenders with respect to any claim except to the extent that the Lenders' liability on that claim would result from the Lenders' "gross negligence or willful misconduct."  *See, e.g.*, CCH Credit Agreement § 11.12; Olympus Credit Agreement § 11.12; UCA/HHC Credit Agreement § 10.4, attached to the Anker Decl. as Exhibits 9, 10 and 11, respectively.  As a matter of law, no showing of gross negligence or willful misconduct on the part of any Lender would even be an element of the ART's Avoidance Claims.  *See* 11 U.S.C. §§ 544, 547, 548, 550 (specifying the elements for avoidance and recovery of fraudulent transfers and preferences, none of which involves any intentional

- 38 -

wrongdoing by the transferee or obligee).  And, while no Lender's claim could be equitably subordinated without a showing of intentional wrongdoing by the Lender, the Amended Complaint contains no such factual allegations.  *See* Mem. of Law in Support of Joint Motion of Various Lenders to Dismiss the Tort Claims in the Amended Complaint, filed contemporaneously herewith.

The motions to dismiss filed contemporaneously herewith by various Non-Agent Lenders explain in greater detail why these claims fail under the Joint Plan.  To avoid needless repetition, the Lenders incorporate by reference the arguments set forth by the Non-Agent Lenders in their motions to dismiss, in support of the dismissal of all Bankruptcy Claims against the Lenders.[35]

## CONCLUSION

For the reasons set forth above, this Court should dismiss Counts 1 to 16, 33, 41 to 44, and 49 to 52 of the Amended Complaint.

Dated:  New York, New York      Respectfully submitted,
        December 21, 2007

                       WHITE & CASE LLP

                       By: /s/Heather K. McDevitt
                          Sandeep Qusba (SQ-8834)
                          Heather K. McDevitt (HM-9973)

                       1155 Avenue of the Americas
                       New York, New York  10036-2787
                       Tel:     212-819-8200
                       Fax:     212-354-8113

                       Counsel to ABN AMRO Bank, N.V.

---

[35] *See*, *e.g.*, CCH Non-Agent Lenders' Motion to Dismiss Counts 5, 6, 7, 8, 33, 41 and 50 of Plaintiffs' Amended Complaint, dated December 21, 2007.

- 39 -

CLIFFORD CHANCE US LLP

By:_____/s/_____
       Mark A. Kirsch (MK-7806)
       Christopher M. Joralemon (CJ-1403)

31 West 52nd Street
New York, New York 10019
(212) 878-8000

Counsel for The Bank of New York and The Bank
of New York Mellon Corporation (f/k/a The Bank
of New York Company, Inc.)

Counsel for Morgan Stanley Senior Funding, Inc.


KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP

By:_____/s/_____
       Richard S. Miller (RM-2428)
       Michael R. Gordon (MG-7838)
       Robert Honeywell (RH-7684)

599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 536-3900
Facsimile:  (212) 536-3901

Attorneys for Barclays Bank PLC


WILMER CUTLER PICKERING HALE
 AND DORR LLP

By:_____/s/_____
       Philip D. Anker (PA-7833)
       John A. Valentine (JV-1064)

399 Park Avenue
New York, NY  10022
Telephone:  (212) 230-8800

- 40 -

Facsimile:  (212) 230-8888

Counsel to Credit Suisse, New York Branch,
  Credit Suisse Capital Funding, Inc., and
  The Royal Bank of Scotland plc


McKEE NELSON LLP

By: _____/s/_____
          Steven G. Brody (SB-6859
          Jennifer Hurley McGay (JHM-7487)
          Matthew Minerva (MM-8840)

One Battery Park Plaza
New York, New York 10004
Telephone:  (917) 777-4200
Facsimile:  (917) 777-4299

Attorneys for Deutsche Bank AG


STROOCK & STROOCK & LAVAN LLP

By: _____/s/_____
          Kenneth Pasquale

180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-540

Attorneys for The Fuji Bank Limited


WILLIAMS & CONNOLLY, LLP

By: _____/s/_____
          F. Whitten Peters (pro hac vice pending)
          Lance A. Wade (pro hac vice pending)

725 – 12th Street, NW
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (fax)

- 41 -

BLANK ROME LLP

By: _____/s/_____

Raymond L. Shapiro (RS-1120)
James V. Masella, III (JM-5121)
Andrew B. Eckstein (AE-6142)


405 Lexington Avenue
New York, NY 10174
(212) 885-5000
(212) 885-5002 (fax)


Attorneys for PNC Bank, NA


STITES & HARBISON PLLC

By:_____/s/_____

        Robert W. Griffith (RG 3095)
        Garry K. Grooms (GG 1019)
        Bethany A. Breetz (BB 5182)
        Samuel L. Zeigler (SZ 6154)


SunTrust Plaza
401 Commerce Street, Suite 800
Nashville, TN  37219
Direct Dial: (615) 782-2213
Direct Fax (615) 742-4131


Attorneys for SunTrust Banks, Inc. and SunTrust
Bank

- 42 -