UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                    ::
                                                    ::
ADELPHIA RECOVERY TRUST,                            ::
                                                    ::
Plaintiff,                                          ::
                                                    ::
                                                    ::      No. 05 Civ. 9050 (LMM)
        -against-                                   ::
                                                    ::
BANK OF AMERICA, N.A., et al.,                      ::
                                                    ::
Defendants.                                         ::
                                                    ::
--------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION OF VARIOUS LENDERS TO DISMISS THE TORT CLAIMS IN THE AMENDED COMPLAINT

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
*(Counsel to ABN AMRO Bank, N.V.)*

McKEE NELSON LLP
One Battery Park Plaza
New York, New York 10004
*(Attorneys for Deutsche Bank AG)*

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
*(Counsel for The Bank of New York and The Bank of New York Mellon Corporation)*
*Counsel for Morgan Stanley Senior Funding, Inc.)*

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
*(Attorneys for The Fuji Bank Limited)*

WILLIAMS & CONNOLLY, LLP
725 – 12th Street, NW
Washington, D.C.  20005

KIRKPATRICK & LOCKHART
PRESTON GATES ELLIS LLP
599 Lexington Avenue
New York, New York 10022
*(Attorneys for Barclays Bank PLC)*

BLANK ROME LLP
405 Lexington Avenue
New York, NY 10174
*(Attorneys for PNC Bank, NA)*

WILMER CUTLER PICKERING HALE
  AND DORR LLP
399 Park Avenue
New York, NY 10022
*(Counsel to Credit Suisse, New York Branch, Credit Suisse Capital Funding, Inc., and The Royal Bank of Scotland plc)*

STITES & HARBISON PLLC
SunTrust Plaza
401 Commerce Street, Suite 800
Nashville, TN  37219
*(Attorneys for SunTrust Banks, Inc. and SunTrust Bank)*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................ 2

PROCEDURAL POSTURE ................................................................... 3

ARGUMENT ...................................................................................... 5

I.      RULES 8(A) AND 9(B) REQUIRE ALL CLAIMS, ESPECIALLY THOSE
       SOUNDING IN FRAUD, TO BE PLEADED WITH PARTICULARITY AS
       TO EACH DEFENDANT ............................................................... 5

II.     CLAIMS 37, 38, AND 55 DO NOT MEET THE PLEADING STANDARDS
       IN RULES 8(A) AND 9(B) ........................................................... 9

      A.    The AC Improperly Relies on Group Pleading for All of the Co-
           Borrowing Facilities................................................................ 10

      B.    The Allegations Relating to the UCA/HHC Co-Borrowing Facility are
           Insufficient. .......................................................................... 13

           1.    Failure to Disclose Terms of the Credit Agreement to the
                Independent Directors.................................................... 13

           2.    Failure to Disclose to the Independent Directors the Rigas
                Family's Intended Use of Funds. ...................................... 15

           3.    Failure to Disclose Joint and Several Liability....................... 18

           4.    Fraudulent Intent........................................................... 19

      C.    The Allegations Relating to the CCH Co-Borrowing Facility are
           Insufficient. .......................................................................... 20

           1.    Oral Misrepresentations to Independent Directors. ................ 20

           2.    Allegedly Misleading Term Sheet – Failure to Disclose Joint
                and Several Liability........................................................ 21

           3.    Allegedly Misleading Term Sheet – Failure to Disclose the
                Leverage Ratio.............................................................. 22

           4.    The AC Itself Demonstrates that the CCH Facility Was
                Adequately Secured by Rigas Family Assets. ...................... 23

      D.    The Allegations Relating to the Olympus Co-Borrowing Facility are
           Insufficient. .......................................................................... 25

           1.    Failure to Disclose Terms of the Credit Agreement to the
                Independent Directors.................................................... 25

           2.    Failure to Disclose to the Independent Directors the Rigas
                Family's Intended Use of Funds. ...................................... 26

           3.    Failure to Disclose True Terms of Olympus Facility. .............. 27

           4.    Allegedly Misleading Term Sheet – Leverage Ratio................ 28

5.      Fraudulent Intent.................................................................................... 30

CONCLUSION............................................................................................................... 30

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ........................................5, 6, 15

*Billard v. Rockwell Int'l Corp.*, 683 F.2d 51 (2d Cir. 1982)..............................................8

*Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364 (11th Cir. 1997) ......................7

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) .....................................7, 10, 26, 27

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)................................11, 16

*Concorde Funds, Inv. v. Value Line, Inc.*, No. 04 Civ. 9932 (NRB), 2006 WL 522466
(S.D.N.Y. Mar. 2, 2006) ..............................................................................8

*Conley v. Gibson*, 355 U.S. 41 (1957) ...............................................................5

*Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42 (2d Cir. 1991) ............................11, 23

*DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242 (2d Cir. 1987)........................7

*Fisher v. Offerman & Co.*, No. 95 Civ. 2566 (JGK), 1996 WL 563141 (S.D.N.Y. Oct. 2,
1996) ..............................................................................................19

*Haskin v. R .J. Reynolds Tobacco Co.*, 995 F. Supp. 1437 (M.D. Fla. 1998) .............................7

*Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir. 1995) ....................................11

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007) ..........................3, 4, 5, 17

*In re Crude Oil Commodity Litigation,* No. 06 Civ. 6677, 2007 WL 1946553 (S.D.N.Y.
June 28, 2007)......................................................................................8

*Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F. Supp. 518 (S.D.N.Y. 1977)........................10

*Kolbeck v. LIOT Am., Inc.*, 939 F. Supp. 240 (S.D.N.Y. 1996)................................6, 17

*Kramer v. Time-Warner*, 937 F.2d 767 (2d Cir. 1991)................................................18

*Lerner v. Fleet Bank, N.A.,* 459 F.3d 273 (2d Cir. 2006) ..........................................7

*Mangiafico v. Blumenthal*, 471 F.3d 391 (2d Cir. 2006)................................11, 16, 18

*Mazzaro de Abreu v. Bank of Am. Corp.*, No. 06 Civ. 673, 2007 WL 2609535 (S.D.N.Y.
Sept. 10, 2007)....................................................................................19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young,* No. 91-Civ-2923, 1994 WL 88129
(S.D.N.Y. Mar. 15, 1994) ............................................................................................8

*Mills v. Polar Molecular Corp.,* 12 F.3d 1170 (2d Cir. 1993) ......................................................7

*Rombach v. Chang,* 355 F.3d 164 (2d Cir. 2004) ......................................................................6

*Roth v. Jennings,* 489 F.3d 499 (2d Cir. 2007) ......................................................................11

*S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.,* 84 F.3d 629 (2d Cir. 1996) ..........................9

*Saltzman v. Zern,* 407 F. Supp. 49 (E.D. Pa. 1976) ...........................................................10, 17

*San Leandro Emergency Med. Plan v. Philip Morris,* 75 F.3d 801 (2d Cir. 1996)..................11, 18

*Sears v. Likens,* 912 F.2d 889 (7th Cir. 1990) ......................................................................7

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* No. 03 Civ. 3120, 2005 WL 1902780
(S.D.N.Y. Aug. 9, 2005) ............................................................................................8

*Skylon Corp. v. Guilford Mills, Inc.,* No. 93 Civ. 5581 (LAP), 1997 WL 88894 (S.D.N.Y.
Mar. 3, 1997).............................................................................................................9

*Swartz v. KPMG LLP,* 476 F.3d 756 (9th Cir.2007) ................................................................7

*United States v. N.Y. City Health & Hosp. Corp.,* No. 95 Civ. 7649, 2000 WL 1610802
(S.D.N.Y. Oct. 27, 2000) ...........................................................................................8

*Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771 (7th Cir.1994) ..........................7

*Weiszmann v. Kirkland & Ellis,* 732 F. Supp. 1540 (D. Colo. 1990) .........................................6

*Yucyco, Ltd. v. Republic of Slovenia,* 984 F. Supp. 209 (S.D.N.Y. 1997)..................................6

## STATE CASES

*In re Estate of Evasew,* 584 A.2d 910 (Pa. 1990) ..................................................................17

*Kaufman v. Cohen,* 760 N.Y.S.2d 157 (N.Y. App. Div. 2003) .............................................10, 17

*Viguers v. Phillip Morris USA, Inc.,* 837 A.2d 534 (Pa. Super. Ct. 2003) ...................................9

## OTHER AUTHORITIES

Fed. R. Civ. P. 8(a) ............................................................................................... passim

Fed. R. Civ. P. 9(b) ............................................................................................ passim

Fed. R. Evid. 201(e) ....................................................................................................18

Ruder, *Multiple Defendants in Securities Fraud Cases: Aiding and Abetting, Conspiracy,*
     In Pari Delecto*, Indemnification, and Contribution*, 120 U. Pa. L. Rev. 597 (1971) ..............10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
                                                   ::
                                                   ::
ADELPHIA RECOVERY TRUST,                           ::
                                                   ::
Plaintiff,                                         ::
                                                   ::          No. 05 Civ. 9050 (LMM)
             -against-                             ::
                                                   ::
BANK OF AMERICA, N.A., et al.,                     ::
                                                   ::
Defendants.                                        ::
                                                   ::
--------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION
## OF VARIOUS LENDERS TO DISMISS
## THE TORT CLAIMS IN THE AMENDED COMPLAINT

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), Defendants ABN

AMRO Bank, N.V., The Bank of New York, The Bank of New York Mellon Corporation (f/k/a

The Bank of New York Company, Inc.), Barclays Bank PLC, Credit Suisse, New York Branch,

Credit Suisse Capital Funding, Inc., Deutsche Bank AG, The Fuji Bank Limited, Morgan Stanley

Senior Funding, Inc., PNC Bank, NA, The Royal Bank of Scotland plc, SunTrust Banks, Inc. and

SunTrust Bank (collectively, the "Lenders" or "moving defendants") respectfully submit this

Memorandum of Law in support of their joint motion to dismiss Claims 37, 38, and 55 (the "Tort

Claims") in the amended complaint (the "Amended Complaint" or "AC"), filed on October 31,

2007, by the Adelphia Recovery Trust (the "ART" or "Plaintiff").

The Amended Complaint asserts both common law tort and statutory bankruptcy claims

against the Lenders.  This Memorandum of Law addresses the tort claims.  The Lenders are

moving separately to dismiss the bankruptcy claims.

## PRELIMINARY STATEMENT

Although the ART's 475-page, 1,655-paragraph Amended Complaint is long on words, it suffers from a striking – and fatal – lack of detail about the fraud-based claims it asserts against the moving defendants.  It is precisely for such claims that FED. R. CIV. P. 9(b) exists to prevent plaintiffs from carelessly dragging innocent defendants through a time-consuming and costly discovery process without a sufficient basis for alleging that wrongdoing occurred. Notwithstanding what the Bankruptcy Court aptly described as "massive" discovery that has already occurred in connection with the Debtors' bankruptcy and related proceedings – close to a million pages of pre-complaint discovery under Bankruptcy Rule 2004, more than 100 related depositions, access to all of Adelphia's own records and witnesses, access for two years to many documents produced by the Lenders,[1] and a four-month criminal trial – *and* that the ART received specific notice of the shortcomings under Rule 9(b) of the original Complaint when Judge Gerber dismissed a number of claims under that Rule in his decision of June 11, 2007, the AC is devoid of any of the specifics required under Rules 8(a) and 9(b).  Indeed, as to the moving defendants, there is not a single specific allegation other than their names, addresses, and the co-borrowing facilities with which they were associated.  If Rules 8(a) and 9(b) are to have any meaning, they must prevent plaintiffs from proceeding to the merits stage on such insufficiently pleaded claims.

---

[1]      In July 2005, the Creditors' Committee filed document discovery requests against all of the Agent Banks and their investment bank affiliates.  Judge Gerber ordered all of the Agent Banks and Investment Banks to produce documents to the Creditors' Committee by November 30, 2005.  *See* Orders of June 29 and September 19, 2005, in Docket No. 03-04942 (Docket Entries 321, 352).  The Lenders complied with this schedule.

## PROCEDURAL POSTURE

On July 6, 2003, one of Plaintiff's predecessors, the Creditors' Committee, commenced this action by filing an adversary complaint (the "Complaint") in the Bankruptcy Court against some 400 pre-petition lenders and affiliated investment banks with a motion seeking leave for the Committee to prosecute the complaint in the name of Adelphia Communications Corporation ("Adelphia") and its affiliated Chapter 11 debtors (collectively, "the Debtors").  The Creditors' Committee did not serve the Complaint at that time except on the administrative agents for each pre-petition loan facility (the "Administrative Agents"),[2] three of which were so-called "co-borrowing" facilities.[3]  Thereafter, the Creditors' Committee agreed by stipulation and order that the only parties required to respond to the Complaint were the Administrative Agents.  Other defendants were permitted to respond, but were not required to do so until 45 days after resolution of the Administrative Agents' motions to dismiss.  *See* First Amended Stipulation and Order of September 19, 2003, at ¶ 5 & n.7 (Docket Entry 2428, in No. 02-41729 (REG)).  Thereafter, the Administrative Agents, the Investment Banks, and several other defendants filed motions to dismiss the Complaint asserting, among other things, that it failed to meet the requirements of Rule 9(b).

On June 11, 2007, Judge Gerber resolved those motions.  He dismissed three fraud-based claims against the Investment Banks (fraud, fraudulent concealment, and aiding and abetting fraud) because the Complaint was "too vague" and did not meet the requirements of Rule 9(b).  *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 61-62 (Bankr. S.D.N.Y. 2007) (fraud not adequately pleaded where there were no allegations of "what was not disclosed, and to whom,

---

[2]        Unless otherwise defined herein, capitalized terms have the same meaning as in the AC.

[3]        The Administrative Agents were Wachovia Bank, NA; Bank of Nova Scotia; Bank of America, NA; Citibank, NA; JPMorgan Chase Bank; and Bank of Montreal.

when and under what circumstances"); *Adelphia Commc'ns Corp.*, Nos. 02-41729 (REG), 03-04942 (REG), 2007 WL 2403553, at *10 (Bankr. S.D.N.Y. Aug. 17, 2007) (dismissing fraud and fraudulent concealment claims on same grounds.).  Moreover, with respect to the fraud claims against secondary actors such as the Administrative Agents, Judge Gerber held that:

> The Court has similar, and perhaps more serious, concerns as to the Rule 9(b) deficiencies of the effort to impose secondary liability . . . . If there are allegations concerning the knowledge, if any, of Defendants regarding what the Rigases told and did not tell the independent directors, and the extent to which the Defendants knew that the Rigases were concealing things from the independent directors, the Court has missed them.

365 B.R. at 61-62.

With these holdings, Judge Gerber put the Creditors' Committee and its successor, the ART, on clear notice that its practice of group pleading – lumping all of the so-called Agent Banks and Investment Banks together − failed to meet the specificity requirements of Rule 9(b).

Shortly thereafter, the defendants reached an agreement with the ART that those defendants, including the Lenders, who had not already moved to dismiss the original Complaint would file such motions against the anticipated Amended Complaint, and that the time for them to do so would be 45 days after service of the Amended Complaint.  The ART served the Amended Complaint on October 19, 2007.  The parties subsequently agreed that the date for filing motions or answers to the AC would be December 21, 2007.  Consistent with that agreement, the Lenders – all of whom are Nominal Agents as described below – hereby move to dismiss the Tort Claims in the AC on the grounds that they are insufficiently pleaded under FED. R. CIV. P. 8(a) and 9(b).

**ARGUMENT**

Claim 37 (aiding and abetting breach of fiduciary duty),[4] Claim 38 (aiding and abetting fraud), and Claim 55 (fraud) against the Lenders all sound in fraud, but are utterly devoid of the specifics required by Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure.  These claims allege – but only with improper group pleading – that the so-called Agent Banks, by participating in the co-borrowing facilities, committed fraud and aided and abetted the Rigas Family's fraud and breach of fiduciary duty by failing to take steps to insure that Adelphia's independent directors were informed that the Rigas Family Entities ("RFEs") among the borrowers in three co-borrowing facilities could borrow up to the full amount of each facility.

I.     **RULES 8(A) AND 9(B) REQUIRE ALL CLAIMS, ESPECIALLY THOSE SOUNDING IN FRAUD, TO BE PLEADED WITH PARTICULARITY AS TO EACH DEFENDANT**

Under FED. R. CIV. P. 8(a), a complaint must set forth for each claim "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Id.* § 8(a)(2).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).  Rather, to survive a motion to dismiss, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level" in order to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 47

---

[4]     The Lenders join the position advocated on appeal by the Administrative Agents and the Investment Banks that Pennsylvania law, which Judge Gerber ruled applies to the aiding and abetting claims, *see In re Adelphia Commc'ns Corp.*, 365 B.R. at 39, does not recognize the tort of aiding and abetting a breach of fiduciary duty.  This motion to dismiss that claim does not waive this argument, but merely asserts that even if such a claim does exist in Pennsylvania, the AC does not plead it with sufficient particularity.

(1957)).  Unless plaintiffs can "nudge[] their claims across the line from conceivable to

plausible," the complaint must be dismissed.  *Id.* at 1974.  Critically, "where . . . there are

multiple defendants, the complaint should specify what conduct by *each defendant* gives rise to

the asserted claim."  *Yucyco, Ltd. v. Republic of Slovenia*, 984 F. Supp. 209, 219 (S.D.N.Y.

1997) (quoting *Weiszmann v. Kirkland & Ellis*, 732 F. Supp. 1540, 1549 (D. Colo. 1990))

(internal quotation marks omitted) (emphasis added).

    With respect to the challenged claims, the allegations in the AC must meet a higher bar

than Rule 8(a).   Rule 9(b) requires that "[i]n all averments of fraud . . . , the circumstances

constituting fraud . . . shall be stated with particularity."  FED. R. CIV. P. 9(b).  This heightened

pleading requirement applies not only to claims of fraud, but to "all averments of fraud," even if

asserted in support of a non-fraud cause of action.  *Rombach v. Chang*, 355 F.3d 164, 171 (2d

Cir. 2004) (quoting FED. R. CIV. P. 9(b)).  A claim "sounds in fraud" if it is clearly predicated on

averments of fraud, including instances in which the "gravamen of the complaint is plainly

fraud."  *Id.* (internal citation omitted).[5]  This heightened pleading requirement exists to

"provid[e] a defendant fair notice of plaintiff's claim" so that he may prepare his defense,

"protect[] a defendant from harm to his reputation or goodwill," and "reduce[] the number of

---

[5]    Here, "the gravamen of the complaint is plainly fraud" for Claims 37 (aiding and abetting
breach of fiduciary duty) and 38 (aiding and abetting fraud).  The allegations regarding each
claim are merely different ways of expressing the ART's allegations concerning the alleged
misrepresentations to the independent directors. Thus, Claims 37 and 38 should be dismissed on
the same grounds as Claim 55, insofar as they depend on the same defectively pleaded averment
of fraud.  *See Rombach*, 355 F.3d at 171-72 ("Plaintiffs assert that their . . . claims do not sound
in fraud but the wording and imputations of the complaint are classically associated with fraud:
that the Registration statement was 'inaccurate *and* misleading;' that it contained '*untrue*
statements of material facts;' and that 'materially *false* and *misleading* written statements' were
issued."); *Kolbeck v. LIOT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918
(2d Cir. 1998) ("To the extent the underlying primary violations [of an aiding and abetting
breach of fiduciary duty claim] are based on fraud, the allegations of aiding and abetting liability
must meet the particularity requirements of Fed. R. Civ. P. 9(b).").

strike suits." *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.

1987).

Pursuant to Rule 9(b), complaints alleging fraud must "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet

Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006) (citation omitted); *see also Caputo v. Pfizer, Inc.*,

267 F.3d 181, 191 (2d Cir. 2001) (explaining that Rule 9(b) requires a plaintiff claiming fraud to

allege with specificity "the time, place, speaker and content of the alleged misrepresentation").

As with Rule 8(a), Rule 9(b) does not allow a complaint to lump multiple defendants

together but "'require[s] plaintiffs to differentiate their allegations when suing more than one

defendant . . . and inform each defendant separately of the allegations surrounding his alleged

participation in the fraud.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting

*Haskin v. R .J. Reynolds Tobacco Co.*, 995 F. Supp. 1437, 1439 (M.D. Fla. 1998)).  "Therefore,

in a case involving multiple defendants, . . . 'the complaint should inform each defendant of the

nature of his alleged participation in the fraud.'" *Vicom, Inc. v. Harbridge Merchant Services,

Inc.*, 20 F.3d 771, 778 (7th Cir. 1994) (finding that allegations stating that misrepresentations

were made "at the direction, under the supervision, or with the knowledge and consent" of all the

defendants "would appear to fall short of the standards set forth in the caselaw"); *see also Brooks

v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997) ("Plaintiffs have

simply 'lumped together' all of the Defendants in their allegations of fraud.") (quoting *Vicom,* 29

F.3d at 778); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is

not satisfied where the complaint vaguely attributes the alleged fraudulent statements to

'defendants'"); *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir. 1990) ("A complaint that attributes

misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient"); *In re Crude Oil Commodity Litigation*, No. 06 Civ. 6677, 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007) ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement"); *Sedona Corp. v. Ladenburg Thalmann & Co., Inc.,* No. 03 Civ. 3120, 2005 WL 1902780, at *12 (S.D.N.Y. Aug. 9, 2005) ("Neither allegations of ability to control or lumped-together accusations of wrongdoing by undifferentiated groups of defendants, is sufficient to satisfy Rule 9(b)."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Young*, No. 91-Civ-2923, 1994 WL 88129, at *7 (S.D.N.Y. Mar. 15, 1994) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)."); *Ainwick v. European Micro Holdings, Inc.,* 281 F. Supp. 2d 629, 640 (S.D.N.Y. Sept. 15, 2003) (holding that Rule 9(b) standards were not satisfied where the complaint lumped several defendants together and "fail[ed] to specify what each defendant said").  The complaint here does precisely what the above authority prohibits.

        In addition, where a plaintiff has had access to substantial discovery prior to asserting its claims – as the ART unquestionably has – the law requires even "greater precision" than the already heightened pleading requirements of Rule 9(b).  *See Billard v. Rockwell Int'l Corp.*, 683 F.2d 51, 57 (2d Cir. 1982) ("greater precision" required where discovery has been conducted in related litigation); *United States v. N.Y. City Health & Hosp. Corp.*, No. 95 Civ. 7649, 2000 WL 1610802, at *2 (S.D.N.Y. Oct. 27, 2000) (McKenna, J.) (same).  Rule 9(b)'s requirements are also applied particularly strictly where, as here, the plaintiff is in as good a position as the defendants to know the specifics of the alleged fraud.  *See Concorde Funds, Inv. v. Value Line,*

*Inc.*, No. 04 Civ. 9932 (NRB), 2006 WL 522466, at *5 n.8 (S.D.N.Y. Mar. 2, 2006) (dismissing a claim under Rule 9(b) where "plaintiff is in as good a position as the defendants are to recall the speakers, dates, and content of the alleged misrepresentations"); *Skylon Corp. v. Guilford Mills, Inc.*, No. 93 Civ. 5581 (LAP), 1997 WL 88894, at *2 (S.D.N.Y. Mar. 3, 1997) ("Because plaintiff alleges misrepresentations made to [itself] . . . the date, place and content of the statement are not facts peculiarly within the knowledge of the defendants, but facts shared by both parties."). Indeed, the ART, as successor to the Debtors, is in a better position than any other party to know what alleged misrepresentations its own directors relied upon.

## II.    CLAIMS 37, 38, AND 55 DO NOT MEET THE PLEADING STANDARDS IN RULES 8(A) AND 9(B)

In this case, the Plaintiff does not, and cannot, meet the standard of either Rule 8(a) or Rule 9(b). The nearly 500-page AC manages to be utterly devoid of information necessary to give each of the moving defendants fair notice of the claims against it and the grounds upon which they rest.

***First***, as discussed below, the AC improperly relies on group pleading with respect to all three of the fraud-based claims in stark contrast to what Rules 8(a) and 9(b) require of plaintiffs alleging claims based on fraud. ***Second***, in order to state a claim for fraud, a complaint must include "facts that give rise to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996); *see also Viguers v. Phillip Morris USA, Inc.*, 837 A.2d 534, 540 (Pa. Super. Ct. 2003) (requiring "intent [to] mislead[] another into rel[iance]" in order to establish fraud). As discussed below, however, the allegations contained in the AC are insufficient to give rise to such an inference for any of the Lenders, much less for each of them. ***Third***, in order to state a claim for aiding and abetting, a plaintiff must adequately allege that a defendant knew of the underlying tort and intended to further the tortious conduct.

*See Kaufman v. Cohen*, 760 N.Y.S.2d 157, 169 (N.Y. App. Div. 2003) ("A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant *knowingly* induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." (emphasis added)); *Saltzman v. Zern*, 407 F. Supp. 49, 56 (E.D. Pa. 1976) ("*[k]nowledge* of wrongful purpose [is] a crucial element in aiding and abetting" (quoting Ruder, *Multiple Defendants in Securities Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delecto*, Indemnification, and Contribution*, 120 U. Pa. L. Rev. 597, 630-31 (1971)) (internal quotation marks omitted))).  As discussed below, however, the AC does not allege any facts indicating that the Lenders knew of the Rigases' improper purpose or actions with respect to Adelphia's independent directors.

A. **The AC Improperly Relies on Group Pleading for All of the Co-Borrowing Facilities.**

Rather than alleging with specificity "the time, place, speaker and content of the alleged misrepresentation" of each moving defendant, *Caputo*, 267 F.3d at 191, the AC does precisely what courts within this District have repeatedly said a complaint cannot do:  It attempts to rely on blanket references to the acts or omissions of groups of "defendants" with scant, if any, allegations about the supposed involvement of each one individually.  *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F. Supp. 518, 522 n.7 (S.D.N.Y. 1977) (stressing that a complaint "may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which [it] individually stands charged").

The clearest example of improper group pleading is the AC's repeated use of the generic phrase "Agent Banks" to describe not only the Administrative Agents, who had actual duties under the loan agreements, but also the Lenders who were nothing more than "Nominal Agents"

holding honorific titles but having no duties to the Debtors under the respective Credit

Agreements except to lend money, and no fiduciary or other duty to any other lender.[6]  For

example, the UCA/HHC Credit Agreement provided that:

> Notwithstanding anything else to the contrary contained in this
> Agreement or any other Loan Document, neither the Syndication
> Agent, the Documentation Agent nor any Arranging Agent, in such
> capacity, shall have any implied obligations hereunder or under
> any other Loan Document, or any fiduciary relationship with any
> Lender, and no implied covenants, functions, responsibilities,
> duties, obligations or liabilities shall be read into this Agreement or
> otherwise exist against either the Syndication Agent, the
> Documentation Agent or any Arranging Agent.

UCA/HHC Credit Agreement, at § 9.8, attached as Exhibit 9 to the Declaration of Philip D.

Anker ("Anker Decl.").[7]

In addition, the AC (¶ 825) acknowledges that there were three different Co-Borrowing

Facilities – UCA/HHC, CCH, and Olympus – and only one or two Administrative Agents for

each (¶¶ 843, 881, 927).  Yet, it treats every one of the Agent Banks – Administrative Agents

---

[6]    The relevant provision of each of the Credit Agreements is set out in Appendix A.  The Court may consider these documents without converting the instant motion into a motion for summary judgment because the AC relies heavily upon their terms and effects and thus they are integral to the complaint.  *See Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.  Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

[7]    For the convenience of the Court, the moving defendants have created a consolidated Declaration for both the bankruptcy claims and the tort claims: the Declaration of Philip D. Anker ("Anker Decl.").  Annexed to that Declaration are copies of the Plans and a handful of other bankruptcy filings and loan documents, which this Court may consider on a motion to dismiss because these materials are incorporated into the Amended Complaint, are public records of which this Court may take judicial notice, or are otherwise properly part of a 12(b) record. *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *San Leandro Emergency Med. Plan v. Philip Morris*, 75 F.3d 801, 808-09 (2d Cir. 1996); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir. 1995); *Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

and Nominal Agents alike – as a single unit across the three different loans.  This is grossly

improper.  As the table below shows, for example, PNC Bank participated in the UCA/HHC loan

in 1999, but in no other co-borrowing loans, and yet the AC claims it is liable for aiding and

abetting a fraud on the independent directors in 2000 and 2001 in the CCH and Olympus loans.

Similarly, Fuji Bank and Royal Bank of Scotland did not participate in a co-borrowing facility

until 2001 and Fleet did not participate until 2000, yet all three are alleged to be liable for fraud

committed in 1999.   And while the AC alleges that all of the Agents "fully participated in the

Rigas Family's fraud" in order to earn "extraordinary financial benefits" (¶ 1575), in fact Royal

Bank of Scotland and several other affiliates of Nominal Agents underwrote a mere $1,000 each

in Adelphia notes at the time they participated in the Olympus Facility.  *See* Prospectus

Supplement (Adelphia Communications Corp. Form 424(b)(3)), filed October 24, 2001), Anker

Decl. Ex. 12.  Therefore, the notion that Royal Bank of Scotland, or the other Nominal Agents,

committed fraud to protect this paltry business is beyond the pale.

| Loan Facility | Administrative Agent(s) | Documentation Agent(s) | Syndication Agent(s) | Arranging Agent(s) | Book Runner(s) & Manager(s) | Lead Arranger(s) | Managing Agent(s) |
|---|---|---|---|---|---|---|---|
| **UCA/HHC (5/6/1999)** | Wachovia | BMO | PNC Bank | Wachovia, BMO, PNC Bank | Wachovia, BMO, PNC Bank | | |
| **CCH (4/14/2000)** | Bank of America, Chase | CIBC | TDI | Barclays | BAS, Chase Securities | BAS, Chase Securities | BMO, Wachovia, Citibank, ABN AMRO, BNS, BNY, Credit Lyonnais, CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, Rabobank, SunTrust |

| Loan Facility | Administrative Agent(s) | Documentation Agent(s) | Syndication Agent(s) | Arranging Agent(s) | Book Runner(s) & Manager(s) | Lead Arranger(s) | Managing Agent(s) |
|---|---|---|---|---|---|---|---|
| **Olympus (9/28/2001)** | BMO | Fleet, BNY | Wachovia, BNS | | Wachovia Securities, BNS | Wachovia Securities, BNS | Bank of America, Bankers Trust Company, Citicorp, TDI, Chase, CSFB, Credit Lyonnais, Royal Bank of Scotland, Societe Generale, Fuji Bank |

These are just a few examples of the fundamental defects in the AC.  Indeed, when the AC is reviewed in finer detail as discussed below, it is apparent that the AC is devoid of allegations specifically relating to any particular Nominal Agent Bank.

**B.      The Allegations Relating to the UCA/HHC Co-Borrowing Facility are Insufficient.**

With respect to the UCA/HHC Co-Borrowing Facility, the AC's fraud-based claims are premised on the alleged failure of the Agent Banks – grouped as one – to disclose to the Debtors' independent directors: (1) the terms of the Credit Agreement; (2) the Rigas Family's intended use of funds, and (3) that the Credit Agreement imposed joint and several liability.  (*See* ¶¶ 841-77).  The AC also alleges that fraudulent intent can be inferred from the Agent Banks' desire to earn fees from Adelphia.  (¶¶ 1574-75).  These conclusory allegations are insufficient under Rules 8(a) and 9(b) to state a claim against the Nominal Agents.

**1.      Failure to Disclose Terms of the Credit Agreement to the Independent Directors.**

The AC alleges that the Administrative Agent, Wachovia, "worked closely with the Rigas Family and James Brown to prepare a term sheet describing the terms of the UCA/HHC Co-

Borrowing Facility" (¶ 847) and that this term sheet was misleading in that it failed to disclose that the Rigas-affiliated borrower, Hilton Head, could borrow "up to the entire amount available under the facility without regard to Hilton Head's financial condition or the relatively small amount of collateral pledged by Hilton Head in connection with the facility." (¶ 859). The AC asserts that, based on this misrepresentation and other oral misrepresentations allegedly made by Timothy Rigas and James Brown at a board meeting held on April 22, 1999, the independent directors, Messrs. Metros, Patterson and Coyle, approved Adelphia's participation in the UCA/HHC credit facility (¶¶ 848-49), unaware that the Rigas Family could borrow up to the full amount of the credit facility. (¶ 860).

At the outset, the AC's reliance on the so-called independent directors as a *sine qua non* for its claims is directly contrary to the Creditors' Committee's own original Complaint. That Complaint alleged that the Rigas Family so dominated the Adelphia board that the existence of any independent directors was irrelevant. (Original Complaint ¶¶ 412-16).

But even if the ART's about-face could be credited, the AC does not allege how any Lender became aware that the independent directors had been snookered by the Rigas Family. That is, the AC fails to allege that: (i) *any* of the Nominal Agents attended the April 22, 1999 board meeting; (ii) *any* of the Nominal Agents *knew* the allegedly defective term sheet was going to be provided to the independent directors at that meeting; and (iii) *any* of the Nominal Agents subsequently learned of the alleged oral or written misrepresentations made by Rigas and Brown at that meeting.

Moreover, there is no basis in the AC or in reality for any suggestion that the Lenders should have anticipated the alleged misrepresentations to the independent directors. The ART's fraud theory is premised in part on the allegation that the Agent Banks assisted Adelphia in

preparing term sheets that Timothy Rigas and James Brown used to mislead the independent directors into believing that "each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing," as had been the case with the 1996 HVA/TALP/Global Facility ("HVA Facility").  (*See* ¶¶ 847-51, 885-89, 931-35).[8] Although the ART attempts to characterize the borrowing restrictions in the HVA Facility as "set[ting] the stage" for the three co-borrowing facilities that followed (AC, header at 235), the AC fails to allege facts suggesting that the Lenders had any knowledge of those restrictions.  Nor could it plausibly do so.  The Lenders were neither agents nor participants in the HVA Facility (¶ 840), and the AC does not allege that they ever had occasion to examine information concerning the HVA Facility to note any difference in borrowing restrictions.  Absent such facts, there is no plausible basis to conclude that the Lenders ever understood or appreciated the alleged differences between the HVA Facility and subsequent co-borrowing facilities.  Such deficiencies are fatal under Rules 8(a) and 9(b).  *See Twombly*, 126 S. Ct. at 1974.

### 2.   Failure to Disclose to the Independent Directors the Rigas Family's Intended Use of Funds.

The AC further alleges that the Rigas Family intended to use $250 million of loan proceeds to buy Adelphia stock and $350 million to pay down existing debt incurred by the Rigas-owned Hilton Head Communications, L.P.,[9] that the Agent Banks knew this, but the Rigas Family did not tell the independent directors.  (¶¶ 862-63).  In an unsupported leap, the AC then alleges that the "Agent Banks and their affiliated Investment Banks" intentionally failed to

---

[8]      As discussed below, these allegations are contradicted by the term sheets themselves, which gave no indication that such limits existed.  *See*, *supra*, pp. 18, 21-23, 28-30.

[9]      Ironically, the AC suggests that Hilton Head had no borrowing power of its own (¶ 859), but at the same time alleges that it had been able to borrow $350 million on its own account that was later paid down by the UCA/HHC loan.  (¶ 862).

disclose in the term sheet the Rigas' intended to use loan proceeds to pay down pre-existing debt and to make a distribution to the Rigas Family.  (¶ 864).

This conclusory allegation is plainly insufficient to support the ART's claims.  First, the AC alleges that Wachovia wrote the term sheet and does not allege that any other Agent Bank even saw it before it was presented to the Adelphia board.  In addition, the AC does not allege that any Agent Bank knew that the Rigas Family had failed to disclose its intentions on use of the loan.

Although the AC baldly asserts that "[t]he Rigas Family advised the UCA/HHC Agent Banks . . . of these intended uses of the funds in or about February 1999 in a request for proposal that they sent to the Agent Banks," (¶ 862), a simple review of the request for proposal ("RFP") makes evident that it did no such thing.[10]  While the RFP states that a proposed use of funds would be a distribution to the Rigas Family and a repayment of Hilton Head debt, it does ***not*** specify how large the distribution to the Rigas Family would be, or how much Hilton Head debt would be repaid.  *See* UCA/HHC RFP, at BOA-020-01613, Anker Decl., Ex. 13.  Indeed, the $250 million and $350 million figures alleged in the AC appear nowhere in the RFP.

In addition, there is ***no*** indication in the RFP that the RFE assets would provide insufficient collateral for the RFE's use of loan proceeds, nor does the ART in its Amended Complaint give any indication of the actual value of the assets pledged by Hilton Head and the other RFEs in the UCA/HHC Facility.  Thus, the crux of the ART's fraud theory – that the UCA/HHC Agent Banks knew the Rigases' intended personal uses of the UCA/HHC Facility

---

[10]     As with the Credit Agreements, the Court may consider the RFPs when deciding the motion to dismiss because the AC "relies heavily upon [their] terms and effect[s]," rendering them "integral to the complaint." *Mangiafico*, 471 F.3d at 398 (quoting *Chambers*, 282 F.3d at 152-53).

"were out of proportion with the collateral that Hilton Head had pledged or . . . could not be supported by Hilton Head's financial condition" (¶ 860) – lacks any factual basis in the AC.

In other words, when the documents identified in the AC are examined to see what they actually say, far from showing that *each* of the moving defendants had knowledge of the fraud and breach of fiduciary duty, they show the reverse: that none of the Lenders had the required knowledge.  Since knowledge is an element required to establish scienter and to support aiding and abetting claims with respect to each underlying violation,[11] the failure to make the required allegations of knowledge is fatal under Rules 8(a) and 9(b).  *See Saltzman*, 407 F. Supp. at 56 (noting that knowledge of wrongful purpose is a crucial element for aiding and abetting fraud); *Kaufman*, 760 N.Y.S.2d at 169 (explaining that aiding and abetting a breach of fiduciary duty requires knowledge).

Moreover, nowhere does the AC allege how any of the Agent Banks came to have a legal duty to disclose anything to Adelphia's board – and Judge Gerber has already ruled that the Banks had no such duty, *see In re Adelphia Commc'ns Corp.*, 365 B.R. at 66.  Absent a legal duty, an omission is not actionable.  *See In re Estate of Evasew*, 584 A.2d 910, 913 (Pa. 1990) ("[A]n omission is actionable as fraud only where there is an independent duty to disclose the omitted information ....").

Finally, only *three* banks were agents of any kind – Administrative or Nominal – in the UCA/HHC loan (*see* Chart, pp. 12-13, *supra*), and yet with no explanation, the ART seeks to hold every single Agent Bank and Investment Bank liable for the supposed actions of these three.

---

[11]     In addition to knowledge, the tort of aiding and abetting requires substantial assistance by the alleged aider and abettor that amounts to "active participation."  *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996).  However, other than having their names appear on a piece of paper (*i.e.,* the UCA/HHC Credit Agreement), the AC does not allege how any of the Nominal Agents "active[ly] participat[ed]" in the underlying violations.

### 3.    Failure to Disclose Joint and Several Liability.

The AC also suggests (in ¶¶ 867, 871) that the independent directors were not aware that there was joint and several liability for the amounts borrowed by the RFEs because this was not disclosed by the Wachovia term sheet.  However, the contrary is plainly the case.  The allegedly fraudulent term sheet, which the independent directors allegedly saw and relied upon, describes the liability among borrowers in the UCA/HHC loan as joint and several on its very first page:

> BORROWERS:  HHC, UCA, UCA LLC, National Cable Acquisition Associates L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P., and Tele-Media Company of Hopewell-Prince George ("the Borrowers"), ***jointly and severally***.
>
> GUARANTORS:  All current and future subsidiaries of Borrowers will ***jointly and severally*** guarantee the Facilities.

UCA/HHC Term Sheet, p. 1, Anker Decl., Ex. 14 (emphasis added).

Not only is the joint and separate liability set out on page one of the term sheet, it is also set out in Adelphia's SEC filings which, the AC alleges, the independent directors "had to approve" (¶ 873) and are therefore presumed to have read.  First, the complete UCA/HHC credit agreement was set out as an exhibit to a Form 8-K[12] filed by Adelphia on September 17, 1999, and that agreement clearly states that "[t]he Borrowers jointly and severally agree that the Loans shall be repaid . . . ."  UCA/HHC Credit Agreement, at § 3.1, Anker Decl., Ex. 9.  Second, Adelphia's 10-K for 1999, filed on March 30, 2000, clearly states that obligations under the co-borrowing agreements were joint and several:  "Each of the co-borrowers is liable for all

---

[12]    In deciding the present motion to dismiss, this Court may take judicial notice of Adelphia's 8-K filing, as well as its 10-K filing for 1999, pursuant to Fed. R. Evid. 201(e). *Kramer v. Time-Warner*, 937 F.2d 767, 773-74 (2d Cir. 1991) (holding that a district court may take judicial notice under Fed. R. Evid. 201(e) of documents filed with the SEC when deciding a motion to dismiss).  In addition, these documents may be considered in deciding the motion to dismiss because they are "integral" to the claims advanced in the AC.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan*, 75 F.3d at 808-09; *Mangiafico*, 471 F.3d at 398.

borrowings under the credit agreements . . . ."  Adelphia Communications Corp. Mar. 30, 2000

10-K, at 74, Anker Decl., Ex. 15.

In light of the UCA/HHC term sheet and these SEC filings, approved by the independent

directors, it is simply not believable that the independent directors only became aware of joint

and several liability in 2002.

Moreover, even if the independent directors were not aware of the joint and several

liability, the AC is totally devoid of any allegation that any of the Nominal Agent Banks were

aware of the directors' lack of knowledge, aware of what occurred at the April 1999 board

meeting or aware of the contents of the Wachovia term sheet used at that meeting.

### 4.    Fraudulent Intent.

Perhaps realizing that the AC makes no satisfactory allegations against the Nominal

Agents, the ART attempts to save its claims by alleging that the requisite level of fraudulent

intent can be inferred from the fact that the "Agent Banks and their affiliated Investment Banks

financially benefited … by earning inordinately high fees for funding the fraudulent scheme" and

were motivated by a desire to protect their sources of income.  (¶¶ 1574-75).  It is well-settled,

however, that a motive to earn transactional fees "is not alone sufficient to sustain a strong

inference of fraudulent intent.  If it were, every underwriter, law firm, accountant, and

investment advisor whose compensation or commission depended upon the completion of a[]

[securities] offering would have a motive to commit fraud, which would make Rule 9(b) wholly

meaningless."  *Fisher v. Offerman & Co.*, No. 95 Civ. 2566 (JGK), 1996 WL 563141, at *7

(S.D.N.Y. Oct. 2, 1996); *see also Mazzaro de Abreu v. Bank of Am. Corp.*, No. 06 Civ. 673,

2007 WL 2609535, at *5 (S.D.N.Y. Sept. 10, 2007) (McKenna, J.) ("[P]laintiff 'must allege

more than an interest in bank fees . . . to create a reasonable inference of fraudulent intent.'"

(internal citation and alteration omitted)).

C. **The Allegations Relating to the CCH Co-Borrowing Facility are Insufficient.**

The allegations with respect to the CCH Co-Borrowing Facility are equally insufficient under Rules 8(a) and 9(b).  The AC bases its claims of fraud relating to this facility on allegations of (1) oral misrepresentations to the independent directors made by Timothy Rigas and James Brown concerning the limits on an individual borrower's ability to draw on the facility, (2) descriptions of the loan in the term sheet for the facility that supposedly put all the banks on notice of those misrepresentations, and (3) a failure to disclose that the loan imposed joint and several liability.  (*See* ¶¶ 885-922).  The AC also alleges that the CCH Co-Borrowing Facility was not adequately secured by Rigas Family assets.  (¶ 903).  However, when these allegations are examined, it is clear that the Nominal Agents did not participate in the Rigas Family's fraud.

1. **Oral Misrepresentations to Independent Directors.**

The AC alleges that at the Adelphia board meeting where this loan was discussed, Timothy Rigas and James Brown stated falsely that each borrower could only borrow amounts "commensurate with the amount of collateral that they were providing."  (¶ 889).  However, the AC does not allege that any Nominal Agent was present when such oral misrepresentations were supposedly made, nor does the AC allege any facts suggesting that any Nominal Agent ever became aware that the independent directors had been misled in the manner alleged.  These defects are fatal to the AC's fraud-based claims against the Lenders.  As discussed above, they cannot be held liable for misrepresentations of which they are not alleged even to have been aware (let alone to have knowingly aided and abetted).

2.      **Allegedly Misleading Term Sheet – Failure to Disclose Joint and Several Liability.**

The AC seeks to overcome this fatal defect by pointing to alleged flaws in the term sheets that were presented to the independent directors.  However, those flaws simply do not exist.

As with the UCA/HHC Co-Borrowing Facility, the AC suggests (in ¶ 912) that the independent directors were not aware of the basic fact that there was joint and several liability for the amounts borrowed by the RFEs.  As noted above, however, the UCA/HHC term sheet presented to the independent directors in 1999 clearly identified joint and several liability, as did the Form 10-K filed by Adelphia in early 2000.  CCH was intended to be a similar facility.   Not surprisingly, therefore, the CCH term sheet discloses joint and several liability on its very first page:[13]

> RESTRICTED BORROWERS:  Century Holdings, LLC, F. Myers Acquisitions Limited Partnership and Highland Prestige Georgia, LLC, ***to be jointly and severally liable***.
>
> UNRESTRICTED BORROWERS:  The Restricted Borrowers shall be permitted to add additional Borrowers to the credit Facilities ("Unrestricted Borrowers").  Drawings under the Credit Facilities by Unrestricted Borrowers shall be limited to $500,000,000.  Unrestricted borrowers shall be liable for the portion of the Credit Facility actually borrowed by them. Restricted Borrowers shall be ***jointly and severally liable*** for all borrowings under the Credit Facilities. . . .

CCH Term Sheet, p. 1, Anker Decl., Ex. 16 (emphasis added).

The SEC filings that the independent directors had to approve relating to the CCH Co-Borrowing Facility also clearly spell out the joint and several nature of the CCH loan.  The

---

[13]      Moreover, even if it were true that the term sheet had in fact been misleading, the AC is totally devoid of any allegation that any of the Nominal Agent Banks had any hand in crafting the CCH Term Sheet or had any knowledge about what went on in the board meeting where the independent directors were supposedly misled about this fact.

complete CCH Credit Agreement was set out as an exhibit to Adelphia's 10-Q filed on May 15,

2000.  It states:

> Borrowers shall pay the Obligation in accordance with the terms
> and provisions of the Loan Documents. Restricted Borrowers shall
> be ***jointly and severally liable*** for the Obligation.

CCH Credit Agreement, at § 9.6, Anker Decl., Ex. 10 (emphasis added).

It is, therefore, simply not believable that the independent directors only became aware of

joint and several liability in 2002.

### 3.    Allegedly Misleading Term Sheet – Failure to Disclose the Leverage Ratio.

The ART also alleges with respect to the CCH facility that the term sheet presented to the

independent directors was misleading because it "did not define 'Leverage Ratio' as it actually

was used in the [co-borrowing facilities]."  (¶ 896).  Indeed, the ART alleges that the CCH terms

sheet "did not contain a definition of 'leverage ratio' and did not state that the leverage ratios to

be used in connection with the [facilities] would be a single combined leverage ratio calculated

in the aggregate for all participating co-borrowers."  (¶ 899).

Contrary to this allegation, the CCH term sheet does indeed define "leverage ratio," and it

defines it as a combined ratio.  To understand this, it is necessary to set out several definitions

found in the term sheet:

- "Restricted Borrowers" was defined to be "Century Holdings, LLC, Ft. Myers
  Acquisition Limited Partnership and highland Prestige Georgia, LLC" – that is, the
  Restricted Borrowers included both Adelphia and RFE companies.  CCH Term Sheet,
  p. 1, Anker Decl., Ex. 16.

- "Operating Cash Flow" was defined as the "***combined*** net income from operations of
  the Restricted Borrowers and their restricted subsidiaries . . . for the most recently
  ended fiscal quarter." *Id.* at 9 (emphasis added).

- "Annualized Operating Cash Flow" was defined as Operating Cash Flow multiplied
  by 4. *Id.* at 8.

The "Leverage Ratio" was then defined as "the Restricted Borrowers' ratio of the **sum** of Senior Debt to Annualized Operating Cash Flow (the 'Leverage Ratio')."  *Id*. at 3 (emphasis added).  Thus, tracking through the definitions, the term sheet unambiguously defines the leverage ratio as the **sum** of the Senior Debt held by the three principal borrowers divided by four times their **combined** quarterly net operating income.  In other words, the CCH term sheet did correctly define the leverage ratio as it was used in the co-borrowing facility.

This is yet another example of where the specific documents incorporated into the AC directly contradict its characterization of those documents.  This, too, is fatal to the fraud-based claims against the Lenders.

### 4.   The AC Itself Demonstrates that the CCH Facility Was Adequately Secured by Rigas Family Assets.

The AC's only other allegation concerning the CCH Facility is that the CCH Agent Banks were informed that proceeds from the facility would be used, in part, "to fund the Rigas families [sic] purchase of certain cable assets from Prestige Communications ($400 mm)" (¶ 975), and that Highland Prestige, an RFE, allegedly carried out this acquisition by borrowing funds in an amount that was not "commensurate with the amount of collateral that [it] had put up to secure the facility."  (¶ 903).  The ART alleges:

> On or about July 5, 2000, Highland Prestige, an RFE acquired various cable systems in Georgia owned by Prestige Communications, Inc., . . . using as much as $365 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable. . . . On or about July 2, 2001, Highland Prestige also acquired various cable systems from the Estate of Bill Daniels," and that this acquisition was funded "with approximately $345 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable."

(¶¶ 996-97).

Under the ART's theory, using the CCH Facility to fund the Prestige Communications and Bill Daniels' acquisitions was improper because Highland Prestige supposedly pledged insufficient collateral to secure those loans.  But this theory ignores ***Section 6 of the CCH Agreement, which requires borrowers, upon acquisition of new cable systems, to provide additional guarantees or pledges in favor of the lenders***.  The express purpose of these provisions was to "provid[e] for the guaranty of payment and performance of the Obligation." *See* CCH Credit Agreement, at § 6.1, Anker Decl., Ex. 10.  Thus, when CCH funds were used to purchase cable systems, those acquired systems became part of the collateral used to secure the CCH facility.

Indeed, the AC concedes that Highland Prestige in fact provided the required additional guarantees and/or pledges:

> In addition, Prestige Communications, Inc., an RFE, guaranteed repayment of funds drawn under this facility pursuant to a CCH Guaranty Agreement, dated as of September 27, 2000 .... Highland Prestige, an RFE, and each of John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Ellen Rigas also pledged certain of their interests in direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a separate CCH Pledge Agreement, dated September 27, 2001.

(¶¶ 887-80).

Taken together, these excerpts demonstrate that, far from constituting "Fraudulent Uses of the Co-Borrowing Facilities," the acquisitions by Highland Prestige were used to secure the Rigas Family's use of the co-borrowing facility.  This fact − evident from materials incorporated in the AC − affirmatively refutes the ART's concluding allegation that the Nominal Agents were aware of the Rigases' "personal use" of the co-borrowing facilities in amounts that were not commensurate with their contribution of collateral.

### D.    <u>The Allegations Relating to the Olympus Co-Borrowing Facility are Insufficient.</u>

The allegations in the AC relating to the Olympus Co-Borrowing Facility are subject to the same fatal pleading failures as those identified above.  Like the allegations discussed relating to the UCA/HHC Co-Borrowing Facility, the allegations concerning the Olympus Co-Borrowing Facility are premised on the supposed failure – by the Rigas Family, not the Nominal Agents – to disclose to the independent directors: (1) the terms of the Credit Agreement, (2) the Rigas Family's intended use of funds, and (3) that the Credit Agreement imposed joint and several liability.  (¶¶ 931-68).  The AC also alleges that the Olympus term sheet presented to the independent directors was misleading.  (¶ 942).  Again, such conclusory allegations are insufficient under Rules 8(a) and 9(b) to support claims sounding in fraud against the Lenders.

### 1.    Failure to Disclose Terms of the Credit Agreement to the Independent Directors.

The AC alleges that Timothy Rigas and James Brown breached fiduciary duties and committed fraud when they obtained the independent directors' approval for the Olympus Co-Borrowing Credit Facility at an August 7, 2001 board meeting.  (¶¶ 932-34).  Rigas and Brown allegedly secured the independent directors' approval through oral misrepresentations and the presentation of a faulty term sheet designed to mislead the independent directors into approving the facility.  (¶¶ 932-34).  Plaintiff further alleges – in a continuation of its pattern of impermissible group pleading – that the "Olympus Agent Banks and their affiliated Investment Banks worked closely with the Rigas Family and James Brown to prepare" the term sheet. (¶ 931).  These allegations, taken together, fall woefully short of meeting the pleading requirements under Rule 9(b).

The AC fails to identify which of the **18** Agent Banks – if any – supposedly "worked closely with the Rigas Family and James Brown to prepare [the Olympus] term sheet," alleging

instead that that **all** of the Agent Banks, **and** their investment banking affiliates, were in such close consultation.  (¶ 932).  The Federal Rules of Civil Procedure require more.  "[W]here there are multiple defendants, as in the present case, the complaint must disclose the specific nature of **each defendant's** participation in the alleged fraud," *Stander*, 718 F. Supp. at 1210 (emphasis added), and allege with specificity "the time, place, speaker and content of the alleged misrepresentation," *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001).

Even more telling, the AC fails to allege that:  (i) **any** of the Olympus Agent Banks attended the August 7, 2001 board meeting; (ii) **any** of the Olympus Agent Banks **knew** the allegedly defective term sheet was going to be provided to the independent directors at that meeting;[14] or (iii) **any** of the Olympus Agent Banks subsequently learned of the oral or written misrepresentations made by Rigas and Brown at that meeting.  Without such indispensable factual allegations, there is simply no support for Plaintiff's conclusory assertion that the Olympus Agent Banks aided and abetted the failure by the Rigas Family to disclose the terms of the Olympus Co-Borrowing Credit Facility to the independent directors.

> **2.**    **Failure to Disclose to the Independent Directors the Rigas Family's Intended Use of Funds.**

The AC alleges that the Olympus Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to use a large portion of the proceeds of the Olympus Co-Borrowing Credit Facility to "pay down Rigas Family and RFE debt," but that no one disclosed this fact to the independent directors.  (¶ 955).  There are many problems with this conclusory allegation.  First, as already discussed, Judge Gerber held that the banks had no duty to make a

---

[14]    Indeed, as discussed below, the Olympus terms sheets are not misleading on their face. (*See*, *infra*, pp. 28-30).

disclosure to the Adelphia directors, and therefore an omission is not actionable.  (*See*, *supra*, p. 17).

Second, as with the other Co-Borrowing Facilities, the ART fails to plead how the Olympus Agent Banks came to know of the Rigas Family's intended uses for the facility.  Nor does the ART allege how the Olympus Agent Banks, which did not attend Adelphia board meetings, came to know what Rigas and Brown told the independent directors at the August 7, 2001 board meeting in which the Adelphia board approved the Olympus facility

### 3.    Failure to Disclose True Terms of Olympus Facility.

Finally, the ART makes the familiar allegation that the independent directors thought that "each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing" (¶ 935) and did not know "that the Adelphia entities would be jointly and severally liable for the RFE's loans" (¶ 958).  If they had known otherwise, they supposedly "would have rejected the proposed Olympus Co-Borrowing Facility."  (*Id.*)

These allegations are absolutely incredible because by August 2001, the independent directors had seen two terms sheets establishing joint and several liability in the UCA/HHC and CCH Co-Borrowing Facilities and they had approved the 1999 Adelphia 10-K which stated that the co-borrowing loans were joint and several obligations.  Moreover, earlier in 2001, the independent directors had approved and signed the 2000 Adelphia 10-K, filed April 2, 2001, which describes the co-borrowing facilities as follows:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250. **Each of the co-borrowers is liable for all borrowings under the credit agreements, and may borrow up to the entire amount of the available credit under the facility.**

Adelphia Communications Corp. Apr. 2, 2001 10-K, at 65, 101, Anker Decl., Ex. 17 (emphasis added).  Thus, no later than April 2, 2001, the independent directors clearly knew the opposite of

what is alleged in the AC, namely that the RFE borrowers could borrow "the entire amount of the available credit" (*id.*) and that Adelphia was liable for those debts.  Yet, the independent directors took no action whatsoever based on this knowledge.

Even assuming the actual case – that the independent directors were completely supine, ignorant, and dominated by the Rigas family, as the Creditors' Committee itself alleged in the original Complaint – the ART offers no explanation as to why any Lenders should be liable for an omission, when no bank was under a duty to brief the Adelphia directors, and it is not alleged that ***any*** bank was present or knew what had allegedly happened at the August 7, 2001 board meeting.

Moreover, the very documents incorporated into the AC contradict the AC's allegations. They demonstrate that the independent directors knew full well that the Olympus facility, like the other two co-borrowing facilities, imposed joint and several liability on all borrowers.  After all, the Olympus Co-Borrowing Credit Agreement was an exhibit to Adelphia's Form 8-K, filed on October 12, 2001.  As the ART itself alleges, that filing was "approve[d]" by the independent directors (¶ 964), and it clearly states "[t]he Borrowers shall be jointly and severally liable for the [loans]."  Olympus Credit Agreement, at § 9.6(a), Anker Decl., Ex. 11.  Given the many SEC filings approved by the independent directors prior to their approval of the Olympus co-borrowing facility, which disclosed the true nature of the UCA/HHC and CCH Co-Borrowing Facilities, it is inherently implausible that the independent directors would think that the Olympus Co-Borrowing Facility would work any differently.

### 4.    Allegedly Misleading Term Sheet – Leverage Ratio.

As with the CCH facility, the ART alleges with respect to the Olympus facility that the term sheet was misleading because it "did not define 'Leverage Ratio' as it actually was used in the [co-borrowing facilities]."  (¶ 942).  In particular, the ART claims that the terms sheet "did

not contain a definition of 'leverage ratio' and did not state that the leverage ratios to be used in connection with the Olympus Co-Borrowing facility would be a single combined leverage ratio calculated in the aggregate for all participating co-borrowers." (¶ 945).  The AC asserts that this omission was fraudulent because:

> Based on the misleading information pertaining to leverage ratios in the Olympus Term Sheet . . . the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with that particular co-borrower's individual leverage ratio.

(¶ 946).

But as shown above, the independent directors knew in April 2001, well before the board vote on the Olympus Facility, that the UCA/HHC and CCH Facilities did not so limit the borrowings of a party to the loan agreement.  The Olympus term sheet is no different in this regard.  In addition, the Olympus term sheet, like the prior two term sheets, defined the leverage ratio in terms essentially identical to those found in the CCH term sheet:

- "Restricted Borrowers" was defined to be "Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, Highland Video Associates, L.P., Coudersport Television Cable Company and Adelphia Holdings 2001, LLC." – that is, the Restricted Borrowers included both Adelphia and RFE companies.  Olympus Term Sheet, p. 1, Anker Decl., Ex. 18.
- "Operating Cash Flow" was defined as the "**combined** net income from operations of the Restricted Borrowers and their restricted subsidiaries … for the most recently ended fiscal quarter." *Id.* at 10 (emphasis added).
- "Annualized Operating Cash Flow" was defined as Operating Cash Flow multiplied by four. *Id.* at 9.

The "Leverage Ratio" was then defined as "the Restricted Borrowers' ratio of Senior Debt to Annualized Operating Cash Flow (the 'Leverage Ratio')." *Id.* at 3.  Thus, the Olympus term sheet tracks the two earlier term sheets in defining the leverage ratio as the Senior Debt held by the principal borrowers as a group divided by four times their **combined** quarterly net operating income.

Again, the specific documents incorporated into the AC directly contradict its characterization of those documents.  This is fatal to the fraud-based claims against the Lenders.

**5.      Fraudulent Intent.**

Noticeably absent from the ART's voluminous AC is any allegation with respect to the fraudulent intent on the part of ***any*** of the Olympus Agent Banks.  Further, as discussed above, it is well-settled that the desire to obtain transactional fees is not enough to sustain an inference of fraudulent intent.  (*See*, *supra*, p. 19).

## <u>CONCLUSION</u>

The ART's Amended Complaint is as defective as the original.  Despite access to extensive discovery, the ART has been unable to set out the circumstances surrounding the fraud-based claims brought against the moving defendants.  Instead, the AC attempts to morph the wrongdoing of the Rigases into the wrongdoing of all the Nominal Agents by employing group pleading – a technique that courts within this District have explicitly rejected as anathema to Rules 8(a) and 9(b).  Accordingly, Claims 37, 38, and 55 should be dismissed.


Respectfully submitted,

WHITE & CASE LLP


By: _____/s/_____
     Sandeep Qusba (SQ-8834)
     Heather K. McDevitt (HM-9973)

1155 Avenue of the Americas
New York, New York  10036-2787
Tel:    212-819-8200
Fax:    212-354-8113

Counsel to ABN AMRO Bank, N.V.

CLIFFORD CHANCE US LLP


By: _____/s/_____
    Mark A. Kirsch (MK-7806)
    Christopher M. Joralemon (CJ-1403)

31 West 52nd Street
New York, New York 10019
(212) 878-8000

Counsel for The Bank of New York and The Bank
of New York Mellon Corporation (f/k/a The Bank
of New York Company, Inc.)

Counsel for Morgan Stanley Senior Funding, Inc.


KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP

By: _____/s/_____
    Richard S. Miller (RM-2428)
    Michael R. Gordon (MG-7838)
    Robert Honeywell (RH-7684)

599 Lexington Avenue
New York, NY  10022
Telephone:  (212) 536-3900
Facsimile:  (212) 536-3901

Attorneys for Barclays Bank PLC

WILMER CUTLER PICKERING HALE
 AND DORR LLP

By: _____/s/_____
        Philip D. Anker (PA-7833)
        John A. Valentine (JV-1064)

399 Park Avenue
New York, NY  10022
Telephone:  (212) 230-8800
Facsimile:  (212) 230-8888

Counsel to Credit Suisse, New York Branch,
 Credit Suisse Capital Funding, Inc., and
 The Royal Bank of Scotland plc


McKEE NELSON LLP

By: _____/s/_____
        Steven G. Brody (SB-6859
        Jennifer Hurley McGay (JHM-7487)
        Matthew Minerva (MM-8840)

One Battery Park Plaza
New York, New York 10004
Telephone:  (917) 777-4200
Facsimile:  (917) 777-4299

Attorneys for Deutsche Bank AG


STROOCK & STROOCK & LAVAN LLP

By: _____/s/_____
        Kenneth Pasquale

180 Maiden Lane
New York, New York 10038
Telephone:  (212) 806-540

Attorneys for The Fuji Bank Limited

WILLIAMS & CONNOLLY, LLP

By: _____/s/_____
       F. Whitten Peters (pro hac vice pending)
       Lance A. Wade (pro hac vice pending)

725 – 12th Street, NW
Washington, D.C.  20005
(202) 434-5000
(202) 434-5029 (fax)

BLANK ROME LLP

By: _____/s/_____
       Raymond L. Shapiro (RS-1120)
       James V. Masella, III (JM-5121)
       Andrew B. Eckstein (AE-6142)

405 Lexington Avenue
New York, NY 10174
(212) 885-5000
(212) 885-5002 (fax)

Attorneys for PNC Bank, NA

STITES & HARBISON PLLC

By: _____/s/_____
       Robert W. Griffith (RG 3095)
       Garry K. Grooms (GG 1019)
       Bethany A. Breetz (BB 5182)
       Samuel L. Zeigler (SZ 6154)

SunTrust Plaza
401 Commerce Street, Suite 800
Nashville, TN  37219
Direct Dial: (615) 782-2213
Direct Fax (615) 742-4131

Attorneys for SunTrust Banks, Inc. and SunTrust
Bank

Dated: New York, New York
      December 21, 2007

# APPENDIX A

**UCA/HHC Credit Agreement**

SECTION 9.8. Limitation on Duties. Notwithstanding anything else to the contrary contained in this Agreement or any other Loan Document, neither the Syndication Agent, the Documentation Agent nor any Arranging Agent, in such capacity, shall have any implied obligations hereunder or under any other Loan Document, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against either the Syndication Agent, the Documentation Agent or any Arranging Agent.

**CCH Credit Agreement**

12.10 Agents. None of the Lenders identified in this Agreement as "Co-Administrative Agent" (other than Administrative Agent), "Syndication Agent," "Documentation Agent," "Arranging Agent," or "Managing Agent" shall have any Rights, powers, obligations, liabilities, responsibilities, or duties under the Loan Documents other than as an Issuing Lender (if applicable) and those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders so identified as "Co-Administrative Agent," "Syndication Agent," "Documentation Agent," "Arranging Agent," or "Managing Agent" shall have or be deemed to have any fiduciary relationship with any Lender. Any Lender that is a "Co-Administrative Agent" (other than Administrative Agent which shall be governed by Section 12.1(b)), "Syndication Agent," "Documentation Agent," "Arranging Agent," or "Managing Agent" may voluntarily relinquish its title by *giving* written notice thereof to Administrative Agent and Borrower. Upon such relinquishments, a successor "Co- Administrative Agent" (other than Administrative Agent which shall be governed by Section 12 .1.(b). "Syndication Agent," "Documentation Agent," "Arranging Agent," or "Managing Agent" may be appointed upon the mutual agreement of Restricted Borrowers and Administrative Agent.

**Olympus Credit Agreement**

12.10 The Agents. None of the Lenders identified *in* this Agreement as a "Syndication Agent," "Documentation Agent," "Managing Agent," "Joint Book Runner" or "Joint Lead Arranger" shall have any Rights, powers, obligations, liabilities, responsibilities, or duties under the Loan Documents other than as an Issuing Lender (if applicable) and those applicable to all the Lenders as such. Without limiting the foregoing, none of the Lenders so identified as "Syndication Agent," "Documentation Agent," "Managing Agent, " or "Joint Book Runner" "Joint Lead Arranger" shall have or be deemed to have any fiduciary relationship with any Lender. Any Lender that is identified in this Agreement as a "Syndication Agent," "Documentation Agent," "Managing Agent," "Joint Book Runner" or "Joint Lead Arranger" may voluntarily relinquish its title by giving written notice thereof to the Administrative Agent and the Borrowers. Upon such relinquishments, a successor "Syndication Agent," "Documentation Agent," "Managing Agent," "Joint Book Runner" or "Joint Lead Arranger" may be appointed upon the mutual agreement of the Borrowers and the Administrative Agent.