UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/17/08
```

------------------------------------x

ADELPHIA RECOVERY TRUST,                :

                         Plaintiff,    :        05 Civ. 9050 (LMM)
                                                (related to 03 MDL 1529)
              - against –               :
                                                DECISION ON APPEAL
BANK OF AMERICA, N.A., <u>et al.</u>,      :        FROM BANKRUPTCY COURT

                         Defendants.    :

------------------------------------x

McKENNA, D.J.,

1.

        This action was commenced as an adversary proceeding in
the United States Bankruptcy Court for the Southern District of New
York, in the Chapter 11 proceedings relating to Adelphia
Communications Corporation ("Adelphia") and affiliated companies
(collectively, with Adelphia, the "Debtors"), by the Adelphia
Creditors' Committee.  Pursuant to the confirmed First Modified
Amended Joint Chapter 11 Plan for Adelphia Communications
Corporation and Certain of its Affiliated Debtors, title to the
claims asserted by the Creditors' Committee has been transferred to
plaintiff Adelphia Recovery Trust.

        On February 9, 2006, this Court withdrew the reference to
the Bankruptcy Court of the Creditors' Committee adversary
proceeding, leaving the many motions for dismissal of the
complaint, with the consent of the movants, for determination by



JAN 1 7 2008

the judge assigned, Hon. Robert E. Gerber, B.J.  (See Mem. & Order,

Feb. 7, 2006.)

In a Decision and Order on Motions to Dismiss dated

June 11, 2007 ("Decision"), Judge Gerber dismissed a number of

claims of the adversary proceeding complaint ("Complaint"), and

left a number standing.  On September 5, 2007, this Court granted

leave to appeal from Judge Gerber's determinations sustaining

Claims 32, 33 and 37 of the Complaint (see Mem. & Order, Sept. 5,

2007), and on September 28, 2007, in a decision relating to certain

objections by plaintiff-appellee to some of defendant-appellants'

formulations of the issues on appeal, granted leave to appeal from

the sustaining of Claim 37 on the asserted ground that plaintiff

does not have Article III standing.  (See Mem. & Order, Sept. 28,

2007, at 3-4.)[1]

---

[1] The appellants are:  (i) ABN AMRO Inc. and a number of other
entities (identified in the Joint Brief for Certain Investment Bank
Appellants, Sept. 28, 2007, at 1, n.2) ("Investment Banks"); (ii) Bank
of America, N.A., and a number of other entities (identified in the Joint
Appellants' Brief of Certain Lenders, Sept. 28, 2007, at 1) ("Lender
Banks"); (3) Calyon New York Branch and related entities (identified in
the Appellate Brief of the Calyon Parties, Sept. 28, 2007, at 1)
("Calyon"); (4) Citibank, N.A. and Citicorp USA, Inc. ("Citibank"); (5)
JPMorgan Chase Bank, N.A. ("JPMC"); and (6) CIBC, Inc. and CIBC World
Markets Corp. ("CIBC").

2.

The 244 page Complaint asserts 52 claims for relief, most of which do not need to be summarized here.[2]

"In general, [plaintiff] bring[s] this suit against numerous commercial banks and their investment bank affiliates (the 'Defendants'), charging wrongdoing on the part of the Defendants in their dealings with Adelphia's former management, John, Timothy, Michael and James Rigas (the 'Rigases'), and Rigas family entities ('RFEs'), against whom Adelphia brought suit for the looting of the company." (Decision at 1.)

Among the Complaint's many claims, plaintiff asserts "violation of the Bank Holding Company Act" (id. at 3) (see Claim 32), and "seeks to equitably subordinate and/or disallow . . . bank lenders' claims." (Decision at 2.) (See Claim 33.)

> [Plaintiff's] claims include claims for aiding and abetting the Rigases' breaches of fiduciary duty—principally in connection with three "co-borrowing" facilities under which Adelphia became liable to repay the banks for billions of dollars that went to or for the benefit of the Rigases and RFEs. A prominent feature of the aiding and abetting claims—which are asserted against both bank lenders and their investment bank affiliates—is the allegation that the co-borrowing loans, in and of themselves, would not provide an acceptable risk

---

[2] The Complaint contains a helpful Table of Contents (Complaint at i-vi), and Judge Gerber's Decision a helpful Attachment summarizing his disposition of the claims. (Attachment at 1-3.)
On or about October 31, 2007, plaintiff filed a 474 page amended complaint which was not before Judge Gerber and is not before this Court on the present appeal, other than as an argumentative suggestion as to what plaintiff believes it could now allege, were it required and allowed to replead any of the claims on appeal.

adjusted return on capital, and the participation of the investment banks is an important aspect of the alleged wrongful conduct. In general terms, it is alleged that the bank lenders and investment bank affiliates entered into the co-borrowing arrangements motivated by the much greater profitability of the investment banking side of the transactions.

(Decision at 1-2.)   (footnote omitted) (<u>See</u> Claim 37.)[3]

### 3.

A district court reviews the conclusions of law of a bankruptcy court <u>de novo</u>.   <u>In re Ionosphere Clubs, Inc.</u>, 922 F.2d 984, 988 (2d Cir. 1990).   In the case of a motion under Fed. R. Civ. P. 12(b)(6), the reviewing court "'must accept as true all the factual allegations in the complaint,' and 'draw all reasonable inferences in plaintiffs' favor.'"   <u>In re Tamoxifen Citrate Litig.</u>, 466 F.3d 187, 200 (2d Cir. 2006) (quoting <u>Leatherman v. Tarrant County Narcotics & Intelligence Coordination Unit</u>, 507 U.S. 163, 164 (1993), and <u>Freedom Holdings Inc. v. Spitzer</u>, 357 F.3d 205, 216 (2d Cir. 2004)).   "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"   <u>ATSI Comm'ns, Inc. v. Shaar Fund Ltd.</u>, 493 F.3d 87, 98

---

[3] The structure of a co-borrowing facility is described in the Complaint:   "each 'co-borrower' -- whether an indirect Adelphia subsidiary or an unaffiliated entity owned by the Rigas family -- could borrow the entire amount of the facilities (up to approximately $5.6 billion) without regard to its ability to repay and with all co-borrowers being jointly and severally liable to repay the loans." (Complaint ¶ 4.)

(2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007)) (footnote omitted).

Before considering Judge Gerber's rulings on the motions to dismiss (to the extent leave to appeal has been granted), the court turns to the argument of Calyon that this Court lacks subject matter jurisdiction over Claims 32, 33 and 37.

**4.**

In its Memorandum and Order of September 28, 2007, the Court granted Calyon leave to appeal from the Decision on the ground of lack of Article III standing only as to Claim 37, noting that "[o]ther than as to Claim 37, an appeal from Judge Gerber's decision is not the forum for a challenge to Article III standing." (Mem. & Order, Sept. 28, 2007, at 3-4 & n.2.) Calyon nevertheless seeks reversal of the Decision, on the ground of lack of Article III standing, as to the Decision's failure to dismiss Claims 32, 33 and 37. (Calyon Mem., Sept. 28, 2007, at 18.) The Court here considers the Article III standing issue as to Claim 37 only.[4]

In Claim 37, plaintiff alleges that the Agent Banks and the Investment Banks aided and abetted the breach, by the Rigas family and James Brown and Michael Mulcahy, senior officers of

---

[4] Calyon has joined in other arguments, of other appellants, which are considered below.

Adelphia, of their fiduciary duties to Adelphia, and seeks the recovery of damages of at least $5 billion.  (Complaint, ¶ 858.)[5]

Calyon asserts that plaintiff has "failed to appropriately plead that each of the 247 separate entities that comprise the Adelphia estate has suffered an injury-in-fact with respect to each claim, and ha[s] therefore failed to carry [its] burden of establishing Article III Standing."   (Calyon Mem., Sept. 28, 2007, at 2.)

> The Supreme Court has explained that:
>
>> The "core component" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy requirement of Article III."   The requisite elements of this "core component" derived directly from the Constitution" are familiar:  "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."

DaimlerChrysler Corp. v. Cuno, 126 S.Ct. 1854, 1861 (2006) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992), and Allen v. Wright, 468 U.S. 737, 751 (1984)).

Where, as here, "'standing is challenged on the basis of the pleadings, we "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party."'"  Connecticut v. Physicians Health Services of

---

[5] Agent Banks are, according to the Complaint, banks that were agents for other banks that became parties to credit agreements described in the Complaint.  (See Complaint ¶¶ 21-70, identifying both Agent Bank and Investment Bank defendants.)

6

Conn., Inc., 287 F.3d 110, 114 (2d Cir. 2002) (quoting United

States v. Vazquez, 145 F.3d 74, 81 (2d Cir. 1998)).   See also,

Brooklyn Legal Services Corp. v. Legal Services Corp., 462 F.3d

219, 226 (2d Cir. 2006).

Calyon's argument, citing paragraphs 519, 520, 865, 874

and 883 of the Complaint, proceeds on a reading of the complaint as

asserting "claims [-- including Claim 37--] clearly reliant upon a

particularized group of alleged frauds as to the solicitation of

several separate groups of securities purchasers which are alleged

to have been positioned over a three year period to suffer the

'first losses.'"   (Calyon Mem., Sept. 28, 2007, at 5 (quoting

Complaint ¶ 523).)   Such claims are claims, Calyon argues, of

creditors, and are not common to all of the creditors.   (Id. at

5-6.)   Not only have these claims been paid, according to Calyon

(id. at 6), they cannot be asserted by plaintiff (which Calyon

acknowledges stands in the same legal position as a trustee (id. at

9 n.14)), because the claims do not represent a generalized harm

for which a trustee might sue for the general benefit of all

creditors, but rather particular injuries to individual creditors

or groups thereof which a trustee cannot pursue on behalf of the

entire creditor body.   (Id. at 9 (citing St. Paul Fire & Marine

Ins. Co. v. PepsiCo., Inc., 884 F.2d 688, 701, 704-06 (2d Cir. 1989).)[6]

Plaintiff, however, contrary to Calyon's premise, insists that in Claim 37, it "is not seeking damages for creditors' individual injuries, but rather for the injury to the corporate body as a whole arising from Appellants' role in aiding and abetting the Rigases' breach of fiduciary duty."   (Pl. Mem., Oct. 23, 2007, at 22 (footnote omitted).)

The Complaint alleges that, as a result of the Agent Banks' and the Investment Banks' aiding and abetting of the breaches of fiduciary duty of the members of the Rigas Family, Brown and Mulcahy, "the Debtors [i.e., Adelphia and its affiliated debtors] have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial."   (Complaint ¶ 866.) It alleges, at the outset, that "[t]he Rigas Family siphoned away over $3.4 billion from the Debtors -- funds knowingly and eagerly loaned by Defendants -- rendering the Debtors bankrupt and insolvent."   (Complaint ¶ 2.)

As is pointed out in St. Paul Fire & Marine Ins. Co., 884 F.2d at 700, whether the right to pursue a claim belongs to the debtor or to the individual creditors turns on state law. Pennsylvania law, which governs Claim 37, holds that "a corporation

---

[6] Calyon further points out that trade creditors are differently situated than the debt securities purchasers it emphasizes.   (Calyon Mem., Sept. 28, 2007, at 9-10.)

can suffer an injury unto itself, and any claim it asserts to recover for that injury is independent and separate from the claims of shareholders, creditors, and others.  We think it is irrelevant that, in bankruptcy, a successfully prosecuted cause of action leads to an in flow of money to the estate that will immediately flow out again to repay creditors."  <u>Official Comm. of Unsecured Creditors v. R.L. Lafferty & Co.</u>, 267 F.3d 340, 348-49 (3d Cir. 2001) (citations omitted).

Thus, plaintiff brings Claim 37 to recover for the Debtors, as it has a right to do.

In reply, Calyon points out that plaintiff is pursuing the claims not just of Adelphia, but of the almost 250 Debtors, including Adelphia.  (Calyon Reply Mem., Nov. 13, 2007, at 1.) Calyon argues that "constitutional standing requires <u>each</u> putative plaintiff to assert facts showing an injury personal to itself and not one potentially suffered by other members of the agglomerated group."  (<u>Id.</u> at 5 (citing <u>Simon v. E. Ky. Welfare Rights Org.</u>, 426 U.S. 26 (1976)).[7]

---

[7] <u>Simon</u>, discussed at some length by Calyon, no doubt correctly states some generalities about standing, but it does not bear directly on the allegations in the present case.  <u>Simon</u> found that the plaintiffs there did not have standing because the wrongs alleged, denial of non-emergency hospital services to indigent persons by not-for-profit hospitals, could not be redressed where no such hospital was a defendant.  "[T]he complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire."  <u>Simon</u>, 426 U.S. 45-46.

Calyon does not show, however, that the multiple Debtors are not alleged to have been harmed, and that in a common way.  The Complaint explicitly alleges that, "[s]addled with the massive debt burden of loans that were intended to benefit only the Rigas Family (and which, in fact, did only benefit the Rigas Family), on June 25, 2002, the Debtors filed petitions pursuant to Chapter 11 of the Bankruptcy Code in [the Bankruptcy] Court."   (Complaint, ¶ 527.)[8]

In Lafferty, the Third Circuit concluded that, "if faced with the issue, the Pennsylvania Supreme Court would determine that 'deepening insolvency' may give rise to a cognizable injury."  267 F.3d at 349.  "Deepening insolvency," as used by the Third Circuit in Lafferty, includes a claim that given defendants have expanded a debtor's debt out of all proportion to the debtor's ability to repay and ultimately forced the debtor to seek bankruptcy protection.  Id. at 347-48 (citations omitted).  Here, the Court reads Claim 37 of the Complaint to allege the tort of aiding and abetting a breach of fiduciary duty that had such an effect on all of the Debtors.  Plaintiff has Article III standing to assert that claim.

Calyon's arguments to the effect that the Debtors' creditors have been paid in full are not to the point on this

---

[8] Many or all of the Debtors other than Adelphia (see Complaint, ¶ 20) were parties with Adelphia to at least one of the Co-Borrowing Facilities.  (See Complaint, ¶¶ 427, 432, 433, 438 & 439.)  Calyon has not identified any particular Debtor as not a party to a Co-Borrowing facility.

motion.  In the first place, the fact is disputed (see Pl. Mem.,
Oct 23, 2007, at 23), and even if it is the case, that does not
mean that no Debtors have unrecompensed injury.  Most important of
all, however, whether the claims asserted by plaintiff have been
satisfied is a matter of factual defense that cannot be resolved on
the present appeal, which is concerned only with whether plaintiff
has standing to assert Claim 37, and whether Judge Gerber erred in
not dismissing Claims 32, 33 and 37 under Fed. R. Civ. P. 12(b)(6).

**5.**

Claim 32 alleges that the Agent Banks (see n.5, supra)
and the Investment Banks violated the Bank Holding Company Act, in
that:

> At various times herein, the Agent Banks
> conditioned their extensions of credit to the
> Debtors, and/or fixed or varied the consideration
> thereof, and/or otherwise required the Debtors in
> conjunction with the foregoing to obtain some
> additional credit, property, or service from a bank
> holding company of such bank or from, among other
> entities, the Investment Banks.

(Complaint ¶ 813.)

> The Bank Holding Company Act provides, in part, that:
>
> (1) A bank shall not in any manner extend credit,
> lease or sell property of any kind, or furnish any
> service, or fix or vary the consideration for any
> of the foregoing, on the condition or requirement--
>
>> (A) that the customer shall obtain some
>> additional credit, property, or service from
>> such bank other than a loan, discount,
>> deposit, or trust service;

11

(B) that the customer shall obtain some
additional credit, property, or service from a
bank holding company of such bank, or from any
other subsidiary of such bank holding company.

(12 U.S.C. § 1972(1)(A) & (B).)

Several issues as to Claim 32 are raised on appeal.

The first is raised by the Investment Banks only, who
argue that the anti-tying provisions of 12 U.S.C. § 1972 do not
apply to them because they do not come within the definition of
"bank" in that section.[9]  They are correct.

For purposes of 12 U.S.C. § 1972, the term "bank" has the
meaning ascribed to it in 12 U.S.C. § 1841.  Id. § 1971.  12 U.S.C.
§ 1841 defines "bank" as follows:

Except as provided in paragraph (2), the term
"bank" means any of the following:

(A) An insured bank as defined in section
1813(h) of this title.

(B) An institution organized under the laws of
the United States, any State of the United
States, the District of Columbia, any
territory of the United States, Puerto Rico,
Guam, American Samoa, or the Virgin Islands
which both--

(i) accepts demand deposits or deposits
that the depositor may withdraw by check
or similar means for payment to third
parties or others; and

(ii) is engaged in the business of making
commercial loans.

---

[9] The Decision does not address this issue.

12

Id. § 1841(c)(1)(A) & (B).  Plaintiff does not argue that any exception found in § 1841(c)(2) applies, and, while the Complaint alleges that the Agent Banks come within the definition (Complaint ¶ 811), it does not make the same allegation as to the Investment Banks.  While it may be that there is no precedent directly in point (see Pl. Mem. at 56), that is beside the point.[10]  The Investment banks very plainly do not come within the definition, nor has plaintiff come forward with any authority for reading the definition to mean anything other than its plain meaning.  "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last:  'Judicial inquiry is complete.'" Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254-55 (1992) (quoting Rubin v. United States, 449 U.S. 424, 430 (1981)) (other citations omitted).

A second issue is raised by the Agent Banks and the Investment Banks.  Citing paragraphs 509, 511 and 514 of the Complaint, they argue that plaintiff alleges that it was Adelphia, or the Rigas Family, that dictated the tie of loans and investment services.  See Complaint ¶ 511 (". . . members of the Rigas Family

---

[10] It is fair, however, to note the Seventh Circuit's observation that "[t]his narrow definition was purposefully provided by Congress. . . ." Flintridge Station Assoc. v. Am. Fletcher Mortgage Co., 761 F.2d 434, 437 (7th Cir. 1985) (citing 1970 U.S. Code Cong. & Ad. News 5541).

expressly conditioned the granting of investment banking business on participation in the Co-Borrowing Facilities.")

The Bank Holding Company Act "'appl[ies] the general principles of the Sherman Antitrust Act prohibiting anti-competitive tying arrangements specifically to the field of commercial banking. . . .'" S & N Equip. Co. v. Casa Grande Cotton Fin. Co., 97 F.3d 337, 343 (9th Cir. 1996) (quoting Davis v. First Nat'l Bank of Westville, 868 F.2d 206, 208 (7th Cir. 1989)). "A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product.'" Yentsch v. Texaco, Inc., 630 F.2d 46, 56 (2d Cir. 1980) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)). One element that must be shown in a tying case is "actual coercion by the seller that in fact forced the buyer to accept the tied product." Id. at 57 (citations omitted). Plaintiff does not dispute that it must allege that the banks coerced the Debtors to accept investment services as a condition of obtaining loans, but it argues that it has in fact so alleged, citing paragraphs 813, 499 and 500 of the Complaint. See also id. ¶ 833. Judge Gerber plainly understood Claim 32 to allege coercion by the Agent Banks. (Decision at 74-75.)

The net result of the paragraphs of the Complaint cited by defendants and those cited by plaintiff in the one Complaint is a degree of ambiguity that should be corrected (consistently with

14

Fed. R. Civ. P. 11).  Accordingly, Claim 32 is dismissed but with leave to replead, to resolve this ambiguity, within 20 days of the date hereof.[11]

Defendants further argue that plaintiff has not adequately alleged injury as a result of the alleged tying. Plaintiff does allege that "[a]s a result of the [tying] activities of the Agent Banks, the Debtors have suffered damage." (Complaint ¶ 814.)  Defendants have not cited binding authority that would require more at this stage.[12]

Citibank raises another pleading issue, that plaintiff has failed to allege an anti-competitive practice.  That argument, however, is premised on the assumption that plaintiffs are alleging the violation of the Bank Holding Company Act because "Adelphia and/or the Rigases, and not the banks, demanded the alleged ties" (Citibank Mem., Sept. 28, 2007, at 1), the banks thus being in "significant competition for Adelphia's business."  (Id. at 2.) However, as found above, that is not plaintiff's underlying allegation in Claim 32, and the argument is thus not persuasive.

---

[11] If plaintiff believes the Amended Complaint, which the Court here does not pass upon, satisfies the need for clarification, it may so advise the Court in writing in lieu of repleading.  If plaintiff repleads, it is free to consider being selective in the prior allegations it wishes to incorporate by reference in Claim 32.

[12] That does not mean that contention interrogatories would not be appropriate at the conclusion of discovery.

**6.**

The concluding allegation of Claim 33 is that:

> By reason of the [alleged wrongdoing of defendants], (a) Plaintiffs are entitled to judgment equitably disallowing the Investment Banks and the Co-Borrowing Lenders' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, Plaintiffs are entitled to judgment (i) subordinating the Investment Banks and the Co-Borrowing Lenders' claims to the prior payment in full of the claims of unsecured creditors of the Debtors, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of the Debtors' estates.

(Complaint ¶ 836.)  On appeal, defendants argue that Judge Gerber erred in recognizing a power in the bankruptcy court to equitably disallow a claim.

Judge Gerber recognized that the Bankruptcy Code does not expressly provide for equitable disallowance of claims, but reasoned that 11 U.S.C. §§ 510(c) and 502, silent on the subject, do not prohibit it, and that a very specific statement in the Bankruptcy Code's legislative history -- to the effect that Section 510(c) is intended to codify case law, including <u>Pepper v. Litton</u>, 308 U.S. 295 (1939), and does not "preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances" (Decision at 68 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess., at 359, <u>reprinted in</u> Collier, <u>Bankruptcy</u> (15th ed. 2006), App. Pt. 4 - 1495) (footnote omitted)) -- allows (depending of course on the factual showing) equitable disallowance of claims.

16

The heart of defendants' argument is that the plain meanings of 11 U.S.C. §§ 502 and 510(c) make it clear that equitable disallowance is not available, re-enforcing this argument by pointing out that a provision of one of the bills that preceded enactment of the Bankruptcy Code contained a Section 510(c)(3) specifically providing for equitable disallowance, but that that provision was not included in the statute as passed, showing that Congress expressly rejected the equitable disallowance remedy. (Lender Banks Mem., Sept. 28, 2007, at 6 & n.11.)  The parties' legislative history arguments require a closer look.[13]  The parties have not, unfortunately, addressed the specific provenance of the items of legislative history they respectively cite, but provenance is important, particularly when dealing with the legislative history of the Bankruptcy Code.

The path to the Bankruptcy Code enacted on November 6, 1978, effective, for the most part, on October 1, 1979, was long

---

[13] Bankruptcy courts remain courts of equity, contrary to defendants' suggestion.  (See id. at n.22.)  The statutory provisions of 11 U.S.C. §§ 1123(b)(5), 1129 and 105(a) "are consistent with the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify debtor-creditor relationships."  United States v. Energy Res. Co., 495 U.S. 545, 549 (1990) (citing Pepper, 308 U.S. at 303-304) (other citations omitted).  "Bankruptcy courts have long had broad equity power to manage the affairs of debtors [citing Pepper], a power now codified in Section 105 of the Bankruptcy Code."  In re Croton River Club, Inc., 52 F.3d 41, 45 (2d Cir. 1995).  Of course, as the maxim has it, "[e]quity follows the law."  W.S. Simkins, A Federal Equity Suit, at 11 (3d Ed. 1916), and "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code."  Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988).

17

and complex in the extreme.  See Matter of Virtual Network Services Corp., 902 F.2d 1246, 1247-49 (7th Cir. 1990).  See also Kenneth N. Klee, Legislative History of the New Bankruptcy Law, 28 DePaul L. Rev. 941 (1979), reprinted in Collier, Bankruptcy, App. Pt. 4-199.

Turning first to plaintiff's argument, on September 8, 1977, the House Judiciary Committee reported to the full House a bill, H.R. 8200.

Section 510(b) as it appeared in H.R. 8200 read as follows:

> Notwithstanding subsection (a) of this section, after notice and a hearing, the court may, on equitable grounds--
>
> > (1) subordinate for purposes of distribution all or any part of another allowed claim or interest; or
> >
> > (2) order that any lien securing such a subordinated claim be transferred to the estate.

(Collier, Bankruptcy, App. Pt. 4-922.)   The House Judiciary Committee Report which accompanied H.R. 8200 states the following as to Section 510(b):

> Subsection (b) permits the court to subordinate, on equitable grounds, all or any part of an allowed claim or interest to all or any part of another allowed claim or interest, and permits the court to order that any lien securing claim subordinated under this provision be transferred to the estate. This section is intended to codify case law, such as Pepper v. Litton, 308 U.S. 295 (1939), and Taylor v. Standard Gas and Electric Co., 306 U.S. 307 (1938), and is not intended to limit the court's power in any way.  The bankruptcy court will remain a court of equity, proposed 28 U.S.C.

18

> § 1481; <u>Local Loan v. Hunt</u>, 292 U.S. 234, 240
> (1934).   Nor  does  this  subsection  preclude  a
> bankruptcy  court  from  completely  disallowing  a
> claim in appropriate circumstances.  <u>See</u> <u>Pepper v.
> Litton</u>, <u>supra</u>.  The court's power is broader than
> the  general  doctrine  of  equitable  subordination,
> and  encompasses  subordination  on  any  equitable
> grounds.

(Collier, App. Pt. 4-1495.)

If Congress had passed and the President signed H.R. 8200

with the Section 510(b) quoted above, plaintiff's argument would be

a strong one.  But, as can be seen in <u>Virtual Network</u> and the Klee

article, H.R. 8200 cannot be said to represent the text which

Congress passed.

> Only a few members of Congress were involved in the
> negotiations  of  the  final  versions  of  the  bill.
> And although the "eleventh-hour" hearings secured
> passage  of  the  Act,  they  resulted  in  a  document
> representing  compromises  which  were  previously
> unevaluated by congressional committee.
>
> Particularly,  the  committees  in  charge  of
> evaluating § 510 did not prepare a final report on
> the section.

<u>Virtual Network</u>, 902 F.2d at 1248 (citations omitted).  As Collier,

<u>Bankruptcy</u>, points out in introducing the House Report:  "This

Report explains only the provisions of the bill that was reported

by the House Judiciary Committee.  It does not, of course, reflect

any subsequent developments in the legislative process." (Collier,

<u>Bankruptcy</u>, App. Pt. 4-1047.)

In these circumstances, the Court cannot find in the

legislative history cited by plaintiff a basis to attribute to

19

Congress an intent that the Code should authorize equitable disallowance as well as equitable subordination.

H.R. 8200, with amendments, was passed by the House on February 1, 1978, and sent to the Senate. The Senate Judiciary Committee, on July 14, 1978, favorably reported S. 2266, which, in Section 510, contained a provision, Section 510(c)(3), stating that, "[a]fter notice and a hearing the court may -- . . . disallow, in part or in whole, any claim or interest in accordance with the equities of the case." (Collier, Bankruptcy, App. Pt. 4-1789-1790.) The Report (S. Rep. No. 95-989, 95th Cong., 2d Sess. (1978)), as to Section 510 (Collier, Bankruptcy, App. Pt. 4-2018-2019), does not refer to Section 510(c)(3), or to equitable disallowance, nor does it refer to its difference in Section 510 from H.R. 8200. Defendants give no indication of, nor has the Court found, the point in the legislative history at which Section 510(c)(3) of S.2266 was dropped, nor any evidence as to why it was dropped. The end result, Section 510 of the Bankruptcy Code as passed by Congress and signed by the President contains no provision for equitable disallowance. In the circumstances, and in the light of how the Act was finally put together as described in Virtual Network, supra, the Court cannot give any weight to the omission of Section 510(c)(3) of S.2266 from the Bankruptcy Code. Congress could have decided to do away with equitable disallowance, or it could have thought specific reference to it was superfluous.

20

The inquiry cannot end there, however.   Judge Gerber quoted the Supreme Court's statement that "[t]he normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.  The Court has followed this rule with particular care in construing the scope of bankruptcy codifications."   Midlantic Nat'l Bank v. N. J. Dept. of Envtl. Protection, 474 U.S. 494, 501 (1986) (citation omitted) (quoted in Decision at 8).[14]

The Supreme Court has also pointed out "statements in the legislative history [of the Bankruptcy Code] that Congress 'intended that the term "principles of equitable subordination" [in 11 U.S.C. § 510(c)(1)] follow existing case law and leave to the courts development of this principle.'"   United States v. Noland, 517 U.S. 535, 539 (1996) (quoting 124 Cong. Rec. 32398 (1978) (Rep. Edwards), and id. 33998 (Sen. DeConcini)).

Pepper v. Litton, fairly read, certainly endorses the practice (in appropriate circumstances) of the equitable disallowance of claims, not on the basis of any statutory language, but as within the equitable powers of a bankruptcy court.   For reasons already described, the legislative history cited by the

---

[14] See also Dewsnup v. Timm, 502 U.S. 410, 419 (1992), and Pa. Dept. of Pub. Welfare v. Davenport, 495 U.S. 552, 563 (1990) ("We will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.")

parties neither mandates nor prohibits equitable disallowance, but, on the other hand, nothing has been cited from the legislative history to suggest a Congressional intent to disavow Pepper v. Litton and eliminate equitable disallowance in any and all circumstances.  Nor does the Supreme Court's reading of 11 U.S.C. § 502(b) in Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric, 127 S. Ct. 1199 (2007) suggest the abandonment of Pepper v. Litton.  For these reasons, the Court agrees with Judge Gerber's conclusion that "equitable disallowance is permissible under Pepper" (Decision at 71), concurring as well in his caveats regarding the doctrine's applicability to facts.  (Id. at 70-71.)

7.

Claim 37 alleges that the Agent Banks and the Investment Banks aided and abetted the breach, by the Rigas family, Brown and Mulcahy, of their fiduciary obligations to Adelphia.  The Decision is challenged on appeal on a number of points, and it will be worthwhile at the outset to summarize the Decision briefly, insofar as it considers Claim 37 as appealed from.  (Decision at 13-44.)

Judge Gerber first determined that Pennsylvania law applied (Decision at 14-18), a conclusion not challenged on appeal. He then -- recognizing that the Pennsylvania Supreme Court had not determined whether or not Pennsylvania law recognized a cause of action for aiding and abetting a breach of fiduciary duty -- found, upon a review of lower court cases, principally Koken v. Steinberg,

22

825 A.2d 723 (Pa. Commw. Ct. 2003), that, if the issue were presented to it, the Pennsylvania Supreme Court would recognize the tort. (Decision at 18-23.) He next rejected defendants' argument, relying in large part on <u>Lafferty</u>, 267 F.3d at 354-55, that, if Claim 37 did represent a claim recognized in Pennsylvania law, it should be dismissed under the doctrine of <u>in pari delicto</u>. (Decision at 23-44.) Judge Gerber did not find <u>Lafferty</u> binding or persuasive, but said that, even if it were binding, "issues of fact as to the application of <u>in pari delicto</u> would be present here that would preclude dismissal on motion in this case." (Decision at 40.) Judge Gerber also noted that the applicability of the "adverse interest" and "innocent decision-maker" defenses to an <u>in pari delicto</u> defense present issues of fact and could not be resolved on a Rule 12(b)(6) motion. (<u>Id.</u> at 42-44.)

This Court understands the net effect of the Decision as to Claim 37 to be that plaintiff, under Pennsylvania law, may assert that claim and that defendants may assert the equitable defense of <u>in pari delicto</u>, even though that defense does not result in the dismissal of Claim 37 as a matter of law. Any exceptions to the <u>in pari delicto</u> defense may, in turn, be asserted by plaintiff. This Court concurs in substance, although at some points for different or additional reasons.

Judge Gerber concluded that, if faced with the issue, the Pennsylvania Supreme Court would recognize a cause of action for

aiding and abetting a breach of fiduciary duty in reliance on the 2003 decision of the Pennsylvania Commonwealth Court in <u>Koken</u> where that court -- in response to the argument that a claim that a defendant "aided and abetted breaches of fiduciary duty of executives of" a corporation "must be dismissed because no Pennsylvania court has recognized the tort," 825 A.2d at 731 -- found that the tort was within Section 876 of the Restatement (Second) of Torts, as read by the Pennsylvania Supreme Court in <u>Skipworth v. Lead Industries Ass'n, Inc.</u>, 690 A.2d 169 (1997), and was convinced that "Section 876 is a viable cause of action in Pennsylvania," <u>id.</u>, concluding that the plaintiff "has stated a cause of action . . . for aiding and abetting a breach of fiduciary duty pursuant to Section 876 of the Restatement (Second) of Torts." <u>Id.</u> at 732.[15]

Since the lower state and federal courts in Pennsylvania are not consistent with each other on the issue, reliance on <u>Koken</u>, as the basis for finding that aiding and abetting a breach of fiduciary duty would be recognized by the Pennsylvania Supreme Court as a tort, was open to argument (although Judge Gerber's conclusion was certainly a reasonable one). However, defendants have now called this Court's attention to a line of Second Circuit cases -- <u>Official Comm. of Unsecured Creditors of Color Tile, Inc.</u>

---

[15] The <u>Koken</u> decision makes it clear that, in this regard, it is relying on Section 876(b) of the Restatement (Second) of Torts. <u>See id.</u>

v. Coopers & Lybrand, LLP, 322 F.3d 147, 157 n.4 (2d Cir. 2003),

Booking v. General Star Management Co., 254 F.3d 414, 421 (2d Cir.

2001), and Factors Etc., Inc. v. Pro Arts, Inc., 652 F.2d 278, 282-

284 (2d Cir. 1981) -- under which a federal court "will

conclusively defer to a federal court of appeals' interpretation of

the law of a state that is within its circuit," Booking, 254 F.3d

at 421, with exceptions where "prior state court decisions had been

inadvertently overlooked by the pertinent court of appeals" or "the

pertinent court of appeals has disregarded clear signals emanating

from the state's highest court pointing toward a different rule."

Factors, 652 F.2d at 283.  A relatively recent decision by the

Third Circuit, Huber v. Taylor, 469 F.3d 67, 79 (3d Cir. 2006),

assumes the existence in Pennsylvania of the tort of aiding and

abetting the breach of fiduciary duty (and refers to Koken in

regard to a detail of such a claim).  Huber, given the deference

this Court, under Second Circuit law, must give the Third Circuit,

is sufficient, when added to Koken, to convince the Court that the

Pennsylvania Supreme Court would recognize the tort of aiding and

abetting a breach of fiduciary duty.

> The Second Circuit case law also requires deference to

Lafferty on most of the issues surrounding the in pari delicto

defense.[16]  Lafferty, decided on its own record, does not, however,

---

[16] Plaintiff argues that Lafferty is within an exception to the
deference rule, see Factors, 652 F.2d at 283, because in Lafferty the
Third Circuit did not refer at all to the decision of the Pennsylvania

lead to the conclusion that the present case should be dismissed as a matter of law.   A closer look at <u>Lafferty</u> will make things clearer.

"The doctrine of <u>in pari delicto</u> provides that a plaintiff may not assert a claim against a defendant if the plaintiff bears fault for the claim." <u>Lafferty</u>, 267 F.3d at 354 (citations omitted).  In the present case, "[w]hether the <u>in pari delicto</u> doctrine applies . . . depends on whether the [wrongdoers'] conduct can be imputed to the Debtors and hence to [plaintiff], which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one person's wrongdoing to another person." <u>Id.</u> at 355.

The <u>Lafferty</u> court found, first, that it "must decide whether, when evaluating a claim brought by a bankruptcy trustee, a court of law may consider post-petition events that may affect an equitable defense, such as <u>in pari delicto</u>," <u>id.</u> at 355, and concluded that "section 541 [of the Bankruptcy Code] directs courts to evaluate defenses as they existed at the commencement of the bankruptcy." <u>Id.</u> at 356.  In <u>Lafferty</u>, the wrongdoers were a part of the debtors' management at the commencement of the bankruptcy, and were removed post-petition, and, since "[t]he plain language of

Supreme Court in <u>Universal Builders, Inc. v. Moon Motor Lodge, Inc.</u>, 244 A.2d 10 (Pa. 1968).  This Court is not convinced.  <u>Lafferty</u> cites (as making pretty much the same point as <u>Universal Builders</u> is cited for) <u>Jack Greenberg, Inc.</u>, 240 B.R. 486 (Bankr. E.D. Pa. 1999), which in turn refers to <u>Universal Builders</u> at some length.

section 541 . . . prevents courts from taking into account events that occur after commencement of the bankruptcy case," the court concluded that it "must evaluate the in pari delicto defense without regard to whether the [plaintiff] is an innocent successor." Id. at 357 (citing Bank of Marin v. England, 385 U.S. 99, 101 (1966)) (other citation omitted).

The Lafferty court next considered whether the wrongdoers' "conduct should, in fact, be imputed to the Debtors such that the doctrine of in pari delicto bars the [plaintiff's] claims." Id. at 358. "Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation." Id. (citation omitted). The court found that the allegations of the complaint established that the wrongdoing was perpetrated by the wrongdoers during the course of their employment, and went on to consider the second part of the imputation test, analyzing it under the "adverse interest exception": i.e., that "fraudulent conduct will not be imputed if the officer's interests were adverse to the corporation and 'not for the benefit of the corporation.'" Id. at 359 (quoting Waslow v. Grant Thornton, 212 B.R. 76, 84 (Bankr. E.D. Pa. 1997)) (other citation omitted). The plaintiff argued that the wrongdoers' interests were, indeed, adverse to the debtors' interests so that

27

imputation was inappropriate.   In response to this argument, the

court found that

> even assuming that the Shapiros' interests were
> adverse to the Debtors' interests, the Committee
> cannot prevail because the "adverse interest
> exception" is itself subject to an exception--the
> "sole actor" exception.   The general principle of
> the "sole actor" exception provides that, if an
> agent is the sole representative of a principal,
> then that agent's fraudulent conduct is imputable
> to the principal regardless of whether the agent's
> conduct was adverse to the principal's interests.

Lafferty, 267 F.3d at 359 (citation omitted).   The court, then, on

the bases that the Shapiros "clearly dominated" the debtors, that

"they were the sole representative in the alleged fraud with

Lafferty," and that William Shapiro was the sole shareholder,"

concluded that the "sole actor" exception was applicable, and

imputed the wrongdoing to the plaintiff, barring the action.[17]  Id.

at 360.

As Judge Gerber recognized, there are issues which

prevent the application of Lafferty to bar the present action on a

Rule 12 motion.

In the first place, in relation to Section 541 of the

Bankruptcy Code, it must be pointed out that, while Pennsylvania

law governs most issues in this case relating to the tort of aiding

and abetting a breach of fiduciary duty, the in pari delicto

---

[17] In Lafferty, William Shapiro owned one of the debtors which owned
the second debtor; other Shapiros assisted in the wrongdoing.  Id. at 344
& n.2.

28

defense to that tort, and the exceptions to that defense, and while Lafferty must be taken as an authoritative statement of Pennsylvania law, the construction and application of Section 541 is not a matter of Pennsylvania law, but of federal law. In re Educators Group Health Trust, 25 F.3d 1281 (5th Cir. 1994), on which Judge Gerber relied in part (Decision at 34), is as authoritative here in its construction of Section 541 as Lafferty, and it comes to the opposite conclusion, rejecting an argument that Section 541 can mean that "a defense on the merits of a claim brought by the debtor precludes the debtor from bringing the claim." 25 F.3d at 1286[18].   In the absence of binding Second circuit authority on the point at issue, this Court finds Educators more persuasive than Lafferty.

Even if Lafferty were followed in its construction of Section 541, however, that statute would not, in the present case, have the same effect as in Lafferty because, here, the wrongdoers were removed from Adelphia's management pre-petition (see Pl. Mem. at 30 (citing Complaint ¶¶ 20, 416)), a fact not disputed.   That Lafferty, in the matter of its application of Section 541, was based on the precise issue as to when -- either pre- or post-petition -- the wrongdoers were removed is confirmed, very clearly,

---

[18] This does not mean a defendant cannot seek to defeat a debtor's claim through motion under Rule 12 or Rule 56, but it does prevent Section 541 from being used to exclude otherwise relevant information.

by the dissenting opinion.  <u>Lafferty</u>, 267 F.3d at 362 (Cowen, J., dissenting).

Next, the applicability of the "adverse interest exception" to the <u>in pari delicto</u> defense presents an issue of fact, since at least some defendants proffer that the Debtors, whatever the Rigases may have taken for themselves, also benefited from Adelphia's entry into the co-borrowing and other lending arrangements.  (<u>See</u> Investment Bank's Mem. at 21.)[19]  Such a question presents an issue of fact.  <u>Buckley v. Deloitte & Touche USA LLP</u>, No. 06 Civ. 3291, 2007 WL 1491403, at *5-*6 (S.D.N.Y. May 22, 2007) (applying Pennsylvania law); <u>Phar-Mor, Inc. v. Coopers & Lybrand</u>, 900 F. Supp. 784, 786 (W.D. Pa. 1995).

In the case of the "sole actor exception" to the "adverse interest exception" to the <u>in pari delicto</u> defense, once again, in the present case, there are issues of fact because it is not clear at all from the Complaint that the Rigas family alone, or with Brown and Mulcahy, are to be considered a sole "actor," without evidentiary detail as to the operation of Adelphia, and the performance of other Adelphia directors.

Judge Gerber referred to another response to the <u>in pari delicto</u> defense, characterized by the Investment Banks as the

---

[19] Since only the plaintiff's Complaint was before Judge Gerber, and not any answer on the part of defendants, defendants have not, so far, had any reasonable opportunity to affirmatively plead facts favoring them in the <u>in pari delicto</u> sequence of issues.

"'innocent director' exception to the sole actor rule."
(Investment Banks Mem., Sept. 28, 2007, at 23.)   The banks argue
that Pennsylvania does not recognize the doctrine.   <u>Id.</u> (citation
omitted).   Determination of whether the Pennsylvania Supreme Court
would recognize, if called upon to do so, this exception to an
exception to an exception to a defense need not be reached to
dispose of the appeal from the dismissal of Claim 37, and will
therefore not be discussed here.

The banks also argue that Claim 37 should be dismissed
because it does not satisfy Fed. R. Civ. P. 9(b) in that it does
not adequately plead "defendants' actual knowledge of the primary
violation."  (Investment Banks Mem., Sept. 28, 2007, at 28.)   Under
Rule 9(b), however, "knowledge . . . may be averred generally."
Fed. R. Civ. P. 9(b).   <u>See</u> <u>Wight v. BankAmerica Corp.</u>, 219 F.3d 79,
91-2 (2d Cir. 2000).   Plaintiff has done that, alleging that "each
of the Agent Banks and each of the Investment Banks aided and
abetted the foregoing breaches of fiduciary duties by substantially
assisting in those breaches with knowledge of their unlawfulness."
(Complaint ¶ 862.)   That is sufficient.

\*          \*          \*

For the reasons set forth above, Judge Gerber's Decision
is affirmed with the exception that Claim 32 is dismissed as to the

31

Investment Banks and dismissed with leave to replead as to the

Agent Banks.[20]


                                    SO ORDERED.
Dated:   January *17*, 2008


                              _____
                                    Lawrence M. McKenna
                                         U.S.D.J.

---

[20] Copies of this Decision are being delivered to counsel for
plaintiff (who are requested to transmit copies to Bankruptcy Judge
Gerber and Judge (Ret.) Weinstein), and to counsel for the Investment
Banks (who are requested to transmit copies to counsel for the other
appellants).