692.    Upon information and belief, Osprey Investments Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

693.    Upon information and belief, Pilgrim America High Income Investments, Ltd. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

694.    Upon information and belief, ING Prime Rate Trust (f/k/a Pilgrim Prime Rate Trust) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

695.    Upon information and belief, PIMCO High Yield Fund (Account 705) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

696.    Upon information and belief, Pinehurst Trading, Inc. is a corporation engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an

193

assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

697.    Upon information and belief, Pioneer Floating Rate Trust is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

698.    Upon information and belief, PNC Bank, N.A. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

699.    [Deleted]

700.    Upon information and belief, Post Total Return Fund, L.P. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

701.    Upon information and belief, The President and Fellows of Harvard College (Ref. Harvard Special Situations Account) is a banking association engaged in the business of, among

194

other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

702.    Upon information and belief, Provident - PNC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

703.    Upon information and belief, Putnam Floating Rate Income Fund is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

704.    Upon information and belief, Putnam Funds Trust - Putnam High Yield Trust II is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

705.    Upon information and belief, Putnam High Yield Fixed Income Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

195

incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

706.    Upon information and belief, Putnam High Yield Managed Trust is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

707.    Upon information and belief, Putnam Managed High Yield Trust is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

708.    Upon information and belief, Putnam Strategic Income Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

709.    Upon information and belief, Quadrangle Master Funding Ltd. is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

196

710. Upon information and belief, Rabobank International, New York Branch is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

711. Upon information and belief, Raintree Trading LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

712. Upon information and belief, Raven Credit Opportunities Master Fund, Ltd. is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

713. Upon information and belief, Regents of the University of California is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

714. Upon information and belief, Resolution Master Fund LP is a limited partnership engaged in the business of, among other things, acquiring bank debt. This entity acquired

197

pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

715.    Upon information and belief, Reynolds American Defined Benefit Master Trust is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

716.    Upon information and belief, Ritchie Special Credit Investments is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

717.    Upon information and belief, Riviera Funding LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

718.    Upon information and belief, Royal Bank of Canada is a banking association organized under the laws of Canada, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by

198

Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

719.    Upon information and belief, Royal Bank of Scotland, plc is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

720.    Upon information and belief, Royalton Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

721.    Upon information and belief, Sagamore Hill Hub Fund Ltd. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

722.    Upon information and belief, Citigroup Financial Products, Inc. (f/k/a Salomon Brothers Holding Co., Inc.) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-

Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

723.    Upon information and belief, Citigroup Global Markets, Inc. (f/k/a Salomon Smith Barney) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

724.    Upon information and belief, Sandler Associates, LP is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

725.    Upon information and belief, Sandler Communications Offshore Fund, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

726.    Upon information and belief, Sankaty High Yield Asset Partners, L.P. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

727.    Upon information and belief, Sankaty High Yield Asset Partners III, L.P. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

728.    Upon information and belief, Saratoga CLO I Limited is an investment company organized under the laws of the Cayman Islands, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

729.    Upon information and belief, Satellite Senior Income Fund II, LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

730.    Upon information and belief, Security Income Fund - Income Opportunity Series is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

731.    Upon information and belief, Sei Institutional Investments Trust is an investment company engaged in the business of, among other things, acquiring bank debt. This entity

201

acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

732.   Upon information and belief, Sei Institutional Managed Trust is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

733.   Upon information and belief, Seminole Funding LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

734.   Upon information and belief, Senior Loan Fund 2 is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

735.   Upon information and belief, Silver Oak Capital LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

202

incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

736.    Upon information and belief, Smoky River CDO, L.P. (f/k/a Indosuez Capital Funding IV) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

737.    Upon information and belief, Smoky River CDO, LP is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

738.    Upon information and belief, Société Générale, S.A. is a banking association organized under the laws of France, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus, UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

739.    Upon information and belief, SOL Loan Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

incurred under the UCA/HHC and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

740.   Upon information and belief, SPCP Group, L.L.C. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

741.   Upon information and belief, Spectrum Investment Partners LP is a limited partnership engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

742.   Upon information and belief, SRF Trading, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

743.   Upon information and belief, SRI Fund is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

204

744.    Upon information and belief, Stanwich Loan Fund LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

745.    Upon information and belief, Highland Floating Rate Fund Limited Liability Company (f/k/a Stein Roe Floating Rate Limited Liability Company) is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

746.    Upon information and belief, Strand Funding is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

747.    Upon information and belief, Strategic Managed Loan Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

205

748.    Upon information and belief, Sumitomo Mitsui Banking Corporation (f/k/a The Sumitomo Bank, Limited) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

749.    [Deleted]

750.    Upon information and belief, The Sumitomo Trust & Banking Co., Ltd. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

751.    Upon information and belief, The Sumitomo Trust & Banking Co., Ltd., New York Branch is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

752.    Upon information and belief, AIG Retirement Services, Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

206

753. Upon information and belief, SunAmerica Life Insurance Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

754. Upon information and belief, SunTrust Bank is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

755. Upon information and belief, Swiss Life US Rainbow Limited is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

756. Upon information and belief, T. Rowe Price High Yield Fund is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

757. Upon information and belief, T. Rowe Price Institutional High Yield Fund is an investment company engaged in the business of, among other things, acquiring bank debt. This

207

entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

758. Upon information and belief, Thales Holdings Ltd. Inc. is a corporation engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

759. Upon information and belief, Third Avenue Value Fund Series is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

760. Upon information and belief, Toronto Dominion (Texas), Inc. is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

761. Upon information and belief, Payden Opportunity Bond Fund (f/k/a The Total Return Fund) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by

208

Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

762.    Upon information and belief, Legg Mason Partners Variable Portfolios III, Inc. (f/k/a Travelers Series Fund, Inc.) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

763.    Upon information and belief, Travelers Series Fund, Inc.-Putnam is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

764.    Upon information and belief, Anthem Southeast Inc. (successor by merger to Trigon Healthcare, Inc.) is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

765.    Upon information and belief, Trilogy Portfolio Company LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

209

766.    Upon information and belief, TRS Callisto LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, Olympus and CCH Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

767.    Upon information and belief, TRS Elara LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

768.    Upon information and belief, TRS IO LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

769.    Upon information and belief, TRS Plainfield LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

770.    Upon information and belief, TRS Thebe LLC is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an

210

assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

771.    Upon information and belief, U.S. Bank National Association is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

772.    Upon information and belief, UBS AG is a banking association organized under the laws of Switzerland, engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

773.    Upon information and belief, UBS AG Stamford Branch is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC, CCH and Olympus Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

774.    Upon information and belief, United of Omaha Life Insurance Company is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt

211

was incurred under the CCH Co-Borrowing Facility, and upon information and belief received

payments from Adelphia on account of that debt.

775.    Upon information and belief, Van Kampen Senior Loan Fund is a banking

association engaged in the business of, among other things, acquiring bank debt. This entity

acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was

incurred under the Olympus, UCA/HHC and CCH Co-Borrowing Facilities, and upon

information and belief received payments from Adelphia on account of that debt.

776.    [Deleted]

777.    Upon information and belief, Variable Insurance Products Fund II: Asset

Manager: Growth Portfolio is a banking association engaged in the business of, among other

things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt

incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon

information and belief received payments from Adelphia on account of that debt.

778.    Upon information and belief, Variable Insurance Products Fund II: Asset

Manager Portfolio (222) is a banking association engaged in the business of, among other things,

acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt

incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon

information and belief received payments from Adelphia on account of that debt.

779.    Upon information and belief, Variable Insurance Products Fund: High Income

Portfolio is a banking association engaged in the business of, among other things, acquiring bank

debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia,

212

which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

780.   Upon information and belief, Variable Insurance Products Fund: VIP High Income Portfolio is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

781.   Upon information and belief, Wachovia Bank, National Association is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus, CCH and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

782.   Upon information and belief, Waterville Funding LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

783.   Upon information and belief, WB Loan Funding 3 LLC is a limited liability company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

213

784.    Upon information and belief, WBNA is an investment company engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

785.    Upon information and belief, Webster Bank is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

786.    Upon information and belief, Blue Cross of California is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

787.    Upon information and belief, Whippoorwill Distressed Opportunity Fund is a banking association engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the Olympus and UCA/HHC Co-Borrowing Facilities, and upon information and belief received payments from Adelphia on account of that debt.

788.    Upon information and belief, Whippoorwill Offshore Distressed Opportunity is a banking association engaged in the business of, among other things, acquiring bank debt. This

214

entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the UCA/HHC Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

789.    Upon information and belief, York Capital Management LP is a limited partnership engaged in the business of, among other things, acquiring bank debt. This entity acquired pursuant to an assignment a portion of the debt incurred by Adelphia, which debt was incurred under the CCH Co-Borrowing Facility, and upon information and belief received payments from Adelphia on account of that debt.

790.    The true names, identities and capacities of the Defendants sued herein as John Doe Nos. 1-100; and John Doe, Inc., Nos. 1-100 are unknown to Plaintiff. These fictitiously named Defendants hold, or at one time held, some or all of the right, title and interest in one or more of the Co-Borrowing and Non-Co-Borrowing Credit Facilities described herein. As and when the names, identities and capacities of these fictitiously named Defendants become known, Plaintiff will amend this Complaint to set forth these Defendants' true names, identities and capacities and otherwise proceed against them as if they had been named as parties upon the commencement of this adversary proceeding in accordance with Rules 15 and 25 of the Federal Rules of Civil Procedure.

791.    The parties identified in paragraphs 157 through 790, above, are collectively referred to herein as the "Assignees."

215

## The Rigas Family Entities

792.    Upon information and belief, Hilton Head Communications, L.P. ("Hilton Head") was a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

793.    Upon information and belief, Highland Prestige of Georgia, Inc. ("Highland Prestige") was a corporation organized under the laws of the State of Delaware, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

794.    Upon information and belief, Highland Video Associates, L.P. ("Highland Video") was a limited partnership organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

795.    Upon information and belief, Highland Communications LLC ("Highland Communications") was a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

796.    Upon information and belief, Highland Preferred Communications LLC ("Highland Preferred") was a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

216

797.    Upon information and belief, Highland Holdings ("Highland Holdings") was a general partnership organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

798.    Upon information and belief, Coudersport Cable and Television Company ("CCT") was a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in the Commonwealth of Pennsylvania and was wholly owned by members of the Rigas Family.

799.    Hilton Head, Highland Prestige, Highland Video, Highland Communications, Highland Preferred, Highland Holdings, CCT and other entities wholly-owned by the Rigas Family are collectively referred to herein as the "RFEs." At all times material to the allegations herein, none of the Adelphia entities owned any beneficial interest in any of the RFEs.

## FACTS

### A.    The Rigas Family's Ownership And Control Of Adelphia.

800.    In or about 1952, John Rigas entered the cable business by acquiring a small cable system located in Coudersport, Pennsylvania. Over the next fifty years, this company, known as ACC, became the sixth largest cable provider in the United States.

801.    At all relevant times, members of the Rigas family, principally John Rigas and his three sons, Timothy, Michael and James Rigas (hereinafter, the term "Rigas Family" refers to John, Timothy and Michael Rigas), with substantial assistance from two senior ACC executives, James Brown ("Brown") and Michael Mulcahey ("Mulcahey"), held all of the most senior

217

executive positions of Adelphia, subject to the oversight and control of the Adelphia Board of Directors. John Rigas was ACC's President and Chief Executive Officer; Timothy Rigas was ACC's Executive Vice-President, Chief Financial Officer, Chief Accounting Officer and Treasurer; Michael Rigas was ACC's Executive Vice-President in charge of operations; and James Rigas was ACC's Executive Vice-President in Charge of Strategic Planning. Subject to the oversight of Adelphia's Board of Directors, the Rigas Family managed the operations of each of ACC's direct and indirect subsidiaries and made, or approved of, the major business decisions on behalf of Adelphia. The Rigas Family caused Adelphia to engage in all acts or omissions alleged herein to have been made by Adelphia, with the assistance of Brown, Mulcahey and other senior executives of Adelphia who were complicit in the fraud. The Rigas Family also controlled the operations of the RFEs.

802.    The Rigas Family also maintained a majority of the voting power of ACC's shares through its ownership of nearly all of ACC's issued and outstanding Class B shares of common stock, each share of which carried ten times the voting power of an ACC Class A share. At all relevant times, ACC's Class A stock and debt securities (along with certain debt securities issued by indirect ACC subsidiaries) were publicly traded and listed on one or more national exchanges.

803.    Prior to each of their forced resignations in May 2002, members of the Rigas Family had a majority of the seats on ACC's Board of Directors (except for six months from November 1999 to May 2000 when they held five of the Board's ten seats) and occupied all of its senior management positions. John Rigas was Chairman of the Board of ACC, and Michael, Timothy and James Rigas each were directors of ACC. A relative of the Rigas Family, Peter Venetis, also was a director and under the control of the Rigas Family. The remaining seats on

218

the Board were occupied at all relevant times by independent outside directors who were not members of ACC's management (the "Independent Directors"). The Independent Directors on the Board were Perry Patterson from 1986 until May 2000, Pete Metros from November 1986 through June 2002, Dennis Coyle from September 1995 through December 2003, Erland Kailbourne from November 1999 through December 2003, and Leslie Gelber from November 1999 through May 2003.

804.    Controlling corporate law and provisions in the controlling credit agreements and indentures for various debt and equity instruments required Adelphia to obtain the separate approval of the Independent Directors before entering into material transactions with affiliated companies. These limitations on affiliated transactions, imposed by law and contract, restricted the ability of the Rigas Family to abuse their shareholder and board majorities to use ACC's assets for their own personal benefit and for the benefit of their wholly owned RFEs. The Rigas Family owed a fiduciary duty to Adelphia to seek and obtain the approval of the Board of Directors and the Independent Directors before entering into affiliated transactions and to ensure that such affiliated transactions complied with these legal obligations, whether they arose from law or contract. The Co-Borrowing Lenders were aware of the Rigas Family's fiduciary duties at the time that the Co-Borrowing Lenders entered into the Co-Borrowing Facilities. The Co-Borrowing Lenders and the Investment Banks knew that the Co-Borrowing Facilities in the form that the Rigas Family, the Agent Banks, and the Investment Banks had structured them did not satisfy those fiduciary duties and that the Independent Directors would not have approved the Co-Borrowing Facilities unless that approval was based on material misrepresentations concerning the Co-Borrowing Facilities or unless material and necessary information was withheld from them.

219

805.     The Rigas Family abused its ubiquitous position within ACC to conceal the nature
and extent of its fraudulent conduct from the Independent Directors, creditors (other than
Defendants) and other constituents. Adelphia's Independent Directors or officers could have and
would have acted to stop the fraud had it been disclosed to them prior to 2002. Instead, the
Rigas Family and their accomplices made numerous misrepresentations and omissions of
material facts to the Independent Directors that concealed the Rigas Family's fraud in connection
with the Co-Borrowing Facilities.

806.     Indeed, when the fraud was disclosed to the Independent Directors in March
2002, they acted swiftly and decisively: they investigated and promptly terminated the
fraudulent borrowing activities; forced the Rigas Family and other faithless officers off the
Board and out of their management positions at Adelphia; cooperated with federal authorities,
including the Department of Justice and the Securities and Exchange Commission in the
investigations conducted by those agencies; engaged independent counsel and new auditors to
commence an internal investigation of Adelphia's prior business activities while under the Rigas
Family's management; and identified and put in place new members of management and
directors of Adelphia to conduct Adelphia's business going forward. The Independent Directors
at that time were Messrs. Coyle, Gelber, Kailbourne, and Metros.

## B.     Adelphia's Credit Facilities.

807.     Beginning in 1998, the Rigas Family found themselves without access to
sufficient cash or credit that they needed to maintain their lifestyles and achieve their personal
business endeavors. The Rigas Family worked closely with the Agent Banks and the Investment
Banks to devise a scheme to use Adelphia's credit to obtain access to funds that the Rigas Family

220

could use for their personal benefit. With the assistance of the Agent Banks and the Investment Banks, the Rigas Family secretly diverted billions of dollars of proceeds of the co-borrowing facilities, for which Adelphia was fully responsible, to their own personal use, including the expansion of their privately owned cable business. The debt facilities Adelphia incurred during this period, including bank debt facilities, most of which were outstanding as of the Petition Date, are identified in section B.2 below. The Co-Borrowing Facilities that made up a substantial part of these debt facilities greatly benefited the Rigas Family's personal interests but provided no benefit to Adelphia.

**I.      The Publicly-Traded Debt.**

808.    From 1993 through 2001, the Rigas Family caused ACC and certain of its affiliated entities to issue senior and subordinated notes in the aggregate principal amount of some $9.38 billion, all of which was outstanding on the Petition Date. These notes were offered to investors through no less than twenty-eight public offerings.

809.    Each of the public debt offerings was transacted pursuant to indentures that contained provisions designed to protect Adelphia, public investors, and other lenders. The safeguards in the indentures included provisions that prohibited non-arms' length transactions between Adelphia bond-issuing entities and affiliated entities that were on terms more favorable than those available to the affiliates with third parties, and consequently not in the Adelphia bond-issuing entities' best interests or the best interests of the investors holding the notes. These safeguards also arose independently by virtue of statutory and common-law fiduciary duty obligations. As described more fully below, the Rigas Family, with the assistance of the Agent

221

Banks and the Investment Banks, circumvented these safeguards, to the detriment of Adelphia

and its creditors (other than defendants).

810.   An Indenture dated as of October 7, 1996, relating to the issuance of notes by

ACC subsidiaries FrontierVision Operating Partners, L.P. and FrontierVision Capital

Corporation contained such a safeguard that imposed limits on transactions between the issuers

and their affiliates. That Indenture provided in pertinent part:

> SECTION 4.03. Limitation on Transactions with Affiliates and
> Related Persons.
>
> The Company will not, and will not permit, cause or suffer any
> Restricted Subsidiary to, directly or indirectly, conduct any
> business or enter into any transaction (or series of related
> transactions) with or for the benefit of any of their respective
> Affiliates or any beneficial holder of 10% or more of the Equity
> Interests of the Company or any officer, director or employee of
> the Company or any Restricted Subsidiary (each an "Affiliate
> Transaction"), unless (a) such Affiliate Transaction is on terms
> which are no less favorable to the Company or such Restricted
> Subsidiary, as the case may be, than would be available in a
> comparable transaction with an unaffiliated third party, (b) if such
> Affiliate Transaction (or series of related Affiliate Transactions)
> involves aggregate payments or other consideration having a Fair
> Market Value in excess of $5.0 million, a majority of the
> disinterested members of the Board of Directors of FV Inc. shall
> have approved such transaction and determined that such
> transaction complies with the foregoing provisions and (c) if such
> Affiliate Transaction (or series of related Affiliate Transactions)
> involves aggregate payments or other consideration having a Fair
> Market Value of $25.0 million or more, the Company shall have
> obtained a written opinion from an Independent Financial Advisor
> stating that the terms of such Affiliate Transaction are fair to the
> Company or the Restricted Subsidiary, as the case may be, from a
> financial point of view.

811.   The Fifth Supplemental Indenture Dated as of January 23, 1997, relating to the

issuance of senior notes by the ACC subsidiary known as Arahova Communications (f/k/a

222

Century Communications) contained a similar provision limiting transactions with affiliates,

providing in pertinent part:

> SECTION 11.12. Limitation on Transactions with Affiliates.
>
> Neither the Company nor any Subsidiary may engage in any
> transaction with an Affiliate of the Company (other than a
> Restricted Subsidiary), or any director, officer or employee of the
> Company or any Subsidiary, on terms less favorable to the
> Company or such Subsidiary than would be obtainable at the time
> in comparable transactions of the Company or such Subsidiary
> with Persons which are not Affiliates[.]

812.    Similarly, the indenture dated as of July 2, 1998, relating to the issuance of senior

notes by ACC, contained a provision limiting transactions with affiliates, providing, in pertinent

part:

> Section 4.04.    Limitation on Transactions with Affiliates.
>
> The Company shall not, and shall not permit any
> Restricted Subsidiary to, engage in any transaction with any
> Affiliate upon terms which would be any less favorable than those
> obtainable by the Company or a Restricted Subsidiary in a
> comparable arm's-length transaction with a Person which is not an
> Affiliate. The Company shall not, and shall not permit any
> Restricted Subsidiary to, engage in any transaction (or series of
> related transactions) involving in the aggregate $1,000,000 or more
> with any Affiliate except for (i) the making of any Restricted
> Payment, (ii) any transaction or series of transactions between the
> Company and one or more of its Restricted Subsidiaries or
> between two or more of its Restricted Subsidiaries (provided that
> no more than 5% of the equity interest in any of its Restricted
> Subsidiaries is owned by an Affiliate), and (iii) the payment of
> compensation (including, without limitation, amounts paid
> pursuant to employee benefit plans) for the personal services of
> officers, directors and employees of the Company or any of its
> Restricted Subsidiaries, so long as the Board of Directors of the
> Company in good faith shall have approved the terms thereof and
> deemed the services theretofore or thereafter to be performed for
> such compensation or fees to be fair consideration therefor; and
> provided further that for any Asset Sale, or a sale, transfer or other

223

disposition (other than to the Company or any of its Restricted Subsidiaries) of an interest in a Restricted Investment, involving an amount greater than $25,000,000, such Asset Sale or transfer of interest in a Restricted Investment is for fair value as determined by an opinion of a nationally recognized investment banking firm filed with the Trustee. Notwithstanding the foregoing, this provision shall not prohibit any such transaction which is determined by the independent members of the Board of Directors of the Company, in their reasonable, good faith judgment (as evidenced by a Board Resolution filed with the Trustee) to be (a) in the best interests of the Company or such Restricted Subsidiary, and (b) upon terms which would be obtainable by the Company or a Restricted Subsidiary in a comparable arm's-length transaction with a Person which is not an Affiliate.

813.    The indentures relating to the other note offerings of Adelphia entities contained similar safeguards regarding transactions with affiliates and requiring resolutions by the Independent Directors approving such transactions.

814.    These provisions relating to affiliate transactions were publicly disclosed. The Agent Banks, the Investment Banks, and the other Co-Borrowing Lenders involved in the Co-Borrowing Facilities (defined and discussed below) were aware of the indentures and the existence of the safeguards contained therein at the time they entered into the Co-Borrowing Facilities. The Agent Banks, the Investment Banks, and the other Co-Borrowing Lenders were also aware at the time they entered into the Co-Borrowing Facilities that Adelphia's Articles of Incorporation and statutory and common law imposed similar safeguards on Adelphia's Board of Directors. Despite this knowledge, the Agent Banks and their affiliated Investment Banks substantially assisted the Rigas Family in circumventing these safeguards.

2.    **Bank Debt.**

    a.    **The Non-Co-Borrowing Facilities.**

224

815.    Certain of ACC's subsidiaries were borrowers in three bank credit facilities: the FrontierVision Credit Facility, the Parnassos Credit Facility, and the Century TCI Credit Facility (each of which is defined and described in further detail below and referred to herein collectively as the "Non-Co-Borrowing Facilities.").

(i)    The FrontierVision Credit Facility.

816.    Pursuant to a Second Amended and Restated Credit Agreement, dated as of December 19, 1997 (as amended on October 7, 1998, July 15, 1999 and March 2, 2001, the "FrontierVision Credit Agreement"), an ACC indirect subsidiary -- FrontierVision Operating Partners, L.P. -- entered into an $800 million facility with various lenders, comprising two separate term loans of $250 million each and a $300 million revolving line of credit. Other indirect subsidiaries of ACC, including FrontierVision Capital Corporation, FrontierVision Cable New England, Inc., Adelphia Communications of California III, LLC, FOP Indiana, L.P., and The Maine Internetworks, Inc.,[2] guaranteed the repayment of funds drawn under the facility pursuant to a Subsidiary Guaranty Agreement, dated as of December 19, 1997 (collectively, the "FrontierVision Guaranty Agreements"). FrontierVision Operating Partners, L.P., pledged all of its assets (including the stock of its subsidiaries) to secure repayment pursuant to a Security Agreement, as amended, dated as of December 19, 1997 (the "FrontierVision Security Agreement"). Other ACC indirect subsidiaries, including FrontierVision Holdings, L.P. and FrontierVision Operating Partners, LLC, guaranteed the repayment of funds drawn under the facility, and pledged their respective partnership interests in FrontierVision Operating Partners, L.P. to secure repayment pursuant to a Partner Pledge Agreement, as amended, dated as of

---

[2]    Each of the Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the FrontierVision Facility are referred to herein as the "FrontierVision Debtors."

225

December 19, 1997 (the "FrontierVision Partner Pledge Agreements"). FrontierVision Holdings, L.P., also pledged its holdings in its subsidiary, FrontierVision Operating Partners, LLC, to secure repayment pursuant to a Stock Pledge Agreement, as amended, dated as of December 19, 1997 (the "FrontierVision Stock Pledge Agreement," and together with the FrontierVision Credit Agreement, the FrontierVision Security Agreement, the FrontierVision Guaranty Agreements, the FrontierVision Partner Pledge Agreements and all related agreements, the "FrontierVision Credit Facility").

817.    Chase acted as Administrative Agent, J.P. Morgan Securities, Inc. acted as Syndication Agent, and CIBC acted as Documentation Agent under the FrontierVision Credit Facility. Other defendants participating in the FrontierVision Credit Facility include Morgan Guaranty, BMO, FNBC, Wachovia, Long-Term Credit, UBC, Fleet, Rabobank, ABN AMRO, BankBoston, BONY, Dresdner Bank, Credit Lyonnais, Mellon Bank, Bank Paribas, PNC Bank, Royal Bank of Canada, CBRI, BNP, U.S. Bank, First Hawaiian, The Fuji Bank, Industrial Bank of Japan, Mitsubishi Trust, Sumitomo, SunTrust, Natexis, KZH Holding, Van Kampen Trust, ING Trust, Merrill Lynch Floating Rate Fund, Octagon, Travelers, CAI, PFL Life, Royalton, and one or more of the Assignees.[3]

818.    As of the Petition Date, approximately $617 million was outstanding under the FrontierVision Credit Facility.

---

[3]    The lenders in the FrontierVision Facility are referred to herein collectively as the "FrontierVision Lenders."

226

### (ii)    The Parnassos Credit Facility.

819.    Pursuant to a Credit Agreement, dated as of December 30, 1998 (the "Parnassos Credit Agreement"), Parnassos, L.P., an ACC subsidiary, entered into a $700 million facility with various lenders, comprising a $350 million term loan and a $350 million revolving line of credit. Other indirect ACC subsidiaries, including Parnassos Communications, L.P. and Parnassos Holdings, L.L.C.,[4] pledged their respective partnership interests in Parnassos, L.P. to secure repayment pursuant to a Partners Pledge Agreement, dated as of December 30, 1998 (the "Parnassos Pledge Agreement," and together with the Parnassos Credit Agreement and all related agreements, the "Parnassos Credit Facility").

820.    BNS acted as Administrative Agent, BofA acted as Documentation Agent, and TD Securities acted as Syndication Agent for the Parnassos Credit Facility. In addition, (i) each of the following acted as Managing Agent: BMO, Barclays, CIBC, Credit Lyonnais, CSFB, Wachovia, Fleet, PNC Bank, Rabobank and SBHC; and (ii) each of the following acted as Co-Agent: BHV, Dresdner Bank, MeesPierson, BONY and Lehman Brothers. Other Defendants participating in the Parnassos Credit Facility include BNP, SunTrust, First Hawaiian, FNBM, GSLP, MTTC, U.S. Trust, and one or more of the Assignees.[5]

821.    As of the Petition Date, approximately $623 million was outstanding under the Parnassos Credit Facility.

---

[4]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the Parnassos Facility are referred to herein collectively as the "Parnassos Debtors."

[5]    Each of the lenders participating in the Parnassos Facility are referred to herein collectively as the "Parnassos Lenders."

227

### (iii)   The Century-TCI Credit Facility.

822.   Pursuant to a Credit Agreement, dated as of December 3, 1999 (the "Century-TCI Credit Agreement"), Century-TCI California, L.P., an ACC subsidiary, entered into a $1 billion credit agreement with various lenders, comprising a $500 million term loan and a $500 million revolving line of credit. Other indirect ACC subsidiaries, including Century-TCI California Communications, L.P. and Century-TCI Holdings, LLC,[6] pledged their partnership interests in Century-TCI California, L.P. to secure repayment pursuant to a Pledge Agreement, dated as of December 3, 1999 (the "Century-TCI Pledge Agreement," and together with the Century-TCI Credit Agreement and all related agreements, the "Century-TCI Credit Facility").[7]

823.   Citibank acted as Administrative Agent, Société Générale and Deutsche Bank Securities were Co-Syndication Agents, SSB was Lead Arranger and Sole Book Manager, and Mellon Bank was Documentation Agent for the Century-TCI Credit Facility. Other defendants participating in the Century-TCI Credit Facility include BofA, BONY, BNS, Bank One, Chase, CIBC, Credit Lyonnais, Dai-Ichi Kangyo, Mitsubishi Trust, TDI, BMO, Barclays, Credit Locale, Wachovia, Industrial Bank of Japan, PNC Bank, Webster Bank, and one or more of the Assignees.[8]

824.   As of the Petition Date, approximately $1 billion was outstanding under the Century-TCI Credit Facility.

---

[6]   The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the Century-TCI Facility are referred to collectively as the "Century-TCI Debtors."

[7]   The FrontierVision, Parnassos and Century-TCI Credit Facilities are referred to herein collectively as the "Non-Co-Borrowing Facilities." The lenders in the Non-Co-Borrowing Facilities are referred to herein collectively as the "Non-Co-Borrowing Lenders."

[8]   The lenders in the Century-TCI Credit Facility are referred to herein collectively as the "Century-TCI Lenders."

228

### b. The Co-Borrowing Facilities.

#### (i) The Unprecedented Structure Of The Co-Borrowing Facilities.

825. The three Co-Borrowing Facilities that remained outstanding as of the Petition Date -- the UCA/HHC Co-Borrowing Facility, the CCH Co-Borrowing Facility and the Olympus Co-Borrowing Facility (each of which is defined and described below and all of which are referred to collectively as the "Co-Borrowing Facilities") -- were at the heart of the fraud perpetrated by the Rigas Family with the substantial assistance of the Agent Banks and the Investment Banks.

826. Pursuant to each of the Co-Borrowing Facilities, each member of the borrowing group in the facility (a "co-borrower") -- whether a subsidiary of ACC or an entity owned by the Rigas Family -- could borrow up to the entire amount of the applicable Co-Borrowing Facility. Each co-borrower was jointly and severally liable for all amounts borrowed by any of the other co-borrowers regardless of whether it received any benefit from such borrowings. The provision of billions of dollars of co-borrowing loans under these circumstances to privately owned entities that were insufficiently collateralized was unprecedented. The Agent Banks, Investment Banks, and Syndicate Lenders all knew that permitting the RFEs to borrow substantial amounts -- that they clearly could not repay -- against the credit of the Adelphia co-borrowers served no legitimate corporate purpose for Adelphia and provided no benefit to Adelphia.

827. The Rigas Family and certain of the Agent Banks and Investment Banks purposefully structured each of the Co-Borrowing Facilities to leverage Adelphia's credit to provide the Rigas Family with access to billions of dollars for their personal use while protecting the Co-Borrowing Lenders' ability to recover payment on their loans. Without Adelphia's credit

229

support, the Rigas Family could not have obtained loans of this magnitude. Indeed, upon information and belief, the first of the relevant Co-Borrowing Facilities – the UCA/HHC Credit Agreement – was put into place because the Rigas Family had exhausted its own borrowing capacity under several credit facilities and margin loan accounts held at BofA, SSB, and other defendants. Moreover, each of the Agent Banks, Co-Borrowing Lenders and Investment Banks knew that the Co-Borrowing Facilities were intended to finance the Rigas Family's personal asset acquisitions, to pay off loans to the Rigas Family, and for other personal uses by the Rigas Family.

828.    The money that the RFE co-borrowers drew down pursuant to the Co-Borrowing Facilities conferred no benefit on Adelphia and, indeed, substantially harmed Adelphia. From the outset, it was clear to the Rigas Family, the Agent Banks, the Investment Banks, and the Co-Borrowing Lenders that Adelphia would not receive any benefit from billions of dollars taken by the RFEs from the Co-Borrowing Facilities. It was the intention of the Rigas Family at all times to benefit themselves rather than to provide any benefit to Adelphia.

829.    The RFEs were overwhelmingly less creditworthy than the Adelphia co-borrowers. Defendants knew that the RFEs were far less creditworthy than Adelphia. The creditworthiness of cable providers such as Adelphia and the cable operator RFEs -- and hence their borrowing capacity -- is measured principally by the cash flow generated by their respective subscriber bases. One of the standard valuation methodologies used in the cable industry is a multiple of the number of a company's subscribers. Prior to the closing of each of the Co-Borrowing Facilities, the Agent Banks, the Co-Borrowing Lenders, and the Investment Banks knew that the RFE co-borrowers had insufficient assets (i.e., subscribers) to repay their

230

respective share of the amounts they knew would be initially drawn and were likely to be drawn thereafter for the benefit of the Rigas Family.

830.    The RFEs contributed on average well under 10% of the subscribers to each of the Co-Borrowing Facilities despite being entitled to borrow all of the funds thereunder and despite ultimately drawing nearly 60% of the funds available under those facilities.

### (ii)    The 1996 HVA/TALP/Global Credit Facility Sets The Stage.

831.    In 1996, Adelphia entered into the first co-borrowing facility with an RFE (hereafter, the "1996 HVA/TALP/Global Facility"). Unlike the three Co-Borrowing Facilities that followed, the 1996 HVA/TALP/Global Facility was in Adelphia's corporate interests and the terms of this facility contained safeguards and protections that were notably absent from the future Co-Borrowing Facilities.

832.    The 1996 HVA/TALP/Global Facility involved one Adelphia entity — Telesat Acquisition Limited Partnership ("TALP") — and two RFEs – Highland Video Associates, L.P. ("HVA") and Global Acquisition Partners, L.P. ("Global"). The 1996 HVA/TALP/Global Facility closed March 29, 1996.

833.    The 1996 HVA/TALP/Global Facility was created shortly after the closing of a Rigas Family credit facility (the "HVA Facility"). The HVA Facility closed February 28, 1996 and made available to HVA loans in the maximum aggregate principal amount of $200 million. HVA obtained the HVA Facility based entirely on its own creditworthiness and its own assets, which were sufficient to support the entire $200 million facility.

231

834.    Shortly after the HVA Facility was established, Adelphia became interested in acquiring the Telesat cable system in a short time frame. To allow ACC to consummate the Telesat acquisition, the HVA Facility was amended to include TALP and Global as additional borrowers, resulting in the 1996 HVA/TALP/Global Facility. HVA provided approximately two-thirds of the total cable asset collateral of 99,330 cable subscribers that the borrowers together pledged for the 1996 HVA/TALP/Global Facility. As discussed below, the converse was true with respect to the later Co-Borrowing Facilities, in which the RFEs contributed a disproportionately small collateral contribution relative to their total borrowings.

835.    Under the 1996 HVA/TALP/Global Facility, there were limits on the total amount that each of the borrowers was allowed to draw. Each of the borrowers (HVA, Global, and TALP) was permitted to draw loans in a maximum aggregate principal amount not to exceed the lesser of (i) the "Applicable Commitment Amount" for such borrower and (ii) in the aggregate for all borrowers, $200 million.

836.    As used in the 1996 HVA/TALP/Global Facility, the term "Applicable Commitment Amount" meant:

    (a)    with respect to HVA (a RFE) , $200 million;
    (b)    with respect to Global (a RFE), $84 million; and
    (c)    with respect to TALP (an Adelphia entity), $39.5 million.

837.    Pursuant to the 1996 HVA/TALP/Global Facility credit agreement, TALP was permitted to draw down $39.5 million for the express purpose of repaying a $39.5 million loan from its general partner, Olympus Communications, L.P. in connection with the Telesat acquisition.

232

838.    The 1996 HVA/TALP/Global Facility permitted Adelphia's subsidiary TALP to borrow funds in an amount and with a speed that it could not achieve through a credit facility of its own and HVA had put up most of the collateral securing the facility. These features and the limitation on the amounts each borrower could draw down were absent from the Co-Borrowing Facilities that followed.

839.    The RFE borrowers in the subsequent Co-Borrowing Facilities were expressly permitted to draw down the entire amount of those facilities even though they had contributed only a de minimis amount of collateral. There was no benefit to Adelphia from including the RFEs in those Co-Borrowing Facilities. Notwithstanding these critical distinctions, the Rigas Family thereafter misled the Independent Directors into believing that each of the subsequent Co-Borrowing Facilities was structured similarly to the 1996 HVA/TALP/Global Facility and was not antithetical to Adelphia's interests. The Agent Banks and Investment Banks substantially assisted the Rigas Family in accomplishing their deception and knew or consciously avoided the fact that the Rigas Family misled the Independent Directors to accomplish their fraud and breach their duties to Adelphia.

840.    BNS was a lender and acted as the Administrative Agent for the other lenders participating in the 1996 HVA/TALP/Global Facility. Chemical Bank was a lender and acted as the Documentation Agent. BMO was a lender and acted as Syndication Agent. Other defendants participating in the 1996 HVA/TALP/Global Facility included CoreStates Bank, N.A. (now Wachovia), CIBC, Sumitomo, NationsBank (now BofA), Toronto Dominion and Fleet.

233

(iii)   The UCA/HHC Co-Borrowing Facility.

841.   By the end of 1998, the Rigas Family and the RFEs had exhausted their sources of cash and credit and they turned to Adelphia. With the active assistance and participation of the Agent Banks and the Investment Banks, the Rigas Family embarked on a scheme by which the Rigas Family and the RFEs could exploit Adelphia's credit to obtain access to funds that they otherwise could not have obtained. In 1999, the Rigas Family and certain of the Agent Banks and Investment Banks (identified below) set up a new Co-Borrowing Facility – the UCA/HHC Facility – to implement the fraudulent scheme. The UCA/HHC Facility was different in material ways from the 1996 HVA/TALP/Global Facility. The UCA/HHC Facility was intended to be – and was – an instrumentality of simple theft for the benefit of the Rigas Family.

842.   Pursuant to a Credit Agreement, dated as of May 6, 1999 (the "UCA/HHC Credit Agreement"), six indirect subsidiaries of ACC – UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., Tele-Media Company of Hopewell-Prince George, and SVHH Cable Acquisition, L.P. – and one RFE – Hilton Head – entered into an $850 million Co-Borrowing Facility with various lenders, comprising a $600 million revolving credit loan and a $250 million term loan. Other indirect ACC subsidiaries, including Ultracom of Montgomery County, Inc., Multi-Channel T.V. Cable Company of Virginia, Van Buren County Cablevision, Inc., Valley Cablevision, Inc., Western Reserve Cablevision, Inc., Huntingdon Television Cable Co., Tele-Media Investment Partnership, L.P., and one RFE, Ionian Communications, L.P., guaranteed the repayment of funds drawn under the UCA/HHC Co-Borrowing Facility pursuant to a Subsidiary Guaranty, dated as of May 6, 1999 (the "UCA/HHC Guaranty Agreement"). In addition, to secure repayment of the UCA/HHC Credit Agreement, (i) ACC pledged the stock of its indirect subsidiaries UCA Corp. and Grand Island

234

Cable, Inc., (ii) ACC subsidiary ACC Operations, Inc. pledged its holdings in its subsidiary UCA LLC, (iii) indirect ACC subsidiaries UCA Corp., UltraCom of Montgomery County, Inc., UCA LLC, SVHH Holdings, Inc., SHHH Acquisition Corp., Eastern Virginia Cablevision Holdings, LLC, Eastern Virginia Cablevision, L.P., Olympus Communications, L.P., Olympus Communications Holdings, LLC and National Cable Acquisition Associates, L.P. pledged the stock of their direct subsidiaries, (iv) RFEs NCAA Holdings, Inc. and Doris Holdings, L.P. pledged their respective holdings in Hilton Head, and (v) RFEs Iliad Holdings, Inc. and Hilton Head pledged their partnership interests in Ionian Communications, L.P., pursuant to an Obligor Pledge Agreement, dated as of May 6, 1999 (the "UCA/HHC Pledge Agreement," and together with the UCA/HHC Credit Agreement, the UCA/HHC Guaranty and all related agreements, the "UCA/HHC Co-Borrowing Facility"). On April 25, 2002, indirect ACC subsidiaries Southwest Virginia Cable, Inc., Adelphia Cablevision of Santa Ana, LLC, Adelphia Cablevision of Simi Valley, LLC and Adelphia Central Pennsylvania, LLC became guarantors under the UCA/HHC Guaranty and pledged their membership interests under the UCA/HHC Pledge Agreement.[9]

843.    Wachovia was a lender and acted as the Administrative Agent for the other lenders participating in the UCA/HHC Co-Borrowing Facility.   BMO was a lender and acted as the Documentation Agent.  PNC Bank was a lender and acted as the Syndication Agent. Wachovia, BMO and PNC Bank were also Arranging Agents and Joint Book Runners.[10]

---

[9]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Debtors" or the "UCA/HHC Co-Borrowing Debtors."

[10]    The lenders named as agents in the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Agent Banks." The lenders in the UCA/HHC Co-Borrowing Facility are referred to collectively as the "UCA/HHC Lenders" or the "UCA/HHC Co-Borrowing Lenders."

844.    Upon information and belief, each of the UCA/HHC Agent Banks conducted significant due diligence on Adelphia's businesses prior to closing of the UCA/HHC Co-Borrowing Facility. The UCA/HHC Agent Banks also prepared an offering memorandum, with the assistance of Adelphia employees under the direction of the Rigas Family, to solicit other lenders to participate in the facility. Each of the UCA/HHC Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the amounts outstanding under the facility and providing information concerning the statements by the borrowers that they were in compliance with the UCA/HHC Credit Agreement. Upon information and belief, the UCA/HHC Agent Banks were required to, and, in fact, did transmit this information to each of the UCA/HHC Lenders in the ordinary course of business.

845.    Other defendants participating in the UCA/HHC Facility as Syndicate Banks include: BofA, ABN AMRO, BONY, BNS, Barclays, Chase, CIBC, Rabobank, Credit Lyonnais, CSFB, FMB, SBHC, Franklin Trust, Industrial Bank of Japan, MeesPierson, NCBP, Royal Bank of Canada, and one or more of the Assignees.

846.    The UCA/HHC Co-Borrowing Facility constituted an affiliate transaction, as defined in the various public debt offerings. Adelphia needed the approval of Adelphia's Board of Directors and the separate approval of the Independent Directors in order to participate in the UCA/HHC Co-Borrowing Facility.

847.    Wachovia (then known as First Union) worked closely with the Rigas Family and James Brown to prepare a term sheet describing the terms of the UCA/HHC Co-Borrowing Facility (the "UCA/HHC Term Sheet"). The UCA/HHC Term Sheet was incomplete and

236

misleading and was used to mislead the Independent Directors about the terms of the UCA/HHC Co-Borrowing Facility.

848.    The Rigas Family sought and obtained the approval of the Independent Directors for the UCA/HHC Co-Borrowing Facility at a meeting of the ACC Board of Directors on April 22, 1999. Present at this meeting either in person or by telephone were directors John Rigas, Michael Rigas, Timothy Rigas, James Rigas and Independent Directors Pete Metros, Perry Patterson and Dennis Coyle. James Brown was also present.

849.    At the meeting, Timothy Rigas and James Brown made verbal representations to the Independent Directors regarding the structure, size and terms of the UCA/HHC Co-Borrowing Facility and the identities of the various Adelphia entities and the RFE that were to participate as co-borrowers. Timothy Rigas and James Brown also presented the Independent Directors with the UCA/HHC Term Sheet prepared jointly by First Union (now known as Wachovia) and the Rigas Family that purported to describe the terms of the proposed UCA/HHC Co-Borrowing Facility.

850.    The Independent Directors approved the UCA/HHC Co-Borrowing Facility based on material misrepresentations and omissions in the oral presentation by Timothy Rigas and James Brown and in the written presentation contained in the UCA/HHC Term Sheet.

851.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the UCA/HHC Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

237

852.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the UCA/HHC Term Sheet misled the Independent Directors into believing that the terms and conditions of the UCA/HHC Co-Borrowing Facility were in the best interests of Adelphia, when in fact they were not.

853.    The UCA/HHC Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that the proceeds of the facility would "be used to (i) repay existing indebtedness at Closing, (ii) to make distributions and (iii) fund working capital and general partnership purposes."

854.    The UCA/HHC Term Sheet described a series of provisions that would restrict affiliate transactions, including transactions with RFEs, such as loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

855.    In particular, the UCA/HHC Term Sheet presented to the Independent Directors provided that the UCA/HHC Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained from those with third parties:

> No Borrower shall enter into any transaction with any Affiliate
> except in the ordinary course of business under terms and
> conditions no less favorable than those available in a third party
> transaction. Notwithstanding the above limitation, the Borrower
> shall be permitted to enter into a management agreement with the
> manager subject to the limitations upon Management Fees.

856.    The UCA/HHC Term Sheet presented to the Independent Directors provided that the UCA/HHC Co-Borrowing Facility would contain a "Restricted Investments" clause that

238

would prohibit any of the Adelphia borrowers under that facility from making investments in any

of the RFEs. That provision read:

> No Borrower shall make any investments except:
> 1.   in the ordinary course of business;
> 2.   in securities having one of the two highest ratings
>      by Moody's or S & P;
> 3.   in short-term commercial paper rated A-1 or P-1,
>      obligations of the United States or an agency, and
>      certificates of deposit of any financial institution
>      having one of the two highest ratings by S & P or
>      Moody's; or
> 4.   Restricted Investments as permitted herein.

857.    In turn, the referenced Restricted Payments section placed substantial limits on

affiliated transactions, reading:

> The Borrowers shall not pay any dividends or make any
> distributions, Restricted Investments or payments of principal and
> interest in cash on Affiliate Indebtedness ("Restricted Payments").
> Notwithstanding the foregoing, the Borrowers may make
> Restricted Payments if (i) no Default or Event of Default under the
> Total Funded Debt exists before and after giving effect thereto and
> (ii) the ratio of Total Funded Debt to annualized Operating Cash
> Flow is less than 5.0:1 (after giving effect to the Restricted
> Payment). Notwithstanding the foregoing, the Borrowers will be
> permitted to make Restricted Payments in an amount not to exceed
> the amount of Capital Contributions made into the Borrowers and
> Affiliate Indebtedness incurred by the Borrowers subsequent to the
> Closing Date, provided no Defaults or Events of Default are
> continuing or would, on a pro forma basis, cause a Default or
> Event of Default.

858.    Despite these provisions in the UCA/HHC Term Sheet, the Rigas Family, Brown,

and the UCA/HHC Term Sheet deliberately failed to disclose all material facts to the

Independent Directors concerning the UCA/HHC Co-Borrowing Facility and intentionally

provided the Independent Directors with false and misleading information regarding the terms

and conditions of the facility and the uses to which the RFEs intended to put the funds they drew down from the facility.

859.    The UCA/HHC Term Sheet deliberately failed to disclose to the Independent Directors that the UCA/HHC Co-Borrowing Facility would not contain any borrowing limits upon the amount of proceeds that the Hilton Head RFE could draw down and failed to disclose that Hilton Head would, in fact, be permitted to draw down up to the entire amount available under the facility without regard to Hilton Head's financial condition or the relatively small amount of collateral pledged by Hilton Head in connection with the facility.

860.    Based on the misrepresentations by James Brown and Timothy Rigas, and in reliance on the restrictions on affiliate transactions set forth in the UCA/HHC Term Sheet presented to the Independent Directors and the UCA/HHC Term Sheet's failure to disclose the maximum amounts each co-borrower could draw down from the proposed facility, the Independent Directors believed that Hilton Head would not be permitted to borrow amounts that were out of proportion with the collateral that Hilton Head had pledged or that could not be supported by Hilton Head's financial condition.

861.    Despite the limitations in the UCA/HHC Term Sheet and the restrictions on affiliate transactions in pre-existing indentures and credit agreements, the Rigas Family and the UCA/HHC Agent Banks and their affiliated Investment Banks knew at the time they provided the UCA/HHC Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions.

862.    Prior to presenting the UCA/HHC Term Sheet to the Independent Directors, the Rigas Family and the UCA/HHC Agent Banks and their affiliated Investment Banks had

240

expressly agreed that the Rigas Family would draw down approximately $250 million from the UCA/HHC Co-Borrowing Facility and that the Rigas Family would put those funds to their personal use by purchasing ACC securities at an upcoming offering and that Hilton Head would draw down $350 million to pay off its own pre-existing credit facility. The Rigas Family advised the UCA/HHC Agent Banks and their affiliated Investment Banks of these intended uses of the funds in or about February 1999 in a request for proposal that they sent to the Agent Banks and to 25 to 30 other banks seeking to participate in this facility, including but not limited to NationsBank, Bank of America, NationsBanc Montgomery Securities LLC, CSFB, BMO, Chase, Barclays, TD Bank, PNC Bank, Chemical Bank, Fleet Bank, Lehman Brothers, Credit Lyonnais, SSB, BONY, BNS, and CIBC. The Rigas Family did not advise the Independent Directors of the Rigas Family's intended uses of the funds and did not provide the Independent Directors with a copy of the request for proposal.

863.    Shortly after sending the request for proposal and two months prior to the April 22, 1999 Board of Directors meeting, ACC's Director of Finance, Dean Marshall, explicitly advised Mark Misenheimer of First Union National Bank (now Wachovia), in an e-mail dated February 18, 1999: "We do specifically intend a portion of the [UCA/HHC Co-Borrowing Facility] to be distributed to the Rigas Family for purposes of participating in the upcoming equity offering we discussed." In addition, a February 23, 1999 internal memorandum at NationsBank (now Bank of America) acknowledged that this facility would be used "to provide for a $250 million distribution to the Rigas family . . . to purchase additional equity in the follow-on equity offering planned for March" and to provide $350 million to repay an existing Hilton Head credit facility. The Rigas Family never conveyed this information to the Independent Directors at the April 22, 1999 Board of Directors Meeting or at any other time.

241

Nor did the UCA/HHC Agent Banks convey this information to the Independent Directors, whether in the UCA/HHC Term Sheet or otherwise.

864.    The UCA/HHC Agent Banks and their affiliated Investment Banks intentionally failed to disclose in the UCA/HHC Term Sheet that the Rigas Family intended to take approximately $600 million of the proceeds for their own personal use and to pay off a credit facility incurred by an RFE.

865.    The Rigas Family's plans to use $600 million of the proceeds from the $850 million UCA/HHC Co-Borrowing Facility was in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause regarding Restricted Investments. This use of proceeds also violated statutory and common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures and in the 1996 HVA/TALP/Global Facility. The Rigas Family and the Agent Banks and their affiliated Investment Banks involved in the UCA/HHC Co-Borrowing Facility knew that the Rigas Family's intention to draw down excess funds and use $600 million in this manner violated the restrictive clauses and the Rigas Family's fiduciary duties.

866.    The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the UCA/HHC Co-Borrowing Facility.

867.    Had the Independent Directors been aware that Hilton Head -- the RFE co-borrower -- could draw down up to the entire amount available under the UCA/HHC Co-Borrowing Facility with no regard to Hilton Head's collateral contribution or its financial condition and the Adelphia entities would be jointly and severally liable for that loan, the Independent Directors would have rejected the proposed UCA/HHC Co-Borrowing Facility.

242

868.   Had the Independent Directors been aware that the Rigas Family intended to take $600 million of the $850 million proceeds available under the UCA/HHC Co-Borrowing Facility – a loan for which ACC itself, through its subsidiaries, was jointly and severally liable – for their personal benefit, the Independent Directors would have rejected the proposed UCA/HHC Co-Borrowing Facility.

869.   Instead, the Independent Directors voted to approve the UCA/HHC Co-Borrowing Facility because the UCA/HHC Term Sheet contained provisions restricting affiliate transactions and prohibiting investments outside the ordinary course of business, which should have operated to protect Adelphia's interests but which the UCA/HHC Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to violate; because the UCA/HHC Term Sheet was misleading in that it was designed to obscure the fact that any co-borrower could draw down up to the entire amount available under the UCA/HHC Co-Borrowing Facility once in place; and because the Rigas Family and James Brown induced the Independent Directors, through misstatements and omissions, to conclude that the UCA/HHC Co-Borrowing Facility would be similar in structure to the 1996 HVA/TALP/Global Facility (in which the RFE co-borrowers had contributed most of the collateral securing the facility and the use of funds – at least with regard to TALP – was strictly limited).

870.   The Independent Directors' approval of the UCA/HHC Co-Borrowing Facility was obtained under false pretenses. The UCA/HHC Agent Banks and their affiliated Investment Banks knew or consciously avoided that fact.

871.   The UCA/HHC Agent Banks and their affiliated Investment Banks knew that the UCA/HHC Term Sheet given to the Independent Directors was misleading by omitting the fact

243

that any co-borrower could draw down up to the entire amount available under the facility regardless of its financial condition and that all co-borrowers would be jointly and severally liable for the full amount regardless of whether they drew down any of the funds.

872.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that the Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public debt provisions, pursuant to the proposed terms of the UCA/HHC Co-Borrowing Facility, and pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions. The Agent Banks and their affiliated Investment Banks knew that the Rigas Family's intended use of the co-borrowed funds provided no benefit to Adelphia and was not in Adelphia's interests. The UCA/HHC Agent Banks and their affiliated Investment Banks knew or consciously avoided knowledge that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

873.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent and actual liabilities arising from the UCA/HHC Co-Borrowing Facility and the Rigas Family's use of funds from the UCA/HHC Co-Borrowing Facility for which Adelphia was directly liable. The UCA/HHC Agent Banks and their affiliated Investment Banks also knew that ACC's Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

874.    The UCA/HHC Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the true

244

liabilities arising from the UCA/HHC Co-Borrowing Facility and the Rigas Family's personal use of funds from the UCA/HHC Co-Borrowing Facility for their own benefit.

875.    At no time prior to March 27, 2002 did ACC publicly disclose the enormous contingent liabilities it had amassed as a result of the RFE's draws from the UCA/HHC Co-Borrowing Facility.

876.    The UCA/HHC Agent Banks and their affiliated Investment Banks were aware that ACC had assumed enormous contingent liabilities as a result of its participation in the UCA/HHC Co-Borrowing Facility. The Agent Banks knew, or consciously avoided, the fact that ACC's Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

877.    As of the Petition Date, approximately $831 million was outstanding under the UCA/HHC Co-Borrowing Facility.

(iv)    The CCH Co-Borrowing Facility.

878.    Shortly after entering into the UCA/HHC Co-Borrowing Facility, the Rigas Family embarked on another scheme to expand the Rigas Family's personal empire by acquiring more than $700 million in cable assets for themselves. Having diverted most of the UCA/HHC Facility for their own personal use and benefit, there was insufficient borrowing capacity under existing facilities to fund this expansion. The Rigas Family did not have the assets or borrowing ability to finance the $700 million in acquisitions by the RFEs on their own. Once again, the Rigas Family made use of Adelphia's access to bank debt and the public capital markets for their

245

own benefit. The Rigas Family worked with the Agent Banks and their affiliated Investment Banks to copy the UCA/HHC blueprint to create a new fraudulent co-borrowing facility.

879.    Pursuant to a Credit Agreement, dated as of April 14, 2000 (the "CCH Credit Agreement"), two ACC indirect subsidiaries -- Century Cable Holdings, LLC and Ft. Meyers Cablevision, LLC -- and one RFE -- Highland Prestige -- entered into a $2.25 billion Co-Borrowing Facility with various defendants, comprising a $1.5 billion revolving credit facility and a $750 million term loan. An additional $500 million term loan was funded on September 28, 2000 bringing the total amount available under the facility to $2.75 billion. Other indirect ACC subsidiaries guaranteed repayment of funds drawn under this facility pursuant to a Guaranty Agreement, dated as of April 14, 2000 (the "CCH Guaranty Agreement") including the following: Adelphia Cleveland, LLC, Adelphia Prestige Cablevision, LLC, Fort Myers/Gateway, LLC, Tri-States, LLC, Wellsville Cablevision, LLC, Century Colorado Springs Partnership, CMA Cablevision Associates VII, L.P., CMA Cablevision Associates XI, Limited Partnership, Eastern Virginia Cablevision, L.P., Martha's Vineyard Cablevision, L.P., Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Blacksburg/Salem Cablevision, Inc., Brazas Communications, Inc., CDA Cable, Inc., Century Alabama Corp., Century Alabama Holding Corp., Century Berkshire Cable Corp., Century Cable Management Corporation, Century Carolina Corp., Century Cullman Corp., Century Enterprise Cable, Corp., Century Huntington Company, Century Indiana Corp., Century Island Associates, Inc., Century Island Cable Television, Inc., Century Kansas Cable Television Corp., Century Lykens Cable Corp., Century Mendocino Cable Television, Inc., Century Mississippi Corp., Century Mountain Corp., Century New Mexico Cable Television Corp., Century Norwich Corp., Century Ohio Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television

246

Corp., Century Trinidad Cable Television Corp., Century Virginia Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Century Wyoming Cable Television, Inc., Century Wyoming Cable Television, Corp., Clear Cablevision, Inc., Cowlitz Cablevision, Inc., DVD Marketing Company, Inc., E&E Cable Service , Inc., Enchanted Cable Corporation, Grafton Cable Company, Huntington CATV, Inc., Imperial Valley Cablevision, Inc., Kootenai Cable, Inc., Louisa Cablevision, Inc., Manchester Cablevision, Inc., Mickelson Media, Inc., Mickelson Media of Florida, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Paragon Cablevision Construction Corporation, Paragon Cablevision Management Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., Sentinel Communications of Muncie, Indiana, Inc., Southwest Colorado Cable, Inc., S/T Cable Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, TMC Holdings Corporation, Valley Video, Inc., Warrick Cablevision, Inc., The Westover T.V. Cable Co., Incorporated, Wilderness Cable Company and Yuma Cablevision, Inc. In addition, Prestige Communications, Inc., an RFE, guaranteed repayment of funds drawn under this facility pursuant to a CCH Guaranty Agreement, dated as of September 27, 2000.[11]

880.    In addition, other indirect subsidiaries of ACC pledged the stock of their direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a Pledge Agreement, dated April 14, 2000 (the "CCH Pledge Agreement," and together with the CCH Credit Agreement, the CCH Guaranty Agreement, and related agreement, the "CCH Co-Borrowing Facility"), including the following: Tri-States, LLC, Wellsville Cablevision, LLC, Tele-Media Company of Tri-States, L.P., Badger Holding Corporation, Brazas Communications,

---

[11]    The Adelphia entities that are obligors, pledgors or guarantors of indebtedness under the CCH Co-Borrowing Facility are referred to collectively as the "CCH Debtors" or the "CCH Co-Borrowing Debtors."

247

Inc., Century Cable Holding Corp., Century Alabama Holding Corp., Century Huntington Company, Century Indiana Corp., Century Island Cable Television, Inc., Century New Mexico Cable Television Corp., Century Shasta Cable Television Corp., Century Southwest Colorado Cable Television Corp., Century Warrick Cable Corp., Century Washington Cable Television, Inc., Ft. Myers Acquisition Limited Partnership, Mickelson Media, Inc., Owensboro on the Air, Inc., Paragon Cable Television, Inc., Rentavision of Brunswick, Inc., Scranton Cablevision, Inc., ·S/T Cable Corporation, Star Cable, Inc., Star Cablevision, Inc., Tele-Media Company of Western Connecticut, and TMC Holdings Corporation. Highland Prestige, an RFE, and each of John Rigas, Timothy Rigas, Michael Rigas, James Rigas, and Ellen Rigas also pledged certain of their interests in direct subsidiaries to secure repayment under the CCH Credit Agreement pursuant to a separate CCH Pledge Agreement, dated September 27, 2001.

881.    BofA and Chase were lenders and acted as Co-Administrative Agents for the other lenders participating in the CCH Co-Borrowing Facility. TDI was a lender and acted as Syndication Agent under the facility. Barclays was a lender and acted as Arranging Agent. BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais, CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, Rabobank, and SunTrust were lenders and · acted as Managing Agents. BAS and Chase Securities acted as Lead Arrangers and Joint Book Managers under the facility. CIBC Securities acted as Documentation Agent.[12]

882.    Upon information and belief, each of the CCH Agent Banks and their affiliated Investment Banks conducted significant due diligence on Adelphia's businesses prior to closing the CCH Co-Borrowing Facility. The CCH Agent Banks also prepared an offering

---

[12]    The lenders named as agents in the CCH Co-Borrowing Facility are referred to collectively as the "CCH · · · Agent Banks." The lenders in the CCH Co-Borrowing Facility are referred to collectively as the "CCH · Lenders" or the "CCH Co-Borrowing Lenders."

memorandum, with the assistance of Adelphia employees under the direction of the Rigas

Family, to solicit other Co-Borrowing Lenders to participate in the facility. Each of the CCH

Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the

amounts outstanding under the facility and providing information concerning statements by the

borrowers that they were in compliance with the CCH Credit Agreement. Upon information and

belief, the CCH Agent Banks were required to and, in fact, did transmit this information to each

of the CCH Lenders in the ordinary course of business.

883.    Other Defendants participating in the CCH Co-Borrowing Facility as Syndicate

Banks include: CIBC, BLG, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, Fifth

Third, First Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper

Fund, KZH III, KZH CypressTree, KZH ING, KZH Langdale, KZH Pondview, KZH Shoshone,

KZH Waterside, Liberty-Stein, MeesPierson, Mellon Bank, Natexis, NCBP, CypressTree

Floating Rate Fund, Olympic Funding, Oppenheimer, Pinehurst, Principal Life, Société

Générale, Stein Roe, U.S. Bank, United of Omaha, and one or more of the Assignees.

884.    The CCH Co-Borrowing Facility constituted an affiliate transaction as defined in

the various public debt offerings, the 1996 HVA/TALP/Global Facility, and the UCA/HHC Co-

Borrowing Facility. Adelphia needed the approval of Adelphia's Board of Directors and the

separate approval of the Independent Directors in order to participate in the CCH Co-Borrowing

Facility.

885.    The CCH Agent Banks and their affiliated Investment Banks worked closely with

the Rigas Family and James Brown to prepare a term sheet describing the terms of the CCH Co-

Borrowing Facility (the "CCH Term Sheet").

249

886.    The Rigas Family sought and obtained the approval of the Independent Directors for the CCH Co-Borrowing Facility at a meeting of the ACC Board of Directors on March 9, 2000. Present at this meeting either in person or by telephone were directors John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Peter Venetis, and Independent Directors Perry Patterson, Pete Metros, Dennis Coyle, Erland Kailbourne and Leslie Gelber. Mr. Kailbourne and Mr. Gelber both had joined the Board as Independent Directors in November 1999. Also present were Colin Higgin and James Brown of Adelphia.

887.    At the meeting, Timothy Rigas and James Brown made verbal representations to the Independent Directors regarding the structure, size and terms of the CCH Co-Borrowing Facility and the identities of the various ACC entities and the RFE that were to participate as co-borrowers. Timothy Rigas and James Brown also presented the Independent Directors with the CCH Term Sheet prepared jointly by the CCH Agent Banks and their affiliated Investment Banks and the Rigas Family that purported to describe the terms of the proposed CCH Co-Borrowing Facility.

888.    The Independent Directors approved the CCH Co-Borrowing Facility based on material misrepresentations and omissions in the oral presentation by Timothy Rigas and James Brown and in the written presentation contained in the CCH Term Sheet.

889.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the CCH Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

250

890.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the CCH Term Sheet misled the Independent Directors into believing that the terms and conditions of the CCH Co-Borrowing Facility were in the best interests of Adelphia, when in fact they were not.

891.    The CCH Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that the proceeds of the facility "shall be used to (i) acquire the Cablevision Cleveland cable system and the Prestige Cable systems, (ii) and for working capital and general limited liability company, partnership and corporate purposes."

892.    The CCH Term Sheet described a series of provisions that would restrict affiliate transactions, including with RFEs, including loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

893.    In particular, the CCH Term Sheet presented to the Independent Directors provided that the CCH Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained in transactions with third parties:

> No Restricted Borrower, nor any restricted subsidiary, shall enter into any transaction with any Affiliate except in the ordinary course of business under terms and conditions no less favorable than those available in a third party transaction. Notwithstanding the above limitation, each Restricted Borrower and its restricted subsidiaries shall be permitted to enter into a management agreement with the Manager subject to the limitations upon Management Fees.

894.    The CCH Term Sheet presented to the Independent Directors provided that the CCH Co-Borrowing Facility would contain a "Restricted Investments" clause that would

251

prohibit any of the Adelphia borrowers under that facility from making investments in any of the

RFEs. That provision read:

> No Restricted Borrower, nor its restricted subsidiaries, shall make
> any investments except:
>    1.    in the ordinary course of business;
>    2.    in securities having one of the two highest ratings
>          by Moody's or S & P;
>    3.    in short-term commercial paper rated A-1 or P-1,
>          obligations of the United States or an agency, and
>          certificates of deposit of any financial institution
>          having one of the two highest ratings by S & P or
>          Moody's; or
>    4.    Restricted Investments as permitted herein
>          including without limitation those permitted under
>          the Restricted Payments section.

895.    In turn, the referenced Restricted Payments section placed substantial limits on

affiliated transactions, reading:

> No Restricted Borrower, nor its restricted subsidiaries, shall pay
> any dividends, make any distributions, Restricted Investments or
> payments of principal and interest on Affiliate Indebtedness (other
> than payment-in-kind of interest) or make any loans and/or
> advances to, equity contributions to, or redemptions of equity
> interests in, unrestricted subsidiaries, nor shall there be any draws
> under the Facilities by an Unrestricted Borrower ("Restricted
> Payments"). Notwithstanding the foregoing, each Restricted
> Borrower and its restricted subsidiaries may make Restricted
> Payments if (i) no default or event of default under the Credit
> Facilities exists before and after giving effect thereto and (ii) the
> ratio of Senior Debt to Annualized Operating Cash Flow is less
> than 5.5:1 (after giving effect to the Restricted Payment).
> Notwithstanding the foregoing, each Restricted Borrower and its
> restricted subsidiaries will be permitted to make Restricted
> Payments in an amount not to exceed the amount of Capital
> Contributions made into the Restricted Borrowers and their
> restricted subsidiaries and Affiliate Indebtedness incurred by the
> Restricted Borrowers and their restricted subsidiaries, subsequent
> to the Closing Date, provided, that no default or event of default is
> continuing or would, on a pro forma basis, cause a default or event
> of default.

252

896.    The CCH Term Sheet presented to the Independent Directors also provided that "The Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels for each specified period," and then set forth a chart of periods and corresponding applicable leverage ratios. The CCH Term Sheet presented to the Independent Directors did not define "Leverage Ratio" as it actually was used in the CCH Co-Borrowing Facility.

897.    Despite these provisions in the CCH Term Sheet, the Rigas Family and the CCH Term Sheet prepared with the CCH Agent Banks and their affiliated Investment Banks deliberately failed to disclose all material facts to the Independent Directors concerning the CCH Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFE intended to put the funds it drew down from the facility.

898.    Timothy Rigas and James Brown advised the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets. The Rigas Family knew that this statement was false when made. The Rigas Family had agreed previously with the CCH Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition.

899.    The CCH Term Sheet presented to the Independent Directors did not contain a definition of "leverage ratio" and did not state that the leverage ratios to be used in connection

253

with the CCH Co-Borrowing Facility would be a single combined leverage ratio calculated in the aggregate for all participating co-borrowers. This was a material omission.

900.    Based on the misleading information pertaining to leverage ratios in the CCH Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the CCH Co-Borrowing Facility proposed at the March 9, 2000 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with that particular co-borrower's individual leverage ratio.

901.    The CCH Credit Agreement was finalized after the Independent Directors' approval had been obtained. The CCH Credit Agreement was created and agreed to by the Rigas Family, the CCH Agent Banks and their affiliated Investment Banks, and the CCH Co-Borrowing Lenders. That Agreement defined "Leverage Ratio" as follows: "*Leverage Ratio means, with respect to the Companies on a combined basis, at any date of determination thereof, the ratio of (a) the Total Debt outstanding on such date to (b) Annualized Operating Cash Flow*" (emphasis supplied). The CCH Credit Agreement provision regarding Leverage Ratio differed materially from the CCH Term Sheet and the statements made by Timothy Rigas and James Brown at the time the Independent Directors were asked to approve the CCH Co-Borrowing Facility.

902.    The Rigas Family and the CCH Term Sheet presented to the Independent Directors also failed to disclose the amount of collateral to be put up by each co-borrower to secure the CCH Co-Borrowing Facility. This was a material omission and rendered the oral presentation and the CCH Term Sheet materially misleading.

254

903.    Based on the material misstatements and omissions in the CCH Term Sheet presented to the Independent Directors, and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the CCH Co-Borrowing Facility proposed at the March 9, 2000 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with the collateral that particular co-borrower had put up to secure the facility.

904.    The Rigas Family and the CCH Term Sheet deliberately failed to disclose to the Independent Directors that the CCH Co-Borrowing Facility would not contain any limits upon the amount of proceeds that Highland Prestige, the participating RFE, could draw down and failed to disclose that Highland Prestige would, in fact, be permitted to draw down the entire amount available under the facility without regard to the relatively small amount of collateral that Highland Prestige pledged in connection with the facility.

905.    The CCH Agent Banks and their affiliated Investment Banks knew differently. The CCH Agent Banks and their affiliated Investment Banks prepared and sent to the CCH Lender Banks a Confidential Information Memorandum in March 2000, after the Independent Directors approved the CCH Co-Borrowing Facility, describing the terms of the CCH Co-Borrowing Facility and the CCH Credit Agreement. As the March 2000 Confidential Information Memorandum made clear, the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by Highland Prestige. The March 2000 Confidential Information Memorandum explicitly stated that the collateral contributions of ACC co-borrowers Century Holdings, LLC and Ft. Myers Acquisition LP would be based on revenues from a combined total of 1,476,983 cable television subscribers, whereas RFE co-borrower

255

Highland Prestige's collateral contribution would be based on revenues from 55,831 cable television subscribers. Nonetheless, Highland Prestige was permitted to draw down up to the full amount of the CCH Co-Borrowing Facility. This information was not stated in the CCH Term Sheet presented to the Independent Directors and was not disclosed to them at the March 9, 2000 Board of Directors Meeting.

906.    In reliance on the restrictions on affiliate transactions set forth in the CCH Term Sheet presented to the Independent Directors and the misleading nature of the CCH Term Sheet with regard to the fact that any co-borrower would be able to draw down the entire amount available under the proposed facility, the Independent Directors believed that Highland Prestige would not be permitted to borrow amounts that were out of proportion with Highland Prestige's leverage ratio or collateral contribution.

907.    Borrowings by Highland Prestige under the CCH Co-Borrowing Facility in excess of the amounts that Highland Prestige could have borrowed based on the collateral it had pledged and based on its own leverage ratio, for which the Adelphia borrowers would be jointly and severally liable, would be an affiliate transaction that would not be in the ordinary course of business on commercially reasonable terms and would not be in Adelphia's best interests. Therefore, such transactions would be in direct contravention of the CCH Term Sheet clause restricting affiliate transactions. Such transactions would also violate statutory and common law duties that the Rigas Family owed to Adelphia.

908.    Despite the limitations in the CCH Term Sheet and the restrictions on affiliate transactions in pre-existing indentures, credit agreements, and statutory and common law, the Rigas Family and the CCH Agent Banks and their affiliated Investment Banks knew at the time

256

they provided the CCH Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions.

909.    The Rigas Family knew at the time the Independent Directors approved the CCH Co-Borrowing Facility that they would use a large portion of the proceeds from the CCH Co-Borrowing Facility for their own personal use and benefit.

910.    The Rigas Family's plans to use proceeds from the CCH Co-Borrowing Facility for their own personal use and benefit were in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause regarding Restricted Investments. This intended use of proceeds also violated statutory and common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the Rigas Family's fiduciary duties.

911.    The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the CCH Co-Borrowing Facility.

912.    Had the Independent Directors been aware that Highland Prestige, the RFE co-borrower, could draw down up to the entire amount available under the CCH Co-Borrowing Facility with no regard to Highland Prestige's leverage ratio or collateral contribution and that the Adelphia entities would be jointly and severally liable for that loan, the Independent Directors would have rejected the proposed CCH Co-Borrowing Facility.

913.    Had the Independent Directors been aware that the Rigas Family intended to take a portion of the proceeds available under the CCH Co-Borrowing Facility – a loan for which

257

ACC itself, through its subsidiaries, was jointly and severally liable – and use it for their own personal benefit, the Independent Directors would have rejected the proposed CCH Co-Borrowing Facility.

914.    Instead, the Independent Directors voted to approve the CCH Co-Borrowing Facility because the CCH Term Sheet contained provisions restricting affiliate transactions, which should have operated to protect Adelphia's interests but which the CCH Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to violate; because the CCH Term Sheet was misleading with regard to the calculation of the Leverage Ratio and the fact that any co-borrower could draw down the entire amount available under the CCH Co-Borrowing Facility once in place; and because the Rigas Family and James Brown induced the Independent Directors, through misstatements and omissions, to conclude that the CCH Co-Borrowing Facility would be similar to the 1996 HVA/TALP/Global Facility (in which the RFE co-borrowers had contributed collateral commensurate with the amount of proceeds they were permitted to draw down from the facility).

915.    The Independent Directors' approval of the CCH Co-Borrowing Facility was obtained under false pretenses. The CCH Agent Banks and their affiliated Investment Banks knew or consciously avoided that fact.

916.    The CCH Agent Banks knew that the CCH Term Sheet given to the Independent Directors was misleading with respect to the fact that any co-borrower could draw down the entire amount available under the facility regardless of its financial condition and assets.

917.    The CCH Agent Banks and their affiliated Investment Banks knew that the Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public

258

debt provisions, pursuant to the proposed terms of the CCH Co-Borrowing Facility, and pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions. In contrast, the true terms and conditions of the CCH Co-Borrowing Facility provided no benefit to Adelphia and were not in Adelphia's interests. The CCH Agent Banks and their affiliated Investment Banks knew or consciously avoided that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

918.    The CCH Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent and actual liabilities arising from the CCH Co-Borrowing Facility. The CCH Agent Banks also knew that ACC's Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

919.    At the time the CCH Agent Banks and their affiliated Investment Banks became involved in the CCH Co-Borrowing Facility, the CCH Agent Banks and their affiliated Investment Banks knew that Adelphia's SEC filings and proxy statements failed to disclose the true extent of Adelphia's liabilities already existing as a result of Adelphia's participation in the prior UCA/HHC Co-Borrowing Facility.

920.    At no time prior to March 27, 2002 did ACC publicly disclose the enormous contingent liabilities it had amassed as a result of Highland Prestige's draws from the CCH Co-Borrowing Facility.

259

921.    The CCH Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the true liabilities arising from the CCH Co-Borrowing Facility.

922.    The CCH Agent Banks and their affiliated Investment Banks were aware that Adelphia had assumed enormous contingent liabilities as a result of its participation in the CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility. Moreover, the CCH Agent Banks knew, or consciously avoided, the fact that ACC's Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

923.    As of the Petition Date, approximately $2.5 billion was outstanding under the CCH Co-Borrowing Facility.

(v)    The Olympus Co-Borrowing Facility.

924.    In early 2001, the Rigas Family's continuing need for access to credit arose again. In connection with another Adelphia facility in early 2001, the Rigas Family had assumed an obligation to invest more than $800 million in Adelphia. In addition, the RFE Highland Video's obligations under the 1996 HVA/TALP/Global Facility were coming due at or around the same time. The Rigas Family did not have sufficient assets or borrowing capacity to fulfill these contractual obligations. Therefore, the Rigas Family turned again to its lending and investment banks to craft a third fraudulent co-borrowing facility.

925.    Pursuant to a Credit Agreement, dated as of September 28, 2001 (the "Olympus Credit Agreement"), three indirect ACC subsidiaries -- Olympus Cable Holdings, LLC, Adelphia

Company of Western Connecticut, and Adelphia Holdings 2001, LLC -- and two RFEs --
Highland Video and CCT -- entered into a $2.03 billion Co-Borrowing Facility with various
Defendants, comprising a $765 million revolving credit facility, a $765 million term loan, and a
$500 million term loan. Other ACC indirect subsidiaries, including ACC Cable
Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Media VA, Inc., Adelphia
Cable Partners, L.P., Adelphia Cablevision Associates, L.P., Adelphia Cablevision of New York,
Inc., Adelphia GS Cable, LLC, Arahova Holdings, LLC, Better TV Inc. of Bennington, CCC-III,
Inc., CDA Cable, Inc. Century Alabama Corp., Century Alabama Holding Corp., Century Cable
Management Corporation, Century Carolina Corp., Century Cullman, Corp., Century Enterprise
Cable Corp., Century Huntington Company, Century Kansas Cable Television Corp., Century
Lykens Cable Corp., Century Mississippi Corp., Century Norwich Corp., Century Shasta Cable
Television Corp., Century Washington Cable Television, Inc., Chelsea Communications, Inc.,
Chelsea Communications, LLC, Cowlitz Cablevision, Inc., Genesis Cable Communications
Subsidiary, LLC, GS Cable, LLC, Imperial Valley Cablevision, Inc., Kalamazoo County
Cablevision, Inc., Key Biscayne Cablevision, Kootenai Cable, Inc., Mickelson Media of Florida,
Mountain Cable Communications Corporation, Mountain Cable Company, L.P., Mt. Lebanon
Cablevision, Inc., Multi-Channel T.V. Cable Company, Olympus Cable Holdings LLC, Pericles
Communication Corporation, Pullman TV Cable Co., Inc., Rentavision of Brunswick, Inc.,
Richmond Cable Television Corporation, Rigpal Communications, Inc., Southeast Florida Cable,
Inc., Telesat Acquisition, LLC, Three Rivers Cable Associates, L.P., Timotheus
Communications, L.P., Upper St. Clair Cablevision, Inc., Valley Video, Inc. Warrick
Cablevision, Inc., Warrick Indiana, L.P., West Boca Acquisition Limited Partnership, Wilderness
Cable Company, and Yuma Cablevision, Inc., guaranteed repayment of funds drawn under the

261

Olympus Co-Borrowing Facility pursuant to a Guaranty, dated as of September 28, 2001 (the "Olympus Guaranty Agreement"). Each of the following RFEs also signed an Olympus Guaranty Agreement: Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II, LLC, Highland Video and Montgomery Cablevision Associates, L.P.

926.    In addition, (i) an indirect Adelphia subsidiary, ACC Operations, Inc., pledged its holdings in Adelphia Cable Partners, L.P., and (ii) other indirect Adelphia subsidiaries, including ACC Cable Communications FL-VA, LLC, ACC Cable Holdings VA, Inc., ACC Holdings II, LLC, ACC Media VA, Inc., Adelphia Cable Partners, L.P., Adelphia GS Cable, LLC, Arahova Holdings, LLC, CCCIII, Inc., Century Alabama Holding Corp., Century Shasta Cable Television Corp., Century Washington Cable Television, Inc., Chelsea Communications, Inc., Chelsea Communications, LLC, Kalamazoo County Cablevision, Inc., Mountain Cable Communications Corporation, Mt. Lebanon Cablevision, Inc., Olympus Cable Holdings LLC, Olympus Cable Holdings LLC, Olympus Communications Holdings, LLC, Olympus Subsidiary, LLC, Pericles Communication Corporation, Rigpal Communications, Inc., Three Rivers Cable Associates, L.P., TMC Holdings LLC, Upper St. Clair Cablevision, Inc., Warrick Cablevision, Inc., and West Boca Acquisition Limited Partnership, pledged the stock of their direct subsidiaries to secure repayment pursuant to a Pledge Agreement, dated as of September 28, 2001 (the "Olympus Pledge Agreement," and together with the Olympus Credit Agreement, the Olympus Guaranty Agreement, and related agreements, the "Olympus Co-Borrowing Facility").[13]  Later,

---

[13]    The Adelphia entities that were obligors, pledgors or guarantors of indebtedness under the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Debtors" or the "Olympus Co-Borrowing

each of the following RFEs also signed an Olympus Pledge Agreement: Bucktail Broadcasting Corporation, CCT, Henderson Community Antenna Television, Inc., Adelphia Cablevision Associates of Radnor, L.P., Adelphia Cablevision Associates of West Palm Beach, LLC, Adelphia Cablevision Associates of West Palm Beach II, LLC, Highland Holdings, Highland Video and Montgomery Cablevision Associates, L.P.

927.    BMO was a lender and acted as the Administrative Agent for the other lenders participating in the Olympus Co-Borrowing Facility. Wachovia and BNS were lenders and acted as Syndication Agents. Fleet and BONY were lenders and acted as Documentation Agents. BofA, Bankers Trust Company, Citicorp, TDI, Chase, CSFB, Credit Lyonnais, Royal Bank of Scotland, Société Générale, and Fuji Bank were lenders and acted as Managing Agents. Wachovia Securities and BNS acted as Lead Arrangers and Joint Book Managers under the facility.[14]

928.    Upon information and belief, each of the Olympus Agent Banks and their affiliated Investment Banks conducted significant due diligence on Adelphia's businesses prior to closing the Olympus Co-Borrowing Facility. The Olympus Agent Banks and their affiliated Investment Banks also prepared an offering memorandum, with the Rigas Family's assistance, to solicit other Co-Borrowing Lenders to participate in the facility. Each of the Olympus Agent Banks received compliance certificates from Adelphia on a quarterly basis evidencing the amounts outstanding under the facility and providing information concerning statements by the

Debtors." The UCA/HHC Debtors, the CCH Debtors and the Olympus Debtors are referred to herein collectively as the "Co-Borrowing Debtors."

[14]    The lenders named as agents in the Olympus Co-Borrowing Facility are referred to herein collectively as the "Olympus Agent Banks." The lenders in the Olympus Co-Borrowing Facility are referred to collectively as the "Olympus Lenders" or the "Olympus Co-Borrowing Lenders." The UCA/HHC Lenders, the CCH Lenders and the Olympus Lenders are referred to herein collectively as the "Co-Borrowing Lenders."

263

borrowers that they were in compliance with the Olympus Credit Agreement. Upon information and belief, the Olympus Agent Banks were required to, and, in fact, did transmit this information to each of the Olympus Lenders in the ordinary course of business.

929.   Other Defendants participating in the Olympus Co-Borrowing Facility as Syndicate Banks include: CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding, Stanwich, Sumitomo, Toronto Dominion, and one or more of the Assignees.

930.   The Olympus Co-Borrowing Facility constituted an affiliated transaction as defined in the various public debt offerings, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the CCH Co-Borrowing Facility. Adelphia needed the approval of Adelphia's Board of Directors and the separate approval of the Independent Directors then sitting on the Board in order to participate in the Olympus Co-Borrowing Facility.

931.   The Olympus Agent Banks and their affiliated Investment Banks worked closely with the Rigas Family and James Brown to prepare a term sheet describing the terms of the Olympus Co-Borrowing Facility (the "Olympus Term Sheet").

932.   The Rigas Family sought and obtained the approval of the Independent Directors for the Olympus Co-Borrowing Facility at a meeting of the ACC Board of Directors on August 7, 2001. Present at this meeting were directors John Rigas, Michael Rigas, Timothy Rigas, James Rigas, and Peter Venetis, and Independent Directors Pete Metros, Dennis Coyle, Erland Kailbourne, and Leslie Gelber. Also present were Colin Higgin, James Brown, Ann Montgomery, Randy Fisher, Mike Brady, and Ed Hartman of ACC.

264

933.    At the meeting, Timothy Rigas and James Brown made verbal representations to the Independent Directors regarding the structure, size and terms of the Olympus Co-Borrowing Facility and the identities of the various ACC entities and RFEs that were to participate as co-borrowers. Timothy Rigas and James Brown also presented the Independent Directors with the Olympus Term Sheet prepared jointly by the Olympus Agent Banks and their affiliated Investment Banks and the Rigas Family that purported to describe the terms of the proposed Olympus Co-Borrowing Facility.

934.    The Independent Directors approved the Olympus Co-Borrowing Facility based on material misrepresentations and omissions in the oral presentation by Timothy Rigas and James Brown and in the written presentation contained in the Olympus Term Sheet.

935.    Timothy Rigas and James Brown falsely advised the Independent Directors that the structure of the Olympus Co-Borrowing Facility would be substantially similar to that of the 1996 HVA/TALP/Global Facility in that each of the co-borrowers could only borrow amounts that were commensurate with the amount of collateral that they were providing.

936.    Timothy Rigas's and James Brown's verbal misrepresentations and the incomplete and/or inaccurate information set forth in the Olympus Term Sheet misled the Independent Directors into believing that the terms and conditions of the Olympus Co-Borrowing Facility provided a benefit to and were in the best interests of Adelphia, when in fact they were not.

937.    The Olympus Term Sheet that Timothy Rigas and James Brown presented to the Independent Directors stated, *inter alia*, that "the proceeds of the Facilities shall be used to (i)

265

acquire approximately 155,000 subscribers, (ii) refinance existing indebtedness, and (iii) for working capital and general limited liability company, partnership and corporate purposes."

938.    The Olympus Term Sheet described a series of provisions that would restrict affiliate transactions, including with RFEs, including loans, investments, and transactions outside the ordinary course of business among affiliated ACC entities.

939.    In particular, the Olympus Term Sheet presented to the Independent Directors provided that the Olympus Co-Borrowing Facility would contain a protective clause prohibiting transactions with affiliates that were not on the same terms as could be obtained in transactions with third parties:

> No Restricted Borrower, nor any restricted subsidiary, shall enter into any transaction with any Affiliate except in the ordinary course of business under terms and conditions no less favorable than those available in a third party transaction. Notwithstanding the above limitation, each Restricted Borrower and its restricted subsidiaries shall be permitted to enter into a management agreement with the manager subject to the limitations upon Management Fees.

940.    The Olympus Term Sheet presented to the Independent Directors provided that the Olympus Co-Borrowing Facility would contain a "Restricted Investments" clause that would prohibit any of the Adelphia borrowers under that facility from making investments in any of the RFEs. That provision read:

> No Restricted Borrower, nor its restricted subsidiaries, shall make any investments except:
>    1.    in the ordinary course of business;
>    2.    in securities having one of the two highest ratings by Moody's or S & P;
>    3.    in short-term commercial paper rated A-1 or P-1, obligations of the United States or an agency, and certificates of deposit of any financial institution

266

> having one of the two highest ratings by S & P or
> Moody's;
>
> 4.  Restricted Investments as permitted herein
>     including without limitation those permitted under
>     the Restricted Payments section;
>
> 5.  Investments in any restricted subsidiary by any
>     Restricted Borrower; or
>
> 6.  Loans among Restricted Borrowers and restricted
>     subsidiaries.

941.  In turn, the referenced Restricted Payments section placed substantial limits on

affiliated transactions, reading:

> No Restricted Borrower, nor its restricted subsidiaries, shall pay
> any dividends or make distributions (other than dividends or
> distributions from a restricted subsidiary to another restricted
> subsidiary or to a Restricted Borrower), make Restricted
> Investments of the type described in item 4 under the "Restricted
> Investments" section above, make payments of principal under
> Affiliate Indebtedness, make any loans and/or advances to
> Affiliates, make equity contributions to unrestricted subsidiaries,
> or make redemptions of equity interests in unrestricted
> subsidiaries, nor shall there be any draws under the Facilities by an
> Unrestricted Borrower ("Restricted Payments"). Notwithstanding
> the foregoing, each Restricted Borrower and its restricted
> subsidiaries may make Restricted Payments, and an Unrestricted
> Borrower may make draws under the Facilities, if (i) no default or
> event of default under the Credit Facilities exists before and after
> giving effect thereto and (ii) the ratio of Senior Debt to Annualized
> Operating Cash Flow is less than 5.5:1 (after giving effect to the
> Restricted Payment). Notwithstanding the foregoing, each
> Restricted Borrower and its restricted subsidiaries will be
> permitted to make Restricted Payments, and an Unrestricted
> Borrower may make draws under the Facilities, in an amount not
> to exceed the amount of Capital Contributions made into the
> Restricted Borrowers and their restricted subsidiaries and Affiliate
> Indebtedness incurred by the Restricted Borrowers and their
> restricted subsidiaries, subsequent to the Closing Date, provided,
> that no default or event of default is continuing or such Restricted
> Payment would, on a pro forma basis, cause a default or event of
> default.

942.    The Olympus Term Sheet presented to the Independent Directors also provided that "The Restricted Borrowers shall not permit the Leverage Ratio for the most recently completed quarter to exceed the following levels determined at the end of the applicable quarter," and then set forth a chart of periods and corresponding applicable leverage ratios. The Olympus Term Sheet presented to the Independent Directors did not define "Leverage Ratio" as it was actually used in the Olympus Co-Borrowing Facility.

943.    Despite these provisions in the Olympus Term Sheet, the Rigas Family and the Olympus Term Sheet deliberately failed to disclose all material facts to the Independent Directors concerning the Olympus Co-Borrowing Facility and intentionally provided the Independent Directors with false and misleading information regarding the terms and conditions of the facility and the uses to which the RFEs intended to put the funds they drew down from the facility.

944.    Timothy Rigas and James Brown advised the Independent Directors that the leverage ratio would be applied to prevent any individual co-borrower from borrowing more funds than could be supported by its own collateral and assets. The Rigas Family knew that this statement was false when made. The Rigas Family had agreed with the Agent Banks and their affiliated Investment Banks that the leverage ratio would be calculated on a combined basis for all borrowers so that any individual co-borrower could draw down as much as any other co-borrower regardless of its individual assets or financial condition.

945.    The Olympus Term Sheet presented to the Independent Directors did not contain a definition of "leverage ratio" and did not state that the leverage ratios to be used in connection

268

with the Olympus Co-Borrowing Facility would be a single combined leverage ratio calculated in the aggregate for all participating co-borrowers. This was a material omission.

946.    Based on the misleading information pertaining to leverage ratios in the Olympus Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the Olympus Co-Borrowing Facility proposed at the August 7, 2001 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with that particular co-borrower's individual leverage ratio.

947.    The Olympus Credit Agreement was finalized after the Independent Directors' approval had been obtained. The Olympus Credit Agreement was created and agreed to by the Rigas Family, the Olympus Agent Banks and their affiliated Investment Banks, and the Olympus Co-Borrowing Lenders. That Agreement defined "Leverage Ratio" as follows: "*Leverage Ratio means, with respect to the Companies on a combined basis*, at any date of determination thereof, the ratio of (a) the Total Debt outstanding on such date to (b) Annualized Operating Cash Flow" (emphasis supplied). The Olympus Credit Agreement provision regarding Leverage Ratio differed materially from the Olympus Term Sheet and the statements made by Timothy Rigas and James Brown at the time the Independent Directors were asked to approve the Olympus Co-Borrowing Facility.

948.    The Rigas Family and the Olympus Term Sheet presented to the Independent Directors also failed to disclose the amount of collateral to be put up by each co-borrower to secure the Olympus Co-Borrowing Facility. This was a material omission and rendered the oral presentation and the Olympus Term Sheet materially misleading.

269

949.    Based on the material misstatements and omissions in the Olympus Term Sheet presented to the Independent Directors and the material misstatements and omissions of Timothy Rigas and/or James Brown with regard to the Olympus Co-Borrowing Facility proposed at the August 7, 2001 Board of Directors Meeting, the Independent Directors believed that the amount each participating co-borrower would be permitted to draw down from the facility would be commensurate with the collateral that particular co-borrower had put up to secure the facility.

950.    The Rigas Family and the Olympus Term Sheet deliberately failed to disclose to the Independent Directors that the Olympus Co-Borrowing Facility would not contain any limits upon the amount of proceeds that the participating RFEs could draw down and failed to disclose that the RFEs would, in fact, be permitted to draw down the entire amount available under the facility without regard to the relatively small amount of collateral pledged by the RFEs in connection with the facility.

951.    The Olympus Agent Banks and their affiliated Investment Banks knew differently. The Olympus Agent Banks and their affiliated Investment Banks prepared and sent to the Olympus Lender Banks a Confidential Information Memorandum in August 2001, after the Independent Directors approved the Olympus Co-Borrowing Facility, describing the terms of the Olympus Co-Borrowing Facility and the Olympus Credit Agreement. As the August 2001 Confidential Information Memorandum made clear, the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by the RFE co-borrowers.

952.    The August 2001 Confidential Information Memorandum explicitly stated that the collateral contributions of ACC co-borrowers Olympus Cable Holdings, LLC and Adelphia Company of Western Connecticut would be based on revenues from a combined total of

270

1,505,512 cable television subscribers, whereas RFE co-borrowers Highland Video Associates, LP and Coudersport Television Cable Company's combined collateral contribution would be based on revenues from a combined total of 61,335 cable television subscribers. Nonetheless, the RFE co-borrowers were permitted to draw down the full amount of the Olympus Co-Borrowing Facility. This information was not stated in the Olympus Term Sheet presented to the Independent Directors and not disclosed to them at the August 7, 2001 Board of Directors Meeting.

953.    In reliance on the restrictions on affiliate transactions set forth in the Olympus Term Sheet presented to the Independent Directors and the misleading nature of the Olympus Term Sheet with regard to the fact that any co-borrower would be able to draw down the entire amount available under the proposed facility, the Independent Directors believed that the RFEs would not be permitted to borrow amounts that were out of proportion with the RFEs' leverage ratios or collateral contributions.

954.    Despite the limitations in the Olympus Term Sheet and the restrictions on affiliate transactions in pre-existing indentures and credit agreements and statutory and common law, the Rigas Family and the Olympus Agent Banks and their affiliated Investment Banks knew at the time they provided the Olympus Term Sheet to the Independent Directors that the Rigas Family intended to engage in conduct and affiliate transactions that violated those restrictions.

955.    The Rigas Family and the Olympus Banks and their affiliated Investment Banks knew that the Rigas Family in fact intended to use large portions of the funds available under the Olympus Co-Borrowing Facility to pay down Rigas Family and RFE debt, including, without limitation, debt incurred by the RFEs under the 1996 HVA/TALP/Global Facility. The Olympus

271

Term Sheet did not disclose this planned use of funds. The Rigas Family never disclosed to the Independent Directors this planned use of funds.

956.   The Rigas Family's plans to use proceeds from the Olympus Co-Borrowing Facility for their own personal benefit and to pay down RFE debts would be in clear violation of both the clause restricting affiliate transactions to only those that were in the best interests of Adelphia and the clause regarding Restricted Investments. This use of proceeds would also be in clear violation of statutory and common law duties to Adelphia as well as the pre-existing clauses restricting affiliate transactions in the public debt indentures, the 1996 HVA/TALP/Global Facility, the UCA/HHC Co-Borrowing Facility, and the CCH Co-Borrowing Facility.

957.   The Independent Directors were not informed of any of these facts at any time before they adopted a resolution approving the Olympus Co-Borrowing Facility.

958.   Had the Independent Directors been aware that the RFE co-borrowers could draw down up to the entire amount available under the Olympus Co-Borrowing Facility with no regard to the leverage ratios or collateral contributions attributable to the participating RFEs and that the Adelphia entities would be jointly and severally liable for the RFEs' loans, the Independent Directors would have rejected the proposed Olympus Co-Borrowing Facility.

959.   Had the Independent Directors been aware that the Rigas Family intended to take a portion of the proceeds available under the Olympus Co-Borrowing Facility – a loan for which ACC itself, through its subsidiaries, was jointly and severally liable – and use it to pay off RFE debts and for the personal benefit of the Rigas Family, the Independent Directors would have rejected the proposed Olympus Co-Borrowing Facility.

272

960.   Instead, the Independent Directors voted to approve the Olympus Co-Borrowing Facility because the Olympus Term Sheet contained the provision restricting affiliate transactions, which should have operated to protect Adelphia's interests but which the Olympus Agent Banks and their affiliated Investment Banks knew that the Rigas Family intended to violate; because the Olympus Term Sheet was misleading with respect to the calculation of the Leverage Ratio and the fact that any co-borrower could draw down the entire amount of proceeds available under the Olympus Co-Borrowing Facility once in place regardless of its financial condition; and because the Rigas Family and James Brown induced the Independent Directors, through misstatements and omissions, to conclude that the Olympus Co-Borrowing Facility would be similar to the 1996 HVA/TALP/Global Facility (in which the RFE co-borrower had contributed collateral commensurate with the amount of proceeds it was permitted to draw down from the facility and the use of funds was strictly limited).

961.   The Independent Directors' approval of the Olympus Co-Borrowing Facility was obtained under false pretenses. The Olympus Agent Banks and their affiliated Investment Banks knew or consciously avoided that fact.

962.   The Olympus Agent Banks and their affiliated Investment Banks knew that the Olympus Term Sheet was misleading with respect to the fact that any co-borrower could draw down the entire amount available under the facility regardless of its financial condition.

963.   The Olympus Agent Banks and their affiliated Investment Banks knew that the Independent Directors were under a duty and obligation, pursuant to pre-existing loan and public debt provisions, pursuant to the proposed terms of the Olympus Co-Borrowing Facility, and pursuant to their statutory and common law fiduciary duties to Adelphia, to approve only those

273

transactions that were in the best interests of Adelphia and that satisfied limits on affiliate transactions. In contrast, the true terms and conditions of the Olympus Co-Borrowing Facility provided no benefit to Adelphia and were not in Adelphia's interests. The Olympus Agent Banks and their affiliated Investment Banks knew or consciously avoided the fact that the Independent Directors' approval was secured by false and fraudulent omissions and misstatements of material facts.

964.    The Olympus Agent Banks and their affiliated Investment Banks knew that Adelphia was under an obligation timely to disclose in its SEC filings and proxy statements the contingent and actual liabilities arising from the Olympus Co-Borrowing Facility. The Olympus Agent Banks and their affiliated Investment Banks also knew that the Independent Directors had to approve the information set forth in such SEC filings and proxy statements.

965.    At the time the Olympus Agent Banks and their affiliated Investment Banks became involved in the Olympus Co-Borrowing Facility, the Olympus Agent Banks and their affiliated Investment Banks knew that Adelphia's SEC filings and proxy statements failed to disclose the true extent of Adelphia's liabilities already existing as a result of Adelphia's participation in the prior CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility.

966.    At no time prior to March 27, 2002 did Adelphia publicly disclose the enormous contingent liabilities it had amassed as a result of the RFEs' draws from the Co-Borrowing Facilities.

274

967.    The Olympus Agent Banks and their affiliated Investment Banks knew that, prior to the Petition Date, Adelphia's SEC filings and proxy statements failed to disclose the liabilities arising from the Olympus Co-Borrowing Facility.

968.    The Olympus Agent Banks and their affiliated Investment Banks were aware that ACC had assumed enormous contingent liabilities as a result of its participation in the Olympus Co-Borrowing Facility, the prior CCH Co-Borrowing Facility and the prior UCA/HHC Co-Borrowing Facility. Moreover, the Olympus Agent Banks and their affiliated Investment Banks knew, or consciously avoided, the fact that the Independent Directors could not have approved public disclosures of ACC that failed to disclose those liabilities unless the Independent Directors had been misled and defrauded.

969.    As of the Petition Date, approximately $1.3 billion was outstanding under the Olympus Co-Borrowing Facility.

3.    **The Rigas Family Intended That The Co-Borrowing Facilities Would Be Used For Fraudulent Purposes.**

a.    **UCA/HHC.**

970.    The Rigas Family did not hide from the Agent Banks, Co-Borrowing Lenders, and Investment Banks their intention to use the UCA/HHC Co-Borrowing Facility to defraud Adelphia and its other creditors. To the contrary, the Rigas Family disclosed its fraudulent intent to the UCA/HHC Lenders. Discussing the UCA/HHC Co-Borrowing Facility before closing, the Rigas Family informed certain of the Agent Banks that they "specifically intended a portion of the facility to be distributed to the Rigas Family for purposes of participating in the upcoming

[Adelphia] equity offering" and that they intended to use a substantial portion to pay off existing RFE debt (emphasis added).

971.    The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment Banks informed the other Co-Borrowing Lenders of this intention before closing. Thus, the UCA/HHC Lenders acknowledged and agreed that $250 million of the $850 million of the initial proceeds from the facility would be used by the Rigas Family to purchase equity securities from ACC for their personal account and that $350 million would be used by the Rigas Family to pay down RFE debt. The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment Banks also disclosed that the RFE co-borrower under the UCA/HHC Co-Borrowing Facility was not owned by Adelphia. The UCA/HHC Lenders knew that Adelphia received no benefit from loans to the Rigas Family or the RFEs. The UCA/HHC Lenders knew that such loans to the Rigas Family and the RFEs breached the provisions of the UCA/HHC Term Sheet presented to the Independent Directors. The UCA/HHC Lenders participated in the UCA/HHC Co-Borrowing Facility with knowledge of these breaches.

972.    Prior to the closing of the UCA/HHC Co-Borrowing Facility, the Rigas Family also disclosed to the UCA/HHC Lenders that the assets of the RFE participating in the facility were disproportionately small compared to those of the UCA/HHC Debtors. Of the 395,000 subscribers owned by the borrowers participating in the UCA/HHC Co-Borrowing Facility, the sole RFE member of the borrowing group, Hilton Head, contributed just 72,000 subscribers, or approximately 18%.

973.    As of the Petition Date, Hilton Head, an RFE, had drawn approximately $642 million of the $831 million outstanding under the UCA/HHC Co-Borrowing Facility, or 77% of

276

the amount borrowed. No prudent lender would have lent Hilton Head $642 million (or more) without Adelphia's credit support. The UCA/HHC Lenders knew or consciously avoided the facts, which were readily apparent to them, that the terms of the UCA/HHC Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family stood to benefit enormously from their participation in the UCA/HHC Co-Borrowing Facility, at the expense of Adelphia.

974.    The Rigas Family determined to enter into the UCA/HHC Facility in order to benefit themselves and the RFEs. The UCA/HHC Facility did not benefit Adelphia. None of the amounts drawn by, or on behalf of, Hilton Head benefited Adelphia. The UCA/HHC Lenders knew this.

        b.    **CCH.**

975.    The Rigas Family advised the CCH Lenders of its intention to use the CCH Co-Borrowing Facility to defraud Adelphia. The Rigas Family and their cohorts expressly advised the CCH Agent Banks that they intended to use the proceeds from the CCH Co-Borrowing Facility to acquire assets for the personal account of the Rigas Family. In a written invitation to the CCH Agent Banks to participate in the CCH Co-Borrowing Facility dated February 17, 2000, ACC executive James Brown stated:

> The use of proceeds for this facility will be primarily to fund
> Adelphia's purchase of the Cleveland, Ohio cable system from
> Cablevision Systems Corporation ($990 mm), to fund Adelphia's
> purchase of certain cable assets from Prestige Communications
> ($700mm) and to fund the Rigas families [sic] purchase of certain
> cable assets from Prestige Communications ($400 mm).

Thus, from the outset, the CCH Agent Banks knew that the Rigas Family intended to draw hundreds of millions of dollars from the facility at closing for the sole benefit of the RFE co-borrower.

976.    Upon information and belief, the Rigas Family also disclosed to each of the other CCH Lenders that (i) the RFE co-borrower was privately owned by the Rigas Family, and (ii) the Rigas Family intended to use a portion of the funds under the CCH Co-Borrowing Facility to fund the Rigas Family's personal acquisition of the Prestige Systems.

977.    Based on the substantial participation of CCH Lenders that had participated in the UCA/HHC Co-Borrowing Facility, the CCH Lenders also knew that the Rigas Family had been using the proceeds of other co-borrowing loans for fraudulent purposes. The CCH Lenders knew that the Independent Directors were never advised of such activities.

978.    The offering memorandum for the CCH Co-Borrowing Facility that the CCH Agent Banks and their affiliated Investment Banks prepared and circulated to the CCH Lenders after the Independent Directors approved of the facility informed the CCH Lenders that the number of cable subscribers owned by the RFE co-borrower was disproportionately small compared to the number of subscribers owned by the CCH Debtors and patently insufficient to support repayment of the loans. Of the 1,532,814 subscribers owned by the CCH Co-Borrowing Facility borrowing group, the sole RFE member, Highland Prestige, contributed just 55,831 subscribers, or approximately 3.6% of the total assets supporting the loan.

979.    Nonetheless, as of the Petition Date, Highland Prestige had drawn approximately $1.66 billion of the $2.48 billion outstanding under the CCH Co-Borrowing Facility, or 67% of the amount borrowed. No prudent lender would have lent Highland Prestige $1.66 billion (or

278

more) without the credit support of Adelphia. The CCH Lenders knew or consciously avoided the facts, which were readily apparent to them, that the terms of the CCH Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that Highland Prestige and the Rigas Family benefited enormously and personally from their participation in the CCH Co-Borrowing Facility, at the expense of Adelphia.

980.    The Rigas Family determined to enter into the CCH Facility in order to benefit themselves and the RFEs. The CCH Facility did not benefit Adelphia. None of the amounts drawn by, or on behalf of, Highland Prestige benefited Adelphia. The CCH Lenders knew this.

c.    Olympus.

981.    The Rigas Family advised the Olympus Lenders of its intention to use the Olympus Co-Borrowing Facility for its personal benefit. The offering memorandum distributed to the Olympus Lenders specifically stated that: (i) the initial proceeds would be used to pay at least $152 million of indebtedness owed by RFEs, and (ii) the RFEs were privately owned by the Rigas Family.

982.    The information that the Rigas Family intended to use $152 million of funds available under the Olympus Co-Borrowing Facility to pay down RFEs' debt, a transaction that would not benefit Adelphia, was not contained in the Olympus Term Sheet presented to the Independent Directors and was not otherwise disclosed to them at the August 7, 2001 Board Meeting at which the Independent Directors adopted a resolution approving the Olympus Co-Borrowing Facility.

279

983.   Based on the substantial overlapping participation of lenders from the UCA/HHC and CCH Co-Borrowing Facilities, the Olympus Lenders knew that the Rigas Family had been misappropriating the proceeds of other Co-Borrowing Facilities for their own personal purposes, to the detriment of Adelphia, as more fully described above.  The Olympus Lenders knew that the Independent Directors were never advised of such activities.

984.   The offering memorandum for the Olympus Co-Borrowing Facility that the Olympus Agent Banks prepared and circulated to the Olympus Lenders (created after the Independent Directors' approval of the facility had been obtained) advised the Olympus Lenders that the number of cable subscribers owned by the RFE co-borrowers was disproportionately small compared to the Olympus Debtors and patently insufficient to support repayment of the loans.  Of the 1,566,847 subscribers contributed to the Olympus Co-Borrowing Facility borrowing group as collateral, the two RFE members of the borrowing group, Highland Video and CCT, contributed just 61,335 subscribers, or approximately 3.9% of the total assets supporting the loan.

985.   Nonetheless, as of the Petition Date, Highland Video and CCT had drawn approximately $751.5 million of the $1.27 billion outstanding under the Olympus Co-Borrowing Facility, or 59% of the amount borrowed.  No prudent lender would have lent Highland Video and CCT $751 million (or more) without Adelphia's credit support.  The Olympus Lenders knew or consciously disregarded the facts, which were readily apparent to them, that the terms of the Olympus Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and

the Rigas Family benefited enormously and personally from their participation in the Olympus Co-Borrowing Facility, at the expense of Adelphia.

986.    The Rigas Family determined to enter into the Olympus Facility in order to benefit themselves and the RFEs. The Olympus Facility did not benefit Adelphia. None of the amounts drawn by, or on behalf of, Highland Video and CCT benefited any of the Adelphia entities. The Olympus Lenders knew this.

### 4.    The Fraudulent Uses Of The Co-Borrowing Facilities By The Rigas Family.

#### a.    The Rigas Family's Purchase Of $1.9 Billion Of ACC Securities.

987.    From late 1998 until their forced resignations in May 2002, the Rigas Family engaged in at least eleven transactions for the purchase of approximately $1.9 billion in securities issued by ACC, including common stock and convertible bonds. The Rigas Family funded many of these transactions directly from the proceeds of the Co-Borrowing Facilities. Each of these transactions was fraudulent because, as discussed infra, Adelphia received no consideration. The Rigas Family used this money for their own personal benefit and self-interest to maintain their stock position within Adelphia in order to ensure their continued management of Adelphia and their continued access to Adelphia's credit support and facilities. This use of the Co-Borrowing Facilities and Adelphia's assets was improper and did not benefit Adelphia.

988.    Although the Rigas Family intended to, and did, use large portions of the funds available under the Co-Borrowing Facilities in this improper and self-interested manner, such intentions and activities were never disclosed to the Independent Directors, either in the UCA/HHC Term Sheet, the CCH Term Sheet, the Olympus Term Sheet or in verbal and other

281

representations made by Timothy Rigas and/or James Brown to the Independent Directors before and after the Co-Borrowing Facilities were approved. These securities purchases with co-borrowed funds violated the Term Sheets, the public debt indentures, the bank credit agreements, and applicable statutory and common law. The Agent Banks and the Investment Banks knew that such securities purchases violated the Rigas Family's fiduciary duties and existing indentures and credit agreements.

989.  Had the Independent Directors known that the Rigas Family intended to use, and did use, the Co-Borrowing Facilities in this improper manner, which was contrary to the interests of Adelphia, they would have rejected the Co-Borrowing Facilities and would have taken action to prevent the Rigas Family from using the Co-Borrowing Facilities for this purpose.

### b.    Adelphia's Payment Of Approximately $351 Million Of Margin Loans On Behalf Of The Rigas Family.

990.  From March 2000 until May 2002, the Rigas Family used in excess of $351 million from the Co-Borrowing Facilities to make payments on margin loans owed by the members of the Rigas Family on personal margin accounts maintained at defendants BofA, SSB, Deutsche Bank Securities, and Goldman Sachs (the "Margin Lenders").

991.  At the time that the Rigas Family incurred the margin loan obligations, the Margin Lenders knew that the Rigas Family had access to the funds available under the Co-Borrowing Facilities. At the time that the Rigas Family incurred the margin loan obligations, the Margin Lenders also knew that the Rigas Family did not have significant funds or independent access to credit to satisfy all of their credit obligations while still paying off their margin loans. A significant amount of the margin payments made by the Rigas Family with funds drawn from

the Co-Borrowing Facilities -- approximately $194 million -- occurred after March 27, 2002, the date on which the Rigas Family first disclosed its fraudulent concealment of the true amount of ACC's liability under the Co-Borrowing Facilities to the public and the Independent Directors.

992.    Prior to March 27, 2002, the four Margin Lenders had received a total of approximately $157 million in payments to the margin loan accounts paid out of the Co-Borrowing Facilities. In the days and weeks after the March 27, 2002 disclosure, these four Margin Lenders received approximately $194 million in margin loan repayments paid out of the Co-Borrowing Facilities: Bank of America received $41 million on April 1, 2002; SSB received $72 million in April and May 2002; Goldman Sachs received $30 million in April and May 2002; and Deutsche Bank received $50 million on March 28 and April 3, 2002.

993.    The Margin Lenders (or their affiliates) that were Co-Borrowing Lenders knew prior to their receipt of the margin payments for the personal benefit of the Rigas Family that such payments came from Co-Borrowing Facilities. The Margin Lenders knew that use of the Co-Borrowing Facilities to pay down Rigas Family margin loans violated existing indentures and credit agreements and applicable statutory and common law. Defendants Bank of America, SSB, and Deutsche Bank were each Agent Banks or affiliated with an Agent Bank, at the same time they were margin lenders. These margin loan repayments thus benefited these defendants by converting their unpaid margin loans, that were substantially undersecured due to the plummeting value of the Rigas Family's Adelphia securities holdings, into senior credit obligations under the Co-Borrowing Facilities secured by all of the assets of the Adelphia entities that were parties to those facilities.

994.    Although the Rigas Family intended to, and did, use large portions of the funds available under the Co-Borrowing Facilities to pay down private margin loans, such intentions and activities were never disclosed to the Independent Directors, either in the UCA/HHC Term Sheet, the CCH Term Sheet, the Olympus Term Sheet or in verbal and other representations made by John Rigas, Timothy Rigas, and/or James Brown to the Independent Directors before and after the Co-Borrowing Facilities were approved.

995.    Had the Independent Directors known that the Rigas Family intended to use, and did use, the Co-Borrowing Facilities to pay down private margin loans, they would have rejected the Co-Borrowing Facilities and would have taken action to prevent the Rigas Family from using the Co-Borrowing Facilities for this purpose. After the disclosures on March 27, 2002, members of the Special Committee created by the Independent Directors to investigate and remedy the Rigas Family's misconduct took steps to inquire as to any outstanding obligations, including margin loans, that might still be subject to payment out of the Co-Borrowing Facilities. In particular, Leslie Gelber asked various banks at a meeting in April 2002 at the offices of Citibank whether such obligations existed. Representatives of Citibank and SSB, among others, denied knowledge of such obligations at that time. Nor did co-borrowing lenders Deutsche Bank or Bank of America advise the Independent Directors that they were continuing to receive margin loan payments from Adelphia on behalf of the Rigas Family after March 27, 2002. At the same time, SSB and the other Margin Lenders were receiving payments on the outstanding margin loans from the Co-Borrowing Facilities. The Independent Directors did not learn of these margin loan repayments until after they occurred.

c.    **The Rigas Family's Purchase
Of $710 Million Of Cable Systems.**

996.    On or about July 5, 2000, Highland Prestige, an RFE, acquired various cable systems in Georgia owned by Prestige Communications, Inc. (the "Prestige Acquisition"). The Prestige Acquisition involved various transfers of funds and other assets by which the Rigas Family, through Highland Prestige, consummated the Prestige Acquisition using as much as $365 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable.

997.    On or about July 2, 2001, Highland Prestige also acquired various cable systems from the Estate of Bill Daniels (the "Daniels Acquisition"). The Daniels Acquisition also involved various transfers of funds and other assets by which the Rigas Family, through Highland Prestige, consummated the Daniels Acquisition with approximately $345 million of funds borrowed from the CCH Co-Borrowing Facility, for which Adelphia remained liable.

d.    **Other Uses By The Rigas Family Of
Funds From The Co-Borrowing Facilities.**

998.    The Rigas Family also used funds from the Co-Borrowing Facilities to finance certain non-Adelphia related ventures and to cause Adelphia entities to enter into other fraudulent transactions with RFEs.

999.    For example, the Rigas Family used at least a portion of the Co-Borrowing Facilities to fund expenditures relating to the development of a golf course at Wending Creek Farms on Rigas Family land, and used funds from the CMS to fund expenses for Niagara

285

Frontier Hockey, L.P., a Rigas Family controlled entity that owned the Buffalo Sabres professional hockey team.

1000.  The Rigas Family also caused ACC to use at least a portion of the Co-Borrowing Facilities to purchase in non-arms length transactions approximately $40 million in furniture and to purchase timber rights from RFEs.

1001.  As of the Petition Date, the Rigas Family fraudulently had used at least $3.4 billion of the $5.6 billion available under the Co-Borrowing Facilities for their own personal enrichment, to the detriment of Adelphia and its other creditors.  As more fully discussed herein, the Co-Borrowing Lenders knew of or consciously avoided knowledge of the Rigas Family's personal use of these funds.

1002.  The Rigas Family never disclosed to the Independent Directors the Rigas Family's intention to use funds available under the Co-Borrowing Facilities for the aforementioned non-Adelphia-related ventures, none of which benefited, and none of which were in the best interests of, Adelphia.

1003.  Had the Independent Directors been informed that the Rigas Family intended to use proceeds from the Co-Borrowing Facilities to fund such non-Adelphia-related ventures, and had they understood that Adelphia would become wholly liable for such ventures, the Independent Directors would have taken action to prevent the Rigas Family from entering into and using the Co-Borrowing Facilities for these purposes.  As a result of the extraordinary burdens placed on Adelphia for the funds that the Rigas Family looted through the Co-Borrowing Facilities, Adelphia received no benefit at all from those facilities.

### 5.   The Rigas Family's Fraudulent Use Of The Century-TCI Non-Co-Borrowing Facility.

1004.  The Rigas Family's fraudulent use of Adelphia's credit facilities was not limited to the Co-Borrowing Facilities. The Rigas Family used at least one of Adelphia's Non-Co-Borrowing Credit Facilities to fund personal expenses. In contrast to the Co-Borrowing Facilities, however, these other credit facilities did not explicitly authorize RFEs to access such credit.

1005.  The Century-TCI Lenders knew, or consciously avoided, the fact that the proceeds of their loans were being used to illegally shift value from Adelphia to the Rigas Family without consideration. In this regard, on October 30, 2001, October 31, 2001, and November 1, 2001, the Rigas Family caused Adelphia to draw a total of $490 million from the Century-TCI Facility (a Non-Co-Borrowing Credit Facility); upon information and belief, the Rigas Family used these proceeds to pay for purchases of common stock and convertible notes for $408 million in October and November 2001. At or about that time, the Co-Borrowing Facilities were fully drawn. Adelphia therefore requested from Citibank, as the administrative agent for the Century-TCI Credit Facility, a previously unplanned $350 million draw; Adelphia also drew from Century-TCI another $60 million on October 31, and another $80 million on November 1.

1006.  Although the Rigas Family acquired $408 million of ACC securities in October and November 2001, in reality, the Rigas Family did not pay $408 million or any other amount to ACC. Instead, the Rigas Family merely recycled Century-TCI funds to consummate this stock purchase rather than contributing fresh capital. The Century-TCI Lenders knew or consciously avoided the fact that the $408 million draw from the Century-TCI Facility and other draws were

287

used by the Rigas Family for their personal benefit and fraudulent purposes and without any benefit to Adelphia.

## C. The Rigas Family Concealed From Creditors Other Than Defendants The True Amount Outstanding Under The Co-Borrowing Facilities.

1007. The Rigas Family's intent to defraud Adelphia, its Independent Directors, and its other creditors is evidenced by their concealment of the true amounts outstanding under the Co-Borrowing Facilities. In 2000, Adelphia's debt burden caused significant reductions in Adelphia's credit ratings, thereby jeopardizing the Rigas Family's ability to take advantage of Adelphia's access to the capital markets. In August 2000, Moody's observed that Adelphia desperately needed a "deleveraging" event. Consequently, the Rigas Family -- with Defendants' knowledge or reckless disregard or conscious avoidance -- concocted a ploy to convince the public that Adelphia was deleveraging when its actual debt load was increasing because of the Rigas Family's illicit uses of the Co-Borrowing Facilities. As more fully explained below, while ACC -- acting by and through the Rigas Family -- concealed the true extent of Adelphia's debt as a result of the RFEs' Co-Borrowing Facility borrowings from other creditors and from the Independent Directors, the Co-Borrowing Lenders knew the correct amounts all along.

### 1. Adelphia Simply Omitted The RFE Uses Of The Co-Borrowing Facilities And Other Amounts From Its Balance Sheets.

1008. At no time prior to March 27, 2002 did Adelphia disclose the true extent of its liabilities under the Co-Borrowing Facilities in filings with the Securities and Exchange Commission ("SEC"). Since May 1999 -- the date the UCA/HHC Co-Borrowing Facility closed -- Adelphia's SEC filings have understated the amount owed under the Co-Borrowing Facilities

288

by billions of dollars. Moreover, ACC and its indirect subsidiaries Arahova Communications, Inc. and Olympus Communications, L.P. each had publicly-traded debt securities. The Rigas Family also caused the SEC filings of these indirect ACC subsidiaries to understate the billions of dollars outstanding under the Co-Borrowing Facilities.

1009. The Rigas Family withheld from the Independent Directors critical information regarding Adelphia's true financial condition in order fraudulently to induce the Independent Directors to sign Adelphia's SEC filings.

1010. The Rigas Family consistently caused Adelphia to omit from its publicly filed financial statements amounts drawn from the Co-Borrowing Facilities (and the Non-Co-Borrowing Facilities) for the personal benefit of the Rigas Family and the RFEs. The Rigas Family and Defendants knew at the time that Adelphia was required to disclose the entire amount of debt it was obligated to pay, including all of the draws under the Co-Borrowing Facilities.

2.    **The Fraudulent Use Of The CMS.**

1011. Until May 2002, when the Rigas Family was forced to relinquish management control of Adelphia, the Rigas Family used Adelphia's cash management system ("CMS") to control cash transactions involving Adelphia and the RFEs. The CMS was a key instrumentality of the fraud. The use of a central cash management system to commingle funds belonging to both a public company and privately owned entities was unprecedented. Defendants knew or consciously avoided knowledge of the structure and fraudulent use of the CMS. Indeed, it was yet another red flag that they ignored.

289

1012. Defendant Wachovia -- an agent bank or lender in all of Adelphia's credit facilities -- maintained the CMS at all relevant times and the Rigas Family controlled its operations. The CMS was a central depository (in reality, the Rigas Family's personal piggy bank) for cash generated or obtained by Adelphia from all sources (including borrowings under each of the Co-Borrowing Facilities, the Non-Co-Borrowing Facilities, the proceeds from Adelphia's debt and equity securities offerings, and Adelphia's operations). Adelphia commingled all of its cash with that of the RFEs in the CMS. After Adelphia deposited cash into the CMS, "ownership" of the cash could be transferred through simple journal entries to any RFE. The cash also could be transferred from the CMS to any of a number of bank accounts held in the name of the RFEs.

1013. Wachovia's internal policies, guidelines, and procedures prohibited this type of cash management account which included companies that were not a common legal entity or which included parents and subsidiaries that were not 100% owned by the parents. Wachovia's policies prohibited commingling funds among public and private corporate entities that were not deemed to be a common legal entity. The Adelphia CMS violated Wachovia's internal policies.

1014. The CMS constituted an Affiliated Transaction as defined under the various public indentures and credit agreements set forth in this complaint. Because the RFEs were allowed to withdraw substantial sums of money from the CMS for purposes that were not for the benefit of Adelphia, including funds deposited from the Co-Borrowing Facilities, while leaving Adelphia responsible for re-paying the full amount drawn down, these were affiliated transactions that required approval of the Independent Directors under existing agreements as well as statutory and common law. The Rigas Family, Wachovia, and the other Agent Banks

290

never informed the Independent Directors of the structure and uses of the CMS or that the funds of Adelphia and the RFEs were commingled in the CMS. Wachovia did not ask for or obtain any proof that the Independent Directors had approved the CMS. Wachovia and the Agent Banks knew or consciously avoided knowledge that the Rigas Family had never obtained the Independent Directors' approval to use the CMS to commingle Adelphia's funds with the RFEs' funds. Wachovia's management of the CMS in this manner, without any corporate authorization from Adelphia, not only violated its own internal policies but substantially assisted the Rigas Family in accomplishing their fraudulent looting of Adelphia's accounts.

1015. Through the CMS, the Rigas Family misappropriated over $3.4 billion from the Co-Borrowing Facilities for its own benefit. Adelphia's banking and wire transfer records reflect that the Rigas Family obtained funds from the Co-Borrowing Facilities by transferring funds from the CMS to an account maintained at Wachovia by Highland Holdings or some other RFE, followed by a transfer from the RFE either directly to individual members of the Rigas Family or to other RFEs, many of which also maintained accounts at Wachovia. Typically, these transfers occurred on the same business day. Thus, on any given business day in which an RFE received cash transfers from Adelphia, the RFE's account balance at Wachovia would fluctuate from zero, to the amount transferred in from Adelphia, and back to zero after the RFE funneled those funds out to the Rigas Family. Defendant Wachovia, an agent bank or lender under each of Adelphia's credit facilities (including the Co-Borrowing Facilities), thus was in a unique position to observe the fraudulent transfer of funds from Adelphia to the Rigas Family. In accordance with its role as an Agent Bank, Wachovia, upon information and belief, shared its knowledge of these transactions with other Co-Borrowing and Non-Co-Borrowing Lenders.

291

### 3.    The Rigas Family Created The False Appearance Of "Deleveraging".

1016.    The Rigas Family was not content with merely concealing the amounts borrowed by the RFEs under the Co-Borrowing Facilities. With the assistance of the Agent Banks and the Investment Banks, the Rigas Family schemed to give the false appearance that Adelphia was affirmatively decreasing its debt load when, in fact, Adelphia's debt load was soaring to new heights as a result of the Rigas Family's misappropriation of Adelphia's credit facilities. To create this illusion, the Rigas Family caused Adelphia to offer stock to the public as a means of raising capital that could be used to pay off Adelphia's debt. The Rigas Family publicly announced that it would be purchasing ACC stock to assist Adelphia in reducing its debt.

1017.    At all relevant times, these statements about reducing Adelphia's debt load were false because Adelphia's debt was actually increasing due to the Rigas Family's improper use of Adelphia's credit facilities. The Rigas Family was not helping to decrease Adelphia's debt because the Rigas Family used Adelphia's credit facilities to pay for the Adelphia stock it was buying.

1018.    The Rigas Family did not disclose to the Independent Directors that they were undermining Board policy to reduce Adelphia's debt load by continuing to misappropriate funds from Adelphia's credit facilities and were using those facilities to pay for the Adelphia stock they were buying. The Rigas Family advised the Independent Directors that they were buying Adelphia securities with the Rigas Family's private funds. The effect of this deception was to increase Adelphia's debt load – not decrease it.

1019.    Defendants knew of and participated in this scheme through their approval of Co-Borrowing Facility draws to fund the Rigas Family's acquisitions of ACC's securities, through