their underwriting of debt and equity offerings in which the fraudulent purchases occurred, and

through their knowledge and disregard that the purported deleveraging was a sham.

1020.   The basic structure of these bogus securities purchase transactions involved:

- a draw down under a Co-Borrowing Facility in the amount of the purchase price of the securities to be purchased;

- a transfer from the co-borrower to an RFE that was not a co-borrower;

- a transfer from the non-co-borrowing RFE to Adelphia;

- ACC's issuance of securities to the non-co-borrowing RFE -- i.e., the Rigas Family; and

- Adelphia's use of proceeds of the Rigas Family's securities purchase to pay down outstanding debt under the Co-Borrowing Facilities.

1021.   As a result of these transactions, Adelphia booked an increase in a shareholders'

equity account in the amount it had received from the RFE, and recorded a correlating decrease

in the debt outstanding under one or more of the Co-Borrowing Facilities. The decrease,

however, was fraudulent and illusory because Adelphia still remained liable for the co-borrowing

funds siphoned away by the RFEs to purchase Adelphia securities.

1022.   From 1999 through 2001, the Investment Banks, by and through analysts,

published a series of reports announcing the Rigas Family's purported campaign to delever

Adelphia. These reports facilitated the fraud by disseminating the Rigas Family's misleading

intentions and actions and giving those plans credibility. The Investment Banks knew or

consciously avoided knowledge that the Rigas Family made bogus equity contributions to ACC,

concealed the actual level of debt and misrepresented their efforts to delever Adelphia.

293

1023. After each of these equity offerings, Adelphia released a 10-K or 10-Q filing with the SEC in which it reported the net cash proceeds of the securities offering. The SEC filings indicated that the Rigas Family had acquired its securities for cash. The Agent Banks and the Investment Banks knew that these reports were misleading in that they failed to disclose that the Rigas Family used the Co-Borrowing Facilities to provide the funds for their securities purchases. The Agent Banks and the Investment Banks knew that the Rigas Family were damaging Adelphia and deceiving its stakeholders (other than Defendants) by making these materially misleading reports.

### D.   Defendants Knew Of Or Consciously Avoided Knowledge Of The Fraud.

#### 1.   The Rigas Family Specifically Informed Defendants Of Their Fraudulent Activities.

1024. Although the Rigas Family concealed their fraud from the public, the Independent Directors and Adelphia's creditors other than Defendants, the Rigas Family did not conceal it from Defendants. To the contrary, the Rigas Family could not have accomplished this massive fraud on Adelphia and its other creditors without Defendants' substantial and knowing assistance.

1025. As set forth above, the Rigas Family disclosed to each of the Co-Borrowing Lenders and their affiliated Investment Banks (prior to closing and thereafter), but not to the Independent Directors, that a substantial portion of the proceeds would be used for purposes benefiting solely the Rigas Family and the RFEs. This disclosure -- along with the structure of the Co-Borrowing Facilities, which the Co-Borrowing Lenders and their affiliated Investment Banks had approved and participated in creating -- gave Defendants actual notice of the

294

misconduct by the Rigas Family for the reasons set forth above. And, as more fully described below, many of the Defendants had a much more substantial relationship with Adelphia and the Rigas Family that provided them with significantly more information about the fraud. And breaches of fiduciary duty

### 2.    Defendants Knew That The Rigas Family Concealed Adelphia's Co-Borrowing Debt.

1026.    The Co-Borrowing Lenders and their affiliated Investment Banks knew or consciously avoided the fact that Adelphia's filings with the SEC consistently concealed the true amount of their co-borrowing liability. The Co-Borrowing Lenders and their affiliated Investment Banks knew the amount owing under the Co-Borrowing Facilities in which they participated. In addition, since Wachovia and BMO were Agent Banks or lenders under all of the Co-Borrowing and Non-Co-Borrowing Facilities, these institutions also knew the outstanding balances of all of Adelphia's bank debt (as did other lenders participating in the Co-Borrowing and Non-Co-Borrowing Facilities). All of the Co-Borrowing Lenders regularly received compliance certificates from Adelphia evidencing the true amounts outstanding under Adelphia's credit facilities.

1027.    Upon information and belief, the Co-Borrowing Lenders performed periodic analyses demonstrating Adelphia's concealment, as caused by the Rigas Family, of billions of dollars under the Co-Borrowing Facilities from Adelphia's balance sheet. For example, on or about March 29, 2001, Defendant Wachovia performed an analysis of Adelphia's total outstanding "bank debt" at the subsidiary level, as of September 30, 2000, under the two Co-Borrowing Facilities then outstanding -- UCA/HHC and CCH -- and under six Non-Co-Borrowing Facilities then outstanding -- Parnassos, Chelsea Communications, Adelphia Cable

295

Partners, Harron Communications, FrontierVision and Century-TCI. Wachovia determined that Adelphia's total "bank debt" as of September 30, 2000 was approximately $5.2 billion.

1028. Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt, as of September 30, 2000, was approximately $3.8 billion. Wachovia did not need any "special" access to Adelphia to obtain this information. All of the Co-Borrowing Lenders could have made this calculation based on information readily accessible to them as lenders. Wachovia's analysis demonstrates that many, if not all, Defendants knew or consciously avoided knowing that Adelphia was understating its total bank debt in 2000 by approximately $1.4 billion and that Adelphia's leverage was not being reduced as represented.

1029. Moreover, upon information and belief, in early 2002, each of the Agent Banks performed an analysis of Adelphia's total outstanding bank debt, as of September 30, 2001, under the Co-Borrowing and Non-Co-Borrowing Facilities. Based on the information available to them (and which had been available since 1999), each of the Agent Banks determined that Adelphia's total bank debt was between $6.8 billion and $7.3 billion.

1030. Adelphia's public filings for the same period, however, disclosed that Adelphia's bank debt as of September 30, 2001, was approximately $5.4 billion, which included amounts borrowed by an Adelphia subsidiary, Adelphia Business Solutions, Inc. ("ABIZ"), that the Agent Banks did not include in their calculations. Thus, even including the amounts borrowed by ABIZ, Defendants knew or consciously avoided the fact that Adelphia understated their total bank debt by at least $1.4 billion. Yet the concealment went much further. Because the SEC filing included significant ABIZ bank debt -- which the Co-Borrowing Agent Banks' analyses excluded -- Adelphia's amounts concealed much more than $1.4 billion.

296

1031.  In addition to the information the Agent Banks received as lenders, including but not limited to the due diligence they conducted at the time they entered into the Co-Borrowing Facilities, the Agent Banks and the Investment Banks had additional and ample opportunities to learn all material aspects of Adelphia's business and finances.  As more fully set forth below, each of the Agent Banks and the Investment Banks, as Adelphia's and the Rigas Family's long-time lenders, investment bankers, underwriters, financial analysts, financial advisors and strategic partners, had access to and possession of significant non-public information concerning the financial affairs of Adelphia, the RFEs and the Rigas Family.  Moreover, the Investment Banks had a legal obligation to conduct extensive due diligence in connection with the securities offerings they underwrote.

### 3.    Defendants Knew That The Rigas Family Was Using The CMS To Facilitate The Fraud.

1032.  Most of the bank accounts through which the Rigas Family caused Adelphia to fraudulently divert the co-borrowing funds -- principally the CMS and the Rigas Family's personal accounts -- were maintained at Defendant Wachovia.  In many instances, Wachovia funded, or otherwise was aware of, massive draw downs by an Adelphia subsidiary under the Co-Borrowing Facilities on the same day that the Rigas Family deposited or transferred significant amounts, which, in some instances, matched the amounts drawn down under a Co-Borrowing Facility the very same day.  As such, Wachovia knew or consciously avoided knowledge of the Rigas Family's fraudulent conduct.  Upon information and belief, other Co-Borrowing Agent Banks knew of the fraudulent use of Co-Borrowing Facilities and the misappropriation of funds via the CMS.

297

1033.  In this regard, records of Adelphia, BofA and Wachovia reflect that, on July 3, 2000, Highland Prestige, an RFE co-borrower, drew $145 million under the CCH Co-Borrowing Facility. The money was transferred directly from BofA, the administrative agent under the CCH Co-Borrowing Facility, to a Highland Prestige bank account at Wachovia. That same day, Highland Prestige transferred approximately $145 million from the same account to the account of another RFE (not a co-borrower), which used the funds to acquire shares of ACC Class B Common Stock.

1034.  Upon information and belief, before each of the Co-Borrowing Facilities closed, all of the Co-Borrowing Lenders obtained summaries, reports and other information relating to the CMS. Thus, Defendants knew of, or consciously avoided, the existence of the CMS, the commingling of funds in the CMS, and the fraudulent use, diversion, and misappropriation by the Rigas Family of funds within the CMS. In particular, Wachovia, by virtue of its oversight of the CMS, Highland Holdings accounts and other Rigas Family accounts that received transfers from the CMS, knew or consciously avoided the fraudulent nature of the transfers between Adelphia and the RFEs via the CMS.

1035.  By contrast, Adelphia, at the direction of the Rigas Family, never informed other creditors, including the holders of public debt securities issued by Adelphia that the CMS included commingled cash from Adelphia and the RFEs that was being fraudulently diverted from Adelphia for the benefit of the Rigas Family. Nor did the Rigas Family ever inform the Independent Directors of these misuses of the CMS.

298

4.      Defendants Knew That The Proceeds Of The
        Non-Co-Borrowing Facilities Were Used For Fraudulent Purposes.

1036.    After May 1999, each of the Co-Borrowing Lenders and the Investment Banks

knew that (i) Adelphia and the RFEs were commingling cash, (ii) the Co-Borrowing Debtors had

agreed to be liable for co-borrowing funds drawn by the RFEs, and (iii) the Rigas Family was

using the Co-Borrowing Facilities for personal expenses, including, but not limited to, the

purchase of securities issued by ACC. The composition of the lenders in the Co-Borrowing

Facilities and the Non-Co-Borrowing Facilities substantially overlapped. Once they had

indisputable notice of the fraud, the Co-Borrowing Lenders participating in the Non-Co-

Borrowing Facilities knew or should have known that the Rigas Family was using the proceeds

of the Non-Co-Borrowing Facilities in furtherance of the fraud.

E.      Many Defendants Assisted In, Or Consciously Ignored,
        The Rigas Family's Fraud To Benefit Themselves.

        1.      The Unity Of Interest Between Each Agent
                Bank And Its Affiliated Investment Bank.

1037.    Substantially all of the Agent Banks had Investment Bank affiliates that rendered

significant loan and securities underwriting, loan syndication, investment banking, and other

advisory services to Adelphia. The following is a chart setting forth the applicable Defendant

Agent Bank and its Defendant Investment Bank affiliate:

| Agent Bank | Investment Bank Affiliate |
|------------|---------------------------|
| BofA       | BAS                       |
| BMO        | BMO NB                    |

299

| Agent Bank | Investment Bank Affiliate |
|---|---|
| Wachovia | Wachovia Securities |
| Citibank | SSB |
| ABN AMRO | ABN AMRO Securities |
| BONY | BNY Capital Markets |
| BNS | Scotia Capital |
| Barclays | Barclays Capital |
| CIBC | CIBC Securities |
| Chase | Chase Securities |
| Credit Lyonnais | Credit Lyonnais Securities |
| CSFB | CSFB Securities |
| Deutsche Bank | Deutsche Bank Securities |
| DLJ | DLJ Securities |
| Fleet | Fleet Securities |
| Merrill Lynch | Merrill Lynch Securities |
| Morgan Stanley | Morgan Stanley Securities |
| PNC Bank | PNC Capital Markets |
| Royal Bank of Scotland | Royal Bank of Scotland |
| Société Générale | SG Cowen |
| SunTrust | SunTrust Securities |
| TDI | TD Securities |

1038.   Each Agent Bank shared a unity of interest, conspired, and acted in concert with

its affiliated Investment Bank with respect to transactions related to Adelphia and the Rigas

Family. Each of the Investment Banks, among other things, underwrote numerous Adelphia securities offerings and credit facilities, syndicated such credit facilities, advised the Rigas Family on structuring various financing transactions for Adelphia and the Rigas Family, and had its purportedly independent analysts issue overly optimistic reports on Adelphia's securities to inflate or maintain the market value of the Rigas Family's stock holdings. While each Agent Bank and its Investment Bank affiliate should have made independent judgments about whether to lend to Adelphia and to underwrite ACC securities, no such independent judgments or decisions were made. Instead, each of the Agent Banks and Investment Banks made decisions based solely on the fee income that would be generated and the opportunity to provide substantial loans to the Rigas Family tied together with the investment advisory business while protecting themselves from credit risk by assuring that the Rigas Family's obligations would be paid for by Adelphia.

1039. The Investment Banks and affiliated Agent Banks shared all material information about Adelphia's businesses and finances. Indeed, upon information and belief, each of the underwriting agreements between the Investment Banks and Adelphia expressly authorized information-sharing between the Investment Banks and their Agent Bank affiliates. One of these underwriting agreements provided that:

> The Investment Banks may . . . share any Offering Document, the Information and any other information or matters relating to Company, any assets to be acquired or the transactions contemplated hereby with Bank of America, N.A. ("BofA") and Citibank, N.A. (together with SSBI, "Citi/SSB") and BofA and Citi/SSB affiliates may likewise share information relating to Company, such assets or such transaction with the Investment Banks.

1040. Not only did the Agent Banks and Investment Banks share information, each of the institutions worked as a team with its affiliate to ensure that they extracted maximum fee income from Adelphia. For example, BAS "deal teams" for many Adelphia securities offerings included employees of both BAS and BofA. The December 21, 2000 agreement pursuant to which Adelphia retained BAS to act as, among other things, its investment advisor, states: "For purposes of this engagement letter, 'BAS' shall mean Banc of America Securities LLC and/or any affiliate thereof, including BofA, as BAS shall determine to be appropriate to provide the services contemplated herein[.]" Moreover, BofA ultimately approved the Co-Borrowing Facilities based on the fees received by BAS, and BofA substantially relied upon information provided by BAS in approving each of the Co-Borrowing Facilities.

1041. Similarly, in performing the acts described herein, Citibank, Citicorp, SSB, SBHC, and their affiliates (the "Citigroup Defendants") acted together in pursuit of a common plan, such that each acted on behalf of, and as the agent for, the others. Among other things, the Citigroup Defendants shared information and worked as a "team" to obtain investment bank engagements and to extend credit to Adelphia, including presenting themselves to Adelphia as a single provider of financing and related services and products. As part of this approach, the Citigroup Defendants at times conditioned the extension of credit by one or more of them to Adelphia and the Rigas Family on Adelphia's engaging another of them to provide investment banking services, and *vice versa*.

1042. BMO and BMO NB, Wachovia and Wachovia Securities and, upon information and belief, the other Agent Banks and their Investment Bank affiliates, also ignored any real distinction between lending and investment banking divisions in their dealing with Adelphia and

302

the Rigas Family. Adelphia deal teams for these entities also included employees from both lending and investment banking groups, and each Agent Bank approved participation in the Co-Borrowing Facilities based primarily upon the fees being earned by its affiliated Investment Bank and their understanding that their otherwise risky loans to the Rigas Family and the RFEs would be satisfied by the stronger credit and collateral of Adelphia.

2.    The Agent Banks' And Investment Banks' Close
       Relationship With Adelphia And The Rigas Family.

1043.    The Agent Banks' and Investment Banks' close relationship with Adelphia and the Rigas Family began long before the Co-Borrowing Facilities. In 1986, ACC became a publicly-traded company through an initial public offering ("IPO") of its common stock.

1044.    Shortly after ACC's IPO, Adelphia, through the Rigas Family, began to establish significant relationships with, upon information and belief, each of the Agent Banks and the Investment Banks and, upon information and belief, other lenders. Over the next sixteen years, many of the Agent Banks and their affiliated Investment Banks provided significant debt and equity financing and underwriting, investment banking advice and other financial services to Adelphia, to certain of the RFEs, and directly to members of the Rigas Family. Indeed, the Agent Banks and Investment Banks were intimately involved, on a non-arm's-length basis, in Adelphia's financial affairs.

1045.    The following chart sets forth some of the Adelphia and Rigas Family-related transactions in which certain lead Agent Banks and their affiliated Investment Banks participated:

303

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| Adelphia Cable Partners Financing | X | X | X | |
| Chelsea Communications Financing | X | X | X | |
| Highland Video (Rigas Family) Financing | | X | X | |
| Hilton Head Communications (Rigas Family) Financing | | | X | |
| $329M Hyperion 13% Discount Notes Offering 2/1996 | X | | | |
| $200M FrontierVision 11% Senior Subordinated Notes 10/7/1996 | | | X | |
| $300M ACC Senior Notes & Preferred Stock 7/1/1997 | X | | | X |
| $145M FrontierVision Discount Notes 9/19/1997 | | | X | |
| $237.65M 11 7/8% Senior Discount Notes 12/12/1997 | | | X | |
| $800M FrontierVision Credit Facility 12/19/1997 | | X | X | |
| $300M Hyperion Initial Public Offering 5/8/1998 | X | | | X |
| $262M Class A Common Stock Offering 8/1998 | X | | | X |
| $700M Parnassos Credit Facility 12/1998 | X | X | X | |
| Harron Credit Facility 1999 | X | X | X | |
| $372M Class A Common Stock Offering 1/1999 | X | | | |
| $400M Senior Notes Offering 1/8/1999 | X | | | X |
| $494M Class A common 4/1999 | X | | | X |
| $500M Convertible Preferred Offering 4/99 | X | | | X |
| $850M UCA/HHC Co-Borrowing Credit Facility 5/6/1999 | X | X | X | X |

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| $350M 7 7/8% Adelphia Senior Notes Offering 6/15/1999 | | X | | X |
| $342 Class A Common Stock Offering 9/30/1999 | X | | X | X |
| November 1999 Hyperion $262.5 Million Common Stock Follow On Offering. | | | | X |
| $500M 9 3/8% Adelphia Bond Offering 11/16/1999 | | X | | X |
| $500M 5 1/2% Convertible Preferred Offering 1999 | X | | | |
| $1.0B Century/TCI Credit Facility 12/1999 | X | X | X | X |
| $2.25B CCH Co-Borrowing Facility 4/14/2000 | X | X | X | X |
| $750M ACC Senior Bonds Offering 9/15/2000 | X | | | X |
| $500M Add-On To CCH Co-Borrowing Facility 9/2000 | X | X | X | X |
| $1.3B Arahova Bridge Loan 1/3/2001 | X | | | X |
| M&A Advisory Services 2/2001 | X | | | X |
| $863M 6% Convertible Notes Offering 1/18/2001 | X | | | X |
| $821M Class A Common Stock Offering 1/18/2001 | X | | | X |
| $575M 3 ¼% Convertible Subordinated Notes Offering 4/20/2001 | X | X | | X |
| $1.0B 10 1/4% Senior Notes Offering 6/7/2001 | X | X | | X |
| $2.03B Olympus Co-Borrowing Facility 9/28/2001 | X | X | X | X |
| $500M 10 1/4% Senior Notes Offering 10/19/2001 | | X | | |

305

| Transaction/Date | BofA/BAS | BMO/ BMO NB | Wachovia/Wachovia Securities | Citibank/ SSB |
|---|---|---|---|---|
| Rigas Family Private Banking/Broker | X | | X | X |

1046.  The other Investment Banks also participated in numerous Adelphia-related

financings. For example:

- ABN AMRO Securities underwrote Adelphia's September 2000 offering of senior notes;

- Barclays Capital underwrote Adelphia's June 1998 offering of senior notes, Adelphia's November 1998 offering of senior notes, Adelphia's January 1998 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- BNY Capital Markets underwrote Adelphia's November 1999 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- Chase Securities underwrote ABIZ's December 1996 offering of senior notes and warrants, Adelphia's November 1999 offering of senior notes, and Adelphia's September 2000 offering of senior notes;

- CIBC Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, and Adelphia's October 2001 offering of senior notes;

- Credit Lyonnais Securities underwrote Adelphia's November 1998 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, ABIZ's November 1999 offering of Class A common stock, Adelphia's September 2000 offering of senior notes, Adelphia's April 2001 offering of convertible subordinated notes, and Adelphia's October 2001 offering of senior notes;

- CSFB Securities underwrote Adelphia's August 1998 offering of Class A common stock, Adelphia's November 1998 offering of senior notes, Adelphia's January 1999 offering of senior notes, Adelphia's October 1999 offering of Class A common stock, Adelphia's October 1999 offering of senior notes, Adelphia's November 1999 offering of senior notes, ABIZ's November 1999 offering of Class A common stock, Adelphia's January 2001

306

offering of Class A common stock, and Adelphia's October 2001 offering of
senior notes;

• Deutsche Bank Securities underwrote Adelphia's October 1999 offering of
  limited partnership interests in Century-TCI, Adelphia's October 1999
  offering of senior notes, and Adelphia's November 2001 offering of Class A
  common stock;

• DLJ Securities underwrote Adelphia's May 1992 offering of Class A common
  stock, Adelphia's October 1999 offering of Class A common stock, and
  ABIZ's November 1999 offering of Class A common stock;

• Fleet Securities underwrote Adelphia's September 2000 offering of senior
  notes, and Adelphia's October 2001 offering of senior notes;

• Merrill Lynch Securities underwrote ABIZ's 1996 offering of Class A
  common stock, and Adelphia's October 1999 offering of Class A common
  stock;

• Morgan Stanley Securities underwrote Adelphia's October 1999 offering of
  Class A common stock, Adelphia's September 2000 offering of senior notes,
  Adelphia's January 2001 offering of Class A common stock, Adelphia's April
  2001 offering of convertible subordinated notes, and Adelphia's November
  2001 offering of Class A common stock;

• PNC Capital Markets underwrote Adelphia's November 1999 offering of
  senior notes, and Adelphia's September 2000 offering of senior notes;

• Royal Bank of Scotland underwrote Adelphia's October 2001 offering of
  senior notes;

• Scotia Capital underwrote Adelphia's November 1998 offering of senior
  notes, Adelphia's November 1999 offering of senior notes, Adelphia's
  September 2000 offering of senior notes, Adelphia's April 2001 offering of
  convertible subordinated notes, and Adelphia's October 2001 offering of
  senior notes;

• SG Cowen underwrote Adelphia's October 1999 offering of Class A common
  stock, Adelphia's October 1999 offering of limited partnership interests in
  Century-TCI, Adelphia's September 2000 offering of senior notes, and
  Adelphia's April 2001 offering of convertible subordinated notes;

• SunTrust Securities underwrote Adelphia's September 2000 offering of senior
  notes; and

• TD Securities underwrote Adelphia's July 1997 offering of senior notes and
  Series A preferred stock, Adelphia's August 1998 offering of Class A

common stock, Adelphia's November 1998 offering of senior notes,
Adelphia's October 1999 offering of senior notes, Adelphia's November 1999
offering of senior notes, Adelphia's September 2000 offering of senior notes,
and Adelphia's October 2001 offering of senior notes.

1047. The Agent Banks -- acting in concert with their Investment Bank affiliates -- did much more than just lend money to Adelphia on a purportedly arin's-length basis. In addition to offering substantial advice to assist Adelphia and the Rigas Family in accessing the commercial lending and capital markets, certain of the Agent Banks, including BofA, BMO and Citibank, participated in structuring the Co-Borrowing Facilities and other credit facilities for Adelphia in a manner that enabled the Rigas Family to strip assets from Adelphia.

1048. Moreover, in addition to their underwriting services, certain of the Investment Banks participated in structuring the co-borrowing facilities, rendered substantial financial advisory services to Adelphia and, after reviewing Adelphia's confidential and proprietary information, advised Adelphia on financing acquisitions and their business plans. For example, BAS and SSB acted as mergers and acquisitions advisors to Adelphia for various acquisitions of cable systems around the country. In connection with those services, BAS, SSB and other Investment Banks had their Agent Bank affiliates offer bridge loans to finance Adelphia's acquisitions.

1049. By providing their lending, underwriting and financial advisory services as one unit -- without recognizing a distinction between their lending and capital markets groups -- the Agent Banks and their affiliated Investment Banks provided "one-stop shopping" for all of Adelphia's financial needs. As a result, the Investment Banks and the Agent Banks, together, became Adelphia's trusted financial advisors and fiduciaries.

308

1050. Moreover, the Agent Banks and the Investment Banks made no meaningful distinction between Adelphia, the Rigas Family, and the RFEs. Indeed, they realized that the key to doing business with Adelphia was to satisfy the personal financial desires of the Rigas Family. Internal documents of each of the Agent Banks and the Investment Banks reflect that their relationship with Adelphia was in reality a relationship with the Rigas Family. For example, BofA and BAS and BMO and BMO NB often referred to their business with Adelphia and the Rigas Family as part of a "Rigas Family" connection, and the Citigroup Defendants often referred to Adelphia and the Rigas Family interchangeably.

1051. As a direct result of the Agent Banks' and their affiliated Investment Banks' intimate relationship with the Rigas Family and the sweetheart deals they made -- i.e., the provision of loans under the Co-Borrowing Facilities as part of a package that included exorbitant investment banking fees -- the Co-Borrowing Facilities were not "arms-length" lending transactions. In addition to working jointly with the Rigas Family to create the fraudulent structure of the Co-Borrowing Facilities, the Agent Banks acquiesced to lending terms (duration, interest rates, etc.) that were not the result of arm's-length negotiations, but were agreed to between the Rigas Family and the Agent Banks as part of a package that included, as demanded by the Agent Banks as a condition to any extension of credit, the acquisition by Adelphia of investment advisory services at prices that more than compensated for the banking fees.

1052. The Agent Banks entered into these terms because the Agent Banks required the Rigas Family to cause Adelphia to engage in other non-lending transactions with such Agent Banks or their affiliated Investment Banks, which carried the promise of lucrative fees to the

309

Agent Banks and the Investment Banks and helped to eliminate any credit risk from the loan transactions, which was their primary motivation in their dealings with Adelphia. The "Rigas Family" connection was extremely lucrative for each of the Agent Banks and the Investment Banks. Upon information and belief, the lead Agent Banks and Investment Banks under the Co-Borrowing Facilities -- BofA, BAS, Wachovia, Wachovia Securities, BMO, BMO NB, Citibank and SSB -- earned hundreds of millions of dollars in investment banking and other fees from Adelphia primarily since the first Co-Borrowing Facility closed.

1053.   This fee income provided the Agent Banks and Investment Banks with a compelling motivation to assist the Rigas Family in their fraudulent activities or to turn a blind eye to them. Each Agent Bank tied its participation in the Co-Borrowing Facilities to Adelphia's agreement to acquire additional services, including but not limited to investment advisory services, at exorbitant rates. Thus, many of the Agent Banks approved the Co-Borrowing Facilities even though their total credit exposure to Adelphia and the Rigas Family exceeded lending policy limits. In almost every instance when this occurred, each of the Agent Banks approved a special exception to the exposure limit principally based on the fees to be earned from other services from such Agent Bank or from their affiliated Investment Bank.

1054.   For example:

a.      Defendant BMO approved its participation in the Olympus Co-Borrowing Facility despite exceeding its house exposure limit for Adelphia and the Rigas Family by more than $200 million. BMO approved this enormous exposure limit exception based upon, among other things, its frustration at being excluded from a $1.3 billion bridge loan to an Adelphia subsidiary and related securities offerings -- which went to Defendants BofA/BAS, Citibank/SSB

310

and others -- and by its desire to obtain a lead role for BMO NB in underwriting future Adelphia securities offerings.

      b.    Indeed, BMO repeatedly tied its willingness to continue to participate in credit arrangements with Adelphia entities to assurances from the Rigases that BMO would receive more lucrative investment banking business as well. In an internal "Transaction Approval Summary" dated February 28, 2000, in connection with the CCH Co-Borrowing Facility, BMO referred to its prior lending and investment banking relationships with Adelphia and said that Adelphia had "acknowledged that we were the first bank to pitch the 'bundled' corporate transaction which these deals represent." BMO went on to state that "[i]n this and other ways, *we have been proactive in demanding greater involvement* in more lucrative aspects of their financing activities [emphasis added]."

      c.    In an internal memorandum dated December 22, 2000, a Managing Director of BMO NB stated that he was contacted by Dean Marshall of Adelphia requesting that BMO increase its share of the upcoming Olympus Co-Borrowing Facility. BMO advised Mr. Marshall that BMO was "continuing to look for the equity issue as compensation for taking on our current capital as well as this proposed increase.... [Dean] expects that [Adelphia] will be issuing [equity] early in 2001, and that we would certainly enjoy remuneration from that -- to an unspecified amount."

      d.    In a subsequent memo dated July 5, 2000, this same Managing Director sought approval to participate in the Olympus Co-Borrowing Facility and to exceed BMO's internal credit limit on the grounds that Adelphia had given BMO in excess of $1 million in investment banking fees that year and "we have indicated to the company that we anticipate

311

capital markets revenue of approximately $1 million on an annual basis." Later that month,
BMO processed an internal request to increase the credit exposure to Adelphia, noting that the
loan originator at BMO "has communicated and will reinforce the bank's need for non-credit
revenues of at least $1MM per year to augment the capital requirements of the proposed
financing and other credit facilities." BMO thus acknowledged that it tied its willingness to enter
into credit facilities with its commercial banking entity on its insistence that Adelphia provide
BMO and its investment banking affiliate with substantial fee revenue through other services to
make up for the limited income earned on the loans.

          e.     Similarly, on March 20, 2000, First Union (now Wachovia) advised James
Brown and Dean Marshall of Adelphia that it approved its participation in the CCH Co-
Borrowing Facility but "subject to the following:  * Named Joint Lead Arranger / Co-Book
Runner on the $1,000,000 Subsidiary Facility to refinance ACP and Harrom Credit Facilities; *
Co-Manager in the Adelphia Business Solutions equity offering; and * Total fee compensation
for participation in the bank facilities and equity offering of $2,000,000 to $2,250,000,
depending upon First Union's final allocation in the bank facilities."

          f.     One year later, in an internal memo at First Union Securities regarding a
proposed participation in the upcoming Olympus Co-Borrowing Facility, an officer discussed the
proposed facility and concluded: "Obviously, the key question is how much we need to get paid
to justify providing this level of capital commitment. We are considering taking a 'total fee'
approach that [Adelphia] can pay in a number of ways including Arrangement fee, High Yield
fees, Advisory fees ... but in any event to be paid in total by FYE 2001. In addition to this bank
deal, the company is planning to access the [High Yield] market in 2001." Thus, First Union

also had made clear in regard to two separate credit facilities in 2000 and 2001 that it would not agree to participate in those facilities on the terms sought by Adelphia unless First Union also received substantial additional fees in connection with advisory and investment banking services.

g.    BofA and BAS similarly acknowledged that they tied the commercial banking and investment banking services. For example, in February 2000, an internal email at BofA acknowledged that it agreed to a higher than ordinary risk ratio for Adelphia because "we are given alot of additional business (ie. capital markets) for delivering commitments on the bank side."

h.    Other Non-Administrative Agent Banks also tied their commercial banking services to Adelphia's agreement to obtain additional credit or other services from those banks' affiliates. For example, in an internal Briefing Memorandum at Citibank in October 2004, the transaction team, consisting of commercial lending and high yield capital markets officers, stated that "This transaction is another great example of cross-selling and how to leverage on our credit exposure to obtain investment banking fees. The bridge facility *is conditional upon* Adelphia agreeing to offer Salomon Smith Barney (i) the M&A role in the transaction and (ii) the role of book running placement agent at pre-determined fees in any debt, equity or other securities offering by Adelphia or Adelphia Business Solutions for a period of [tw] years beginning with the commitment of the loan. [emphasis added]"

i.    In an internal email dated March 21, 2000, an officer of ABN AMRO discussed a request from Adelphia that ABN AMRO participate in the CCH Co-Borrowing Facility and stated: "More importantly, I spoke to [the bank's relationship manager] this morning and he indicates that the company understands clearly that [ABN AMRO] will NOT

313

commit without the promise of significant cross-sell business. Apparently the company has already committed to give us a piece of the High Yield issue .... Therefore, it seems that the question of what can be done if we do not get cross-sell is more academic than real. [emphasis in original]" Shortly thereafter, ABN AMRO became an Agent Bank on the CCH Facility.

      j.    Similarly, in August 2001, a Barclays officer described a conversation with Jim Brown regarding the upcoming Olympus facility. He stated that he discussed with Mr. Brown that "[t]o further compensate Barclays for this the company will look to give Barclays a greater share of bond economics over the next 18 months. The company is planning to issue equity in the 1st or 2nd quarter of 2002 and realizing that Barclays will not be able to participate in this, there is further incentive for the company to give Barclays a greater share in future bond issues."

      k.    Bank of New York also acknowledged internally that it had tied its commercial credit services to its investment banking services. In a memorandum dated August 20, 2001, regarding the Olympus Co-Borrowing Facility, a BNY officer stated that its anticipated participation was large but was justified because "Adelphia has traditionally rewarded its banks for providing credit support. Earlier in 2001, BNY was named co-manager on a $500 million high yield issue, in which we earned $1.74M. We expect Adelphia will be an active participant in the capital markets, and have been assured that we will be included in the company's capital market issuances."

      l.    Toronto Dominion made similar acknowledgments of its tying arrangements. In an email dated September 7, 2001, also regarding the Olympus Co-Borrowing Facility, a TD officer discussed the level of risk being assumed and stated: "The issue for us

314

with Adelphia has been achieving adequate returns relative to large capital outlays. In this regard we have had a frank discussion with the company and they have assured us that we will be given additional business (leads on bank deals, better high yield economics etc.) sufficient to ensure that our return hurdles are met. We are therefore asking for approval of our participation subject to our satisfaction with their assurances that this will be the case and that our RAROC [risk adjusted return on capital] on this deal (and ultimately the entire relationship) will exceed [X]%."

1055.    Wachovia and Citibank also authorized exposure exceptions in connection with their approval of the Olympus Co-Borrowing Facility and justified those exceptions based upon "future capital markets opportunities." SSB authorized margin loans for the Rigas Family that were outside house limits with a similar motive.

1056.    The Rigas Family clearly recognized that the Agent Banks were requiring that Adelphia offer the opportunity to receive investment banking fees in order to lead the Agent Banks to participate in the Co-Borrowing Facilities. Each of the Administrative Agent Banks, and some or all of the other Agent Banks, advised the Rigas Family that they would not agree to enter into the credit facilities, which were less lucrative to them, unless they were assured that the Rigas Family would cause Adelphia to retain their affiliated Investment Banks for upcoming securities advice and transactions. In his February 17, 2000 letter to the Agent Banks regarding the CCH Co-Borrowing Facility, James Brown acknowledged that Adelphia understood that the Agent Banks were tying the credit facilities to additional investment banking service and that Adelphia agreed to do so, stating that:

> All of the lead managers and co-managers of each of these credit
> facilities are expected to have an opportunity to play <u>a meaningful
> role in either the ADLAC or ABIZ public security offerings.</u>

(emphasis added). Thus, Adelphia and the Agent Banks both understood that the Agent Banks'
agreement to participate in the CCH Co-Borrowing Facility, among others, was tied to
Adelphia's assurance that their affiliated Investment Banks would garner substantial fees.

F.    <u>Defendants Rewarded The Rigas Family With Extensive Margin Loans.</u>

1057.   One of the most significant and consistent demands made by the Rigas Family —
and enticements offered by the Agent Banks and Investment Banks to win business — was the
provision of margin loans to finance the Rigas Family's purchase of Adelphia securities. The
substantial margin loans provided by Defendants Citigroup, BofA and Deutsche Bank Securities
also provided a strong motive for their participation in the Co-Borrowing Facilities: they would
always have a second, secured source of repayment if the Rigas Family defaulted on the margin
loans.

1058.   The margin loans — much like the Rigas Family's use of the Co-Borrowing
Facilities — were pivotal to enable the Rigas Family to retain management control over Adelphia
during a period of rapid growth through acquisitions. As Adelphia issued additional stock in
connection with these acquisitions, the Rigas Family needed additional cash to purchase
Adelphia stock to avoid dilution of their equity interest. If the Rigas Family were not able to
maintain management control over Adelphia, they risked exposure of their looting and breaches
of fiduciary duty. Citigroup, BofA, Deutsche Bank Securities and other defendants knew that
the Rigas Family used the margin loans and the Co-Borrowing Facilities to ensure their
continued management of Adelphia.

G.    The Investment Banks' Fraudulent Solicitation Of Adelphia's Notes.

1059.    At all relevant times, each of the Investment Banks had affiliates that were Co-Borrowing and Non-Co-Borrowing Lenders.

1060.    Since May 1999, when the UCA/HHC Co-Borrowing Facility closed, the Investment Banks have underwritten the following public offerings of debt securities:

| Debt Security | Issuer | Date | Underwriters |
|---|---|---|---|
| $500 million 9.375% Senior Notes due 11/15/09 | Adelphia | 11/1999 | CSFB Securities, SSB, BNY Capital Markets, Chase Securities, BMO NB, PNC Capital Markets, Scotia Capital, TD Securities |
| $745 million 10.875% Senior Notes due 10/1/10 | Adelphia | 9/2000 | SSB, BAS, Chase Securities, Morgan Stanley Securities, Scotia Capital, TD Securities, ABN AMRO Securities, Barclays Capital, Credit Lyonnais Securities, Fleet Securities, PNC Capital Markets, SG Cowen, SunTrust Securities |
| $1.0 billion 6.0% Convertible Subordinated Notes due 2/15/06 | Adelphia | 1/2001 | SSB, BAS |
| $975 million 3.25% Convertible Subordinated Notes due 5/1/21 | Adelphia | 4/2001 | SSB, BAS, BMO NB, Wachovia Securities, Morgan Stanley Securities, BNY Capital Markets, Credit Lyonnais Securities, Chase Securities, Scotia Capital, SG Cowen |
| $1.0 billion 10.250% Senior Notes due 6/15/11 | Adelphia | 6/2001 | SSB, BAS, BMO NB, CIBC Securities, CSFB Securities, Deutsche Bank Securities, Chase Securities, TD Securities |
| $500 million 10.250% Senior Notes due 11/1/06 | Adelphia | 10/2001 | CSFB Securities, BMO NB, BNY Capital Markets, CIBC Securities, Credit Lyonnais Securities, Fleet Securities, Mizuho International plc, Scotia Capital, SG Cowen, TD Securities, Royal Bank of Scotland |

1061.    None of the prospectuses for the debt securities noted above contained accurate disclosures with respect to the amounts outstanding under the Co-Borrowing Facilities. Indeed,

317

the standard practice in these offerings was simply to incorporate by reference Adelphia's most recent SEC filings. The Investment Banks knew or consciously avoided knowledge that these filings grossly understated the amount outstanding under the Co-Borrowing Facilities. Nonetheless, the Investment Banks circulated to prospective investors offering materials that they knew or consciously avoided knowing were false and materially misleading, thereby substantially assisting the Rigas Family in covering up their fraudulent conduct in connection with the Co-Borrowing Facilities and the Rigas Family's looting of the funds under those facilities.

1062. The Investment Banks focused significantly more effort on generating fee income than ensuring appropriate disclosure of the Co-Borrowing Facilities. At all relevant times, the Investment Banks and their Agent Bank affiliates shared all material information and due diligence regarding Adelphia, the RFEs and the Rigas Family. The Investment Banks and Agent Banks did not properly maintain the "information walls" that would prohibit the sharing of such information. To the contrary, the Investment Banks and Agent Banks needed to and, in fact, did share information to maximize their ability to garner additional fees. Thus, uncovering the fraud was as simple as requesting from Adelphia -- or from their own Agent Bank affiliates -- the amounts outstanding under Adelphia's credit facilities and comparing those amounts with Adelphia's SEC filings. The Investment Banks either obtained this information from their affiliated lenders (which would have provided actual notice of the fraud) or the Investment Banks consciously avoided doing so.

1063. The debt securities solicited by the Investment Banks were issued on a structurally subordinated basis to the Co-Borrowing Facilities. The structurally subordinated

318

debt securities ensured that the Co-Borrowing Lenders would have more credit support to ensure repayment of their loans.

## H.    The Fraud Is Disclosed.

1064.  On or about March 27, 2002, members of the Rigas Family announced that they had concealed from the public approximately $2.3 billion of the Co-Borrowing debt. Later, that amount was increased to approximately $3.4 billion. On or about April 1, 2002, ACC failed to file its Annual Reports on Form 10-K with the SEC as required by applicable regulations. The failure timely to file the 10-K triggered an Event of Default under the Co-Borrowing Facilities.

1065.  Notwithstanding the Rigas Family's concealment of $3.4 billion of debt and the default under the Co-Borrowing Facilities, the Co-Borrowing Lenders, and in particular BofA, Citibank and/or Citicorp, and Deutsche Bank -- each being, upon information and belief, acutely aware of the Rigas Family's significant liabilities with respect to their margin accounts at BofA, SSB, and Deutsche Bank Securities -- continued to approve borrowing requests under the Co-Borrowing Facilities. Worse still, the Co-Borrowing Lenders knew that Adelphia would use most, if not all, of the post-disclosure, post-default borrowings to fund margin payments owed by the Rigas Family and the RFEs to the Margin Lenders. Thus, the Co-Borrowing Lenders allowed the Rigas Family to borrow funds under the senior Co-Borrowing Facilities -- on which Adelphia was obligated -- to pay off the junior margin loans -- on which only the Rigas Family was obligated.

1066.  Faced with the harshly critical public reaction to the disclosure of the fraud at Adelphia, BofA, BMO, Wachovia, the Citigroup Defendants and their respective affiliates issued internal status reports. None of the status reports expressed any shock -- let alone surprise --

about the situation at Adelphia. To the contrary, <u>each of these institutions acknowledged that they had always known all the material (and previously undisclosed) facts about the Co-Borrowing Facilities</u>. Indeed, the Agent Banks viewed the disclosure and the negative public reaction as an opportunity to earn additional fees through restructuring services and bankruptcy financing.

## I.    The Inevitable Result Of The Fraud:  Adelphia Files Chapter 11.

1067.  Saddled with the massive debt burden of loans that were intended to benefit only the Rigas Family (and which, in fact, did only benefit the Rigas Family), on June 25, 2002 Adelphia filed petitions pursuant to Chapter 11 of the Bankruptcy Code in this Court.

1068.  During the course of the bankruptcy proceeding, Adelphia continued to make payments on its secured debt in the form of adequate protection, pursuant to an order of the bankruptcy court. Pursuant to that order, all such payments were subject to disgorgement. The bankruptcy court directed that all Co-Borrowing Lenders, including any Assignees of any Co-Borrowing Lenders, that received such adequate protection payments were required to acknowledge that they (i) consent to the personal jurisdiction of the District Court for the Southern District of New York in connection with a proceeding to recover or otherwise impose any legal or equitable remedy regarding those payments, (ii) agree to accept service of any complaint in such a proceeding, and (iii) agree to provide notice to any subsequent assignee that the instruments transferred are subject to all claims or defenses of Adelphia to the same extent as Adelphia had against the assignor.

320

**J.    Indictment Of The Rigas Family.**

1069.    On July 24, 2002, John Rigas, Timothy Rigas, and Michael Rigas, along with Brown and Mulcahey, were arrested in connection with a criminal complaint filed by the United States Attorney for the Southern District of New York and were charged with nine counts of bank, securities and wire fraud. On September 23, 2002, each of them was indicted.

1070.    The criminal complaint against these members of the Rigas Family alleged, among other things, that they "looted Adelphia on a massive scale, using the company as the Rigas Family's personal piggy bank, at the expense of public investors and creditors," and that the Rigas Family "fraudulently concealed [their] self-dealing from the public." The criminal complaint also alleged that the Rigas Family concealed their self-dealing by, among other things, failing to accurately disclose Adelphia's liabilities under the Co-Borrowing Facilities and using co-borrowing funds -- for which the Co-Borrowing Debtors remained liable -- to acquire Adelphia securities to mislead the public into believing that Adelphia was reducing its consolidated leverage.

1071.    Brown and another former ACC executive, Timothy Werth, pleaded guilty to charges resulting from their participation in the Rigas Family's fraud. In July 2004, John and Timothy Rigas were convicted of fraud following a lengthy jury trial. Michael Rigas subsequently pleaded guilty to one count of filing a false instrument in connection with the fraud. In August 2007, John and Timothy Rigas began serving sentences of 15 and 20 years, respectively, in federal prison.

## K.   Litigation Against The Rigas Family And The Plan of Reorganization.

1072.   In June 2002 and February 2005, ACC commenced civil proceedings against members of the Rigas Family seeking damages for fraud and breach of fiduciary duty and for the return of certain property, along with other related claims. Also in June 2002, the Securities and Exchange Commission commenced a civil action against ACC and John, Timothy, Michael, and James Rigas.

1073.   On or about April 2005, the Rigas Family entered into a settlement with Adelphia (the "Adelphia-Rigas Settlement") and a separate settlement agreement with the United States Attorney's Office for the Southern District of New York (the "Government Settlement"), which together resolved, *inter alia*, the civil suits brought by ACC and the United States Government against the Rigas Family.

1074.   Pursuant to the Government Settlement, the Rigas Family and their affiliated RFEs agreed to forfeit all securities and other interests in ACC and its subsidiaries, that any proceeds of any of the Rigas Family's forfeited assets would be placed in a Victims' Fund to be administered by the government, and not to make any claim against the forfeited assets or the Victims' Fund.

1075.   Pursuant to the Adelphia-Rigas Settlement, the Rigas Family agreed that all claims that any of them had against Adelphia would be expunged and that they would not file any future claims against Adelphia.

1076.   Pursuant to the Plan of Reorganization, fifty percent of the first $230 million of any net recovery by the ART will go the Victims' Fund to benefit innocent holders of Adelphia's

322

securities and the other fifty percent together with any further recovery will be distributed pursuant to the Plan of Reorganization to other classes of claimants that are innocent creditors of Adelphia.

1077. The Rigas Family will not share in any recovery obtained in this case because they no longer have any interests in Adelphia and they have forfeited any and all rights to make any claims against the assets of the estate.

1078. The Plan of Reorganization provided that if this litigation results in a compromise, settlement, judgment or order that provides for a full or partial waiver, subordination or disallowance of a defendant's claim, then such defendant shall be required to disgorge any or all of the payments it received on its claim. Any funds disgorged by the defendants in this action shall be paid to the Plaintiff Adelphia Recovery Trust for distribution to creditors pursuant to the Plan of Reorganization. No such payments can be made to members of the Rigas Family or their affiliates.

## FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

1079. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1080. The UCA/HHC Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the UCA/HHC Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility (the "UCA/HHC Co-Borrowing Obligations").

1081.   To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed liens, security interests, mortgages, and pledges of their respective property to the UCA/HHC Co-Borrowing Lenders (the "UCA/HHC Co-Borrowing Security Interests").

1082.   With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1083.   The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1084.   In incurring the UCA/HHC Co-Borrowing Obligations and granting the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

1085.   At the time the UCA/HHC Co-Borrowing Obligations were incurred and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Debtors knew or consciously avoided the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility. The RFEs contributed

a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1086.  In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the UCA/HHC Debtors' leverage was being reduced when, in fact, the UCA/HHC Debtors' debts under the UCA/HHC Co-Borrowing Facility were increasing.

1087.  The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1088.  The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

1089.  By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $400 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or

within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

1090.    Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully set forth herein.

1091.    The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

1092.    To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors granted the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

1093.    With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

326

1094. The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1095. When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1096. The UCA/HHC Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs. The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs. Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder. The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs. The UCA/HHC Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1097. The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the

327

UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1098. The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests. All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

1099. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all UCA/HHC Co-Borrowing Obligations incurred pursuant to the UCA/HHC Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $400 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRD CLAIM FOR RELIEF

(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)

1100. Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully set forth herein.

328

1101.  The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-Borrowing Facility.

1102.  To secure the repayment of the UCA/HHC Co-Borrowing Obligations, the UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests to the UCA/HHC Co-Borrowing Lenders.

1103.  At least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1104.  The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the UCA/HHC Co-Borrowing Debtors.

1105.  The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the UCA/HHC Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1106.  The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs. Each of The UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder. At the time the UCA/HHC Co-Borrowing Obligations were incurred

329

and the UCA/HHC Co-Borrowing Security Interests were granted, the UCA/HHC Co-Borrowing Lenders knew or consciously avoided the fact that the UCA/HHC Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the UCA/HHC Co-Borrowing Facility.

1107. The UCA/HHC Co-Borrowing Lenders knew that the RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1108. In furtherance of this fraud, the Rigas Family caused the UCA/HHC Co-Borrowing Debtors to conceal at least $642 million of the borrowings under the UCA/HHC Co-Borrowing Facility from the public and creditors other than the UCA/HHC Co-Borrowing Lenders. Thus, the UCA/HHC Co-Borrowing Debtors knew that the incurrence of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests would severely inhibit the UCA/HHC Co-Borrowing Debtors' ability to repay other creditors.

1109. The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, conscious avoidance, and/or consent.

1110. The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests. All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with

330

full knowledge of all relevant facts relating to the voidability of the UCA/HHC Co-Borrowing Facility.

1111. At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1112. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

331

## FOURTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the UCA/HHC Co-Borrowing Lenders)**

1113.  Plaintiff realleges paragraphs 1 through 1078 and 1080 through 1081 as if fully
set forth herein.

1114.  The UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-Borrowing
Obligations in the approximate amount of $831 million pursuant to the UCA/HHC Co-
Borrowing Facility.

1115.  To secure the repayment of the UCA/HHC Co-Borrowing Facility, the
UCA/HHC Co-Borrowing Debtors conveyed the UCA/HHC Co-Borrowing Security Interests.

1116.  The incurrence of the UCA/HHC Co-Borrowing Obligations and the grant of the
UCA/HHC Co-Borrowing Security Interests were transfers of interests in property of the
UCA/HHC Co-Borrowing Debtors.

1117.  When the UCA/HHC Co-Borrowing Debtors incurred the UCA/HHC Co-
Borrowing Obligations and granted the UCA/HHC Co-Borrowing Security Interests, the
UCA/HHC Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were
engaged or were about to engage in business or a transaction for which any property remaining
with the UCA/HHC Co-Borrowing Debtors was an unreasonably small capital, and/or
(iii) intended to incur, or believed that they would incur, debts that would be beyond their ability
to pay as such debts matured.

332

1118.  With each of the UCA/HHC Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $642 million of the proceeds of the UCA/HHC Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.  The UCA/HHC Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the UCA/HHC Co-Borrowing Debtors or the RFEs.  Each of the UCA/HHC Co-Borrowing Debtors and the RFEs could borrow amounts at will under the UCA/HHC Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

1119.  The RFEs contributed a disproportionately small amount of assets to the UCA/HHC Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1120.  The UCA/HHC Co-Borrowing Lenders' conduct in participating in the UCA/HHC Co-Borrowing Facility was recklessly indifferent and in bad faith.   The uses of the UCA/HHC Co-Borrowing Facility by the Rigas Family occurred with the UCA/HHC Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1121.  The UCA/HHC Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests.  All of the UCA/HHC Co-Borrowing Lenders received their interest in the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the UCA/HHC Co-Borrowing Facility.

1122.  At all times relevant hereto, there were actual creditors of the UCA/HHC Co-Borrowing Debtors holding unsecured claims allowable against the UCA/HHC Co-Borrowing

333

Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the UCA/HHC Co-Borrowing Obligations and the UCA/HHC Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1123.  By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FIFTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)

1124.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

334

1125. The CCH Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the CCH Co-Borrowing Lenders in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility (the "CCH Co-Borrowing Obligations").

1126. To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the CCH Co-Borrowing Lenders (the "CCH Co-Borrowing Security Interests").

1127. With the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1128. The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1129. In incurring the CCH Co-Borrowing Obligations and granting the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1130. At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact that the CCH Co-Borrowing Debtors would receive no benefit from the

335

amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1131. In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the CCH Debtors' leverage was being reduced when, in fact, the CCH Debtors' debts under the CCH Co-Borrowing Facility were increasing.

1132. The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1133. The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

1134. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $600 million, should be avoided, recovered, and preserved for the benefit of

336

Plaintiff, as successor in interest to the Debtors' estates; and (ii) all CCH Co-Borrowing Security

Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the

Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as

successor in interest to the Debtors' estates, together with all interest paid in respect of the

obligations avoided hereunder.

## SIXTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the CCH Co-Borrowing Lenders)

1135.  Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully

set forth herein.

1136.  The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in

the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1137.  To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-

Borrowing Debtors granted the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing

Lenders.

1138.  With each of the CCH Co-Borrowing Lender's knowledge, reckless disregard,

conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-

Borrowing Facility were used by the CCH Co-Borrowing Debtors and the Rigas Family for

purposes benefiting solely the Rigas Family and the RFEs. A substantial portion of this amount

was incurred by paid in the year preceding the Petition Date.

1139.  The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1140.  When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1141.  The CCH Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs. The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder. The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs. The CCH Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1142.  The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-

Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders'
knowledge, reckless disregard, conscious avoidance, and/or consent.

1143.    The CCH Co-Borrowing Lenders were initial and/or immediate or mediate
transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security
Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-
Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all
relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

1144.    By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the
Bankruptcy Code, (i) all CCH Co-Borrowing Obligations incurred pursuant to the CCH Co-
Borrowing Facility on or within one year preceding the Petition Date, which Plaintiffs believe is
not less than $600 million, should be avoided, recovered, and preserved for the benefit of
Plaintiff, as successor in interest to the Debtors' estates; and (ii) all CCH Co-Borrowing Security
Interests securing CCH Co-Borrowing Obligations incurred on or within one year preceding the
Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as
successor in interest to the Debtors' estates, together with all interest paid in respect of the
obligations avoided hereunder.

## SEVENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)

1145.    Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully
set forth herein.

339

1146. The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1147. To secure the repayment of the CCH Co-Borrowing Obligations, the CCH Co-Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests to the CCH Co-Borrowing Lenders.

1148. At least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1149. The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1150. The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the CCH Co-Borrowing Debtors were or became indebted on or after the date that such obligations were incurred or such security interests were granted.

1151. The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility and both would be jointly and severally liable for all borrowings thereunder. At the time the CCH Co-Borrowing Obligations were incurred and the CCH Co-Borrowing Security Interests were granted, the CCH Co-Borrowing Debtors knew or recklessly disregarded the fact

340

that the CCH Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the CCH Co-Borrowing Facility.

1152.  The CCH Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1153.  In furtherance of this fraud, the Rigas Family caused the CCH Co-Borrowing Debtors to conceal at least $1.66 billion of the borrowings under the CCH Co-Borrowing Facility from the public and creditors other than the CCH Co-Borrowing Lenders.  Thus, the CCH Co-Borrowing Debtors knew that the incurrence of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests would severely inhibit the CCH Co-Borrowing Debtors' ability to repay other creditors.

1154.  The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1155.  The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests.  All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the CCH Co-Borrowing Facility.

341

1156. At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1157. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## EIGHTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the CCH Co-Borrowing Lenders)**

1158. Plaintiff realleges paragraphs 1 through 1078 and 1125 through 1126 as if fully set forth herein.

1159.   The CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations in the approximate amount of $2.5 billion pursuant to the CCH Co-Borrowing Facility.

1160.   To secure the repayment of the CCH Co-Borrowing Facility, the CCH Co-Borrowing Debtors conveyed the CCH Co-Borrowing Security Interests.

1161.   The incurrence of the CCH Co-Borrowing Obligations and the grant of the CCH Co-Borrowing Security Interests were transfers of interests in property of the CCH Co-Borrowing Debtors.

1162.   When the CCH Co-Borrowing Debtors incurred the CCH Co-Borrowing Obligations and granted the CCH Co-Borrowing Security Interests, the CCH Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the CCH Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1163.   With each of the CCH Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $1.66 billion of the proceeds of the CCH Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. The CCH Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the CCH Co-Borrowing Debtors or the RFEs. Each of the CCH Co-Borrowing Debtors and the RFEs could borrow amounts at will under the CCH Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

343

1164.   The RFEs contributed a disproportionately small amount of assets to the CCH Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1165.   The CCH Co-Borrowing Lenders' conduct in participating in the CCH Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the CCH Co-Borrowing Facility by the Rigas Family occurred with the CCH Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1166.   The CCH Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests. All of the CCH Co-Borrowing Lenders received their interest in the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the CCH Co-Borrowing Facility.

1167.   At all times relevant hereto, there were actual creditors of the CCH Co-Borrowing Debtors holding unsecured claims allowable against the CCH Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the CCH Co-Borrowing Obligations and the CCH Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1168.   By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all CCH Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations should be

avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## NINTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)

1169. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1170. The Olympus Co-Borrowing Debtors borrowed from, and incurred the obligation to pay indebtedness to, the Olympus Co-Borrowing Lenders in the approximate amount of $831 million pursuant to the Olympus Co-Borrowing Facility (the "Olympus Co-Borrowing Obligations").

1171. To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed liens, security interests, mortgages and pledges of their respective property to the Olympus Co-Borrowing Lenders (the "Olympus Co-Borrowing Security Interests").

1172. With the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the Olympus Co-

345

Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family. A substantial portion of this amount was incurred and paid in the year preceding the Petition Date.

1173.  The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1174.  In incurring the Olympus Co-Borrowing Obligations and granting the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors intended to delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1175.  At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility. The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1176.  In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility and, as alleged supra, deceived creditors into believing that the Olympus Debtors' leverage was being reduced when, in fact, the Olympus Debtors' debts under the Olympus Co-Borrowing Facility were increasing.

1177. The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1178. The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests. All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

1179. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $500 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

347

## TENTH CLAIM FOR RELIEF

(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers
Under 11 U.S.C. §§ 548, 550 and 551 Against the Olympus Co-Borrowing Lenders)

1180. Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully
set forth herein.

1181. The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing
Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing
Facility.

1182. To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus
Co-Borrowing Debtors granted the Olympus Co-Borrowing Security Interests to the Olympus
Co-Borrowing Lenders.

1183. With each of the Olympus Co-Borrowing Lender's knowledge, reckless
disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the
Olympus Co-Borrowing Facility were used by the Olympus Co-Borrowing Debtors and the
Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. A substantial
portion of this amount was incurred and paid in the year preceding the Petition Date.

1184. The incurrence of the Olympus Co-Borrowing Obligations and the grant of the
Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus
Co-Borrowing Debtors.

1185. When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing
Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-

348

Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged, or were about to engage in business or a transaction for which any property remaining with the Olympus Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1186.   The Olympus Co-Borrowing Debtors did not receive any value, let alone reasonably equivalent value, from the borrowings by the RFEs.  The Olympus Co-Borrowing Credit Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs.  Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.  The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.  The Olympus Co-Borrowing Debtors did not receive fair value or reasonably equivalent value from the borrowings by the Rigas Family or the RFEs.

1187.   The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1188.·  The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-

349

Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

1189. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) all Olympus Co-Borrowing Obligations incurred pursuant to the Olympus Co-Borrowing Facility on or within one year preceding the Petition Date, which Plaintiff believes is not less than $500 million, should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## ELEVENTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)**

1190. Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully set forth herein.

1191. The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

1192. To secure the repayment of the Olympus Co-Borrowing Obligations, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests to the Olympus Co-Borrowing Lenders.

350

1193.  At least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs.

1194.  The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1195.  The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests with the actual intent to delay, hinder and defraud any entity to which the Olympus Co-Borrowing Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.

1196.  The Olympus Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs. Each of the Olympus Co-Borrowing Debtors and the RFEs could borrow amounts at will under the Olympus Co-Borrowing Facility, and both would be jointly and severally liable for all borrowings thereunder. At the time the Olympus Co-Borrowing Obligations were incurred and the Olympus Co-Borrowing Security Interests were granted, the Olympus Co-Borrowing Debtors knew or recklessly disregarded the fact that the Olympus Co-Borrowing Debtors would receive no benefit from the amounts borrowed by the RFEs and that the RFEs would be unable to repay amounts borrowed under the Olympus Co-Borrowing Facility.

351

1197. The Olympus Co-Borrowing Debtors knew that the RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1198. In furtherance of this fraud, the Rigas Family caused the Olympus Co-Borrowing Debtors to conceal at least $751.5 million of the borrowings under the Olympus Co-Borrowing Facility from the public and creditors other than the Olympus Co-Borrowing Lenders. Thus, the Olympus Co-Borrowing Debtors knew that the incurrence of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests would severely inhibit the Olympus Co-Borrowing Debtors' ability to repay other creditors.

1199. The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith. The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1200. The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests. All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all relevant facts relating to the voidability of the Olympus Co-Borrowing Facility.

1201. At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations

352

and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1202. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## TWELFTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Olympus Co-Borrowing Lenders)**

1203. Plaintiff realleges paragraphs 1 through 1078 and 1170 through 1171 as if fully set forth herein.

353

1204. The Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations in the approximate amount of $1.3 billion pursuant to the Olympus Co-Borrowing Facility.

1205. To secure the repayment of the Olympus Co-Borrowing Facility, the Olympus Co-Borrowing Debtors conveyed the Olympus Co-Borrowing Security Interests.

1206. The incurrence of the Olympus Co-Borrowing Obligations and the grant of the Olympus Co-Borrowing Security Interests were transfers of interests in property of the Olympus Co-Borrowing Debtors.

1207. When the Olympus Co-Borrowing Debtors incurred the Olympus Co-Borrowing Obligations and granted the Olympus Co-Borrowing Security Interests, the Olympus Co-Borrowing Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Olympus Co-Borrowing Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1208. With each of the Olympus Co-Borrowing Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $751.5 million of the proceeds of the Olympus Co-Borrowing Facility were used by the Debtors and the Rigas Family for purposes benefiting solely the Rigas Family and the RFEs. The Olympus Co-Borrowing Facility specifically contemplated that borrowings thereunder could be used by the Olympus Co-Borrowing Debtors or the RFEs. Each of the Olympus Co-Borrowing Debtors and the RFEs

354

could borrow amounts at will under the Olympus Co-Borrowing Facility, with all borrowers being jointly and severally liable for all borrowings thereunder.

1209.    The RFEs contributed a disproportionately small amount of assets to the Olympus Co-Borrowing Facility, and such assets were not sufficient to secure repayment of the amounts borrowed by the RFEs.

1210.    The Olympus Co-Borrowing Lenders' conduct in participating in the Olympus Co-Borrowing Facility was recklessly indifferent and in bad faith.  The uses of the Olympus Co-Borrowing Facility by the Rigas Family occurred with the Olympus Co-Borrowing Lenders' knowledge, reckless disregard, conscious avoidance, and/or consent.

1211.    The Olympus Co-Borrowing Lenders were initial and/or immediate or mediate transferees of the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests.  All of the Olympus Co-Borrowing Lenders received their interest in the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests with full knowledge of all facts relevant to the voidability of the Olympus Co-Borrowing Facility.

1212.    At all times relevant hereto, there were actual creditors of the Olympus Co-Borrowing Debtors holding unsecured claims allowable against the Olympus Co-Borrowing Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Olympus Co-Borrowing Obligations and the Olympus Co-Borrowing Security Interests under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1213. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (A) (i) all Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## THIRTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Century-TCI Lenders)

1214. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1215. The Century-TCI Debtors borrowed from, and incurred the obligation to pay indebtedness to, the Century-TCI Lenders in the approximate amount of $1 billion pursuant to the Century-TCI Facility (the "Century-TCI Obligations").

1216. To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed security interests and pledges in their respective property to the Century-TCI Lenders (the "Century-TCI Security Interests").

356

1217.   With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $408 million from the Century-TCI Credit Facility was used by the Rigas Family to purchase common stock and convertible notes (the "Century-TCI Securities Transfer") in the year preceding the Petition Date.

1218.   In consummating the Century-TCI Securities Transfer, the Debtors intended to delay, hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or after the date that the Century-TCI Securities Transfer was incurred or the Century-TCI Security Interests for the Century-TCI Securities Transfer were granted. The Century-TCI Debtors knew that the Century-TCI Securities Transfer would benefit solely the Rigas Family.

1219.   The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Century-TCI Facility would not be used in furtherance of the fraud.

1220.   The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests in property of the Debtors.

1221.   By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all

Century-TCI Security Interests securing the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## FOURTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548, 550 and 551 Against the Century-TCI Lenders)

1222. Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1223. The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1224. To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors granted the Century-TCI Security Interests.

1225. With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $490 million from the Century-TCI Credit Facility was used to consummate the Century-TCI Securities Transfer in the year preceding the Petition Date.

1226. The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling

the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1227. The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1228. When the Century-TCI Securities Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1229. The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer. All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer with full knowledge of the facts relating to such transfers.

1230. By virtue of the foregoing, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

359

## FIFTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders)

1231.  Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1232.  The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1233.  To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

1234.  With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $408 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.  In addition, the Rigas Family caused Adelphia to draw down at least $100 million from the Century-TCI Facility in July 2000 in order to fund Highland Prestige's purchase of Prestige Communications in the Prestige Acquisition (the "Century-TCI Prestige Transfer").

1235.  In consummating the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, the Century-TCI Debtors intended to delay, hinder and defraud any entity to which the Century-TCI Debtors were or became indebted, on or after the date that such obligations were incurred or such security interests were granted.  The Century-TCI Debtors knew or recklessly disregarded the fact that the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer would benefit solely the Rigas Family.

1236. The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1237. The incurrence of the Century-TCI Obligations and the grant of the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1238. The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and of the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer. All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer with full knowledge of the facts relating to such transfers.

1239. At all times relevant hereto, there were actual creditors of the Century-TCI Debtors holding unsecured claims allowable against the Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-

361

TCI Prestige Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1240. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates; and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SIXTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b), 550 and 551 Against the Century-TCI Lenders)

1241. Plaintiff realleges paragraphs 1 through 1078 and 1215 through 1217 as if fully set forth herein.

1242. The Century-TCI Debtors incurred the Century-TCI Obligations in the amount of $1 billion.

1243. To secure the repayment of the Century-TCI Obligations, the Century-TCI Debtors conveyed the Century-TCI Security Interests.

1244. With each of the Century-TCI Lender's knowledge, reckless disregard, conscious avoidance, and/or consent, at least $508 million of the Century-TCI Obligations were incurred for purposes that benefited solely the Rigas Family.

1245.   When the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer occurred, the Century-TCI Debtors: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining with the Century-TCI Debtors was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1246.   The Century-TCI Lenders' conduct was recklessly indifferent and in bad faith. By virtue of their substantial participation in the Co-Borrowing Facilities, the Century-TCI Lenders knew or recklessly disregarded the fact that the Debtors' business was suffused with fraud; that the Debtors used proceeds of the Co-Borrowing Facilities for purposes that benefited solely the Rigas Family; that the Debtors were concealing billions of dollars of their borrowings under the Co-Borrowing Facilities from other creditors; and that the Debtors were commingling the Debtors' and the Rigas Family's cash. The Century-TCI Lenders had no reasonable basis to believe that the Non-Co-Borrowing Facilities would not be used in furtherance of the fraud.

1247.   The incurrence of the Century-TCI Obligations and the Century-TCI Security Interests were transfers of interests of the Debtors in property.

1248.   The Century-TCI Lenders were initial and/or immediate or mediate transferees of the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer. All of the Century-TCI Lenders received their interest in the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer with full knowledge of the facts relating to such transfers.

363

1249. At all times relevant hereto, there were actual creditors of the applicable Debtors holding unsecured claims allowable against the Century-TCI Debtors' estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors, among others, have the right to void the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer and the Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1250. By virtue of the foregoing, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates, together with all interest paid in respect of the obligations avoided hereunder.

## SEVENTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)

1251. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1252. From June 14, 1999 to May 1, 2002, Sabres, Inc., a subsidiary of ACC, and/or one or more of the Adelphia entities, made transfers (the "Fleet Payments") to Fleet (individually and/or as agent for other banks). The Fleet Payments were made in order to (i) purchase certain pre-petition loans between Fleet (individually and/or as agent for other banks), on the one hand,

364

and Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition loans that Fleet (individually and/or as agent for other banks) made to Niagara Frontier Hockey, L.P. and/or its affiliates (the "Fleet Niagara Frontier Loans"). The Fleet Payments were made for the benefit of John Rigas and Niagara Frontier Hockey, L.P.. Niagara Frontier Hockey, L.P. became an RFE in July 2000.

1253.  The Fleet Payments were made on the following dates and in the following amounts:

| Date | Amount |
|------|--------|
| 06/14/99 | $157,505.17 |
| 06/14/99 | $161,913.29 |
| 06/30/99 | $21,303.81 |
| 06/30/99 | $202,258.54 |
| 07/09/99 | $156,679.11 |
| 07/09/99 | $162,739.35 |
| 08/03/99 | $139,021.81 |
| 08/03/99 | $180,396.65 |
| 09/01/99 | $152,269.48 |
| 09/01/99 | $167,148.98 |
| 10/01/99 | $148,602.59 |
| 10/01/99 | $170,815.87 |
| 11/01/99 | $143,095.63 |
| 11/01/99 | $176,322.83 |
| 12/01/99 | $44,015.73 |
| 12/01/99 | $149,398.61 |
| 12/01/99 | $170,019.85 |
| 12/01/99 | $405,965.93 |
| 01/03/00 | $125,103.83 |
| 01/03/00 | $194,314.63 |
| 01/31/00 | $188,569.70 |
| 01/31/00 | $200,325.63 |
| 03/01/00 | $111,827.33 |
| 03/01/00 | $177,068.00 |
| 03/22/00 | $18,583,541.96 |
| 03/31/00 | $160,614.20 |
| 03/31/00 | $178,281.13 |

| Date | Amount |
|------|--------|
| 05/01/00 | $150,472.40 |
| 05/01/00 | $188,422.93 |
| 05/31/00 | $156,388.61 |
| 05/31/00 | $182,506.72 |
| 07/03/00 | $147,528.03 |
| 07/03/00 | $191,367.30 |
| 07/31/00 | $146,882.85 |
| 07/31/00 | $180,774.81 |
| 08/31/00 | $149,454.86 |
| 08/31/00 | $178,202.80 |
| 09/29/00 | $161,869.22 |
| 09/29/00 | $165,788.44 |
| 10/30/00 | $151,483.11 |
| 10/30/00 | $176,174.55 |
| 11/29/00 | $158,142.17 |
| 11/29/00 | $169,515.49 |
| 12/29/00 | $159,229.30 |
| 12/29/00 | $168,428.36 |
| 01/26/01 | $156,692.54 |
| 01/26/01 | $171,225.39 |
| 02/26/01 | $152,129.31 |
| 02/26/01 | $175,788.62 |
| 03/28/01 | $141,651.85 |
| 03/28/01 | $186,266.08 |
| 04/27/01 | $197,456.04 |
| 04/27/01 | $130,461.89 |
| 05/25/01 | $108,915.30 |
| 05/25/01 | $219,002.63 |
| 06/25/01 | $111,426.03 |
| 06/25/01 | $216,491.90 |
| 07/26/01 | $104,317.12 |
| 07/26/01 | $183,726.12 |
| 08/28/01 | $109,979.92 |
| 08/28/01 | $178,063.32 |
| 09/28/01 | $98,005.49 |
| 09/28/01 | $190,037.75 |
| 10/30/01 | $80,309.15 |
| 10/30/01 | $207,734.09 |
| 11/30/01 | $217,426.50 |
| 11/30/01 | $70,616.74 |
| 12/31/01 | $64,275.98 |
| 12/31/01 | $223,767.26 |
| 01/31/02 | $205,635.55 |
| 01/31/02 | $60,581.08 |
| 03/01/02 | $54,269.61 |

| Date | Amount |
|------|--------|
| 03/01/02 | $211,947.02 |
| 04/01/02 | $58,308.49 |
| 04/01/02 | $207,908.14 |
| 05/01/02 | $56,198.30 |
| 05/01/02 | $210,018.33 |
| **Total** | $30,572,385.13 |

1254. Adelphia made the Fleet Payments to purchase and pay principal and interest on the Fleet Niagara Frontier Loans. The cost to purchase the Fleet Niagara Frontier Loans was far greater than and not reasonably equivalent to the value of the Fleet Niagara Frontier Loans to Adelphia. The cost of paying the principal and interest on the Fleet Niagara Frontier Loans was far greater than and not reasonably equivalent to the value Adelphia received for paying the principal and interest on the Fleet Niagara Frontier Loans.

1255. Upon information and belief, the purchase of the Fleet Niagara Frontier Loans and the payment of interest and principal on the Fleet Niagara Frontier Loans were made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent. Alternatively, upon information and belief, the purchase of the Fleet Niagara Frontier Loans and the payment of interest and principal on the Fleet Niagara Frontier Loans rendered Sabres, Inc. and/or other of the Adelphia entities insolvent.

1256. Sabres, Inc. and/or other Adelphia entities made the Fleet Payments with intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of Fleet, on or after the date that the Fleet Payments were made. Adelphia received no consideration for the Fleet Payments. The Fleet Payments were made to Fleet, which was not a good faith transferee and which, in return, did not provide

367

Adelphia with reasonably equivalent value. The Fleet Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more of the RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1257.   The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1258.   Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1259.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the Fleet Payments. These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1260.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## EIGHTEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Fleet)

1261.   Plaintiff reallege paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1262.   Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier

368

Hockey, L.P. The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres. The Fleet Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans.

1263. The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1264. Sabres, Inc. and/or one of the Adelphia entities, made the Fleet Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1265. Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1266. At all times relevant hereto, there were actual creditors of the applicable Adelphia entities holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors have the right to void the Fleet Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

369

1267.  By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## NINETEENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against Fleet)

1268.  Plaintiff reallege paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1269.  Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P. The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres. At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

1270.  The Fleet Payments were made to purchase the Fleet Niagara Frontier Loans and to pay principal and interest on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P. The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres. The Fleet Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans.

1271.  The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

370

1272.  Sabres, Inc. and/or the other Adelphia entities made the Fleet Payments with the intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of Fleet, on or after the date that the Fleet Payments were made.  Adelphia received no consideration for the Fleet Payments.  The Fleet Payments were made to Fleet, which was not a good faith transferee and which, in return, did not provide Adelphia with reasonably equivalent value.  The Fleet Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1273.  Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1274.  By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTIETH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 And 550 Against Fleet)

1275.  Plaintiff realleges paragraphs 1 through 1078 and 1253 as if fully set forth herein.

1276.  Sabres, Inc. and/or one or more of the Adelphia entities made the Fleet Payments to purchase the Fleet Niagara Frontier Loans and to make principal and interest payments on the Fleet Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P.  The purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans related to the Buffalo Sabres.  The Fleet Payments

were earmarked by Sabres, Inc. and/or Adelphia to pay Fleet for the purchase of the Fleet Niagara Frontier Loans and the payment of principal and interest on the Fleet Niagara Frontier Loans. At least $3,121,043.89 of the Fleet Payments were made on or within a year of the Petition Date.

1277.    The Fleet Payments were transfers of an interest of one or more of the Adelphia entities in property.

1278.    Sabres, Inc. and/or one of the Adelphia entities, made the Fleet Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1279.    Fleet was the initial and/or immediate or mediate transferee of the Fleet Payments.

1280.    By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, at least $3,121,043.89 of the Fleet Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

1281.    Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

372

1282.  From June 28, 1999 to March 22, 2000, Sabres, Inc. and/or one or more of the Adelphia entities made transfers (the "HSBC Payments") to HSBC (individually and/or as agent for other banks). The HSBC Payments were made in order to (i) purchase certain pre-petition loans between HSBC (individually and/or as agent for other banks), on the one hand, and Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition loans that HSBC (individually and/or as agent for other banks) made to Niagara Frontier Hockey, L.P. and/or its affiliates (the "HSBC Niagara Frontier Loans").  Adelphia made the HSBC Payments for the benefit of John Rigas and Niagara Frontier Hockey, L.P.

1283.  Adelphia made the HSBC Payments on the following dates and in the following amounts:

| Date | Amount |
|------|--------|
| 06/28/99 | $306,503.02 |
| 06/28/99 | $32,278.50 |
| 12/01/99 | $615,085.56 |
| 12/01/99 | $66,690.50 |
| 03/22/00 | $769,264.25 |
| 03/22/00 | $10,826,133.67 |
| Total | $12,615,955.50 |

1284.  Adelphia made the HSBC Payments to purchase and pay principal and interest on the HSBC Niagara Frontier Loans.  The cost to purchase the HSBC Niagara Frontier Loans was far greater than and not reasonably equivalent to the value to Adelphia of the HSBC Niagara Frontier Loans.  The cost of paying the principal and interest on the HSBC Niagara Frontier Loans was far greater than and not reasonably equivalent to the value Adelphia received for paying principal and interest on the HSBC Niagara Frontier Loans.

1285.  Upon information and belief, the purchase of the HSBC Niagara Frontier Loans and the payment of interest and principal on the HSBC Niagara Frontier Loans were made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent. Alternatively, upon information and belief, the purchase of the HSBC Niagara Frontier Loans and the payment of interest and principal on the HSBC Niagara Frontier Loans rendered Sabres, Inc. and/or other of the Adelphia entities insolvent.

1286.  The HSBC Payments were made with intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of HSBC, on or after the date that the HSBC Payments were made. Adelphia received no consideration for the HSBC Payments. The HSBC Payments were made to HSBC, which was a non-good faith transferee and which, in return, did not provide Adelphia with reasonably equivalent value. The HSBC Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1287.  The HSBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1288.  HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

1289.  At all times relevant hereto, there were actual creditors of the Adelphia entities that made the HSBC Payments. These creditors have the right to void the HSBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1290. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against HSBC)

1291. Plaintiff realleges paragraphs 1 through 1078 and 1283 as if fully set forth herein.

1292. Sabres, Inc. and/or one or more of the Adelphia entities made the HSBC Payments to purchase the HSBC Niagara Frontier Loans and to make principal and interest payments on the HSBC Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P. The purchase of the HSBC Niagara Frontier Loans and the payment of principal and interest on the HSBC Niagara Frontier Loans related to the Buffalo Sabres. The HSBC Payments were earmarked by Sabres, Inc. and/or Adelphia to pay HSBC for the purchase of the HSBC Niagara Frontier Loans and the payment of principal and interest on the HSBC Niagara Frontier Loans.

1293. The HSBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1294. Sabres, Inc. and/or one of the Adelphia entities, made the HSBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction, for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

375

1295.  HSBC was the initial and/or immediate or mediate transferee of the HSBC Payments.

1296.  At all times relevant hereto, there were actual creditors of the applicable Adelphia entities holding unsecured claims allowable against Adelphia's estates within the meaning of Sections 502(d) and 544(b) of the Bankruptcy Code. These creditors have the right to void the HSBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1297.  By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the HSBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTY-THIRD CLAIM FOR RELIEF

#### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against Key Bank)

1298.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1299.  From June 28, 1999 to March 22, 2000, Sabres, Inc. and/or one or more of the Adelphia entities made transfers (the "Key Bank Payments") to Key Bank (individually and/or as agent for other banks). The Key Bank Payments were made in order to (i) purchase certain pre-petition loans between Key Bank (individually and/or as agent for other banks), on the one hand, and Niagara Frontier Hockey, L.P. (in which John Rigas had significant ownership interests) and/or its affiliates, on the other hand, and (ii) pay interest and principal on those and other pre-petition loans made to Niagara Frontier Hockey, L.P. and/or its affiliates (the "Key Bank Niagara

Frontier Loans"). Adelphia made the Key Bank Payments for the benefit of John Rigas and Niagara Frontier Hockey, L.P..

1300.  Adelphia made the Key Bank Payments on the following dates and in the following amounts:

| Date | Amount |
|------|--------|
| 06/28/99 | $104,433.13 |
| 06/28/99 | $176,870.26 |
| 06/28/99 | $93,650.81 |
| 06/28/99 | $10,739.75 |
| 12/01/99 | $91,040.39 |
| 12/01/99 | $171,809.80 |
| 12/01/99 | $205,016.85 |
| 12/01/99 | $22,189.42 |
| 03/22/00 | $3,902,444.49 |
| **Total** | **$4,778,194.90** |

1301.  Adelphia made the Key Bank Payments to purchase and pay principal and interest on the Key Bank Niagara Frontier Loans. The cost to purchase the Key Bank Niagara Frontier Loans was far greater than and not reasonably equivalent to the value to Adelphia of the Key Bank Niagara Frontier Loans. The cost of paying the principal and interest on the Key Bank Niagara Frontier Loans was far greater than and not reasonably equivalent to the value Adelphia received for paying principal and interest on the Key Bank Niagara Frontier Loans.

1302.  Upon information and belief, the purchase of the Key Bank Niagara Frontier Loans and the payment of interest and principal on the Key Bank Niagara Frontier Loans were made at a time when Sabres, Inc. and/or other of the Adelphia entities were insolvent. Alternatively, upon information and belief, the purchase of the Key Bank Niagara Frontier Loans

377

and the payments of interest and principal on the Key Bank Niagara Frontier Loans rendered Sabres, Inc. and/or other of the Adelphia entities insolvent.

1303.   The Key Bank Payments were made with intent to hinder, delay or defraud any entity to which Adelphia was or became indebted, with the knowing participation, knowledge and acquiescence of Key Bank, on or after the date that the Key Bank Payments were made. Adelphia received no consideration for the Key Bank Payments.  The Key Bank Payments were made to Key Bank, which was not a good faith transferee and which, in return, did not provide Adelphia with reasonably equivalent value.  The Key Bank Payments were made by Sabres, Inc. and/or one of the Adelphia entities with the intent to benefit solely the Rigas Family and one or more RFEs, including but not limited to the RFE Niagara Frontier Hockey, L.P.

1304.   The Key Bank Payments were transfers of an interest of one or more of the Adelphia entities in property.

1305.   Key Bank was the initial and/or immediate or mediate transferee of the Key Bank Payments.

1306.   At all times relevant hereto, there were actual creditors of the Adelphia entities that made the Key Bank Payments.  These creditors have the right to void the Key Bank Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1307.   By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Key Bank Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-FOURTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 against Key Bank)

1308.  Plaintiff realleges paragraphs 1 through 1078 and 1300 as if fully set forth herein.

1309.  Sabres, Inc. and/or one or more of the Adelphia entities made the Key Bank Payments to purchase the Key Bank Niagara Frontier Loans and to pay principal and interest on the Key Bank Niagara Frontier Loans for the benefit of the Rigas Family and the RFE Niagara Frontier Hockey, L.P. The purchase of the Key Bank Niagara Frontier Loans and the payment of principal and interest on the Key Bank Niagara Frontier Loans related to the Buffalo Sabres. The Key Bank Payments were earmarked by Sabres, Inc. and/or Adelphia to pay Key Bank for the purchase of the Key Bank Niagara Frontier Loans and the payment of principal and interest on the Key Bank Niagara Frontier Loans.

1310.  The Key Bank Payments were transfers of an interest of one or more of the Adelphia entities in property.

1311.  Adelphia made the Key Bank Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1312.  Key Bank was the initial and/or immediate or mediate transferee of the Key Bank Payments.

1313.  At all times relevant hereto, there were actual creditors of the Adelphia entities that made the Key Bank Payments. These creditors have the right to void the Key Bank Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1314.  By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the Key Bank Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-FIFTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against BNS)

1315.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1316.  One or more of the Adelphia entities made the following payments to BNS, individually and/or as agent for certain other banks (the "BNS Payments"):

| Date | Amount |
|------|--------|
| 01/29/99 | $915,711.27 |
| 03/01/99 | $50,000.00 |
| 03/31/99 | $2,059,232.18 |
| 03/31/99 | $5,000,000.00 |
| 04/30/99 | $1,490,402.98 |
| 04/30/99 | $190,000,000.00 |
| 06/30/99 | $119,075.34 |
| 07/02/99 | $185,000,000.00 |
| 09/30/99 | $78,561.64 |
| 09/30/99 | $171,061.63 |
| 10/08/99 | $245,200.00 |
| 10/08/99 | $180,000,000.00 |
| 12/31/99 | $133,150.68 |
| 02/16/00 | $1,609,190.63 |
| 03/03/00 | $50,000.00 |
| 03/31/00 | $5,000,000.00 |

380

| Date | Amount |
|---|---|
| 03/31/00 | $701,079.17 |
| 05/15/00 | $2,310,609.38 |
| 06/30/00 | $621,959.72 |
| 06/30/00 | $6,250,000.00 |
| 07/17/00 | $1,735,551.56 |
| 09/22/00 | $12,306.25 |
| 10/02/00 | $565,272.92 |
| 10/02/00 | $6,250,000.00 |
| 10/16/00 | $2,553,829.69 |
| 12/15/00 | $1,662,750.00 |
| 12/29/00 | $115,576.39 |
| 12/29/00 | $6,250,000.00 |
| 01/02/01 | $314,157.64 |
| 03/12/01 | $2,391,412.50 |
| 04/20/01 | $50,000.00 |
| 04/02/01 | $293,058.59 |
| 04/02/01 | $6,250,000.00 |
| 05/02/01 | $48,572.92 |
| 06/12/01 | $2,011,760.25 |
| 06/29/01 | $72,389.24 |
| 06/29/01 | $8,750,000.00 |
| 09/12/01 | $1,624,546.45 |
| **Total** | **$622,756,419.02** |

1317.  Adelphia made the BNS Payments on account of debts owed by one or more RFEs.  The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1318.  The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1319.  Adelphia made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the BNS Payments were made.  Adelphia received no consideration for the BNS Payments.  Instead, the BNS Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

381

1320. BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1321. At all times relevant hereto, there were actual creditors of the Adelphia entities that made the BNS Payments. These creditors have the right to void the BNS Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1322. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### TWENTY-SIXTH CLAIM FOR RELIEF

**(Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against BNS)**

1323. Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1324. The BNS Payments were made on account of debts owed by one or more RFEs. The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1325. The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1326. Adelphia made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

382

1327. BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1328. At all times relevant hereto, there were actual creditors of Adelphia that made the BNS Payments. These creditors have the right to void the BNS Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1329. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-SEVENTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS)

1330. Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1331. One or more of the Adelphia entities made the BNS Payments. At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date. The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1332. The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1333. Adelphia made the BNS Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the BNS Payments were made. Adelphia received no consideration for the BNS Payments. Instead, the

These claims, if allowed, easily rendered the Obligor Debtors insolvent and placed the ACC and Arahova bondholders on a *pari passu* level with the Banks. All of the foregoing issues and controversies as well as others later became known as the "Inter-Creditor Dispute." As further discussed below, the creditors that would benefit from the Inter-Creditor Dispute claims agreed to receive interests in any recoveries under this litigation (through the Trust) as compensation for those Inter-Creditor Dispute claims under the relevant reorganization plans. Those claims were never released or satisfied.

    2.   The Sale Process And The MJA Litigation.

Adelphia attempted valiantly to emerge from bankruptcy as a stand-alone entity. Ultimately, operational challenges and the substantial uncertainty arising out of the Inter-Creditor Dispute compelled it to recognize that the best means to maximize value for creditors and exit Chapter 11 was through a divestiture of its assets. On April 22, 2004, Adelphia announced that it was putting itself up for sale. 4th Am. Discl. 246. After a lengthy sales process, on or about April 21, 2005, Adelphia announced that it had executed definitive contracts with Time Warner and Comcast, which were collectively the highest bidder, for a transaction valued at approximately $17.6 billion. The contracts required, as a condition to closing, confirmation of a plan of reorganization for all 266 Debtors by July 1, 2006. Bench Dec. 154.

The Inter-Creditor Dispute presented enormous challenges to confirmation of a plan. Essentially, it prevented Adelphia from allocating consideration among its warring creditor classes. Adelphia attempted to resolve the Inter-Creditor Dispute in time to meet the July 1, 2006 deadline by filing, on June 24, 2005, its Motion in Aid of Confirmation (Bankruptcy

---

wrongdoing, wrongful conduct and instances of fraud and general impropriety ... [the] proof of claim ... is filed predicated on theories of piercing the corporate veil, alter ego doctrine, agency theory, instrumentality doctrine, domination for fraudulent or illegal purposes, abuse of corporate privilege, fraudulent conveyance law and other related theories." Plaintiff's App., Ex. E, at 5.

19

BNS Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

1334.  BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

1335.  By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, at least $10,446,935.69 of the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-EIGHTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against BNS)

1336.  Plaintiff realleges paragraphs 1 through 1078 and 1316 as if fully set forth herein.

1337.  One or more of the Adelphia entities made the BNS Payments.  At least $10,446,935.69 of the BNS Payments were made on or within the year preceding the Petition Date.  The BNS Payments were earmarked by Adelphia to pay BNS in respect of such debt.

1338.  The BNS Payments were transfers of an interest of one or more of the Adelphia entities in property.

1339.  Adelphia made the BNS Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1340.  BNS was the initial and/or immediate or mediate transferee of the BNS Payments.

384

1341. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, at least $10,446,935.69 of the BNS Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## TWENTY-NINTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)

1342. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1343. One or more of the Adelphia entities made the following payments to CIBC, individually and as agent for certain other banks (the "CIBC Payments"):

| Date | Amount |
|------|--------|
| 01/04/99 | $386,511.67 |
| 01/04/99 | $222,000,000.00 |
| 01/19/99 | $103,000,000.00 |
| 03/15/99 | $207,333.33 |
| 03/15/99 | $100,000,000.00 |
| 03/31/99 | $134,794.52 |
| 03/31/99 | $245,029.11 |
| 04/07/99 | $315,947.92 |
| 04/07/99 | $262,500,000.00 |
| 04/29/99 | $62,029.11 |
| 05/06/99 | $110,609.05 |
| 05/06/99 | $16,181.51 |
| Total | $688,978,436.22 |

1344. The CIBC Payments were on account of a debt of Hilton Head, an RFE. The CIBC Payments were earmarked by Adelphia to pay CIBC in respect of such debt.

1345. The CIBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

385

1346. Adelphia made the CIBC Payments with the actual intent to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that the CIBC Payments were made. Adelphia received no consideration for the CIBC Payments. Instead, the CIBC Payments were made by Adelphia with the intent to benefit solely the Rigas Family and one or more RFEs.

1347. CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

1348. At all times relevant hereto, there were actual creditors of Adelphia that made the CIBC Payments. These creditors have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1349. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRTIETH CLAIM FOR RELIEF

### (Avoidance and Recovery of Constructively Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 544(b) and 550 Against CIBC)

1350. Plaintiff realleges paragraphs 1 through 1078 and 1343 as if fully set forth herein.

1351. The CIBC Payments were made on account of debts owed by Hilton Head, an RFE. The CIBC Payments were earmarked by Adelphia to pay CIBC in respect of such debt.

386

1352. The CIBC Payments were transfers of an interest of one or more of the Adelphia entities in property.

1353. Adelphia made the CIBC Payments when they: (i) were insolvent or were rendered insolvent, (ii) were engaged or were about to engage in business or a transaction for which any property remaining was an unreasonably small capital, and/or (iii) intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts matured.

1354. CIBC was the initial and/or immediate or mediate transferee of the CIBC Payments.

1355. At all times relevant hereto, there were actual creditors of Adelphia that made the CIBC Payments. These creditors, among others, have the right to void the CIBC Payments under applicable law, including, but not limited to, the laws of the Commonwealth of Pennsylvania and the States of New York, Texas, North Carolina and Illinois.

1356. By virtue of the foregoing, pursuant to sections 544(b) and 550 of the Bankruptcy Code, the CIBC Payments should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 Against the Margin Lenders)

1357. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

387

1358.  The Rigas Family and/or the RFEs incurred certain margin loans (the "Margin Loans") to the Margin Lenders.  The Margin Loans were secured by stock and other securities owned by the Rigas Family, including securities issued by Adelphia.

1359.  In the year preceding the Petition Date, Adelphia made the following payments to the Margin Lenders in respect of the Margin Loans in the following amounts (the "Margin Loan Payments"):

| Transferee | Date | Amount |
|---|---|---|
| SSB | 07/12/01 | $1,373,414.95 |
| SSB | 09/26/01 | $6,121,277.47 |
| SSB | 10/03/01 | $1,165,173.09 |
| SSB | 10/03/01 | $6,380,378.00 |
| SSB | 10/09/01 | $1,829,412.00 |
| SSB | 10/11/01 | $1,963,150.00 |
| SSB | 10/15/01 | $610,501.00 |
| SSB | 10/15/01 | $17,000,000.00 |
| SSB | 10/17/01 | $8,522,889.00 |
| SSB | 10/19/01 | $1,162,960.00 |
| SSB | 11/02/01 | $357,891.00 |
| SSB | 11/02/01 | $5,000,000.00 |
| SSB | 11/05/01 | $3,488,580.00 |
| SSB | 11/05/01 | $14,000,000.00 |
| SSB | 11/15/01 | $31,000,000.00 |
| SSB | 11/16/01 | $4,127,767.00 |
| SSB | 2/22/02 | $3,000,000.00 |
| SSB | 03/28/02 | $2,994,394.00 |
| SSB | 4/01/02 | $25,000,000.00 |
| SSB | 04/03/02 | $10,678,982.02 |
| SSB | 04/04/02 | $48,401.00 |
| SSB | 04/05/02 | $5,232,869.00 |
| SSB | 04/08/02 | $5,174,727.00 |
| SSB | 04/09/02 | $3,750,223.00 |
| SSB | 04/10/02 | $2,296,648.00 |
| SSB | 04/12/02 | $145,358.00 |
| SSB | 04/17/02 | $203,500.00 |
| SSB | 04/18/02 | $5,494,214.00 |
| SSB | 04/19/02 | $2,936,520.00 |
| SSB | 04/24/02 | $959,360.00 |
| SSB | 04/26/02 | $1,409,463.00 |

| Transferee | Date | Amount |
|---|---|---|
| SSB | 04/29/02 | $755,859.00 |
| SSB | 05/10/02 | $5,000,000.00 |
| | Subtotal | $179,183,911.53 |
| | | |
| BofA | 07/31/01 | $714,277.78 |
| BofA | 10/05/01 | $2,920,211.35 |
| BofA | 10/31/01 | $622,441.93 |
| BofA | 01/28/02 | $410,692.69 |
| BofA | 01/28/02 | $1,764.29 |
| BofA | 02/22/02 | $6,056,078.54 |
| BofA | 04/01/02 | $232,551.14 |
| BofA | 04/01/02 | $3,381.00 |
| BofA | 04/01/02 | $41,023,710.11 |
| | Subtotal | $51,985,108.83 |
| Goldman Sachs | 08/17/01 | $1,700,000.00 |
| Goldman Sachs | 08/23/01 | $2,700,000.00 |
| Goldman Sachs | 08/29/01 | $2,100,000.00 |
| Goldman Sachs | 09/18/01 | $5,000,000.00 |
| Goldman Sachs | 09/20/01 | $500,000.00 |
| Goldman Sachs | 09/21/01 | $5,000,000.00 |
| Goldman Sachs | 09/25/01 | $350,000.00 |
| Goldman Sachs | 09/25/01 | $(350,000.00) |
| Goldman Sachs | 09/25/01 | $3,500,000.00 |
| Goldman Sachs | 09/27/01 | $1,750,000.00 |
| Goldman Sachs | 10/01/01 | $4,500,000.00 |
| Goldman Sachs | 10/03/01 | $2,500,000.00 |
| Goldman Sachs | 11/15/01 | $150,000.00 |
| Goldman Sachs | 11/19/01 | $75,000.00 |
| Goldman Sachs | 02/21/02 | $2,352,592.00 |
| Goldman Sachs | 02/22/02 | $798,926.00 |
| Goldman Sachs | 03/28/02 | $6,359,647.00 |
| Goldman Sachs | 03/29/02 | $3,886,669.00 |
| Goldman Sachs | 04/02/02 | $3,934,629.00 |
| Goldman Sachs | 04/03/02 | $2,786,446.00 |
| Goldman Sachs | 04/04/02 | $1,705,815.00 |
| Goldman Sachs | 04/05/02 | $2,245,631.00 |
| Goldman Sachs | 04/12/02 | $4,296,928.00 |
| Goldman Sachs | 04/15/02 | $2,180,853.00 |
| Goldman Sachs | 04/22/02 | $1,554,668.00 |
| Goldman Sachs | 04/23/02 | $971,667.00 |
| Goldman Sachs | 04/29/02 | $43,185.00 |
| Goldman Sachs | 05/09/02 | $266,522.00 |
| | Subtotal | $62,859,178.00 |

389

| Transferee | Date | Amount |
|---|---|---|
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 03/28/02 | $25,000,000.00 |
| Deutsche Bank | 04/03/02 | $264,793.11 |
| Deutsche Bank | 04/03/02 | $20,391.66 |
| | Subtotal | $50,285,184.77 |
| | **Grand Total** | $344,313,383.13 |

1360.  In making the Margin Loan Payments, Adelphia intended to delay, hinder and defraud any entity to which Adelphia was or became indebted, on or after the date that such payments were made. The Debtors received no consideration for the Margin Loan Payments. To the contrary, the Margin Loan Payments were made for the sole purpose of benefiting the Rigas Family.

1361.  The Margin Lenders knew or consciously avoided the fact that the Rigas Family intended to cause Adelphia to repay the Margin Loans and that Adelphia and its creditors received no consideration from the Margin Loan Payments.

1362.  By virtue of the foregoing, pursuant to sections 548 and 550 of the Bankruptcy Code, all Margin Loan Payments made on or within one year preceding the Petition Date should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## THIRTY-SECOND CLAIM FOR RELIEF

### (Violation of the Bank Holding Company Act Against the Agent Banks)

1363.  Plaintiff realleges paragraphs 1 through 73, 792 through 1008, 1037 through 1063, and 1067 through 1078 as if fully set forth herein.

1364.  Each of the Agent Banks is engaged in the business of making commercial loans and is either or both of the following: (a) an insured bank as defined in section 1813(h) of title 12 of the United States Code, or (b) an institution organized under the laws of the United States, a State, the District of Columbia or any territory of the United States which both accepts demand deposits or deposits that the depositor may withdraw by check or similar means for payment to third parties or others.

1365.  Each of the Agent Banks is a "bank" within the meaning of sections 1841(c) and 1971 of title 12 of the United States Code.

1366.  Each of the Investment Banks acted in concert with its affiliated Agent Bank in connection with its dealings with Adelphia, as described in this complaint.

1367.  The Agent Banks and Investment Banks, acting in concert as a single unit, extended credit and/or furnished services to Adelphia, and/or fixed or varied the consideration for the extension of credit and/or the provision of services, on the condition or requirement that Adelphia also obtain some additional credit, property, and/or service from the Agent Bank, other than a loan, discount, deposit, or trust service, or from another subsidiary of the bank holding company of such bank, including the Investment Banks.

391