1368.  As a result of the activities of the Agent Banks, Adelphia suffered damage.

1369.  Pursuant to section 1975 of title 12 of the United States Code, the ART, as successor in interest to Adelphia, is entitled to recover an amount from the Agent Banks that is three times the amount of the damages sustained in an amount to be determined at trial, plus costs and attorneys' fees.

## THIRTY-THIRD CLAIM FOR RELIEF

**(Equitable Disallowance of Defendants' Claims or, Alternatively, Equitable Subordination Under 11 U.S.C. § 510(c) Against all Defendants)**

**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED IN PART AS TO CERTAIN DEFENDANTS PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT AS TO THOSE DEFENDANTS TO PRESERVE THE CLAIM FOR APPEAL]**

1370.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1371.  As alleged herein, each of the Co-Borrowing Lenders and each of the Investment Banks engaged in wrongful conduct directed towards Adelphia and its arm's-length creditors.

1372.  Each of the Co-Borrowing Lenders entered into the Co-Borrowing Facilities and authorized funding thereunder despite actual knowledge, reckless disregard, or conscious avoidance, of the fact that the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars (for which the Co-Borrowing Debtors would remain liable), that the Rigas Family intended to, and did, use those funds for their own benefit, and that the Rigas Family caused Adelphia to conceal the true extent of its liabilities under the Co-Borrowing Facilities. The Co-Borrowing Lenders were similarly aware of the fraudulent uses of the Non-Co-Borrowing Facilities as alleged herein.

392

1373.  Prior to the consummation of the Co-Borrowing Facilities, each of the Agent Banks conducted extensive due diligence on behalf of themselves and the other Co-Borrowing Lenders. Similarly, the Agent Banks obtained extensive due diligence about Adelphia from the Investment Banks that underwrote one or more securities offerings on behalf of Adelphia. After each of the Co-Borrowing Facilities closed, the Agent Banks and the other Co-Borrowing Lenders obtained compliance certificates from Adelphia as required by the Co-Borrowing Agreements. Upon information and belief, the Agent Banks were authorized to obtain compliance certificates and other information on behalf of the other Co-Borrowing Lenders as well. Upon information and belief, the Agent Banks were obligated to, and did, transmit to the other Co-Borrowing Lenders compliance certificates and other information about the Co-Borrowing Debtors' borrowings under the Co-Borrowing Facilities and other indebtedness. To the extent that any of the Co-Borrowing Lenders or the Non-Co-Borrowing Lenders did not know of, or consciously avoided knowledge of, or recklessly disregarded, the massive fraud at Adelphia perpetrated by the Rigas Family, the knowledge and wrongful conduct of the Agent Banks should be imputed to each of the other Co-Borrowing Lenders and the Non-Co-Borrowing Lenders by virtue of the agency relationship among them.

1374.  For their part, the Investment Banks earned hundreds of millions of dollars of fees providing structured finance advice to Adelphia and underwriting and marketing Adelphia's securities. In the process, each of the Investment Banks induced purchasers of those securities to rely on various offering materials that these Investment Banks knew were materially misleading.

1375.  Indeed, at all times during the marketing of Adelphia's securities, each of the Investment Banks either knew, recklessly disregarded, or consciously avoided knowledge of the

393

fact that the offering materials contained material misrepresentations and omissions regarding the business and financial condition of Adelphia, including, without limitation, the extent of Adelphia's leverage. Indeed, none of the offering materials made any disclosure of the extensive fraud the Rigas Family was perpetrating at Adelphia, including the failure to disclose the true amounts outstanding under the Co-Borrowing Facilities. The Investment Banks induced investors to rely on those false and deceptive representations about Adelphia's financial condition in making their decisions to extend credit to Adelphia by purchasing debt securities.

1376.  Moreover, many of the Investment Banks had their purportedly independent analysts issue knowingly or recklessly misleading reports on Adelphia's securities to inflate the market value of the Rigas Family's holdings, the bonds issued by Adelphia and its direct and indirect subsidiaries, and the portion of Adelphia's credit facilities that their affiliated Agent Banks were selling in the secondary loan market.

1377.  Thus, with respect to the wrongful conduct directed at Adelphia and its arm's-length creditors, each Investment Bank and its affiliated Agent Bank acted as a single unit. Indeed, many of the Investment Banks and the Agent Banks held themselves out to Adelphia as unitary organizations offering underwriting and related financial advisory services, along with traditional credit banking services.

1378.  Each of the Co-Borrowing Lenders acted callously and with reckless disregard or conscious avoidance of the consequences of its inequitable conduct. Each of the Co-Borrowing Lenders intended to syndicate all or a substantial portion of its interest in the Co-Borrowing Facilities to other institutions. By and through the syndication, each of the Co-Borrowing Lenders attempted to eliminate the significant risk of exposure to the continuing fraud being

394

perpetrated by the Rigas Family. The Co-Borrowing Lenders and the Investment Banks further, and knowingly, improved their positions by using the equity and debt offerings to bring in additional funds that would be junior to their secured debt obligations and would give a misleading impression of Adelphia's financial health.

1379. Moreover, the Co-Borrowing Lenders and the Investment Banks assisted the Rigas Family in creating the fraudulent structure of the Co-Borrowing Facilities or ratified this fraudulent structure through their participation in the Co-Borrowing Facilities, and took advantage of the fraudulent structure for their own personal gain.

1380. At all relevant times, Adelphia had significant obligations to make principal and interest payments to the holders of public debt securities issued by Adelphia and certain of its direct and indirect subsidiaries. As a holding company, Adelphia relied almost exclusively on the cash flow generated from cable subscribers at its indirect operating subsidiaries to fulfill those payment obligations.

1381. Upon information and belief, with the assistance of certain of the Co-Borrowing Lenders and the Investment Banks, the Rigas Family caused Adelphia to structure each of Adelphia's credit facilities, including the Co-Borrowing Facilities, so that all borrowings would be made by ACC's indirect operating subsidiaries, not the parent holding company ACC. In this way, all revenues generated by Adelphia's operations -- revenues that Adelphia's bondholders relied upon for payment of principal and interest -- would first be available to Adelphia's lenders, including Defendants.

1382. Because the Rigas Family intended to use the Co-Borrowing Debtors' credit to access billions of dollars from the Co-Borrowing Facilities, and knew that the Co-Borrowing

Lenders would only give them such access if an ACC-related entity remained liable for amounts used by the Rigas Family, the Rigas Family gave the Co-Borrowing Lenders priority over creditors of ACC's indirect holding company subsidiaries for repayment of the obligations fraudulently incurred by the Rigas Family under the Co-Borrowing Facilities by structuring the Co-Borrowing Facilities so that all borrowings occurred at the operating subsidiary level.

1383.  Each of the Co-Borrowing Lenders and the Investment Banks knew of the fraudulent manner in which the Rigas Family structured the Co-Borrowing Debtors' participation in the Co-Borrowing Facilities. Indeed, upon information and belief, in light of Adelphia's significant public debt, the Co-Borrowing Lenders would not have approved the Co-Borrowing Facilities absent the purported priority afforded to them by the fraudulent structuring of such facilities. Each of the Co-Borrowing Lenders approved each of the Co-Borrowing Facilities, and their participation in other Adelphia-related credit facilities, based upon, among other things, the structural priority that the Co-Borrowing Lenders purportedly would have over Adelphia's bondholders for repayment of the loans.

1384.  Defendants' misconduct similarly has damaged all of Adelphia's arm's-length unsecured creditors, who extended credit without knowledge of Defendants' actions and who, unlike Defendants, played no role in damaging Adelphia. Indeed, without the Defendants' inequitable conduct, Adelphia's arm's-length unsecured creditors would not have acquired ACC's securities or extended credit to Adelphia.

1385.  If the Co-Borrowing Lenders' claims for payment were allowed, those claims would consume a substantial portion of the value of Adelphia's estates, while Adelphia's arm's-

length creditors -- who invested pursuant to false and deceptive offering materials -- and other unsecured claims, will receive a substantially smaller distribution.

1386. The Investment Banks' involvement in structuring the Co-Borrowing Facilities, the deceptive marketing of Adelphia's securities and the Co-Borrowing Lenders' consummation of the Co-Borrowing Facilities at a senior level to the interests of Adelphia's arm's-length creditors constituted inequitable conduct and reduced those creditors' chances of being repaid in full, or in substantial part, on their claims.

1387. The Co-Borrowing Lenders received an unfair advantage over Adelphia's arm's-length creditors by virtue of their misconduct. The Co-Borrowing Lenders agreed to provide the Co-Borrowing Facilities to Adelphia and the RFEs on the condition that the Investment Banks receive lucrative underwriting engagements from Adelphia. The Co-Borrowing Lenders made loans pursuant to the Co-Borrowing Facilities knowing that Adelphia's arm's-length creditors would be the first to incur losses from any expected deterioration in Adelphia's value. The Co-Borrowing Lenders' favorable treatment is a result of the inequitable conduct of the Defendants. Therefore, if the Co-Borrowing Lenders' claims are not disallowed or equitably subordinated to those of Adelphia's arm's-length creditors, the Co-Borrowing Lenders will be unjustly enriched and Adelphia's arm's-length creditors will be financially damaged.

1388. There were substantial assets of Adelphia including, but not limited to, equipment, accounts receivable, human resources, contract rights, avoidance actions and derivative actions that could have been used to satisfy the claims of unsecured creditors if the Co-Borrowing Lenders' claims were equitably disallowed or subordinated.

1389.   Equitable subordination of each of the Co-Borrowing Lender's claims is consistent with the Bankruptcy Code.

1390.   By reason of the foregoing, (a) Plaintiff is entitled to judgment equitably disallowing the Investment Banks' and the Co-Borrowing Lenders' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, Plaintiff is entitled to judgment (i) subordinating the Investment Banks' and the Co-Borrowing Lenders' claims to the prior payment in full of the claims of unsecured creditors of Adelphia, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of Adelphia.

## THIRTY-FOURTH CLAIM FOR RELIEF

### (Recharacterization of Debt as Equity Against the Co-Borrowing Lenders)
**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1391.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1392.   At least $2 billion of the proceeds of the Co-Borrowing Facilities were used by the Rigas Family to finance the purchases of ACC's common and preferred stock and to maintain voting control over Adelphia (the "Co-Borrowing Stock Purchases"). Most, if not all, of the Co-Borrowing Stock Purchases were disclosed to the public as equity contributions by the Rigas Family. In economic reality, the Co-Borrowing Stock Purchases were sham transactions because the Rigas Family used the Co-Borrowing Facilities to finance the purchases rather than contributing new capital to the enterprise.

398

1393.  At the time of the Co-Borrowing Stock Purchases, the Co-Borrowing Lenders knew or recklessly disregarded the fact that Adelphia was undercapitalized.  Adelphia lacked sufficient capital to conduct their businesses and operations in the ordinary course of business.

1394.  The Co-Borrowing Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Co-Borrowing Facilities for the Co-Borrowing Stock Purchases with the ultimate purpose of maintaining voting control.  In connection with these purchases, the Rigas Family would fraudulently record an increase in shareholders' equity on ACC's financial statements and a decrease in the amount of Adelphia's indebtedness under the Co-Borrowing Facilities.  The indebtedness from such uses of the Co-Borrowing Facilities would be shifted to an RFE, notwithstanding the fact that Adelphia remained liable for all draw downs under the Co-Borrowing Facilities.  The Co-Borrowing Lenders knew of or recklessly disregarded this course of conduct.

1395.  Because of their consent to the Co-Borrowing Stock Purchases and the misrepresentations to third parties about the economic reality of these transactions, the Co-Borrowing Lenders should be estopped from claiming that the Co-Borrowing Stock Purchases by the Rigas Family were anything other than what the Rigas Family and Adelphia characterized them to be:  equity contributions to ACC.

1396.  By virtue of the foregoing, the Court should recharacterize that portion of the Co-Borrowing Facilities used for the purchase of stock as an equity contribution to ACC, which portion Plaintiff believes is at least $2 billion.

399

## THIRTY-FIFTH CLAIM FOR RELIEF

(Recharacterization of Debt as Equity Against the Century-TCI Lenders)
[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE
DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES
BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS
AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]

1397.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1398.  In October and November 2001, at least $400 million of the proceeds of the
Century-TCI Facility were used by the Rigas Family to finance the close of the Rigas Family's
purchases of Adelphia's common stock and convertible bonds to maintain voting control over
the Debtors (the "Century-TCI Purchases"). Adelphia and the Rigas Family mischaracterized
the Century-TCI Purchases in their public disclosures as equity contributions by the Rigas
Family. In economic reality, the Century-TCI Purchases were sham transactions because the
Rigas Family used the Century-TCI Facility to finance the purchases rather than contributing
new capital to the enterprise.

1399.  At the time of the closing of the Century-TCI Purchases, the Century-TCI
Lenders knew or recklessly disregarded the fact that the Debtors were undercapitalized. At that
time, the Debtors lacked sufficient capital to conduct their businesses and operations in the
ordinary course of business.

1400.  In connection with the Century-TCI Purchases, in January 2001 the Rigas Family
recorded an increase in shareholders' equity on the Debtors' financial statements and a
corresponding receivable of equal amount owing to the Debtors from the RFE purchaser of the

securities. The Rigas Family at that time intended to close this transaction (i.e., pay the receivable when it came due in October 2001) with co-borrowed funds.

1401. In October 2001, however, the Co-Borrowing Facilities had reached their limits, and no liquidity was available to close the transaction. Consequently, the Rigas Family caused the Debtors instead to draw on the liquidity available under the Century-TCI Facility to extinguish the receivable and close the Century-TCI Purchases. Citibank and the other Century-TCI Lenders knew or recklessly disregarded the fact that the Rigas Family was using the proceeds of the Century-TCI Facility for the Century-TCI Purchases.

1402. Because of their consent to, and/or role in the facilitation of, the Century-TCI Purchases and the misrepresentations to third parties about the economic reality of these transactions, Citibank and the other Century-TCI Lenders should be estopped from claiming that the Century-TCI Stock Purchases by the Rigas Family were anything other than what the Rigas Family and the Debtors characterized them to be: equity contributions to Adelphia.

1403. By virtue of the foregoing, the Court should recharacterize that portion of the Century-TCI Facility used for the purchase of stock as an equity contribution to Adelphia, which portion Plaintiff believes is at least $400 million.

## THIRTY-SIXTH CLAIM FOR RELIEF

(Breach of Fiduciary Duty Against the Agent Banks and the Investment Banks)
[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED IN PART AS TO CERTAIN DEFENDANTS PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT AS TO THOSE DEFENDANTS TO PRESERVE THE CLAIM FOR APPEAL]

1404. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1405.  A relationship of trust and confidence existed between Adelphia and each of the Agent Banks and Investment Banks as a result of, among other things, the roles each of the Agent Banks and Investment Banks played in Adelphia's financial affairs as, among other things, Adelphia's lenders, underwriters and financial advisors.

1406.  As a result, each of the Agent Banks and each of the Investment Banks owed Adelphia fiduciary duties of good faith, fidelity and undivided loyalty.

1407.  As a result of the conduct alleged herein, each of the Agent Banks breached its fiduciary duties to Adelphia by, among other things, approving participation in each of the Co-Borrowing Facilities and authorizing funding thereunder despite actual or constructive knowledge that: (i) the Co-Borrowing Facilities were fraudulently structured and used to give the Rigas Family access to billions of dollars on Adelphia's credit (for which Adelphia would remain liable); (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to Adelphia; and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

1408.  As a result of the conduct alleged herein, each of the Investment Banks breached its fiduciary duties to Adelphia by, among other things, underwriting ACC's securities offerings and failing to fully inform the Independent Directors on ACC's Board of Directors despite actual or constructive knowledge that: (i) the Co-Borrowing Facilities were fraudulently structured and used to give the Rigas Family access to billions of dollars on Adelphia's credit (for which Adelphia would remain liable); (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to Adelphia; and (iii) the Rigas

402

Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

1409. In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey acted in a manner that was adverse to the interests of Adelphia. However, the Rigas Family, Brown and Mulcahey were not the "sole actors" with respect to Adelphia. Rather, there were Independent Directors at Adelphia who would have brought the activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised by any of the Agent Banks or the Investment Banks.

1410. The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality. In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of Adelphia's rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

1411. Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed the public generally because, among other things: (i) public investors and arm's-length creditors relied upon Adelphia's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arm's-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and

(iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to ACC's shareholders and other public investors. Each of the Agent Banks authorized its participation in, and funding under, the Co-Borrowing Facilities, and each of the Investment Banks participated in underwritings of Adelphia's securities, despite its knowledge or reckless disregard or conscious avoidance of the wrongful conduct of the Rigas Family.

1412. By reason of the foregoing, Adelphia has been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-SEVENTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary Duty Against the Agent Banks and the Investment Banks)

1413. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1414. Each member of the Rigas Family owed fiduciary duties to Adelphia as officers and directors of Adelphia. Each member of the Rigas Family breached these fiduciary duties by, among other things, (i) causing Adelphia to enter into the fraudulently structured Co-Borrowing Facilities for the purpose of obtaining access to funds for their personal use based on Adelphia's credit support, (ii) causing Adelphia and certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used for the sole benefit of the Rigas Family, (iii) using such funds for purposes that provided no benefit to Adelphia, (iv) failing to fully inform the Independent Directors on Adelphia's Board of Directors of the circumstances surrounding such conduct, and (v) failing to fully disclose the scope of Adelphia's liability for the funds drawn down by and for the benefit of the Rigas Family.

404

1415.   Each of Brown and Mulcahey breached his fiduciary duties to Adelphia as officers of Adelphia by, among other things, (i) causing Adelphia to enter into the fraudulently structured Co-Borrowing Facilities, (ii) causing Adelphia and certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used solely for the benefit of the Rigas Family, and (iii) failing to fully inform the Independent Directors on Adelphia's Board of Directors of the circumstances surrounding such conduct.

1416.   Each of the Agent Banks and each of the Investment Banks knew of breaches of fiduciary duty by the Rigas Family, Brown, and Mulcahey. As a result of the conduct alleged herein, each of the Agent Banks and each of the Investment Banks aided and abetted the foregoing breaches of fiduciary duties by substantially assisting in those breaches with knowledge of their unlawfulness.

1417.   In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey was a faithless fiduciary who acted in a manner that was completely adverse to the interests of Adelphia. The Rigas Family, Brown and Mulcahey were not the "sole actors" with respect to Adelphia. Rather, there were Independent Directors at Adelphia who were unaware of the Rigas Family's wrongdoing and did not participate in it. The Independent Directors would have brought the activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised of those activities, including by any of the Agent Banks or the Investment Banks. The Margin Lenders further assisted the Rigas Family's breaches after the initial public announcement on March 27, 2002 by telling the Independent Directors that there were no further abuses of the Co-Borrowing Facilities at the same time that

405

the Margin Lenders were accepting re-payments from Adelphia on the Margin Loans to the Rigas Family.

1418.  The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality.  In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of Adelphia's rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

1419.  Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed not only Adelphia, but harmed the public generally because, among other things: (i) public investors and arm's-length creditors relied upon Adelphia's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arm's-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia, ACC's shareholders and other public investors.  Each of the Agent Banks authorized its participation in, and funding under, the Co-Borrowing Facilities, and each of the Investment Banks participated in underwritings of Adelphia's securities, despite its knowledge or reckless disregard or conscious avoidance of the wrongful conduct of the Rigas Family.

406

1420.  By reason of the foregoing, the ART, as successor in interest to Adelphia, has been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-EIGHTH CLAIM FOR RELIEF

**(Aiding and Abetting Fraud Against the Agent Banks and the Investment Banks)**

1421.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1422.  Each member of the Rigas Family and each of Brown and Mulcahey made fraudulent misrepresentations and omissions of material facts by, among other things, causing Adelphia to enter into the fraudulently structured Co-Borrowing Facilities and materially misrepresenting to ACC's Independent Directors the true structure, purpose, and effect of the facilities and the grave risk at which the structure of the Co-Borrowing Facilities placed Adelphia. The Rigas Family and each of Brown and Mulcahey fraudulently caused Adelphia and certain RFEs to draw down in excess of $3.4 billion under the Co-Borrowing Facilities to be used for the sole benefit of the Rigas Family, used such funds for purposes that were intended to benefit the Rigas Family and the RFEs and that provided no benefit to Adelphia, failed to inform the Independent Directors of the circumstances surrounding such conduct, and misled Adelphia's Independent Directors about the purported plan to deleverage Adelphia.

1423.  Each member of the Rigas Family and each of Brown and Mulcahey made such representations and omissions of material facts to Adelphia and the Independent Directors with the actual intent that Adelphia and the Independent Directors rely upon them. As set forth, *supra*, those misrepresentations and omissions included but were not limited to (a) statements that (i) the Co-Borrowing Facilities were structured in a manner similar to the 1996 HVA/TALP/ Global Facility and contained similar limitations on borrowings and uses of funds, (ii) the Co-

407

Borrowing Facilities were in the best interests of Adelphia, (iii) the proceeds of the Co-Borrowing Facilities would be used for Adelphia's legitimate corporate purposes, (iv) to the extent the Co-Borrowing Facilities were affiliate transactions they were on terms that were no less favorable than could be obtained in arm's-length third party transactions, (v) the Co-Borrowing Facilities satisfied the limits at law and pursuant to contract on affiliate transactions and restricted investments contained in pre-existing public and private debt financing documents, and (vi) the proceeds of related transactions would be used to aid in Adelphia's deleveraging efforts; and (b) written materials including Term Sheets that omitted material terms and facts regarding the structure of the Co-Borrowing Facilities and the uses of the funds that would be drawn under them. As set forth, *supra*, the omissions also included failures to disclose that in excess of $3.4 billion of the Co-Borrowing Facility proceeds would be used by the Rigas Family to purchase ACC securities, to pay off margin loans to some of the Defendants, to acquire cable company assets to be owned by certain RFEs, and to engage in other specific transactions for the sole benefit of the Rigas Family and the RFEs.

1424.   From their meetings and discussions with the Rigas Family, Brown, Mulcahey and other ACC employees, their due diligence, their review of the Co-Borrowing Facilities, public indentures and ACC's SEC filings, the Agent Banks and the Investment Banks knew and/or consciously avoided knowledge that the Rigas Family, Brown, and Mulcahey made the foregoing misrepresentations and omissions to Adelphia and the Independent Directors and that Adelphia and the Independent Directors relied on those misrepresentations and omissions in approving the Co-Borrowing Facilities.

1425.   Adelphia and the Independent Directors reasonably relied upon such misrepresentations and omissions of material fact to their detriment.

1426.   By virtue of the facts, circumstances and the conduct alleged herein, each of the Agent Banks and each of the Investment Banks aided and abetted the foregoing fraudulent conduct by substantially assisting in such conduct with knowledge of its unlawfulness. Their substantial assistance included but was not limited to (i) structuring the Co-Borrowing Facilities in a manner that allowed, and were intended to allow, the Rigas Family to loot Adelphia of billions of dollars in assets; (ii) preparing Term Sheets for review by the Independent Directors that misrepresented the terms of the Co-Borrowing Facilities; (iii) providing the Rigas Family with extremely excessive amounts of funds drawn down from the proceeds of the Co-Borrowing Facilities with knowledge that the draws were in amounts well beyond their ability to repay; and (iv) covering up the fraudulent use of the Co-Borrowing Facilities by underwriting, engaging in, and marketing securities offerings in which the Rigas Family intended to purchase sufficiently large amounts to maintain their majority control of ACC despite their inability to pay for those purchases without the abuse of the Co-Borrowing Facilities.

1427.   In pursuing a fraudulent course of conduct, each member of the Rigas Family and Brown and Mulcahey was a faithless and disloyal fiduciary of Adelphia and acted in a manner that was completely adverse to the interests of Adelphia.

1428.   Not only did the Agent Banks and the Investment Banks know of or consciously avoid knowledge of the Rigas Family's, Brown's, and Mulcahey's fraudulent course of conduct, but they knowingly assisted in that course of conduct and provided the Rigas Family, Brown,

and Mulcahey with the ability to loot the proceeds of Adelphia's credit facilities in connection with their fraud.

1429. The Rigas Family, Brown, and Mulcahey were not the "sole actors" with respect to Adelphia. Rather, there were Independent Directors at ACC and certain of its subsidiaries who would have brought the fraudulent activities of the Rigas Family, Brown and Mulcahey to an abrupt halt had they been properly and timely advised by any of the Agent Banks or the Investment Banks.

1430. The Agent Banks and the Investment Banks chose instead to substantially assist the fraud in an effort to reap the substantial pecuniary gains they made through their transaction fees and their continued relationship with Adelphia and the Rigas Family. The Agent Banks and the Investment Banks also withheld information from and misled the Independent Directors after the Rigas Family's excessive borrowings and looting became public, thereby delaying the Independent Directors' ability to stop the Rigas Family's looting and the improper payments of the margin loans.

1431. The conduct of each of the Agent Banks and each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality. In addition, the acts and omissions of each of the Agent Banks and each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of Adelphia's rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

1432. Moreover, the conduct of each of the Agent Banks and each of the Investment Banks harmed the public generally because, among other things: (i) public investors and arm's-

410

length creditors relied upon ACC's public filings, which each of the Agent Banks and each of the Investment Banks knew were inaccurate with respect to ACC's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded ACC's securities shortly after the initial offerings; (iii) ACC's public investors and arm's-length creditors relied on each of the Agent Banks and each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks and each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia, ACC's shareholders and other public investors. Each of the Agent Banks structured the Co-Borrowing Facilities and authorized its participation in, and funding under, the Co-Borrowing Facilities, and each of the Investment Banks structured the Co-Borrowing Facilities and participated in syndications and underwritings of ACC's debt and securities, despite its knowledge or reckless disregard or conscious avoidance of the wrongful conduct of the Rigas Family.

1433.   By reason of the foregoing, the ART, as successor in interest to Adelphia, has been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## THIRTY-NINTH CLAIM FOR RELIEF

### (Gross Negligence Against The Agent Banks)

**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1434.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

411

1435.  By virtue of its fiduciary duty, special relationship and/or superior knowledge with respect to Adelphia, each of the Agent Banks owed a duty to Adelphia (i) to act with reasonable care in the course of its duties and responsibilities as lenders, and (ii) to keep Adelphia fully informed of material facts concerning its services.

1436.  Each of the Agent Banks breached its duty by, among other things, approving participation in each of the Co-Borrowing Facilities and authorizing funding thereunder despite actual or constructive knowledge that (i) the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars on the Debtors' credit (for which the Debtors would remain liable), (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors, and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

1437.  Each of the Agent Banks breached its duties to the Debtors so that its affiliated Investment Bank could earn millions of dollars of transaction fees for underwriting and financial advisory services in connection with Adelphia's issuance of securities.

1438.  The conduct of each of the Agent Banks caused the Debtors and the Debtors' arm's-length creditors significant harm.  Among other things, had any of the Agent Banks disclosed to Adelphia's Independent Directors the material information it possessed with respect to, among other things, the fraudulent structure of the Co-Borrowing Facilities, the Rigas Family's fraudulent use of co-borrowing funds and the Rigas Family's failure to cause Adelphia to accurately disclose its liabilities under the Co-Borrowing Facilities, Adelphia's Board of Directors would not have authorized such facilities.

1439.   Thus, as a result of each of the Agent Bank's breaches, the Debtors became insolvent, further insolvent, inadequately capitalized and/or unable to pay its debts as they would become due in the ordinary course of its business and affairs.

1440.   The conduct of each of the Agent Banks was wrongful and without justification or excuse. In addition, the acts and omissions of each of the Agent Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

1441.   Moreover, the conduct of each of each of the Agent Banks harmed the public generally because, among other things:  (i) public investors and arm's-length creditors relied upon Adelphia's public filings, which each of the Agent Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the each of the Agent Bank's affiliated Investment Bank involved numerous investors that publicly traded Adelphia's securities shortly after the initial offerings; (iii) Adelphia's public investors and arm's-length creditors relied on each of the Agent Bank's affiliated Investment Bank to conduct itself prudently and without conflicts of interest; and (iv) each of the Agent Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors. Each of the Agent Banks participated in the Co-Borrowing Facilities despite its knowledge or conscious avoidance of the wrongful conduct of the Rigas Family.

1442.   By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

413

## FORTIETH CLAIM FOR RELIEF

### (Gross Negligence Against The Investment Banks)

### [PRESERVED CLAIM – THIS CLAIM WAS DISMISSED IN PART AS TO CERTAIN DEFENDANTS PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT AS TO THOSE DEFENDANTS TO PRESERVE THE CLAIM FOR APPEAL]

1443.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1444.   By virtue of its fiduciary duty, special relationship and/or superior knowledge with respect to the Debtors, each of the Investment Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as underwriters and/or financial advisors, and (ii) to keep the Debtors fully informed of all material facts concerning its services.

1445.   Each of the Investment Banks breached its duties by, among other things, structuring and/or syndicating the Co-Borrowing Facilities and syndicating or underwriting Adelphia's debt and securities offerings and failing to keep Adelphia's Independent Directors fully informed of all material facts despite actual or constructive knowledge that (i) each of the Co-Borrowing Facilities were fraudulently structured to give the Rigas Family access to billions of dollars on the Debtors' credit (for which the Debtors would remain liable), (ii) the Rigas Family intended to use funds from the Co-Borrowing Facilities for their own purposes with no benefit to the Debtors, and (iii) the Rigas Family was causing Adelphia to fail to disclose the true extent of its liability under the Co-Borrowing Facilities.

414

1446.   Each of the Investment Banks breached its duties to the Debtors so that it could earn millions of dollars of transaction fees for its underwriting and financial advisory services in connection with Adelphia's issuance of securities.

1447.   The conduct of each of the Investment Banks caused the Debtors and the Debtors' arms-length creditors significant harm. Among other things, had any of the Investment Banks disclosed to Adelphia's Independent Directors the material information it possessed with respect to, among other things, the Rigas Family's fraudulent use of co-borrowing funds and the Rigas Family's failure to cause the Debtors to accurately disclose their liabilities under the Co-Borrowing Facilities, Adelphia's Board of Directors would not have authorized such facilities.

1448.   Thus, as a result of each of the Investment Bank's breaches, the Debtors became insolvent, further insolvent, inadequately capitalized and/or unable to pay its debts as they would become due in the ordinary course of its business and affairs.

1449.   The conduct of each of the Investment Banks was wrongful, without justification or excuse and contrary to generally accepted standards of morality. In addition, the acts and omissions of each of the Investment Banks were committed with actual malice and/or a wanton and willful disregard of the Debtors' rights and, in light of the parties' relationship, represent unconscionable and unjustifiable conduct.

1450.   Moreover, the conduct of each of each of the Investment Banks harmed the public generally because, among other things: (i) public investors and arm's-length creditors relied upon Adelphia's public filings, which each of the Investment Banks knew were inaccurate with respect to Adelphia's liabilities under the Co-Borrowing Facilities; (ii) the offerings underwritten by the Investment Banks involved numerous investors that publicly traded Adelphia's securities

shortly after the initial offerings; (iii) Adelphia's public investors and arm's-length creditors relied on each of the Investment Banks to conduct itself prudently and without conflicts of interest; and (iv) each of the Investment Banks knew that it was advising the members of the Rigas Family, who owed fiduciary duties to Adelphia's shareholders and other public investors. Each of the Investment Banks participated in underwritings of the Debtors' securities, despite its knowledge or reckless disregard or conscious avoidance of the wrongful conduct of the Rigas Family.

1451. By reason of the foregoing, the Debtors have been damaged in the amount of at least $5 billion, or such other amount to be determined at trial.

## FORTY-FIRST CLAIM FOR RELIEF

### (Declaratory Judgment Against the CCH Co-Borrowing Lenders)

1452. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1453. The CCH Credit Agreement provides, among other things:

> Notwithstanding any contrary provision, it is the intention of the Borrowers, the Lenders, and the Administrative Agent that the amount of the Obligation for which any Borrower is liable shall be, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar Laws applicable to such Borrower. Accordingly, notwithstanding anything to the contrary contained in this Agreement or any other agreement or instrument executed in connection with the payment of any of the Obligations, the amount of the Obligation for which any Borrower is liable shall be limited to an aggregate amount equal to the largest amount that would not render such Borrower's obligations hereunder subject to avoidance under *Section 548* of the *United States Bankruptcy Code* or any comparable provision of any applicable state Law.

(CCH Credit Agreement, Section 9.6) (original emphasis).

416

1454.  Defendants BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit
Lyonnais, CSFB, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, SunTrust, CIBC,
BLG, Rabobank, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, DLJ, Fifth Third,
First Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper Fund,
KZH III, KZH CypressTree, KZH ING, KZH Langdale, KZH Pondview KZH Shoshone, KZH
Waterside, Liberty-Stein, MeesPierson, Mellon Bank, Natexis, NCBP, CypressTree Floating
Rate Fund, Olympic Funding, Oppenheimer, Pinehurst, Principal Life, Société Générale, Stein
Roe, U.S. Bank and United of Omaha are parties to the CCH Credit Agreement.

1455.  As a result of the conduct alleged herein, all or a significant portion of the
Obligations (as defined in the CCH Credit Agreement) under the CCH Credit Agreement are
subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable
provision of any applicable state law.

1456.  There is a bona fide dispute among the parties concerning their rights and
obligations under the CCH Credit Agreement.

1457.  Plaintiff is entitled to a declaration that, under the CCH Credit Agreement, the
ART, as successor in interest to Adelphia, is not liable for any of the Obligations under the CCH
Credit Agreement in excess of those permitted by the CCH Credit Agreement.

## FORTY-SECOND CLAIM FOR RELIEF

### (Declaratory Judgment Against the Olympus Co-Borrowing Lenders)

1458.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1459.  The Olympus Credit Agreement provides, among other things:

Notwithstanding any contrary provision, it is the intention of the Borrowers, the Lenders, and the Administrative Agent that the amount of the Obligation for which any Borrower is liable shall be, but not in excess of, the maximum amount permitted by fraudulent conveyance, fraudulent transfer, or similar Laws applicable to such Borrower. Accordingly, notwithstanding anything to the contrary contained in this Agreement or any other agreement or instrument executed in connection with the payment of any of the Obligations, the amount of the Obligation for which any Borrower is liable shall be limited to an aggregate amount equal to the largest amount that would not render such Borrower's obligations hereunder subject to avoidance under *Section 548* of the *United States Bankruptcy Code* or any comparable provision of any applicable state Law.

(Olympus Credit Agreement, Section 9.6) (original emphasis.)

1460.   Defendants BMO, Wachovia, BNS, Fleet, BONY, BofA, Citicorp, TDI, Chase, Deutsche Bank, CSFB, Credit Lyonnais, Royal Bank of Scotland, Société Générale, Fuji Bank, CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding, Stanwich, Sumitomo and Toronto Dominion are parties to the Olympus Credit Agreement.

1461.   As a result of the conduct alleged herein, all or a significant portion of the Obligations (as defined in the Olympus Credit Agreement) under the Olympus Credit Agreement are subject to avoidance under Section 548 of the United States Bankruptcy Code or any comparable provision of any applicable state law.

1462.   There is a bona fide dispute among the parties concerning their rights and obligations under the Olympus Credit Agreement.

418

1463.   Plaintiff is entitled to a declaration that, under the Olympus Credit Agreement, the ART, as successor in interest to Adelphia, is not liable for any of the Obligations under the Olympus Credit Agreement in excess of those permitted by the Olympus Credit Agreement.

### FORTY-THIRD CLAIM FOR RELIEF

**(Avoidance and Recovery of Voidable Preferences Under
11 U.S.C. §§ 547 and 550 Against the Century-TCI Lenders)**

1464.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1465.   On or within the ninety-day period preceding the Petition Date, the Century-TCI Lenders received payments of principal, interest and fees in the amount of at least $4,000,240.45 from the Century-TCI Debtors (the "Century-TCI Payments").

1466.   The Century-TCI Payments were transfers of an interest in the property of the Century-TCI Debtors.

1467.   Each of the Century-TCI Debtors was insolvent as of the date of the Century-TCI Payments.

1468.   As a result of the Century-TCI Payments, the Century-TCI Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1469.   By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the Century-TCI Payments should be avoided, recovered and preserved for the benefit of the Century-TCI Debtors' estates.

419

## FORTY-FOURTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under
### 11 U.S.C. §§ 547 and 550 Against the Parnassos Lenders)

1470. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1471. On or within the ninety-day period preceding the Petition Date, the Parnassos Lenders received payments of principal, interest and fees in the amount of at least $25,370,318.41 from the Parnassos Debtors (the "Parnassos Payments").

1472. The Parnassos Payments were transfers of an interest in the property of the Parnassos Debtors.

1473. Each of the Parnassos Debtors was insolvent as of the date of the Parnassos Payments.

1474. As a result of the Parnassos Payments, the Parnassos Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1475. By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the Parnassos Payments should be avoided, recovered and preserved for the benefit of the Parnassos Debtors' estates.

## FORTY-FIFTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the UCA/HHC Lenders)

### [PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]

1476.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1477.  The UCA/HHC Co-Borrowing Lenders approved the UCA/HHC Co-Borrowing Facility and authorized funding thereunder despite their knowledge that, among other things:  the structure of the UCA/HHC Co-Borrowing Facility allowed the Rigas Family to use proceeds of the facility for their own benefit, with no benefit to Adelphia; the RFE co-borrowers contributed a disproportionately small number of the assets from which the UCA/HHC Co-Borrowing Lenders could expect repayment; and the Rigas Family intended to, and in fact did, use funds from the UCA/HHC Co-Borrowing Facility for their own purposes, with no benefit to Adelphia.

1478.  Despite their knowledge, at the closing of the UCA/HHC Co-Borrowing Facility, the UCA/HHC Co-Borrowing Lenders received the UCA/HHC Co-Borrowing Security Interests and, thereafter, received principal and interest payments from Adelphia on funds drawn down by the Rigas Family, for which Adelphia received no benefit.  Moreover, the UCA/HHC Co-Borrowing Lenders seek to recover from Adelphia principal and interest payments on amounts drawn by the Rigas Family under the UCA/HHC Co-Borrowing Facility, for which Adelphia received no benefit.

1479.  By reason of the foregoing, the UCA/HHC Co-Borrowing Lenders have been unjustly enriched at Adelphia's expense.

421

1480.  Adelphia has no adequate remedy at law.

1481.  Equity and good conscience compels the UCA/HHC Co-Borrowing Lenders to:
(i) terminate the UCA/HHC Co-Borrowing Security Interests, (ii) return to Adelphia all amounts
paid by Adelphia in respect of funds drawn under the UCA/HHC Co-Borrowing Facility that
were used by the Rigas Family, plus interest from the date of each payment made by Adelphia to
the UCA/HHC Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from
Adelphia for amounts drawn under the UCA/HHC Co-Borrowing Facility by the Rigas Family.

## FORTY-SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the CCH Co-Borrowing Lenders)
### [PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]

1482.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1483.  The CCH Co-Borrowing Lenders approved the CCH Co-Borrowing Facility and
authorized funding thereunder despite their knowledge that, among other things: the structure of
the CCH Co-Borrowing Facility allowed the Rigas Family to use proceeds of the facility for their
own benefit, with no benefit to Adelphia; the RFE co-borrower contributed a disproportionately
small number of the assets from which the CCH Lenders could expect repayment; and the Rigas
Family intended to, and in fact did, use funds from the CCH Co-Borrowing Facility for their own
purposes, with no benefit to Adelphia.

1484.  Despite their knowledge, at the closing of the CCH Co-Borrowing Facility, the
CCH Lenders received the Century Security Interests and, thereafter, received principal and

422

interest payments from Adelphia on funds drawn down by the Rigas Family, for which Adelphia received no benefit. Moreover, the CCH Lenders seek to recover from Adelphia principal and interest payments on amounts drawn by the Rigas Family under the CCH Co-Borrowing Facility, for which Adelphia received no benefit.

1485.   By reason of the foregoing, the CCH Lenders have been unjustly enriched at Adelphia's expense.

1486.   Adelphia has no adequate remedy at law.

1487.   Equity and good conscience compels the CCH Lenders to:  (i) terminate the CCH Co-Borrowing Security Interests, (ii) return to Adelphia all amounts paid by Adelphia in respect of funds drawn under the CCH Co-Borrowing Facility that were used by the Rigas Family, plus interest from the date of each payment made by Adelphia to the CCH Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from Adelphia for amounts drawn under the CCH Co-Borrowing Facility by the Rigas Family.

## FORTY-SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment Against the Olympus Lenders)
**[PRESERVED CLAIM -- THIS CLAIM WAS DISMISSED PURSUANT TO THE DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1488.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1489.   The Olympus Lenders approved the Olympus Facility and authorized funding thereunder despite their knowledge that, among other things:  the structure of the Olympus Facility allowed the Rigas Family to use proceeds of the facility for their own benefit, with no

423

benefit to Adelphia; the RFE co-borrower contributed a disproportionately small number of the assets from which the Olympus Lenders could expect repayment; and the Rigas Family intended to, and in fact did, use funds from the Olympus Facility for their own purposes, with no benefit to Adelphia.

1490.   Despite their knowledge, at the closing of the Olympus Facility, the Olympus Lenders received the Olympus Security Interests and, thereafter, received principal and interest payments from Adelphia on funds drawn down by the Rigas Family, for which Adelphia received no benefit. Moreover, the Olympus Lenders seek to recover from Adelphia principal and interest payments on amounts drawn by the Rigas Family under the Olympus Facility, for which Adelphia received no benefit.

1491.   By reason of the foregoing, the Olympus Lenders have been unjustly enriched at Adelphia's expense.

1492.   Adelphia has no adequate remedy at law.

1493.   Equity and good conscience compels the Olympus Lenders to: (i) terminate the Olympus Security Interests, (ii) return to Adelphia all amounts paid by Adelphia in respect of funds drawn under the Olympus Facility that were used by the Rigas Family, plus interest from the date of each payment made by Adelphia to the Olympus Co-Borrowing Lenders, and (iii) relinquish any purported right to payment from Adelphia for amounts drawn under the Olympus Co-Borrowing Facility by the Rigas Family.

424

## FORTY-EIGHTH CLAIM FOR RELIEF

### (Equitable Estoppel Against the Co-Borrowing Lenders)

**[PRESERVED CLAIM – THIS CLAIM WAS DISMISSED PURSUANT TO THE
DECISION AND ORDER DATED JUNE 11, 2007, ISSUED BY UNITED STATES
BANKRUPTCY JUDGE ROBERT E. GERBER AND HAS BEEN INCLUDED IN THIS
AMENDED COMPLAINT TO PRESERVE THE CLAIM FOR APPEAL]**

1494.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1495.  As alleged herein, each of the Co-Borrowing Lenders and each of the Investment
Banks engaged in wrongful conduct directed towards Adelphia and its arm's-length creditors.

1496.  Each of the Co-Borrowing Lenders entered into the Co-Borrowing Facilities and
authorized funding thereunder despite actual knowledge, or reckless disregard or conscious
avoidance, of the fact, that the Co-Borrowing Facilities were fraudulently structured to give the
Rigas Family access to billions of dollars (for which the Co-Borrowing Debtors would remain
liable), that the Rigas Family intended to, and did, use those funds for their own benefit, and that
Adelphia concealed the true extent of their liabilities under the Co-Borrowing Facilities.  The
Co-Borrowing Lenders were similarly aware of the fraudulent uses of the Non-Co-Borrowing
Facilities as alleged herein.

1497.  Prior to the consummation of the Co-Borrowing Facilities, each of the Agent
Banks conducted extensive due diligence on its own behalf and on behalf of the other Co-
Borrowing Lenders.  Similarly, each of the Agent Banks approved participation in the Co-
Borrowing Facilities to obtain millions of dollars of investment banking fees for its affiliated
Investment Bank, and obtained extensive due diligence about the Debtors from its Investment
Bank (which underwrote one or more of Adelphia's securities offerings).  After each of the Co-

425

Borrowing Facilities closed, the Agent Banks and the other Co-Borrowing Lenders obtained
compliance certificates from Adelphia as required by the Co-Borrowing Agreements. Upon
information and belief, the Agent Banks also were authorized to obtain compliance certificates
and other information on behalf of the other Co-Borrowing Lenders. Upon information and
belief, the Agent Banks were obligated to, and did, transmit to the other Co-Borrowing Lenders
information about the Co-Borrowing Debtors' borrowings under the Co-Borrowing Facilities and
other indebtedness. To the extent that any of the Co-Borrowing Lenders did not know of, or
recklessly disregarded or consciously avoided knowledge of, the massive fraud at the Debtors,
the knowledge and wrongful conduct of the Agent Banks should be imputed to each of the other
Co-Borrowing Lenders by virtue of the agency relationships among them.

1498. For their part, the Investment Banks -- as a result of, among other things, the
efforts of the Agent Banks -- earned hundreds of millions of dollars of fees providing structured
finance advice to Adelphia and underwriting and marketing Adelphia's securities. In the process,
each of the Investment Banks induced purchasers of those securities to rely on various offering
materials that were materially misleading.

1499. Indeed, at all times during the marketing of Adelphia's securities, each of the
Investment Banks either knew, recklessly disregarded or consciously avoided the fact that the
offering materials contained material misrepresentations and omissions regarding the business
and financial condition of Adelphia, including, without limitation, the extent of Adelphia's
leverage. Indeed, none of the offering materials made any disclosure of the extensive fraud the
Rigas Family was perpetrating at Adelphia, including the failure to disclose the true amount of
the Co-Borrowing Obligations. The Investment Banks induced investors to rely on those false

426

and deceptive representations about Adelphia's financial condition in making their decisions to extend credit to ACC and other Adelphia entities by purchasing debt securities.

1500.   Moreover, each of the Investment Banks had its purportedly independent analysts issue knowingly misleading reports on Adelphia's securities to inflate the market value of the Rigas Family's holdings, the bonds issued by ACC and its direct and indirect subsidiaries, and the portion of the Debtors' credit facilities that its affiliated Agent Bank was selling in the secondary loan market.

1501.   Thus, with respect to the wrongful conduct directed at Adelphia and its arm's-length creditors, each Investment Bank and its affiliated Agent Bank acted as a single unit. Indeed, many of the Investment Banks and the Agent Banks held themselves out to Adelphia as unitary organizations offering underwriting and related financial advisory services, along with traditional credit banking services.

1502.   Moreover, each of the Co-Borrowing Lenders intended to syndicate all or a substantial portion of their interest in the Co-Borrowing Facilities to other institutions.  By and through the syndication, each of the Co-Borrowing Lenders attempted to eliminate the significant risk of exposure to the continuing fraud being perpetrated by the Rigas Family.

1503.   The foregoing conduct amounts to a knowing misrepresentation and/or concealment of material facts from the independent members of Adelphia's Board of Directors, with the intention that Adelphia act upon such conduct.

1504.   As alleged above, the independent members of Adelphia's Board of Directors lacked knowledge of the true facts and would have taken action to thwart the foregoing conduct

had they been fully informed. Indeed, the independent members of Adelphia's Board of Directors -- and thus, Adelphia -- relied upon the conduct of the Co-Borrowing Lenders and the Investment Banks by, among other things, approving the Co-Borrowing Facilities and continuing to allow Adelphia -- and, as a result of the foregoing fraudulent conduct, the Rigas Family -- to draw funds thereunder.

1505. By reason of the foregoing inequitable conduct, the Co-Borrowing Lenders should be estopped from retaining and enforcing the Co-Borrowing Security Interests, from retaining principal and interest payments made by Adelphia in respect of amounts drawn down under the Co-Borrowing Facilities for the benefit of the Rigas Family, and from seeking to recover outstanding principal and interest payments from Adelphia with respect to funds drawn under the Co-Borrowing Facilities for the benefit of the Rigas Family.

## FORTY-NINTH CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547, 550 and 551 Against the FrontierVision Lenders)

1506. Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1507. In the ninety-day period preceding the Petition Date, the FrontierVision Debtors granted to the FrontierVision Lenders as collateral all or a portion of the stock, limited liability company interests or partnership interests, as applicable, or assets of the following entities (the "FrontierVision Collateral Transfers"): Adelphia Communications of California III, LLC, FOP Indiana, L.P., and The Maine Internetworks, Inc.

428

1508.   In the ninety-day period preceding the Petition Date, the FrontierVision Lenders perfected the FrontierVision Collateral Transfers by, among other things, filing financing statements pursuant to the Uniform Commercial Code ("UCC").

1509.   In the ninety-day period preceding the Petition Date, the FrontierVision Lenders received payments of interest in the amount of at least $16,842,141.40 (the "FrontierVision Payments").

1510.   The FrontierVision Collateral Transfers, the perfection of the FrontierVision Collateral Transfers and the FrontierVision Payments were transfers of an interest in the property of the FrontierVision Debtors (the "FrontierVision Preferential Transfers").

1511.   Each of the FrontierVision Debtors was insolvent as of the date of the FrontierVision Preferential Transfers.

1512.   As a result of the FrontierVision Preferential Transfers, the FrontierVision Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1513.   By virtue of the foregoing, pursuant to sections 547, 550 and 551 of the Bankruptcy Code, all of the FrontierVision Preferential Transfers should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## FIFTIETH CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547 and 550 Against the CCH Lenders)

1514.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

429

1515.   In the ninety-day period preceding the Petition Date, the CCH Lenders received payments of principal, interest and fees in the amount of at least $520,020,641.72 (the "CCH Payments").

1516.   The CCH Payments were transfers of an interest in the property of the applicable CCH Co-Borrowing Debtors (the "CCH Preferential Transfers").

1517.   Each of the CCH Co-Borrowing Debtors was insolvent as of the date of the CCH Preferential Transfers.

1518.   As a result of the CCH Preferential Transfers, the CCH Co-Borrowing Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1519.   By virtue of the foregoing, pursuant to sections 547 and 550 of the Bankruptcy Code, all of the CCH Preferential Transfers should be avoided, recovered, and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

## FIFTY-FIRST CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under 11 U.S.C. §§ 547, 550 and 551 Against the Olympus Lenders)

1520.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1521.   In the ninety-day period preceding the Petition Date, the Olympus Co-Borrowing Debtors granted to the Olympus Lenders as collateral all or a portion of the capital stock or assets of Starpoint, Limited Partnership, Three Rivers Cable Associate L.P., Cable Sentry Corporation, Coral Security, Inc., Westview Security, Inc., Lake Champlain Cable Television

430

Corporation, Young's Cable TV Corp, and ACC Cable Communications FL-VA, LLC (the "Olympus Collateral Transfers").

1522. In the ninety-day period preceding the Petition Date, the Olympus Co-Borrowing Lenders perfected the Olympus Collateral Transfers by, among other things, filing financing statements pursuant to the UCC, obtaining possession of the applicable stock certificates or using other means provided by applicable state law.

1523. In the ninety-day period preceding the Petition Date, the Olympus Co-Borrowing Lenders received payments of principal, interest and fees in the amount of at least $14,025,192.86 (the "Olympus Payments").

1524. The Olympus Collateral Transfers, the perfection of the Olympus Collateral Transfers and the Olympus Payments were transfers of an interest in the property of the Olympus Co-Borrowing Debtors (the "Olympus Preferential Transfers").

1525. Each of the Olympus Co-Borrowing Debtors was insolvent as of the date of the Olympus Preferential Transfers.

1526. As a result of the Olympus Preferential Transfers, the Olympus Co-Borrowing Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1527. By virtue of the foregoing, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, all of the Olympus Preferential Transfers should be avoided, recovered and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

431

## FIFTY-SECOND CLAIM FOR RELIEF

### (Avoidance and Recovery of Voidable Preferences Under
### 11 U.S.C. §§ 547, 550 and 551 Against the UCA/HHC Lenders)

1528.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1529.  In the ninety-day period preceding the Petition Date, the UCA/HHC Debtors granted to the UCA/HHC Co-Borrowing Lenders as collateral all or a portion of the capital stock or assets of Southwest Virginia Cable, Inc. Adelphia Central Pennsylvania, LLC, Adelphia Cablevision of Santa Ana LLC, and Adelphia Cablevision of Simi Valley LLC (the "UCA/HHC Collateral Transfers").

1530.  In the ninety-day period preceding the Petition Date, the UCA/HHC Co-Borrowing Lenders perfected the UCA/HHC Collateral Transfers by, among other things, filing financing statements pursuant to the UCC, obtaining possession of the applicable stock certificates or using other means provided by applicable state law.

1531.  In the ninety-day period preceding the Petition Date, the UCA/HHC Lenders received payments of principal, interest and fees in the amount of at least $25,707,881.96 (the "UCA/HHC Payments").

1532.  The UCA/HHC Collateral Transfers, the perfection of the UCA/HHC Collateral Transfers and the UCA/HHC Payments were transfers of an interest in the property of the UCA/HHC Co-Borrowing Debtors (the "UCA/HHC Preferential Transfers").

1533.  Each of the UCA/HHC Co-Borrowing Debtors was insolvent as of the date of the UCA/HHC Preferential Transfers.

432

1534.  As a result of the UCA/HHC Preferential Transfers, the UCA/HHC Co-Borrowing Lenders recovered more than they would have recovered in a Chapter 7 liquidation.

1535.  By virtue of the foregoing, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, all of the UCA/HHC Preferential Transfers should be avoided, recovered and preserved for the benefit of Plaintiff, as successor in interest to the Debtors' estates.

### FIFTY-THIRD CLAIM FOR RELIEF

#### (Negligence – Against SSB)

1536.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1537.  SSB agreed with Adelphia to render opinions ("Fairness Opinions") as to whether the amount paid by the RFEs and/or the Rigas Family for shares of ACC stock issued by ACC to them was financially fair to ACC.

1538.  In rendering the Fairness Opinions, SSB owed a duty to Adelphia to: (i) act with reasonable care in the course of its duties and responsibilities as advisor to Adelphia; and (ii) avoid conflicts of interest in the course of its duties advising Adelphia and Adelphia's Board of Directors.

1539.  Adelphia hired SSB to render advice based upon SSB's exercise of its own independent judgment and to bring to Adelphia's attention any flaws in any transactions considered by Adelphia and its Board of Directors.

433

1540.  SSB rendered an opinion on April 9, 1999 and recommended that it was fair for ACC to sell certain ACC Class B common stock to a RFE, Highland Holdings, for $375 million ("April 9, 1999 Opinion").

1541.  In reliance upon the April 9, 1999 Opinion and recommendation, ACC conveyed the Class B common stock to Highland Holdings and purportedly received $375 million therefore from Highland Holdings.

1542.  As SSB knew, the Rigas Family transferred $375 million from the Cash Management System to Highland Holdings for Highland Holdings to pay for the Class B common stock.

1543.  As set forth above, the consideration that ACC received for the Class B common stock was wholly illusory.

1544.  SSB knew that Highland Holdings was going to use money drawn from Adelphia's Co-Borrowing Facilities to fund the stock purchases when SSB issued the April 9, 1999 Opinion and made its recommendation.

1545.  Thus, SSB breached its duty to Adelphia when it recommended to Adelphia that the share price was fair and that it proceed with the transaction.

1546.  SSB rendered an opinion on September 30, 1999 and recommended that it was fair for ACC to sell 2,500,000 shares of ACC Class B common stock to the Rigas Family, or an affiliate thereof, at $54 per share or $135 million ("September 30, 1999 Opinion").

434

1547.  In reliance upon the September 30, 1999 Opinion and recommendation, ACC conveyed the Class B common stock to the Rigas Family or a RFE and purportedly received $135 million therefore from Highland Holdings.

1548.  As SSB knew, the Rigas Family transferred $135 million from the Cash Management System, funds belonging to Adelphia, to Highland Holdings for Highland Holdings to pay for the Class B common stock.

1549.  As set forth above, the consideration that ACC received for the Class B common stock was wholly illusory.

1550.  SSB knew that Highland Holdings was going to use money drawn down from Adelphia's Co-Borrowing Facilities to fund the stock purchases when it issued the September 30, 1999 Opinion and made its recommendation.  SSB therefore breached its duty to Adelphia when it recommended to Adelphia that the share price was fair and that it proceed with the transaction.

1551.  SSB rendered an opinion on January 17, 2001 and recommended that it was fair for ACC to sell 5,819,367 shares of ACC Class B common stock to a RFE, Highland 2000, L.P. for $44.75 per share or $260.416 million ("January 17, 2001 Opinion").

1552.  In reliance upon the January 17, 2001 Opinion and recommendation, ACC conveyed the Class B common stock to Highland 2000, L.P. and purportedly received $260.416 million therefore from Highland Holdings.

1553.  As SSB knew, the Rigas Family transferred $260.416 million from the Cash Management System, which funds belonged to Adelphia, to Highland Holdings for Highland Holdings to pay for the Class B common stock.

435

1554. Thus, the consideration that ACC received for the Class B common stock was wholly illusory. SSB knew that Highland Holdings was going to use money drawn down from Adelphia's Co-Borrowing Facilities to fund the stock purchases when it issued the January 17, 2001 Letter. SSB therefore breached its duty to Adelphia when it recommended to Adelphia that the share price was fair and that it proceed with the transaction.

1555. By issuing the Fairness Opinions and otherwise recommending that Adelphia proceed with the public offerings and private placements in which the Rigas Family acquired Adelphia's debt and equity securities, SSB breached its duty to Adelphia.

1556. SSB recommended that Adelphia proceed with those transactions so that it could garner millions of dollars of fees for its financial advisory services in connection with the public offerings and private placements, with the prospect that it could garner additional fees.

1557. The SSB recommendations and issuance of the Fairness Opinions induced ACC's Board of Directors to approve the offerings and private placements. Had SSB properly declined to issue the Fairness Opinions or properly declined to recommend that ACC's Board of Directors approve the offerings, ACC's Board of Directors would not have approved the offerings and private placements.

1558. SSB knew, should have known or consciously avoided the fact that Adelphia was not receiving fair consideration and/or reasonably equivalent value for the offerings and private placements.

1559. By virtue of the foregoing, the Plaintiff is entitled to recover in an amount to be determined at trial.

436

## FIFTY-FOURTH CLAIM FOR RELIEF

### (Fraudulent Concealment Against the Investment Banks)

1560.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1561.   As a result of the Investment Banks' (i) role as underwriters on behalf of and financial advisors to Adelphia, (ii) being consequently situated in a position of specialized knowledge regarding Adelphia's incurrence of bank debt, the syndication and marketing of such debt and of Adelphia securities to public investors and a position of superior knowledge regarding Adelphia's own true financial condition, and (iii) knowing that Adelphia reasonably had relied, and reasonably would rely, on its statements and their completeness, each Investment Bank had a duty to Adelphia to act truthfully and faithfully and disclose anything adverse to Adelphia in connection with their investment banking services.

1562.   Adelphia depended and relied on the Investment Banks to advise them regarding the debt syndications and securities offerings and the information that Adelphia would need to determine whether to pursue those public offerings.  Adelphia further depended and relied on the Investment Banks to advise them regarding the information and material that they would have to disclose to prospective public investors in order to consummate these transactions.

1563.   The Investment Banks worked closely with their affiliated Agent Banks to gather the information necessary to advise Adelphia regarding these transactions.  The Investment Banks knew that the Independent Directors were required to approve only those transactions that were in the best interests of Adelphia and that the Independent Directors had to approve the public disclosures and SEC filings regarding these transactions.  The Investment Banks had

437

specialized knowledge regarding the syndication and offering of these debt and securities transactions and the Investment Banks induced Adelphia to rely on them for their expert advice.

1564.  By virtue of their own due diligence and the information in the possession of their affiliated Agent Banks that was available to and shared with them, the Investment Banks had actual knowledge of or consciously avoided facts concerning the Rigas Family's misuse of the Co-Borrowing Facilities, the Non-Co-Borrowing Facilities, and the CMS for their own personal purposes.  The Investment Banks also knew or consciously avoided the fact that the Independent Directors did not have the same knowledge as they did of these fraudulent uses of Adelphia's funds at the times that the Independent Directors approved the facilities, the disclosures related to them, and the offerings of Adelphia equity and debt to public investors.  By virtue of their superior knowledge, their knowledge that Adelphia was relying on their expertise, and their knowledge that the Independent Directors were relying on information that was incorrect, misleading, and that omitted material facts, the Investment Banks owed a duty to Adelphia to provide it with accurate and true information and expert advice.

1565.  The Investment Banks engaged in fraudulent concealment in at least the following ways:

> (i)    fraudulently failing to disclose that the Rigas Family excluded more than $2 billion in off-balance-sheet debt from Adelphia's financial statements;
>
> (ii)   fraudulently failing to disclose that the Rigas Family's use of co-borrowed proceeds for the purchase of stock in Adelphia in transactions had the effect of artificially reducing Adelphia's reported debt while at the same time artificially increasing its reported equity;
>
> (iii)  fraudulently failing to disclose that Adelphia's stock sales to the Rigas Family did not have the effect of de-leveraging Adelphia, when in fact they were drawing Adelphia deeper into debt;

438

(iv)      fraudulently failing to disclose that funds drawn down from the Co-Borrowing Facilities into the CMS were used for the Rigas Family's personal purposes, including to pay the Rigas Family's personal margin calls at Adelphia's expense;

(v)      working with the Agent Banks to develop the inherently fraudulent structure of the Co-Borrowing Facilities and then failing to disclose the true ramifications of that structure and the Rigas Family's misuse of the Co-Borrowing Facilities to the Independent Directors; and

(v)      crafting materials for Adelphia's debt and equity offerings that contained material misstatements and omissions regarding Adelphia's financial condition that operated to deceive not only prospective public investors but also Adelphia's Independent Directors themselves.

1566. The concealment of the foregoing and other material facts by the Investment Banks had the effect of causing Adelphia's Independent Directors to be lulled into a false sense of security with regard to Adelphia's true financial condition, Adelphia's credit facilities and securities offerings, and the Rigas Family's management of and fidelity to Adelphia. This inured to the great financial benefit of the Investment Banks.

1567. The Investment Banks garnered immense fees for the public debt and equity offerings in which they participated. The Investment Banks knew that if they fully and completely disclosed Adelphia's true financial condition to the Independent Directors, the Independent Directors then would be under a duty and obligation to step in and terminate the fraud occurring within Adelphia. The Investment Banks also knew that, if this were to happen, they would no longer be able to garner their fees.

1568. Many of the fees garnered by the Investment Banks related to their sale of debt arising under the Co-Borrowing Facilities. Thus, to generate such fees, the Investment Banks, acting from their position of specialized and superior knowledge and acting together with their affiliated Agent Banks, worked to structure the Co-Borrowing Facilities in a manner that was

439

inherently detrimental to Adelphia. The Investment Banks, acting with their affiliated Agent Banks, then concealed that fact from the Independent Directors to secure their approval of the Co-Borrowing Facilities.

1569.   To protect their source of fees, the Investment Banks, acting from their position of specialized and superior knowledge, also advised and encouraged Adelphia to engage in public debt and equity offerings. Such advice and encouragement created in the Independent Directors the false impression that Adelphia's financial condition was healthy, that such offerings were in the best interests of Adelphia when, in fact, they had the effect of drawing the company deeper into debt, and that the Rigas Family was satisfying their duties of care and loyalty to Adelphia's interests.

1570.   By reason of the foregoing, the Investment Banks breached their duty to Adelphia and caused Adelphia to be damaged in an amount to be determined at trial, but not less than $3.625 billion.

### FIFTY-FIFTH CLAIM FOR RELIEF

#### (Fraud against the Agent Banks and the Investment Banks)

1571.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1572.   As set forth in more detail above, the Agent Banks, Investment Banks and the Rigas Family engaged in fraud against Adelphia and its other creditors in at least the following ways:

(i)     improperly transferring Adelphia's assets and funds to benefit the Rigas Family's own interests;

440

(ii)  concealing those wrongful transactions through, for example, the improper use of "netting" and "reclassification" procedures;

(iii)  misrepresenting Adelphia's finances in offering materials by excluding more than $2 billion in off-balance-sheet debt that was borrowed by the Rigas Family or RFEs for their own benefit and for which Adelphia was nevertheless jointly and severally liable;

(iv)  using or permitting to be used co-borrowed proceeds for the purchase of stock in Adelphia in transactions that had the effect of artificially reducing Adelphia's reported debt while at the same time artificially increasing its reported equity;

(v)  falsely and fraudulently representing that Adelphia's stock sales had the effect of de-leveraging the company, when in fact they had the opposite effect;

(vi)  using or permitting to be used funds drawn down from the Co-Borrowing Facilities into the CMS to pay the Rigas Family's or RFEs' personal margin calls;

(vii)  failing to disclose that the Rigas Family's purchase of Adelphia stock was financed with loans guaranteed by Adelphia;

(viii)  "purchasing" or permitting to be "purchased" through Highland 2000 over $800 million worth of Adelphia's debt and equity securities by simply recording journal entries; and

(ix)  using the Co-Borrowing Facilities and the CMS to loot billions of dollars from Adelphia.

1573.  The Agent Banks and the Investment Banks specifically participated in the Rigas Family's fraudulent schemes to siphon money and assets from Adelphia without disclosing that information to Adelphia and the Independent Directors and knowingly acting to further those schemes in at least the following ways:

(i)  as to the Agent Banks, and where appropriate, their affiliated Investment Banks, by designing, implementing, and funding the Co-Borrowing Facilities in a way that made it possible for the Rigas Family to use co-borrowing funds for their own benefit at the expense of the Debtors; and with knowledge that the Rigas Family intended to use the funds for those purposes;

441

(ii)    as to the Agent Banks, and where appropriate, their affiliated Investment Banks, by permitting the RFEs to draw upon the Co-Borrowing Facilities when they did not have sufficient capital to secure the funds allocated to them;

(iii)    as to the Investment Banks, by issuing securities to the Rigas Family when the Investment Banks knew that the Rigas Family or RFEs were using Adelphia's funds to acquire those securities;

(iv)    as to the Investment Banks, by providing substantial assistance to the Rigas Family in perpetuating their control over Adelphia through the acquisition of ACC stock in public offerings, private placements, and margin loans;

(v)    as to SSB, by providing a "fairness opinion" as to the Rigas Family's or the RFEs' purchases of ACC securities, when such purchases were inherently unfair to Adelphia; and

(vi)    as to the Investment Banks and, where appropriate, their affiliated Agent Banks, by crafting materials for Adelphia's debt and equity offerings that contained material misstatements and omissions regarding Adelphia's financial condition that operated to deceive not only prospective public investors but also Adelphia's Independent Directors themselves.

1574.   The Agent Banks and the Investment Banks financially benefited, directly or indirectly, by earning inordinately high fees for funding the fraudulent scheme and designing the essential aspects of that scheme.

1575.   The Agent Banks and the Investment Banks thus fully participated in the Rigas Family's fraud, knowingly funding the fraud in violation of their own practices and standard banking practices and reaping extraordinary financial benefits for themselves as their share of the fraudulent scheme.

1576.   By reason of the foregoing, Adelphia has been damaged in an amount to be determined at trial but not less than $5 billion.

442

## FIFTY-SIXTH CLAIM FOR RELIEF

### (Aiding and Abetting Breach of Fiduciary
### Duty Against Fleet, HSBC, and Key Bank)

1577.  Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

## NATURE OF THE CLAIM

1578.  This claim seeks damages suffered by Adelphia stemming from the active and knowing assistance of three banks, Fleet, HSBC, and Key Bank (the "Buffalo Sabres Banks"), in breaches of fiduciary duties owed to Adelphia by John Rigas and other members of his family. These breaches arose out of John Rigas's personal desire to own a professional hockey team, the Buffalo Sabres.

1579.  From 1994 to 2002, John Rigas misused Adelphia funds to finance his personal interest in the Buffalo Sabres, which was owned and operated by the Delaware partnership Niagara Frontier Hockey, L.P. ("NFHLP"). John Rigas orchestrated the funneling of over $175 million from Adelphia to NFHLP through an Adelphia wholly-owned subsidiary, Sabres, Inc.

1580.  In 1998 John Rigas decided that it was time for him to buy out the limited partners in NFHLP and become its sole owner (along with his sons). A number of years earlier, in 1995 and again in 1997, the team had taken out loans with a total face amount of $80 million from the Buffalo Sabres Banks to help pay for the construction of the HSBC Arena in downtown Buffalo and for the operating expenses of NFHLP.

1581.  As early as 1998, the loans were in default. The partnership and the arena were losing money. The partnership needed a recapitalization or there was a real possibility that the team would have to file for bankruptcy protection.

443

1582.   In the face of this financial distress, the Buffalo Sabres Banks decided that they had to sell the loans and cut their losses. John Rigas was determined to use Adelphia money to recapitalize the partnership, pay principal and interest on the loans, purchase the loans outright, and buy out the limited partners, even though none of these actions was in the interests of the publicly-owned Adelphia. The Buffalo Sabres Banks were aware that these actions were not in the interests of Adelphia. They knew that these actions would saddle Adelphia with more debt and eradicate Adelphia's existing ownership interests in the team. They also knew that they were facilitating transactions that would result in John Rigas and his sons owning the team and leaving Adelphia with nothing but debt. They also knew that once the loans were sold, NFHLP, which remained the borrower under the loans, would still not have enough money to pay Sabres, Inc. the amounts due and owing under the loans.

1583.   These actions were blatant breaches of the fiduciary duties John Rigas and members of the Rigas Family owed to Adelphia. The Buffalo Sabres Banks substantially and actively assisted in these breaches of fiduciary duties, helped John Rigas take control of NFHLP, and extracted $34.1 million of Adelphia's money to purchase loans that were worth far less.

1584.   John Rigas and the members of the Rigas Family also breached their fiduciary duties by making sure that Adelphia, and not NFHLP, paid the principal and interest on the loans even though Adelphia was never a borrower under the loans. Here too the Buffalo Sabres Banks provided active and substantial assistance by, among other things, facilitating the payments and encouraging John Rigas to transfer funds from Adelphia to the team in order to keep the team alive, even though they knew that the team was losing, and was projected to keep losing, millions of dollars and that Adelphia would derive no benefit from its payments.

444

1585. Because Fleet, HSBC, and Key Bank actively and substantially assisted John Rigas and members of the Rigas Family in breaching their fiduciary duties when John Rigas caused Adelphia to transfer millions of dollars to the banks, Fleet, HSBC, and Key Bank are liable for aiding and abetting breach of fiduciary duty.

## Niagara Frontier Hockey, L.P.

1586. NFHLP is a Delaware partnership that was formed on March 14, 1988. The original general partner of NFHLP was a New York corporation owned and controlled by prominent businessmen in Buffalo. NFHLP's main assets were the Buffalo Sabres and its interests in the HSBC Arena.

1587. NFHLP borrowed funds from the Buffalo Sabres Banks in May 1995 to finance the construction of the HSBC Arena. In July 2000, John Rigas (using Adelphia money) bought out the limited partners of NFHLP and the partnership became an RFE.

1588. NFHLP ran the team and the HSBC Arena through its subsidiaries, including Crossroads Arena LLC ("CALLC") and Buffalo Sabres Concession LLC ("Sabres Concession").

1589. NFHLP and its subsidiaries filed for bankruptcy protection in the Bankruptcy Court for the Western District of New York in January 2003. On March 13, 2003, Hockey Western New York, LLC purchased substantially all of the assets of NFHLP and its subsidiaries. The bankruptcy action was dismissed on July 23, 2007.

445

## Patmos, Inc.

1590.   Patmos, Inc. is a Delaware corporation that was incorporated on March 4, 1998. John Rigas was President of Patmos, Inc. and, Michael Rigas, Tim Rigas and James Rigas were Executive Vice Presidents.

1591.   Patmos, Inc. became the General Partner of NFHLP in July 2000. The shareholders of Patmos, Inc. consisted only of John Rigas and members of the Rigas Family.

## Sabres, Inc.

1592.   Sabres, Inc. is a Delaware corporation. It was a wholly-owned subsidiary of Adelphia. The sole members of the Board of Directors of Sabres, Inc. in 2000 were John Rigas, Michael Rigas, Timothy Rigas, and James Rigas.

1593.   Sabres, Inc. first became involved with the Buffalo Sabres in 1994 when it provided NFHLP with a $15 million loan. Between the years 1994 and 2000, Sabres, Inc. was the holder of significant economic interests in NFHLP. Sabres, Inc. owned, among other things, secured debt obligations of NFHLP and one of its subsidiaries and three subordinated notes issued by NFHLP to Sabres, Inc. in 1995, 1996, and 1997. Sabres, Inc. was also an account party under a standby letter of credit securing debt obligations owed by another subsidiary of NFHLP. Adelphia filed a Proof of Claim in NFHLP's bankruptcy that asserted a claim of $203,899,974, making it NFHLP's largest creditor.

1594.   Sabres, Inc. filed for bankruptcy protection in June 2002.

446

## The Buffalo Sabres Banks

1595. Fleet, HSBC, and Key Bank are national banks with branches in Buffalo, New York. Fleet, HSBC and Key Bank were the major lenders to NFHLP from approximately 1995 to 2000.

## The Buffalo Sabres Loans

1596. On or about May 10, 1995, HSBC, Key Bank, and Fleet entered into a "Building Loan Contract" with CALLC pursuant to which they agreed to lend CALLC an amount not to exceed $35 million for the construction of the HSBC Arena (the "Construction Loan").

1597. On or about May 10, 1995, Fleet and Key Bank entered into an "Interim and Term Concession Loan Agreement" with Sabres Concession pursuant to which Fleet agreed to lend Sabres Concession an amount not to exceed $32.5 million for certain costs incurred in connection with the construction of the HSBC Arena (the "Concession Loan").

1598. On or about February 28, 1997, NFHLP and Fleet entered into an Amended and Restated Credit Agreement pursuant to which Fleet agreed to establish a revolving credit in favor of NFHLP in the principal amount of $12 million for the working capital and general partnership purposes of NFHLP (the "Revolver Loan"). The Construction Loan, the Concession Loan, and the Revolver Loan are referred to herein as the "Buffalo Sabres Loans."

## The Financial Deterioration Of NFHLP And The Buffalo Sabres Banks' Efforts To Sell The Buffalo Sabres Loans To The Adelphia Subsidiary Sabres, Inc.

1599. By February 2000, the financial fortunes of NFHLP, the Buffalo Sabres and the HSBC Arena had substantially deteriorated. The Buffalo Sabres Loans were in default. NFHLP

447

and its subsidiaries owed the Buffalo Sabres Banks millions of dollars under the Buffalo Sabres
Loans, which had a total face amount of approximately $80 million. Going concern warnings
had been issued for a number of years by NFHLP's auditors. The collateral and assets securing
the Buffalo Sabres Loans had been losing value for years. By the end of 1997, NFHLP projected
that it was likely to receive $35-50 million less out of the HSBC Arena than initially estimated.
The Buffalo Sabres Banks were aware of these projections and of NFHLP's, the Buffalo Sabres',
and the HSBC Arena's financial difficulties.

1600. From in or around 1997 to 2000, the Buffalo Sabres Banks actively negotiated
with John Rigas, members of the Rigas Family, Sabres, Inc., and NFHLP to sell the Buffalo
Sabres Loans. At the same time, John Rigas was planning to take over control of NFHLP and
buy out the other investors. The Buffalo Sabres Banks were aware of John Rigas's intentions and
actively encouraged him to purchase the team as long as the Adelphia subsidiary Sabres, Inc.
purchased the Buffalo Sabres Loans.

1601. The Buffalo Sabres Banks agreed with John Rigas and members of the Rigas
Family on a plan that would allow John Rigas and his family to take control of NFHLP,
restructure its debts (to Adelphia's detriment), and use Adelphia money to buy out the Buffalo
Sabres Loans. In furtherance of this illicit plan, the Buffalo Sabres Banks participated in
meetings, conferences, telephone calls, and correspondence, and exchanged drafts of agreements
with John Rigas (and/or his sons) during this two-year period. While these discussions were
continuing, John Rigas caused Adelphia, through Sabres, Inc., to make payments of principal and
interest on the Buffalo Sabres Loans, on behalf of NFHLP, to the Buffalo Sabres Banks. The

448

Buffalo Sabres Banks were aware at all times that these payments were made by Adelphia and
that Adelphia derived no benefit from these payments.

### The March 2000 Purchase Of The Construction
### And Revolver Loans By The Adelphia Subsidiary Sabres, Inc.

1602.   On or about March 17, 2000, HSBC and Key Bank, and the Adelphia subsidiary,
Sabres, Inc., entered into a "Junior Participation Agreement" concerning the Construction Loan
(the "Construction Loan Junior Participation Agreement"), pursuant to which Fleet was also a
lender. Pursuant to the Construction Loan Junior Participation Agreement:

- Sabres, Inc. agreed to purchase from the Buffalo Sabres Banks a "ninety-five
  percent (95%) undivided junior participation interest" in the advances, loans
  and obligations owed by CALLC to them under the Construction Loan; and,

- The Buffalo Sabres Banks consented (a consent which was required under the
  loan documents) to the transfer of ownership of Niagara Frontier Hockey, L.P.
  and its subsidiaries and affiliates to family members of, or affiliates controlled
  by, John Rigas.

1603.   On March 17, 2000, Fleet and Sabres, Inc. also entered into a Junior Participation
Agreement in connection with the Revolver Loan (the "Revolver Loan Junior Participation
Agreement"). Pursuant to the Revolver Loan Junior Participation Agreement:

- Sabres, Inc. agreed to purchase from Fleet a "ninety-five percent (95%)
  undivided junior participation interest" in the advances, loans and obligations
  owed by NFHLP to Fleet under the Revolver Loan; and,

- The Buffalo Sabres Banks consented to the transfer of ownership of Niagara
  Frontier Hockey, L.P. and its subsidiaries and affiliates to family members of,
  or affiliates controlled by, John Rigas.

1604.   Sabres, Inc. was unable to purchase the Concession Loan at the same time
because consent from a necessary third-party could not be obtained. Instead, Sabres, Inc.
provided a guarantee for the loan, which at the time had a principal amount due of $27 million.

449

1605.  On March 22, 2000, John Rigas and members of the Rigas Family caused Sabres, Inc. to transfer to Fleet, HSBC, and Key Bank $34,081,384 to purchase the 95% junior participation interests in the Construction and Revolver Loans (the "Loan Purchases"). The funds were transferred in the following amounts:

- To Fleet: $18,583,542;
- To HSBC: $11,595,398; and,
- To Key Bank: $3,902,444.

1606.  As a result of these transactions, the Adelphia wholly-owned subsidiary Sabres, Inc., became the holder of the Construction and Revolver Loans, but NFHLP continued to be the obligor under the Construction and Revolver Loans (and the Concession Loan).

## The Recapitalization Of NFHLP And The Sale Of NFHLP To The Rigas Family.

1607.  Shortly after the Loan Purchases, in or around May 2000, Patmos, Inc. and John Rigas, pursuant to a "Purchase Agreement" among those parties and certain others (which included transfers of cash and other transactions), became the General Partner and Limited Partner, respectively, of NFHLP.

1608.  John Rigas used Adelphia money to purchase the limited partners' interests in NFHLP. To that end, following the execution of the Purchase Agreement, on July 26, 2000, John Rigas and members of the Rigas Family caused the Adelphia subsidiary Adelphia Cablevision LLC to transfer $9,650,000 to Highland Holdings, a partnership controlled by members of the Rigas Family. The same day, Highland Holdings sent the $9,650,000 to counsel

for the limited partners of NFHLP. Upon information and belief, the $9,650,000 was drawn down from the CCH Co-Borrowing Facility, of which Fleet was a lender and managing agent.

1609.   In conjunction with the sale of NFHLP to John Rigas and Patmos, Inc., NFHLP also underwent a recapitalization. Sabres, Inc.'s convertible debt was changed into two non-convertible 10% fully subordinated debt instruments (one for $30 million principal amount and the other for $46.5 million principal amount). As a result of this recapitalization, Sabres, Inc. gave up its equity interests in NFHLP and was left with only debt.

1610.   Pursuant to the Buffalo Sabres Loans, the Rigases needed the Buffalo Sabres Banks' consent to the Purchase Agreement and the recapitalization. The Buffalo Sabres Banks threatened to block the transfer of ownership of NFHLP to John Rigas and members of the Rigas Family unless and until Adelphia subsidiary Sabres, Inc. bought the Construction and Revolver Loans. It was only upon agreement to the Loan Purchases by Adelphia that the Buffalo Sabres Banks provided their consent, which was made an exhibit to the Purchase Agreement.

1611.   Thus, the Buffalo Sabres Banks were integral players in, and provided substantial assistance to, the recapitalization and sale of NFHLP and the sale of the Construction and Revolver Loans to the Adelphia wholly-owned subsidiary Sabres, Inc.

1612.   Following consummation of the Purchase Agreement, John Rigas owned a 99% limited partnership interest in NFHLP and the Rigas Family (through Patmos, Inc.) shared ownership of the remaining 1% indirect general partnership interest in NFHLP.

451

**The Failure By NFHLP To Pay Sabres, Inc, Any Of The**
**Monies Due And Owing Under The Construction And Revolver Loans.**

1613.  From March 17, 2000 forward (the date the Adelphia subsidiary Sabres, Inc.

became the owner of the Buffalo Sabres Loans), NFHLP (still the obligor under the Buffalo

Sabres Loans) never paid Sabres, Inc. any of the monies due and owing under the Construction

and Revolver Loans.  Only eight months later, in November 2000, at the direction of Tim Rigas

(who at the time was President of NFHLP), the $34.1 million was written down and classified by

Adelphia as a loan that would never be repaid.  Moreover, at the time the Buffalo Sabres Banks

sold the Construction and Revolver Loans to Sabres, Inc. (if not before), the Buffalo Sabres

Banks were aware that NFHLP did not have the financial capability, willingness, or intent to pay

Sabres, Inc. monies owed under the Construction and Revolver Loans.

1614.  Following the execution of the Junior Participation Agreements in March 2000,

NFHLP owed Sabres, Inc., under the Construction Loan approximately $30 million, which was

never paid.  NFHLP owed Sabres, Inc., under the Revolver Loan approximately $10 million,

which was also never paid.

**The Payments By Adelphia To The Buffalo Sabres**
**Banks Of Principal And Interest On The Buffalo Sabres Loans.**

1615.  The Rigas Family caused Adelphia, and at times Sabres, Inc., and/or other

Adelphia subsidiaries, to pay the Buffalo Sabres Banks the principal and interest payments due

to them under the Buffalo Sabres Loans from the CMS from June 14, 1999 to May 1, 2002.  The

dates and amounts of these payments are set forth in detail in Claims 17-24 of this complaint,

and are incorporated herein by reference.  At the time of the payments, however, the obligor

452

under the Buffalo Sabres Loans was NFHLP which was neither an affiliate nor a subsidiary of Adelphia.

1616.   To the extent that any of the principal and interest payments made to the Buffalo Sabres Banks on the Buffalo Sabres Loans were transferred from NFHLP, NFHLP did not have dominion and control over the funds transferred to it by Adelphia for the purpose of making the payments. NFHLP was, therefore, a conduit for Adelphia. The Buffalo Sabres Banks were the entities for whose benefit the transfers were made.

1617.   At no time was Adelphia, its subsidiaries or affiliates an obligor or borrower under the Buffalo Sabres Loans.

1618.   The principal and interest payments made by Adelphia to Fleet under the Buffalo Sabres Loans from June 14, 1999 through May 1, 2002 totaled $11,988,843.17.

1619.   The principal and interest payments made by Adelphia to HSBC under the Buffalo Sabres Loans from June 28, 1999 to March 22, 2000 totaled $1,789,821.83.

1620.   The principal and interest payments made by Adelphia to Key Bank under the Buffalo Sabres Loans from June 28, 1999 to December 1, 1999 totaled $875,750.41.

**The Recapitalization And Sale Of NFHLP To John Rigas
And Members Of The Rigas Family Was A Breach Of The Fiduciary
Duties Owed To Adelphia By John Rigas And Members Of The Rigas Family.**

1621.   The recapitalization of NFHLP and sale of NFHLP to John Rigas and members of the Rigas Family were made at the behest and under the direction of John Rigas and members of the Rigas Family, who owed fiduciary duties to Adelphia.

453

1622.   The transactions that resulted in the Rigas Family holding all of the equity in NFHLP, while leaving Adelphia with only debt, were a breach of the fiduciary duties owed to Adelphia by John Rigas and members of the Rigas Family.  The transactions caused Adelphia to pour even more money into NFHLP while no funds or equity interests were transferred in return. Only debt was left.  The debt was incurred at a time when John Rigas, his sons, and the Buffalo Sabres Banks knew that NFHLP did not have the financial capability, willingness, or intent of ever paying it.  That debt was never repaid to Adelphia by NFHLP.

1623.   The Buffalo Sabres Banks were parties to the negotiations that resulted in the recapitalization and sale of NFHLP and, upon information and belief, they were aware that the sale of NFHLP to John Rigas and members of the Rigas Family would place all of NFHLP's equity into the Rigas Family, leaving Adelphia with only debt.

1624.   The recapitalization of NFHLP and the sale of NFHLP to John Rigas and members of the Rigas Family was a breach of the fiduciary duties John Rigas and members of the Rigas Family owed to Adelphia because the transactions drained Adelphia of money, created no benefit for Adelphia, converted Sabres, Inc.'s ownership interest in NFHLP into debt, and enabled John Rigas, in his personal capacity, and his company Patmos, Inc. to enjoy all of the ownership of NFHLP and its assets.  These transactions could not have occurred without the knowledge, consent, and substantial assistance of the Buffalo Sabres Banks.

454

**The Loan Purchases Were Breaches Of The Fiduciary Duties**
**Owed To Adelphia By John Rigas And Members Of The Rigas Family.**

1625.   The Loan Purchases were breaches of the fiduciary duties owed to Adelphia by

John Rigas and members of the Rigas Family. The Loan Purchases did not benefit Adelphia

because, among other reasons:

- The purchase of the Buffalo Sabres Loans drained money from Sabres, Inc. while no funds flowed back from NFHLP to Adelphia or Sabres, Inc.;

- NFHLP could not afford to pay to Adelphia the monies used by Sabres, Inc. to make the Loan Purchases and it had no reasonable prospect of doing so in the future;

- The purchase of the Buffalo Sabres Loans caused Adelphia to transfer funds to organizations and entities (NFHLP, the Buffalo Sabres and the HSBC Arena), that had been losing money and value for years and which were projected to continue to lose money and value in the coming five years;

- The value of the loans purchased was less than the $34.1 million that Sabres, Inc. paid for the loans; and,

- Protecting NFHLP from going into bankruptcy did not improve or aid in the growth, income or stability of Adelphia.

1626.   The decision and action by John Rigas and members of the Rigas Family to cause

Sabres, Inc. to purchase the Construction and Revolver Loans for approximately $34.1 million in

March 2000 from the Buffalo Sabres Banks was a breach of their fiduciary duties to Adelphia.

**The Payment Of The Principal And Interest On The**
**Buffalo Sabres Loans By Sabres, Inc. Was A Breach Of The Fiduciary**
**Duties Owed By John Rigas And Members Of The Rigas Family To Adelphia.**

1627.   The principal and interest payments made by Adelphia to the Buffalo Sabres

Banks under the Buffalo Sabres Loans did not benefit Adelphia because, among other reasons,

NFHLP was not a subsidiary of Adelphia, and Adelphia and its subsidiaries were not the obligors or borrowers under the Buffalo Sabres Loans.

1628. At no time did NFHLP repay Adelphia for these principal and interest payments. Furthermore, the Buffalo Sabres Banks were aware at the time of the payments that NFHLP did not have the financial ability to pay the principal and interest on the Buffalo Sabres Loans.

1629. The principal and interest payments made by Adelphia to the Buffalo Sabres Banks under the Buffalo Sabres Loans were made at the behest and under the direction of John Rigas and members of the Rigas Family who had a fiduciary duty to Adelphia. Causing Adelphia to make these payments to the Buffalo Sabres Banks was a breach of the fiduciary duties John Rigas and members of the Rigas Family owed to Adelphia.

1630. John Rigas and the Rigas Family deceived the Independent Directors in obtaining authority to have Sabres, Inc.: (i) make principal and interest payments on the Buffalo Sabres Loans, (ii) make the Loan Purchases, (iii) recapitalize NFHLP, and (iv) fund the cash portion of the sale of NFHLP to John Rigas and the Rigas Family, by, among other things, withholding material information concerning the terms of the transactions and the negative effects and implications to Adelphia flowing from those transactions.

1631. Had the Independent Directors been informed of the terms and effects of the transactions they would not have permitted the transactions to occur.

**The Buffalo Sabres Banks Substantially Assisted John Rigas And Members
Of The Rigas Family In The Foregoing Breaches of Their Fiduciary Duties.**

1632.  The Buffalo Sabres Banks had actual knowledge of, knowingly participated in,
and affirmatively, knowingly and substantially assisted and encouraged John Rigas and members
of the Rigas Family in breaching their fiduciary duties set forth above.  The substantial assistance
was executed as follows:

(i)    **Preparing The Junior Participation Agreements**

1633.  Between 1997 and 2000, there were many meetings, telephone calls, letters,
conferences, and exchanges of documents between the Buffalo Sabres Banks and the Rigas
Family concerning the terms of the Loan Purchases.  The Buffalo Sabres Banks drafted the
Junior Participation Agreements.  During the negotiations, the Buffalo Sabres Banks were aware
that the 95% junior participation interests in the Construction and Revolver Loans were being
sold to Sabres, Inc. and that Sabres, Inc. was a wholly-owned subsidiary of Adelphia.

1634.  Employees of the Buffalo Sabres Banks testified in related litigation that (i) the
Junior Participation Agreements were the result of "constant negotiations" with the Rigas
Family; (ii) they had meetings and discussions amongst themselves regarding the structure and
terms of the sale of the Construction and Revolver Loans to Sabres, Inc.; (iii) they met with
representatives of Sabres, Inc. on numerous occasions to discuss the sale; and (iv) they originally
withheld approval of the sale of NFHLP to John Rigas, but then changed their minds when they
knew that Sabres, Inc., and not NFHLP, would be purchasing the 95% junior participation
interests in the loans.

457

1635. The Junior Participation Agreements, which were negotiated and structured by the Buffalo Sabres Banks, were the mechanisms by which John Rigas and the members of the Rigas Family breached their fiduciary duties to Adelphia when they caused an Adelphia subsidiary, Sabres, Inc., to purchase the Construction and Revolver Loans for $34.1 million when, among other things, the loans were worth less than $34.1 million. At all relevant times, the Buffalo Sabres Banks knew that the Construction and Revolver Loans were worth materially less than the price Adelphia paid for them. The Junior Participation Agreements required the approval of the Buffalo Sabres Banks and they were signatories to the documents.

### (ii) Buffalo Sabres Banks Insisted There Would Be No Sale Of NFHLP Unless Adelphia Bought The Loans

1636. By making the sale of the Construction and Revolver Loans a condition to the sale of NFHLP to John Rigas and members of the Rigas Family, the Buffalo Sabres Banks substantially assisted in making sure that the Rigas Family structured the sale and recapitalized NFHLP in a way that gave the Rigas Family all the equity in NFHLP and left Adelphia with only the debt. The Buffalo Sabres Banks made the sale of the Construction and Revolver Loans a part of the deal and threatened to stop the transfer of ownership of NFHLP to the Rigas Family if the Construction and Revolver Loans were not bought by Adelphia.

1637. The Buffalo Sabres Banks specifically told the Rigas Family that they would consent to the sale of NFHLP to the Rigas Family only if the Rigas Family caused Adelphia to buy out the Construction and Revolver Loans.

1638. In a bank group meeting, Fleet and Key Bank made it clear to HSBC that consent to the ownership transfer of NFHLP to John Rigas would not take place until the parties had

458

reached an understanding of and agreement to Adelphia's plans for repaying the Construction Loan. Schedule 5.5 of the Purchase Agreement states in relevant part as well that the NFHLP's limited partners "have been notified by HSBC, as Agent for the [Construction Loan that] . . . the lenders have taken the position that their consent to the transaction is required."

1639.   The Buffalo Sabres Banks decided not to foreclose on the assets securing the Buffalo Sabres Loans as long as principal and interest payments were being made by Adelphia even though NFHLP was the obligor. The Buffalo Sabres Banks consistently and deliberately encouraged John Rigas and members of the Rigas Family to transfer millions of dollars into financially failing organizations and entities (NFHLP, the Buffalo Sabres and the HSBC Arena), while at the same time knowing that the funds were coming from Adelphia.

### (iii)   The Buffalo Sabres Banks' Actual Knowledge Of The Rigases' Breaches Of Their Fiduciary Duties

1640.   The Buffalo Sabres Banks knew that the Rigases were improperly using Adelphia money to fund the Loan Purchases, principal and interest payments, and recapitalization. The Buffalo Sabres Banks were so concerned about the financial role of Sabres, Inc. in NFHLP, that Fleet "indicated that we might want to consider hiring [an] outside source to review the internal flow of funds with the Sabres organization so that we can be in a better position to make further decisions."

1641.   The Buffalo Sabres Banks consented to the transfer of ownership and to the sale of the loans while at the same time they knew that (i) Sabres, Inc. had been assuming the substantial financial burdens of the soon-to-be Rigas-owned and Rigas-controlled NFHLP, and (ii) the value of the organizations and assets that Sabres, Inc. was bailing out had been eroding

459

for years, had been projected to incur further losses in the upcoming five years, and had been subject to going concern warnings issued by NFHLP's auditors for years.

1642. The Buffalo Sabres Banks also consented to the transfer of ownership and the sale of the loans while at the same time knowing that NFHLP could not pay the monies due and owing under the Construction and Revolver Loans to Sabres, Inc., and while questioning among themselves whether payments from Adelphia in connection with NFHLP and the Buffalo Sabres benefited Adelphia in any way.

1643. The Buffalo Sabres Banks made the sale of the loans possible by insisting on a quid-pro-quo by threatening to block the sale of NFHLP to the Rigas Family unless Sabres, Inc. purchased 95% junior participation interests in the Construction and Revolver Loans.

1644. The assistance of the Buffalo Sabres Banks was a substantial factor in causing John Rigas and members of the Rigas Family to breach their fiduciary duties to Adelphia by having Adelphia pay the principal and interest under the Buffalo Sabres Loans when NFHLP was responsible under those loans, by making the recapitalization possible, and by consenting to the transfer of ownership of NFHLP to the Rigas Family which resulted in Adelphia holding only debt in the partnership. But for the substantial assistance of the Buffalo Sabres Banks, the Rigas Family could not have breached their fiduciary duties to Adelphia in these ways.

1645. The Buffalo Sabres Banks substantially assisted John Rigas and members of the Rigas Family in breaching their fiduciary duties to Adelphia and its wholly-owned subsidiary Sabres, Inc. by committing the above-referenced acts in New York State.

1646.   By reason of the foregoing, the ART has been damaged in the amount of at least $48 million, or such other amount to be determined at trial.

## FIFTY-SEVENTH CLAIM FOR RELIEF

### (Equitable Disallowance of HSBC's, Fleet's, and Key Bank's Administrative Claims or, Alternatively, Equitable Subordination Of Those Claims Under 11 U.S.C. § 510(c))

1647.   Plaintiff realleges paragraphs 1 through 1078 as if fully set forth herein.

1648.   On March 23, 2007, Fleet and HSBC filed Administrative Claim Notices in In re Adelphia Communications Corporation (Chapter 11), Case No. 02-417-29 (REG) in the Bankruptcy Court for the Southern District of New York (the "Adelphia Bankruptcy") and on March 26, 2007, Key Bank filed an Administrative Claim Notice in the Adelphia Bankruptcy (collectively, the "Buffalo Sabres Banks' Administrative Claims").

1649.   The Buffalo Sabres Banks' Administrative Claims are based on alleged post-petition torts by Adelphia.

1650.   As alleged herein, however, each of the Buffalo Sabres Banks engaged in wrongful conduct directed towards Adelphia by, among other things, aiding and abetting the breach of fiduciary duties owed to Adelphia by John Rigas and members of the Rigas Family. Each of the Buffalo Sabres Banks acted callously and with reckless disregard or conscious avoidance of the consequences of their inequitable conduct.

1651.   The Buffalo Sabres Banks' misconduct has damaged Adelphia and its unsecured creditors who extended credit or performed services without knowledge of the Buffalo Sabres Banks' actions and who, unlike the Buffalo Sabres Banks, played no role in damaging Adelphia.

1652.   There were substantial assets of Adelphia including, but not limited to, equipment, accounts receivable, human resources, contract rights, avoidance actions and derivative actions that could have been used to satisfy the claims of unsecured creditors if the Buffalo Sabres Banks' Administrative Claims were equitably disallowed or subordinated.

1653.   If the Buffalo Sabres Banks' Administrative Claims are allowed, those claims would consume a portion of the value of the Adelphia estates, while Adelphia's other creditors will receive a smaller distribution.

1654.   Equitable disallowance of each of the Buffalo Sabres Banks' Administrative Claims is consistent with the Bankruptcy Code.

1655.   By reason of the foregoing, Plaintiff is entitled to judgment (a) equitably disallowing the Buffalo Sabres Banks' Administrative Claims in their entirety; or (b) alternatively, pursuant to Section 510(c) of the Bankruptcy Code, Plaintiff is entitled to judgment subordinating the Buffalo Sabres Banks' Administrative Claims to the prior payment in full of all claims of unsecured creditors of Adelphia, including, but not limited to any intercompany claims, as provided for in the Plan.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff.

(i)        on its First Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all UCA/HHC Co-Borrowing Security

462

Interests securing UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(ii)     on its Second Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, in an amount not less than $400 million, and all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(iii)    on its Third Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all UCA/HHC Co-Borrowing Obligations, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(iv)     on its Fourth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all UCA/HHC Co-Borrowing Obligations, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing

Obligations; or, alternatively, (B) (i) all UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all UCA/HHC Co-Borrowing Security Interests securing UCA/HHC Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(v)     on its Fifth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, in an amount not less than $600 million, and all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(vi)     on its Sixth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, in an amount not less than $600 million, and all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(vii)     on its Seventh Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all CCH Co-Borrowing Obligations, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations; or,

464

alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(viii)    on its Eighth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all CCH Co-Borrowing Obligations, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations; or, alternatively, (B) (i) all CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all CCH Co-Borrowing Security Interests securing CCH Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(ix)    on its Ninth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, and all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date in an amount not less than $500 million, together with all interest paid in respect of the obligations avoided hereunder;

(x)    on its Tenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates all Olympus Co-Borrowing Obligations incurred or granted on or

465

within the year preceding the Petition Date, in an amount not less than $500 million, and all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred or granted on or within the year preceding the Petition Date, together with all interest paid in respect of the obligations avoided hereunder;

(xi)      on its Eleventh Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all Olympus Co-Borrowing Obligations, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(xii)      on its Twelfth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, preserving and recovering for the benefit of Plaintiff, as successor in interest to the Debtors' estates: (A) (i) all Olympus Co-Borrowing Obligations, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations; or, alternatively, (B) (i) all Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, and (ii) all Olympus Co-Borrowing Security Interests securing Olympus Co-Borrowing Obligations incurred for the benefit of the Rigas Family, together with all interest paid in respect of the obligations avoided hereunder;

(xiii)      on its Thirteenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of Plaintiff, as

466

successor in interest to the Debtors' estates (i) the Century-TCI Securities Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer, together with all interest paid in respect of the obligations avoided hereunder;

    (xiv)    on its Fourteenth Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates (i) the Century-TCI Securities Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer, together with all interest paid in respect of the obligations avoided hereunder;

    (xv)    on its Fifteenth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, together with all interest paid in respect of the obligations avoided hereunder;

    (xvi)    on its Sixteenth Claim for Relief, pursuant to sections 544(b), 550, and 551 of the Bankruptcy Code, avoiding, recovering and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates (i) the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, and (ii) all Century-TCI Security Interests securing the Century-TCI Securities Transfer and the Century-TCI Prestige Transfer, together with all interest paid in respect of the obligations avoided hereunder;

(xvii)   on its Seventeenth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the Fleet Payments;

(xviii)   on its Eighteenth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the Fleet Payments;

(xix)   on its Nineteenth Claim for Relief, pursuant to sections 548 and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates at least $3,121,043.89;

(xx)   on its Twentieth Claim for Relief, pursuant to sections 548 and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates at least $3,121,043.89;

(xxi)   on its Twenty-First Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the HSBC Payments;

(xxii)   on its Twenty-Second Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the HSBC Payments;

(xxiii)   on its Twenty-Third Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the Key Bank Payments;

468

(xxiv)      on its Twenty-Fourth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the Key Bank Payments;

(xxv)       on its Twenty-Fifth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the BNS Payments;

(xxvi)      on its Twenty-Sixth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the BNS Payments;

(xxvii)     on its Twenty-Seventh Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates at least $10,446,935.69;

(xxviii)    on its Twenty-Eighth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates at least $10,446,935.69;

(xxix)      on its Twenty-Ninth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the CIBC Payments;

(xxx)       on its Thirtieth Claim for Relief, pursuant to sections 544(b) and 550 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the CIBC Payments;

469

(xxxi)     on its Thirty-First Claim for Relief, pursuant to sections 548, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates all Margin Loan Payments made on or within one year preceding the Petition Date;

(xxxii)    on its Thirty-Second Claim for Relief, pursuant to section 1975 of title 12 of the United States Code, an amount that is three times the amount of the damages sustained, in an amount to be determined at trial, plus costs and attorneys' fees;

(xxxiii)   on its Thirty-Third Claim for Relief, (a) judgment equitably disallowing Defendants' claims in their entirety; or, alternatively, (b) pursuant to Section 510(c) of the Bankruptcy Code, judgment: (i) subordinating Defendants' claims to the prior payment in full of the claims of unsecured creditors of the Debtors, including, but not limited to any intercompany claims, and (ii) preserving the liens granted under the Co-Borrowing Facilities for the benefit of Plaintiff, as successor in interest to the Debtors' estates;

(xxxiv)   on its Thirty-Fourth Claim for Relief, recharacterizing that portion of the Co-Borrowing Facilities used for the purchase of stock as an equity contribution to Adelphia in an amount not less than $2 billion;

(xxxv)    on its Thirty-Fifth Claim for Relief, recharacterizing that portion of the Century-TCI Facility used for the purchase of stock as an equity contribution to Adelphia in an amount not less than $400 million;

470

(xxxvi) on its Thirty-Sixth Claim for Relief, awarding Plaintiff damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxvii) on its Thirty-Seventh Claim for Relief, awarding Plaintiff damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxviii) on its Thirty-Eighth Claim for Relief, awarding Plaintiff damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xxxix) on its Thirty-Ninth Claim for Relief, awarding Plaintiff damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xl) on its Fortieth Claim for Relief, awarding Plaintiff damages in the amount of at least $5 billion, or such other amount to be determined at trial, plus punitive damages in an amount to be determined at trial;

(xli) on its Forty-First Claim for Relief, granting Plaintiff a declaration that the Debtors are not liable for any of the Obligations under the CCH Credit Agreement in excess of those permitted by the CCH Credit Agreement;

(xlii) on its Forty-Second Claim for Relief, granting Plaintiff a declaration that the Debtors are not liable for any of the Obligations under the Olympus Credit Agreement in excess of those permitted by the Olympus Credit Agreement;

471

(xliii)    on its Forty-Third Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates, the Century-TCI Payments;

(xliv)    on its Forty-Fourth Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates, the Parnassos Payments;

(xlv)    on its Forty-Fifth Claim for Relief, terminating the UCA/HHC Co-Borrowing Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the UCA/HHC Co-Borrowing Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the UCA/HHC Co-Borrowing Lenders, and terminating any purported right of the UCA/HHC Co-Borrowing Lenders to payment from the Debtors for amounts drawn under the UCA/HHC Co-Borrowing Facility by the Rigas Family;

(xlvi)    on its Forty-Sixth Claim for Relief, terminating the CCH Co-Borrowing Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the CCH Co-Borrowing Facility that were used by the Rigas Family, plus interest from the date of each payment made by the Debtors to the CCH Co-Borrowing Lenders, and terminating any purported right of the CCH Co-Borrowing Lenders to payment from the Debtors for amounts drawn under the CCH Co-Borrowing Facility by the Rigas Family;

(xlvii)    on its Forty-Seventh Claim for Relief, terminating the Olympus Co-Borrowing Security Interests, returning to the Debtors all amounts paid by the Debtors in respect of funds drawn under the Olympus Co-Borrowing Facility that were used by the Rigas Family,

472

plus interest from the date of each payment made by the Debtors to the Olympus Co-Borrowing Lenders, and terminating any purported right of the Olympus Co-Borrowing Lenders to payment from the Debtors for amounts drawn under the Olympus Co-Borrowing Facility by the Rigas Family;

(xlviii)    on its Forty-Eighth Claim for Relief, estopping the Co-Borrowing Lenders from retaining and enforcing the Co-Borrowing Security Interests, from retaining principal and interest payments made by the Debtors in respect of amounts drawn down under the Co-Borrowing Facilities for the benefit of the Rigas Family, and from seeking to recover outstanding principal and interest payments from the Debtors with respect to funds drawn under the Co-Borrowing Facilities for the benefit of the Rigas Family;

(xlix)    on its Forty-Ninth Claim for Relief, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the FrontierVision Preferential Transfers;

(l)    on its Fiftieth Claim for Relief, avoiding, recovering, and preserving for the benefit of the Plaintiff, as successor in interest to the Debtors' estates the CCH Preferential Transfers;

(li)    on its Fifty-First Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the Olympus Preferential Transfers;

473

(lii)     on its Fifty-Second Claim for Relief, pursuant to sections 547, 550, and 551 of the Bankruptcy Code, avoiding, recovering, and preserving for the benefit of Plaintiff, as successor in interest to the Debtors' estates the UCA/HHC Preferential Transfers;

(liii)    on its Fifty-Third Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial;

(liv)     on its Fifty-Fourth Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial not less than $3.625 billion;

(lv)      on its Fifty-Fifth Claim for Relief, awarding Plaintiff damages in an amount to be determined at trial not less than $5 billion;

(lvi)     on its Fifty-Sixth Claim for Relief, awarding Plaintiff damages in the amount of at least $48 million, or such other amount to be determined at trial;

(lvii)    on its Fifty-Seventh Claim for Relief, (a) equitably disallowing the Buffalo Sabres Banks' Administrative Claims in their entirety; or (b) alternatively, pursuant to Section 510(c) of the Bankruptcy Code, Plaintiff is entitled to judgment subordinating the Buffalo Sabres Banks' Administrative Claims to the prior payment in full of the administrative claims of unsecured creditors of Adelphia, including, but not limited to, any intercompany claims, as provided for in the Plan;

(lviii)   awarding Plaintiff pre-judgment interest on its claims together with its costs and attorneys' fees, to the fullest extent allowed by law; and

474

(lix)     awarding Plaintiff such other and further relief, including punitive damages,

as the Court may deem just and proper and appropriate to redress the harm caused by

Defendants' conduct.

Dated: New York, New York
       February 29, 2008

KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP

By: _____

David M. Friedman (DF-4278)
Michael C. Harwood (MH-4227)
Howard W. Schub (HS-1600)
Jonathan E. Minsker (JM-8535)
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800

Counsel for Adelphia Recovery Trust as to all
claims except for claims against defendants CIBC,
Inc.; CIBC World Markets Corp.; Rabobank
Nederland, New York; Société Générale; Amaranth
Fund, L.P.; Avenue Special Situations Fund II, LP;
Bear, Stearns & Co., Inc.; Bear Stearns Credit
Products; Bear Stearns Investment Products;
Cedarview Opportunities Master Fund; Contrarian
Funds, LLC; Gabriel Capital LP; Hartford Floating
Rate Fund; Key Bank of New York; Latigo Master
Fund, Ltd.; Longacre Capital Partners; Longacre
Master Fund, Ltd.; MetLife Insurance Co. of
Connecticut; New York Life Insurance Co.; New
York Life Insurance and Annuity Corporation;
Nomura Bond & Loan Fund; Cooperatieve Centrale
Raiffeisen-Boerenleenbank B.A.; Royal Bank of
Canada; SPCP Group; Satellite Senior Income
Fund, LLC; Satellite Senior Income Fund II, LLC;
Cowen and Company, LLC

475

JENNER & BLOCK LLP

By: _Deirdre Connell_ (AAl)
Richard F. Ziegler
Andrew Weissmann
919 Third Avenue
New York, New York  10022
Tel:  (212) 891-1600

Deirdre E. Connell
Vincent E. Lazar
Robert J. Blazejowski
330 N. Wabash Avenue
Chicago, Illinois  60611-7603
Tel:  (312) 923-2661
Fax:  (312) 527-0484

Counsel for Adelphia Recovery Trust as to all
claims except for claims against defendants
Deutsche Bank AG and affiliated defendants;
HSBC Bank USA; Nuveen Floating Rate Income
Fund; Nuveen Senior Income Fund; Nuveen
Floating Rate Income Opportunity Fund; and
National City Bank of Pennsylvania

476

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
ADELPHIA RECOVERY TRUST,                    :     No. 05 Civ. 9050 (LMM)
                                            :
                Plaintiff,                  :     (Related to 03 MDL 1529)
                                            :
        - against -                         :
                                            :
BANK OF AMERICA, N.A., *et al.*,            :
                                            :
                Defendants.                 :
-----------------------------------------------------------------x

## Certificate of Service

I hereby certify that on February 29, 2008, the undersigned served by electronic mail a true and

correct copy of Plaintiff Adelphia Recovery Trust's Second Amended Complaint on counsel who

consented to electronic mail service on behalf of the defendants listed on the attached Exhibit A.

_____
Michael C. Harwood (MH-4227)

Dated: March 3, 2008

1

## EXHIBIT A

| Counsel | Email |
|---|---|
| Blank Rome LLP | aeckstein@blankrome.com<br>jmasella@blankrome.com<br>shapiro@blankrome.com |
| Cleary Gottlieb Steen & Hamilton LLP | athidemann@cgsh.com<br>dbuell@cgsh.com<br>jakim@cgsh.com<br>joonkim@cgsh.com<br>kroberts@ cgsh.com<br>lbarefoot@cgsh.com<br>lgranfield@cgsh.com<br>ischweitzer@cgsh.com<br>mlowenthal@cgsh.com<br>nruskin@cgsh.com |
| Clifford Chance LLP | angelique.shingler@cliffordchance.com<br>andrew.brozman@cliffordchance.com<br>christopher.joralemon@cliffordchance.com<br>david.sullivan@cliffordchance.com<br>james.moyle@cliffordchance.com<br>jennifer.demarco@cliffordchance.com<br>kara.morrow@cliffordchance.com<br>wendy.rosenthal@cliffordchance.com |
| David McGrail Law | dmcgrail@davidmcgraillaw.com |
| Duane Morris LLP | horstmann@duanemorris.com<br>jmparks@ duanemorris.com<br>ljkotler@duanemorris.com |
| Gibson Dunn & Crutcher LLP | acoyle@gibsondunn.com<br>awollin@gibsondunn.com<br>jlanders@gibsondunn.com<br>mking@gibsondunn.com |
| Hahn & Hessen LLP | jamato@hahnhessen.com |
| Haynes & Boone LLP | debbie.mccomas@haynesboone.com<br>judith.elkin@haynesboone.com<br>rick.anigian@haynesboone.com<br>thomas.kurth@haynesboone.com<br>thomas.wisinski@haynesboone.com |
| Jenner & Block LLP | dconnell@jenner.com<br>rblazejowski@jenner.com<br>sascher@jenner.com<br>vlazar@jenner.com<br>aweissmann@jenner.com<br>rziegler@jenner.com |
| Kaye Scholer LLP | mschonholtz@kayescholer.com |

| | stalmatge@kayescholer.com |
| | tfleming@kayescholer.com |
| Kirkland & Ellis LLP | esassower@kirkland.com |
| | bspiegel@kirkland.com |
| | mingalls@kirkland.com |
| | mgottfried@kirkland.com |
| | lthomas@kirkland.com |
| | rwynne@kirkland.com |
| Kirkland Lockhart Preston Gates Ellis LLP | joanna.diakos@klgates.com |
| | michael.gordon@klgates.com |
| | richard.miller@klgates.com |
| | robert.honeywell@klgates.com |
| | brian.koosed@klgates.com |
| Levy Lubarsky & Feigenbaum LLP | hlevi@llf-law.com |
| | wswearingen@llf-law.com |
| Luskin Stern & Eisler LLP | mluskin@lse-law.com |
| | thoffman@lse-law.com |
| Manion McDonough & Lucas PC | jmcdonough@mmlpc.com |
| | ldepaul@mmlpc.com |
| Mayer Brown LLP | jatamian@mayerbrown.com |
| | jstoll@mayerbrown.com |
| | knoble@mayerbrown.com |
| | mannunziata@mayerbrown.com |
| | mmanha@mayerbrown.com |
| | rfinke@mayerbrown.com |
| | rlafont@mayerbrown.com |
| | ssandell@mayerbrown.com |
| McGuire Woods LLP | amccollough@mcquirewoods.com |
| | amccray@mcquirewoods.com |
| | dhayes@mcquirewoods.com |
| | jsheerin@mcquirewoods.com |
| | phayden@mcquirewoods.com |
| McKee Nelson LLP | jhurleymcgay@mckeenelson.com |
| | mminerva@mckeenelson.com |
| | rspitaleri@ mckeenelson.com |
| | sbrody@mckeenelson.com |
| Milbank Tweed Hadley & McCloy LLP | apellegrino@milbank.com |
| | ddunne@milbank.com |
| | dgelfand@milbank.com |
| | ldespins@milbank.com |
| | lmandel@milbank.com |
| | mcomerford@milbank.com |
| | pnewman@milbank.com |
| | rsckino@milbank.com |
| | rhora@milbank.com |
| | rpenski@milbank.com |

| | |
|---|---|
| | rsekino@milbank.com |
| | rwinter@milbank.com |
| | sedelman@milbank.com |
| | srappaport@milbank.com |
| | tarena@milbank.com |
| | trangwala@milbank.com |
| Morgenstern Jacobs & Blue LLC | efisher@mjbllc.com |
| | gblue@mjbllc.com |
| | mjacobs@mjbllc.com |
| | pmorgenstern@mjbllc.com |
| Morrison & Foerster LLP | jbergin@mofo.com |
| Otterbourg, Steindler, Houston & Rosen, PC | pfeldman@oshr.com |
| | apiccione@oshr.com |
| | jbougiamas@oshr.com |
| Pachulski Stang Ziehl Young Jones & Weintraub | dziehl@pszyjw.com |
| Phillips Lytle LLP | wbrown@phillipslytle.com |
| | amiller@phillipslytle.com |
| Ropes & Gray LLP | delkind@ropesgray.com |
| Rosen Slome Marder LLP | amarder@rsmllp.com |
| | lsiedman@rsmllp.com |
| Simpson Thatcher & Bartlett LLP | egraff@stblaw.com |
| | elitwin@stblaw.com |
| | pgluckow@stblaw.com |
| | ppantaleo@stblaw.com |
| | wrussell@stblaw.com |
| Sonnenschein Nath & Roselthal LLP | cneville@sonnenschein.com |
| | mcarney@sonnenschein.com |
| Stevens & Lee | jk@stevenslee.com |
| | apo@stevenslee.com |
| Stites & Harbison PLLC | garry.grooms@stites.com |
| | rwgriffith@stites.com |
| | sam.zeigler@stites.com |
| Stroock & Stroock & Lavan LLP | icutler@stroock.com |
| | kpasquale@stroock.com |
| | mbrosterman@stroock.com |
| | fhealy@stroock.com |
| | cszyfer@stroock.com |
| Swartz Campbell LLC | jwetzel@swartzcampbell.com |
| White & Case LLP | gkurtz@whitecase.com |
| | hmcdevitt@whitecase.com |
| | jnicenko@whitecase.com |
| | kasner@whitecase.com |
| | scampbell@whitecase.com |
| | squsba@whitecase.com |

| Williams & Connolly LLP | lwade@wc.com<br>wpeters@wc.com |
|---|---|
| Wilmer Cutler Pickering Hale & Dorr LLP | andy.weissman@wilmerhale.com<br>daniel.gardner@wilmerhale.com<br>joel.miller@wilmerhale.com<br>john.valentine@wilmerhale.com<br>kevin.chambers@wilmerhale.com<br>philip.anker@wilmerhale.com<br>thaya.brook@wilmerhale.com<br>theresa.titolo@wilmerhale.com |