KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 680-8400
Facsimile:      (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin N. Brady (*admitted pro hac vice*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELPHIA RECOVERY TRUST,<br><br>                    Plaintiff,<br><br>          vs.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>                    Defendants. | Case No.:        05-CV-9050 (LMM) |

## THE CCH, OLYMPUS, AND UCA/HHC NON-AGENT LENDERS' JOINT REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

<u>**TABLE OF CONTENTS**</u>

**Page No.**

INTRODUCTION ...................................................................................................................1

I.      PLAINTIFFS' ARGUMENTS AGAINST INDEMNITY-BASED DISMISSAL
IGNORE THE CONFIRMED PLAN AND MISAPPLY NON-BANKRUPTCY
ASSIGNMENT LAW.......................................................................................................5

      A.     The CBNA Lenders Are Only Seeking To Enforce The Dismissal Rights
Plaintiffs Agreed To In The Post-Petition, Confirmed Plan, And Are Not
Trying To Enforce Prepetition Waivers Of Bankruptcy Protections......................8

            1.     Plaintiffs' case law is irrelevant because it does not address
prepetition indemnity agreements.............................................................9

            2.     Prepetition secured indemnity agreements are enforceable in
bankruptcy................................................................................................10

            3.     Plaintiffs provide no authority that would permit this Court to
disregard the post-petition Plan provisions that provide the CBNA
Lenders with a right to dismissal. ...........................................................11

      B.     *Enron* Is Neither Binding Nor Applicable Here, But Even If It Were, The
CBNA Lenders Would Still Be Entitled To Dismissal Based On
Indemnification. .................................................................................................12

            1.     *Enron* is factually distinguishable and not binding on this Court.............13

            2.     Even if this Court applies *Enron*, then the CBNA Lenders'
indemnification rights, which flow to each Lender and are not sold
or assigned, still entitle them to dismissal from this case. .........................14

            3.     Post-petition transfer documents and knowledge about Adelphia's
financial troubles do not defeat the CBNA Lenders' indemnity-
based right to dismissal under the Plan.....................................................15

II.     THE COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFFS'
BANKRUPTCY CLAIMS BECAUSE PLAINTIFFS DO NOT HAVE
STANDING TO BRING THEM. .....................................................................................18

      A.     The Court Must Consider The CBNA Lenders' Standing Challenge On
The Merits............................................................................................................19

            1.     The law of the case doctrine does not apply to consideration of
jurisdictional issues such as standing and, in any event, is
inapplicable here. ....................................................................................20

            2.     Judicial estoppel does not help Plaintiffs establish standing. ...................22

            3.     *Res judicata* does not prevent this Court from independently
assessing jurisdictional issues such as standing.........................................24

B. The Plan Does Not Contemplate Or Create The Pretend Reality Upon Which Plaintiffs Premise Their Claims. ...............................................25

    1. Article 8.5 of the Plan contemplates that Plaintiffs could continue this litigation even though they paid the bank claims — no more, no less....................................................................................................26

    2. Claims that are deemed resolved *are* resolved. ........................................29

C. Plaintiffs Do Not Have Standing To Assert Their Bankruptcy Claims. ................32

    1. Plaintiffs do not have standing to assert their bankruptcy claims because they cannot establish that any creditors of the obligor debtors were injured on account of the alleged transfers.........................32

        a. The hundreds of Adelphia estates were not and cannot be substantively consolidated. ...........................................33

        b. There are no existing Intercompany Creditors.............................37

    2. Plaintiffs do not have standing to assert their bankruptcy claims because their requested relief cannot redress the Obligor Debtors' creditors' purported injuries.................................................39

        a. Plaintiffs have not established a direct benefit to the Obligor Debtors' creditors. ...........................................40

        b. Plaintiffs have not established an indirect benefit to the Obligor Debtors' creditors. ...........................................42

        c. Plaintiffs' assertion that they need not establish a benefit to the Obligor Debtors' creditors to avoid transfers fails..................44

CONCLUSION.....................................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

Page No.(s)

**Cases**

*A.N. Wight v. Bankamerica Corp.*,
219 F.3d 79 (2d Cir. 2000)....................................................................................... 23

*Acequia, Inc. v. Clinton (In re Acequia Inc.)*,
34 F.3d 800 (9th Cir. 1994) ...................................................................................... 43

*Adelphia Commc'ns Corp. v. Bank of Am., N.A., et al (In re Adelphia Commc'ns Corp.)*,
365 B.R. 24 (Bankr. S.D.N.Y. 2007).................................................................. passim

*Adelphia Recovery Trust v. Bank of Am., N.A., et al.*, No. 05 Civ. 9050,
2008 WL 217057 (S.D.N.Y. Jan. 17, 2008) ............................................................. 22

*Altman v. Bedford Cent. Sch. Dist.*,
245 F.3d 49 (2d Cir. 2001)........................................................................................ 19

*Am. Home Assurance Co. v. Enron Natural Gas Mktg. Corp. (In re Enron Corp.)*,
307 B.R. 372 (S.D.N.Y. 2004)................................................................................... 11

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989).................................................................................................. 18

*Balaber-Strauss v. Town of Harrison (In re Murphy)*,
331 B.R. 107 (Bankr. S.D.N.Y. 2005)...................................................................... 45

*Bank of Am. v. N. LaSalle St. L.P. (In re 203 N. LaSalle St. P'ship)*,
246 B.R. 325 (Bankr. N.D. Ill. 2000) ....................................................................... 10

*Barhold v. Rodriguez*,
863 F.2d 233 (2d Cir.1988)................................................................................. 25, 28

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
502 U.S. 32 (1991).................................................................................................... 25

*Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd. (In re Buttes Gas & Oil, Co.)*,
182 B.R. 493 (Bankr. S.D. Tex. 1994) ..................................................................... 32

*Cable Television Ass'n of N.Y., Inc. v. Finneran*,
954 F.2d 91 (2d Cir. 1992)........................................................................................ 20

*Calpine Corp. v. Rosetta Res. Inc. (In re Calpine Corp.)*,
377 B.R. 808 (Bankr. S.D.N.Y. 2007)...................................................................... 44

*Centennial Indus., Inc. v. NCR Corp. (In re Centennial Indus. Inc.)*,
12 B.R. 99 (Bankr. S.D.N.Y. 1981)........................................................................... 40

*Citibank Tex. v. Progressive Cas. Ins. Co.*,
508 F.3d 779 (5th Cir. 2007) .................................................................................... 14

K&E 12589418.16

*Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*,
   243 B.R. 620 (S.D.N.Y. 2000) ....................................................................... 32

*Cook v. Colgate Univ.*,
   992 F.2d 17 (2d Cir. 1993) ............................................................................. 19

*Corbett v. MacDonald Moving Servs., Inc.*,
   124 F.3d 82 (2d Cir. 1997) ............................................................................. 28

*DeJesus v. Sears, Roebuck & Co., Inc.*,
   87 F.3d 65 (2d Cir. 1996) ................................................................................. 6

*Fed. Deposit Ins. Corp. v. Four Star Holding Co.*,
   178 F.3d 97 (2d Cir. 1999) ............................................................................. 20

*Freedom Party of N.Y. v. N.Y. State Bd. of Elections*,
   77 F.3d 660 (2d Cir. 1996) ............................................................................. 19

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ....................................................................................... 34

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) ....................................................................................... 25

*G.E. Cattle Co. v. United Producers, Inc. (In re United Producers)*,
   353 B.R. 507 (B.A.P. 6th Cir. 2006) ............................................................. 36

*Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., N.Y. Branch (In re*
   *Galerie Des Monnaies of Geneva, Ltd.)*,
   55 B.R. 253 (Bankr. S.D.N.Y. 1985) ............................................................ 40

*Giamo v. Detrano (In re Detrano)*,
   222 B.R. 685 (Bankr. E.D.N.Y. 1998) ............................................................ 9

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*,
   343 B.R. 63 (S.D.N.Y. 2006) ........................................................................ 21

*Harvey Hopper Lobsters, Ltd. v. Best Pack Seafoods, Inc. (In re Best Pack Seafoods,*
   *Inc.)*,
   29 B.R. 23 (Bankr. D. Me. 1983) .................................................................... 9

*Hein v. Freedom from Religion Found.*,
   127 S. Ct. 2553 (2007) ................................................................................... 18

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) .......................................................... 32

*In re Adelphia Commc'ns Corp.*,
   371 B.R. 660 (S.D.N.Y. 2007) ...................................................................... 36

*In re Combustion Eng'g, Inc.*,
   391 F. 3d 190 (3rd Cir. 2004) ........................................................................ 24

*In re Crowthers McCall Pattern, Inc.*,
   120 B.R. 279 (Bankr. S.D.N.Y. 1990) .......................................................... 45

K&E 12589418.16

*In re Joan and David Halpern Inc.*,
    248 B.R. 43 (Bankr. S.D.N.Y. 2000) .......................................................................... 11

*In re Liggett*,
    118 B.R. 219 (Bankr. S.D.N.Y. 1990) ........................................................................ 46

*In re Madison*,
    184 B.R. 686 (Bankr. E.D. Pa. 1995) ........................................................................... 9

*In re Matter of FedPak Sys., Inc.*,
    80 F.3d 207 (7th Cir. 1996) ................................................................................. 18, 34

*In re Nasdaq Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) ........................................................................... 25, 28

*In re Oceana Int'l, Inc.*,
    376 F. Supp. 956 (S.D.N.Y. 1974) .............................................................................. 40

*In re RCM Global Long Term Capital Appreciation Fund*,
    200 B.R. 514 (Bankr. S.D.N.Y. 1996) ........................................................................ 46

*In re Resorts Int'l, Inc.*,
    372 F.3d 154 (3d Cir. 2004) ........................................................................................ 25

*In re Southeast Fin. Assocs., Inc.*,
    212 B.R. 1003 (Bankr. M.D. Fla. 1997) ....................................................................... 9

*Jackson v. State of Ala. State Tenure Comm'n*,
    405 F.3d 1276 (11th Cir. 2005) ................................................................................... 21

*Johnson v. Kriger (In re Kriger)*,
    2 B.R. 19 (Bankr. D. Or. 1979) .................................................................................... 9

*Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp.*,
    56 B.R. 555 (Bankr. S.D.N.Y. 1986) .................................................................... 41, 42

*L M Ericsson Telecommunications, Inc. v. Teltronics Servs., Inc. (In re Teltronics Servs.,
    Inc.)*,
    18 B.R. 705 (E.D.N.Y. 1982) ...................................................................................... 10

*Lance v. Coffman*,
    127 S. Ct. 1194 (2007) ................................................................................................ 18

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................................................... 34

*Marbury v. Madison*,
    5 U.S. 137 (1803) ........................................................................................................ 31

*Maxwell Newspapers*,
    189 B.R. 282 (Bankr. S.D.N.Y. 1995) .................................................................. 40, 41

*McLean v. Mathews*,
    466 F. Supp. 977 (S.D.N.Y. 1976) ........................................................................ 18, 34

*Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re American Sweeteners, Inc.)*,
    248 B.R. 271 (Bankr. E.D. Pa. 2000) ............................................................ 10

*Moore v. Bay*,
    284 U.S. 4 (1931) ......................................................................................... 43

*New Hampshire  v. Maine*,
    532 U.S. 742 (2001) .......................................................................... 23, 35, 36

*NextWave Personal Communications, Inc. v. Federal Communications Commission (In
    re NextWave Personal Communications)*,
    235 B.R. 305 (Bankr. S.D.N.Y. 1999) ................................................... 43, 46

*Olin Corp. v. Riverwood Int'l Corp. (In re Manville Forest Prod. Corp.)*,
    209 F.3d 125 (2d Cir. 2000) .......................................................................... 11

*Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.)*,
    289 B.R. 548 (Bankr. S.D.N.Y. 2003) ..................................................... 9, 23

*Prometheus Radio Project v. Fed. Commc'ns Comm'n*,
    373 F.3d 372 (3d Cir. 2004) .......................................................................... 21

*Raines v. Byrd*,
    521 U.S. 811 (1997) ................................................................................. 18, 46

*Rieger v. Drabinsky (In re Livent, Inc. Noteholders Sec. Litig.)*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001) ........................................................... 33

*Rodino v. Barondess (In re Good Time Charley's, Inc.)*,
    54 B.R. 157 (Bankr. D.N.J. 1984) .................................................................. 9

*Rosen v. Tenn. Comm'r of Fin. and Admin.*,
    288 F.3d 918 (6th Cir. 2002) ........................................................................ 25

*Scarano v. Cent. R.R. Co. of  N.J.*,
    203 F.2d 510 (3d Cir. 1953) .......................................................................... 37

*Sure-Snap Corp. v. State Street Bank & Trust Co.*,
    948 F.2d 869 (2d Cir. 1991) .......................................................................... 28

*Tex. Consumer Fin. Corp. v. First Nat'l City Bank*,
    365 F. Supp. 427 (S.D.N.Y. 1973) ................................................................ 41

*The Soc'y of The Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate
    Fire & Cas. Co.*,
    126 F.3d 727 (5th Cir. 1997) ........................................................................ 21

*Tracar, S.A. v. Silverman (In re Am. Preferred Prescription, Inc.)*,
    266 B.R. 273 (E.D.N.Y. 2000) ..................................................................... 28

*Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*,
    163 B.R. 964 (Bankr. D. Del. 1994) .............................................................. 44

*Travelers Casualty and Surety Co. of America v. Pacific Gas and Electric Co.*,
    127 S. Ct. 1199 (2007) ............................................................................. 8, 10

K&E 12589418.16

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Banking Co.*),
    860 F.2d 515 (2d Cir. 1988)............................................................................... 34

*Vintero Corp. v. Corporacion Venezolana De Fomento* (*In re Vintero Corp.*),
    735 F.2d 740 (2d Cir. 1984)............................................................................... 45

*Walsh v. McGee,*
    918 F. Supp. 107 (S.D.N.Y. 1996) ................................................................... 20

*White's Place, Inc. v. Glover,*
    222 F.3d 1327 (11th Cir. 2000) ........................................................................ 25

*Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y. City,*
    179 F.2d 582 (2d Cir. 1950).................................................................. 40, 42, 45

*Wilson v. Glenwood Intermountain Props. Inc.,*
    98 F.3d 590 (10th Cir.1996) ............................................................................. 25

## Statutes

Fed. R. Civ. P. 12(h)(3)............................................................................................ 23

## Other Authorities

Abraham Lincoln, Former President of the United States, Emancipation Proclamation
    (Jan. 1, 1863).................................................................................................... 32

United States Constitution Article V ........................................................................ 31

*Webster's Third New International Dictionary* 589 (1986) ....................................... 30

## Rules

11 U.S.C. § 101(10) ................................................................................................. 39

11 U.S.C. § 101(5)(A)............................................................................................... 39

11 U.S.C. § 1123(b)(3)(B) ........................................................................................ 41

11 U.S.C. § 544 ........................................................................................................ 46

11 U.S.C. § 548 ........................................................................................................ 46

11 U.S.C. § 550 ........................................................................................................ 46

K&E 12589418.16

## <u>INTRODUCTION</u>

Plaintiffs' Opposition imagines a world where Debtors' Plan of Reorganization was never confirmed or consummated.  Plaintiffs ignore that the Plan provides the CCH, Olympus, and UCA/HHC Non-Agent Lenders (collectively the "Co-Borrowing Non-Agent Lenders" or the "CBNA Lenders")[1] with a new contractual right to indemnity that requires this Court to dismiss the admittedly innocent CBNA Lenders from this lawsuit.  Plaintiffs also pretend that Intercompany Claims and veil-piercing claims resolved and disallowed by the Plan nonetheless continue to exist, thereby creating imaginary creditors of the Obligor Debtors with standing to pursue the bankruptcy claims in this case.  Finally, Plaintiffs outright ignore the fact that no creditor — not even their imaginary creditors — stands to receive any benefit from this litigation, as any proceeds of this litigation will only flow to third parties.  But this Court cannot decide this case based on "facts" that might exist in a pretend world.  In the real world, the end result of the confirmed and consummated Plan — the "facts on the ground" — require dismissal of the bankruptcy claims asserted against the CBNA Lenders.

*The CBNA Lenders Are Entitled To Dismissal Under The Plan:*  Plaintiffs argue that the CBNA Lenders cannot invoke their indemnity rights under the Prepetition Credit Agreements because those indemnification obligations predate Adelphia's bankruptcy and are either unenforceable for public policy reasons or avoidable in this lawsuit.  But Plaintiffs' arguments miss the point and ignore the confirmed and consummated Plan.  Indeed, as explained in their opening briefs, the CBNA Lenders are not seeking to enforce their prepetition indemnity rights

---

[1]  For purposes of this brief, the CBNA Lender movants are those defendants represented by Kirkland & Ellis LLP and sued in their capacity as "Syndicate Banks" or "Assignees" in relation to the CCH Credit Facility, the Olympus Credit Facility and the UCA/HHC Credit Facility.  To the extent that any Kirkland & Ellis LLP represented defendant is alleged to be a "John Doe" lender under these Credit Facilities, that defendant is also a moving party here.  A current list of Kirkland & Ellis LLP represented defendants in all credit facilities is attached as Exhibit 1 to the Declaration of Richard L. Wynne in Support of (A) The CCH, Olympus, and UCA/HHC Non-Agent Lenders' Joint Reply In Support of Their Motions to Dismiss Plaintiffs' Second Amended Complaint, and (B) The Parnassos, FrontierVision and Century-TCI Non-Agent Lenders' Joint Reply in Support of Their Motions to Dismiss Plaintiffs' Second Amended Complaint.

in this lawsuit. Rather, the CBNA Lenders are pursuing their rights to dismissal of this lawsuit pursuant to express provisions of the Plan.

As part of the Plan, Plaintiffs themselves agreed — in exchange for the CBNA Lenders' relinquishing of their secured rights to affirmative indemnity under the Prepetition Credit Agreements (and the CBNA Lenders' agreement to extinguish the Prepetition Credit Agreements) — to provide new, defensive indemnity protection to the CBNA Lenders. The CBNA Lenders gave up valuable indemnity rights to obtain affirmative recovery relating not just to this lawsuit, but to any others relating to the Prepetition Credit Agreements. And critically, the CBNA Lenders agreed to limit their indemnity rights for recovery of costs and fees to a $3 million shared pool, instead of having unlimited, individual rights of reimbursement.

The defensive indemnity protection that Plaintiffs specifically negotiated and agreed to — after the Debtors' bankruptcy filing and while this lawsuit was pending — gives the CBNA Lenders the right to dismissal of any claims in this lawsuit that otherwise would have been indemnifiable by the Debtors under the Prepetition Credit Agreements, subject only to any limitations provided in the Plan. This new Plan-based indemnity right, which is now *res judicata*, provides that with respect to any cause of action relating to the credit agreements, unless the individual CBNA Lender engaged in gross negligence or willful misconduct, such Lender is entitled to be dismissed from this lawsuit. Plaintiffs here have not alleged that any Non-Agent Lender engaged in gross negligence or willful misconduct (and indeed have admitted that they do not allege any bad acts against the Non-Agent Lenders). As a result, all of Plaintiffs' claims against the CBNA Lenders are indemnifiable under the Plan and therefore must be dismissed pursuant to the Plan. This post-petition Plan provision is neither voidable nor against public policy, and nothing Plaintiffs cite in the Opposition suggests otherwise.

Plaintiffs' only remaining argument against the Plan's dismissal requirement is that the *Enron* decision supposedly charges the innocent CBNA Lenders with the alleged knowledge and conduct of the Agent Banks for purposes of Plaintiffs' bankruptcy claims. But *Enron* only "taints" the claim, not the individual lender seeking repayment on the claim. And the CBNA

-2-

Lenders' indemnity rights, which were obtained directly from the Debtors, first under the Prepetition Credit Agreements and then again directly from Debtors under the Plan, indemnify the CBNA Lenders except when they themselves commit bad acts. The *Enron* case is thus irrelevant to the indemnity analysis. Moreover, *Enron*, a case of first impression not binding on this Court, itself highlighted that (1) the court was deciding a case with unique factual circumstances and (2) the court's holding only applies, if at all, to equitable subordination claims (and thus not to avoidance claims such as alleged preferences or fraudulent transfers). Plus, *Enron* expressly held that transferees of bankruptcy claims may contract around the risk of equitable subordination resulting from a "tainted" claim through indemnification agreements. The CBNA Lenders' have done that and indeed have obtained such indemnity not merely from their predecessors but directly from the Debtors. Thus, as noted above, the Plan indemnity provisions entitle the CBNA Lenders to dismissal from this lawsuit.

**The CBNA Lenders Are Also Entitled To Dismissal Because Plaintiffs Lack Standing:**
The confirmed Plan also provides that each of the Obligor Debtors (i.e., the specific Adelphia entities that borrowed funds from the CBNA Lenders and therefore are the only entities that can assert the technical bankruptcy avoidance claims against the CBNA Lenders) will pay all of its respective creditors in full, with interest. Subsequent status reports regarding consummation of the Plan — which Plaintiffs themselves have filed — establish that the Obligor Debtors have done just that. Those facts are undisputed. Nonetheless, Plaintiffs argue that the Court must ignore this reality because they believe that the Bankruptcy Court, in ruling on motions brought by other parties years before the Plan was confirmed, already found that Plaintiffs had standing to bring their bankruptcy claims. The Bankruptcy Court did not make any such finding. And even if it had, that would not preclude this Court from considering its own jurisdiction, including Plaintiffs' standing, at this or any other point in the case.

As the CBNA Lenders explain in their moving papers, to establish standing, Plaintiffs must demonstrate both that (1) the Obligor Debtors' creditors were injured on account of any alleged unlawful acts and (2) the relief Plaintiffs seek can redress those injuries. The burden to

establish standing is on Plaintiffs.  And notwithstanding their attempts to alter reality, they fail to meet this burden.

First, the Obligor Debtors have paid all of their creditors in full under the Plan; therefore, Plaintiffs cannot establish that any of the Obligor Debtors' creditors were injured because of the allegations in Plaintiffs' Second Amended Complaint.[2]  Plaintiffs try to obfuscate this reality by fashioning a pretend world in which (1) the more than 250 individual Adelphia estates are or can be substantively consolidated and (2) the so-called Intercompany Claims (claims one Adelphia-related company may have had against another based on disputed bookkeeping entries) and alleged veil-piercing claims continue to exist.  But the Court cannot predicate its jurisdiction — and Plaintiffs' standing — on hypothetical scenarios or hypothetical injuries.  The Court's jurisdiction must be premised on the record as it actually exists.  That record is clear:  the Plan did not substantively consolidate the Adelphia Debtors into one entity, and the alleged Intercompany Claims and veil-piercing claims have been dismissed, with prejudice.

Second, Plaintiffs cannot establish that even one creditor of an Obligor Debtor will directly or indirectly benefit from, or have any supposed injury redressed by, this lawsuit.  No creditor of any Obligor Debtor received any interest in the Contingent Value Vehicle (the "CVV") under the Plan or can receive a single dollar of benefit on account of Plaintiffs' claims — this benefit was all assigned to remote creditors of the Obligor Debtors' parents, grandparents, great-grandparents and, in some cases, great-great grandparents.  And Plaintiffs' contention that they are exempt from demonstrating any benefit to creditors to establish statutory standing for their fraudulent conveyance actions is contrary to binding Second Circuit precedent, which uniformly recognizes that it would be a "mockery of justice" to allow a debtor that incurred an

---

[2]   The CBNA Lenders originally replied to the Amended Complaint in their Motions.  However, on March 4, 2008, Plaintiffs filed a Second Amended Complaint.  *See* Second Amended Complaint, Docket No. 541 in Case No. 05-civ-9050.  By stipulation filed on March 27, 2008, the parties agreed that the CBNA Lenders' Motions would be treated as if filed in response to the Second Amended Complaint.  *See* Stipulation and Order, Docket No. 599 in Case No. 05-civ-0905.  Therefore, the CBNA Lenders now cite to the Second Amended Complaint.

K&E 12589418.16

obligation or made a transfer to avoid that transaction under the Bankruptcy Code where doing so would not benefit any of its own, existing creditors.

In sum, Plaintiffs cannot prosecute their claims against the CBNA Lenders based on what might have been.  As proponents of the Plan, Plaintiffs themselves agreed that the CBNA Lenders would be dismissed from this case if the CBNA Lenders have not individually engaged in gross negligence or willful misconduct.  They agreed that the Adelphia estates would not be substantively consolidated.  They agreed that Intercompany Claims and veil-piercing claims would be "deemed resolved" and dismissed with prejudice.  And they agreed that the Obligor Debtors would pay all of their creditors in full.  Their attempt to pretend that the facts resulting from the implementation of these agreements never happened cannot save their claims.  The Court should dismiss the CBNA Lenders from this lawsuit, based on the unambiguous language of the Plan, the lack of allegations in the Second Amended Complaint, and the judicially noticeable, uncontested facts that exist today.

I.  **PLAINTIFFS' ARGUMENTS AGAINST INDEMNITY-BASED DISMISSAL IGNORE THE CONFIRMED PLAN AND MISAPPLY NON-BANKRUPTCY ASSIGNMENT LAW.**

The CBNA Lenders' indemnity-based argument for dismissal is simple:  the confirmed Plan cancelled the Prepetition Credit Agreements and expressly provided for a new indemnity-based dismissal right for the Non-Agent Lenders.[3]  Under the confirmed Plan, if a CBNA Lender establishes that Debtors would have owed that Lender indemnification for this lawsuit under the terms set forth in the applicable Prepetition Credit Agreement, then that CBNA Lender is entitled

---

[3]  As discussed in the Motions, the Plan provides for the new indemnity-based dismissal through the definition of Dismissed Bank Actions, which means "the Bank Actions [which term includes this litigation] or one or more Claims asserted therein, if any: . . . (ii) with respect to a particular defendant as to which there is a determination by a court of competent jurisdiction pursuant to a Final Order that such defendant as to such Bank Actions, is (or would be, but for any limitation on indemnification or contribution pursuant to this Plan) entitled to indemnification or contribution (whether under a Prepetition Credit Agreement or under another agreement or principle of law), either by a Debtor or by a Person who is (or would be, but for any limitation on indemnification or contribution pursuant to the Plan) entitled to indemnification or contribution by a Debtor, but only to the extent of such indemnification or contribution."  CCH Mot. at 10 (citing Plan at A-17).

to dismissal from this lawsuit.  Under the Prepetition Credit Agreements, the relevant Debtors agreed to indemnify each individual Lender (and each subsequent individual purchaser of the debt paper) for any claim related to the credit agreements, unless the claim arose from that individual Lender's own gross negligence or willful misconduct.  Notwithstanding the years that Plaintiffs have had to investigate the facts and circumstances surrounding this lawsuit, Plaintiffs do not allege that even one CBNA Lender acted with gross negligence or willful misconduct, nor do they allege (with good reason) that even one of the CBNA Lenders is liable for any tort claims.[4]  Accordingly, the CBNA Lenders would have been entitled to indemnification for Plaintiffs' claims against them, and the Plan requires that such claims be dismissed.

Plaintiffs, however, argue that the prepetition indemnity agreements "cannot nullify statutory bankruptcy remedies" (Pls.' Opp. at 65) and assert that the CBNA Lenders' request for dismissal based on indemnification is a "backdoor means to deprive creditors of statutory remedies" (Pls.' Opp. at 67).  But the sky is not falling on creditors, nor are any statutory bankruptcy remedies being nullified.  To the contrary, Plaintiffs knowingly negotiated and agreed, post-petition and after this lawsuit was filed, that the CBNA Lenders would be dismissed if they would have been entitled to indemnification for the claims asserted here under the standards of the Prepetition Credit Agreements, so long as the CBNA Lenders gave up very

---

[4]  Plaintiffs concede that they make no factual allegations of wrongdoing against the Assignees who make up the bulk of the CBNA Lenders, but assert that the Second Amended Complaint contains "facts that amount to misconduct by all original lenders, including Syndicate Banks."  Pls.' Opp. at 69-70.  Plaintiffs are incorrect, as can be seen from the face of the Second Amended Complaint.  The specific paragraphs cited by Plaintiffs contain no facts alleging bad acts against the Syndicate Banks.  Instead, Plaintiffs' citations for their "facts" refer to paragraphs in the Counts of the Second Amended Complaint containing rote, conclusory allegations against all lenders.  These conclusory allegations rest upon Plaintiffs' "slide tactic" of lumping the Non-Agent Lenders with a group of other lenders against whom some facts may have been alleged.  But Plaintiffs' slide tactic cannot overcome the reality that Plaintiffs have pled no facts supporting any misconduct against the Syndicate Banks.  The unsupported and conclusory allegations in the paragraphs cited to by Plaintiffs (and in the Second Amended Complaint as a whole) are inadequate to state a claim.  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) (finding that conclusory allegations unsupported by factual allegations fail to satisfy Rule 12(b)(6)).

significant secured affirmative indemnity rights to monetary recovery.[5]  The confirmed Plan then cancelled the Prepetition Credit Agreements (so there is no prepetition indemnity obligation to avoid) and expressly provided for this dismissal right (so there is no prepetition agreement being enforced post-petition).  And as Plaintiffs themselves explain (Pls.' Opp. at 37-41), the confirmed Plan (a Plan that creditors approved) is *res judicata* and is immune from collateral attack.  Thus, because Plaintiffs agreed postpetition in the now-confirmed Plan to dismiss bankruptcy claims that would have been indemnifiable under the standards of the Prepetition Credit Agreements, Plaintiffs' arguments regarding prepetition waivers of creditor remedies are misplaced and should be disregarded.

Plaintiffs then argue that the Court should follow non-bankruptcy assignment law, whereby the claim of a successor may be "tainted" by the bad acts of its predecessor, to find that the CBNA Lenders would not have been entitled to indemnification because "the original holders of bank claims are alleged to have engaged in willful misconduct."  Pls.' Opp. at 70. This argument fails, however, because the "taint" recognized in certain assignment law contexts, even if it were applicable here, does not modify the contractual indemnity rights of the CBNA Lenders, which provide that the sole exceptions to their indemnity rights would be their own gross negligence or willful misconduct, not the bad acts of third parties.  In any event, non-bankruptcy assignment law does not apply to statutory bankruptcy causes of action, and indeed only one court — *Enron*[6] — has held, in a legally and factually distinguishable context, that assignment law might be applicable to bankruptcy actions, but only then in actions for equitable subordination.  Plaintiffs do not, however, limit their proposed application of *Enron* to equitable subordination claims.  And even assuming that *Enron* was applicable to the equitable subordination claims in this case, *Enron* recognized that a "tainted" claim does not change the

---

[5]  Not surprisingly, Plaintiffs admit that the Plan precludes any "affirmative" recovery by the CBNA Lenders.  Pls.' Opp. at 75.

[6]  *Springfield Assocs., L.L.C. v. Enron Corp.* (*In re Enron Corp.*), 379 B.R. 425 (S.D.N.Y. 2007).

enforceability of indemnification agreements (like those relied upon by the CBNA Lenders here).  *See* CCH Mot. at 28-30; Olympus Mot. at 16; UCA/HHC Mot. at 16.  Plaintiffs' Opposition never addresses this part of *Enron*.

> **A.     The CBNA Lenders Are Only Seeking To Enforce The Dismissal Rights Plaintiffs Agreed To In The Post-Petition, Confirmed Plan, And Are Not Trying To Enforce Prepetition Waivers Of Bankruptcy Protections.**

Plaintiffs' Opposition spends five pages building up and knocking down a strawman argument that prepetition indemnity contracts are unenforceable in bankruptcy.  Pls.' Opp. at 65-69.  Plaintiffs' argument fails on all fronts.  As an initial matter, none of the cases cited by Plaintiffs discusses the enforceability of prepetition indemnity contracts, much less holds or implies that such contracts are void as a matter of public policy.  In fact, prepetition indemnity agreements constitute valid claims in bankruptcy, as recently reaffirmed by the Supreme Court in *Travelers Casualty and Surety Co. of America v. Pacific Gas and Electric Co.*, 127 S. Ct. 1199, 1206 (2007).  And more importantly — in keeping with the actual record of this case and not Plaintiffs' imaginary world where the Plan does not exist — there are no prepetition indemnification agreements to "void" here and there are no creditors being bound by a prepetition agreement in which they did not participate.  The Plan cancelled and extinguished the Prepetition Credit Agreements (Plan Art. 8.6), and extinguished the CBNA Lenders' secured rights to affirmative indemnification.  In place of Debtors' pre-petition indemnity obligations, the Plan provides that if the CBNA Lenders "would be, *but for any limitation on indemnification or contribution pursuant to this Plan*, entitled to indemnification or contribution (whether under a Prepetition Credit Agreement or under another agreement or principle of law)" (Plan at A-17) (emphasis added), then the CBNA Lenders are entitled to dismissal from this lawsuit.  *See* CCH Mot. at 9-10, 22-23; Olympus Mot. at 6-7, 16; UCA/HHC Mot. at 6-7, 17.  The only limitation provided in the Plan is that instead of having an affirmative indemnity right to recovery, the CBNA Lenders have the right to dismissal of claims against them.  It is this post-petition, Plan-based dismissal right, negotiated and agreed upon with Plaintiffs, that the CBNA Lenders seek to enforce by their Motions to Dismiss.

1.    **Plaintiffs' case law is irrelevant because it does not address prepetition indemnity agreements.**

The case law cited by Plaintiffs to support their assertion that prepetition indemnity provisions are void as a matter of policy (*see* Pls.' Opp. at 66-69) never actually addresses the enforceability of prepetition indemnity agreements.  The prepetition indemnity provisions provide for two types of claims to become additional secured indebtedness of the Obligor Debtors:  substantive claims for indemnification for any liability, costs or expenses against a CBNA Lender, and claims for attorneys' fees and cost reimbursement.  Those lending provisions become additional debt, valid against the obligors under state law.  None of Plaintiffs' cases challenge the validity of such additional obligations, under state law or on public policy grounds.  Instead, Plaintiffs' cases stand for a variety of unremarkable and irrelevant propositions, such as:

- Prepetition agreements that a creditor's claims for payment will not be discharged in the event of a bankruptcy filing are not enforceable.  *See, e.g., Giamo v. Detrano (In re Detrano)*, 222 B.R. 685 (Bankr. E.D.N.Y. 1998) (discussing a prepetition judgment against debtor for breach of a settlement agreement) (Pls.' Opp. at 66).

- Prepetition agreements to not seek bankruptcy protection are not enforceable.  *See, e.g., Johnson v. Kriger (In re Kriger)*, 2 B.R. 19 (Bankr. D. Or. 1979) (discussing a prepetition stipulated judgment for settlement of a personal injury lawsuit) (Pls.' Opp. at 66-67); *In re Madison*, 184 B.R. 686 (Bankr. E.D. Pa. 1995) (discussing an agreement between debtor and her mortgagee to not file for bankruptcy for 180 days, reached after debtor's fourth bankruptcy filing was dismissed and prior to her fifth bankruptcy filing) (Pls.' Opp. at 67); *In re Southeast Fin. Assocs., Inc.*, 212 B.R. 1003 (Bankr. M.D. Fla. 1997) (discussing breach of a stipulation to continue a foreclosure sale) (Pls.' Opp. at 67).

- Prepetition judgments are not binding on a trustee in pursuit of an avoidable transfer, because trustees in pursuit of such transfers are not deemed to be in privity with the debtor.  *See, e.g., Pereira v. Equitable Life Ins. Soc'y of the United States (In re Trace Int'l Holdings, Inc.)*, 289 B.R. 548 (Bankr. S.D.N.Y. 2003) (discussing a prepetition order regarding payment of dividends to preferred shareholders) (Pls.' Opp. at 67); *Rodino v. Barondess (In re Good Time Charley's, Inc.)*, 54 B.R. 157 (Bankr. D.N.J. 1984) (discussing a prepetition judgment reinstating a first mortgage) (Pls.' Opp. at 67); *Harvey Hopper Lobsters, Ltd. v. Best Pack Seafoods, Inc. (In re Best Pack Seafoods, Inc.)*, 29 B.R. 23 (Bankr. D. Me. 1983) (discussing a prepetition attachment on third party payments to debtor) (Pls.' Opp. at 67).

- Prepetition release agreements may not bar claims not known at the time of the release and may not bind creditors not a party to the release.  *See, e.g., Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re American*

*Sweeteners, Inc.)*, 248 B.R. 271 (Bankr. E.D. Pa. 2000) (discussing how an action for equitable subordination was affected by debtor's prepetition release of claims) (Pls.' Opp. at 68); *L M Ericsson Telecommunications, Inc. v. Teltronics Servs., Inc. (In re Teltronics Servs., Inc.)*, 18 B.R. 705 (E.D.N.Y. 1982) (discussing how an action for equitable subordination was affected by a prior judgment dismissing claims) (Pls.' Opp. at 69).

- Prepetition agreements do not override contrary provisions of the Bankruptcy Code. *See, e.g., Bank of Am. v. N. LaSalle St. L.P. (In re 203 N. LaSalle St. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000) (enforcing a prepetition subordination agreement as regards payment, but not enforcing it as regards voting rights) (Pls.' Opp. at 68).

None of these cases offers any support for Plaintiffs' argument that prepetition indemnification clauses like the ones in the now-extinguished Prepetition Credit Agreements are against public policy and are therefore void. And none of them applies at all to provisions voted upon by all creditors and approved in a now-confirmed Plan of Reorganization.

## 2. Prepetition secured indemnity agreements are enforceable in bankruptcy.

Plaintiffs' suggestion that the CBNA Lenders' rights to indemnity are somehow invalid because their claims in this lawsuit arise under bankruptcy law flies in the face of recent Supreme Court precedent. In *Travelers Casualty and Surety Co. of America v. Pacific Gas and Electric Co.*, 127 S. Ct. 1199, 1206 (2007), the Court expressly rejected the idea that the Bankruptcy Code mandated disallowance of contractual pre-petition indemnity claims against the Debtor simply because the attorneys' fees at issue were incurred litigating issues of bankruptcy law. The Court stated that it will "generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." *Id.* Plaintiffs' nebulous public policy arguments against the validity of pre-petition indemnity claims are best addressed to Congress, which as the Court reminded, "has the power to amend the Bankruptcy Code by adding a provision expressly disallowing claims . . . incurred by creditors in the litigation of bankruptcy issues." *Id.* But where, as here, no such provision exists, there is no basis for Plaintiffs' contention that such an indemnity claim is invalid.

Lower courts have likewise found that prepetition indemnity agreements give rise to valid and allowable claims in bankruptcy. *See Olin Corp. v. Riverwood Int'l Corp. (In re Manville*

*Forest Prod. Corp.*), 209 F.3d 125, 129 (2d Cir. 2000) (finding that prepetition indemnification agreements covered future statutory liability and constituted a valid bankruptcy claim); *Am. Home Assurance Co. v. Enron Natural Gas Mktg. Corp. (In re Enron Corp.)*, 307 B.R. 372, 381 n.58 (S.D.N.Y. 2004) (noting that "it is undoubtedly true that the [indemnitees] are entitled to payment from [the debtor] pursuant to the indemnity agreements" and thus the question is priority vis-a-vis other creditors).

Under the governing case law, the CBNA Lenders' secured rights to indemnification under the Prepetition Credit Agreements for Plaintiffs' bankruptcy causes of action would have been enforceable, but for the fact that the Plan extinguished those rights in exchange for the agreed-upon right under the Plan to be dismissed from this lawsuit.

> **3.     Plaintiffs provide no authority that would permit this Court to disregard the post-petition Plan provisions that provide the CBNA Lenders with a right to dismissal.**

Ultimately, not one of Plaintiffs' proffered "policy" arguments addresses the facts of this case. Here, this Court has an unambiguous post-petition agreement (the Plan), negotiated by Plaintiffs and Defendants and voted upon by creditors years after this lawsuit was filed, which incorporates indemnification standards to provide a dismissal remedy to the Bank Litigation. The Plan is now *res judicata* and not subject to collateral attack. Pls.' Opp. at 37-42. And there is no doubt that negotiation of and agreement to post-petition indemnification agreements like the one at issue here are allowed and enforceable under the Bankruptcy Code. *See, e.g.*, *In re Joan and David Halpern Inc.*, 248 B.R. 43, 46 (Bankr. S.D.N.Y. 2000) (finding valid a post-petition indemnification agreement negotiated by debtor and the Creditors' Committee, and noting that the Creditors' Committee's support for the indemnity provision "is entitled to weight. After all, it is the creditors' money that is placed at risk by the indemnity provision").

There are no prepetition waivers of bankruptcy protection at issue, nor are there creditors bound by an agreement in which they did not participate. And because the prepetition secured indemnity rights and Prepetition Credit Agreements have been extinguished, there is no prepetition indemnity claim to avoid. Accordingly, Plaintiffs' "policy" arguments premised on

cases considering distinguishable prepetition agreements that waive fundamental protections of the Bankruptcy Code do not apply to the CBNA Lenders' Plan-based, court-approved right to dismissal from this lawsuit.

> **B.** ***Enron* Is Neither Binding Nor Applicable Here, But Even If It Were, The CBNA Lenders Would Still Be Entitled To Dismissal Based On Indemnification.**

Plaintiffs' only other argument against the CBNA Lenders' indemnity-based right to dismissal rests on the decision in *Springfield Assocs., L.L.C. v. Enron Corp.*, (*In re Enron Corp.*), 379 B.R. 425 (S.D.N.Y. 2007). But, Plaintiffs do not ask this Court to follow the *Enron* court's non-binding decision and limit it, as that court did, to equitable subordination claims. Instead, Plaintiffs suggest a dramatic expansion in which *Enron*'s reliance on notions of "taint" in relation to equitable subordination claims is applicable to other bankruptcy causes of action like the fraudulent conveyance and preference causes of action at issue here, notwithstanding the express statutory provisions of those technical bankruptcy avoidance causes of action. Pls.' Opp. at 69-72. However, Plaintiffs' own cases — none of which (with the exception of *Enron*) is a bankruptcy case — highlight that application of general principles of assignment law to Plaintiffs' bankruptcy avoidance actions is *not* routine, and Plaintiffs offer no support for their unwarranted expansion of the avowedly narrow *Enron* holding except their assertion that it should be so. *See Enron*, 379 B.R. at 428 (noting that the Court's "conclusions of law cleave tightly to the facts presented").

Even assuming, however, that *Enron* applied to Plaintiffs' claims for equitable subordination in this case, this Court should still dismiss the CBNA Lenders because the *Enron* court expressly held that parties could contract around the effect of any "taint" through indemnification agreements. *Enron*, 379 B.R. at 442; *see also* CCH Mot. at 29-30. The CBNA Lenders have done just that, contracting around any alleged "taint" on their claims through their individual indemnification agreements with the Debtors.

1.     ***Enron* is factually distinguishable and not binding on this Court.**

As discussed in the Motions (*see, e.g.*, CCH Mot. at 28-30), the *Enron* court faced an issue of first impression:  whether claims in the hands of innocent transferees were subject to equitable subordination to the same extent as if the claims were still in the hands of the alleged bad actor.  The specific issue the court had to decide was whether the Bankruptcy Code only allowed subordination of claims actually held by the alleged bad actor.  The *Enron* court made a distinction between transfers by sale and transfers by pure assignment, finding that transfers by sale did not pass any "taint" (and so the claim from a bad actor in the hands of a downstream "sale" transferee could not be subordinated on account of any "taint" associated with that bad actor), while transfers by "pure assignment" might pass on a "taint" (and so the claim from a bad actor in the hands of a downstream "assignment" transferee might be tainted, if that transferee could not raise a holder in due course defense).[7]  The *Enron* court cited to "pure assignments" such as subrogation of a surety, or a receiver, or by operation of law where the assignee stands in the shoes of the assignor.  None of those situations exists here.

In addition, none of the *Enron* transferees asserted that they had obtained from the Enron debtors the same kind of fully-secured indemnification rights that the CBNA Lenders had from the Adelphia Obligor Debtors, and thus could not assert against the Enron debtors the indemnification protections the *Enron* court recognized.  *See Enron*, 379 B.R. at 442 ("Parties to true assignments, by contrast, can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee.").  As a result, *Enron* and its rationale do not apply to the CBNA Lenders.

---

[7]   While the CBNA Lenders were, in fact, purchasers and not assignees, this dispute is not before the Court on these Motions.  The Motions seek dismissal on pure issues of law that this Court can decide now, including: (1) whether *Enron* is applicable to this case; and (2) even assuming the Court applies *Enron*, whether the CBNA Lenders are entitled to dismissal based on their indemnification rights under the Plan.

>    **2.    Even if this Court applies *Enron*, then the CBNA Lenders'
>           indemnification rights, which flow to each Lender and are not sold or
>           assigned, still entitle them to dismissal from this case.**

If this Court decides that *Enron* is applicable to the equitable subordination count, then this Court should follow *all* of *Enron*.  As articulated in the Motions, and as outlined in the *Enron* decision, the *Enron* court found that if the post-petition transfers at issue were purchases then the claim would not be "tainted," but if they were pure assignments, then traditional assignment law could apply and transfer the "taint" of an original bad actor to the innocent downstream transferee's claim for repayment (if that transferee could not raise a holder in due course defense or other assignment law defense).  However, the *Enron* court also held that even if the *Enron* defendants were assignees who could not raise the holder in due course defense, they could contract around the effect of the tainted claim through indemnification agreements. *Enron*, 379 B.R. at 442 ("Parties to true assignments . . . can easily contract around the risk of equitable subordination or disallowance by entering into indemnity agreements to protect the assignee."); *see also id.* at 446 (finding that defendant's indemnification rights from its transferor continue and "provide[] protection against the risk" of the taint); *see also Citibank Tex. v. Progressive Cas. Ins. Co.*, 508 F.3d 779 (5th Cir. 2007) (finding that party who could not raise the holder in due course defense should be indemnified under the language of the indemnity agreement).

As applied to this case, and assuming *arguendo* that the transfers were assignments and that Plaintiffs will prove bad acts by the Agent Banks, then this Court could apply the purported "taint" of the Agent Banks' alleged actions to equitably subordinate the repayment claims of the CBNA Lenders.  *But* the indemnification rights the CBNA Lenders received directly from Debtors would remain valid and enforceable.  As discussed in the Motions, the Non-Agent Lenders received indemnification rights directly from Debtors. *See, e.g.*, CCH Mot. at 5-7, 9-10, 22-23; Olympus Mot. at 2-3; UCA/HHC Mot. at 3-4.  These rights were not transferred from purchaser to purchaser, but were instead contracted to anew with each purchase.  Thus, Plaintiffs' implied argument that these indemnity rights are somehow "tainted" through

purchaser to purchaser transfers misstates the record before this Court (and ignores *Enron*'s holding that such transferor/transferee indemnification rights remain valid even when a "taint" affects a claim for repayment).  These rights were not transferred and so cannot be tainted through the alleged acts of previous holders.

And Plaintiffs have admitted, repeatedly, that "there is no allegation that the Syndicate Banks individually did anything improper." *See* Estimation Mot. ¶ 8. [8]  As a result, there is no exception to the CBNA Lenders' individual indemnification rights under the now-extinguished credit agreements.  But for the Plan, the CBNA Lenders would have been entitled to indemnification and are now entitled to dismissal.

### 3. Post-petition transfer documents and knowledge about Adelphia's financial troubles do not defeat the CBNA Lenders' indemnity-based right to dismissal under the Plan.

Finally, Plaintiffs argue that the wording required by the DIP Financing Order (the "Acknowledgement") to be placed in transfer documents for the Co-Borrowing Credit Facilities means that subsequent purchasers agreed to be bound by the alleged bad conduct of the Agent Banks and that, even if this wording were not in place, anyone buying the Co-Borrowing debt paper after March 27, 2002 (when Plaintiffs' alleged Adelphia's problems came to public light), should be charged with actual knowledge of the underlying fraud.  Pls.' Opp. at 71-72. However, the Acknowledgement does not (and does not purport to) create a new legal right in Debtors.  Per the wording of the Acknowledgement, a Lender must inform its "assignee" that the Obligation "is subject to all claims and defenses, if any, of the Debtors' Estates . . . to the same extent that the Debtors' Estates had recourse against such Lender."  Plaintiffs' App. Ex. B. at 1. While this language can be read to inform a purchaser that Debtors may raise claims or defenses against that purchaser if those same claims and defenses could have been raised against that

---

[8]  *See also* Estimation Mot. ¶ 40 ("Given that the complaint in the Bank Action does not allege that the Syndicate Banks individually committed wrongdoing. . . ."); ¶ 67 ("[T]here are no claims that any of the 'after-market' Syndicate Banks individually did anything improper.").

seller,[9] the language cannot be read to bind the purchasers to helplessly acquiesce to any claims or defenses raised by Debtors against all predecessor parties that at one time owned the debt.

In fact, the language does not even mention defenses that may be particular to the purchaser. Instead, it focuses on the "claims" and the "defenses" that Debtors could have raised *against the seller*. Nothing here states that the indemnification rights that the purchaser received from Debtors directly (under the Prepetition Credit Facilities and again under the Plan) would not be viable defenses to any claims Debtors could have raised against the seller. Simply put, the Acknowledgment does not affect the CBNA Lenders' ability to assert their Plan-based indemnity right, a right specifically acknowledged in *Enron* as one that would survive any "taint" by assignment, against Plaintiffs' claims.

Plaintiffs' final suggestion, made without citation to case law, that post-petition public knowledge of problems at Adelphia can be morphed into concrete allegations of actual knowledge of the alleged bank fraud at Adelphia by the CBNA Lenders (and therefore somehow defeat the CBNA Lenders' indemnification rights) (Pls.' Opp. at 72) is no more than a last-ditch attempt to save these bankruptcy causes of action from Plaintiffs' lack of case law support, lack of factual support, and contrary prior admissions. As to the lack of case law, Plaintiffs rest their entire argument on one case — *Enron* — but as discussed above, even under *Enron* the CBNA Lenders should be dismissed.[10] As to the lack of facts, nowhere in the Second Amended

---

[9]  Plaintiffs' suggestion that the Acknowledgement creates an endless chain stretching back all the way to the Agent Banks at the inception of the credit facilities is erroneous on its face. The plain language of the Acknowledgement states that the "Lender" will not sell the Obligation without notifying the "assignee" that the Obligation is subject to claims and defenses, if any, to the same extent as if those claims and defenses were raised against "such Lender." This is not an endless chain, but a simple connection between seller and purchaser. At its earliest, this chain cannot stretch back beyond the first use of the Acknowledgement, which Plaintiffs admit did not occur until post-petition (August 2002) and even then, the DIP Order required the Acknowledgement to be placed only in transfers under the Co-Borrowing Facilities. *See* Plaintiffs' App. Ex. A at 21 n.5.

[10]  In their attempt to use the *Enron* decision to support their dearth of factual allegations against the CBNA Lenders, Plaintiffs misstate the findings of the *Enron* court. Plaintiffs assert that Judge Scheindlin "found that a transferee cannot avoid the risk of equitable subordination where it acquires its interest after it knows or reasonably should have known that the debt was subject to defenses to its enforceability." Pls.' Opp. at 79 (purportedly citing *Enron*, 379 B.R. at 445). In fact, Judge Scheindlin found that "a claim purchaser with *actual notice of* the seller's

(Continued…)

Complaint do Plaintiffs allege *any facts* that the CBNA Lenders did anything more than buy Adelphia debt paper that was traded through loan syndications that had been approved by the full Adelphia Board.  Even post-petition, Plaintiffs point to no facts that the CBNA Lenders knew more than any member of the public, and knowledge of general problems at Adelphia does not equate to actual knowledge of or participation in an alleged fraud.  And as to the contrary admissions, Plaintiffs have repeatedly admitted in documents filed with the Bankruptcy Court, in an ultimately-successful effort to minimize the amount of the Non-Agent Lenders' litigation indemnity fund, that the CBNA Lenders are not alleged to have "individually [done] anything improper."  *See, e.g.,* CCH Mot. at 21 n.13 (citing Plaintiffs' Estimation Motion).

Plaintiffs' pleadings in this case, and their prior admissions, establish that the CBNA Lenders are not alleged to have, and did not, commit gross negligence or willful misconduct. Under the Plan, each CBNA Lender who did not act with gross negligence or willful misconduct in relation to the prepetition credit facilities is entitled to dismissal from this case.  Moreover, since any alleged bad acts on the part of the CBNA Lenders would not even constitute an element of any claim for avoidance of alleged preferential or fraudulent transfers, such allegations would be irrelevant and the CBNA Lenders would be entitled to dismissal of the fraudulent transfer and preference avoidance actions against them under the Plan-based indemnity provisions.  For all these reasons, this Court should dismiss all claims against the CBNA Lenders with prejudice.

---

*receipt of an avoidable transfer* may be subject to equitable subordination *for its own misconduct.*"  *Enron*, 379 B.R. at 445 (emphasis added).  As all bankruptcy claims are "subject to defenses," Plaintiffs' misstatement of the *Enron* Court's opinion would nullify one of its stated effects - stability in the markets for distressed debt.  *See id.* at 439 n.76 ("[T]he concerns raised by Industry Amici with respect to the effects of the Bankruptcy Court's rulings on the markets for distressed debt are no longer present. . . . Equitable subordination and disallowance arising out of the conduct of the transferee will not be applied to good faith open market purchasers of claims.").  Instead, Judge Scheindlin's true language concerns actual notice of avoidability, and misconduct of the transferee, neither of which Plaintiffs have alleged against the CBNA Lenders here.

## II.   THE COURT DOES NOT HAVE JURISDICTION OVER PLAINTIFFS' BANKRUPTCY CLAIMS BECAUSE PLAINTIFFS DO NOT HAVE STANDING TO BRING THEM.

Before a federal court can examine the merits of a case, it must first determine that it has jurisdiction to do so. *Lance v. Coffman*, 127 S. Ct. 1194, 1196 (2007) (per curiam).  In doing so, the court must consider whether it is faced with a live "case" or "controversy." *Hein v. Freedom from Religion Found.*, 127 S. Ct. 2553, 2562 (2007) (recognizing that Article III limits federal courts to deciding real cases and controversies).  And one of the "controlling elements" in determining the existence of a live case or controversy is standing. *ASARCO Inc. v. Kadish*, 490 U.S. 605, 613 (1989) (citations omitted).

A plaintiff bears the burden of establishing its standing — both constitutional and statutory — to assert claims in a litigation.[11]  CCH Mot. at 30-35.  A determination of standing cannot "rest upon *hypothetical* facts," but must rather rest "upon allegations of *concrete* injury." *McLean v. Mathews*, 466 F. Supp. 977, 980 n.9 (S.D.N.Y. 1976) (citation omitted) (emphasis added).  Therefore, a plaintiff cannot establish standing — and thereby the court's jurisdiction — based on injuries that are "hypothetical and unsupported by the record." *In re Matter of FedPak Sys., Inc.*, 80 F.3d 207, 212 (7th Cir. 1996).

In their motions, the CBNA Lenders demonstrate that Plaintiffs do not have standing to bring bankruptcy claims on behalf of the Obligor Debtors because (1) the Obligor Debtors have paid all of their creditors in full (i.e., none of their creditors are injured) and (2) none of the Obligor Debtors' creditors will obtain any benefit from or have any injury redressed by

---

[11]   That said, the constitutional standing requirement that a plaintiff suffer a distinct and palpable personal injury that is likely to be redressed by the requested relief is the benchmark for standing in the federal court system.  While Congress may enact statutes that deny statutory standing to parties who would otherwise have constitutional standing under Article III, it cannot enact statutes that impart standing upon those who would not otherwise have constitutional standing. *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

K&E 12589418.16

Plaintiffs' avoidance, subordination or disallowance of the CBNA Lenders' claims.  *See* CCH Mot. at 32-43.

Rather than meet the CBNA Lenders' standing challenge on the merits (because they cannot), Plaintiffs instead engage in diversions that misrepresent the record, attempt to mislead the Court and generally distract from the standing analysis.  In a nutshell, Plaintiffs contend that (1) the Court should not even consider the CBNA Lenders' standing challenge and should instead interpret the Bankruptcy Court's earlier rulings that Plaintiffs pled the elements of their bankruptcy claims to also mean that the Bankruptcy Court ruled that they had perpetual standing to bring them (Pls.' Opp. at 34-42); *but* (2) if the Court considers the CBNA Lenders' standing anew, Article 8.5 of the Plan requires it to do so on a hypothetical record pretending that the Plan was not confirmed and consummated (Pls.' Opp. at 42); *and* (3) upon that hypothetical record, Plaintiffs would have standing (Pls.' Opp. at 26-28).  These arguments, which turn Article III's jurisdictional standing requirements on their head, have no merit.[12]

### A.    The Court Must Consider The CBNA Lenders' Standing Challenge On The Merits.

In a blatant attempt to evade any consideration of their standing on the merits, Plaintiffs contend that (1) the law of the case doctrine, (2) judicial estoppel, and (3) *res judicata* bar the CBNA Lenders' challenge thereto.  Not one of these judicially created doctrines, however, impedes or diminishes the Court's independent duty to assess its jurisdiction, and thereby

---

[12]   Because the Obligor Debtors waived all of their rights to recover on account of the bankruptcy claims Plaintiffs now seek to prosecute as part of the Plan, Plaintiffs' claims asserted on their behalf should also be dismissed as moot.  *See Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) ("[E]ven as to claims that plaintiffs originally had standing to assert, the court must determine whether those claims remain live controversies or have become moot."); *Cook v. Colgate Univ.,* 992 F.2d 17, 19 (2d Cir. 1993) ("While the standing doctrine evaluates [a litigant's] personal stake as of the outset of the litigation, the mootness doctrine ensures that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit . . . ." (citation omitted)); *Freedom Party of N.Y. v. N.Y. State Bd. of Elections,* 77 F.3d 660, 662 (2d Cir. 1996) ("A case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." (citation omitted)).

Plaintiffs' standing, at each stage of a case.  And in any event, each doctrine is inapposite to this case.

> **1.   The law of the case doctrine does not apply to consideration of jurisdictional issues such as standing and, in any event, is inapplicable here.**

Plaintiffs first contend that the Court must adhere to the Bankruptcy Court's findings, made on other parties' pre-confirmation motions to dismiss, that the Plaintiffs' Original Complaint in this action pled the "existence of injured creditors."  *See* Pls.' Opp. at 34-37.  They are wrong for at least three reasons.

*First*, standing is a jurisdictional issue, and courts must, *sua sponte*, consider whether jurisdiction exists at every stage of the case.  *Walsh v. McGee*, 918 F. Supp. 107, 112 (S.D.N.Y. 1996) ("Plaintiffs' law of the case claim . . . fails because questions of subject matter jurisdiction are generally exempt from law of the case principles.").  *See also Fed. Deposit Ins. Corp. v. Four Star Holding Co.*, 178 F.3d 97, 100 n.2 (2d Cir. 1999) ("[F]ederal courts are under an independent obligation to examine their own jurisdiction." (citation omitted)); *Cable Television Ass'n of N.Y., Inc. v. Finneran*, 954 F.2d 91, 94 (2d Cir. 1992) ("[The court] must consider the question [of jurisdiction] *sua sponte* whenever there is an indication that jurisdiction is lacking." (citations omitted)).  The law of the case doctrine cannot now or ever bar this Court from considering the threshold issue of whether Plaintiffs have standing to bring this lawsuit.  *Walsh*, 918 F. Supp. at 112 ("[I]t is a Court's *obligation* to dismiss a case *whenever* it becomes convinced that it has no proper jurisdiction, no matter how late that wisdom may arrive." (citation omitted) (emphasis in the original)).

*Second*, none of the Bankruptcy Court's earlier decisions, including its June 11, 2007 ruling on the Agent Banks' motions to dismiss, ever considered the "existence of injured creditors" after consummation of the Plan (or, in other words, Plaintiffs' standing as it exists today).  Instead, the earlier decisions considered whether the Plaintiffs had pled or could plead that the Obligor Debtors were insolvent *at the time the Obligor Debtors made the alleged transfers.  See Adelphia Commc'ns Corp. v. Bank of Am., N.A., et al (In re Adelphia Commc'ns*

*Corp.*), 365 B.R. 24, 36-37 (Bankr. S.D.N.Y. 2007).  This issue — whether Plaintiff adequately pled an essential element of preference and constructive fraudulent transfer claims — is an entirely different issue and involves an entirely different analysis from that of whether the Obligor Debtors *today* have injured creditors that could benefit from the relief they request.  It cannot serve as a "law of the case" determination of standing.

*Third*, where there is a new factual record, the law of the case doctrine is inapplicable. *See Prometheus Radio Project v. Fed. Commc'ns Comm'n*, 373 F.3d 372, 389 n.11 (3d Cir. 2004) (reasoning that when there is "a different record" as well as "a different set of parties participat[ing]," the law of the case doctrine does not apply); *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005) ("Law of the case doctrine does not apply . . . because . . . [there is] a different record . . . ." (citation omitted)); *The Soc'y of The Roman Catholic Church of the Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.*, 126 F.3d 727, 736 (5th Cir. 1997) (reasoning that because there is a different record due to additional evidence, the law of the case doctrine did not apply); *see also* Pls.' Opp. at 36 (citing, *e.g.*, *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 343 B.R. 63, 67 (S.D.N.Y. 2006) (recognizing that the law of the case doctrine does not apply when there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice") (citations and internal quotation marks omitted)).

Judge Gerber explicitly states that the facts upon which he based his June 11, 2007 decision "were set forth" in his August 30, 2005 opinion — an opinion issued more than a year before the Plan was confirmed and consummated.  *See In re Adelphia Commc'ns Corp.*, 365 B.R. at 31-32 (citing *In re Adelphia Commc'ns Corp.*, 330 B.R. 364 (Bankr. S.D.N.Y. 2005)).  In that same June 11, 2007 decision, he also explicitly acknowledges that his decision may have been different had he been making it on a post-confirmation record.  For example, Judge Gerber stated that:

- ***With the benefit of hindsight***, the Court believes it to be the case that many, and perhaps all, of the trade (and other non-affiliate) creditors of the Debtors to whom bank lenders made loans received distributions in the

K&E 12589418.16

*Adelphia* chapter 11 cases **sufficient to pay those creditors in full**, and that the creditors who were less fortunate in the *Adelphia* chapter 11 cases were creditors of structurally junior debtor entities, such as intermediate holding companies or Adelphia Parent. *In re Adelphia Commc'ns Corp.*, 365 B.R. at 69 (emphasis added).

- These contentions [that the constructive fraudulent transfer claims must be dismissed by reason of their borrowers' solvency] **will require serious consideration in future proceedings** - since the Court now knows, **with the benefit of hindsight**, that under the Debtors' recently confirmed (and now effective) reorganization plan, many unsecured creditor classes (including many classes of creditors of obligors in the co-borrowing facilities) received payment of their principal and prepetition interest in full - **an outcome materially at odds with contentions of insolvency**. *Id.* at 37 n.28 (emphasis added).

Judge Gerber's decision, having been made on a pre-confirmation different record, cannot be law of the case on any issue that would be affected by the confirmed and consummated plan. The same is true for this Court's decision on certain defendants' request for interlocutory appeal of that decision. *See Adelphia Recovery Trust v. Bank of Am., N.A., et al.*, No. 05 Civ. 9050, 2008 WL 217057, at *11 (S.D.N.Y. Jan. 17, 2008). Plaintiffs cannot avoid consideration of their standing by relying on an inapposite finding on a different factual record.

### 2. Judicial estoppel does not help Plaintiffs establish standing.

In a second attempt to evade consideration of their standing on the merits, Plaintiffs invoke judicial estoppel. They contend that because the CBNA Lenders agreed to disgorge their distributions if Plaintiffs prevailed against them in this litigation, the CBNA Lenders are now estopped from doing anything that would defeat that disgorgement (such as the purportedly horrific act of defending themselves) and, therefore, cannot challenge Plaintiffs' standing. Pls.' Opp. at 42 ("Now, these bank lenders seek to preserve the Court's approval of the payments to them [which were subject to disgorgement] while pointing to those very payments as a basis to defeat the unsecured creditors' rights and benefits."). Plaintiffs miss the point. It is not the fact that the Obligor Debtors paid the CBNA Lenders in full on their secured, senior debt that precludes Plaintiffs' standing here. It is, instead, the fact that the Obligor Debtors paid each and every one of their other creditors in full as well.

As a matter of law, Plaintiffs cannot stop this Court from considering its jurisdiction —
and their standing — by invoking judicial estoppel.  Regardless of how the parties conduct their
case, the federal courts have an independent and continuing obligation to ensure that they have
jurisdiction.  *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks
subject-matter jurisdiction, the court must dismiss the action."); *A.N. Wight v. Bankamerica
Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) ("[I]rrespective of how the parties conduct their case, the
courts have an *independent obligation* to ensure that federal jurisdiction is not extended beyond
its proper limits." (citation omitted) (emphasis added)).  And to have that jurisdiction, Plaintiffs
must have standing to assert their claims.  *See supra* at 18-19.  Accordingly, Plaintiffs cannot
escape their duty to establish standing to maintain their bankruptcy claims by simply invoking
judicial estoppel.

But even if they could, their argument that judicial estoppel somehow bars the CBNA
Lenders from defending themselves in this litigation is absurd.  The judicial estoppel doctrine
applies when (1) a party's later position is clearly inconsistent with its earlier position, and (2)
the previous court adopted the inconsistent position.  *See Pereira v. Dow Chem. Co. (In re Trace
Int'l Holdings, Inc.)*, 301 B.R. 801, 806 (Bankr. S.D.N.Y. 2003); *see also New Hampshire  v.
Maine*, 532 U.S. 742, 750 (2001).  The CBNA Lenders' agreement, as part of the Plan, to
disgorge their distributions if Plaintiffs prevail on their claims is not inconsistent with — much
less clearly inconsistent with — their current position that (1) they can defend themselves in this
lawsuit and (2) one of their defenses is that Plaintiffs do not have standing to bring their
bankruptcy claims.  This is particularly true in light of the fact that the Plan, for which Plaintiffs
were proponents, specifically preserves the CBNA Lenders' right to raise defenses to Plaintiffs'
claims.[13]  *See* Plan Art. 9.2(b); 16.4.  Judicial estoppel does not bar the CBNA Lenders from
raising a challenge to Plaintiffs' standing.

---

[13]  If anything, Plaintiffs themselves are judicially estopped from arguing that the CBNA Lenders cannot raise their
standing defense.  *In re Trace Int'l Holdings, Inc.*, 301 B.R. at 806 (Trustee had previously argued that an obligation

(Continued…)

**3.** ***Res judicata* does not prevent this Court from independently assessing jurisdictional issues such as standing.**

In a final attempt to evade consideration of their standing on the merits, Plaintiffs invoke *res judicata*. They speciously assert that the Bankruptcy Court, by approving the Plan, has already ruled that Plaintiffs have perpetual standing in this case to bring their bankruptcy claims, thereby barring this Court from now considering the same question. Pls.' Opp. at 42. They are wrong again.

*Res judicata* bars consideration of pending claims that an earlier court already specifically considered and disposed of on their merits. *See* Pls.' Opp. at 40-41. Here, Plaintiffs claim that the Debtors' Plan (as approved by the Bankruptcy Court) "repeatedly and conclusively" found that Plaintiffs would have perpetual standing (in this Court) to bring their bankruptcy claims, notwithstanding the fact that the Obligor Debtors might subsequently satisfy all claims asserted against their respective estates. *See* Pls.' Opp. at 42 (arguing that the Plan states "***repeatedly and conclusively*** that confirmation of the Primary Plan . . . ***would not change the standing that previously existed*** to bring these claims") (emphasis added). But the Plan says no such thing. In fact, the Plan *never once* addresses — much less determines — Plaintiffs' standing to maintain their claims in this lawsuit (and, instead, explicitly preserves all of the CBNA Lenders' defenses to the lawsuit). *See* Plan Art. 9.2(b); 16.4.

Nor could the negotiated Plan — or the Bankruptcy Court — have consensually established Plaintiffs' standing, as it is black letter law that parties cannot contract around standing. *See In re Combustion Eng'g, Inc.*, 391 F. 3d 190, 228-29 (3rd Cir. 2004) (holding that "Congress has vested the bankruptcy courts with 'limited authority'" and "[w]here a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement *even in a plan of reorganization*.") (emphasis added) (citing *Bd. of Governors of Fed. Reserve Sys. v. MCorp*

---

was debt and then later claimed that the redemption obligation was not antecedent debt.). *See also* Reply Brief in Support of Joint Motion of Various Lenders to Dismiss the Avoidance and Subordination Claims, Point III, at 31-33, in which the CBNA Lenders join.

*Fin., Inc.*, 502 U.S. 32, 40 (1991)); *In re Resorts Int'l, Inc.*, 372 F.3d 154, 161 (3d Cir. 2004); *In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 103 (S.D.N.Y. 1997) ("Standing is a jurisdictional matter which must be resolved by the court; parties cannot either waive or confer standing by agreement."); *Barhold v. Rodriguez*, 863 F.2d 233, 234 (2d Cir.1988) ("[P]arties do not have the power to confer such jurisdiction upon the Court by conceding the standing of certain plaintiffs."); *Rosen v. Tenn. Comm'r of Fin. and Admin.*, 288 F.3d 918, 931 (6th Cir. 2002) ("Parties cannot confer standing purely by agreement . . . ."); *White's Place, Inc. v. Glover,* 222 F.3d 1327, 1328 (11th Cir. 2000) ("We cannot proceed without determining that standing exists, even if both parties concede jurisdiction."); *Wilson v. Glenwood Intermountain Props. Inc.*, 98 F.3d 590, 593 (10th Cir.1996) ("[P]arties cannot confer subject matter jurisdiction on the courts by agreement").

Accordingly, because the Bankruptcy Court never considered — much less determined — whether Plaintiffs have perpetual standing to bring their bankruptcy claims, *res judicata* cannot bar consideration of the CBNA Lenders' standing challenge.  This Court must *independently* assess whether the Plaintiffs have standing to determine whether it has jurisdiction to hear this case.  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines." (citation and internal quotation marks omitted)).

   **B.    The Plan Does Not Contemplate Or Create The Pretend Reality Upon Which Plaintiffs Premise Their Claims.**

Plaintiffs spend much of their Opposition arguing that various provisions of the Plan require this Court to rule based on a record that might have been.  It does not.  The Court must rule on the actual record that exists today and, in doing so, it should dismiss Plaintiffs' bankruptcy claims.

1.     **Article 8.5 of the Plan contemplates that Plaintiffs could continue this litigation even though they paid the bank claims — no more, no less.**

Because Plaintiffs understand that they cannot establish standing on the record now before the Court, Plaintiffs assert that Article 8.5 of the Plan requires this Court to ignore the actual record and instead determine Plaintiffs' standing based on a hypothetical record — one where the Plan, its resolution of Intercompany Claims and veil-piercing claims, its payment of the Obligor Debtors' creditors, and its consummation without substantive consolidation never occurred.  As part of this argument, Plaintiffs tell the Court that the terms of the Plan, including Article 8.5, provide that "confirmation of the Primary Plan and the conditional resolution of the Inter-Creditor Dispute and payment to the bank lenders (subject to disgorgement) were without prejudice to and would not change the standing that previously existed to bring these claims." Pls.' Opp. at 42.  Neither Article 8.5 nor any other provision of the Plan says anything to this effect.

What Article 8.5 of the Plan does say is this:

> Entry of the [Confirmation] Order shall be deemed entry of a Final Order constituting an Inter-Creditor Dispute Resolution, as of the Effective Date, of all issues related to the Inter-Creditor Dispute. ***All issues relating to the Inter-Creditor Dispute shall be deemed fully settled and compromised, and all proceedings relating to the Inter-Creditor Dispute shall be deemed dismissed with prejudice.*** On the Effective Date, all Persons shall be barred and enjoined from initiating and shall be deemed to have waived and released any Cause of Action, Administrative Claim or Claim to determine any issue which is the subject of the Inter-Creditor Dispute other than a Cause of Action to interpret the meaning of the Global Settlement or the [Confirmation] Order; <u>provided</u>, <u>however</u> that entry of the [Confirmation] Order and the Inter-Creditor Dispute Resolution ***shall not prejudice, diminish, affect, or impair*** the Bank Actions, Bank Third Party Claims, Investment Bank Third Party Claims, ***Defensive Claims*** or Estate Bank Defenses.

Plan Art. 8.5(a) (emphasis added).

Notably, neither Article 8.5 nor any other Plan provision establishes (or even addresses) Plaintiffs' standing to bring their claims either before or after the so-called "Inter-Creditor

Dispute Resolution."  To the contrary, Article 8.5 explicitly acknowledges the CBNA Lenders'

affirmative right to raise defenses (including standing) to Plaintiffs' claims.[14]  Moreover, neither

Article 8.5 nor any other Plan provision provides, as Plaintiffs contend, for a "conditional"

resolution of the so-called "Inter-Creditor Dispute."  In fact, Article 8.5 itself explicitly affirms

that "[a]ll issues related to the Inter-Creditor Dispute shall be deemed ***fully settled and***

***compromised***, and all proceedings relating to the Inter-Creditor Dispute shall be deemed

***dismissed with prejudice*****.**"  *See* Plan Art. 8.5(a) (emphasis added).  Plaintiffs' unfounded

interpretation of the Plan is as imaginative as the pretend reality in which they now profess their

standing.

In fact, Article 8.5 — and every other Plan provision that, according to Plaintiffs, requires

this Court to rule on a hypothetical record — does nothing more than clarify that the Debtors'

payments of the bank claims under the Plan (subject to disgorgement) would not require

dismissal of this lawsuit.[15]  *See* Plan Art. 8.5 ("entry of the [Confirmation] Order and the Inter-

Creditor Dispute Resolution shall not prejudice, diminish, affect, or impair the Bank Actions").

The prospect of such a dismissal was a real concern.  Legions of cases hold that if a debtor fails

to reserve its rights to institute or continue litigation after the confirmation of a Plan or payment

---

[14]  In fact, Plaintiffs' argument that Article 8.5 of the Plan precludes the CBNA Lenders from challenging standing is belied by Article 9.2(b) of the Plan, which provides that "Defensive Claims shall be fully preserved and may be asserted in response to the Bank Actions; <u>provided</u>, <u>however</u>, such Defensive Claims may be asserted . . . solely for purposes of limiting, reducing, offsetting or ***defeating the liability*** of such defendant to any Debtor Party."  Plan Art. 9.2(b) (emphasis added).  It is similarly belied by Article 16.4, which provides that "[t]he terms of this Plan and the Confirmation Order shall not have the effect of . . . (b) impairing or prejudicing in any respect the right of (i) a holder of a Bank Claim . . . to assert (x) solely on a defensive basis and not for any affirmative recovery against any Debtor Party, any Defensive Claims . . . ."  The Plan defines "Defensive Claims" as  "collectively (a) any and all defenses (including, without limitation, judgment reduction, laches or *in pari delicto*) of any defendant that may be asserted against any Debtor Party in response to or in connection with the Bank Actions . . . ."  Plan Exhibit A at A-15.

[15]  Plaintiffs also assert that Article 16.18, which provides that the Plan "shall not constitute or be construed as an admission of any fact or liability, stipulation, or waiver," bars the CBNA Lenders from arguing that the Plan is "evidence of some concession by the Trust[.]"  Pls.' Opp. at 28.  The CBNA Lenders do not argue that the Plaintiffs have admitted or conceded their lack of standing by way of the Plan.  Rather, the CBNA Lenders contend simply that the effect of the confirmed Plan and the consummation thereof is that Plaintiffs do not have standing.

K&E 12589418.16

of a creditor's claim, the subsequent prosecution of that litigation may be barred by *res judicata*. *See, e.g., Sure-Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 870 (2d Cir. 1991) (finding debtor's lender liability claims were barred by *res judicata* when debtor paid a bank's secured claim under a confirmed plan that did not expressly reserve the debtor's right to move forward on lender liability claims); *Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 88 (2d Cir. 1997) (recognizing that when considering whether a debtor can maintain a claim against a creditor post-confirmation, the court must also consider "whether an independent judgment in a separate proceeding would 'impair, destroy, challenge, or invalidate the enforceability or effectiveness' of the reorganization plan." (citing *Sure-Snap*, 948 F.2d at 875-76)); *Tracar, S.A. v. Silverman* (*In re Am. Preferred Prescription, Inc.*), 266 B.R. 273, 278-80 (E.D.N.Y. 2000) (finding that *res judicata* barred subsequent efforts to expunge a claim that the bankruptcy plan had allowed and equitably subordinated).

Accordingly, and contrary to Plaintiffs' self-serving attempt to pervert the plain meaning of the Plan, Article 8.5 does not evidence an agreement by the parties to the Plan (endorsed by the Bankruptcy Court) that this Court can and should decide Plaintiffs' lawsuit on a hypothetical record where it is assumed that Plaintiffs have perpetual standing.[16]  Rather, it reflects the parties' agreement that Plaintiffs would be able to continue their litigation against the banks notwithstanding the Debtors' agreement to pay the banks' claims (subject to disgorgement) under the Plan.  That is all — no more, no less.

---

[16]   As already discussed, the parties could not have agreed to this in any event, as parties cannot contract to create jurisdiction where none would otherwise exist.  *See In re Nasdaq Market-Makers Antitrust Litig.*, 176 F.R.D. 99, 103 (S.D.N.Y. 1997) ("Standing is a jurisdictional matter which must be resolved by the court; parties cannot either waive or confer standing by agreement.") (citation omitted); *Barhold v. Rodriguez*, 863 F.2d 233, 234 (2d Cir. 1988) ("[P]arties do not have the power to confer such jurisdiction upon the Court by conceding the standing of certain plaintiffs.") (citation omitted).

### 2.      Claims that are deemed resolved *are* resolved.

In their pretend reality, Plaintiffs have redefined the word "deemed."  The word no longer means "determined" or "decided."  Instead, in Plaintiffs' world, the word apparently means "not really," or "until we say differently."  Plaintiffs do not get to make up new definitions for words when the words they agreed to no longer suit them.

In their Opposition, Plaintiffs argue that the Intercompany Claims and veil-piercing claims that the Plan "deemed resolved" actually continue to exist in this litigation because "deemed resolved" — as opposed to simply "resolved" — really means "not resolved."  *See* Pls' Opp. at 27-28.  This self-serving argument flies in the face of other Plan provisions to which Plaintiffs willingly give full effect.  As just one example, the Plan specifically defines the phrase "Deemed Value" to mean an agreed-upon formula used to determine the value of cash and Time Warner stock that certain creditors were to receive under the Plan.  *See* Plan at A-15.  Those creditors entitled to receive "Deemed Value" would certainly be shocked if Plaintiffs asked them for a "do over" to adjust and reallocate the value of what they had or were to receive, as it was only a "deemed" — not an actual — value.

Likewise, Article 11.4 of the Plan is titled "Deemed Disallowance" and provides in relevant part:  "Claims (including Claims filed against any of the JV Debtors) filed by an Indenture Trustee for tort or other claims, other than claims for principal, interest, fees and expenses against the issuer(s) and guarantor(s) of the respective debt securities under the Indenture(s) under which the Indenture Trustee serves, shall be ***deemed*** disallowed."  Plan Art. 11.4.  Under Plaintiffs' definition of "deemed," the Indenture Trustees could now come forward to recover on their quite substantial claims from Plaintiffs notwithstanding the fact that the Plan "deemed" them disallowed.  It is difficult to imagine that Plaintiffs, who have now substantially consummated the Plan (under which, of course, they reserved no funds to pay these "deemed" disallowed claims), would agree in this context that "deemed disallowed" means anything but *actually* disallowed.

K&E 12589418.16

Yet Plaintiffs seek this very result with respect to the provisions of the Plan that now bar their standing.  For example, Article 2.3 of the Plan, which deals with Intercompany Claims and veil-piercing claims,  provides as follows:

> Intercompany Claims shall be ***deemed resolved*** as a result of the settlement and compromise embodied in this Plan and therefore holders thereof shall not be entitled to vote on the Plan, or receive any Plan Distribution or other allocations of value.

Plan Art. 2.3 (emphasis added).  And as noted above, Article 8.5 says:

> All issues related to the Inter-Creditor Dispute shall be ***deemed fully settled*** and compromised, and all proceedings relating to the Inter-Creditor Dispute shall be ***deemed dismissed with prejudice***.

Plan Art. 8.5 (emphasis added).  Notwithstanding that the phrases "resolved," "fully settled" and "dismissed with prejudice" each have a clear and necessary meaning in a settlement document such as the Plan, Plaintiffs argue that the use of the word "deemed" before these phrases modifies them to mean "might be resolved" or "could be settled" or "could possibly be dismissed with prejudice."  This is nonsensical.  It is also contrary to the accepted and historic use of the word.

In fact, the word "deemed" has a certain and definite meaning.  Deemed[17] is the imperative and past participle of the verb deem, which is defined by Webster's Online dictionary as:

> To sit in judgment upon, decide, to come to view, judge, or classify after some reflection.[18]

Roget's Thesaurus provides as synonyms for deem:

> View as, consider as, take as, hold as, conceive as, regard as, esteem as, look upon as, account as, set down as; surmise.[19]

---

[17] *See Webster's Third New International Dictionary* 589 (1986).

[18] *Id.*, http://www.webters-online-dictionary.org/definition/deem.

[19] *See* Mawson, C.O.S.  Roget's International Thesaurus, http://www.bartleby.com/110/484.html (1922).

And the word deemed has a long and historic usage in American political and legal life in *affirming* the importance of what comes after it — not undercutting it.  The U.S. Constitution, for example, uses the word deem as synonymous with the words determined or decided — not possibly, maybe, or hypothetically:

> The Congress, whenever two thirds of both Houses shall **deem** it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of     the     several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

U.S. Const. Art. V.

And in one of the seminal decisions from U.S. jurisprudence, the Supreme Court's 1803 decision in *Marbury v. Madison*, 5 U.S. 137, 176 (1803), the Supreme Court stated:  "The principles, therefore, so established, are ***deemed*** fundamental."  (emphasis added).  They were not "conditionally" fundamental — or fundamental only when it suited the Court.

Abraham Lincoln also used the word "deemed" in the affirmative, as something determined or decided, in the Emancipation Proclamation:

> That the Executive will, on the first day of January aforesaid, by proclamation, designate the States and parts of States, if any, in which the people thereof, respectively, shall then be in rebellion against the United States; and the fact that any State or the people thereof, shall on that day be, in good faith, represented in the Congress of the United States by members chosen thereto at elections wherein a majority of the qualified voters of such States shall have participated, shall, in the absence of strong countervailing testimony, be ***deemed***  conclusive  evidence  that

such State, and the people thereof, are not then in rebellion against the United States.[20]

Plaintiffs' redefinition of the word "deemed" as meaning "maybe, perhaps or when we want it to" is completely unfounded in both the Plan, the law, and in the English language itself. It exists only in Plaintiffs' pretend reality. But as the CBNA Lenders reiterate time and time again, this case must be decided in the reality that actually exists. In that reality, the use of the word "deemed" before a word reinforces, rather than detracts from, its meaning.

### C.    Plaintiffs Do Not Have Standing To Assert Their Bankruptcy Claims.

To establish standing, Plaintiffs must demonstrate both that (1) the Obligor Debtors' creditors were injured on account of any alleged unlawful acts and (2) the relief Plaintiffs seek can redress those injuries. As set forth below, Plaintiffs can establish neither of these jurisdictional prerequisites.

### 1.    Plaintiffs do not have standing to assert their bankruptcy claims because they cannot establish that any creditors of the obligor debtors were injured on account of the alleged transfers.

To establish both constitutional and statutory standing, Plaintiffs must be able to show the existence of at least one creditor of an Obligor Debtor who was injured (i.e., whose claims were not satisfied) on account of the Obligor Debtors' allegedly improper transfers. It is beyond dispute, however, that each of the Obligor Debtors here has paid all of its bona-fide creditors in full.[21] *In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007) (finding that the

---

[20]   Abraham Lincoln, Former President of the United States, Emancipation Proclamation (Jan. 1, 1863) (emphasis added).

[21]   The fact that Plaintiffs may have pled (albeit cryptically if at all) that the Obligor Debtors did not satisfy all of their creditors is of no import. The Court may take judicial notice of the Plan and of the status reports Plaintiffs have filed (which constitute admissions) showing that the Obligor Debtors (therein referred to as "Subsidiary Debtors") have all paid their creditors in full, with interest. *Colotone Liquidating Trust v. Bankers Trust N.Y. Corp.*, 243 B.R. 620, 622 n.2 (S.D.N.Y. 2000) (taking judicial notice of the confirmation order, plan of reorganization and the related trust instrument); *Buttes Gas & Oil Co. v. Cal. Reg'l Water Quality Control Bd. (In re Buttes Gas & Oil, Co.)*, 182 B.R. 493, 494 (Bankr. S.D. Tex. 1994) (taking judicial notice of the docket sheet and Bankruptcy Court file, and concluding therefrom that all of the debtor's creditors are being paid pursuant to the plan). *See* Joint App., Ex. 8 at DSS2-26-DSS2-30 (Disclosure Statement); Plan Art. 5.2; Joint App., Ex. 12 (Status Report); Fourth Post-Confirmation Status Report, Docket No. 13996 in *In re Adelphia Commc'ns, Corp.*, Case No. 02-41729 (Bankr. S.D.N.Y.) (all showing that Obligor Debtors have all paid their creditors in full). And to the extent that these

(Continued…)

Obligor Debtors could pay their unsecured creditors in full, with interest).  Plaintiffs therefore cannot satisfy this most fundamental component of standing.  *See also* CCH Mot. at 32-35.

In an attempt to revive their claims, Plaintiffs (relying on their argument that the Court must ignore the Plan in this litigation — at least where such ignorance benefits them) argue that, for purposes of considering their standing, the Court should recognize (1) the hypothetical injury that hypothetical creditors would have been assumed to have suffered had the Plaintiffs been able to substantively consolidate the more than 250 individual Adelphia estates and (2) the hypothetical existence of Intercompany Creditors who settled and compromised their Intercompany Claims as part of the Plan.  Pls.' Opp. at 47-49.  But the jurisdictional bar of standing requires Plaintiffs to establish real parties in interest (here, actual creditors of an Obligor Debtor) and real injuries.  As Plaintiffs cannot do this, the Court cannot exercise jurisdiction over their bankruptcy claims.

### a.   The hundreds of Adelphia estates were not and cannot be substantively consolidated.

While conceding that the more than 250 Adelphia estates are not substantively consolidated, Plaintiffs nonetheless argue that because they *could have* sought substantive consolidation as part of the Plan, the Court now must pretend that (1) the estates are substantively consolidated and (2) this hypothetical substantive consolidation gave rise to a hypothetical injury to the hypothetical creditors of the hypothetically consolidated estates — thereby giving them standing for their claims.[22]  This is both contrary to established law and factually disingenuous.

---

documents prove Plaintiffs' allegations fallacious, the Court may disregard Plaintiffs' allegations in favor of the actual facts.  *Rieger v. Drabinsky* (*In re Livent, Inc. Noteholders Sec. Litig.*), 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (finding that "a court need not feel constrained to accept as truth conflicting pleadings . . . that are contradicted either . . . by documents upon which its pleadings rely, or by facts of which the court may take judicial notice") (citations omitted).

[22]   Stepping back, had Plaintiffs substantively consolidated the bankruptcy estates, each of the more than 250 Adelphia estates would have been merged into one estate, and all of the estates' collective assets would have been pooled for pro-rata distribution to creditors of the merged estates.  This is not what happened, however, and as it

(Continued…)

*First*, the Court cannot consider standing on a hypothetical record.  Instead, in order to find standing, the Court must find that the Obligor Debtors' creditors suffered *actual* injuries in fact, and not hypothetical injuries.  An "injury in fact" which requires an invasion of a legally protected interest cannot be "conjectural or hypothetical."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The injury must be "concrete and particularized" and "actual or imminent."  *Lujan*, 540 U.S. at 560 (citations omitted).  Standing cannot "rest upon hypothetical facts" but must rather rest "upon allegations of concrete injury."  *McLean v. Mathews*, 466 F. Supp. 977, 980 n.9 (S.D.N.Y. 1976) (emphasis added).  Therefore, courts have found that when a plaintiff's alleged injuries are "hypothetical and unsupported by the record[,]" constitutional standing is not established.  *In re Matter of FedPak Sys., Inc.*, 80 F.3d 207, 212 (7th Cir. 1996).  As Plaintiffs' substantive consolidation theory provides this Court with nothing more than a hypothetical injury, it does not afford Plaintiffs standing to raise the bankruptcy claims.

*Second*, even if the Court could rule in Plaintiffs' pretend reality, Plaintiffs' suggestion that there could ever be a reality in which the individual Adelphia estates were substantively consolidated is patently unreasonable.  In confirming the Plan, the Bankruptcy Court specifically found that it was "highly unlikely that the Second Circuit's requirements for substantive consolidation, as described in *Augie Restivo*, could be satisfied."  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 237 n.204 (citing *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.* (*In re Augie/Restivo Banking Co.*), 860 F.2d 515 (2d Cir. 1988)); *see also In re Adelphia Commc'ns*, 368 B.R. at 219 ("I think the ACC Bondholder Group was plainly right in theorizing that substantive consolidation would be a highly unlikely result.").[23]  Plaintiffs themselves have

---

stands today, each of the more than 250 Adelphia estates is a separate legal entity with its own assets, its own liabilities and its own creditors, and each of these individual estates is responsible only for satisfying its own creditors.

[23]   *See also* Transcript Of Court Decision On Joint Motion In Aid, Rate And Computation Of Post-Petition Interest at 15, Docket No. 11149 in *In re Adelphia Commc'ns, Corp.*, Case No. 02-41729 (Bankr. S.D.N.Y. April 27, 2006)

(Continued…)

reiterated this reality, acknowledging that substantive consolidation is an extraordinary remedy that the Adelphia estates were not likely to obtain.  *See* Memorandum of Law in Support of Confirmation of Plan for Adelphia Communications Corporation and Certain Affiliated Debtors at 107, Docket No. 12662 in *In re Adelphia Commc'ns, Corp.*, Case No. 02-41729 (Bankr. S.D.N.Y.) (recognizing that substantive consolidation is only available in cases that meet stringent standards for application of such equitable remedy).  For them to now take an inconsistent position is disingenuous (and, on the legal standard they set forth in their opposition brief, subject to judicial estoppel).  *See* Pls.' Opp. at 42 (citing, *e.g.*, *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)).

Even more disingenuous, however, is Plaintiffs' argument that they could *still* substantively consolidate the individual Adelphia estates if they opted to do so.  They cannot.[24] The Plan has been substantially consummated.  Plan Proponent's Memorandum in Response to Brief on Mootness at 4-5, 9, Docket No. 10 in *In re Adelphia Commc'ns, Corp.*, Case No. 07-1172 (S.D.N.Y.) (where Plaintiffs assert that the Plan has been substantially consummated and cannot be unraveled to allow the ACC Bondholders to proceed with their appeal of the Plan).  To substantively consolidate at this stage (and assuming that the Court would even give them permission to do so in the first place), Plaintiffs would need to (1) recover all of the Plan's distributions, (2) pool those distributions and then (3) redistribute the pooled distributions equally among the creditors of the more than 250 individual Adelphia entities (a particularly

---

("On balance, I think the fact that parent creditors must recover from the entity with whom they dealt — and that the parent's interest in its subs was in law and substance equity — is a matter not just of form, but also of substance. For purposes of analysis in a multi-debtor, parent/subsidiary, case where creditors would have justifiably focused on what we refer to in bankruptcy parlance as 'structural seniority,' that structural seniority must be taken into account. And I believe that the 'structural seniority' of subsidiaries and subsidiary creditors' rights of priority to subsidiary assets was something that senior creditors know about, or should have when they bought their bonds."); *see also In re Adelphia Commc'ns Corp.*, 368 B.R. 140 (Bankr. S.D.N.Y. 2007).

[24]   Nor can Plaintiffs claim that veil-piercing claims are still available.  We join in the Nominal Agents' argument as discussed in the Reply Brief of Various Lenders, pages 21-24, that veil-piercing claims were also extinguished under the Plan.

difficult task given that there would be no Plan to govern this novel distribution).  Plaintiffs themselves have confessed this would "***not only be impracticable (if not impossible), it would be grossly inequitable***."  *Id.* at 11.

On this point, they were right.  In consummating the Plan, the Debtors distributed (1) more than $6.49 billion in cash to more than 8,000 claimants; (2) approximately 111,789,000 freely tradable shares of Time Warner Cable ("TWC") Class A Common Stock to approximately 13,500 claimants; and (3) more than 9.56 billion freely tradable CVV Interests to more than 8,000 claimants and more than 23,000 equityholders.  *Id.* at 4-5.  Plaintiffs have admitted that it would be "impossible" for them to identify and locate the more than 52,500 claimants and equity-holders who received distributions (and, where applicable, their successors), request that those parties disgorge their distributions, and effectively sue those who refuse to comply.  *Id.* at 15.  The District Court, in fact, adopted this position when it denied certain creditors of the Obligor Debtors' parent, grandparent and great-grandparent entities the right to continue prosecuting their appeal of the Plan in light of the Plan's substantial consummation.  *In re Adelphia Commc'ns Corp.*, 371 B.R. 660, 677 (S.D.N.Y. 2007) (adopting the Plaintiffs' view that substantial consummation and Plaintiffs' inability to unravel the Plan rendered the ACC Bondholders' appeal of the Bankruptcy Court's confirmation of the Plan equitably moot).

Given that Plaintiffs have freely admitted the impossibility of unraveling the Plan — an unraveling that is essential to substantive consolidation — their assertion that the estates can be substantively consolidated is shameless.  It is also plainly wrong under the doctrines of judicial estoppel and equitable mootness.  *See id.* (adopting the Plaintiffs' view that substantial consummation and Plaintiffs' inability to unravel the Plan rendered the ACC Bondholders' appeal of the Bankruptcy Court's confirmation of the Plan equitably moot); *G.E. Cattle Co. v. United Producers, Inc. (In re United Producers)*, 353 B.R. 507, 513 (B.A.P. 6th Cir. 2006) (dismissing appeal attacking the confirmation of a Chapter 11 plan under principles of equitable mootness because "requested relief [could not] be granted without totally dismantling the substantially consummated plan" ).  *See also New Hampshire*, 532 U.S. at 751 ("judicial estoppel

forbids use of intentional self-contradiction . . . as a means of obtaining unfair advantage) (citing *Scarano v. Cent. R.R. Co. of  N.J.*, 203 F.2d 510, 513 (3d Cir. 1953) (internal quotation makes omitted)).  Plaintiffs cannot now substantively consolidate the Adelphia estates.  Nor can they pretend that they did.

<b>b.        There are no existing Intercompany Creditors.</b>

In their attempt to rewrite history, Plaintiffs also assert that the Court should pretend that Intercompany Claims were not "resolved" or "compromised and settled" when determining whether the Obligor Debtors have any injured creditors.  Specifically, and again living in the pretend reality they propound, Plaintiffs assert that the Court should instead assume that (1) Intercompany Creditors retained (rather than resolved and released) their disputed claims under the Plan and (2) these hypothetical claims now give rise to hypothetical injuries to these hypothetical creditors.  Pls.' Opp. at 47.  But just as the Court cannot assume jurisdiction based on a hypothetical or pretend reality where the Debtors' estates were substantively consolidated, it also cannot assume jurisdiction based on disputed claims that the Plan already resolved.[25]  *See supra*, Section II(A)(1)(c) (the Court does not have jurisdiction over hypothetical parties and hypothetical injuries).

Despite Plaintiffs' attempt to create ambiguity through the Plan's so-called "neutrality," the Plan unambiguously states that Intercompany Claims (and the related "Inter-Creditor

---

[25]   Putting aside the legal barrier to jurisdiction, Plaintiffs' request inappropriately asks this Court to relitigate the complex, factual Intercompany Claims that the Plaintiffs willingly compromised in the Bankruptcy Court litigation. In the Disclosure Statement, Plaintiffs acknowledged that "were the Resolution Process [i.e., the process the Court utilized to resolve the Intercompany Claims] to be litigated to conclusion before the Bankruptcy Court, a considerable number of additional hearings would need to be held [beyond the more than the 20 days of hearings that had already taken place] — likely extending over a period of months (and, perhaps, with appeals, years) — and additional discovery may need to be conducted." Joint App., Ex. 8 at DSS2-15 (Disclosure Statement).  The Bankruptcy Court echoed this understanding when noting that "most significantly, the complexity of the underlying litigation, and the huge expense and delay that would be occasioned by prosecuting it" was a key factor in its decision to approve the Global Settlement embodied in the Plan.  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 246.

Dispute") are "resolved" and "settled and compromised."  *See* Plan Art. 2.1.  On this point, the

Plan specifically provides:

- The treatment of Claims against and Equity Interests in the Debtors under this Plan represents, among other things, the ***settlement and compromise*** of the Inter-Creditor Dispute pursuant to the Global Settlement.  *Id.* (emphasis added).

- The [Confirmation] Order shall contain findings of fact and conclusions of law, as the case may be, ***resolving*** the Inter-Creditor Dispute and ***discontinuing such litigation, with prejudice***.  *Id.* (emphasis added).

- All findings of fact and conclusions of law contained in the [Confirmation] Order shall be ***binding, for all purposes***, on all Persons with respect to any and every Administrative Claim or Claim against any Equity Interest in a Debtor or JV Debtor, including any Administrative Claim, Claim or Equity Interest that is ***derivative of an Intercompany Claim or an intercompany relationship between and among the Debtors or JV Debtors***.  *Id.* (emphasis added).

- Intercompany Claims shall be ***deemed resolved*** as a result of the settlement and compromise embodied in this Plan and therefore holders thereof shall ***not*** be entitled to vote on the Plan, or ***receive Plan Distribution or other allocations of value***.[26]  *Id.* Art. 2.3 (emphasis added).

---

[26]   As previously discussed, Plaintiffs make much of the fact that this section of the Plan says that Intercompany Claims are "deemed resolved" as opposed to simply "resolved."  This is of no consequence.  Regardless of the language used, the incontrovertible fact is that Intercompany Creditors waived all rights to recover anything on account of their purported Intercompany Claims.  Moreover, on the record before the Bankruptcy Court, it is likely that these claims never existed at all.  Joint App., Ex. 10 at 74 (Bench Decision on Confirmation) (noting the difficulty of basing a legitimate Intercompany Claim on a non-cash transaction whose sole apparent purpose was to manipulate covenants, and had no economic substance); *id.* at 101 ("If a thoughtful judgment call had been made during the prepetition period that there were good reasons for employing the debt, or hybrid, methods of accounting, this would be a close issue.  But the testimony was repeated, and dramatic, that the debt method was chosen simply because it was easier.  Whether or not such a decision makes for sound accounting, it is insufficient support for finding the existence of a claim . . . this is an area where the Arahova Noteholders Committee would almost certainly win."); *id.* at 113 (noting that the Court would "almost certainly be unwilling to find claims" based on intercompany dividends).  *See also* Memorandum of Law in Support of Confirmation of Plan for Adelphia Communications Corporation and Certain Affiliated Debtors at 107 n.121, 109, Docket No. 12662 in *In re Adelphia Commc'ns, Corp*., Case No. 02-41729 (Bankr. S.D.N.Y.) (where Committee, Plaintiffs' predecessor, argued that the Bankruptcy Court should confirm the Plan over the ACC bondholders' objection because "the elimination of intercompany claims" was the primary "premise for settlement of litigation that is destructive to the debtors' estates and creditors' recoveries."); *id.* at 9 (arguing that that pursuant to the Bankruptcy Court's MIA Hearing I Order in the MIA process, the Debtors' May 2005 schedules (upon which alleged Intercompany Claims are based) are not entitled to any presumptive validity, since those schedules were challenged).  In any event, the Intercompany Claims against the Obligor Debtors have been fully settled and compromised, and the prior holders of such Intercompany Claims cannot be viewed as injured creditors for purposes of a standing analysis.

- Pursuant to the Global Settlement, holders of Intercompany Claims ***shall not be entitled to Plan Distributions***, as described in this Plan, and shall be subject to such findings of fact and conclusions of law as the Bankruptcy Court may make in connection with the entry of the Confirmation Order.  *Id.* Art. 5.3 (emphasis added).

- All issues related to the Inter-Creditor Dispute shall be deemed ***fully settled and compromised***, and all proceedings relating to the Inter-Creditor Dispute shall be deemed ***dismissed with prejudice***.  *Id.* Art. 8.5(a) (emphasis added).

Having now waived any right to payment under the Plan, the former Intercompany Creditors cannot be viewed as creditors — much less injured creditors — for purposes of determining Plaintiffs' standing to bring their bankruptcy claims in this case.  *See* 11 U.S.C. § 101(10) (defining a creditor as an entity that has a claim against a debtor), § 101(5)(A) (defining a claim as a "right to payment").  This Court does not have jurisdiction over Plaintiffs' bankruptcy claims, and they must therefore be dismissed.

### 2. Plaintiffs do not have standing to assert their bankruptcy claims because their requested relief cannot redress the Obligor Debtors' creditors' purported injuries.

Even assuming Plaintiffs could establish that the Obligor Debtors have injured (i.e., unpaid) creditors, they would still have to show that the relief they seek in this lawsuit would (1) for purposes of constitutional standing, redress those creditors' injuries *and* (2) for purposes of statutory standing, provide a benefit to those creditors.  The effect of this lawsuit on the Obligor Debtors' creditors — as opposed to some amorphous "Adelphia" creditors — is the focal point of this analysis.  And because the Obligor Debtors' creditors did not receive CVV interests, and therefore cannot benefit directly, indirectly or at all from this lawsuit, Plaintiffs cannot establish either constitutional or statutory standing.  *See also* CCH Mot. at 37-43.

Plaintiffs attempt to divert attention from this plain reality by advancing three arguments. First, they argue that the Obligor Debtors' creditors directly benefit from Plaintiffs' prosecution of the bankruptcy claims because the Plan's appointment of Plaintiffs as representatives of the Obligor Debtors' estates benefited the "Adelphia" estate.  Second, they argue that "Adelphia" creditors will indirectly benefit from their prosecution of the avoidance claims because the proceeds of avoidance will increase the value of the CVV.  And finally, Plaintiffs argue that the

Bankruptcy Code's avoidance statutes do not require them to demonstrate that any of the Obligor Debtors' creditors will benefit at all from this lawsuit in order to establish standing.  All of these arguments fail.

**a.      Plaintiffs have not established a direct benefit to the Obligor Debtors' creditors.**

Citing to *Maxwell Newspapers*, 189 B.R. 282 (Bankr. S.D.N.Y. 1995), Plaintiffs first contend that they have standing to bring the Obligor Debtors' avoidance claims because the Obligor Debtors benefited from Plaintiffs' appointment under the Plan to prosecute those claims. *Maxwell*, however, did not even consider the statutory and constitutional standing issues that the CBNA Lenders raise here.  Accordingly, it does not apply in this case.

In fact, nobody in *Maxwell* had any reason to question the transferor debtor's constitutional or statutory standing to bring avoidance claims in its own right; after its plan was confirmed, the debtor had an entire class of its own unpaid creditors who stood to receive the proceeds of any recovery on those claims.  *Id.* at 286.  Rather, the issue in *Maxwell* was whether the debtor's unpaid creditors had standing under Section 1123 of the Bankruptcy Code, which provision allows the bankruptcy court to appoint an estate representative to prosecute a debtor's claims after confirmation of a plan.  *Maxwell*, 189 B.R. at 286-87.  The court concluded that the unpaid creditors had standing under Section 1123 of the Bankruptcy Code to pursue the debtor's avoidance claims ***as representatives of the estate*** because their rights to pursue the claims derived from a Plan settlement that benefited the debtor's estate as a whole.[27]  *Maxwell*, 189 B.R. at 287.

---

[27]   While agreement on a Plan may be sufficient to satisfy "representative standing" under Section 1123(b)(3)(B) of the Bankruptcy Code, agreement upon a plan is not itself a sufficient benefit to establish statutory or constitutional standing where the transferor debtor's creditors are not entitled to the proceeds of avoidance litigation.  Indeed, if that were the case, then standing could never be an issue in a case where there is a confirmed plan.  *See Whiteford Plastics Co. v. Chase Nat'l Bank of N.Y. City*, 179 F.2d 582, 584 (2d Cir. 1950) (holding, in the context of a confirmed plan, that estate representative did not have statutory standing to raise bankruptcy claims); *In re Oceana Int'l, Inc.*, 376 F. Supp. 956, 962 (S.D.N.Y. 1974) (same); *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G., N.Y. Branch (In re Galerie Des Monnaies of Geneva, Ltd.)*, 55 B.R. 253, 260 (Bankr. S.D.N.Y. 1985) (same); *Centennial Indus., Inc. v. NCR Corp. (In re Centennial Indus. Inc.)*, 12 B.R. 99, 102 (Bankr. S.D.N.Y. 1981)

(Continued…)

*Maxwell*, although wholly inapplicable to Plaintiffs' contention that the Obligor Debtors' would have standing in their own right to pursue their bankruptcy claims (thereby affording Plaintiffs, as the appointed representatives, standing to bring the claims as well), does highlight a fundamental distinction which Plaintiffs gloss over to create confusion here:  the distinction between a non-debtor's standing to assert a debtor's contract, tort and bankruptcy claims as a representative of the debtor's estate on the one hand, and the underlying debtor's standing to assert and maintain those same claims in its own right on the other hand.  To assert claims on behalf of a debtor, a non-debtor must establish both its own and the underlying debtor's standing. *See Join-In Int'l (U.S.A.) Ltd. v. N.Y. Wholesale Distribs. Corp.,* 56 B.R. 555, 560-61 (Bankr. S.D.N.Y. 1986) (finding that even when a plan specifically retains jurisdiction over the adversary proceeding (by assigning a representative to pursue that action post-confirmation), "a ***separate aspect is the question*** of whether these debtors may continue to prosecute the actions.") (emphasis added)).

The first inquiry, which is whether a non-debtor party has standing to sue as a debtor's representative (i.e., "representative standing"), is conducted under Section 1123 of the Bankruptcy Code.  *See* 11 U.S.C. § 1123(b)(3)(B) ("[A] plan may provide for the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest[.]").  To establish "representative standing," a non-debtor party must show that (1) its appointment to prosecute the claims at issue (2) benefits the estate as a whole.  *Maxwell*, 189 B.R. at 287.  While "representative standing" was the fundamental issue in *Maxwell*, it is not at issue here (making Plaintiffs' reliance on *Maxwell* unfounded).

The second inquiry, which is whether the underlying debtor would itself have standing to assert a particular claim, is governed by constitutional standing principles and, where applicable,

---

(analyzing statutory standing of estate representative to raise bankruptcy claims in the context of a confirmed plan); *Tex. Consumer Fin. Corp. v. First Nat'l City Bank*, 365 F. Supp. 427, 431-32 (S.D.N.Y. 1973) (same).

the statute from which the debtor's claim derives.  This inquiry is separate and distinct from that of "representative standing."  *See Join-In Int'l*, 56 B.R. at 561.  And in the context of bankruptcy claims, it requires the non-debtor party to show that the prosecution of the action will benefit the debtor's own unpaid creditors (as opposed to, for example, creditors of the debtor's great-great grandparents, as Plaintiffs seek to do here), thereby redressing their injuries.  *See, e.g., Whiteford Plastics Co.*, 179 F.2d at 584 (determining, on a post-confirmation record, that there was no standing because "the creditors have received cash or stock for their claims, and there is no reason to safeguard their rights further").

Thus, to assert a claim belonging to a debtor, a non-debtor party must separately and distinctly establish (1) that it has "representative standing" to bring the claim on behalf of the debtor's estate; and (2) that the underlying debtor would have had standing to bring the claim in its own right.  Courts must ensure that a non-debtor satisfies both inquiries (as to each particular cause of action) before they can assume jurisdiction over an estate representative's claims.  And in this case, where Plaintiffs cannot establish that the Obligor Debtors would have standing in their own right to pursue the bankruptcy claims for the benefit of their own creditors, Plaintiffs cannot maintain their claims.  Plaintiffs' reliance on *Maxwell* is misplaced, and the bankruptcy claims must be dismissed.

### b.    Plaintiffs have not established an indirect benefit to the Obligor Debtors' creditors.

Plaintiffs next contend that even if they cannot show a direct benefit flowing from their avoidance actions to the Obligor Debtors' creditors (which they cannot), all they really need to show is "some positive benefit" to the "estate," be it direct or indirect, to establish standing to bring the Obligor Debtors' avoidance actions.  *See* Pls.' Opp. at 44-55.  This contention is flawed in two respects.  First, Plaintiffs are once again implicitly assuming that all of the more than 250 Adelphia estates are one and the same, conveniently forgetting (or consciously disregarding) that the only "estate" at issue for purposes of determining their standing to bring an Obligor Debtor's avoidance claims is the estate of the Obligor Debtor on whose behalf they assert the claims.

Second, while courts have found that creditors can benefit indirectly from avoidance actions, and that this indirect benefit can be sufficient to establish statutory standing, there still must be at least *one creditor* who will receive this indirect benefit.  An examination of the very cases Plaintiffs cite to support their novel "some positive benefit" argument demonstrates why their argument must fail.

The first case Plaintiffs cite is *NextWave Personal Communications, Inc. v. Federal Communications Commission* (*In re NextWave Personal Communications*), 235 B.R. 305 (Bankr. S.D.N.Y. 1999), *reversed on other grounds*, *FCC v. Nextwave Pers. Commc'ns, Inc.*, 200 F.3d 43 (2d Cir. 1999).  *NextWave* involved just one debtor entity, NextWave, described as "a small company with few creditors."  Pls.' Opp. at 51.  Pre-confirmation, NextWave sought to avoid an allegedly fraudulent obligation to the FCC in an amount greater than that "necessary to benefit NextWave's *bona fide* creditors."  *Id.* (quoting *NextWave*, 235 B.R. at 306).  The Court, recognizing (1) the existence of unpaid NextWave creditors and (2) that avoidance would allow NextWave to pay those creditors' claims, allowed NextWave to avoid its obligation to the FCC in an amount potentially greater than that necessary to satisfy NextWave's creditors.  *NextWave*, 235 B.R. at 308-09.  The *NextWave* scenario — which expressly recognized that the proposed avoidance would allow NextWave to pay its own bona-fide creditors' claims — is much different than the scenario Plaintiffs now put before this Court.  Plaintiffs here cannot point to even *one creditor* of an Obligor Debtor who will be paid as a result of the avoidance they propose, as recovery from their bankruptcy claims will flow to the third party beneficiaries of the CVV.[28]  *See* CCH Mot. at 37.  Far from supporting Plaintiffs' case, *NextWave* actually supports the moving parties.

---

[28]  Similarly, this requirement that at least one creditor benefit from avoidance renders *Moore v. Bay*, 284 U.S. 4 (1931), and *Acequia, Inc. v. Clinton* (*In re Acequia Inc.*), 34 F.3d 800 (9th Cir. 1994), inapplicable to Plaintiffs' arguments.  In both *Moore* and *Acequia*, the transferor debtor seeking avoidance had at least one existing creditor that would benefit from that avoidance.  Here, the Obligor Debtors have no existing creditors at all.

Plaintiffs' reliance on *Calpine* and *TWA* for the proposition that the Obligor Debtors' creditors will benefit from the bankruptcy claims is similarly misplaced.[29]  In both *Calpine* and *TWA*, the operative plans of reorganization satisfied certain unsecured creditor claims with stock in the reorganized debtor.  Because the operative plans did not provide claimants with a possibility of receiving directly the proceeds from any avoidance actions, the defendants in those actions argued for dismissal of the avoidance claims on the grounds that no creditors would benefit from the pursuit thereof.  In each case, the court disagreed, finding that any recovery in the avoidance actions would increase the value of the reorganized company, and could therefore indirectly benefit the creditors who had been given equity in the company under the operative plans.  *Calpine*, 377 B.R. at 814 (noting that "unsecured creditor claims would be satisfied in whole or in part with distributions of equity in the reorganized company"); *TWA*, 163 B.R. at 973 ("[T]he unsecured creditors w[ould] benefit from the enhanced value of [a] reorganized TWA by reason of being shareholders of the reorganized debtor.").

Here, however, no creditors of the Obligor Debtors will benefit — directly or indirectly — if Plaintiffs prevail on their bankruptcy claims.  Instead, any proceeds of the bankruptcy claims will be placed in the CVV for distribution to the CVV's beneficiaries, none of whom include the Obligor Debtors' creditors.  *See* CCH Mot. at 37.  Whether Plaintiffs win or lose the bankruptcy claims, the Obligor Debtors' creditors will get nothing.  And as such, Plaintiffs lack standing to raise them at all.

> ### c.     Plaintiffs' assertion that they need not establish a benefit to the Obligor Debtors' creditors to avoid transfers fails.

Finally, Plaintiffs contend that they need not show that the Obligor Debtors' creditors will benefit at all from Plaintiffs' avoidance of the allegedly fraudulent transfers in order to assert their avoidance claims because the governing statutes do not explicitly state that avoidance

---

[29]   *Calpine Corp. v. Rosetta Res. Inc. (In re Calpine Corp.)*, 377 B.R. 808 (Bankr. S.D.N.Y. 2007); *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964 (Bankr. D. Del. 1994).

(as distinct from "recovery") must be for the "benefit of the estate."[30]  Pls.' Opp. at 55-59.  This argument, which even Plaintiffs apparently concede would not apply to preference or equitable subordination claims, fails for at least two reasons.

*First*, binding and applicable Second Circuit law, including *Vintero* and *Whiteford Plastics*, requires that Plaintiffs demonstrate that the Obligor Debtors' creditors will benefit from the prosecution of this lawsuit in order to establish standing under the Bankruptcy Code's avoidance statutes.[31]  *See, e.g., Vintero Corp. v. Corporacion Venezolana De Fomento* (*In re Vintero Corp.*), 735 F.2d 740, 742 (2d Cir. 1984);, *Whiteford Plastics*, 179 F.2d at 584 (holding that "[i]t would be [a] mockery of justice to say that the alleged bankrupt may claim through and in the right of creditors whose debts have been paid and discharged; that he may avoid a transaction, valid as to himself but voidable as to creditors, in the right of non-existing creditors").  Notwithstanding Plaintiffs' empty contention that this binding precedent was somehow abrogated by Congress' enactment of the Bankruptcy Code (Pls.' Opp. at 59 n.42), courts in this District continue to routinely apply the principles underlying *Vintero* and *Whiteford Plastics* long after the Bankruptcy Code's enactment.  *See Balaber-Strauss v. Town of Harrison* (*In re Murphy*), 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005) (applying *Vintero* and holding that avoidance actions can only be pursued if there is some benefit to creditors); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 285 n.7 (Bankr. S.D.N.Y. 1990) (applying *Whiteford*

---

[30]  They then go on to assert that while Section 550 of the Bankruptcy Code (the recovery statute) would require them to show a benefit to the estate in order to "recover" any transfer they avoid, they will never need to invoke that statute because the Plan requires the banks to affirmatively disgorge the value of any avoided obligations, thus obviating the need to rely on the "recovery" provision of Section 550.  This, they conclude, provides them a loophole so that they need not ever show that the Obligor Debtors' estates will benefit from their pursuit of the bankruptcy claims.  Pls.' Opp. at 58.

[31]  Plaintiffs claim that the CBNA Lenders "seize upon six words in section 550 of the Bankruptcy Code (the section that prescribes various remedies for recovery of avoided transfers ) — 'for the benefit of the estate'" to argue that fraudulent conveyance actions must be brought for the benefit of unpaid creditors.  Pls.' Opp. at 44-45.  The CBNA Lenders do no such thing.  In fact, their motions are clear that the requirement that avoidance benefit creditors derives from Second Circuit law, not from Section 550 of the Bankruptcy Code.  *See, e.g.,* CCH Mot. at 32-35, 43-45.

*Plastics* to hold that avoidance actions cannot be brought to provide recovery to shareholders); *In re RCM Global Long Term Capital Appreciation Fund*, 200 B.R. 514, 523 (Bankr. S.D.N.Y. 1996) (applying *Vintero* and *Whiteford Plastics* to hold that "where avoidance would benefit only the equity, the debtor in possession lacks standing to maintain a fraudulent conveyance action"); *In re Liggett*, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990) (applying *Whiteford Plastics* and *Vintero* and recognizing that "it is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself"). *See also* Pls.' Opp. at 51 (citing *NextWave*, 235 B.R. at 308 (Bankr. S.D.N.Y.) (noting it would be "inappropriate to use the avoiding powers if the benefit accrued only to the equity")).[32] *See also* CCH Mot. at 46 (courts will not read the Bankruptcy Code to abrogate earlier bankruptcy practice absent a clear directive from Congress, which is not present here). This Court, too, is bound to apply these principles and follow this established precedent.[33]

*Second*, even assuming that Plaintiffs have correctly construed the statutory standing requirements for fraudulent conveyance actions, they must still separately establish constitutional standing. *See Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing."). To do so, they must demonstrate that prosecution of the fraudulent conveyance actions will effectively redress an injury suffered by the Obligor Debtors' creditors. Here, where the Plan specifically assigns the proceeds of any recovery Plaintiffs obtain to the beneficiaries of the CVV, none of whom include the Obligor Debtors' creditors,

---

[32]  Plaintiffs assert that the CBNA Lenders did not cite any post-Bankruptcy Code cases in their motions that would require a transferor debtor to establish that its avoidance action would benefit one or more of its creditors. To the contrary, the CBNA Lenders cite cases for this proposition throughout. CCH Mot. at 30-43; Pls.' Opp. at 59.

[33]  The Second Circuit precedent is, in fact, well founded in the law. As the CBNA Lenders discussed at length in their moving papers, the fact that the recovery provision of the Bankruptcy Code (Section 550) uses the words "for the benefit of the estate," while the avoidance provisions (Sections 544 and 548) do not, does not mean that Congress intended to allow a debtor a do-over (at the expense of parties with whom it did business) when that do-over would do nothing to benefit an injured creditor. CCH Mot. at 39.

they cannot do so.  *See* CCH Mot. at 37.  Because Plaintiffs cannot establish constitutional standing, their bankruptcy claims must be dismissed.

## <u>CONCLUSION</u>

For the reasons set forth above and in the CBNA Lenders opening briefs, the Court should dismiss Counts 1-12, 33, 41, 42, 50-52 of Plaintiffs' Second Amended Complaint.


Dated:  March 31, 2008

   /s/ Richard L. Wynne
Richard L. Wynne (S.B.N. 120349)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin N. Brady (*admitted pro hac vice*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

K&E 12589418.16