KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin N. Brady (*admitted pro hac vice*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ADELPHIA RECOVERY TRUST,<br><br>            Plaintiff,<br><br>   vs.<br><br>BANK OF AMERICA, N.A., *et al.*,<br><br>           Defendants. | Case No.:     05-CV-9050 (LMM) |

## THE CCH, OLYMPUS AND UCA/HHC NON-AGENT LENDERS' JOINT REPLY TO PLAINTIFFS' SECOND OPPOSITION IN SUPPORT OF THEIR MOTIONS TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page No.**

INTRODUCTION ..................................................................................................................1

I.      JUDGE GERBER DID NOT DECIDE WHETHER PLAINTIFFS
ADEQUATELY PLEADED CLAIMS AGAINST THE NON-AGENT
LENDERS..................................................................................................................3

II.     PLAINTIFFS' CONCLUSORY ALLEGATIONS OF WRONGDOING BY THE
CBNA LENDERS ARE INADEQUATE TO STATE A CLAIM FOR
EQUITABLE SUBORDINATION .............................................................................4

      A.     Plaintiffs' Pleadings Establish That Any Distinction Between The
"Syndicate Banks" And The "Assignees" Is Meaningless. ....................................6

      B.     Plaintiffs' Conclusory Allegations Do Not State A Claim For Equitable
Subordination. .......................................................................................................9

      C.     Plaintiffs Plead No Facts Supporting Bad Acts By Any Of The CBNA
Lenders..................................................................................................................11

            1.     Plaintiffs' slide tactic paragraphs fail to state a claim against the
CBNA Lenders...........................................................................................11

            2.     Plaintiffs' Unsupported Conclusion Paragraphs fail to state a claim
against the CBNA Lenders. ......................................................................12

            3.     Plaintiffs' Neutral Fact Paragraphs fail to state a claim against the
CBNA Lenders...........................................................................................14

III.    NO AGENCY RELATIONSHIP EXISTED BETWEEN THE AGENT BANKS
AND THE CBNA LENDERS, AND THE COURT SHOULD DISREGARD
PLAINTIFFS' CONCLUSORY ALLEGATIONS OF SUCH A RELATIONSHIP........16

CONCLUSION....................................................................................................................19

## TABLE OF AUTHORITIES

Page No.(s)

**Cases**

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*,
   731 F.2d 112 (2d. Cir. 1984) ........................................................................... 16

*Armco Inc. v. N. Atl. Ins. Co. (In re Bird)*,
   229 B.R. 90 (Bankr. S.D.N.Y. 1999) ................................................................ 4

*Associated Gen'l Contractors of Cal. Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) ........................................................................................... 9

*Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*,
   57 F.3d 146 (2d. Cir. 1995) ............................................................................... 16

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007) ................................................................................. 9, 11

*Bulger v. Royal Doulton, PLC*,
   Slip Copy, No. 05 Civ. 7709, 2006 WL 3771016 (S.D.N.Y. Dec. 19, 2006) .................... 9

*Cannon v. Douglas Elliman, LLC.*,
   No. 06 Civ. 7092, 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007) .................................. 17

*Cromer Fin. Ltd. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) .............................................................. 17

*DeJesus v. Sears, Roebuck & Co., Inc.*,
   87 F.3d 65 (2d Cir. 1996) ........................................................... 5, 9, 10, 11

*Exxon Corp. v. Cent. Gulf Lines, Inc.*,
   717 F. Supp. 1029 (S.D.N.Y. 1989) .................................................................. 17

*In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*,
   No. 03 MD 1529, 2007 WL 2615928 (S.D.N.Y. Sept. 10, 2007) .................................... 9

*Iqbal v. Hasty*,
   490 F.3d 143 (2d Cir. 2007) ............................................................................ 10

*Jama v. Immigration and Customs Enforcement*,
   543 U.S. 335 (2005) ........................................................................................... 4

*Long Island Lighting Co. v. County of Suffolk, N.Y.*,
   628 F. Supp. 654 (E.D.N.Y. 1986) .................................................................... 4

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*,
    476 F. Supp. 2d 414 (S.D.N.Y. 2007) ............................................................................. 17

*Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf*,
    930 F.2d 240 (2d. Cir. 1991) ........................................................................................... 17

*Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co, Inc.*
    *(In re Sunbeam Corp.)*,
    284 B.R. 355 (Bankr. S.D.N.Y. 2002) ............................................................................. 11

*Phillips v. Better Homes Depot, Inc.*,
    No. 02-CV-1168, 2003 U.S. Dist. LEXIS 27299 (E.D.N.Y. 2003) .............................. 6, 7

*Republic Nat'l Bank v. Hales*,
    75 F. Supp. 2d 300 (S.D.N.Y. 1999) ............................................................................... 16

*Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*,
    379 B.R. 425 (S.D.N.Y. 2007) ........................................................................................... 4

*Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ 8058, 2004 WL 2072536
    (S.D.N.Y. Sept. 14, 2004) ................................................................................................ 18

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................................ 5, 9

## INTRODUCTION

In their motions to dismiss ("Motions"), the Co-Borrowing Non-Agent Lenders ("CBNA Lenders")[1] established that Plaintiffs do not plead a single fact alleging bad acts by any CBNA Lender — either against the so called "Assignees" or against the "Syndicate Banks." This pleading failure mandates dismissal of Count 33, for equitable subordination or disallowance, because in order to state an action for equitable subordination of the CBNA Lenders' claims, Plaintiffs must plead facts establishing that the CBNA Lenders committed fraud, some other illegal act and/or breached some legal duty owed to Debtors. In their Motions, the CBNA Lenders established that the Second Amended Complaint[2] relied not on factual allegations of wrongdoing but on unsupported, conclusory statements which are inadequate to state a claim. In an attempt to disguise this pleading failure, Plaintiffs employed a "slide tactic" by which Plaintiffs attempted to slide specific factual allegations made against one defendant or a group of other defendants onto the CBNA Lenders without adding any supporting facts.

In The Adelphia Recovery Trust's Second Memorandum Of Law In Opposition To The Motions To Dismiss The Amended Complaint (the "Second Opposition"), Plaintiffs first attempt to convince this Court that it need not address the CBNA Lenders' arguments at all because

---

[1]   For purposes of this brief, the CBNA Lender movants are those defendants represented by Kirkland & Ellis LLP and sued in their capacity as "Syndicate Banks" or "Assignees" in relation to the CCH Credit Facility, the Olympus Credit Facility and the UCA/HHC Credit Facility. To the extent that any Kirkland & Ellis LLP represented defendant is alleged to be a "John Doe" lender under these Credit Facilities, that defendant is also a moving party here. A current list of Kirkland & Ellis LLP represented defendants in all credit facilities is attached as Exhibit 1 to the Declaration of Richard L. Wynne in Support of (A) The CCH, Olympus, and UCA/HHC Non-Agent Lenders' Joint Reply In Support of Their Motions to Dismiss Plaintiffs' Second Amended Complaint, and (B) The Parnassos, FrontierVision and Century-TCI Non-Agent Lenders' Joint Reply in Support of Their Motions to Dismiss Plaintiffs' Second Amended Complaint, Docket No. 650 in Case No. 05-civ-0950.

[2]   The CBNA Lenders originally replied to the Amended Complaint in their Motions. However, on March 4, 2008, Plaintiffs filed a Second Amended Complaint. *See* Second Amended Complaint, Docket No. 541 in Case No. 05-civ-9050 ("Sec. Am. Compl."). By stipulation filed on March 27, 2008, the parties agreed that the CBNA Lenders' Motions would be treated as if filed in response to the Second Amended Complaint. *See* Stipulation and Order, Docket No. 599 in Case No. 05-civ-9050. Therefore, the CBNA Lenders now cite to the Second Amended Complaint.

1

Judge Gerber, Plaintiffs allege, has already decided this issue.  Despite Plaintiffs' attempt to "slide" onto the CBNA Lenders a ruling predicated on the sustainability of allegations against the *Agent and Investment Banks* — against whom Plaintiffs made very different allegations — this version of the "slide tactic" will not work.  Judge Gerber had no power to bind the CBNA Lenders who *were not even parties* to the motions before Judge Gerber and who had not yet appeared in this case.  Indeed, hundreds of the CBNA Lenders were first named in this litigation only when Plaintiffs filed their Amended Complaint on October 31, 2007, almost three years after Judge Gerber heard oral argument on the motions before him, and four months after his decision on those motions.   The current Motions represent the CBNA Lenders' first opportunity to establish the failings of Plaintiffs' allegations as against them.  The Court must decide this issue based on these pleadings.

Plaintiffs then, implicitly conceding that Judge Gerber's ruling is irrelevant here, assert that the Second Amended Complaint adequately alleges knowledge of the fraud by *all* of the CBNA Lenders.  Not only is this assertion flatly contradicted by Plaintiffs' own admissions that no bad acts are asserted against the so-called "Assignees," but Plaintiffs' assertion also is contradicted by the very paragraphs Plaintiffs cite in support.  Each of those paragraphs relies on Plaintiffs' slide tactic, and/or on unsupported conclusory allegations, and/or on assertions of facts which do not support "bad acts" by the CBNA Lenders.

In fact, Plaintiffs' own citations reinforce what the CBNA Lenders explain in their Motions: the facts pleaded against all of the CBNA Lenders establish only that some of the CBNA Lenders received some information about Adelphia's Prepetition Credit Facilities — credit facilities approved by Adelphia's Board — and decided to purchase debt as passive investors in the Co-Borrowing Facilities.  These allegations do not establish "bad acts" by the

2

CBNA Lenders.  And case law is clear that Plaintiffs must allege *facts* to withstand the CBNA

Lenders' Motions.  Since none are pleaded, the Court should dismiss the equitable subordination

and disallowance claim against the CBNA Lenders.

**I.      JUDGE GERBER DID NOT DECIDE WHETHER PLAINTIFFS ADEQUATELY PLEADED CLAIMS AGAINST THE NON-AGENT LENDERS**

Plaintiffs contend that "defendants have not raised any new issues" in arguing for

dismissal of the equitable subordination count,[3] and that therefore this Court should follow Judge

Gerber's June 11, 2007 ruling on the *Agent and Investment Banks*' motions to dismiss and deny

the CBNA Lenders' Motions.  Pls.' Sec. Opp. at 75.  Plaintiffs are incorrect.  First, the CBNA

Lenders *do* raise new issues because Plaintiffs' allegations against the CBNA Lenders are

dramatically different from Plaintiffs' allegations against the Agent and Investment Banks.  An

unequivocal indicator of the difference in these allegations is Plaintiffs' decision to pursue the

Agent and Investment Banks for tortious conduct (e.g., fraud), but not to pursue the CBNA

Lenders for any such alleged tortious conduct.  *See, e.g.*, Pls.' Sec. Opp. at 4 (stating that tortious

conduct has been pleaded only against the Agent and Investment Banks).

In addition, Plaintiffs' contention that the CBNA Lenders' Motions to dismiss the

equitable subordination claim should be rejected because Judge Gerber, in a footnote — and in a

classic example of dicta — stated that he "knowingly declines to dismiss" these claims with

respect to the CBNA Lenders, is without merit.  *See* Pls.' Sec. Opp. at 75-76.  Pursuant to a prior

---

[3]   The arguments raised in this Reply apply with even more force to Plaintiffs' claim for equitable disallowance. Equitable disallowance is a far more severe sanction than equitable subordination, and when applied (in the rare case) historically, was generally reserved only for insider misconduct.  Plaintiffs, who fail to plead facts sufficient to state an equitable subordination claim, also fail to meet the more rigorous pleading requirements necessary to state a claim for equitable disallowance.  *See* CCH Mot. at 54-55.

3

stipulation,[4] these Motions are the CBNA Lenders' first motions to dismiss.  Because the CBNA

Lenders did not appear or otherwise participate in the prior motions to dismiss (and many of the

CBNA Lenders had yet to be named as parties), the adequacy of the factual allegations against

the CBNA Lenders and the applicability of the *Enron*[5] taint theory to the CBNA Lenders were

not before Judge Gerber.  Therefore, Judge Gerber had no authority to, nor did he, decide these

issues.  *See Long Island Lighting Co. v. County of Suffolk, N.Y.*, 628 F. Supp. 654, 656 (E.D.N.Y.

1986) ("[T]hose issues are not before the Court, and the Court cannot reach out and decide

them.").  In fact, Judge Gerber's footnote amounts to no more than "comments" by a previous

judge on a previous motion which "were [not] intended to settle the issue that is now being

raised a[s] they were not made in response to any argument or briefing on the point." *Armco Inc.*

*v. N. Atl. Ins. Co. Ltd. (In re Bird)*, 229 B.R. 90, 93 (Bankr. S.D.N.Y. 1999).  Accordingly, Judge

Gerber's dicta with respect to an issue not raised by any moving party before him (regarding a

now-overruled decision in the *Enron* bankruptcy case) have no bearing on the CBNA Lenders'

motions to dismiss in this Court.  *See Jama v. Immigration and Customs Enforcement*, 543 U.S.

335, 352 n.12 (2005) ("Dictum settles nothing, even in the court that utters it.").

## II.  PLAINTIFFS' CONCLUSORY ALLEGATIONS OF WRONGDOING BY THE CBNA LENDERS ARE INADEQUATE TO STATE A CLAIM FOR EQUITABLE SUBORDINATION

Plaintiffs try to refute the CBNA Lenders' argument that the Second Amended Complaint

contains no factual allegations of bad acts by the CBNA Lenders by citing to specific paragraphs

---

4   *See* Stipulation And Order Regarding (1) The Creditors' Committee's Motion For Leave To Prosecute Claims And Causes Of Action Against The Pre-Petition Agents And Pre-Petition Secured Lenders, (2) The Equity Committee's Motion To Intervene In The Adversary Proceeding And (3) The Pre-Petition Agents' Responses In Opposition To The Motions Of The Creditors' Committee And The Equity Committee And Alternative Motions To Dismiss The Creditors' Committee's Complaint, Docket No. 1925 in Case No. 02-41729 (July 29, 2003).

5   *Springfield Assocs., L.L.C. v. Enron Corp.* (*In re Enron Corp.*), 379 B.R. 425 (S.D.N.Y. 2007).

of the Second Amended Complaint.  But Plaintiffs' cited "facts" are not facts at all.  Rather, these cited paragraphs contain only naked conclusions or neutral facts that do not support any bad acts by the CBNA Lenders.  When claims like Plaintiffs' consist only of conclusory allegations, they fail to satisfy Federal Rule of Civil Procedure 12(b)(6).  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996).

Plaintiffs also imply that even if they have pleaded no bad acts against the so-called "Assignees,"[6] they have pleaded facts supporting bad acts against the "Syndicate Banks."  While Plaintiffs' Second Amended Complaint establishes that while the Syndicate Banks are distinguishable from the Assignees on the basis that the Syndicate Banks purchased debt as non-agent lenders in the credit facilities at inception (whereas the "Assignees" purchased the debt in the secondary market), it is a distinction without a difference because Plaintiffs do not plead any facts that any CBNA Lender engaged in wrongdoing.

Indeed, as the CBNA Lenders explained in their Motions, Plaintiffs' stories of fraud do not allege or even require the knowledge or participation of the CBNA Lenders in the Adelphia fraud.  Plaintiffs' central allegations regarding the deception of Adelphia's Independent Directors and the allegedly deceptive term sheets include *no facts* indicating that the CBNA Lenders knew anything about the term sheets, knew the term sheets had been presented to the directors or knew of the alleged Rigas misrepresentations.  *See, e.g.*, CCH Mot. at 10-17.  Plaintiffs pleaded no facts at all suggesting that the CBNA Lenders had any reason to doubt the validity of the Board's approval of all three Co-Borrowing Credit Facilities.  Moreover, Plaintiffs failed completely to respond to the CBNA Lenders' argument that the CBNA Lenders had no duty to second guess

---

[6]  Plaintiffs have previously, and repeatedly, conceded that they allege no bad acts against the secondary market purchasers.  *See* discussion at Part II.A.

K&E 12696384.10

the business judgment of Adelphia's Board of Directors.  *Id*. at 52.  The CBNA Lenders were merely passive investors in the credit facilities, and Plaintiffs allege no facts indicating otherwise.

An analysis of the Second Opposition's cited "facts" of wrongdoing pleaded against the CBNA Lenders shows that such "facts" fall into three overlapping groups, each of which fails to satisfy Plaintiffs' pleading obligations: (1) Plaintiffs' slide tactic by which they really only allege facts against other defendants but "slide" these on to the CBNA Lenders; (2) flat assertions of knowledge or legal conclusions, unsupported by any facts (the "Unsupported Conclusions Paragraphs"); and/or (3) facts that — assuming them to be true for purposes of these Motions — do not establish or suggest any wrongdoing by the CBNA Lenders (the "Neutral Fact Paragraphs").  Allegations of bad acts by others, unsupported assertions of knowledge, and assertions of fact establishing the CBNA Lenders' purchased debt paper in credit facilities approved by Adelphia and its Board of Directors do not, individually or collectively, adequately state an equitable subordination claim against the CBNA Lenders.

### A.   Plaintiffs' Pleadings Establish That Any Distinction Between The "Syndicate Banks" And The "Assignees" Is Meaningless.

Plaintiffs' suggestion that specific allegations of wrongdoing are made against the "Syndicate Banks," as opposed to the "Assignees," is incorrect.[7]  Plaintiffs argue that they have

---

[7]   Given Plaintiffs' attempt to establish a distinction between the Syndicate Banks and Assignees, it is ironic that Plaintiffs chastise the CBNA Lenders for discussing distinctions among the Lenders.  Pls.' Sec. Opp. at 77-78.  Plaintiffs argue that the CBNA Lenders may not draw a "distinction" between Syndicate Banks and Agent Banks because such distinctions are fact-based (and therefore inappropriate at the pleading stage), and case law allows fraud to be pleaded against defendants with a "lesser" involvement than other defendants as long as the fraud liability is "premised on knowing participation in a scheme to defraud, even if that participation does not by itself suffice to constitute fraud."  *Id.* (*citing Phillips v. Better Homes Depot, Inc.*, No. 02-CV-1168, 2003 U.S. Dist. LEXIS 27299 at *56-59 (E.D.N.Y. 2003).  Plaintiffs' citation to *Phillips* is inapposite for several reasons, including: (1) that MHE (the defendant in *Phillips* arguing "lesser involvement") had, with its co-defendants, been accused of fraud, conspiracy to commit fraud, and fraud in the inducement (but the CBNA Lenders here are not alleged to have participated in fraud); and (2) the court found that specific facts supporting a fraudulent scheme had been alleged

(Continued…)

defined clearly the phrase "Syndicate Bank" to include only those non-agent banks which purchased debt paper in the Co-Borrowing Facilities at inception.[8]  Pls.' Sec. Opp. at 77.  Even assuming that Plaintiffs have adequately pleaded that the Syndicate Banks are original Non-Agent Lenders, the mere "fact" of participation in the Co-Borrowing Facilities at inception (versus participation through purchase in the secondary market) is not an allegation of wrongdoing, as Plaintiffs' own arguments make clear.  For example, Plaintiffs assert that the activities of the Syndicate Banks "are described in detail" and cite to paragraphs 845, 883 and 929 of the Second Amended Complaint.  Pls.' Sec. Opp. at 11.  This "detailed" description of the "activities" of the Syndicate Banks is as follows:

- "Other defendants participating in the UCA/HHC Facility as Syndicate Banks include: BofA, ABN AMRO, BONY, BNS, Barclays, Chase, CIBC, Rabobank, Credit Lyonnais, CSFB, FMB, SBHC, Franklin Trust, Industrial Bank of Japan, MeesPierson, NCBP, Royal Bank of Canada, and one or more of the Assignees."  Sec. Am. Compl. ¶ 845.

- "Other Defendants participating in the CCH Co-Borrowing Facility as Syndicate Banks include: CIBC, BLG, Credit Industriel, CypressTree, Dai-Ichi Kangyo, DG Bank, Fifth Third, First Allmerica, Firstar, Foothill, Industrial Bank of Japan, Jackson National, Kemper Fund, KZH III, KZH CypressTree, KZH ING, KZH Langdale, KZH Pondview, KZH Shoshone, KZH Waterside, Liberty-Stein, MeesPierson, Mellon Bank, Natexis, NCBP, CypressTree Floating Rate Fund, Olympic Funding, Oppenheimer, Pinehurst, Principal Life, Société Générale, Stein Roe, U.S. Bank, United of Omaha, and one or more of the Assignees."  Sec. Am. Compl. ¶ 883.

- Other Defendants participating in the Olympus Co-Borrowing Facility as Syndicate Banks include: CIBC, Credit Industriel, Merrill Lynch Debt Fund, Merrill Lynch Trust, Merrill Lynch Portfolio, Merrill Lynch Floating Rate Fund, Natexis, Riviera Funding,

---

against MHE, including evidence that MHE had lent substantial sums to other defendants, other defendants steered business to MHE, and that MHE itself submitted false loan applications (but Plaintiffs here have alleged no specific facts at all that the CBNA Lenders committed acts of wrongdoing).  *Phillips*, 2003 U.S. Dist. LEXIS 27299 at *2-3; *57-59.  But more fundamentally, the "distinction" here raises no factual questions because it is based on the pleadings in Plaintiffs' Second Amended Complaint, which tell a story of Rigas fraud at Adelphia, allegedly involving the Agent and Investment Banks, but not involving the CBNA Lenders.  *See generally* CCH Mot. at 10-17 (summarizing the allegations in the Second Amended Complaint).

[8]   As the CBNA Lenders have previously established, Plaintiffs' definitions of the CBNA Lenders are far from clear.  *See, e.g.*, CCH Mot. at 11-12.

Stanwich, Sumitomo, Toronto Dominion, and one or more of the Assignees.  Sec. Am. Compl. ¶ 929.

Plaintiffs' "detailed" description of the Syndicate Banks "activities" supporting Plaintiffs' allegations of wrongdoing is no more than a list of Lenders alleged to have purchased debt in each of the three Co-Borrowing Facilities.  Plaintiffs thus effectively concede that the "activities" of the Syndicate Banks for which Plaintiffs brought suit are identical to the "activities" Plaintiffs allege against the so-called "Assignees:" each group of Non-Agent Lenders purchased debt in the Co-Borrowing Credit Facilities.  And Plaintiffs have repeatedly admitted that no bad acts are pleaded against the after-market purchasers of the Co-Borrowing debt.[9]  *See* Joint App., Ex. 14 ¶ 8 (Estimation Mot.) (stating that "[i]n the Bank Action, there is no allegation that the Syndicate Banks individually did anything improper.  Rather, the only issue specific to the Syndicate Banks is whether as 'after-market' holders of Bank Claims under the Prepetition Credit Facilities, their debt may be 'tainted' by the torts and other wrongful conduct of the Banks from whom they purchased that debt."); *see also id.* ¶ 40 ("[T]he complaint in the Bank Action does not allege that the Syndicate Banks individually committed wrongdoing . . . ."); *id.* ¶ 67 ("In the Bank Action, there are no claims that any of the 'after-market' Syndicate Banks individually did anything improper.  In fact, most, if not all, of the Syndicate Banks are not even

---

[9]  Plaintiffs have previously argued, and they argue again here (Pls.' Sec. Opp. at 78-80), that they do not need to plead any bad acts by the downstream purchasers of the co-borrowing debt (the "Assignees"), because the District Court's decision in *Enron* decides this matter, applying a "taint" to any downstream purchaser in the chain of title from a bad actor, and because the Acknowledgement forms signed by post-petition purchasers of the Co-Borrowing Debt allegedly deny such purchasers the ability to raise defenses to Plaintiffs' claims.  Plaintiffs are wrong on both counts, as explained in detail in The CCH, Olympus and UCA/HHC Non-Agent Lenders' Joint Reply In Support Of Their Motions To Dismiss Plaintiffs' Second Amended Complaint ("First Joint Reply") at 12-15 Docket No. 647 in Case No. 05-civ-9050.  The CBNA Lenders will not reiterate the complete argument of the First Joint Reply, which the CBNA Lenders incorporate by reference here, but note that, as explained in the First Joint Reply, even if *Enron* were applicable here (and it is not), the CBNA Lenders are still entitled to dismissal through indemnification, and the plain wording of the post-petition Acknowledgements does not affect the ability of downstream purchasers to raise defenses, including indemnification.

8

banks."). Without factual allegations of wrongdoing by the CBNA Lenders, Plaintiffs' claim for

equitable subordination fails, and this Court should dismiss that claim.

> **B.     Plaintiffs' Conclusory Allegations Do Not State A Claim For Equitable Subordination.**

Plaintiffs suggest that the conclusions they have pleaded against the CBNA Lenders are

adequate to state a claim for equitable subordination against those Lenders, but case law is clear

that Plaintiffs must provide more than "labels and conclusions" to withstand a motion to dismiss.

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).  Plaintiffs, in fact, "must provide

'plausible grounds' for the allegations with 'enough fact to raise a reasonable expectation that

discovery will reveal evidence' to support them."  *In re Adelphia Commc'ns Corp. Sec. and

Derivative Litig.*, No. 03 MD 1529, 2007 WL 2615928, at *1 (S.D.N.Y. Sept. 10, 2007)

(McKenna, J.) (quoting *Twombly*, 127 S. Ct. at 1965).  When "pleadings are devoid of any

specific facts or circumstances supporting [Plaintiffs'] assertion[s]," and a complaint consists

only of "conclusory allegations unsupported by factual assertions," the complaint "fails even the

liberal standard of Rule 12(b)(6)."  *DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d

Cir. 1996); *see also Bulger v. Royal Doulton, PLC*, Slip Copy, No. 05 Civ. 7709, 2006 WL

3771016, at *8 (S.D.N.Y. Dec. 19, 2006) (dismissing with prejudice claim for unfair competition

where plaintiffs pleaded nothing more than the conclusions in support of bad faith knowledge

and actions).  The Court should not assume that Plaintiffs can prove facts they have not alleged.

*See Associated Gen'l Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519,

526 (1983).

In relation to the Agent and Investment Banks' motions to dismiss, Plaintiffs argue that

the Second Circuit would not apply *Twombly* to those allegations because this is not a context in

which "amplification is needed to render the claim plausible."  Pls.' Sec. Opp. at 28 n. 9.

Plaintiffs' argument against the Agent and Investment Banks is irrelevant as against the CBNA Lenders, against whom Plaintiffs make few and vastly different allegations, all of which rest on unsupported suppositions or conclusions and not facts.  Unlike the Agent and Investment Banks, the CBNA Lenders play no role in Plaintiffs' stories of fraud involving the Rigas Family's abuse of the Cash Management System ("CMS") and the alleged participation of the Agent and Investment Banks in the Rigas Family's fraud.  CCH Mot. at 12-19.  Given Plaintiffs' theory (which focuses on other defendants), the complexity of this case and the likely massive discovery it will require, the Court should apply *Twombly* to its analysis of Plaintiffs' allegations of wrongdoing against the CBNA Lenders.  *See Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (noting the *Twombly* Court's concern with sprawling and costly discovery in complex cases and stating that these concerns provided a basis for applying *Twombly* to cases "where massive discovery is likely to create unacceptable settlement pressures.").  Plaintiffs' claims of wrongdoing by the CBNA Lenders are not plausible and, moreover, are wholly conclusory and so fail to state a claim even under pre-*Twombly* standards.  *See DeJesus*, 87 F.3d at 70.

As established in the CBNA Lenders' Motions, any facts alleged by Plaintiffs establish only that the CBNA Lenders were passive investors in Co-Borrowing Facilities that were approved by Adelphia's full Board of Directors.  *See* CCH Mot. at 12-17.  Other "facts" upon which Plaintiffs rely to establish their claim for equitable subordination are not facts at all, but unsupported conclusions to which this Court should give no weight, as discussed in detail below. The Court should dismiss Count 33 for equitable subordination and disallowance as against the CBNA Lenders.

K&E 12696384.10

**C.      Plaintiffs Plead No Facts Supporting Bad Acts By Any Of The CBNA Lenders.**

In order to adequately state their claim for equitable subordination, Plaintiffs must allege facts — not conclusions — that establish plausible grounds for the claim that the CBNA Lenders "committed fraud or some other illegal action, or that the [CBNA Lenders] breached some legal duty that [they] owed to the debtor or its creditors."  *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co, Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002); *see also Twombly*, 127 S. Ct. at 1965; *DeJesus,* 87 F.3d at 70 (stating that conclusory allegations unsupported by factual assertions are inadequate to state a claim under Rule 12(b)(6)).  Despite Plaintiffs' argument that the Second Amended Complaint "sufficiently alleges that *all* of the Co-Borrowing Lenders had knowledge or consciously avoided knowledge of the fraud," (Pls.' Sec. Opp. at 77) (emphasis in original), Plaintiffs' "sufficient" allegations consist only of (1) Plaintiffs' slide tactic, and/or (2) Unsupported Conclusions Paragraphs, and/or (3) the Neutral Fact Paragraphs.  Plaintiffs' citations to these specific paragraphs of the Second Amended Complaint (Pls.' Sec. Opp. at 77-78) establish why the Court must dismiss the equitable subordination count against the CBNA Lenders: no facts identified by Plaintiffs (and indeed no facts in the whole Second Amended Complaint) indicate any wrongdoing by any CBNA Lender.

**1.      Plaintiffs' slide tactic paragraphs fail to state a claim against the CBNA Lenders.**

Plaintiffs' slide tactic attempts to transform an allegation against one defendant or a specific group of defendants into a factual allegation against any defendant referenced in that or related paragraphs.  In general, a paragraph using the slide tactic will contain allegations of fact or knowledge against particular defendants and will also contain conclusory assertions that a much larger group of defendants knew or participated in or should have known what the specific

11

defendants are alleged to have known.  For example, Plaintiffs cite to paragraph 1065 in support

of "factual" allegations against the CBNA Lenders:

> Notwithstanding the Rigas Family's concealment of $3.4 billion of
> debt and the default under the Co-Borrowing Facilities, the Co-
> Borrowing Lenders, and in particular BofA, Citibank and/or
> Citicorp, and Deutsche Bank — each being, upon information and
> belief, acutely aware of the Rigas Family's significant liabilities
> with respect to their margin accounts at BofA, SSB, and Deutsche
> Bank Securities — continued to approve borrowing requests under
> the Co-Borrowing Facilities.  Worse still, the Co-Borrowing
> Lenders knew that Adelphia would use most, if not all, of the post-
> disclosure, post-default borrowings to fund margin payments owed
> by the Rigas Family and the RFEs to the Margin Lenders.  Thus,
> the Co-Borrowing Lenders allowed the Rigas Family to borrow
> funds under the senior Co-Borrowing Facilities — on which
> Adelphia was obligated — to pay off the <u>junior</u> margin loans — on
> which only the Rigas Family was obligated.

Pls.' Sec. Opp. at 77.  This paragraph is a classic example of Plaintiffs' slide tactic: start with a

general unsupported allegation against a large group of defendants like the Co-Borrowing

Lenders.  Then, include specific allegations (on information and belief) only against a small

subset of the first group, here BofA, SSB and Deutsche Bank Securities.  And then, expand the

allegations back out to the larger group in an attempt to make it seem as if the specific

knowledge the margin banks might have had somehow was knowledge shared by all the Co-

Borrowing Lenders.  But Plaintiffs plead no facts establishing that the Co-Borrowing Lenders

had this knowledge.  Plaintiffs' slide tactic paragraphs do not contain allegations of *fact* against

the CBNA Lenders supporting Plaintiffs' claim for equitable subordination, and this Court

should disregard these allegations.[10]

### 2. Plaintiffs' Unsupported Conclusion Paragraphs fail to state a claim against the CBNA Lenders.

---

[10]   Other slide tactic paragraphs cited by Plaintiffs' are identified and discussed in Exhibit 1.

Plaintiffs' Unsupported Conclusion Paragraphs attempt to connect the CBNA Lenders to alleged bad acts discussed elsewhere in the Second Amended Complaint by asserting — with no factual support whatsoever — that the CBNA Lenders knew about those acts.  For example, Plaintiffs cite to paragraph 971 in support of factual allegations against the CBNA Lenders:

> The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment Banks informed the other Co-Borrowing Lenders of this intention before closing.[11]  Thus, the UCA/HHC Lenders acknowledged and agreed that $250 million of the $850 million of the initial proceeds from the facility would be used by the Rigas Family to purchase equity securities from ACC for their personal account and that $350 million would be used by the Rigas Family to pay down RFE debt.  The Rigas Family, the UCA/HHC Agent Banks, and their affiliated Investment Banks also disclosed that the RFE co-borrower under the UCA/HHC Co-Borrowing Facility was not owned by Adelphia.  The UCA/HHC Lenders knew that Adelphia received no benefit from loans to the Rigas Family or the RFEs.  The UCA/HHC Lenders knew that such loans to the Rigas Family and the RFEs breached the provisions of the UCA/HHC Term Sheet presented to the Independent Directors.  The UCA/HHC Lenders participated in the UCA/HHC Co-Borrowing Facility with knowledge of these breaches.

Pls.' Sec. Opp. at 77.  Here, after alleging that the Rigas Family, Agent Banks and Investment Banks all informed the CBNA Lenders of the Rigas Family's intended uses for some of the proceeds from the UCA/HHC Credit Facility — none of which uses were illegal — Plaintiffs assert the conclusion that all of the UCA/HHC Lenders knew that the loans breached the provisions of the UCA/HHC Term Sheet.  However, Plaintiffs never allege that the CBNA Lenders had seen the Term Sheet or been involved in its creation.  Plaintiffs' conclusory "factual" allegation that all the CBNA Lenders knew that the Rigas Family's intended uses

---

[11]   This is an example of how Plaintiffs' unclear definitions affect their pleadings.  Clearly, the after-market purchasers of the UCA/HHC debt (the "Assignees") did not receive this information prior to closing, yet the allegation is made against all Co-Borrowing Lenders

breached a document the CBNA Lenders are not alleged to have seen, is not a "fact" of which this Court should take notice.

In a similar fashion, Plaintiffs' citation to paragraph 983, which states that "[t]he Olympus Lenders knew that the Independent Directors were never advised of" the Rigas Family's misuse of the Co-Borrowing funds is another example of an Unsupported Conclusion Paragraph. Pls.' Sec. Opp. at 78. Plaintiffs allege no facts indicating that the CBNA Lenders ever knew anything about what the Independent Directors knew or did not know, much less that the CBNA Lenders had any reason to doubt that the information provided to them by Adelphia had been allegedly concealed from the Independent Directors.[12] Plaintiffs' Unsupported Conclusion Paragraphs do not contain allegations of *fact* against the CBNA Lenders supporting Plaintiffs' claim for equitable subordination, and this Court should disregard these allegations.[13]

> **3.      Plaintiffs' Neutral Fact Paragraphs fail to state a claim against the CBNA Lenders.**

Plaintiffs' Neutral Fact Paragraphs cite facts alleged in the Second Amended Complaint that support only that the CBNA Lenders entered into arm's-length transactions to purchase syndicated debt in credit facilities approved by Adelphia's full Board. However, Plaintiffs attempt, often through use of conclusory allegations, to suggest that these Neutral Facts somehow show wrongdoing by the CBNA Lenders. For example, Plaintiffs cite to paragraph 1036 as support for factual allegations of wrongdoing by the CBNA Lenders:

> After May 1999, each of the Co-Borrowing Lenders and the
> Investment Banks knew that (i) Adelphia and the RFEs were

---

[12]   Notably, Plaintiffs consistently allege that the CBNA Lenders received offering information *after* the Independent Directors had approved the facilities. *See, e.g.*, Sec. Am. Compl. ¶ 984. This fact is consistent with the CBNA Lenders' participation in the credit facilities as arm's-length, good faith purchasers.

[13]   Other Unsupported Conclusion Paragraphs cited by Plaintiffs in this section are identified and discussed in Exhibit 2.

14

> commingling cash, (ii) the Co-Borrowing Debtors had agreed to be
> liable for co-borrowing funds drawn by the RFEs, and (iii) the
> Rigas Family was using the Co-Borrowing Facilities for personal
> expenses, including, but not limited to, the purchase of securities
> issued by ACC.  The composition of the lenders in the Co-
> Borrowing Facilities and the Non-Co-Borrowing Facilities
> substantially overlapped.  Once they had indisputable notice of the
> fraud, the Co-Borrowing Lenders participating in the Non-Co-
> Borrowing Facilities knew or should have known that the Rigas
> Family was using the proceeds of the Non-Co-Borrowing Facilities
> in furtherance of the fraud.

Pls.' Sec. Opp. at 77.  Plaintiffs thus allege that the Co-Borrowing Lenders knew (1) that the

CMS handled funds from both Adelphia and the RFEs; (2) that the liability of the Co-Borrowing

Borrowers was joint and several; and (3) that the Rigas Family planned to use some of the funds

from the Co-Borrowing Credit Facilities to buy stock in Adelphia.  Notably, none of these facts

support participation in or knowledge of wrongdoing on the part of the CBNA Lenders.  And

while there is the neutral statement that there was some overlap between lenders in the two types

of facilities, no CBNA Lender is alleged to have had any specific knowledge or involvement in

fraudulent activities.

First, Plaintiffs' Second Amended Complaint makes clear that it was the Rigas Family's

manipulation of the CMS — and not its mere existence — that allowed the Rigas Family to

defraud Adelphia.  *See, e.g.*, CCH Mot. at 18-19 (discussing the Rigas Family's manipulation of

the CMS).  And the Second Amended Complaint contains no factual allegations that the CBNA

Lenders knew of the Rigas Family's abuse of the CMS.  Second, joint and several liability

among borrowers is perfectly legal and was clearly spelled out in both the Term Sheets and the

Prepetition Credit Agreements themselves.  *See, e.g*, Joint App., Ex. 15 at 1 (CCH Term Sheet);

Joint App., Ex. 16 at 1 (Olympus Term Sheet); Joint App., Ex. 20 at 1 (UCA/HHC Term Sheet);

Joint App., Ex. 1 § 9.6, (CCH Credit Agreement); Joint App., Ex. 4 §§ 3.2, 9.6 (Olympus Credit

Agreement); Joint App., Ex. 6 §§ 3.1, 4.10.1 (UCA/HHC Credit Agreement).  Thus, Plaintiffs'

Neutral Fact Paragraphs do not contain allegations of *fact* against the CBNA Lenders supporting

Plaintiffs' claim for equitable subordination, and this Court should disregard these allegations.[14]

By citing paragraphs like the three types discussed above, Plaintiffs only establish that

the CBNA Lenders purchased debt as part of arm's-length lending transactions, which

borrowings were allegedly fraudulently used by the Rigas Family to the detriment of Adelphia.

Plaintiffs allege no duty on the part of the CBNA Lenders to second guess the wisdom of

Adelphia's Board of Directors in approving these credit facilities or their uses — nor could they,

since none exists. *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57

F.3d 146, 158 (2d. Cir. 1995) (holding that "[g]enerally, banking relationships are not viewed as

special relationships giving rise to a heightened duty of care" and that "the usual relationship of a

bank and its customer is not a fiduciary one, but simply that of debtor and creditor") (citing

*Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 122 (2d. Cir.

1984)); *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 316-17 (S.D.N.Y. 1999) (holding that

"[i]t is well settled under New York law that the usual relationship of a bank and its customer is

not a fiduciary one, but rather one of creditor and debtor," and that "[n]othing in [an] arms-length

relationship . . . would justify a departure from this rule") (citations omitted).

## III. NO AGENCY RELATIONSHIP EXISTED BETWEEN THE AGENT BANKS AND THE CBNA LENDERS, AND THE COURT SHOULD DISREGARD PLAINTIFFS' CONCLUSORY ALLEGATIONS OF SUCH A RELATIONSHIP

Plaintiffs argue that even if the Court agrees that the Second Amended Complaint

contains inadequate allegations of wrongdoing by the CBNA Lenders to state a claim for

equitable subordination, the Court still may not dismiss this claim because Plaintiffs included in

their pleadings a conclusory allegation of agency between the Agent Banks and the CBNA

---

[14] Other Neutral Fact Paragraphs cited by Plaintiffs in this section are identified and discussed in Exhibit 3.

Lenders, and the question of agency presents an issue of fact. *See* Pls.' Sec. Opp. at 77 n.37. Contrary to Plaintiffs' assertion, the Court may determine the existence and scope of an agency relationship on the pleadings. *See* CCH Mot. at 52-53; *see also Cannon v. Douglas Elliman, LLC.*, No. 06 Civ. 7092, 2007 WL 4358456, at *5 (S.D.N.Y. Dec. 10, 2007) (dismissing under 12(b)(6) claims that required an agency relationship for liability because plaintiffs did not sufficiently allege an agency relationship — only conclusory allegations of agency were alleged, and there was no allegation of control by one party over another); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 487 (S.D.N.Y. 2001) (dismissing agency claims from complaint because complaint did not contain facts showing actual or apparent authority).

Under New York law, "[i]t is well-settled that an agency relationship involves: (1) consent; (2) fiduciary duty; (3) absence of gain or risk to the agent; (4) control by the principal; and (5) power of the agent to alter the legal relations between the principal and third persons and between the principal and himself." *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 717 F. Supp. 1029, 1031 (S.D.N.Y. 1989); *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.,* 476 F. Supp. 2d 414, 422 (S.D.N.Y. 2007) (same).  Of all the factors that establish an agency relationship, "[t]he crucial element of an agency relationship . . . 'is that the agent acts subject to the principal's direction and control.'" *Nat'l Petrochemical Co. of Iran v. The M/T Stolt Sheaf*, 930 F.2d 240, 244 (2d. Cir. 1991).  *See also Mouawad Nat'l*, 476 F. Supp. 2d at 422 ("The principal's power to control the agent is an essential element of an agency relationship.") (citations omitted).

Plaintiffs have not alleged facts showing an agency relationship existed between the Agent Lenders and other Co-Borrowing Lenders.  There are no allegations in the Second Amended Complaint that the Agent Lenders were subject to the direction and control of other

Co-Borrowing Lenders or vice versa.  Neither have Plaintiffs pleaded that one party consented to be an agent of another.  To the contrary, the credit facilities unambiguously repudiate the establishment of any agency relationship.  *See* Joint App., Ex. 1 § 12.5(a) (CCH Credit Agreement) (stating that no Agent has a fiduciary relationship with any Lender); *see also id*. § 12.1(c) (stating that the Administrative Agent has no fiduciary duty to the CCH Borrowers or the Lenders); Joint App., Ex. 4 § 12.5(a) (Olympus Credit Agreement) (stating that no Agent has a fiduciary relationship with any Lender); *see also id.* § 12.1(c) (stating that the Administrative Agent has no fiduciary duty to the Olympus Borrowers or the Lenders); Joint App., Ex. 6 § 9.8 (UCA/HHC Credit Agreement) (stating that no Agent has a fiduciary relationship with any Lender).

Instead, Plaintiffs claim that they properly allege an agency relationship between the Agent Lenders and the other Co-Borrowing Lenders because "[e]ach of the Agent Banks conducted extensive due diligence on its own behalf and on behalf of the other Co-Borrowing Lenders."  Pls.' Sec. Opp. at 77 n.37 (citing Sec. Am. Compl. ¶¶ 1373, 1497).  Plaintiffs fail to cite to any supporting authority that establishes that performing due diligence for another party is by itself enough to establish an agency relationship.  Even in cases where a court found that a party was an agent for another because the agent performed due diligence on the principal's behalf, there was also a finding that the agent who performed due diligence was subject directly or indirectly to the principal's *control*.  *See, e.g., Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2004 WL 2072536, at *6 n.10 (S.D.N.Y. Sept. 14, 2004) (finding that the company performing due diligence was an agent because it was subject to the control of the principal).  Contrary to the *Steed* case, however, the Second Amended Complaint contains no allegations that the CBNA Lenders exercised control over the Agent Banks' due diligence.  Rather,

18

Plaintiffs themselves admit that the "Agent Banks conducted extensive due diligence *on its own behalf* and on behalf of the other Co-Borrowing Lenders."  Pls.' Sec. Opp. at 77 n.37 (emphasis added).

## **CONCLUSION**

For the foregoing reasons, the CBNA Lenders respectfully request that the Court dismiss Count 33 of Plaintiffs' Second Amended Complaint as to the CBNA Lenders, without leave to amend.

Dated:  April 21, 2008

                                                        /s/ Richard L. Wynne                 
Richard L. Wynne (S.B.N. 120349)

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4675
Richard L. Wynne (RW 5630)
Bennett L. Spiegel (BS 7153)

-and-

777 South Figueroa Street
Los Angeles, California  90017
Telephone:     (213) 680-8400
Facsimile:      (213) 680-8500
Melissa D. Ingalls (*admitted pro hac vice*)
Erin N. Brady (*admitted pro hac vice*)
Laura A. Thomas (*admitted pro hac vice*)

Attorneys for The Non-Agent Lenders

19

# EXHIBIT 1

# ADDITIONAL EXAMPLES OF SLIDE TACTIC PARAGRAPHS
## CITED BY PLAINTIFFS ON PAGES 77 - 78
## OF THE SECOND OPPOSITION

**"Plaintiffs' Slide Tactic:"**  In general, Plaintiffs' slide tactic attempts to transform an allegation against one or a specific group of defendants into a factual allegation against any defendant referenced in that or related paragraphs.

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Slide Tactic |
|---|---|---|
| ¶ 970 | The Rigas Family did not hide from the Agent Banks, Co-Borrowing Lenders, and Investment Banks their intention to use the UCA/HHC Co-Borrowing Facility to defraud Adelphia and its other creditors.  To the contrary, the Rigas Family disclosed its fraudulent intent to the UCA/HHC Lenders.  Discussing the UCA/HHC Co-Borrowing Facility before closing, the Rigas Family informed certain of the Agent Banks that they "specifically intended a portion of the facility to be distributed to the Rigas Family for purposes of participating in the upcoming [Adelphia] equity offering" and that they intended to use a substantial portion to pay off existing RFE debt (emphasis added). | Plaintiffs start with an unsupported assertion against a large group - the CBNA Lenders, but then include specific allegations of knowledge against only "certain of the Agent Banks" in an attempt to slide the alleged specific knowledge the Agent Banks might have had onto the CBNA Lenders.<br><br>Plaintiffs triple up here, as this paragraph also qualifies as an Unsupported Conclusion Paragraph, as well as a Neutral Facts Paragraph.  First, there are no factual allegations that the CBNA Lenders knew of the Rigas Family's intent to defraud Adelphia and its other creditors. Second, use of loan proceeds to purchase stock in a public company is not indicative of wrongdoing.  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) (there must be "specific facts" supporting Plaintiffs' assertions). Additionally, Plaintiffs' allegation that all Co-Borrowing Lenders received this information "before closing" is clearly incorrect as the majority of the CBNA Lenders did not even purchase this debt paper until after closing. |

K&E 12714522.5

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Slide Tactic |
|---|---|---|
| ¶ 1026 | The Co-Borrowing Lenders and their affiliated Investment Banks knew or consciously avoided the fact that Adelphia's filings with the SEC consistently concealed the true amount of their co-borrowing liability.  The Co-Borrowing Lenders and their affiliated Investment Banks knew the amount owing under the Co-Borrowing Facilities in which they participated.  In addition, since Wachovia and BMO were Agent Banks or lenders under all of the Co-Borrowing and Non-Co-Borrowing Facilities, these institutions also knew the outstanding balances of all of Adelphia's bank debt (as did other lenders participating in the Co-Borrowing and Non-Co-Borrowing Facilities).  All of the Co-Borrowing Lenders regularly received compliance certificates from Adelphia evidencing the true amounts outstanding under Adelphia's credit facilities. | In this classic slide tactic paragraph, Plaintiffs start with general unsupported allegations against a large group of defendants like the Co-Borrowing Lenders; then, Plaintiffs include specific allegations against only a small subset of the larger group — here, Wachovia and BMO; finally, Plaintiffs expand the allegations back out to the larger group in an attempt to make it seem as if the specific knowledge Wachovia and BMO might have had was somehow shared by the Co-Borrowing Lenders.  Not surprisingly, this paragraph also contains a false predicate: there is no allegation that BMO or Wachovia compared the debt owing under each of the facilities to Adelphia's SEC filings, or that they even had a duty to do so. |

# EXHIBIT 2

# ADDITIONAL EXAMPLES OF UNSUPPORTED CONCLUSION PARAGRAPHS CITED BY PLAINTIFFS ON PAGES 77 - 78 OF THE SECOND OPPOSITION

**"Unsupported Conclusion Paragraphs:"**  A paragraph asserting legal conclusions and/or conclusions with no underlying facts.

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Unsupported Conclusion Paragraph |
|---|---|---|
| ¶ 6 | The primary purpose and the plain effect of each of the Co-Borrowing Facilities at issue in this action was to use Adelphia's assets to give the Rigas Family access to billions of dollars that only Adelphia would have the wherewithal to repay, and to ensure that the Rigas Family would continue to manage Adelphia.  The very structure of the Co-Borrowing Facilities — a structure that the Agent Banks and Investment Banks created and approved — provided the principal means by which the Rigas Family's looting could and did occur.  Moreover, the Co-Borrowing Lenders and the Investment Banks actually knew or consciously avoided the fact that the looting occurred as soon as the Co-Borrowing Facilities closed and that it continued thereafter by the Rigas Family's ongoing abuses of those Co-Borrowing Facilities. | Plaintiffs combine tactics here, opening the paragraph with an Unsupported Conclusion that the "purpose" of the credit facilities was to allow fraud, and closing the paragraph with another Unsupported Conclusion that all of the Co-Borrowing Lenders knew of the fraud.  Plaintiffs plead no facts that the CBNA Lenders knew of any fraudulent purpose or use of the credit facilities.  Plaintiffs slide in a Neutral Fact allegation against the Agent and Investment Banks in the middle of the paragraph — that the Agent and Investment Banks created and approved the structure of the facility — but the structure of the credit facility was publicly disclosed in numerous SEC filings and does not support knowledge of any Rigas Family fraud.  These are clearly not "facts" of which this Court should take notice.  *See DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996) (reasoning that there must be "specific facts" supporting Plaintiffs' assertions). |

1

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Unsupported Conclusion Paragraph |
|---|---|---|
| ¶ 9 | Each of the Agent Banks, Investment Banks, and Co-Borrowing Lenders actually knew or consciously avoided the fact that the Rigas Family was using the Co-Borrowing Facilities to defraud Adelphia.  Since well before the closing of the Co-Borrowing Facilities until shortly before Adelphia's bankruptcy filings, many of the Defendants provided significant underwriting, investment banking, advisory and other financial services to Adelphia and the Rigas Family.  As a result of their extensive relationship with Adelphia and the Rigas Family, these Defendants obtained confidential information concerning the financial affairs of Adelphia and the Rigas Family.  In addition, before each of the Co-Borrowing Facilities closed, the Rigas Family disclosed to the Co-Borrowing Lenders and the Investment Banks that hundreds of millions of dollars of the loan proceeds would be used to fund personal expenses and investments of the Rigas Family.  These Defendants knew, or consciously chose to disregard, the intended and actual fraudulent uses of the Co-Borrowing Facilities. | Plaintiffs triple up here, using all three techniques.  Plaintiffs open with an Unsupported Conclusion that *all* Co-Borrowing Lenders knew about the fraud, and then move straight into their slide tactic, by narrowing the group of defendants against whom they make allegations to "many" defendants or "these" defendants and then broadening out the group of defendants again to all Co-Borrowings Lenders in an attempt to slide the allegations made against "many" defendants on to the whole group.  Plaintiffs close this paragraph with an Unsupported Conclusion and a disguised Neutral Fact.  Plaintiffs allege no facts indicating that the CBNA Lenders knew the Rigas Family used the credit facility funds for "personal expenses."  Plaintiffs do allege, in a conclusory fashion, that the Rigas Family told at least some of the Co-Borrowing Lenders, in some credit facilities, that the funds would be used to pay down existing RFE indebtedness, to purchase new cable systems and to purchase stock.  Sec. Am. Compl. ¶¶ 971; 976; 981.  None of these facts supports knowledge of the fraud by the CBNA Lenders. |

2

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Unsupported Conclusion Paragraph |
|---|---|---|
| ¶ 974 | The Rigas Family determined to enter into the UCA/HHC Facility in order to benefit themselves and the RFEs.  The UCA/HHC Facility did not benefit Adelphia.  None of the amounts drawn by, or on behalf of, Hilton Head benefited Adelphia.  The UCA/HHC Lenders knew this. | This paragraph is a blatant example of an Unsupported Conclusion Paragraph.  Plaintiffs state, without *any factual* support whatsoever, that the UCA/HHC Lenders knew that the facility did not benefit Adelphia.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (reasoning that Plaintiffs "must provide 'plausible grounds' for the allegations with '*enough fact* to raise a reasonable expectation that discovery will reveal evidence' to support them") (emphasis added). |
| ¶ 977 | Based on the substantial participation of CCH Lenders that had participated in the UCA/HHC Co-Borrowing Facility, the CCH Lenders also knew that the Rigas Family had been using the proceeds of other co-borrowing loans for fraudulent purposes.  The CCH Lenders knew that the Independent Directors were never advised of such activities. | Plaintiffs do double Unsupported Conclusions here, first alleging that the CCH Lenders knew that the Rigas Family had been using the proceeds of other co-borrowing loans for fraudulent purposes, and then alleging that the CCH Lenders knew that the Independent Directors were not advised of such activities.  Plaintiffs allege no facts supporting the conclusion that the CBNA Lenders knew of any fraud, and no facts that the CBNA Lenders ever knew anything about what the Independent Directors knew or did not know.  Such bald, unsupported assertions should be afforded no weight.  *See Twombly*, 127 S. Ct. at 1965. |

3

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Unsupported Conclusion Paragraph |
|---|---|---|
| ¶ 980 | The Rigas Family determined to enter into the CCH Facility in order to benefit themselves and the RFEs.  The CCH Facility did not benefit Adelphia.  None of the amounts drawn by, or on behalf of, Highland Prestige benefited Adelphia.  The CCH Lenders knew this. | Again, there is no support for the allegation that the CCH Lenders knew that the CCH Facility did not benefit Adelphia.  This is simply not a *factual* allegation. |
| ¶ 986 | The Rigas Family determined to enter into the Olympus Facility in order to benefit themselves and the RFEs.  The Olympus Facility did not benefit Adelphia.  None of the amounts drawn by, or on behalf of, Highland Video and CCT benefited any of the Adelphia entities.  The Olympus Lenders knew this. | And once again, these assertions that all Olympus Lenders knew that Adelphia did not benefit from a legal credit facility it entered into and used are wholly conclusory and unsupported and should be disregarded.  *See Twombly*, 127 S. Ct. at 1965. |
| ¶ 1034 | Upon information and belief, before each of the Co-Borrowing Facilities closed, all of the Co-Borrowing Lenders obtained summaries, reports and other information relating to the CMS.  Thus, Defendants knew of, or consciously avoided, the existence of the CMS, the commingling of funds in the CMS, and the fraudulent use, diversion, and misappropriation by the Rigas Family of funds within the CMS.  In particular, Wachovia, by virtue of its oversight of the CMS, Highland Holdings accounts and other Rigas Family accounts that received transfers from the CMS, knew or consciously avoided the fraudulent nature of the transfers between Adelphia and the RFEs via the CMS. | Here, Plaintiffs allege the unsupported conclusion that the Co-Borrowing Lenders received information about the fraudulent use of the CMS.  However, Plaintiffs make no factual allegations that the CBNA Lenders knew of *any* of the Rigas Family's fraud.<br><br>Plaintiffs double up here, as this paragraph also qualifies as a slide tactic paragraph.  First, Plaintiffs make an unsupported assertion against a large group — here, the Co-Borrowing Lenders.  Then, Plaintiffs make a specific allegation against only a subset of that group — here Wachovia — in an attempt to make it appear that the knowledge Wachovia might have had was somehow shared by all of the Co-Borrowing Lenders. |

4

# EXHIBIT 3

# ADDITIONAL EXAMPLES OF NEUTRAL FACT PARAGRAPHS CITED BY PLAINTIFFS ON PAGES 77 - 78 OF THE SECOND OPPOSITION

**"Neutral Fact Paragraphs:"** Paragraphs asserting facts, but facts which do not support any wrongdoing by the CBNA Lenders.

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
|---|---|---|
| ¶ 972 | Prior to the closing of the UCA/HHC Co-Borrowing Facility, the Rigas Family also disclosed to the UCA/HHC Lenders that the assets of the RFE participating in the facility were disproportionately small compared to those of the UCA/HHC Debtors. Of the 395,000 subscribers owned by the borrowers participating in the UCA/HHC Co-Borrowing Facility, the sole RFE member of the borrowing group, Hilton Head, contributed just 72,000 subscribers, or approximately 18%. | Plaintiffs allege here that the assets of the RFE participating in the UCA/HHC Facility were small compared to the assets of the UCA/HHC Debtors. This fact does not support participation or knowledge of wrongdoing on the part of the CBNA Lenders. This paragraph also shows Plaintiffs' disregard for the factual distinctions of when each Non-Agent Lender purchased debt paper. Plaintiffs make this allegation against all Co-Borrowing Lenders, but it is simply impossible for secondary market purchasers to have received this information "prior to closing." |
| ¶ 973 | As of the Petition Date, Hilton Head, an RFE, had drawn approximately $642 million of the $831 million outstanding under the UCA/HHC Co-Borrowing Facility, or 77% of the amount borrowed. No prudent lender would have lent Hilton Head $642 million (or more) without Adelphia's credit support. The UCA/HHC Lenders knew or consciously avoided the facts, which were readily apparent to them, that the terms of the UCA/HHC Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family stood to benefit enormously from their participation in the UCA/HHC Co-Borrowing | Plaintiffs double up in this paragraph. First, Plaintiffs start with the Neutral Fact that an RFE drew down $642 million of the $831 million facility in a credit facility with joint and several liability among borrowers. Plaintiffs then add an Unsupported Conclusion because there is no support for the "factual" allegation that the CBNA Lenders knew or avoided knowledge of the terms on which Adelphia might have otherwise borrowed money. *See* |

K&E 12714530.6

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
|---|---|---|
| | Facility, at the expense of Adelphia. | *DeJesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d. Cir. 1996) ("conclusory allegations unsupported by factual assertions . . . fail[] even the liberal standard of Rule 12(b)(6)"). |
| ¶ 975 | The Rigas Family advised the CCH Lenders of its intention to use the CCH Co-Borrowing Facility to defraud Adelphia.  The Rigas Family and their cohorts expressly advised the CCH Agent Banks that they intended to use the proceeds from the CCH Co-Borrowing Facility to acquire assets for the personal account of the Rigas Family.  In a written invitation to the CCH Agent Banks to participate in the CCH Co-Borrowing Facility dated February 17, 2000, ACC executive James Brown stated:<br><br>The use of proceeds for this facility will be primarily to fund Adelphia's purchase of the Cleveland, Ohio cable system from Cablevision Systems Corporation ($990 mm), to fund Adelphia's purchase of certain cable assets from Prestige Communications ($700mm) <u>and to fund Rigas families [sic] purchase of certain cable assets from Prestige Communications ($400 mm).</u><br><br>Thus, from the outset, the CCH Agent Banks knew that the Rigas Family intended to draw hundreds of millions of dollars from the facility at closing for the sole benefit of the RFE co-borrower. | Plaintiffs allege that funds would be used to fund (1) Adelphia's purchase of the Cleveland, Ohio cable system, (2) Adelphia's purchase of cable assets from Prestige Communications, and (3) the Rigas Family's purchase of certain cable assets.  These facts do not support knowledge of wrongdoing on the part of the CBNA Lenders.<br><br>Plaintiffs double up here, starting this paragraph with the Unsupported Conclusion that the Rigas Family advised all CCH Lenders of their intent to defraud Adelphia.  The remainder of this paragraph establishes that these facts are actually being alleged against the CCH Agent Banks. |

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
|---|---|---|
| ¶ 976 | Upon information and belief, the Rigas Family also disclosed to each of the other CCH Lenders that (i) the RFE co-borrower was privately owned by the Rigas Family, and (ii) the Rigas Family intended to use a portion of the funds under the CCH Co-Borrowing Facility to fund the Rigas Family's personal acquisition of the Prestige Systems. | These allegations, pleaded on information and belief, are neutral.  There is nothing about the fact that the Rigas Family disclosed that the Borrowers to the facility would use the funds to acquire assets that supports knowledge of fraud by the CBNA Lenders.  These allegations are not indicative of wrongdoing. |
| ¶ 978 | The offering memorandum for the CCH Co-Borrowing Facility that the CCH Agent Banks and their affiliated Investment Banks prepared and circulated to the CCH Lenders after the Independent Directors approved of the facility informed the CCH Lenders that the number of cable subscribers owned by the RFE co-borrower was disproportionately small compared to the number of subscribers owned by the CCH Debtors and patently insufficient to support repayment of the loans.  Of the 1,532,814 subscribers owned by the CCH Co-Borrowing Facility borrowing group, the sole RFE member, Highland Prestige, contributed just 55,831 subscribers, or approximately 3.6% of the total assets supporting the loan. | The allocation of the assets among the jointly and severally obligated Borrowers is a neutral fact that does not support allegations of wrongdoing by the CBNA Lenders. |

3

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
|---|---|---|
| ¶ 979 | Nonetheless, as of the Petition Date, Highland Prestige had drawn approximately $1.66 billion of the $2.48 billion outstanding under the CCH Co-Borrowing Facility, or 67% of the amount borrowed. No prudent lender would have lent Highland Prestige $1.66 billion (or more) without the credit support of Adelphia. The CCH Lenders knew or consciously avoided the facts, which were readily apparent to them, that the terms of the CCH Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that Highland Prestige and the Rigas Family benefited enormously and personally from their participation in the CCH Co-Borrowing Facility, at the expense of Adelphia. | Plaintiffs again double up. First, Plaintiffs start with the Neutral Fact that Highland Prestige drew down $1.66 billion of the $2.48 billion facility in a credit facility in which there was joint and several liability among borrowers. Second, Plaintiffs add an Unsupported Conclusion because there is no support for Plaintiffs' contention that the CBNA Lenders knew or consciously avoided knowledge of terms on which Adelphia might have otherwise borrowed money. *See Twombly*, 127 S. Ct. at 1965 (Plaintiffs must provide "plausible grounds" for the assertions and "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support them.). |
| ¶ 981 | The Rigas Family advised the Olympus Lenders of its intention to use the Olympus Co-Borrowing Facility for its personal benefit. The offering memorandum distributed to the Olympus Lenders specifically stated that: (i) the initial proceeds would be used to pay at least $152 million of indebtedness owed by RFEs, and (ii) the RFEs were privately owned by the Rigas Family. | Alleged knowledge that proceeds from the facility would be used to pay down debt provides no evidence that the Olympus CBNA Lenders had knowledge of fraud. Moreover, the fact that the RFEs were privately owned by the Rigas Family, and the CBNA Lenders knew that, suggests nothing improper. These are simply neutral facts. |

4

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
|---|---|---|
| ¶ 984 | The offering memorandum for the Olympus Co-Borrowing Facility that the Olympus Agent Banks prepared and circulated to the Olympus Lenders (created after the Independent Directors' approval of the facility had been obtained) advised the Olympus Lenders that the number of cable subscribers owned by the RFE co-borrowers was disproportionately small compared to the Olympus Debtors and patently insufficient to support repayment of the loans.  Of the 1,566,847 subscribers contributed to the Olympus Co-Borrowing Facility borrowing group as collateral, the two RFE members of the borrowing group, Highland Video and CCT, contributed just 61,335 subscribers, or approximately 3.9% of the total assets supporting the loan. | Again, these allegations merely show that the number of cable subscribers owned by the RFE co-borrowers was small compared to the Olympus Debtors.  These allegations are not allegations of wrongdoing on the part of the CBNA Lenders. |
| ¶ 985 | Nonetheless, as of the Petition Date, Highland Video and CCT had drawn approximately $751.5 million of the $1.27 billion outstanding under the Olympus Co-Borrowing Facility, or 59% of the amount borrowed.  No prudent lender would have lent Highland Video and CCT $751 million (or more) without Adelphia's credit support. The Olympus Lenders knew or consciously disregarded the facts, which were readily apparent to them, that the terms of the Olympus Co-Borrowing Facility were significantly less favorable to Adelphia than terms that would have been available from third parties in arm's-length transactions, and that the RFEs and the Rigas Family benefited enormously and personally from their participation in the Olympus Co-Borrowing Facility, at the expense of Adelphia. | Plaintiffs again double up.  First, Plaintiffs' "bad fact" that Highland Video and CCT drew down $751.5 million of the $1.27 billion facility is not indicative of wrongdoing, as there was joint and several liability among the borrowers. Moreover, this paragraph is an Unsupported Conclusion Paragraph because there is no support for the "factual" allegation that the CBNA Lenders knew or consciously disregarded knowledge of terms on which Adelphia might otherwise borrowed money. |

5

| Paragraph in the Second Amended Complaint | Text of the Paragraph | Explanation of Neutral Fact Paragraph |
| --- | --- | --- |
| ¶ 1025 | As set forth above, the Rigas Family disclosed to each of the Co-Borrowing Lenders and their affiliated Investment Banks (prior to closing and thereafter), but not to the Independent Directors, that a substantial portion of the proceeds would be used for purposes benefiting solely the Rigas Family and the RFEs.  This disclosure — along with the structure of the Co-Borrowing Facilities, which the Co-Borrowing Lenders and their affiliated Investment Banks had approved and participated in creating — gave Defendants actual notice of the misconduct by the Rigas Family for the reasons set forth above.  And, as more fully described below, many of the Defendants had a much more substantial relationship with Adelphia and the Rigas Family that provided them with significantly more information about the fraud. And breaches of fiduciary duty [sic]. | Plaintiffs obfuscate here, carefully wording their Neutral Fact Paragraph in such a way as to suggest possible wrongdoing when the facts actually plead are neutral.  Plaintiffs state that the Co-Borrowing Lenders knew the Rigas Family would use credit facility proceeds for the Rigas Family's sole benefit.  But Plaintiffs make no factual allegation that the Rigas Family told the CBNA Lenders that the Family would use funds for their "sole benefit."  Instead, the Second Amended Complaint alleges that the Rigas Family told some of the Lenders, in some of the Co-Borrowing Facilities, that the funds would be used to pay down existing RFE indebtedness, to purchase new cable systems and to purchase stock.  Sec. Am. Compl.  ¶¶ 971; 976; 981.  None of these facts are illegal. |

K&E 12714530.6