UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
                                   :
ADELPHIA RECOVERY TRUST,           :
                                   :
                    Plaintiff,     :
                                   :        05 Civ. 9050(LMM)
             v.                    :   MEMORANDUM AND ORDER
                                   :
BANK OF AMERICA, N.A., et al.,     :
                                   :
                    Defendants.    :
                                   :
- - - - - - - - - - - - - - - - - X


McKENNA, D.J.

        Defendants in this action are various lenders, including

Syndicate Lenders,[1] Assignees,[2] the Agent Banks,[3] against whom

---

[1] As alleged in the Amended Complaint, the Syndicate Lenders were banks to which the ART alleges each of the Co-Borrowing Facilities was syndicated and which agreed to lend Adelphia a portion of the total amount to be funded under the Co-Borrowing Facilities. (Adversary Proceeding Amended Complaint ("Amended Complaint" or "Am. Cmpl.") ¶¶ 74-116.) The Syndicate Lenders are identified in ¶¶ 75-116 of the Amended Complaint.

[2] As alleged in ¶¶ 146-791 of the Amended Complaint, Assignees were entities that obtained portions of the Adelphia bank debt after the original issue date pursuant to assignment agreements. The ART alleges that all Assignees included in the Amended Complaint purchased Adelphia bank debt at a discount after the fraud was revealed and therefore "knowingly and voluntarily assumed this risk of disgorgement" when they purchased the debt. (Memorandum of Law in Opposition to the Non-Agent Lender and Nominal Agent Defendants' Motions to Dismiss the Amended Complaint Addressed to Standing and Indemnification Issues Regarding Bankruptcy Claims, March 3, 2008 ("Pl.'s Mem.") p. 8 (citing Am. Cmpl. ¶¶ 153-156).) The ART's demand for relief seeks the return (with interest) of all principal, interest, and fees that the Assignees have received on the Adelphia bank debt that is avoided, disallowed, or subordinated in whole or in part in this action. (Id.) The Assignees are identified in ¶¶ 157-790 of the Amended Complaint.

[3] As alleged in the Amended Complaint, "Agent Banks" were banks that provided services and advice to Adelphia in structuring, arranging and managing the Co-Borrowing Facilities. (Am. Cmpl. ¶ 24.) The Amended Complaint describes the structures of the Co-Borrowing Facilities as follows: "each 'co-borrower' on a loan facility – whether an indirect Adelphia subsidiary or an unaffiliated entity privately owned by the Rigas Family – could borrow the

the plaintiff, the Adelphia Recovery Trust ("ART" or "Plaintiff"), has asserted numerous claims stemming from the Chapter 11 bankruptcy proceedings of Adelphia Communications Corporation ("Adelphia" or "ACC") and affiliated companies (collectively, with Adelphia, the "Debtors").  A large subset of Defendants (collectively, the "Lenders") now moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Counts 1 to 16; 33; 41 to 44; and 49 to 52 of the Adversary Proceeding Amended Complaint (the "Amended Complaint"), comprising the statutory bankruptcy avoidance claims and the equitable subordination and equitable disallowance claim (collectively, the "Bankruptcy Claims").  The Lenders' principal argument is that the ART lacks standing to pursue these claims.

    For the reasons set forth below, the Lenders' motion to dismiss the Bankruptcy Claims in the Amended Complaint is GRANTED.


## I.    Background

### a.    Procedural Background

    This adversary proceeding was commenced in the United States Bankruptcy Court for the Southern District of New York,

---

entire amount of the facility (in the aggregate, up to approximately $5.6 billion) without regard to that co-borrower's ability to repay and with all other co-borrowers being jointly and severally liable to repay the loans." (Am. Cmpl. ¶ 4.)  The Agent Banks are identified in ¶¶ 24-73 of the Amended Complaint.

in the Chapter 11 proceedings relating to Adelphia and affiliated companies, by the Adelphia Creditors' Committee. Pursuant to the First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of its Affiliated Debtors (the "Joint Plan"), confirmed by an Order dated January 5, 2007,[4] title to the claims asserted by the Creditors' Committee has been transferred to Plaintiff Adelphia Recovery Trust ("Plaintiff" or the "ART").

The Creditors' Committee filed its original complaint in this action (the "Original Complaint") on July 6, 2003. Under stipulations approved by the Bankruptcy Court, the movants were not required to respond to the Original Complaint until after the Bankruptcy Court had resolved the motions to dismiss that were filed by other defendants. (See Memorandum of Law in Support of Joint Motion of Various Lenders to Dismiss the Avoidance and Subordination Claims ("Lenders' Joint Mem.") pp. 5-6; Response of Various Lenders to Pl.'s Sur-Reply Memorandum ("Lenders' Response to Sur-Reply") at n.3.) The Bankruptcy judge assigned, Hon. Robert E. Gerber, decided those motions in his Decision and Order of June 11, 2007 (Adv. No. 03-4942 (Bankr. S.D.N.Y.), Docket No. 463, at 10 n.28 ("Bankruptcy Court June 2007 Decision")), granting the motions in part and denying

_____

[4] Order Confirming First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors, dated Jan. 5, 2007.

them in part.  The ART then elected to file the Amended Complaint on October 31, 2007 and agreed that the Lenders should respond in all subsequent motions to the Amended Complaint rather than the Original Complaint.  (Lenders' Joint Mem. pp. 5-6.)

Pursuant to an agreement between the parties, the Lenders have bifurcated their briefing on the motions to dismiss.[5]  The Court here addresses the parties' arguments regarding the Lenders' Motion to Dismiss as to the statutory bankruptcy avoidance claims and claim for equitable subordination.  The parties have filed separate briefs addressing all other issues raised in the Lenders' Motion to Dismiss, and the Court will address those issues at a later date.

**b.   Factual Background**

The 537-page Amended Complaint asserts 57 claims for relief, most of which do not need to be summarized here.[6]

"In general, [Plaintiff] bring[s] this suit against numerous commercial banks and their investment bank affiliates (the 'Defendants'), charging wrongdoing on the part of the Defendants in their dealings with Adelphia's former management, John, Timothy, Michael and James Rigas (the 'Rigases'), and

---

[5] See Stipulation and Order of Feb. 20, 2008 and Stipulation and Order of March 17, 2008.

[6] The Amended Complaint contains a Table of Contents (Am. Cmpl. at i-vii) summarizing the claims.

Rigas family entities ('RFEs'), against whom Adelphia brought suit for the looting of the company."  Bankruptcy Court June 2007 Decision at 1.

i.    **The Bankruptcy Claims**

In the Bankruptcy Claims challenged by the Lenders in this motion, the ART seeks to avoid and recover various amounts of money in loan obligations that were owed by various operating subsidiaries of ACC, referred to in the parties' briefs as the "Obligor Debtors," to the Lenders and other financial institutions (collectively, the "Banks").  The Amended Complaint states that these loan obligations, payments and liens were incurred by the Obligor Debtors in connection with the three Co-Borrowing Facilities.[7]  (Am. Cmpl. ¶¶ 842, n. 9, 879, 880, n.11, 925, 926, n.13, 1516, 1521, 1524, 1532.)  The ART additionally seeks to equitably subordinate the secured claims of the Banks against the Obligor Debtors to the claims of unsecured creditors of Adelphia debtors.  (Am. Cmpl. ¶¶ 1370-1390.)

Included in the Bankruptcy Claims challenged by the Lenders in this motion are the fraudulent transfer claims, which the ART brings pursuant to Sections 544, 548, 550 and 551 of the

---

[7] The Obligor Debtors are differentiated in the Amended Complaint according to the Co-Borrowing Facilities with which each entity was connected; the Obligor Debtors as a group therefore comprise the "UCA/HHC Debtors" or "UCA/HHC Co-Borrowing Debtors" (¶ 842, n. 9); the "CCH Debtors" or "CCH Co-Borrowing Debtors" (¶ 879, n. 11); and the "Olympus Debtors" or "Olympus Co-Borrowing Debtors" (¶ 926, n. 13).

Bankruptcy Code and applicable state law (the "Fraudulent Transfer Claims").  (Am. Cmpl. Counts 1-16 (¶¶ 1079-1250).)  The ART alleges in the Amended Complaint that approximately $3.4 billion in loan proceeds were used by the Rigas family and related entities and not by the Obligor Debtors, and it seeks to avoid and recover the corresponding loan obligations incurred and security interests granted by those Debtors to the Banks in connection with four Adelphia credit facilities: the three Co-Borrowing Facilities (see supra, n.7), including (1) the UCA/HHC Co-Borrowing Facility, (2) the CCH Co-Borrowing Facility, and (3) the Olympus Co-Borrowing Facility; and the Century-TCI Credit Facility.[8]  The ART also seeks a declaratory judgment that the Obligor Debtors are not liable to repay loan obligations under the CCH and Olympus Co-Borrowing Facilities to the extent those obligations are avoidable as fraudulent transfers.  (Am. Cmpl. Counts 41-42 (¶¶ 1452-1463).)

The Lenders additionally challenge the ART's claims pursuant to Sections 547, 550, and 551 of the Bankruptcy Code (the "Preference Claims," and together with the Fraudulent Transfer Claims, the "Avoidance Claims"), in which the ART seeks to avoid and recover certain pre-bankruptcy payments made to the Banks.  Specifically, the ART seeks to avoid and recover

---

[8] See Am. Cmpl. ¶¶ 822, 842, 880, 926, 1082, 1089, 1093, 1099, 1103, 1112, 1118, 1123, 1127, 1134, 1138, 1144, 1148, 1157, 1163, 1168, 1172, 1179, 1183, 1189, 1193, 1202, 1208, 1213, 1217, 1221, 1225, 1230, 1234, 1240, 1244, 1250, identifying and describing the facilities.

approximately $605 million in principal, interest and fees allegedly paid by the Obligor Debtors to the Lenders and other Banks during the 90-day period preceding the Chapter 11 filings. (Am. Cmpl. ¶¶ 1465, 1471, 1509, 1513, 1515, 1521-23, 1529-31.) The ART alleges that the pre-petition payments allowed the Lenders to receive more than they would have received had there been no such pre-petition payments and had the Obligor Debtors instead paid the Lenders' claims in their bankruptcy cases. (Am. Cmpl. ¶¶ 1468, 1474, 1518, 1526, 1534.)

Finally, the Lenders challenge the ART's claim for equitable disallowance of the Lenders' claims against the Obligor Debtors arising from the three Co-Borrowing Facilities (the "Equitable Disallowance claim"), or alternatively, pursuant to Section 510(c) of the Bankruptcy Code, for equitable subordination of these claims to the claims of all other unsecured creditors against any of the Debtors, including ACC and the other debtors at the top of the Adelphia corporate structure (with ACC, the "Parent Debtors"[9]) (the "Equitable Subordination claim").   (Am. Cmpl. ¶ 1390.)

**ii.**   **The Joint Plan and JV Plan (together, the "Plans")**

This motion represents the Court's first occasion to consider the ART's Bankruptcy Claims fully in light of the

---

[9] The "Obligor Debtors" or "Subsidiary Debtors" (see infra, note 12) were operating subsidiaries of the Parent Debtors.

Debtors' two confirmed Chapter 11 plans of reorganization:  the Joint Plan,[10] which addresses loan obligations, payments and liens with respect to the three Co-Borrowing Facilities; and the JV Plan,[11] which addresses loan obligations, security interests and pre-bankruptcy payments with respect to three Non-Co-Borrowing Facilities (together, the "Plans").  Prior motions to dismiss in this case before Judge Gerber and this Court were filed before the confirmation of the Plans, and focused largely on the issue of whether the Obligor Debtors were insolvent at the time they incurred the bank debt.  See Bankruptcy Court June 2007 Decision pp. 10-11.

The Joint Plan defines each of the Obligor Debtor entities as "Subsidiary Debtors"[12] and provides that each Subsidiary Debtor will pay all of its creditors in full with interest. (Joint Plan §§ 5.2(a), (b), (c), (d), (e); 6.2(e); 6.3.)[13]

---

[10] Confirmed by the Bankruptcy Court in January 2007, see supra, note 4.

[11] See Third Modified Fourth Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for the Century-TCI Debtors and Parnassos Debtors, as Confirmed, dated June 28, 2006 (the "JV Plan"), ¶¶ 2.01, 2.03, 2.04, 4.01, 4.02, 4.03, 4.17, 4.18, 4.19, 4.22, 4.23, 4.24.

[12] See Joint Plan Ex. A (defining "Subsidiary Debtor" as the Debtors "listed on Schedule II to the Disclosure Statement; Second Disclosure Statement Supplement Relating to Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain Affiliated Debtors, dated Oct. 16, 2006 ("Second Disclosure Statement Supplement"), at Schedule II (listing 254 Debtors, including each of the Obligor Debtors).

[13] For example, § 5.2(a) of the Joint Plan provides, inter alia, that "Allowed Subsidiary Debtor Priority Claims...shall be Paid in Full in accordance with such reinstated rights [the legal, equitable and contractual rights to which the holders of the Claims are entitled] on the Initial

According to Post-Confirmation Status Reports submitted by the Lenders, the Joint Plan has been implemented in accordance with its terms, and all unsecured claims against the Obligor Debtors entitled to distributions under the Joint Plan have been paid in full, with post-petition interest.  (Third Post-Confirmation Status Report, Ex. A, Exhibit 6 of the Anker Declaration accompanying the Lenders' motion and Joint Mem.)

The Joint Plan treats each Debtor, among both the Subsidiary Debtors and Parent Debtors, as a separate entity, recognizing that each debtor has its own creditors, assets and liabilities.  (Joint Plan § 2.2 (explaining that debtors are grouped together "solely for purposes of describing treatment under the Plan" and that "except as otherwise explicitly provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities.").)  In his decision confirming the Joint Plan, Judge Gerber emphasized the separateness of individual debtors under the plan, and the improbability of any future substantive consolidation of the claims and assets of different entities:  "[C]orporate identities [of each separate Debtor] were maintained, and

---

Distribution Date or the first Subsequent Distribution Date after which such Subsidiary Debtor Priority Claim becomes Allowed."

§ 5.2(b) of the Joint Plan provides, inter alia, that "[e]ach holder of an Allowed Subsidiary Debtor Secured Claim will (A) receive on the Initial Distribution Date...a Cash payment equal to the sum of (1) the principal amount of such holder's Allowed Subsidiary Debtor Secured Claim and (2) accrued postpetition interest...in full satisfaction of such holder's Subsidiary Debtor Secured Claim."

records reflected exactly when and how money was spent, and for
which entity's benefit....[T]he ACC Bondholder Group was plainly
right...that substantive consolidation would be a highly
unlikely result."   In re Adelphia Commc'ns Corp., 368 B.R. 140,
219 (Bankr. S.D.N.Y. 2007).

### iii.   Intercompany Claims[14] under the Joint Plan

Plaintiff ART places great weight in its arguments on the
treatment of Intercompany Claims under the Joint Plan.   (See,
e.g., Memorandum of Law in Opposition to the Non-Agent Lender
and Nominal Agent Defendants' Motions to Dismiss the Amended
Complaint Addressed to Standing and Indemnification Issues
Regarding Bankruptcy Claims, March 3, 2008 ("Pl.'s Mem."), pp.
26-27.)   The terms of the Joint Plan provide that the
Intercompany Claims will be "deemed resolved as a result of the
settlement and compromise embodied in this Plan and therefore
holders thereof shall not be entitled to vote on the Plan, or
receive any Plan Distribution or other allocation of value."
(Joint Plan § 2.3.)   The Joint Plan further provides that
"[p]ursuant to the Global Settlement, holders of Intercompany
claims shall not be entitled to Plan Distributions, as described

---

[14] The Joint Plan defines an Intercompany Claim as "any Claim, Cause of
Action, remedy or Administrative Claim asserted by a Debtor, Debtor Group or
JV Debtor as applicable against another Debtor, Debtor Group or JV Debtor,
including, without limitation, any Claim, Cause of Action, remedy or
Administrative Claim related to or arising under the Inter-Creditor Dispute;
provided that Intercompany Claims shall not include Retained Claims." (Joint
Plan, Ex. A, pp. A-24 – A-25.)

in the Plan, and shall be subject to such findings of fact and conclusions of law as the Bankruptcy Court may make in connection with the entry of the Confirmation Order."  (<u>Id.</u> at § 5.3.)

## II.  Discussion

### a.  <u>Legal Standard Governing Motions to Dismiss</u>

A complaint should be dismissed if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. Proc. 12(b)(6).  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  <u>ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 127 S.Ct. 1955, 1965 (2007)).

"In certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6). Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered."  <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007) (citing <u>Pani v. Empire Blue Cross Blue Shield</u>, 152 F.3d 67, 71 (2d Cir. 1998), <u>cert.</u> <u>denied</u>, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d. 770 (1999)).  <u>See</u> <u>also</u> <u>ATSI Commc'ns</u>, 493 F.3d at 98 (citing <u>Rothman v. Gregor</u>, 220 F.3d 81,

88 (2d Cir. 2000) (In evaluating a 12(b)(6) motion, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.")).

In a bankruptcy-related proceeding, the terms of a confirmed plan of reorganization are binding on parties to the plan and should be considered by a court when deciding a motion to dismiss.  See In re Victory Mkts, Inc., 221 B.R. 298, 303 (2d Cir. BAP 1998) ("[A] confirmed plan holds the status of a binding contract as between the debtor and its creditors....As with any contract, the starting point for review of a plan is its plain language.  Unless some ambiguity is to be found within the plan itself, the Court has no basis to look beyond its text.") (internal citations omitted), aff'd, No. 98-5033, 1999 U.S. App. Lexis 7647 (2d Cir. 1999).  "'Under the Bankruptcy Code, a confirmed plan of reorganization acts like a contract that is binding on all of the parties, debtor and creditors alike.'"  In re Sunbrite Cleaners, 284 B.R. 336 (N.D.N.Y. 2002) (quoting In re Varat Enters., Inc., 81 F.3d 1310, 1317 (4th Cir. 1996)).

b.   **Plaintiff's "Law of the Case" and Res Judicata Arguments**

Plaintiff ART contends that <u>Res Judicata</u> and the "Law of the Case" doctrine bar the Lenders from arguing that the ART lacks standing to prosecute the Avoidance and Equitable Subordination claims because Judge Gerber has addressed these issues in previous decisions. (<u>See</u> Pl.'s Mem., pp. 34-42.)  In so arguing, Plaintiff relies in part on Judge Gerber's decision of August 30, 2005, which held that the ACC had standing to pursue the claims in the Original Complaint on behalf of, and together with, Adelphia.  <u>See</u> <u>In re Adelphia Commc'ns Corp. v. Bank of America, et al.</u>, 330 B.R. 364 (Bankr. S.D.N.Y. 2005) (the "Standing Decision").  However, Judge Gerber's Standing Decision, issued over a year prior to the confirmation of the Joint Plan, addressed the question of which party – the Debtors or the Creditors' Committee – would be authorized to prosecute any claims on behalf of the Debtors' estates; Judge Gerber did not reach the question of whether the Creditors' Committee had standing to prosecute specific claims or of how the Plans' provisions would affect these standing questions.  <u>Id.</u>

Plaintiff additionally relies on Judge Gerber's June 2007 Decision, in which Judge Gerber sustained many of the ART's claims, including the Bankruptcy Claims at issue here, on the grounds that the ART had adequately pled that the Obligor Debtors were insolvent or inadequately capitalized at the time

13

that they incurred the bank debt.  Bankruptcy Court June 2007
Decision, p. 9.  Plaintiff argues that Judge Gerber was fully
aware at the time of the June 2007 Decision of the terms of the
Joint Plan that Lenders argue provided for payment in full of
the creditors of the Obligor Debtors, both due to Judge Gerber's
involvement in the Plans' confirmation and the briefs that the
Lenders submitted at that time, in which they presented
arguments analogous to those they present here.  (See
Plaintiff's Sur-Reply Memorandum in Further Opposition to the
Non-Agent Lender Defendants' Motions to Dismiss ("Pl.'s Sur-
Reply Mem.") pp. 2-7.)  Plaintiff also argues that Judge Gerber
explicitly addressed and rejected the arguments that the Lenders
present here, finding that they presented issues of fact not
appropriate for resolution on a 12(b)(6) motion.  (Id. at 5-7.)

        The ART's arguments are incomplete in their analysis of
Judge Gerber's decision and the relevance of the Joint Plan to
his reasoning.  First, Judge Gerber's decision on Plaintiff's
fraudulent transfer claims focused primarily on the question of
whether Plaintiff had adequately pled that the Obligor Debtors
were insolvent at the time of the transfers cited as the basis
for the claims.  Bankruptcy Court June 2007 Decision, p. 10.  As
Judge Gerber himself observed, this is a separate issue from the
question of whether the payments to creditors effected by the
Joint Plan impact the ART's standing to bring these claims.

14

(Id. at p. 10 n.28, discussed infra.)  The Lenders' arguments in
the instant motion, in contrast, focus primarily on the question
of whether the ART has standing to bring the Bankruptcy Claims
if recovery would benefit none of the creditors of the Obligor
Debtors when these creditors have been paid in full under the
terms of the Joint Plan.  (See, e.g., Lenders' Joint Mem., pp.
4-5.)

        Furthermore, Judge Gerber was not in a position to consider
fully the provisions of the Joint Plan with respect to the
12(b)(6) motions before him at the time of his June 2007
Decision because those motions had been filed prior to the
confirmation of the Plans.  Judge Gerber acknowledged that the
payments under the Joint Plan would have important implications
for future motions, observing that "under the Debtors' recently
confirmed (and now effective) reorganization plan, ... many
unsecured creditor classes (including many classes of creditors
of obligors in the co-borrowing facilities) received payment of
their principal and interest in full," and that the legal
sufficiency of the fraudulent transfer claims therefore "will
require serious consideration in future proceedings."
Bankruptcy Court June 2007 Decision, p. 10 n.28.

        As previously noted, a confirmed plan of reorganization is
a contract to be interpreted by the court, and is appropriate
for consideration on a motion to dismiss.  The Confirmed Plans

15

are properly before this Court and are appropriate for
consideration according to principles of contract law in this
Court's analysis of the standing issues raised in the instant
motions.  See, e.g., In re Victory Mkts, Inc., 221 B.R. at 303;
In re Sunbrite Cleaners, 284 B.R. 336 (discussed supra, p. 12).

     The Court agrees with the Lenders that the grounds for
Judge Gerber's Standing Decision and June 2007 Decision on the
Motions to Dismiss the Original Complaint addressed different
issues than those raised in the instant motion and do not
operate to bar the Lenders' arguments here.  The intervening
payment-in-full effected by the confirmed Plans for many classes
of unsecured creditors (including all of the Obligor Debtors'
creditors) provides a new and independent legal basis for the
motion to dismiss currently before the Court.

     Further, this Court's January 2008 decision on
Interlocutory Appeal from the Bankruptcy Court's June 2007
Decision did not reach the issues presented here in upholding
the ART's Article III standing to assert a claim for aiding and
abetting a breach of fiduciary duty.  See Adelphia Recovery
Trust v. Bank of America, et al., 2008 WL 217057 (S.D.N.Y., Jan.
17, 2008) (the "Appeal Decision").  In the Appeal Decision, this
Court found, inter alia, that Pennsylvania law, the relevant
authority, permits a debtor to bring this type of claim on its
own behalf, irrespective of the rights or claims of creditors,

shareholders, or others.  Id. at 8-11.  The Court's decision has no preclusive effect on the arguments presented here, since the issue now before the Court – whether the payment-in-full of creditors of the Obligor Debtors under the Plans destroys the ART's standing to bring the Avoidance and Equitable Subordination claims on behalf of the Obligor Debtors – is entirely different from that addressed in the Appeal Decision. Furthermore, as was true of Judge Gerber in his June 2007 Decision, this Court was not at liberty in its Appeal Decision to consider the effect of the Plans' payouts on the ART's standing to bring claims on behalf of the Obligor Debtors due to the timing of the motions then before this Court on appeal.

This Court's September 2007 decision granting the ART leave to appeal under 28 U.S.C. § 158(3)(a) from some of Judge Gerber's determinations in his June 2007 Decision is equally devoid of preclusive effect; it represented this Court's discretionary grant of leave to appeal, and not a consideration of the merits of any claim.  See Adelphia Recovery Trust v. Bank of America, et al., 2007 WL 2585065 (S.D.N.Y. Sept. 5, 2007).

c.   **Plaintiff's Judicial Estoppel Argument**

Plaintiff ART further argues that the Lenders are judicially estopped from challenging Plaintiff's standing because this challenge contradicts the positions that the Lenders asserted in the Plans' confirmation proceedings, as well

17

as the terms of the plans themselves.  (Pl.'s Mem. pp. 42-44.)
Judicial estoppel applies where: (i) a party advances a position
inconsistent with one it advanced in a prior proceeding; and
(ii) the prior position was adopted by a court "in some matter."
Peralta v. Vasquez, 467 F.3d 98, 105 (2d Cir. 2006) (internal
citations omitted).  Plaintiff points to the provisions in the
Joint Plan for disgorgement of any payments to "defendants"
under the Plan in the event of a compromise and settlement or
judgment in a Bank Action that result in an "Excess Amount"[15] of
payments to a defendant; Plaintiff argues that the Lenders
contradict the intent of these provisions by challenging
Plaintiff's standing to bring the Bankruptcy Claims on the basis
of the Plan's payout provisions.

     The Court is unconvinced by Plaintiff's argument that the
language of the Joint Plan itself precludes the Lenders from
contesting the ART's standing to bring these claims.  (Pl.'s
Mem. pp. 38-42.)  Sections 5.2(c)(iv) and (v) speak of possible
disgorgement of payments to "defendants" and not third party
creditors, such as the creditors of the Obligor Debtors, whose
payouts under the Joint Plan provide the basis for the Lenders'
standing challenge.  (Joint Plan, §§ 5.2(c)(iv) and (v).)
Moreover, these disgorgement provisions express the Joint Plan's

---

[15] "Excess Amount" is defined as an amount greater than that to which such
defendant would have been entitled had such Disgorgement Order been enforced
prior to the Effective Date.  (Joint Plan, § 5.2(c)(iv).)

aim of preventing duplicative payments in the interplay between the Joint Plan and the ongoing Bank Actions.  The Joint Plan provides for disgorgement of plan payouts to defendants should their recovery in the Bank Actions be in any way duplicative of these payouts, but these disgorgement provisions do not impact the question of whether Plaintiff may bring an avoidance claim where Plaintiff's recovery on the claim would be duplicative of a payout under the Plan or where recovery on the claim would fail to benefit the creditors on whose behalf the claim is asserted.  (Id.)

Additionally, while it is true that the Joint Plan gives title to the ART of any causes of action the Debtors may have against the Lenders, it is also true that the Joint Plan explicitly preserves the Lenders' rights to assert any defenses that they may have to those causes of action.  The Joint Plan provides that "Defensive Claims shall be fully preserved and may be asserted in response to the Bank Actions...."  (Joint Plan § 9.2(b).)

Plaintiff ART has also failed to point to an instance in a prior proceeding in which the Lenders waived their defenses to claims asserted in the Bank Actions.

Both the ART and the Lenders agree that the Plans are "litigation neutral", both transferring title to certain causes of action to the ART and preserving the Lenders' rights to

assert defenses in the Bank Actions.   (Pl.'s Mem. p. 30; Reply
Brief in Support of Joint Motion of Various Lenders to Dismiss
the Avoidance and Subordination Claims ("Lenders' Joint Reply
Mem.") p. 30.)   Moreover, the distributions at issue here -
payouts to creditors of the Obligor Debtors - are not made
contingent on the outcome of any litigation, and the Court
agrees with the Lenders that nothing in the Plans prohibits the
Lenders from challenging the ART's standing to assert particular
claims based on the Plans' distributions.   Stated another way,
it is proper for this Court to consider the Plans' distributions
in evaluating the instant challenge to the ART's standing.

**d.   The Avoidance Claims**

The Lenders argue that the Avoidance Claims, as well as the
Equitable Subordination Claim, should be dismissed because under
the terms of the Joint Plan, all of the creditors of the Obligor
Debtors have been paid in full, and recovery on the Bankruptcy
Claims would therefore benefit none of the Obligor Debtor's
creditors.   The Lenders assert that the only parties who would
benefit from recovery by the ART in light of the execution of
the Plans' provisions are the creditors and shareholders of the
Parent Debtors, who are separate and distinct from the Obligor
Debtors.   See supra, pp. 5 (defining Obligor Debtors), 9-10.   As
a result, the Lenders contend, any recovery by the ART on the
Avoidance Claims at issue here, including the Fraudulent

Transfer Claims and Preference Claims, would benefit only the estate represented by the ART and not the creditors of the Obligor Debtors.

i. **The Fraudulent Transfer Claims (Counts 1 to 16, 41, and 42 of the Amended Complaint)**

The ART brings Fraudulent Transfer Claims under §§ 544, 548, 550 and 551 of the Bankruptcy Code.

Section 544(b) incorporates state fraudulent conveyance law, providing that:

> [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable under section 502(e) of this title.

11 U.S.C. § 544(b).  The Lenders note in their brief that of the five states that the ART alleges are applicable with respect to the ART's fraudulent conveyance claims (see, e.g., Am. Cmpl. ¶¶ 1156, 1167, 1239, 1249) - Pennsylvania, Texas, Illinois, North Carolina, and New York - the fraudulent conveyance laws of each clearly provide that only an unpaid creditor may avoid a transaction, and then only to the extent necessary to satisfy that creditor's claim.[16]  (Lenders' Joint Mem. p. 20.)

---

[16] The Lenders assert that these laws are all variations on the Uniform Fraudulent Transfer Act ("UFTA") or the Uniform Fraudulent Conveyance Act, whose declared purpose is "to protect unsecured creditors against transfers and obligations injurious to their rights." Unif. Fraudulent Transfer Act § 1 (1984), cmt. 3.

Interpreting these state statutes, courts in the five states
have held that a fraudulent conveyance action may be maintained
only by, and thus only for the benefit of, an unpaid creditor of
the debtor that made the transfer or incurred the obligation
sought to be avoided.[17]

---

For example, under Pennsylvania statute, "[i]n an action for relief against
a transfer or obligation under this chapter, **a creditor**...may
obtain…[a]voidance of the transfer or obligation **to the extent necessary to
satisfy the creditor's claim**."  12 Pa. Cons. Stat. Ann. § 5107(a)(emphasis
added).

Under New York statute, "[w]here a conveyance or obligation is fraudulent **as
to a creditor**, **such creditor**...may...[h]ave the conveyance set aside or
obligation annulled **to the extent necessary to satisfy his claim**[.]" N.Y.
Debt. & Creditor Law § 278(a)(emphasis added).

[17] For example, Pennsylvania's version of the UFTA "grants remedies only to
creditors," Phillips v. Selig, No. 1550, 2001 WL 1807951, at *7 (Pa. Comm.
Pl. Sept. 19, 2001), and "is designed to protect creditors from debtors."
Bell v. Wyatt, No. 3225, 2005 WL 1522015, at *1 (Pa. Comm. Pl. Jun. 23,
2005), aff'd 903 A.2d 39 (Pa. Super. 2006).

The purpose of New York's fraudulent conveyance law "is...to aid specific
creditors who have been defrauded by the transfer of a debtor's property."
HBE Leasing Corp. v. Frank, 48 F.3d 623, 634 (2d Cir. 1995).  "[O]nly
creditors of the transferor are entitled to assert claims under [New York
law] for fraudulent conveyances."  Lippe v. Bairnco Corp., 225 B.R. 846, 857
(S.D.N.Y. 1998).

The Lenders cite similar authority from Texas, Illinois, and North Carolina
state courts.  (See Lenders' Joint Mem. pp. 21-22.)

Section 548[18] focuses on transfers and obligations and permits a trustee of a debtor to avoid transactions made with the intent to hinder, delay or defraud a past or future creditor, as well as certain transfers made for less than reasonably equivalent consideration "if the debtor was or thereby becomes insolvent, was engaged in business with an unreasonably small capital, or intended to incur debts that would be beyond his ability to repay."  S. Rep. No. 95-989 (1978).

The Lenders cite two Second Circuit cases, <u>Whiteford Plastics Co. v. Chase National Bank</u>, 179 F.2d 582 (2d Cir. 1950), and <u>Vintero Corp. v. Corporacion Venezolana De Fomento</u> (<u>In re Vintero Corp</u>.), 735 F.2d 740 (2d Cir.), <u>cert.</u> <u>denied</u>, 469 U.S. 1087 (1984), for the proposition that an obligation or

---

[18] Section 548 provides in part:

**§ 548.  Fraudulent transfers and obligations**

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor...if the debtor voluntarily or involuntarily—
    (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became...indebted; or
    (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
        (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
            (II) was engaged in business or a transaction...for which any property remaining with the debtor was an unreasonably small capital; or
            (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1).

transfer cannot be avoided as a fraudulent transfer or preference under sections 544, 547 and 548 of the Bankruptcy Code when doing so would not benefit any creditor of the particular debtor that incurred the obligation or made the transfer.  (Lenders' Joint Mem. pp. 18-20.)  Following this principle, the Lenders argue, requires this Court to dismiss Plaintiff's avoidance claims, which involve obligations and transfers of the Obligor Debtors, because recovery on the avoidance claims would not benefit the creditors of the Obligor Debtors, who have been paid in full with interest under the terms of the Joint Plan.  (Id.; See also Joint Plan ¶¶ 5.2(a), (b), (c), (d), (e); 6.2(e); 6.3.)

     In Whiteford Plastics, the Second Circuit refused to allow a debtor to avoid a defectively recorded lien under Section 70(c) of the former Bankruptcy Act, the precursor to Section 544(a) of the Bankruptcy Code, because doing so would have benefited only the debtor and not the unsecured creditors of the debtor, who would have received no distribution from the avoidance under the terms of the debtor's confirmed plan.  179 F.2d at 584.  The court noted that the debtor "had never contributed or offered to contribute this value [the voided lien] to the plan" but rather sought "to obtain it purely for its own benefit."  Id.  The court observed that:

> 'It would be a mockery of justice to say that the
> alleged bankrupt may claim through and in the
> right of creditors whose debts have been paid and
> discharged; that he may avoid a transaction,
> valid as to himself but voidable as to creditors,
> in the right of non-existing creditors.'

Id. (quoting In re J.C. Winship Co., 120 F. 93, 96 (7th Cir.
1903)).

In Vintero, decided nearly three decades after Whiteford
Plastics, the Second Circuit held that a Chapter 11 debtor had
the right to avoid an unperfected security interest only to the
extent that such avoidance benefited third party creditors, but
that the avoided security interest would remain fully
enforceable against the debtor itself.  735 F.2d 740.  Citing
the reasoning of Whiteford Plastics, the Vintero Court
explained:

> Vintero [the debtor] was given the right to avoid
> CVF's security interest in order to protect such
> third parties, not to create a windfall for
> Vintero itself.... To the extent that other
> creditors of Vintero are not affected adversely
> by enforcement of CVF's security interest, there
> is no reason why such interest should not be
> enforced.

735 F.2d at 742 (internal citations omitted).

The ART argues that Whiteford Plastics and Vintero do not
apply to the instant case because both decisions preceded the
enactment of the current Bankruptcy Code, and interpreted the
avoidance provisions (§ 70c) of the older Bankruptcy Act, the
predecessor to § 544 of the Bankruptcy Code.  (Pl.'s Mem. p. 59,

n.42.)  However, the ART has failed to point to any substantive differences between the old and new avoidance provisions that would render this case law inapplicable to the instant case.

As the Lenders note in their brief, the Second Circuit's reasoning in Whiteford Plastics and Vintero accords with the interpretations of §§ 544 and 548 of the Bankruptcy Code, as stated in treatises, legislative history and Second Circuit bankruptcy court opinions.  (Lenders' Joint Mem. pp. 22-24.) "The purpose of the trustee's strong-arm powers under § 544 is to vindicate the rights of creditors as a group."  DOUGLAS G. BAIRD, THE ELEMENTS OF BANKRUPTCY 100 (Found. Press 1992).

The legislative history of the current Bankruptcy Code indicates that Congress intended no substantive changes in enacting the new § 544 to replace the old § 70c.  See S. Rep. No. 95-989 (1978) ("Subsection (a) [of § 544] is the 'strong arm clause' of current law, now found in Bankruptcy Act § 70c...."); see also 5 COLLIER ON BANKRUPTCY ¶ 544.LH[1] (Alan N. Resnick et al. eds., 15th ed. Rev. 2007) (explaining that Congress re-enacted § 70c as § 544(a) of the Bankruptcy Code).

Furthermore, as this Court has noted, rules of statutory construction dictate that courts "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure."  Appeal Decision p. 21 and p. 21, n.14.

Bankruptcy courts in this circuit have repeatedly interpreted §§ 544 and 548 in line with Whiteford Plastics and Vintero, holding that the Bankruptcy Code's avoidance provisions can only be asserted to benefit a creditor of the debtor in question.  "[A] transaction can be avoided under section 544(b) only to the extent the avoidance benefits unsecured creditors." In re Crowthers McCall Pattern, Inc., 120 B.R. 279, 288 (Bankr. S.D.N.Y. 1990) (citing Collier on Bankruptcy, ¶ 544.03 (15th ed. 1989); Whiteford Plastics, 179 F.2d at 584).  "[I]t is well settled in the Second Circuit, that avoiding powers may be exercised by a debtor in possession only for the benefit of creditors, and not for the benefit of the debtor itself."  In re Liggett, 118 B.R. 219, 222 (Bankr. S.D.N.Y. 1990) (citing Whiteford Plastics and Vintero).  The court in In re Murphy, 331 B.R. 107 (Bankr. S.D.N.Y. 2005), emphasized the goal of respecting state law inherent in the narrow interpretation of the Bankruptcy Code's fraudulent conveyance provisions permitting avoidance only for the benefit of creditors:

> Given the important principle that bankruptcy courts should recognize state law to the extent that it does not conflict with federal interests and Section 548's limited purpose as a fraudulent conveyance law, the trustee in this case has the right to avoid the transfer of the Property as fraudulent but only to the extent necessary to satisfy allowed prepetition and administrative creditor claims, i.e., those legally harmed by the transfer.

331 B.R. at 126.

* * *

The constitution limits a federal court's jurisdiction to actual cases or controversies.  See, e.g., Raines v. Byrd, 521 U.S. 811, 818 (1997).  To establish the existence of an actual case or controversy sufficing to create federal court jurisdiction, a litigant "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." DaimlerChrysler Corp. v. Cuno, 126 S.Ct. 1854, 1861 (2006) (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).

It is clear from the Joint Plan's provisions that all of the creditors of the Obligor Debtors have been paid in full. See supra, pp. 7-10.  Under the principles of federal jurisdiction, a party does not have standing to sue where the party is not able to allege an injury that is likely to be redressed by the relief sought.  See DaimlerChrysler Corp., 126 S.Ct. at 1861.  Given that the creditors of the Obligor Debtors have received full payment with interest under the Plans, it follows that these creditors do not stand to benefit from recovery on the Bankruptcy Claims at issue here, and the ART does not have standing to bring these claims on their behalf.

The ART argues that an indirect benefit to the creditors by way of a more financially sound estate could suffice to provide

28

the necessary benefit (see Pl.'s Mem. pp. 47-55), but none of the payouts to the Obligor Debtors' creditors included shares in the ART, according to the terms of the Joint Plans, so there is no apparent benefit that the creditors would accrue from the ART's recovery.  (Joint Plan §§ 5.2(a), (b), (c), (d), (e); 6.2(e); 6.3.)

The ART's argument that there are unpaid Intercompany Claims that survive under the Joint Plan and are a means by which recovery on the Bankruptcy Claims would benefit the Obligor Debtors' creditors is also unconvincing.  (See Pl.'s Mem. pp. 26-28.)  The plain language of the relevant sections of the Joint Plan, quoted above, makes clear that the Intercompany Claims are resolved under the Plan and do not remain contested issues in the ongoing Bank litigation.  As discussed supra, at pages 11-12, the terms of the confirmed Joint Plan are a proper subject for consideration and interpretation by this Court in addressing the instant motions; the ART's argument, repeated throughout their brief, that questions regarding the Plans' terms constitute triable issues of fact and are not subject to interpretation by this Court is incorrect.

The treatment of Intercompany Claims under the Joint Plan is further clarified by Judge Gerber's Confirmation Decision of January 3, 2007, In re Adelphia Communications Corp., 368 B.R. 140 (Bankr. S.D.N.Y. 2007) ("Confirmation Decision"), the

content of which is binding on the parties to the Joint Plan
under the language of § 5.3 of the Joint Plan.  Section 5.3
states, <u>inter alia</u>, that "holders of Intercompany Claims...shall
be subject to such findings of fact and conclusions of law as
the Bankruptcy Court may make in connection with the entry of
the Confirmation Order."  In the Confirmation Decision, Judge
Gerber describes the Intercompany Claims as a longstanding point
of dispute in the Joint Plan negotiations, primarily pursued by
creditors of ACC, the ultimate holding company, and opposed by
creditors of Arahova and other lower-level holding-company
Parent Debtors.  Confirmation Decision at 157-58; 161-62.  Judge
Gerber states in the Confirmation Decision that the Joint Plan
"has as its cornerstone a settlement...of intercreditor disputes
that have plagued the Adelphia cases for years (and that, if not
settled, would continue to do so)."  <u>Id.</u> at 147; <u>see also id.</u> at
244-45.

     The ACC Bondholder's Group objected to the confirmation of
the Joint Plan on the ground that the Plan was "eliminating
[the] Intercompany Claims" and "strip[ping] value from the ACC
Noteholders and reduce[ing] their recovery."[19]  Additionally,
the Lenders note in their brief that the Creditors' Committee,
in opposing the ACC Bondholder's Group's objections to the Joint

---

[19] ACC Bondholder Group's Objection to Approval of the Global Settlement and
Confirmation of the Fifth Am. Joint Chapter 11 Plan, Chapter 11 Docket No.
12538, dated Nov. 24, 2006, at 2-3, 5.

Plan, did not suggest that the Intercompany Claims would survive
in the confirmed Joint Plan.  (Lenders' Joint Reply Mem., pp.
19-20 (citing Mem. Law Supp. Confirmation Fifth Amended Joint
Chapter 11 Plan, Ch. 11 Docket No. 12662, at 107 n.121, 109,
dated Dec. 4, 2006 (filed by the Debtors and the Official Cmtee
of Unsecured Creditors), Ex. 3 to the Anker Decl.).)

    The ART argues that in describing the Intercompany Claims
as "deemed resolved" as opposed to "released," a term applied to
other claims, the Joint Plan preserves the Intercompany Claims
for resolution in the Bank Actions.  (Pl.'s Mem. pp. 26-28.)
However, given Judge Gerber's characterization of the Joint
Plan's treatment of these claims in his Confirmation Decision,
the two sides' characterizations in their briefs prior to
confirmation, and the lack of any wording in the Joint Plan
backing the ART's interpretation of this provision, the Court
finds the ART's arguments unpersuasive.

    As in its Res Judicata and Judicial Estoppel arguments,
Plaintiff attempts to argue with respect to the Intercompany
Claims that the Joint Plan's "litigation neutral" character
prevents the Lenders from citing any plan provisions as the
basis for challenging Plaintiff's standing to bring particular
claims in the Amended Complaint.  (See, e.g., Pl.'s Mem. pp. 37-
38.)  However, as previously discussed, it is entirely
appropriate for this Court to consider the effect of the

Confirmed Plans in evaluating the instant standing challenges,
and the Plans' "litigation neutral" character impairs neither
the Plaintiff's right to bring these claims nor the Defendants'
right to present defenses to the claims.

The ART additionally argues that there are unpaid veil-
piercing claims asserted by the bondholders of ACC and Arahova
(both Parent Debtors) against the Obligor Debtors, and that
these are a further means by which the Obligor Debtors'
creditors would benefit from recovery on these claims.  (Pl.'s
Mem. at 18-19 & n.19, 47.)  However, as the Lenders note in
their brief, these claims have been disallowed by Section 11.4
of the Joint Plan[20] and by a separate final order by Judge
Gerber, approving stipulations between the Indenture Trustees
for the ACC and Arahova bond debt and the Adelphia Debtors and
disallowing all of the Veil-Piercing Claims in full.[21]  (See
Lenders' Joint Reply Mem. p. 23.)  The Court therefore finds

---

[20] Section 11.4 of the Joint Plan provides:

**11.4  Deemed Disallowance**

...Claims(including Claims filed against any of the JV Debtors) filed by an
Indenture Trustee [defined to include the ACC and Arahova indenture
trustees] for tort or other claims, other than claims for principal,
interest, fees and expenses against the issuer(s) and guarantor(s) of the
respective debt securities under the Indenture(s) under which the Indenture
Trustee serves, shall be deemed *Disallowed*.

[21] See Stipulation and Agreed Order Regarding Claims Filed by Law Debenture
Trust Company of New York as Trustee for ACC Senior Notes, Jan. 12, 2007,
Ch. 11 Docket No. 13053, ¶ 2; Stipulation and Agreed Order Regarding Claims
Filed by U.S. Bank National Association as Trustee for Arahova Notes,
FrontierVision Opco Notes, and FrontierVision Holdco Notes, Jan. 12, 2007,
Ch. 11 Docket No. 13051, ¶ 4.

that the veil-piercing claims do not provide a means by which
Plaintiff can assert that the Obligor Debtors' creditors would
benefit from the ART's recovery on the Bankruptcy Claims.

The ART also argues in its brief that the Lenders'
interpretation of §§ 544 and 548 of the Code wrongly applies §
550's "benefit of the estate" language to these other sections,
and that, in any case, the Lenders interpret § 550's "benefit of
the estate" language too narrowly.  (Pl.'s Mem. pp. 47-55.)
However, the Court agrees with the Lenders that the cases they
cite interpreting § 70c of the Bankruptcy Act, and by extension,
§§ 544 and 548 of the Bankruptcy Code, Whiteford Plastics,
Vintero, and their progeny, interpret § 70c Bankruptcy Act and
§§ 544 and 548 of the Code independently of § 550, without
reference to § 550's "benefit of the estate" requirement.

Moreover, even the broad interpretation of § 550's "benefit
of the estate" language put forward by the ART in their cited
cases does not extend to encompass the instant case.  As
discussed supra, at pages 7-10 and 28, the terms of the Joint
Plan indicate that no creditors of the Obligor Debtors, the
specific debtors whose transfers and obligations the ART seeks
to avoid, would benefit from recovery on these claims, as all
creditors have been paid in full with interest under the Plans,
and no creditors have been issued shares of the ART.  It is
therefore impossible to see how any recovery by the ART could

result in any benefit, direct or indirect, to the creditors of the Obligor Debtors.

The Court finds as a matter of law that the terms of the Plans establish that all creditors of the Obligor Debtors have been paid in full and would not benefit from the ART's recovery on the Fraudulent Transfer Claims under the facts alleged in the Amended Complaint, and that the ART therefore lacks standing to assert these claims. Lenders' motion to dismiss the Amended Complaint is therefore GRANTED as to the Fraudulent Transfer Claims.

## ii.   **The Preference Claims (Counts 43, 44, and 49 to 52)**

The ART also brings the Preference Claims under §§ 547, 550 and 551 of the Bankruptcy Code, alleging in the Amended Complaint that it is entitled to avoid and recover approximately $605 million in principal, interest and fees allegedly paid by the Obligor Debtors to the Lenders and other Banks during the 90-day period preceding the Chapter 11 filings. (Am. Cmpl. ¶¶ 1465, 1471, 1509, 1513, 1515, 1521-23, 1529-31.)

Section 547 permits a trustee to avoid a pre-petition payment or other transfer by a debtor to a creditor as a "preference" if the transfer allowed the creditor to receive more than it would have received had the payment not been made and the debtor had instead paid the creditor's claim through the bankruptcy process. The section provides in part:

(b) Except as provided in subsection (c) of this section, **the trustee may avoid any transfer of an interest of the debtor in property –**
(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent;
...; and
**(5) that enables such creditor to receive more than such creditor would receive if—**
**(A) the case were a case under chapter 7 of this title;**
**(B) the transfer had not been made; and**
**(C) such creditor received payment of such debt to the extent provided by the provisions of this title.**

11 U.S.C. § 547 (2004) (emphasis added).  The language of the statute therefore indicates a concern with pre-bankruptcy transfers made in such a way as to advantage one creditor over other creditors in the bankruptcy estate.

The legislative history of § 547 also emphasizes that a goal of the preference provisions is to facilitate "the prime bankruptcy policy of equality of distribution among creditors of the debtor."  H.R. Rep. No. 95-595, at 177-78 (1977).  Given this objective, it is illogical for a debtor to be permitted to invoke § 547 if its creditors have all been paid in full.

As discussed, supra at pages 7-10 and 28, the terms of the Joint Plan, which have been executed, provide for all creditors of the Obligor Debtors to be paid in full with interest; the ART cannot therefore argue that any individual creditor has received preferential treatment under the meaning of § 547.  The Lenders

35

observe that in light of the payment-in-full to creditors of the Obligor Debtors under the Joint Plan, recovery by the debtor under § 547 would have a completely circular result: "[s]ince all other creditors would have already been paid in full..., the debtor would be required to pay back the avoided and recovered payment to the same party surrendering the preference in satisfaction of that party's claim under Section 502(h)." (Lenders' Joint Mem. p. 26. (citing In re Enron Creditors Recovery Corp., 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007)).)

As with Plaintiff's Fraudulent Transfer Claims, the Court finds that the ART lacks standing to assert the Preference Claims, as the terms of the Plans establish as a matter of law that the creditors of the Obligor Debtors have been paid in full and do not stand to benefit from the ART's recovery on these claims under the facts alleged in the Amended Complaint.  The Lenders' motion to dismiss the Amended Complaint is therefore GRANTED as to Plaintiff's Preference Claims.

**e.   The Equitable Subordination and Equitable Disallowance Claims (Count 33)**

Finally, the Lenders challenge the ART's claim for equitable disallowance of the Co-Borrowing Lenders' claims against the Obligor Debtors, or, in the alternative, for equitable subordination of the Co-Borrowing Lenders' claims, pursuant to Section 510(c) of the Bankruptcy Code, to the claims

36

of all other unsecured creditors against any of the Debtors,
including ACC and the other Parent Debtors.  (See Am. Cmpl. ¶
1390.)

### i.  **Equitable Subordination**

Section 510(c) of the Bankruptcy Code states:

> [A]fter notice and a hearing, the court may –
> (1) under principles of equitable subordination,
> subordinate for purposes of distribution all or
> part of an allowed claim to all or part of
> another allowed claim or all or part of an
> allowed interest to all or part of another
> allowed interest....

11 U.S.C. § 510(c).  The statute's distinction between "claims"
and "interests" corresponds to the distinction between creditors
and equity holders.  See 7 COLLIER ON BANKRUPTCY ¶ 1122.03[2] (Alan
N. Resnick et al. eds., 15th ed. Rev. 2007).  The plain language
and legislative history of § 510(c) indicate that a claim may be
subordinated to another claim and an interest may be
subordinated to another interest under court-developed
principles of equitable subordination.  See 1984 U.S. Code Cong.
and Adm. News, p. 576.

"The purpose of equitable subordination is to undo
wrongdoing by an individual creditor in the interest of the
other creditors."  In re AppliedTheory Corp., 345 B.R. 56,
59 (S.D.N.Y. 2006) (citing In re Lockwood, 14 B.R. 374, 380-81
(Bankr. E.D.N.Y. 1981) ("The fundamental aim of equitable
subordination is to undo or offset any inequality in the claim

position of a creditor that will produce injustice or unfairness to other creditors in terms of bankruptcy results.")).   It follows reasonably from the judicial and legislative interpretations of the statute that the "other creditors" whose welfare is the primary focus of equitable subordination law must be creditors of the same debtor, as a given claim may not be subordinated to an equity interest, but only to another claim.

The Court agrees with the Lenders that their claims against the Obligor Debtors cannot be subordinated to claims of creditors represented by the ART because the Lenders' claims have not been substantively consolidated with the estate represented by the ART.   The creditors of the Obligor Debtors have been paid in full under the terms of the Joint Plan, rendering irrelevant any possible concern with their relative amounts of recovery, the primary area of concern in equitable subordination law.   As the Lenders note in their brief, the only means by which recovery here would potentially benefit the creditors of the Obligor Debtors is by way of an equity interest in the ART; however, as a claim may not be subordinated to an interest, this link would still be insufficient to state a claim under the statutory requirements.   (See Lenders' Joint Mem. pp. 35-38.)

The Court finds that because the creditors of the Obligor Debtors do not stand to benefit from recovery under the asserted

Equitable Subordination Claim, given their payment-in-full under the terms of the Plans, Plaintiff lacks standing to assert these claims.  The Lenders' motion to dismiss the Amended Complaint is therefore GRANTED as to the Equitable Subordination Claim.

## ii.  **Equitable Disallowance**

The ART also argues that the Lenders' claims against the Obligor Debtors arising from the Co-Borrowing Facilities should be equitably disallowed.  The Court finds it unnecessary to decide the issue, briefed extensively by the Lenders, of whether or not equitable disallowance is a permissible remedy in bankruptcy under any circumstances.[22]  As Judge Gerber noted in his June 2007 Decision, to the extent equitable disallowance is a permissible remedy in bankruptcy it is available only in "extreme instances - perhaps very rare - where it is necessary as a remedy" and is "[p]lainly...more draconian" than equitable subordination, and therefore applied more rarely.  June 2007 Decision at 70.

The ART's failure to allege an injury on the part of the creditors of the Obligor Debtors, in light of their full payment under the terms of the Joint Plan, operates to bar their Equitable Disallowance claim no less than their Equitable Subordination claim.  The Lenders' motion to dismiss the ART's Equitable Disallowance claim is therefore GRANTED.

---

[22] Cf. this Court's January 2008 Appeal Decision at *6.

**f.** **The Lenders' Indemnification Arguments**

In light of the foregoing analysis, the Court finds it unnecessary to address the Lenders' argument that the Bankruptcy Claims at issue here are "Dismissed Bank Actions" under the Joint Plan and must be dismissed on that basis.

## III. Conclusion

For the reasons set forth above, the Lenders' motion to dismiss the Amended Complaint with respect to Counts 1 to 16, 41 and 42, the Fraudulent Transfer claims, Counts 43, 44, and 49 to 52, the Preference claims, and Count 33, the Equitable Subordination claim, is GRANTED.

SO ORDERED.

Dated: June 17, 2008

Lawrence M. McKenna
U.S.D.J.

40