UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X
                                :
ADELPHIA RECOVERY TRUST,        :
                                :
                     Plaintiff, :
                                :        05 Civ. 9050(LMM)
             v.                 :        MEMORANDUM AND ORDER
                                :
BANK OF AMERICA, N.A., <u>et</u> <u>al.</u>, :
                                :
                    Defendants. :
                                :
- - - - - - - - - - - - - - - - X

Table of Contents

1. Factual Background................................................ 6
   A. The Adelphia Fraud........................................... 6
   B. Overview of the Co-Borrowing Facilities...................... 7
   C. The UCA/HHC Co-Borrowing Facility........................... 10
      i. The UCA/HHC Term Sheet Was Prepared by the Defendants......... 11
      ii. The UCA/HHC Term Sheet Contained Omissions and Misstatements. 12
      iii. The UCA/HHC Term Sheet Defects were known To the Defendants. 12
   D. The CCH Co-Borrowing Facility............................... 13
      i. The CCH Term Sheet Was Prepared by the Defendants............. 15
      ii. The CCH Term Sheet Contained Omissions and Misstatements..... 15
      iii. The CCH Term Sheet Defects were known to the Defendants..... 17
   E. The Olympus Credit Facility................................. 19
      i. The Olympus Term Sheet Was Prepared by the Defendants......... 20
      ii. The Olympus Term Sheet Contained Omissions and Misstatements. 21
      iii. The Olympus Term Sheet Defects were known to the Defendants. 22

2. Procedural Background........................................... 23
   A. Proceedings in the Bankruptcy Court......................... 24
   B. Proceedings before this Court............................... 27

3. Standard of Review............................................. 30
   A. Substantive Law is Pennsylvania State Law................... 30
   B. Procedural Law used is that of the Southern District of New York 30
   C. Pleading Standard under Fed. R. Civ. P. 8(a)................ 31
   D. Pleading Standard for Fraud under Fed. R. Civ. P. 9(b)...... 32

4. Discussion..................................................... 33

   A. Claim 38 – Aiding and Abetting Fraud against the Agent Banks and
      Their Affiliated Investment Banks is not Dismissed............. 33
      i. Background of Claim 38...................................... 34
      ii. Aiding and Abetting Fraud is a Valid Claim under Pennsylvania
          State Law................................................. 35
      iii. Aiding and Abetting Fraud is Plead with Particularity...... 44
      iv. Group Pleading of the Agent Banks and Their Affiliated
          Investment Banks Is Permitted............................. 52
      v. Co-Borrowing Term Sheets Do Not Contradict the Amended Complaint
         ......................................................... 57

   B. Claim 37 – Aiding and Abetting a Breach of Fiduciary Duty against
      the Agent Banks and Their Affiliated Investment Banks.......... 59
      i. Background of Claim 37...................................... 60
      ii. Aiding and Abetting a Breach of Fiduciary Duty is Pled with
          Enough Particularity...................................... 63
      iii. Pleadings Related To the Three Facilities.................. 65

   C. Claim 54 – Fraudulent Concealment against the Investment Banks Is
      Dismissed..................................................... 66
      i. Background of Claim 54...................................... 67
      ii. Elements of Fraudulent Concealment.......................... 68
      iii. The Investment Banks Did Not Have an Affirmative Duty to Speak
           Based on a Fiduciary Duty or Unique Knowledge ............... 71

**D. Claim 55 – Fraud against the Agent Banks and their Affiliated Investment Banks Is Dismissed In Part** .......................... 78

    **i. Background of Claim 55** ...................................... 80

    **ii. Elements of a Fraud Claim** .................................. 80

    **iii. Claim 55 Sub-Claims which are not pled with the Necessary Particularity** ................................................. 81

    **iv. The Following Sub-Claims Meet Pleading Requirements** .......... 89

**E. Claim 31 Avoidance and Recover of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 against the Margin Lenders** ........................................... 99

    **i. Claim 31 Background** ......................................... 99

    **ii. SSB Moves For Dismissal of Claim 31 on the Basis it is Untimely** .................................................... 101

    **iii. Goldman Sachs Moves for Dismissal of Claim 31 on the Basis That It Had Not Been Plead With Particularity** ............... 105

**6. Order** ........................................................ 110

McKENNA, D.J.

This action arises from the bankruptcy of Adelphia
Communications Corporation ("Adelphia") following the
disclosure of $2.2 billion in liabilities that had not
previously been reported on its balance sheet.  The
liabilities at Adelphia stemmed in part from Adelphia's
participation in Co-Borrowing Loan Facilities ("Co-
Borrowing Facilities").  Beginning in 1999 Adelphia
participated in three such Co-Borrowing Facilities.  The
Rigas family which was the prior management of Adelphia[1] had
Rigas family entities ("RFEs") enter into Co-Borrowing
Facilities with public Adelphia subsidiaries. This
arrangement allowed the RFEs controlled by the Rigas family
to borrow billions of dollars guaranteed almost exclusively
by Adelphia's assets.   The Rigas family used the Co-
Borrowing Facilities to draw down billions of dollars for
their own purposes.  Adelphia was left to pay the bill.

---

[1] Six senior Adelphia officials orchestrated this widespread scheme: J.
Rigas, Adelphia's founder, Chief Executive Officer ("CEO") and
Chairman; T. Rigas, J. Rigas' son and Adelphia's Chief Financial
Officer ("CFO"), Chief Accounting Officer ("CAO"), Treasurer and a
Director; M. Rigas, J. Rigas' son, Adelphia's Executive Vice President
for Operations and Secretary; J. P. Rigas, J. Rigas' son, and
Adelphia's then Executive Vice President for Strategic Planning and a
Director; Brown, Adelphia's then Vice President of Finance; and
Mulcahey, a Vice President of Adelphia as well as its then Assistant
Treasurer.

Adelphia's disclosure of billions of dollars in liabilities connected to the Co-Borrowing Facilities led to a precipitous chain of events concluding with Adelphia filing for bankruptcy.  The Adelphia Recovery Trust ("ART") was formed to prosecute Adelphia's claims against numerous entities that allegedly assisted the Rigas family in perpetrating a massive financial fraud against Adelphia.[2]

This order addresses ART's claims against 26 Banks and 22 affiliated Investment Banks.  ART alleges these Banks and their affiliated Investment Banks helped to structure the Co-Borrowing Facilities which played a role in the collapse of Adelphia.  This Court previously addressed some of Defendants' motions to dismiss ART's claims pursuant to Rule 12(b)(6).  This order addresses the various Agent Banks and Investment Banks motions' to dismiss the October 31st 2007 Amended Complaint Claims 37, 38, 54 and 55 (collectively, the "Tort Claims").  In addition, this order addresses the motions for dismissal of Claim 31 against Salomon Smith Barney ("SSB") and Goldman Sachs ("GS").

This Court DENIES the various Defendants' motions for dismissal of Claims 31, 37 and 38.  This Court GRANTS

---

[2] The Adelphia Recovery Trust is a Delaware Statutory Trust that was formed pursuant to the Joint Chapter 11 Plan of Reorganization.  The Trust holds certain litigation claims transferred pursuant to the Plan against various third parties and exists to prosecute the causes of action transferred to it for the benefit of holders of Trust interests.

Defendants' motions for dismissal of Claim 54 against the Investment Bank Defendants.   This Court GRANTS in part and DENIES in part Defendants' motions to dismiss Claim 55.

## 1. Factual Background

It is useful to summarize the factual history of the Rigas family fraud owing to the complexity of this case. On a 12(b)(6) motion for dismissal a court will take factual allegations in the Amended Complaint as true.  "For purposes of reviewing the dismissal of a complaint for failure to state a claim, we accept the complaint's factual allegations . . . as true." Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007); see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).

## A. The Adelphia Fraud

Adelphia was a cable company founded in 1952 by John Rigas.  By the late 1990's Adelphia had grown to be the sixth largest cable-television provider in the United States.  However, beginning in the late 1990's the Rigas family needed access to billions of dollars of capital to acquire cable businesses, purchase stock to maintain their majority stockholder status at Adelphia, and finance an

extravagant lifestyle.  (Am. Cmpl. ¶ 807.)  The Rigas

family did not have enough personal capital or available

credit to finance these expenditures.  Lacking in capital

or credit, the Rigas family turned to the balance sheet of

Adelphia to finance their acquisitions, stock purchases,

and lifestyle.   The Rigas family caused Adelphia to enter

into a series of financial transactions whereby RFEs could

borrow hundreds of billions of dollars against the balance

sheet of Adelphia under Co-Borrowing Facilities.  The Rigas

family was not entitled to use Adelphia as a source of

credit or capital for their own ends because Adelphia was a

public company.  (Am. Cmpl. ¶¶  802—04.)  The Rigas family

worked with the Agent Banks and their affiliated Investment

Banks to create the Co-Borrowing Facilities.  (Am. Cmpl. ¶¶

825—30.)


**B. Overview of the Co-Borrowing Facilities**

     Co-Borrowing Facilities allowed the Rigas family to

gain access to the credit and capital of Adelphia.

According to the Amended Complaint, the Co-Borrowing

Facilities were structured primarily with this purpose in

mind.  All Co-Borrowing Facilities were set up so both

Adelphia and the RFEs could borrow up to the entire amount

of the Co-Borrowing Facility.  (Am. Cmpl. ¶ 826.)  The

impact of this arrangement was that Adelphia was liable for the entire amount borrowed by the RFEs. Further, the Co-Borrowing Facilities were capitalized in a lopsided manner. Adelphia pledged significant assets to the Co-Borrowing Facilities, while the RFEs pledged a minute share of assets.[3] The Co-Borrowing Facilities were unprecedented. They pledged the credit and assets of a publicly-held company for the benefit of private enterprises owned by the public company's senior management.

To put each Co-Borrowing Facility into operation the Rigas family needed the approval of Adelphia's independent directors. To win the approval of the Adelphia independent directors, the Rigas family worked with the Agent Banks and their affiliated Investment Banks to prepare deceptive term sheets. (Am. Cmpl. ¶¶ 6, 10, 827.) At board meetings the Adelphia independent directors relied on these term sheets and misrepresentations made by the Rigas family to approve the Co-Borrowing Facilities. Yet the Adelphia independent directors did not know that the information supplied to Adelphia was misleading. (Am. Cmpl. ¶ 10.) The actual

---

[3] The assets pledged to the co-borrowing facilities were often subscribers which provided a stream of revenue to either Adelphia or an RFE. For example, under the CCH Co-Borrowing Facility Adelphia provided collateral contributions in the form of two subsidiaries with 1,476,983 cable television subscribers. The RFE under the CCH Co-Borrowing Facility pledged only 55,831 cable television subscribers. (Am. Cmpl. ¶ 905.)

8

terms of the Co-Borrowing Facilities later memorialized in the credit agreements were materially different than the terms in the term sheets. (Am. Cmpl. ¶¶ 827, 879, 947.)

After the Co-Borrowing Facilities were approved, the RFE Co-Borrowers began to withdraw significant amounts of money from the facilities.  According to the Amended Complaint, by the time the full amount of money borrowed was disclosed, the RFEs had withdrawn roughly 3.4 billion dollars.  (Am. Cmpl. ¶ 11.)  The money withdrawn from the Co-Borrowing Facilities was used to purchase Adelphia securities for Rigas family accounts, purchase cable companies controlled by the Rigas family, build a private golf course, and for numerous other personal purposes. (Am. Cmpl. ¶ 7.)

The Amended Complaint alleges three Co-Borrowing Facilities were used to perpetuate the Rigas family's fraud: the UCA/HHC Facility, the CCH Facility, and the Olympus Facility.[4]  (Am. Cmpl. ¶ 825.)  The extent to which the Co-Borrowing Facilities are described in the Amended Complaint is critical in determining the adequacy of the

---

[4] Adelphia had entered into a previous Co-Borrowing Facilities.  In 1996 Adelphia entered into the 1996 HVA/TALP/Global Credit Facility. According to the Amended Complaint the 1996 HVA/TALP/Global Credit Facility was structurally differently then the Co-Borrowing Facilities which followed.  The 1996 HVA/TALP/Global Credit Facility placed strict limits on the amount of money which could be withdrawn by each entity and the entities which entered into the facility pledged adequate collateral.  (Am. Cmpl. ¶¶ 831-840.)

pleadings.  The following focuses on the three Co-Borrowing
Facilities whose creation the Plaintiffs allege was
critical to the fraud.

## C. The UCA/HHC Co-Borrowing Facility

     The UCA/HHC Co-Borrowing Facility was approved at the
April 22, 1999 board meeting by the Adelphia independent
directors.  (Am. Cmpl. ¶ 848.)  Wachovia, BMO, and PNC Bank
acted as Agent Banks (collectively, the "UCA/HHC Agent
Banks").[5]  The Investment Banks affiliated with these Agent
Banks were Wachovia Securities, BMO ND, and PNC Capital
Markets. (Am. Cmpl. ¶ 1037.)  The UCA/HHC Agent Banks and
their affiliated Investment Banks structured the facility
and assisted in drafting documentation.  (Am. Cmpl. ¶ 843.)
At the board meeting the independent directors were
presented with a summary term sheet which described the
terms and conditions of the UCA/HHC Co-Borrowing Facility
("UCA/HHC Term Sheet").  (Am. Cmpl. ¶¶ 847, 861, 862, 864.)
However, the credit agreement for the UCA/HHC Co-Borrowing
Facility (which memorialized the actual terms of the
facility) was finalized two weeks later on May 6, 1999 and
was not shown to the independent directors at the time they
approved the transaction.  (Am. Cmpl. ¶ 842.)  By the time

---

[5] Short forms are used to identify specific Agent Banks and their affiliated Investment Banks.

of the petition date, 831 million dollars was outstanding under the UCA/HHC Facility.  (Am. Cmpl. ¶ 877.)

ART argues the UCA/HHC Term Sheet was prepared by the UCA/HHC Agent Banks and their affiliated Investment Banks. The UCA/HHC Term Sheet contained omissions and misstatements which the UCA/HHC Agent Banks and their affiliated Investment Banks were aware of.  This allegation forms the basis for the Plaintiffs' claims of aiding and abetting fraud, aiding and abetting a breach of fiduciary duty, fraudulent concealment, and fraud.

### i. The UCA/HHC Term Sheet Was Prepared by the Defendants

In furtherance of the Rigas family fraud in early 1999, the Rigas family worked with UCA/HHC Agent Banks and their affiliated Investment Banks to prepare and approve a summary term sheet describing the terms and conditions of the UCA/HHC Co-Borrowing Facility.  (Am. Cmpl. ¶¶ 847, 861, 862, 864.)  On April 22, 1999, the UCA/HHC Term Sheet was presented by Timothy Rigas and James Brown at a meeting of the Adelphia board of directors.  Present at this meeting were the Adelphia independent directors.  (Am. Cmpl. ¶ 848.)  Timothy Rigas and James Brown presented the UCA/HHC Term Sheet and made verbal misrepresentations about the

UCA/HHC Facility based on the information set forth in the term sheet.  (Am. Cmpl. ¶¶ 850—52.)

### ii. The UCA/HHC Term Sheet Contained Omissions and Misstatements

The Amended Complaint alleges the UCA/HHC Term Sheet portrayed the Co-Borrowing Facility as being restrictive and significantly limiting of affiliate transactions.  (Am. Cmpl. ¶ 860.)  During the same period the UCA/HHC Term Sheet was being drafted the UCA/HHC Agent Banks and Investment Banks were aware that the Rigas family was planning to engage in conduct and affiliate transactions in violation of those restrictions.  (Am. Cmpl. ¶ 861.)

Had the actual terms of the UCA/HHC Facility (which appeared in the credit agreement, not the UCA/HHC Term Sheet) been disclosed to the independent directors or had the intentions of the Rigas family (which were known by the Investment and Agent Banks) been disclosed, the UCA/HHC Facility would not have been approved.  (Am. Cmpl. ¶¶ 860, 864, 866—68.)

### iii. The UCA/HHC Term Sheet Defects were known To the Defendants

The Agent Banks and Investment Banks were made aware of the violative plans of the Rigas family on or about February 1999 "in a request for proposal that [the Rigas's] sent to the Agent Banks and to 25 to 30 other banks seeking participation in this facility". (Am. Cmpl. ¶ 862.) On February 23, 1999, Wachovia ("Lead Agent Bank") was informed via email by Adelphia's Director of Finance that the Rigas family intended to use the UCA/HHC Facility to borrow money for personal use. (Am. Cmpl. ¶ 863.) A similar email was sent on the same date to Bank of America. (Am. Cmpl. ¶ 863.) At no time prior to March 27, 2002 did Adelphia disclose the enormous "contingent liabilities it had amassed as a result of the RFE's draws from the UCA/HHC Co-Borrowing Facility." (Am. Cmpl. ¶ 875.)

**D. The CCH Co-Borrowing Facility**

The Rigas family went back to the trough less than a year after the UCA/HHC Facility was approved. "Once again, the Rigas family made use of Adelphia's access to bank debt and the public capital markets for their own benefit." (Am. Cmpl. ¶ 878.) The Rigas family worked with a set of Agent Banks and their affiliated Investment Banks to design another Co-Borrowing Facility, based on the UCA/HHC

Facility blueprint.  This facility was named the CCH
Facility.

The CCH Co-Borrowing Facility was approved at the
March 9, 2000 board meeting by the Adelphia independent
directors.  (Am. Cmpl. ¶ 879.)  The CCH Facility was a Co-
Borrowing Facility with the following banks acting as Agent
Banks: BofA, Chase, CIBC, BAS, TDI, Barclays, BMO,
Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais,
CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan
Stanley, Rabobank, and SunTrust (collectively, the "CCH
Agent Banks").  (Am. Cmpl. ¶ 881.)  The Investment Banks
affiliated with the CCH Agent Banks are identified in
paragraph 1037 of the Amended Complaint (Am. Cmpl. ¶ 1037.)

At the Board Meeting, the independent directors were
presented with a summary term sheet which described the
terms and conditions of the CCH Co-Borrowing Facility ("CCH
Term Sheet").  (Am. Cmpl. ¶ 903.)  However, the credit
agreement for the CCH Co-Borrowing Facility (which
memorialized the actual terms of the facility) was prepared
a month later on April 14, 2000 and was not shown the
independent directors at the time they approved the
transaction.  (Am. Cmpl. ¶¶ 879, 886, 901.)  By the
petition date, the CCH Facility had approximately 2.5
billion dollars outstanding.  (Am. Cmpl. ¶ 923.)

ART alleges the CCH Term Sheet was prepared by the CCH Agent Banks and their affiliated Investment Banks.  The CCH Term Sheet contained omissions and misstatements which the CCH Agent Banks and their affiliated Investment Banks were aware of.  This allegation forms the basis for ART's claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, fraudulent concealment, and fraud.

**i. The CCH Term Sheet Was Prepared by the Defendants**

The CCH Agent Banks were deeply involved in drafting documents related to the CCH Facility.  The CCH Agent Banks and Investment Banks conducted significant due diligence, prepared an offering memorandum with the assistance of Adelphia, and received compliance certificates from Adelphia.  (Am. Cmpl. ¶ 882.)  The CCH Agent Banks and their affiliated Investment Banks worked closely with the Rigas family to prepare a summary term sheet describing the terms of the CCH Co-Borrowing Facility.  (Am. Cmpl. ¶ 885.)

**ii. The CCH Term Sheet Contained Omissions and Misstatements**

The Amended Complaint catalogs three areas of omissions and misstatements in the CCH Term Sheet.  (Am. Cmpl. ¶¶ 891—97).  First, provisions in the CCH Term Sheet

implied affiliate transactions would be restricted.  The
CCH Term Sheet contains a clause prohibiting transactions
not on the same terms as could be obtained in transactions
with 3rd parties.  (Am. Cmpl. ¶ 893.)  The CCH Term Sheet
contained a clause which led the independent directors to
believe that the proceeds of the CCH Facility would be used
in specific ways which would be to the benefit of Adelphia.
(Am. Cmpl. ¶ 891.)  The CCH Term Sheet represented the CCH
Facility would contain a restrictive investments clause
which would place substantial limits on affiliated
transactions.  (Am. Cmpl. ¶¶ 894, 895.)

Second, the CCH Term Sheet did not define whether the
leverage ratio (the amount which each borrower could borrow
in relation to assets) was calculated on a combined basis
or individual basis.  The failure to define the leverage
ratio was a material omission.  If the leverage ratio was
defined as being individualized then each borrower was
limited to only borrowing under the CCH Facility the amount
of assets and collateral which that borrower pledged to the
CCH Facility.  (Am. Cmpl. ¶ 889.)  If the leverage ratio
was calculated on a combined basis then each borrower could
borrow up to the total value of all assets pledged to the
facility.  In the Adelphia board meeting of March 9, 2000
the leverage ratio was described by Rigas and Brown as

being individualized against each borrower.  The CCH Term Sheet could be taken to support these oral contentions because the CCH Term Sheet was ambiguous and did not define the leverage ratio.  Id.  However, the final CCH Credit Agreement (which was finalized after the March 9, 2000 board meeting) explicitly stated that, "[l]everage ratio means, with respect to the Companies on a combined basis." (Am. Cmpl. ¶ 901.)

Third, the CCH Term Sheet did not disclose that each borrower would be permitted to draw down the entire amount available under the facility (without regard to the amount of capital they had pledged).  This was a material omission.  As an exemplar, Highland Prestige, an RFE and Co-Borrower in the facility, would be able to borrow up to the total amount of the CCH Facility even though it had pledged a relatively small amount of collateral.  (Am. Cmpl. ¶¶ 902, 914.)

### iii. The CCH Term Sheet Defects were known to the Defendants

The CCH Agents Banks and their affiliated Investment Banks knew or should have known that the statements in the CCH Term Sheet were false and/or misleading.  First, the structure of the CCH Facility was so unprecedented that it

should have raised red flags.  According to the Amended
Complaint the CCH Agent Banks were sophisticated parties
who knew or should have known the CCH Term Sheet was
misleading.  (Am. Cmpl. ¶¶ 4, 826.)  The CCH Agent Banks
and their affiliated Investment Banks knew that despite the
representations made to the independent directors, "the
true terms and conditions of the CCH Co-Borrowing Facility
provided no benefit to Adelphia and were not in Adelphia's
interests."  (Am. Cmpl. ¶ 917.)

        Second, a Confidential Information Memorandum prepared
in March 2000 indicates the CCH Agent Banks and their
affiliated Investment Banks knew the CCH Term Sheet
contained misstatements and omissions.  The Confidential
Information Memorandum was prepared by the CCH Agent Banks
and affiliated Investment Banks and was sent to CCH
Lenders.  The Memorandum "made clear that the collateral
put up by the ACC co-borrowers was significantly greater
than the collateral put up by Highland Prestige."  (Am.
Cmpl. ¶ 905.)   "This information was not stated in the CCH
Term Sheet presented to the Independent Directors and was
not disclosed to them at the March 9, 2000 Board of
Directors Meeting."  Id.

        Third, the Agent Banks and Investment Banks knew in
March 2000 that the collateral pledged by the RFEs was de

minimis in comparison to the amount which would be
withdrawn by the RFEs.  (Am. Cmpl. ¶ 908, 1036.)  The
Investment Banks and Agent Banks knew the Rigas family
"intended to engage in conduct and affiliate transactions
that violated these restrictions."  (Am. Cmpl. ¶ 908.)[6]

## E. The Olympus Credit Facility

Roughly a year after opening the CCH Credit Facility
the Rigas family sought to raise additional funds.  (Am.
Cmpl. ¶ 924.)  The Olympus Credit Facility was structured
in much the same way as the CCH and UCA/HHC Facilities had
been structured.  (Am. Cmpl. ¶ 930.)  The Olympus Credit
Facility was a Co-Borrowing Facility with both RFEs and
Adelphia contributing capital.  (Am. Cmpl. ¶ 952.)

The Olympus Co-Borrowing Facility was approved at the
August 7, 2001 board meeting by the Adelphia independent
directors.  (Am. Cmpl. ¶ 932.)  The Olympus Facility was a
Co-Borrowing Facility with the following banks acting as
Agent Banks: BMO, Wachovia, BNS, Fleet, BONY, BofA, Bankers
Trust Company, Citicorp, TDI, Chase, Deutsche Bank, CSFB,
Credit Lyonnais, Royal Bank of Scotland, Societe Generale,
and Fuji Bank  (collectively, the "Olympus Agent Banks").

---

[6] At no time prior to March 27, 2002 did Adelphia, the Agent Banks or
the Investment Banks disclose the liability amassed by Adelphia as a
result of its participation in the CCH Facility.  (Am. Cmpl. ¶ 923.)

(Am. Cmpl. ¶ 927.)  The Investment Banks associated with the Olympus Agent Banks are identified in paragraph 1037 of the Amended Complaint.  (Am. Cmpl. ¶ 1037.)

At the board meeting the independent directors were presented with a summary term sheet describing the terms and conditions of the CCH Co-Borrowing Facility ("Olympus Term Sheet").  (Am. Cmpl. ¶ 933.)  However, the credit agreement for the Olympus Co-Borrowing Facility (which memorialized the actual terms of the facility) was finalized after the board meeting and was not shown to the independent directors at the time they approved the transaction.  (Am. Cmpl. ¶¶ 947, 951.)  As of the petition date approximately 1.3 billion dollars was outstanding under the Olympus Credit Facility.  (Am. Cmpl. ¶ 969.)

ART alleges the Olympus Term Sheet was prepared by the Olympus Agent Banks and their affiliated Investment Banks. The Olympus Term Sheet contained omissions and misstatements the Olympus Agent Banks and their affiliated Investment Banks were aware of.  This allegation forms the basis of ART's claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, fraudulent concealment, and fraud.


**i. The Olympus Term Sheet Was Prepared by the Defendants**

The Agent Banks and their affiliated Investment Banks
in concert with the Rigas family drafted a summary term
sheet for the Olympus Facility ("Olympus Term Sheet").
(Am. Cmpl. ¶¶ 928, 931.)

### ii. The Olympus Term Sheet Contained Omissions and Misstatements

The Amended Complaint alleges three defective areas in
the Olympus Term Sheet.  The alleged defects in the Olympus
Term Sheet mirror the defects in the CCH and UCA/HHC Term
Sheets.  First, the Olympus Term Sheet contained clauses
preventing participants in the Co-Borrowing Facility from
engaging in transactions which do not benefit Adelphia.
The Olympus Term Sheet prohibited transactions which were
"not on the same terms as could be obtained by third
parties."  (Am. Cmpl. ¶ 939.)  The restricted investments
clause in the Olympus Term Sheet claimed to place limits on
affiliated transactions.  (Am. Cmpl. ¶¶ 940, 941.)

Second, the Olympus Term Sheet did not define whether
the 'leverage ratio' was to be calculated on a combined or
individual basis.  (Am. Cmpl. ¶ 942, 945.)  The omission of
a definition for the 'leverage ratio' is a material
omission according to ART's pleadings.  The leverage ratio
(as in the CCH Facility) was critical in determining how

21

much each of the borrowers could borrow from the facility. (Am. Cmpl. ¶ 942—47.)

Third, the Olympus Term Sheet failed to disclose that an RFE could pledge de minimis capital compared to the amount which it intended to borrow from the facility. (Am. Cmpl. ¶ 948.) The omission of this fact from the Olympus Term Sheet was material. If the RFEs' intended use under the facility had been exposed to the independent directors the Olympus Facility would not have been approved. (Am. Cmpl. ¶¶ 949, 950.)

### iii. The Olympus Term Sheet Defects were known to the Defendants

The Olympus Agents Banks and their affiliated Investment Banks knew or should have known that the statements in the Olympus Term Sheet were false and/or misleading. The Amended Complaint lists three independent grounds for actual or constructive knowledge. First, according to the Amended Complaint the structure of the Olympus Facility was highly unusual. The Olympus Agent Banks should have disclosed the unusual arrangement in the Olympus Term Sheet and called attention to its risks. (Am. Cmpl. ¶¶ 961, 962.)

22

Second, the Olympus Agent Banks and their affiliated Investment Banks knew or should have known that the Olympus Term Sheet was defective based on the Rigas family's use of the CCH and UCA/HHC Facilities in the preceding two years. Many of the Olympus Agent Banks assisted in the structuring and management of the previous Co-Borrowing Facilities. By the time the Olympus Term Sheet was drafted by the Olympus Agent Banks the Rigas family had withdrawn hundreds of millions of dollars from the CCH and UCA/HHC Facilities. This money was used for the benefit of the Rigas family. (Am. Cmpl. ¶¶ 956, 965, 1036.)

Third, a Confidential Information Memorandum prepared by the Olympus Agent Banks and their affiliated Investment Banks demonstrated the Banks were aware the Olympus Facility was going to be used in ways contravening the Olympus Term Sheet. The Confidential Information Memorandum prepared in August of 2001 stated, "the collateral put up by the ACC co-borrowers would be significantly greater than the collateral put up by the RFE co-borrowers." (Am. Cmpl. ¶¶ 951, 952.)

**2. Procedural Background**

The collapse of Adelphia led to numerous civil, criminal, and bankruptcy proceedings. This particular case

was part of an original case filed six years ago in the
Southern District of New York Bankruptcy Court before Judge
Robert E. Gerber.  From 2003 until 2006 the case proceeded
in the Southern District of New York Bankruptcy Court.  On
February 9, 2006, this Court withdrew the reference to the
Bankruptcy Court, pursuant to 28 U.S.C. 157(d), and
assigned to the undersigned as related to the Adelphia
multidistrict litigation (03 MDL 1529).  The background of
the case is complex and impacts this decision so an
overview of the proceedings in the Southern District of New
York Bankruptcy Court and before this Court is appropriate.

## A. Proceedings in the Bankruptcy Court

On July 6, 2003 Adelphia's Official Committee of
Unsecured Creditors filed a complaint ("Creditors
Complaint") in the Southern District of New York Bankruptcy
Court before Judge Gerber.  The Creditors Complaint alleged
fifty-two claims against hundreds of Defendants.  The
Creditors Complaint divided the Defendants into four
categories: Agent Banks, Investment Banks, Non-Agent Banks
and Assignees.[7]  The Creditors Complaint alleged the

---

[7] Different defendants played different roles in the Co-Borrowing which
Adelphia entered into.  The Agent Banks provided services and advice to
Adelphia in structuring, arranging, and managing the Co-Borrowing
Facilities.  (C.C. ¶ 69.)  The Investment Banks were each affiliated
with one of the Agent Banks, and assisted their affiliated Agent Banks

Defendants benefited from the Rigas's fraud and in some cases aided in its perpetration.

On July 31, 2003 the Official Committee of Equity Security Holders filed an intervenor complaint ("Intervenor Complaint") in the Southern District of New York Bankruptcy Court (also before Judge Gerber). The Intervenor Complaint joined in the bulk of the claims which had been filed by the Creditors Committee and asserted claims against the Investment Banks for fraudulent concealment; and against the Agent Banks and Investment Banks for fraud and RICO violations.

The Defendants raised two lines of attack to the claims made against them in the Creditors Complaint and the Intervenor Complaint. First, the Defendants alleged the Creditors Committee and Equity Committee lacked Article III standing to bring their claims. Second, the Defendants brought various 12(b)(6) motions to dismiss the claims in the two complaints.

Judge Gerber of the Bankruptcy Court issued three decisions addressing the issues raised by the Defendants.

---

and the Rigas family in structuring the Co-Borrowing Facilities and providing services and advice to Adelphia in connection with debt and equity offerings issued during the during the same period that the Loan Facilities were created. (C.C. ¶ 70.) The Non-Agent Banks were bank lenders under various debt facilities. (C.C. ¶ 71-114.) The Assignees were various lenders who had acquired bank debt related to Adelphia. (C.C. ¶ 144-402.) The Creditors Complaint uses a different nomenclature in grouping defendants then that which is used in the Amended Complaint.

In the first decision, Judge Gerber held both the Equity and Creditor Committees had standing to bring their claims. In re Adelphia Commc'ns Corp., 330 B.R. 364, 377 (Bankr. S.D.N.Y. 2005).  In the second decision, Judge Gerber examined the various Defendants' 12(b)(6) motions to dismiss the Creditors Complaint claims.  In re Adelphia Commc'ns Corp., 365 B.R. 24 (Bankr. S.D.N.Y. 2007).  Judge Gerber in an extensive opinion dismissed some of the claims and sustained others.[8]  In the third decision, Judge Gerber considered the various Defendants' 12(b)(6) motions to dismiss the claims made in the Intervenor Complaint.  In re Adelphia Commc'ns Corp., Adversary N. 03-04942(REG), 2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007).  Judge Gerber dismissed the claims asserted in the Intervenor Complaint, but granted leave to replead the claims for fraud and fraudulent concealment.

Concurrent with the Bankruptcy Court issuing these three decisions a Chapter 11 reorganization of Adelphia was proceeding.  The First Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of Adelphia Communications Corporation and Certain Affiliated Debtors was confirmed and became effective on January 17, 2007 ("Joint Chapter 11

---

[8] The opinion contains a useful table which summarizes the disposition of the various claims.  In re Adelphia Commc'ns Corp., 365 B.R. at 81.

Plan"). The confirmation of the Joint Chapter 11 Plan led
to the consolidation of the Creditor's Complaint and
Intervenor Complaint. The consolidated claims were
transferred to the Adelphia Recovery Trust (ART) to
prosecute.

## B. Proceedings before this Court

The Defendants sought leave to appeal all of the
claims which Judge Gerber had failed to dismiss. This
Court[9] granted leave to appeal with respect to particular
discreet areas of law. <u>Adelphia Recovery Trust v. Bank of
Am., N.A.</u>, No. 05 Civ 9050, 2007 WL 2585065 (S.D.N.Y. Sept.
05, 2007); <u>Adelphia Recovery Trust v. Bank of Am., N.A.</u>,
No. 05 Civ 9050, 2007 WL 2890220 (S.D.N.Y. Sept. 28, 2007).

ART filed an Amended Complaint on October 31, 2007.
(Adversary Proceeding Amended Complaint ("Am. Cmpl.")).
The Amended Complaint consolidated the Creditors' Complaint
and Intervenor Complaint. ART also made revisions to the
claims. The Amended Complaint is in excess of 500 pages,
naming many hundreds of defendants, and provides additional
details to various claims.

---

[9] The phrase 'this Court' refers to proceedings before the undersigned
unless otherwise noted.

This Court on January 17, 2008, issued an order based on the legal issues which it had granted review of in the Sept 5, 2007 and September 28, 2007 decisions. Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 64 (S.D.N.Y. 2008). This Court held Claim 37 for aiding and abetting a breach by the Rigas family, Michael Mulcahey, and James R. Brown of their fiduciary obligations to Adelphia would be governed by Pennsylvania state law. This Court also held aiding and abetting a breach of fiduciary duty was a valid tort under Pennsylvania state law. In addition, this Court held the doctrine of in pari delicto would not lead to the dismissal of a claim on a 12(b)(6) motion. Adelphia Recovery Trust, 390 B.R. at 78-79. This Court concluded the Adelphia Recovery Trust had Article III standing to bring its claims. Adelphia Recovery Trust, 390 B.R. at 71. Lastly, the court dismissed the Bank Holding Company Act Claim (Claim 32) with leave to replead to cure ambiguity in the original allegations. Id.

This Court next turned its attention to the Defendants' various 12(b)(6) motions for dismissal of the Amended Complaint's claims 1 to 16; 33; 41 to 44; and 49 to 52. This Court entered an order on these issues on June 17, 2008. Adelphia Recovery Trust v. Bank of America, N.A., 390 B.R. 80 (S.D.N.Y. 2008). The claims comprised

the statutory bankruptcy avoidance claims and the equitable subordination and equitable disallowance claims; collectively known as the 'Bankruptcy Claims'.  The Court issued a memorandum and order dismissing the Bankruptcy Claims.  On December 8, 2008, this Court entered a stipulation and order of a final judgment[10] whereby claims 1-16, 33, 41-44, and 49-52 of the Amended Complaint were dismissed as to the Non-Agent Lenders.

On March 5, 2008, this Court entered an order severing and transferring ten of the claims in the Amended Complaint.  <u>Adelphia Recovery Trust v. Bank of America, N.A.</u>, No. 05 Civ. 9050, 2009 WL 636719 (S.D.N.Y. March 5, 2009).  The ten claims transferred were factually and legally distinct from other claims in the Amended Complaint and were collectively known as the Sabres Claims.  <u>Id</u>.  The Sabres Claims (claims 17-24 and 56-57) alleged the Rigas family had fraudulently conveyed roughly 30 million dollars to three banks in a series of transactions which allowed the Rigas family to assume control of the Buffalo Sabres Hockey Team.[11]  These claims were transferred to the Western District of New York.

---

[10] Fed. R. Civ. P. 54(b).
[11] The transactions underlying the claims involved loan facilities originated in and around Buffalo, New York.

## 3. Standard of Review

### A. Substantive Law is Pennsylvania State Law

Claims in this case will be decided using the substantive law of the State of Pennsylvania.  At this stage no parties are challenging the choice of Pennsylvania state law as the substantive law of the case. Pennsylvania state law was used repeatedly as the basis to resolve claims in this case.  Judge Gerber used Pennsylvania state law in his opinion addressing the Defendants' 12(b)(6) motions to dismiss the Equity Committee's Complaint.  In re Adelphia Commc'ns Corp., 365 B.R. at 39.  This Court used Pennsylvania state law for evaluating other claims in the Amended Complaint.  Adelphia Recovery Trust, 390 B.R. at 76.

### B. Procedural Law used is that of the Southern District of New York

The procedural law governing this case is that of the Southern District of New York.  Courts have a compelling reason to adopt the procedural law of their local court for deciding the sufficiency of pleadings on a 12(b)(6) motion to dismiss.  In Texaco Inc. v. Pennzoil Co., the Second Circuit Court of Appeals reasoned that a forum had

compelling reasons for applying its own procedural rules

and enormous burdens were avoided when a court applied its

own rules, rather than the rules or interpretations of

another jurisdiction.  Texaco Inc. v. Pennzoil Co., 784

F.2d 1133, 1156 (2d Cir. 1986).  "A court usually applies

its own local law rules prescribing how litigation shall be

conducted even when it applies the local law rules of

another state to resolve other issues in the case."

Restatement (Second), Conflict of Laws, § 122 (comment a)

(1971).[12]


## C. Pleading Standard under Fed. R. Civ. P. 8(a)

This memorandum and order responds to various

defendants' motions to dismiss the tort claims against them

under Rule 12(b)(6).[13]  For ART to avoid dismissal of claims

under Rule 12(b)(6) ART must plead "a short and plain

---

[12] The analysis in the Restatement (Second), Conflict of Laws provides
compelling reasons for adopting local interpretations of pleading
standards, "[e]normous burdens are avoided when a court applies its own
rules, rather than the rules of another state, to issues relating to
judicial administration, such as the proper form of action, service of
process, pleading, rules of discovery, mode of trial and execution and
costs."  Restatement, supra at § 122.  It is "an unreasonable burden on
the judicial machinery of the forum" to require a court to apply the
procedural law of another court.  Bournias v. Atlantic Maritime Co.,
220 F.2d 152, 154 (2d Cir. 1955) (Harlan, J.); see also Dar El-Bina
Engineering & Contracting Co., Ltd. v. Republic of Iraq, 79 F.Supp.2d
374, 388 (S.D.N.Y. 2000).
[13] The Investment Bank defendants move for dismissal of Claim 31 as to
the addition of SSB as a defendant pursuant to Rule 12(c).  However,
the effect of this is minimal as 12(c) imposes the same standards of
reviewing a claim as 12(b)(6).  Cleveland v. Caplaw Enterprises, 448
F.3d 518, 521 (2d Cir. 2006).

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  However, adequate pleadings must raise a right to relief above the speculative level.  "[A] plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964—65 (2007).

**D. Pleading Standard for Fraud under Fed. R. Civ. P. 9(b)**

There is a heightened pleading requirement when a claim is grounded in fraud.  Fed. R. Civ. P. 9(b) requires that fraud be pled with particularity.  Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996).  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. We have explained that in order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)).

Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).  But, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] . . . plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995) (internal quotation marks and citation omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). (citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 278—91 (2d Cir. 2006)).

**4. Discussion**

**A. Claim 38 — Aiding and Abetting Fraud against the Agent Banks and Their Affiliated Investment Banks is not Dismissed**

Claim 38 in the Amended Complaint alleges that the Agent Banks and their affiliated Investment Banks aided and abetted the Rigas family's fraud.  Claim 38 alleges the Agent Banks and their affiliated Investment Banks drafted deceptive term sheets which misrepresented or omitted key provisions concerning the UCA/HHC, CCH, and Olympus Co-Borrowing Facilities.  The preparation and approval of these term sheets aided and abetted the Rigas family's fraud.

The Defendants have filed various memorandums of law in support of their motions to dismiss Claim 38.  Four primary arguments for dismissal are laid out in the memorandums of law: aiding and abetting fraud is not recognized under Pennsylvania state law, the elements of aiding and abetting fraud are not pled with particularity, the Amended Complaint uses impermissible group pleading (the lumping of defendants together), and the term sheets prepared by the Defendants affirmatively disclosed problems with the Co-Borrowing Facilities.

The Defendants' motions for dismissal of Claim 38 are DENIED.

**i. Background of Claim 38**

Claim 38 was first pled in the Creditors Complaint.
The Creditors Complaint alleged the Agent Banks and their
affiliated Investment Banks aided and abetted the Rigas
family's fraud.  (CC ¶  868.)  Judge Gerber dismissed Claim
38 with leave to replead.  Gerber ruled the pleadings in
the Creditors Complaint 'lack the requisite particularity'
required for a fraud claim.   In re Adelphia Commc'ns Corp.,
365 B.R. at 61.  Judge Gerber did not address whether
Pennsylvania courts would recognize a tort for aiding and
abetting fraud.  "The Court does not need to decide, and
does not now decide, whether Pennsylvania would recognize
the tort of aiding and abetting fraud, as a general
matter."  Id.  Claim 38 was repled in the Amended Complaint
which is now before this Court.

## ii. Aiding and Abetting Fraud is a Valid Claim under Pennsylvania State Law

The Defendants urge this Court to dismiss Claim 38 on
the basis that Pennsylvania state law does not recognize
the tort of aiding and abetting fraud.  The Defendants'
argument is rejected.  This Court's January 17, 2008
decision recognized the tort of aiding and abetting a
breach fiduciary duty but did not address directly whether
Pennsylvania state law would recognize a tort for aiding

and abetting fraud.  <u>Adelphia Recovery Trust</u>, 390 B.R. at
77.  However, the analysis underlying this Court's earlier
recognition of a tort for aiding and abetting a breach of
fiduciary duty leads this Court to conclude the
Pennsylvania Supreme Court would also recognize a tort for
aiding and abetting fraud.

The Pennsylvania Supreme Court has not directly ruled
on whether it recognizes a tort of aiding and abetting
fraud.  <u>Klein v. Boyd</u>, No. 95-5410, 1996 WL 675554, at *33
(E.D.Pa. November 19, 1996).  In cases where it is unclear
if a cause of action is allowed by a state supreme court,
"[t]he federal court may not impose its view of what the
state law should be, but must apply existing state law as
interpreted by the state's highest court in an effort to
determine how the state court would decide the precise
legal issue before the federal court." <u>Walsh v. Strenz</u>, 63
F.Supp.2d 548, 551 (M.D.Pa. 1999) (<u>citing</u> <u>Koppers Co., Inc.</u>
<u>v. Aetna Cas. & Sur. Co.</u>, 98 F.3d 1440, 1445 (3d Cir.
1996)).  "In the absence of a reported decision by the
state's highest court addressing the precise issue before
it, a federal court applying state substantive law must
predict how the state's highest court would rule if
presented with the case." <u>Carrasquilla v. Mazda Motor</u>
<u>Corp.</u>, 197 F.Supp.2d 169, 172 (M.D.Pa. 2002).  In the

Second Circuit, a federal district court will "conclusively defer to a federal court of appeals' interpretation of the law of a state that is within its circuit." <u>Booking v. General Star Management Co.</u>, 254 F.3d 414, 421 (2d Cir. 2001), <u>see also</u> <u>Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP</u>, 322 F.3d 147, 157 n. 4 (2d Cir. 2003).

Four factors lead this Court to conclude the Pennsylvania Supreme Court would recognize a tort for aiding and abetting fraud.  First, the adoption of Section 876 of the Restatement (Second) of Torts by the Pennsylvania Supreme Court is strongly indicative that it would recognize a tort for aiding and abetting fraud.  The Pennsylvania Supreme Court held when adopting Section 876 of the Restatement (Second) of Torts that, "[t]his theory provides in pertinent part that '[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him . . .'" <u>Skipworth by Williams v. Lead Industries Ass'n, Inc.</u>, 690 A.2d 169, 174 (Pa. 1997) (<u>quoting</u> <u>Restatement (Second) of Torts</u>, § 876.)[14]  Pennsylvania state courts have

---

[14] The remainder of Section 876 reads:

relied on the holding in Skipworth to conclude that the entirety of Section 876 was adopted under Pennsylvania state law.  "Our Supreme Court addressed Section 876 in Skipworth by Williams v. Lead Industries Association, Inc., and this Court is convinced by this language in Skipworth that Section 876 is a viable cause of action in Pennsylvania."  Koken v. Steinberg, 825 A.2d 723, 732 (Pa.Cmwlth. 2003) (citations omitted).  The opinion in Koken cites the entirety of Section 876 in finding that Skipworth leads to viable claims under all of Section 876. The Superior Court of Pennsylvania has also explicitly adopted all of Section 876.  "In the alternative, a defendant must render substantial assistance to another to accomplish a tortious act. As specifically stated in comment (d) to § 876(b), 'in determining liability, the factors are the same as those used in determining the existence of legal causation when there has been negligence.'"  Cummins v. Firestone Tire & Rubber Co., 344 Pa.Super. 9, 21-22 (Pa. Super. 1985). Other courts in Pennsylvania have similarly found the adoption of Section

---

        (b) knows that the other's conduct constitutes a breach of
        duty and gives substantial assistance or encouragement to
        the other so to conduct himself, or
        (c) gives substantial assistance to the other in
        accomplishing a tortious result and his own conduct,
        separately considered, constitutes a breach of duty to the
        third person.
Restatement (Second) of Torts Section 876.

876 makes aiding and abetting a viable cause of action.
"[A]s set forth in Section 876 of the Restatement (Second)
of Torts, [aiding and abetting] is a recognized civil cause
of action under Pennsylvania law." Sovereign Bank v.
Valentino, 914 A.2d 415, 416 (Pa.Super. 2006).
"[D]efendants aver that Count XX fails to state a claim
upon which relief can be granted for tortious aiding and
abetting. Pennsylvania courts have declared that such a
claim, based upon section 876 of the Restatement (Second)
of Torts, is a viable cause of action in the Commonwealth.
. . ." Cruz v. Roberts, 70 Pa. D. & C.4th 225, 234 -235
(Pa.Com.Pl. 2005) (concluding that although Section 876 has
been adopted the defendant did not state a claim on which
relief could be granted due to insufficient pleading of
facts).

   Federal courts from around the country have taken a state
court's adoption of Section 876 of the Restatement (Second)
of Torts to mean that a state supreme court would recognize
common law aiding and abetting fraud.  This Court's review
of various federal court opinions has found broad agreement
that where a state has adopted Section 876 of the
Restatement aiding and abetting fraud is a valid cause of
action under the law of that state.  This Court is not
bound by the holdings of these other federal courts.

However, this Court finds the broad agreement between
federal courts on this issue to be persuasive. In Cope v.
Price Waterhouse the Ninth Circuit Court of Appeals
reasoned, "[t]he Second Restatement of Torts also supports
a finding that actual knowledge is the proper standard for
a claim of aiding and abetting fraud. Section 876(b)
provides for secondary liability for tortious conduct if a
party 'knows that the other's conduct constitutes a breach
of duty and gives substantial assistance or encouragement
to the other so to conduct himself.'" Cope v. Price
Waterhouse, No. 92-15901, 1993 WL 102598, at *6 (9th Cir.
1993) (citing Restatement (Second) of Torts, § 876(b)); see
also Pathe Computer Control Systems Corp. v. Kinmont
Industries, Inc., 955 F.2d 94, 98 (1st Cir. 1992) (citing
Norman v. Brown, Todd & Heyburn, 693 F. Supp. 1259, 1264
(D. Mass. 1988) (recognizing a cause of action under
Massachusetts law for aiding and abetting fraud by looking
to Section 876)); El Camino Resources, Ltd. v. Huntington
Nat. Bank, No. 1:07-cv-598, 2009 WL 427278, at *3 (W.D.
Mich. February 20, 2009) (looking to Section 876 of the
Restatement to define the elements for aiding and abetting
fraud); In re Enron Corporation Securities, Derivative &
""ERISA'' Litigation, 540 F.Supp.2d 800, 811 (S.D. Tex.
2007) (examining Section 876 and Aetna Casualty and Surety

Co. v. Leahey Construction Co., Inc., 219 F.3d 519, 532-33 (6th Cir. 2000) to determine the elements for aiding and abetting common law fraud.); Neilson v. Union Bank of California N.A., 290 F.Supp.2d 1101, 1119 -1120 (C.D. Cal. 2003) (looking to Section 876 to define the elements for common law fraud).

A federal court in the Southern District of Mississippi looked at twenty-eight cases (dealing with state court adoption of Section 876 prior to 2002) and concluded, "the majority of jurisdictions that have addressed the validity of a claim for aiding and abetting under § 876(b) have held that such a claim exists. Therefore, Mississippi's adoption of the related and analogous tort of civil conspiracy, coupled with the majority rule regarding 876(b), persuades this Court that Mississippi would recognize a claim of aiding and abetting fraud, foreclosing dismissal for failure to state a claim." Dale v. Ala Acquisitions, Inc., 203 F.Supp.2d 694, 700-701 (S.D. Miss. 2002).  The Pennsylvania Supreme Court's adoption of Section 876 of the Restatement Second of Torts in Skipworth is a significant factor in concluding the Pennsylvania Supreme Court would recognize a tort for aiding and abetting fraud.

Second, lower courts in Pennsylvania have recognized the broad tort of civil aiding and abetting. Pennsylvania state courts' recognition of aiding and abetting claims is a strong indicium that the Supreme Court would recognize the subset tort of aiding and abetting fraud. As noted above a number of lower courts in Pennsylvania have recognized aiding and abetting based on Section 876 of the Restatement. See Koken, 825 A.2d at 732; Cummins, 344 Pa.Super. at 21-22; Sovereign Bank, 914 A.2d at 416; Cruz, 70 Pa. D. & C.4th at 234—35.

Third, several federal courts have recognized the broad tort of civil aiding and abetting under Pennsylvania state law. "The tort of civil aiding and abetting, which is also known as concerted tortious conduct, has recently been recognized as 'a viable cause of action' under Pennsylvania common law." Nelson v. DeVry, Inc., No. 07-4436, 2008 WL 2845300, at *4 (E.D.Pa. July 22, 2008) (quoting Koken, 825 A.2d at 731); Thompson v. Glenmede Trust Co., 1993 WL 197031 (E.D.Pa. June 8, 1993) (recognizing aiding and abetting a breach of fiduciary duty is a tort under Pennsylvania Law and that the tort does not require actual harm to be shown). In Huber v. Taylor the Court of Appeals for the Third Circuit held Pennsylvania state law recognizes a tort for aiding and abetting a

breach of fiduciary duty.  Huber v. Taylor, 469 F.3d 67, 79 (3d Cir. 2006) (recognizing there is no conflict of law between Texas and Pennsylvania law regarding aiding and abetting a breach of fiduciary duty since both states do not require a party to show actual harm or injury to state a claim).  The federal district court cases and the case from the Third Circuit Court of Appeals all cite the Commonwealth Court of Pennsylvania's decision in Koken to find a tort for aiding and abetting.[15]  As analyzed above the reasoning behind the decision in Koken (the adoption of Section 876 of the Restatement (Second) of Torts by the Pennsylvania Supreme Court) leads this Court to recognize aiding and abetting fraud as a viable cause of action.

Fourth, recognizing the tort of aiding and abetting fraud would be a natural extension of this Court's earlier holding recognizing a tort for aiding and abetting a breach of fiduciary duty.  This Court's January 17, 2008 order recognizing aiding and abetting a breach of fiduciary duty was in part based on the Third Circuit Court of Appeals recognizing of the tort under Pennsylvania state law. Adelphia Recovery Trust, 390 B.R. at 77.  This Court also

---

[15] Huber cites a case from the Commonwealth Court of Pennsylvania and a case from the Eastern District of Pennsylvania to support recognition of aiding and abetting a breach of fiduciary duty.  Koken v. Steinberg, 825 A.2d 723, 732 (Pa. Cmwlth. 2003); Thompson v. Glenmede Trust Co., No. CIV. A. 92-5233, 1993 WL 197031 (E.D.Pa.  June 8, 1993).

held aiding and abetting a breach of fiduciary duty was a
valid tort because the Pennsylvania Supreme Court had
adopted Section 876 of the Restatement.  Id.  As discussed
above the adoption of Section 876 leads not only to
recognizing a tort for aiding and abetting a breach of
fiduciary duty but also one for aiding and abetting fraud.

### iii. Aiding and Abetting Fraud is Plead with Particularity

The Defendants argue the elements of aiding and
abetting fraud have not been pled with the needed
particularity to meet the requirements of Fed. R. Civ. P.
9(b).  Aiding and abetting fraud has three elements: "(1)
that an independent wrong exist; (2) that the aider or
abettor know of that wrong's existence; and (3) that
substantial assistance be given in effecting that wrong."
Landy v. Federal Deposit Ins. Corp., 486 F.2d 139, 162 -
163 (3d Cir. 1973); Rochez Bros., Inc. v. Rhoades, 527 F.2d
880, 886 (3d Cir. 1975) (defining the elements for aiding
and abetting using Restatement of Torts Section 876).  To
meet the pleading requirements, "a claim for aiding and
abetting fraud requires plaintiff to plead facts showing,
the existence of a fraud, defendant's knowledge of the
fraud, and that the defendant provided substantial

assistance to advance the fraud's commission." <u>Wight v.</u>
<u>BankAmerica Corp.,</u> 219 F.3d 79, 91 (2d Cir. 2000).

In analyzing the sufficiency of the pleadings for
aiding and abetting fraud this Court looks to the
following: the elements of an aiding and abetting fraud
claim, the section of the Amended Complaint which lays out
Claim 38 for aiding and abetting fraud, and facts which are
pleaded elsewhere in the Amended Complaint (with regards to
the three Co-Borrowing Facilities). <u>Hertz Corp. v. City of</u>
<u>New York</u>, 1 F.3d 121, 125 (2d Cir. 1993) (in analyzing the
sufficiency of pleadings a court is to look at all pleaded
facts in a complaint).

The Amended Complaint has a Byzantine-like structure.
Judge Learned Hand described digging through a voluminous
complaint as requiring "a great deal of archeology".  Judge
Augustus Hand, <u>'Trial Efficiency,' dealing with antitrust</u>
<u>cases, Business Practices Under Federal Antitrust Laws,</u>
<u>Symposium</u>, New York State Bar Assn. (C.C.H., 1951) 31-32.
This is such a case.

Paragraphs 1421 to 1433 of the Amended Complaint lay
out aiding and abetting fraud by the Agent Banks and their
affiliated Investment Banks across the three Co-Borrowing
Facilities.  The allegations in paragraphs 1421 to 1433 are
not specific enough of themselves to meet the requirements

of Fed. R. Civ. P. 9(b).  However, Claim 38 references the preceding paragraphs 1 to 1078 of the Amended Complaint. (Am. Cmpl. ¶ 1434.)

The preceding paragraphs of the Amended Complaint plead sufficient facts related to the Co-Borrowing Facilities to sustain the aiding and abetting fraud claim with regards to the UCA/HHC, CCH, and Olympus Co-Borrowing Facilities.  This Court concludes that the elements of aiding and abetting fraud have been pled with the necessary particularity to sustain the claim in regards to the following defendants and associated Co-Borrowing Facilities: the UCA/HHC Agent Banks and their affiliated Investment Banks in connection with the UCA/HHC Co-Borrowing Facility; the CCH Agent Banks and their affiliated Investment Banks in connection with the CCH Co-Borrowing Facility; the Olympus Agent Banks and their affiliated Investment Banks in connection with the Olympus Co-Borrowing Facility.

**a. Aiding And Abetting Fraud Related to the UCA/HHC Facility is Pled with Particularity**

The Amended Complaint pleads with particularity the elements necessary to sustain a claim for aiding and abetting fraud by the UCA/HHC Agent Banks and their

affiliated Investment Banks related to the UCA/HHC Co-
Borrowing Facility.  First, the Amended Complaint pleads
the Rigas family was involved in fraud related to the
UCA/HHC Facility.  The fraud conducted by the Rigas family
occurred when the Rigas family made fraudulent
misstatements and omissions regarding the UCA/HHC Facility
at the April 22, 1999 board meeting.  (Am. Cmpl. ¶ 863.)
The Rigas family used the UCA/HHC Facility to loot Adelphia
of hundred of millions of dollars for personal gain.  (Am.
Cmpl. ¶ 877.)

     Second, the UCA/HHC Agent Banks and their affiliated
Investment Banks had knowledge of the fraud.  UCA/HHC Agent
Banks and their affiliated Investment Banks knew at the
time they provided the UCA/HHC Term Sheet that the "Rigas
family intended to engage in conduct . . . that violated
those restrictions" and engage in fraud.  (Am. Cmpl. ¶
861.)  Banks were aware prior to presenting the UCA/HHC
Term Sheet that the Rigas family was planning on borrowing
extensively from the facility and using the funds for their
personal benefit.  (Am. Cmpl. ¶ 862.)  Emails between the
parties establish the Banks knew the Rigas family intended
to use the UCA/HHC facility for their personal gain.  (Am.
Cmpl. ¶ 863.)  The Banks involved in the UCA/HHC Facility
had ongoing knowledge that the facility was being used in

violation of the Rigas family, Brown and Mulcahey's
fiduciary obligations – as hundreds of millions of dollars
were withdrawn from the facility over the coming years and
used for the personal benefit of the Rigas family.  (Am.
Cmpl. ¶¶ 873—75.)

    The Defendants assert ART has not pled knowledge with
the requisite particularity to satisfy Rule 9(b).  However,
this Court in its January 17, 2008 decision, held knowledge
may be averred generally.  Adelphia Recovery Trust, 390
B.R. at 64.  The Second Circuit has held, "[i]n alleging
fraud or mistake, a party must state with particularity the
circumstances constituting fraud or mistake. Malice,
intent, knowledge, and other conditions of a person's mind
may be alleged generally."  Rombach v. Chang., 355 F.3d
164, 171 (2d Cir. 2004).   "We apply the more general
standard to scienter for the simple reason that 'a
plaintiff realistically cannot be expected to plead a
defendant's actual state of mind.'" Wight v. BankAmerica
Corp., 219 F.3d 79, 91-92 (2d Cir. 2000) (citing
Connecticut Nat'l Bank v. Fluor Corp., 808 F.2d 957, 962
(2d Cir. 1987)).

    The Defendants argue Lerner v. Fleet Bank, N.A.
overruled the Second Circuits' earlier decisions and
requires the Plaintiff to plead facts showing actual

knowledge of the fraud by the Defendants.  (Investment. B.
Mem. at 17 (<u>citing</u> <u>Lerner v. Fleet Bank, N.A.</u>, 459 F.3d
273, 293 (2d Cir. 2006))).  The Defendants' argument
overstates the holding in <u>Lerner</u>.  <u>Lerner</u> does not overrule
<u>Wight</u> (and earlier Second Circuit cases).  Instead, <u>Lerner</u>
incrementally heightens the pleading standard for
knowledge.  <u>Lerner</u>, 459 F.3d at 293.  <u>Lerner</u> stands for the
proposition that one can plead facts which give rise to a
strong inference that the defendant had knowledge of the
fraud.  The inference "may be established either (a) by
alleging facts to show that defendants had both motive and
opportunity to commit fraud, or (b) by alleging facts that
constitute strong circumstantial evidence of conscious
misbehavior or recklessness." <u>Id</u>. at 290-91.  <u>Lerner</u> does
not require the plaintiff to plead actual knowledge on the
part of a defendant; if a party pleads facts leading to a
"substantial inference" that will be enough.  <u>Id.</u>; <u>see also</u>
<u>M-101, LLC v. iN Demand L.L.C.</u>, No. 06 Civ. 12938, 2007 WL
4258191, at *2 (S.D.N.Y. Dec 03, 2007), <u>Oh v. Imagemark,</u>
<u>Inc.</u>, No. 06 Civ. 10187, 2007 WL 2962381, at *3 (S.D.N.Y.
Oct 10, 2007).  In this case ART has met the burden laid
out in <u>Lerner</u>.  ART has pled facts (emails, meetings,
correspondence, and conduct) which constitute strong
circumstantial evidence that the UCA/HHC Agent Banks and

Investment Banks were aware of the fraud related to the UCA/HHC Co-Borrowing Facility.

Third, the UCA/HHC Agent Banks and their affiliated Investment Banks (involved in the UCA/HHC Facility) provided substantial assistance to advance the commission of the fraud.  The UCA/HHC Agent Banks and Investment Banks worked together to draft and approve the UCA/HHC Term Sheet.  (Am. Cmpl. ¶ 861.) The UCA/HHC Term Sheet omitted key terms and made specific misstatements.  These misstatements included: presenting the UCA/HHC Facility as being in the best interest of Adelphia, that the proceeds would only be used for specific purposes, the UCA/HHC Facility would be restricted in its work with RFEs, transactions with affiliates would be prohibited, and the restricted investments clause placed substantial limits on the type of transaction permitted.  (Am. Cmpl. ¶¶ 853–61.) The Amended Complaint alleges that but for the omissions and misstatements in the UCA/HHC Term Sheet the UCA/HHC Facility would not have been approved and the fraud would not have occurred.  (Am. Cmpl. ¶¶ 867–72.)  The UCA/HHC Agent Banks and their affiliated Investment Banks are alleged to have played a key role in furthering the UCA/HHC related fraud.

**b. Aiding And Abetting Fraud Related to the CCH Facility is Pled with Particularity**

The Amended Complaint has enough particularity to meet the pleading requirements for aiding and abetting fraud related to the CCH Facility (by the CCH Agent Banks and their affiliated Investment Banks).  The Amended Complaint's pleading of the facts surrounding the CCH Facility mirror the pleadings for the UCA/HHC Facility so this order will briefly summarize the pleadings (after the more exhaustive overview of the UCA/HHC Facility).

First, the pleadings state with particularity that the Rigas family was involved in fraudulent activities related to the CCH Facility.  (Am. Cmpl. ¶¶ 917, 922, 923.) Second, the Amended Complaint pleads specific facts showing the CCH Agent Banks and their affiliated Investment Banks had knowledge of the fraud related to the CCH Facility. (Am. Cmpl. ¶¶ 905, 909, 975, 978.)  Third, the Amended Complaint pleads facts showing the CCH Agent Banks and their affiliated Investment Banks provided substantial assistance to the Rigas family by crafting term sheets which induced the independent directors of Adelphia to enter into the CCH Co-Borrowing Facility.   (Am. Cmpl. ¶¶ 878, 885, 910. 902, 904, 896, 900.)

**d. Aiding And Abetting Fraud Related to the Olympus Facility is Pled with Particularity**

The Amended Complaint pleads aiding and abetting fraud related to the Olympus Facility by the Olympus Agent Banks and their affiliate Investment Banks with the required particularity.  The facts alleged with regards to the Olympus Facility and the aiding and abetting of fraud mirror those of the UCA/HHC Facility and the CCH Facility.

First, the pleadings state the Rigas family was involved in fraud related to the Olympus Facility.  (Am. Cmpl. ¶¶ 924, 932, 933, 935, 936, 950.)  Second, the Amended Complaint pleads specific facts showing the Olympus Agent Banks and their affiliated Investment Banks had knowledge of fraud related to the Olympus Facility.  (Am. Cmpl. ¶¶ 928, 931, 951, 952, 955.)  Third, the Amended Complaint pleads facts showing the Olympus Agent Banks and their affiliated Investment Banks provided substantial assistance to the Rigas family by crafting term sheets which induced the independent directors of Adelphia to enter into the Olympus Co-Borrowing Facility.   (Am. Cmpl. ¶¶ 937—49, 958, 960.)

**iv. Group Pleading of the Agent Banks and Their Affiliated Investment Banks Is Permitted**

The Defendants argue ART's grouping together of the Agent Banks and Investment Banks in their pleadings fails to satisfy the pleading standards of Rule 9(b) and Rule 8(a).  The Defendants argue "'the time, place, speaker and content of the alleged misrepresentation' of each defendant" must be pled individually.  (Lenders Mem. at 10 (citing Caputo v. Pfizer, Inc., 267 F.3d 181, 191 (2d Cir. 2001))).  Although the lumping of defendants is frowned upon particularly to meet the higher standards of pleading under Rule 9(b) a limited exception is allowed where defendants have collaborated on or approved a document together and the document is the basis for the liability. "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint."  Polar Intern. Brokerage Corp. v. Reeve, 108 F.Supp.2d 225, 237 (S.D.N.Y. 2000).  "[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question."  Luce v. Edelstein, 802 F.2d 49, 55 (2d Cir. 1986).   The group pleading doctrine holds defendants can be pled together where, "'prospectuses, registration statements, annual reports, press releases, or

other group-published information,' are the collective work
of those individuals with direct involvement in the
everyday business of the company." In re Oxford Health
Plans, Inc., 187 F.R.D. 133, 142 (S.D.N.Y. 1999) (citing In
re Stratosphere Corp. Securities Litig., 1 F.Supp.2d 1096,
1108 (D.Nev. 1998)).

Grouping of defendants will be allowed if the
defendants had drafted, prepared or approved collectively a
document and the defendants had knowledge and involvement
in the everyday business of the company.  Id.  The two
elements required by the group pleading doctrine are met by
ART's Amended Complaint.  First, the term sheets were
prepared and approved by the Agent Banks and their
affiliated Investment Banks.  (Am. Cmpl. ¶ 861.)  Second,
the Agent Banks and Investment Banks worked with Adelphia
and had knowledge of the everyday business of the company
owing to their due-diligence, conversations with the Rigas
family, and structuring of the large and complex Co-
Borrowing Facilities.  (Am. Cmpl. ¶ 841, 844, 861—63.)

An overview of cases from this circuit shows the group
pleading doctrine is used in narrow instances factually
similar to the case at hand.  In Polar Intern. Brokerage,
Corp., a federal district court held the group pleading
doctrine was appropriate for grouping defendants where they

drafted and/or approved offering documents.  Defendants

pleaded together included a private equities firm

initiating a tender offer, an indirectly owned subsidiary

of the firm, individual officers and directors of the

target corporation, and investment banks working on the

offer.  Polar Intern. Brokerage, Corp., 108 F.Supp.2d at

238.  In In re AOl Time Warner, Inc. Securities and "Erisa"

Litigation, a federal district court held group pleading

was appropriate in a lawsuit brought against AOL Time

Warner by investors for misstatements in written documents:

"[w]ith respect to group-published documents such as

prospectuses, plaintiffs may rely on a presumption that the

group-information is the collective works of those

individuals."  In re AOL Time Warner, Inc. Securities and

"ERISA" Litigation, 381 F.Supp.2d 192, 220 (S.D.N.Y. 2004);

see also In re Adelphia Communications Corporation

Securities and Derivative Litigation, 398 F.Supp.2d 244,

250 (S.D.N.Y. 2005)[16]; In re Refco, Inc. Securities

Litigation, 503 F.Supp.2d 611, 642 (S.D.N.Y. 2007)

(applying group pleading doctrine to members of an audit

---

[16] In this class action brought by investors against directors and/or
senior officers of Adelphia Business Solutions related to the failure
of Adelphia Communications (in a separate case from the one at hand)
this Court held that group pleading was appropriate against the
directors since the Amended Complaint alleged that they were involved
in the preparation/approval of documents in which fraudulent statements
were made.  In re Adelphia Communications Corporation Securities and
Derivative Litigation, 398 F.Supp.2d at 250.

committee who approved statement); In re Parmalat
Securities Litigation, 479 F.Supp.2d 332, 340 (S.D.N.Y.
2007); In re NTL, Inc. Sec. Litig., 347 F.Supp.2d 15, 22 n.
26 (S.D.N.Y. 2004).

The Defendants contend that group pleading is
inappropriate in this case based on the United States Court
of Appeals for the Second Circuit opinion in Divittorio.
In Divittorio, the Second Circuit held group pleading was
inappropriate where the amended complaint did not allege
that the putative defendants had knowledge of the inner
workings of the company.  DiVittorio v. Equidyne Extractive
Industries, Inc., 822 F.2d 1242, 1249 (2d Cir. 1987).  The
Divittorio case cited by the Defendants is distinguishable
from the facts of this case.  In DiVittorio, the complaint
did not identify the grouped Defendants as being insiders
or affiliates or even being involved in the drafting of
misleading documents.  Id.  Further, "[n]o allegations in
the amended complaint are sufficient to describe any of
them as insiders or affiliates, and there is no allegation
linking any of them in any specific way to any fraudulent
misrepresentation or omission." Id.  In contrast, the
Amended Complaint pleads the Agent Banks and their
affiliated Investment Banks conducted due diligence, worked

with the Rigas family, and detailed contact regarding
Adelphia's business.

**v. Co-Borrowing Term Sheets Do Not Contradict the Amended Complaint**

Defendants argue Claim 38 should be dismissed because
the term sheets for the three Co-Borrowing Facilities
disclosed the true nature of the facilities.  The Banks
argue the provisions in the term sheets did not differ from
the final terms of the credit agreements.  "None of the
term sheets imposes any restriction on any individual co-
borrower's ability to borrow up to the full amount of the
facility."  Agent B. Mem. at 10.  "[A]s such, nothing in
the term sheets would have given the directors any
reasonable basis to conclude that a co-borrower was
contractually limited in its borrowing rights by its
individual financial condition."  Agent B. Mem. at 11.  The
Agent Banks continue, "such alleged misunderstandings are
in direct conflict with the express terms of the documents
themselves and cannot support Plaintiff's fraud claims."
Agent B. Mem. at 13-14.

The Defendants overstate the clarity of the clauses in
the term sheets.  Although some sections of the term sheets
might contradict allegations in the Amended Complaint other

clauses in the same term sheet support allegations in the
Amended Complaint.  Construing all facts pleaded in the
Amended Complaint in favor of the Plaintiff in this case
one can conclude the term sheets contain misleading, self
contradictory terms and omissions.

The Defendants argue that where plain language of an
agreement clearly contradicts the facts alleged in the
Amended Complaint then the allegations in the Amended
Complaint need not be accepted as true and the attached
document controls.  Agent Banks' Reply Memorandum of Law in
Support of Motion to Dismiss Amended Complaint ("Agent B.
Reply Mem.") at 4.  But the term sheets referenced in the
Amended Complaint are not so clear as to plainly contradict
the facts alleged in the Amended Complaint.

The cases cited by the Defendants to support their
claim that the plain language of the agreements disproves
an aiding and abetting fraud claim are not analogous to the
facts in this case.  The cases cited by Defendants involve
documents with clear provisions which are not contradicted
by provisions elsewhere in the same documents.  The facts
in this case are distinguishable because the clauses in the
Co-Borrowing Facilities summary term sheets are
contradicted by provisions elsewhere in the same term
sheets or are vague or ambiguous.  In contrast, the cases

cited by Defendants (<u>Feick</u> and <u>Echostar</u>) are based on
documents which unambiguously and clearly contradict
statements made in the Complaint.  <u>Feick v. Fleener</u>, 653
F.2d 69 (2d Cir. 1981) (plain language of a 'power of
attorney' document where lawsuit was over what power of
attorney the defendant had); <u>Echostar DBS Corp. v. Gemstar-</u>
<u>TV Guide Int'l, Inc.</u>, No. 05 Civ. 8510, 2007 WL 438088
(S.D.N.Y. Feb. 8, 2007) (plain language in a contract suit
over a contract).  This Court will not dismiss the claims
on this basis.  Dismissal at this stage in the proceedings
is inappropriate.  <u>Gonzalez v. Caballero</u>, 572 F.Supp.2d
463, 466 (S.D.N.Y. 2008); <u>see also</u> <u>Ruotolo v. City of New</u>
<u>York</u>, 514 F.3d 184, 188 (2d Cir. 2008).


**B. Claim 37 — Aiding and Abetting a Breach of Fiduciary**
**Duty against the Agent Banks and Their Affiliated**
**Investment Banks**

Claim 37 in the Amended Complaint alleges the Agent
Banks and their Affiliated Investment Banks aided and
abetted breaches of fiduciary duty by the Rigas family
toward Adelphia.  The Defendants urge this Court to dismiss
Claim 37 for aiding and abetting breach of fiduciary duty
against the Agent Banks and their affiliated Investment
Banks.  Lenders Reply Mem. at 4.  The arguments for

dismissal of Claim 37 are similar to those for dismissal of
Claim 38.   The Defendant's allege Claim 37 should be
dismissed because it was not pled with the necessary
particularity and the Pennsylvania Supreme Court would not
recognize a tort of aiding and abetting a breach of
fiduciary duty.   This Court has already examined in
previous orders some of the issues which are raised again
by the Defendants.

**i. Background of Claim 37**

Claim 37 was originally pled in the Creditors
Complaint.   In the Creditors Complaint, Claim 37 alleged
the Agent Banks and their affiliated Investment Banks had
aided and abetted the Rigas family's breaches of fiduciary
duty to shareholders.   The breaches of fiduciary duty
stemmed from six loan facilities.   The loan facilities were
categorized into two groups.   The first group was the Co-
Borrowing Facilities (Olympus, CCH, and UCA/HHC
Facilities).   The second grouping was loan facilities which
did not have structures enabling the Rigas family to use
the balance sheet of Adelphia for personal gain (the
FrontierVision, Parnassos, and Century-TCI Facilitates).

Judge Gerber's opinion dismissed Claim 37 "to the
extent aiding and abetting claims are based on wrongful

acts in connection with FrontierVision, Parnassos and Century-TCI facilities. Claims otherwise survive [as to claims involving the three co-borrowing facilitates]." In re Adelphia Communications Corp., 365 B.R. at 81.  The Bankruptcy Court held the Creditors Committee had Article III standing to bring Claim 37.  In re Adelphia Commc'ns Corp., 330 B.R. at 377.  The Bankruptcy Court held Pennsylvania state law applies in this case and Pennsylvania state law would recognize the claim of aiding and abetting a breach of fiduciary duty.  In re Adelphia Communications Corp., 365 B.R. at 41.  Lastly the bankruptcy court held the in pari delicto doctrine should not lead to the dismissal of Claim 37.  In re Adelphia Communications Corp., 365 B.R. at 45-57.

This Court on January 17, 2008, issued an order on four issues raised in Judge Gerber's opinions.  First, this Court held aiding and abetting would be a tort recognized by the Pennsylvania State Supreme Court (thus ART could properly bring a claim on this ground).  Adelphia Recovery Trust, 390 B.R. at 77-79.  Second, this Court held ART had Article III standing to bring a claim for aiding and abetting a breach of fiduciary duty.   Adelphia Recovery Trust, 390 B.R. at 69-71.  Third, this Court held the in pari delicto defense should not lead to the dismissal of a

claim on a 12(b)(6) motion.  Fourth, this Court in response
to limited briefing from some of the banks, found Claim 37
should not be dismissed for failing to satisfy Rule 9(b)
requirements.

The January 17, 2008 decision did not fully address
the sufficiency of the pleadings for claim 37 as new issues
have been raised in subsequent briefs filed by parties
after the January 17, 2008 opinion and after Claim 37 was
repled (the January 17, 2008 decision looked at the
sufficiency of the Creditor Complaint not the Amended
Complaint which was filed shortly before the January 17th
2008 decision was released).[17]  In addition, the 'Lenders'
filed their Reply Memorandum of Law in Support of their
Motion to Dismiss after this Court had issued its January
17, 2008 opinion.  Lenders Reply Mem. at 4.  The Lenders
argue they "were not among the Agent Banks Defendants who
previously moved to dismiss.  As described in the Lenders'
opening Memorandum, the Lenders . . . were not required to
respond in this action until December 21, 2007, when the
present motion was filed."  Id.  Because of this the

---

[17] The Amended Complaint alleges a breach of fiduciary duty with respect to the 'Co-Borrowing Facilities." (Am. Cmpl. ¶ 1414.)  The Amended Complaint describes these facilities as 'fraudulently structured Co-Borrowing Facilities for the purpose of obtaining access to funds for their personal use." Id. This refers to the UCA/HHC, CCH and Olympus Co-Borrowing Facilities.  The Frontiervision, Parnassos, and Century-TCI Credit Facilities are not named Claim 37 of the Amended Complaint.

Lenders motions for dismissal are alive and are addressed here.

## ii. Aiding and Abetting a Breach of Fiduciary Duty is Pled with Enough Particularity

To adequately plead a claim of aiding and abetting a breach of fiduciary duty under Pennsylvania state law a plaintiff must plead the following elements: "(1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." Baker v. Family Credit Counseling Corp., 440 F.Supp.2d 392, 417-418 (E.D.Pa. 2006); Reis v. Barley, Snyder, Senft & Cohen LLC., 484 F.Supp.2d 337, 343 (E.D.Pa. 2007).

ART's claim of aiding and abetting a breach of fiduciary duty by the Agent Banks and their affiliated Investment Banks must meet the heightened pleading requirement of Fed. R. Civ. P. 9(b). The Amended Complaint's Claim 37 is based on the fraudulent actions of the Rigas family. "Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty-statutory, common law, tort, contractual, or fiduciary." Frota v. Prudential-Bache Securities, Inc., 639 F.Supp.

1186, 1193 (S.D.N.Y. 1986).  "[W]hen a breach of fiduciary duty claim is, in substance, a claim of fraud, the requirements of Rule 9(b) are triggered."  Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc., 964 F.Supp. 783, 804 (S.D.N.Y. 1997).  The cases not subjected to Rule 9(b) requirements (involving aiding and abetting a breach of fiduciary duty) are limited.  These cases typically involve conduct not amounting to fraud, such as by breaching a duty of care, disclosure or loyalty.  "It is well-established that Rule 9(b) is not applicable to breach of fiduciary duty ... claims; it applies only to claims sounding in fraud."  Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc., 964 F.Supp. 783, 804 (S.D.N.Y. 1997) (citing Schupak v. Florescue, No. 92 Civ. 1189, 1993 WL 256572, at *2-3 (S.D.N.Y. July 8, 1993)).  ART's claim of aiding and abetting a breach of fiduciary duty is distinguishable from cases where Rule 9(b) has not been applied.  The breach of the fiduciary duty in this case is firmly rooted in fraud.  The complaint alleges that "in pursuing a fraudulent course of conduct, each member of the Rigas family . . . was a faithless fiduciary."  (Am. Cmpl. ¶ 1417.)  The conduct of each of the Agent Banks and each of the Investment Banks was "wrongful . . . . committed with actual malice and/or a

wanton and willful disregard of Adelphia's rights." (Am. Cmpl. ¶ 1418.)

The aiding and abetting of fiduciary duty claim is tied to the three Co-Borrowing Facilities. To determine whether the claim is pleaded with the necessary particularity this Court looks at the entirety of the Amended Complaint to determine whether there are specific enough allegations; in addition it is necessary to break down the compound nature of the claim which appears in paragraphs 1413 to 1419 by looking at the specific participation of the Agent Banks and their affiliated Investment Banks in aiding and abetting a breach of fiduciary duty using the three Co-Borrowing Facilities.

### iii. Pleadings Related To the Three Facilities

The facts surrounding the three Co-Borrowing Facilities have been described in detail above. The pleadings meet the requirements for pleading aiding and abetting a breach of fiduciary duty. First, the Amended Complaint alleges, the Rigas family breached its fiduciary duty by entering into the UCA/HHC, CCH and Olympus Facilities. (Am. Cmpl. ¶¶ 862—69, 878, 888, 889, 890, 924, 933, 935—36, 1416.) Second, the Agent Banks and their affiliated Investment Banks were aware of the breach of

fiduciary duty by the Rigas family regarding all three of the Co-Borrowing Facilities.  (Am. Cmpl. ¶¶ 905—06, 951, 952, 1416.)  Finally, the Agent Banks and their affiliated Investment Banks provided substantial assistance or encouragement to the Rigas family in effecting the breach of fiduciary duty with regards to all three Co-Borrowing Facilities.  (Am. ¶¶ Cmpl. 848—52, 885, 891-903, 923, 931, 934, 937—49, 1419.)  The Amended Complaint taken as a whole contains specific allegations which tie specific groups of defendants (i.e. the UCA/HHC Agent Banks) to the aiding and abetting of fiduciary duty by the Rigas family related to specific Co-Borrowing Facilities (i.e. the UCA/HHC Co-Borrowing Facility).

Defendants argue the pleadings are insufficient because they rely on grouping together defendants.  The applicability of the group pleading doctrine to this case is discussed above and this Court finds group pleading is appropriate.


**C.  Claim 54 — Fraudulent Concealment against the Investment Banks Is Dismissed**

Claim 54 alleges the Investment Banks fraudulently concealed material information about the Co-Borrowing Facilities from the independent directors at Adelphia.

(Am. Cmpl. ¶ 1565.)  Under Pennsylvania state law, a defendant is only liable for fraudulent concealment if he was under an affirmative duty to disclose the information. However, the applicable case law does not establish that Investment Banks had an affirmative duty to disclose information about the Co-Borrowing Facilities to either Adelphia or the independent directors.  ART has failed to establish a duty to disclose and Claim 54 is DISMISSED.

### i. Background of Claim 54

Claim 54 was originally pled in the Equity Committee's Intervenor Complaint.  Bankruptcy Judge Gerber issued an order on the Defendants' motions to dismiss the claim.  In re Adelphia Commc'ns., Adversary No. 03-04942 (REG), 2007 WL 2403553 (Bankr. S.D.N.Y. Aug. 17, 2007).  In Judge Gerber's opinion the claim is identified as Claim 64 (the claim was later redrafted and merged into the Amended Complaint as Claim 54).  Judge Gerber granted the Defendant Investment Banks' 12(b)(6) motions to dismiss. The Investment Banks' status as underwriters for Adelphia securities offerings did not give rise to a fiduciary relationship and the Investment Banks were under no duty to speak (and cannot be liable for fraudulent concealment). Id.  Judge Gerber granted the Investment Banks leave to

replead but only to the extent they can allege duties of
the Investment Banks arising from the Banks' capacity as
advisors to the Debtors.  Following the dismissal of the
fraudulent concealment claim against the Investment Banks
the claim was redrafted and placed in the Amended Complaint
as Claim 54.  This Court has not till now directly examined
the Defendants' 12(b)(6) motions to dismiss Claim 54.

## ii. Elements of Fraudulent Concealment

Under Pennsylvania state law there are four elements
of a claim of fraudulent concealment.  "Plaintiffs must
establish (1) an affirmative act of concealment by
defendants, (2) which misled or relaxed plaintiffs'
investigation into possible causes of action, and (3) that
plaintiffs' ignorance is not attributable to lack of
diligence in investigating possible claims."  In re
Aspartame Antitrust Litigation, No. 2:06-CV-1732, 2007 WL
5215231, at *3 (E.D.Pa. January 18, 2007); Knit With v.
Knitting Fever, Inc., No. Civ.A. 08-4221, 2008 WL 5381349,
at *21 (E.D.Pa. December 18, 2008).  The fourth element of
fraudulent concealment is that the plaintiff must allege
that the defendant had an affirmative duty to speak.  The
Third Circuit Court of Appeals has held:

The threshold inquiry on this point is whether
Pennsylvania has adopted [Restatement (Second) of
Torts] section 551. In Neuman v. Corn Exchange
Nat. Bank & Trust Co., the Pennsylvania Supreme
Court held that '[t]he deliberate nondisclosure
of a material fact amounts to culpable
misrepresentation no less than does an
intentional affirmation of a material falsity.' .
. . . Numerous intermediate appellate courts in
Pennsylvania have followed Neuman 's lead and
held, following the principles in the
Restatement, that to be liable for material
nondisclosures, a party must have a duty to
speak.

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d
604, 611 (3d Cir 1995) (citing Neuman v. Corn Exchange Nat.
Bank & Trust Co., 51 A.2d 759, 764 (1947)).  The Third
Circuit's opinion is binding on this Court when determining
Pennsylvania law where the Pennsylvania Supreme Court has
not made a final determination.   Booking, 254 F.3d at 421.

Since the opinion in Duquesne Light was issued a
variety of lower Pennsylvania state courts and federal
district courts have held that fraudulent concealment

requires the plaintiff to show that the defendant was under a duty to disclose the omitted information.  "The elements of fraudulent concealment are the same as those of fraudulent misrepresentation, with the additional requirement that the defendant possess a duty to disclose the concealed facts." GMH Assocs. Inc. v. Prudential Realty Group, No. 96-17366, 1998 WL 1053679, at *44 (Pa.Com.Pl. Sep 16, 1998).  A federal district court held, "[a] fraud claim based on intentional non-disclosure (i.e. omission) has the same elements as fraud, except that 'an omission is actionable as fraud only where there is an independent duty to disclose the omitted information.'" Bucci v. Wachovia Bank, N.A., 591 F.Supp.2d 773, 783 (E.D.Pa. 2008) (citing Duquesne Light Co. v. Westinghouse Electric Corp., 66 F.3d 604, 612 (3d Cir. 1995));  see also Daniel Boone Area School District v. Lehman Bros., Inc., 187 F.Supp.2d 400 (W.D.Pa. 2002) (dismissing plaintiff's fraud by omission claim where plaintiff failed to allege a confidential or fiduciary relationship existed between the parties); City of Harrisburg v. Bradford Trust Company, 621 F.Supp. 463 (M.D.Pa. 1985) (omission is actionable only where there is an independent duty to disclose omitted information and such duty exists from a fiduciary or confidential relationship); Debbs v. Chrysler Corp., 810 A.2d 137,

155 (Pa.Super. 2002) ("mere silence without a duty to speak will not constitute fraud.").

The Amended Complaint meets the first three elements required for a fraudulent concealment claim.  ART identifies six areas where the Investment Banks had knowledge of a transaction which they did not disclose to Adelphia.  (Am. Cmpl. ¶ 1565.)  The Amended Complaint alleges that had the true nature of the Co-Borrowing Facilities and attendant financial transactions been disclosed Adelphia would not have been lulled into a false sense of security.  (Am. Cmpl. ¶¶ 1563—66.)  The Investment Banks due to their unique position as a conduit for information had information which Adelphia's independent directors would not have been able to uncover through a reasonable investigation.  (Am. Cmpl. ¶¶1562—64.) However, the Amended Complaint fails to allege the last element of a claim for fraudulent concealment. The Investment Banks did not have a duty to speak.

**iii. The Investment Banks Did Not Have an Affirmative Duty to Speak Based on a Fiduciary Duty or Unique Knowledge**

Under Pennsylvania state law a duty to speak arises when a defendant owes a fiduciary duty to the plaintiff or "as a result of one party's reliance on the other's

representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means." <u>Reichhold Chemicals, Inc. v. Millennium Intern. Technologies, Inc.</u>, No. 99-799, 1999 WL 270391, at *2 (E.D.Pa. May 5, 1999). The Amended Complaint does not adequately allege that the Investment Banks had a duty to disclose based on either formulation (fiduciary duty or unique knowledge).

**1. A Duty to Speak Did Not Arise From Being the Sole Party with Knowledge of the Fraud**

The Amended Complaint does not plead facts establishing that the Investment Banks were the sole party with knowledge of information concealing fraud.  ART is unable to plead the Investment Banks were the sole party in possession of information – even if one were to construe all allegations in the Amended Complaint as true – for three reasons.  First, ART concedes in its Memorandum of Law that the Investment Banks' duty to disclose does not flow from being the only party with knowledge of the concealed information.  ART Mem. at 57-58.  Second, the Amended Complaint pleads the Rigas family had knowledge of the allegedly concealed information.  Because the Rigas family also had access to the same information the

Investment Banks were not solely in control of the information.  Claim 38 and Claim 37 for aiding and abetting fraud and breaches of fiduciary duty lay out the detailed knowledge which the Rigas family had of the fraudulent activities related to the Co-Borrowing Facilities.  (Am. Cmpl. ¶¶ 801, 907.)   Third, other Investment Banks were aware of the allegedly concealed information.   The standard for a duty to disclose is that "one party is the only source of the information to the other party." Reichhold Chemicals, Inc., 1999 WL 270391, at *2.  Because multiple Investment Banks worked on each transaction at any one time there was never 'a singular' party who had knowledge of the fraudulent nature of the transactions and thus the standard for 'only source of information' can not be met.

## 2. Investment Banks Did Not Have a Duty to Disclose Based On Fiduciary Duty

Pennsylvania courts have not examined whether an Investment Bank owes a fiduciary duty to a corporation, the corporation's independent directors, or shareholders.[18]

_____

[18] The Pennsylvania Supreme Court has never addressed directly whether an Investment Bank owes a fiduciary duty to its clients outside of any duties which are imposed by the contract governing the Investment Bank's engagement.  However, the analysis of the Court of Appeals for the Seventh Circuit in the case of Joyce v. Morgan Stanley & Co. is

Because the Pennsylvania Courts have not addressed this issue this Court will look at Pennsylvania state law standards for establishing a breach of fiduciary duty to attempt to predict how the Pennsylvania Supreme Court would rule. Carrasquilla, 197 F.Supp.2d at 172.  This Court concludes that the Pennsylvania Supreme Court would not find a fiduciary relationship between an Investment Bank and a corporation, its shareholders, or independent directors (barring a duty set by written contract). Because the Investment Banks do not owe a fiduciary duty to Adelphia, ART has not alleged a claim on which relief can be granted.

Under Pennsylvania state law a fiduciary duty will arise "where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other." eToll, Inc. v. Elias/Savion Advertising, Inc., 811 A.2d 10, 22 (Pa.Super.Ct. 2002).  "A confidential or fiduciary relationship does not exist merely because one party relies

persuasive.  In that case the Court of Appeals held that under Illinois Law, Morgan Stanley did not owe shareholders of an acquired corporation (Morgan Stanley was the advisor to the acquired corporation) a fiduciary duty since none was mentioned in the contract. The court held that "[t]he fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business. The dominant party must accept the responsibility, accept the trust of the other party before a court can find a fiduciary relationship." Joyce v. Morgan Stanley & Co. Inc., 538 F.3d 797, 802 (7th Cir. 2008) (quoting Pommier v. Peoples Bank Marycrest, 967 F.2d 1115, 1119 (7th Cir. 1992) (internal citations omitted.)

on and pays for the specialized skill or expertise of the other party. Rather, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side." MRED General Partner, LLC v. Tower Economics Co., Inc., No. 2531, 2005 WL 957707, at *2 (Pa.Com.Pl. April 12, 2005) (citations omitted).  Further, "[b]oth our [Pennsylvania] Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others . . . invest such a level of trust that they seek no other counsel." Basile v. H & R Block, Inc., 777 A.2d 95, 102 (Pa.Super. 2001).  Under Pennsylvania state law, a fiduciary relationship will be formed only when the level of overmastering is such that the dependent party seeks no other counsel.  Smith v. John Hancock Ins. Co., 06-CV-3876, 2008 WL 4072585, at *7 (E.D.Pa. September 2, 2008)

An examination of cases from federal district courts (applying Pennsylvania state law) and Pennsylvania state courts shows a general disinclination to find a fiduciary duty between two parties except where there is overmastering influence.  Binary Semantics Ltd. v. Minitab,

75

Inc., 07-CV-1750, 2008 WL 763575, at *13 (M.D.Pa. March 20, 2008) (finding no fiduciary duty between two commercial parties where one party had agreed to distribute the other's computer related products); Ross v. Met. Life Ins. Co., 411 F.Supp.2d 571, 583 (W.D.Pa. 2006) (finding the contractual relationship between insurer and insured does not automatically give rise to a fiduciary relationship); Transmissions, Inc. v. Harris, 759 F.Supp. 1141, 1147 (E.D.Pa. 1991) (holding no fiduciary relationship exists between franchisee and franchisor); Smith v. John Hancock Ins. Co., 06-CV-876, 2008 WL 4072585, at *7 (E.D.Pa. September 02, 2008) (holding no fiduciary duty between purchaser of an annuity and the issuer of the annuity and the investment advisor who counseled the plaintiff to buy the annuity where the plaintiff sought other counsel); In re Scott's Estate, 455 Pa. 429 (1974) (joint tenants of a bank account created by brother and sister, without more, does not place them in a relationship of confidentiality); Temp-Way Corp. v. Continental Bank, 139 B.R. 299 (E.D.Pa. 1992) (a lender "does not ordinarily owe a fiduciary duty to a borrower").

The Amended Complaint does not plead facts which are sufficient to establish a fiduciary relationship between the Investment Banks and Adelphia.  First, the Amended

Complaint merely alleges that Adelphia "reasonably relied" or "depended and relied" based on the investment banks' superior skill.  (Am. Cmpl. ¶¶ 1561, 1562).  But mere reliance based on a superior skill is not enough.  "The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side."  eToll, Inc., 811 A.2d at 23 (Pa.Super. 2002) (quoting Basile v. H & R Block, 777 A.2d 95, 101 (Pa.Super. 2001)).  The Amended Complaint does not plead the Investment Banks exerted overmastering influence and control over Adelphia.  Second, the Amended Complaint pleads that the Investment Banks assisted the Rigas family and the Rigas family was the party with control over Adelphia.  Third, the Amended Complaint fails to allege that Adelphia relied solely on the advice of the Investment Banks.  In Basile the court held a fiduciary duty would be formed where the nature of advice was such that the dependent party did not seek any additional counsel. Basile, 777 A.2d at 102.  The Amended Complaint does not plead that Adelphia relied to such an extent that Adelphia or the Adelphia independent directors did not look to other sources for advice.  Fourth, ART does not provide any

evidence of a contractual term which shows a fiduciary duty was contracted for as part of providing advisory services. Fifth, the Amended Complaint does not plead that Investment Banks were aware that they were in a fiduciary relationship with Adelphia.  A fiduciary relationship requires that "both parties must have acknowledged such a fiduciary relationship." In re Cara Corp., 148 B.R. 760, 772 (E.D. Pa. 1992).  Taken together these factors show the pleadings have not alleged facts which establish a fiduciary duty between the Investment Banks and Adelphia.

Claim 54 alleging fraudulent concealment on the part of the Investment Banks is DISMISSED.

**D. Claim 55 – Fraud against the Agent Banks and their Affiliated Investment Banks Is Dismissed In Part**

Claim 55 alleges fraud on the part of the Agent Banks and their affiliated Investment Banks.  Claim 55's structure is such that it is comprised of fifteen sub-claims of fraud.  (Am. Cmpl. ¶¶1571—576.)  Some of these sub-claims overlap one another.  Other sub-claims allege conduct which is independent of the other sub-claims.  To determine the sufficiency of the pleadings for fraud this Court will examine each sub-claim in Claim 55.

Paragraph 1572 of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks engaged

78

in fraud against Adelphia and its other creditors.  (Am.
Cmpl. ¶ 1572.)  Paragraph 1572 lists nine sub-claims
alleging fraud.  The fraud sub-claims run the gamut from
use of the central cash management system ("CMS") to loot
funds from Adelphia to misrepresenting Adelphia's finances
in offering materials by excluding 2 billion dollars in
off-balance sheet debt.  (Am. Cmpl. ¶¶ 1572(vi),
1572(iii).)

Paragraph 1573 of the Amended Complaint alleges the
Agent Banks and their affiliated Investment Banks
participated in the Rigas family's fraudulent schemes to
siphon money and assets from Adelphia by failing to
disclose information and acting to further the schemes.
(Am. Cmpl. ¶ 1573.)  Paragraph 1573 iterates six 'schemes'.
Id.  The six schemes range from the Agent Banks and their
affiliated Investment Banks designing and implementing Co-
Borrowing Facilities to Salomon Smith Barney ("SSB")
providing a 'fairness opinion' regarding the purchase of
Adelphia Securities by the Rigas family and RFEs.  (Am.
Cmpl. ¶¶ 1573(i), 1573(v).)

Claim 55 is composed of fifteen sub-claims.  Because
of the compound nature of Claim 55 this Court will examine
each of Claim 55 sub-claims to determine if the Amended
Complaint has sufficiently pled the elements of fraud.

**i. Background of Claim 55**

Claim 55 was originally pled in the Equity Committee's Intervenor Complaint.  On August 17, 2007, Bankruptcy Judge Gerber issued a memorandum and order dismissing the claim with leave to replead.  Judge Gerber dismissed the claim of fraud against the Agent Banks and their affiliated Investment Banks on grounds that "[t]he Equity Committee bases its fraud claim on exactly the same facts on which the Creditors' Committee based its aiding and abetting fraud claim.  For that reason, the Equity Committee intervenor complaint suffers from the same Rule 9(b) deficiencies as the Creditors' Committee's complaint."  <u>In re Adelphia Communications Corp.</u>, 2007 WL 2403553, at *11. Judge Gerber ruled the particularity requirements of Rule 9(b) had not been satisfied and to meet the pleading requirements of Rule 9(b) ART would have to, "allege what fraudulent representations were made (or not made) by the banks, to whom and by whom, when, and under what circumstances."  <u>Id</u>.  Judge Gerber granted leave to replead.  The claim was subsequently repled in the Amended Complaint as Claim 55.  (Am. Cmpl. ¶¶ 1571—576).

**ii. Elements of a Fraud Claim**

Under Pennsylvania State Law, the tort of common law fraud has the following six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994) (footnote omitted); Debbs v. Chrysler Corp., 810 A.2d 137, 155 (Pa.Super. 2002). All of these elements must appear in the pleadings to support a claim of fraud. Rivello v. New Jersey Auto. Full Ins. Underwriting Ass'n, 638 A.2d 253 (Pa. 1994). The elements of a fraud claim must be pled with the particularity described in Fed. R. Civ. P. 9(b). Christidis v. First Pennsylvania Mortg. Trust, 717 F.2d 96, 99 (3d Cir 1983).

**iii. Claim 55 Sub-Claims which are not pled with the Necessary Particularity**

**1. Amended Complaint ¶ 1572(i)**

The sub-claim in paragraph 1572(i) of the Amended Complaint alleges fraud based on the Agent Banks and their

affiliated Investment Banks improperly transferring
Adelphia's assets and funds for the benefit the Rigas
family's own interests.  (Am. Cmpl. ¶ 1571(i).)  The
pleading of this sub-claim falls short of the requirements
of Rule 9(b).  The pleadings provide no notice to the
Defendants of which of the many Agent Banks and Investment
Banks transferred Adelphia's assets, when these transfers
occurred and the nature of these transfers (so the
Defendants know which transfers are alleged to be
fraudulent).  The Defendants are not placed on notice with
which to defend themselves from such broad pleadings.
Amended Complaint ¶ 1572(i) is dismissed for failure to
state a claim with particularity.


**2. Amended Complaint ¶ 1572(ii)**

     The sub-claim in paragraph 1572(ii) of the Amended
Complaint alleges the Agent Banks and their affiliated
Investment Banks concealed, "wrongful transactions through,
for example, the improper use of 'netting' and
'reclassification' procedures.'"  (Am. Cmpl. ¶ 1572(ii).)
Like sub-claim ¶ 1572(i) this sub-claim fails to meet the
particularity requirements of Rule 9(b).  It is unclear
from the pleadings what wrongful transactions the sub-claim
is referring to.  The 483 page Amended Complaint lists

hundreds of transactions many of which might be construed by ART as wrongful or benefiting of the Rigas family.  (Am. Cmpl. ¶ 1572(ii).)

A search of the Amended Complaint finds the specific term 'wrongful transaction' is only used in this sub-claim. Because no other transactions in the Amended Complaint are labeled 'wrongful transaction' the Amended Complaint does not make it possible for a Defendant to determine which transactions the sub-claim is referring to when they use the term 'wrongful transaction'.  The general nature of the pleading in this sub-claim fails to provide notice to defendants and thus fails to meet the particularity requirement of Rule 9(b).

### 3. Amended Complaint ¶ 1572(v)

The sub-claim in paragraph 1572(v) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks falsely and fraudulently represented "that Adelphia's stock sales had the effect of de-leveraging the company, when in fact they had the opposite effect."  (Am. Cmpl. ¶ 1572(v).)  This sub-claim fails because it does not specify what the fraudulent representations were, which defendants made them, and when they were made.

Under Rule 9(b) the plaintiff must identify what misrepresentations regarding de-leveraging were made, who made them, and when they were made.  Fed. R. Civ. P. 9(b). A search of the Amended Complaint yields scant reference to 'de-leveraging'.  The term 'de-leveraging' is used in four places in the nearly 500 page Amended Complaint.  (Am. Cmpl. ¶¶ 1007, 1019, 1423.)  None of the sections referencing 'de-leveraging' provide specifics about when and who represented the Adelphia stock sales as de-leveraging.  A representative section of the Amended Complaint which uses the term de-leveraging provides no specifics.  "[T]he Rigas family -- with Defendants' [referring to all the Agent Banks and their affiliated Investment Banks] knowledge or reckless disregard or conscious avoidance -- concocted a ploy to convince the public that Adelphia was deleveraging [sic] when its actual debt load was increasing."  (Am. Cmpl. ¶ 1007.)  This allegation like the other allegations about de-leveraging in the Amended Complaint does not plead specific details. Sub-claim ¶ 1572(v) is dismissed for failing to meet the pleading requirements of Rule 9(b).

**4. Amended Complaint ¶ 1572(vi)**

The sub-claim in paragraph 1572(vi) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks engaged in fraud against Adelphia by "using or permitting to be used funds drawn down from the Co-Borrowing Facilities into the CMS to pay the Rigas family's or RFEs' personal margin calls." (Am. Cmpl. ¶ 1572(vi).) This sub-claim fails to identify which Defendants were responsible for the drawing down of funds and when the draw downs occurred. The proceeding 400 pages of the Amended Complaint fails to provide additional details about these margin calls and which banks were aware of them. Paragraph 13 of the Amended Complaint provides the only other mention of margin calls in the Amended Complaint. (Am. Cmpl. ¶ 13.) However, paragraph 13 of the Amended Complaint does not identify which defendants were involved in the margin calls or when they occurred. Id. The sub-claim in paragraph 1572(vi) fails to meet the particularity requirements of Rule 9(b).

**5. Amended Complaint ¶ 1572(vii)**

The sub-claim in paragraph 1572(vii) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks failed to disclose that the Rigas family's purchase of Adelphia stock was financed with loans

guaranteed by Adelphia.  (Am. Cmpl. ¶ 1572(vii).)  This sub-claim fails to state with particularity when the disclosures should have been made and which stock purchases made by the Rigas family were fraudulent.   The sub-claim does not even reference the fraudulent Co-Borrowing Facilities.  The language of this sub-claim is broad and could encompass loans which are unrelated to the Co-Borrowing Facilities.  The sub-claims expansive wording fails to meet the particularity requirements of Rule 9(b).

### 6. Amended Complaint ¶ 1572(viii)

     The sub-claim in paragraph 1572(viii) of the Amended Complaint alleges the Agent Banks and Investment Banks worked with the Rigas family to allow the "'purchasing' or permitting to be 'purchased' through Highland 2000 over 800 million dollars worth of Adelphia's debt and equity securities by simply recording journal entries."  (Am. Cmpl. ¶ 1572(viii).)  This sub-claim is dismissed because it fails to state with any particularity which Agent Banks and Investment Banks worked with the Rigas family to allow the purchase of debt and securities through Highland 2000.

     The entity Highland 2000 is only mentioned in the Amended Complaint in paragraph 1551 and 1552 and neither paragraph details which banks worked with Highland 2000.

(Am. Cmpl. ¶¶ 1551, 1552.)  Further, paragraph 1551 and
1552 of the Amended Complaint allege $260,416,000 million
dollars of Adelphia debt and securities were purchased by
Highland 2000 (not the 800 million dollar figure which is
attributed in paragraph 1572).  Id.  The remainder of the
Amended Complaint does not provide additional details to
buttress or particularize the allegation in sub-claim
1572(viii).

**7. Amended Complaint ¶ 1573(iii)**

The sub-claim charged in paragraph 1573(iii) of the
Amended Complaint alleges the Investment Banks issued
securities to the Rigas family paid for by the Rigas family
or RFE's using Adelphia funds.  (Am. Cmpl. ¶ 1573(iii).)
Further, the Investment Banks knew the provenance of the
funds used to purchase the securities.  Id.  The Amended
Complaint does not meet the requirements of Rule 9(b)
because it does not specify which investment banks were
issuing securities to the Rigas family, when these
securities were issued, which securities they were, or even
the amount of the securities involved.  The Amended
Complaint fails to provide details necessary to sustain
this claim under Rule 9(b).  The sub-claim is dismissed.

**8. Amended Complaint ¶ 1573(iv)**

The sub-claim contained in paragraph 1573(iv) of the
Amended Complaint alleges the Investment Banks participated
in the Rigas family's fraudulent schemes by "providing
substantial assistance to the Rigas family in perpetuating
their control over Adelphia through the acquisition of ACC
stock in public offerings, [and] private placements."  (Am.
Cmpl. ¶ 1573(iv).)  However, the Amended Complaint does not
provide any specific details outlining how the Investment
Banks provided assistance through the acquisition of
Adelphia Stock through public offerings and private
placements.  Further neither the public offerings nor the
private placements are identified.  Private placements are
only mentioned five other times in the Amended Complaint
and none of these examples provide additional details
regarding the who, what, or when of the private placements.
(Am. Cmpl. ¶¶ 1555—558.)   The Amended Complaint fails to
establish with the necessary particularity the details of
this sub-claim to meet the requirements of Rule 9(b).


**9. Amended Complaint ¶ 1573(vi)**

Paragraph 1573(vi) alleges the Investment Banks and
their affiliated Agent Banks aided the Rigas family's
fraudulent schemes by crafting materials for "Adelphia's

debt and equity offerings that contained material
misstatements and omissions regarding Adelphia's financial
condition that operated to deceive not only prospective
public investors but also Adelphia's Independent Directors
themselves."  (Am. Cmpl. ¶ 1573(vi).)  This sub-claim fails
to provide the particularized allegations required by Rule
9(b).  The sub-claim does not identify when the materials
were authored or which of the Investment Banks authored
them.  The sub-claim is not limited to the Co-Borrowing
Facilities and could encompass all offering materials
issued on behalf of Adelphia.  The sub-claim fails to meet
the pleading requirements of Rule 9(b).


**iv. The Following Sub-Claims Meet Pleading Requirements**

**1. Amended Complaint ¶ 1572(iii)**

The sub-claim in paragraph 1572(iii) of the Amended
Complaint alleges the Agent Banks and their affiliated
Investment Banks misrepresented "Adelphia's finances in
offering materials by excluding more than 2 billion dollars
in off-balance-sheet debt that was borrowed by the Rigas
family or RFEs for their own benefit and for which Adelphia
was nevertheless jointly and severally liable."  (Am. Cmpl.
¶ 1572(iii).)  The Amended Complaint alleges facts which
provide support for sub-claim 1572(iii) and which meet the

six elements of common law fraud.  These elements are pled
with the necessary particularity required by Rule 9(b) with
regards to the Investment Banks.  (Am. Cmpl. ¶ 1060.)
However, the Amended Complaint does not provide details
related to the Agent Banks involvement and the claim as
against them is dismissed.

First, the pleading identifies specific prospectuses
drafted or approved by the Investment Banks.  (Am. Cmpl. ¶¶
1060, 1061.)  6 debt offerings are identified and the
underwriters who drafted the offering materials are named.
Id.  The pleadings do not allege the Agent Banks were
involved in the drafting of these prospectuses for debt
securities.

Second, the pleadings allege misstatements about the
off-balance-sheet debt were material to the fraud.
"Investment Banks . . . offering materials contained
material misrepresentations and omissions regarding the
business and financial condition of Adelphia, including,
without limitation, the extent of Adelphia's leverage."
(Am. Cmpl. ¶ 1375)

Third, the Amended Complaint pleads that the exclusion
of the off-balance sheet debt from the offering materials
was either known to be false by the banks or was made in a
reckless manner by the parties.  Knowledge of falsity can

be adequately pleaded by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness which lead to an inference that the defendants knew of the falsity.  Lerner, 459 F.3d at 293.  As discussed above (with regard to the Co-Borrowing Facilities) the Amended Complaint contains many allegations of specific facts which indicate that the Defendants were aware their filings were false (indicia included: memorandums, meetings, emails, and familiarity with past conduct of the Rigas family.)

Fourth, the Amended Complaint alleges the Investment Banks had the requisite intent to commit fraud.   In the Third Circuit, a plaintiff may establish the strong inference of fraudulent intent either (a) "by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  In re Suprema Specialties, Inc. Securities Litigation, 438 F.3d 256, 275 (3d Cir. 2006) (citing In re Burlington Coat Factory, 114 F.3d 1410, 1418 (3d Cir. 1997)).

The Amended Complaint does not plead facts showing a 'motive and opportunity to commit fraud' on the part of the Investment Banks.  ART alleges generating fee income

provided a motive to commit fraud by the Investment Banks.
(Am. Cmpl. ¶ 1062.)   However, this Court has held that
profit motive does not provide the requisite inference of
fraudulent intent.  Mazzaro de Abreu v. Bank of Am. Corp.,
525 F. Supp. 2d 381, 389 (S.D.N.Y 2007).  This is supported
by other cases which have held that a motive to earn
transaction fees "is not alone sufficient to sustain a
strong inference of fraudulent intent."  Fisher v. Offerman
& Co., No. 95 Civ. 2566, 1996 WL 563141, at *7 (S.D.N.Y.
Oct. 2, 1996); GSC Partners CDO Fund v. Washington, 368
F.3d 228, 238 (3d Cir. 2004).

     The Amended Complaint alleges facts which establish
the banks were reckless in structuring the Co-Borrowing
Facilities (and issuing documents related to these
facilities).  The recklessness alleged establishes
scienter.  Under Pennsylvania state law the "scienter
element in civil fraud [sic] case is satisfied by either
conscious knowledge of the falsity of the representation or
such recklessness as amounts to conscious indifference to
the truth." Office of Disciplinary Counsel v. Anonymous
Attorney A, 552 Pa. 223, 231 (Pa. 1998).  Allowing a court
to find scienter through recklessness conduct is
particularly appropriate in cases arising through the
bankruptcy of a party where the state of mind of parties is

hard to know.  "Faced with this issue other Courts have
determined that fraudulent intent can be established by
circumstantial evidence or by inferences drawn from a
course of conduct as established by the evidence." In re
Kisberg, 150 B.R. 354, 356 (Bkrtcy. M.D. Pa. 1992).  "The
Third Circuit has defined a reckless act as one 'involving
not merely simple, inexcusable negligence, but an extreme
departure from the standards of ordinary care, and which
present a danger of misleading buyers or sellers that is
either known to the defendant or is so obvious that the
actor must have been aware of it.'"  Ravisent Technologies,
Inc., 2004 WL 1563024, at *8 (E.D. Pa. 2004) (citing In re
Advanta Corp. Securities Litigation, 180 F.3d 525, 535 (3d
Cir. 1999))

Viewing the Amended Complaint in the light most
favorable to the Plaintiff (ART) and drawing all reasonable
inferences in its favor, as this Court must, we conclude
that ART pled sufficient facts constituting strong evidence
the Defendants knew or were reckless in not knowing that
the statements they made in the offering materials were
materially false and misleading.  (Am. Cmpl. ¶¶ 1062, 1375,
1377.)

Fifth, the amended complaint alleges Adelphia relied
on the misrepresentations made in the offering materials.

(Am. Cmpl. ¶¶ 1411, 1419.)  Lastly, the Amended Complaint
alleges that the resulting injury was proximately caused by
the reliance.  The failure to disclose debt incurred
through the Co-Borrowing Facilities led to the purchase of
debt offerings and the continuation of the Co-Borrowing
Facilities.  (Am. Cmpl. ¶¶ 1417, 1419.)

**2.  Amended Complaint ¶ 1572(iv)**

Paragraph 1572(iv) of the Amended Complaint alleges
that Agent Banks and their affiliated Investment Banks
allowed the Rigas family to use the proceeds from Co-
Borrowing Facilities to be used for the purchase of stock
in Adelphia that had the effect of artificially reducing
Adelphia's reported debt while at the same time
artificially increasing reported equity.  (Am. Cmpl. ¶
1572(iv).) The Amended Complaint alleges the details of
this allegation with enough particularity to maintain the
claim.  Because this claim overlaps to an extent with sub-
claim ¶ 1572(iii) the court will focus on two issues raised
by the Defendants.

The Amended Complaint alleges there was a fraud.  The
fraud was the establishment of the UCA/HHC, CCH, and
Olympus Co-Borrowing Facilities which had an unusual
structure allowing the Rigas family and RFEs to withdraw

funds against the balance sheet of Adelphia.  (Am. Cmpl. ¶
5.)  The details of the structuring of these facilities
and the role of the Agent Banks and their affiliated
Investment Banks are provided in extensive detail in the
Amended Complaint.  (Am. Cmpl. ¶¶ 841-1003.)

The Amended Complaint alleges the Agent Banks and
their affiliated Investment Banks were so reckless in the
structuring of the Co-Borrowing Facilities (and drafting of
documents related to the facilities) that scienter is
established.  (Am. Cmpl. ¶¶ 970—86.)  This recklessness was
not limited to structuring the facilities but also the
continued use of the facilities by the Rigas family to
purchase Adelphia stock.  Id.

### 3. Amended Complaint ¶ 1572(ix)

Paragraph 1572(ix) alleges fraud on the part of the
Agent Banks and their affiliated Investment Banks for
assisting the Rigas family in using the Co-Borrowing
Facilities and the Cash Management System ("CMS") to loot
billions of dollars from Adelphia. (Am. Cmpl. ¶ 1572(ix).)
The adequacy of the pleadings related to fraud and the
UCA/HHC, CCH, and Olympus Co-Borrowing Facilities is
discussed with relation to the preceding two claims.  The
Amended Complaint pleads facts which meet the requirements

of Rule 9(b) with regards to these three Co-Borrowing
Facilities.

The CMS at Adelphia allowed the commingling of funds
among the Adelphia subsidiaries and Rigas family entities.
(Am. Cmpl. ¶ 1011.)  The commingling of funds was central
to the Adelphia fraud by making it difficult to distinguish
between funds belonging to Adelphia and funds which
belonged to the Rigas family or RFEs.  Id. The CMS was
established and managed by Wachovia.  (Am. Cmpl. ¶ 1012.)
Further the CMS was tied into the Co-Borrowing Facilities
which were structured or managed by the Agent Banks and
their affiliated Investment Banks.  (Am. Cmpl. ¶ 1015.)
The Amended Complaint alleges that the establishment and
continued use of the CMS amounted to reckless behavior and
ran counter to Wachovia's internal policies and standard
practices.  (Am. Cmpl. ¶ 1013.)   The Amended Complaint
provides enough particularity to show that the Agent Banks
and their affiliated Investment Banks by allowing the CMS
to be used by the Rigas family with regards to the Co-
Borrowing Facilities constituted fraud and was reckless.


**4. Amended Complaint ¶ 1573(i)**

Paragraph 1573(i) alleges the Agent Banks and their
affiliated Investment Banks committed fraud by designing,

implementing, and funding the Co-Borrowing Facilities and
making it possible for the Rigas family to use co-borrowing
funds for their own benefit.  (Am. Cmpl. ¶ 1573(i).)  This
sub-claim overlaps with other sub-claims which have been
discussed above including ¶ 1572(iii), ¶ 1572(vi), ¶
1572(ix).  As established above the Amended Complaint
pleads facts which establish the Agent Banks and their
affiliated Investment Banks committed fraud by helping
structure fraudulent Co-Borrowing Facilities.  The fraud
was present not only in the very structure of the UCA/HHC,
CCH, and Olympus Co-Borrowing Facilities but also in the
term sheets of the Co-Borrowing Facilities.  As discussed
above the Amended Complaint alleges recklessness to an
extent which fulfills the requirement for scienter at this
stage in the proceedings.


**5. Amended Complaint ¶ 1573(ii)**

     Paragraph 1573(ii) alleges the Agent Banks, and where
appropriate, their affiliated Investment Banks,
participated in a fraudulent scheme by permitting the RFEs
to draw upon the Co-Borrowing Facilities when they did not
have sufficient capital to secure the funds allocated to
them.  (Am. Cmpl. ¶ 1573(ii).)  This sub-claim mirrors the
sub-claim preceding it.  As discussed above the Amended

Complaint alleges with particularity the role of the Agent Banks and their Investment Banks in structuring the Co-Borrowing Facilities and alleges that these Co-Borrowing Facilities constituted a fraudulent course of conduct which the Defendants were reckless in setting up and allowing to continue to operate.

### 6. Amended Complaint ¶ 1573(v)

Paragraph 1573(v) of the Amended Complaint alleges Salomon Smith Barney participated in the Rigas family's fraudulent schemes "by providing a 'fairness opinion' as to the Rigas family's or the RFEs' purchases of ACC securities, when such purchases were inherently unfair to Adelphia." (Am. Cmpl. ¶ 1573(v).)  The Amended Complaint provides details surrounding this claim to meet the requirements of Rule 9(b).  The Amended Complaint identifies specific omissions in the fairness opinion which rose to the level of fraud.  (Am. Cmpl. ¶ 1546—551.) Further the Amended complaint alleges that the actions of SSB were reckless enough to establish scienter.  (Am. Cmpl. ¶¶ 1538, 1548, 1557.)  SSB had intimate knowledge of Adelphia's finances owing to their work on Co-Borrowing Facilties, Margin Loans, and other financial offerings. (Am. Cmpl. ¶ 25, 1060, 1065.)  Despite this SSB failed to

disclose the material information which it had a duty to disclose in the fairness opinion.  (Am. Cmpl. ¶ 1557.)

**E. Claim 31 Avoidance and Recover of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 against the Margin Lenders**

Claim 31 alleges Salomon Smith Barney, Bank of America, Goldman Sachs and Deutsche Bank (collectively, the "Margin Lenders") received payments in the months preceding the Adelphia Bankruptcy.  ART seeks to have the monies paid to these banks avoided, recovered or preserved for ART under 11 U.S.C. §§ 548 and 550.  (Am. Cmpl. ¶ 1357—362.) The Investment Banks move to dismiss Claim 31 against SSB under Fed. R. Civ. P 12(c).  Investment. B. Mem. at 23. Goldman Sachs moves in a separate motion for dismissal of Claim 31 pursuant to Rule 12(b)(6) and 9(b).  Goldman Sachs Memorandum of Law in Support of Motion to Dismiss Amended Complaint ("Goldman Mem.") at 1.  This Court DENIES both motions for dismissal of Claim 31.

**i. Claim 31 Background**

Claim 31 was originally pled in the Creditors Complaint.  Judge Gerber's June 11, 2007 order addressed the Defendants' various motions to dismiss all of the

claims in the Creditors Complaint.  In re Adelphia
Communications Corp., 365 B.R. 24.  Judge Gerber rejected
Defendants' motions to dismiss Claim 31 (various other
claims in the Creditors Complaint were dismissed).  In re
Adelphia Communications Corp., 365 B.R. at 38.  Judge
Gerber's order found Claim 31 had been pled with the
necessary particularity to satisfy Rule 9(b).  Id.
Following Judge Gerber's ruling, ART added details to the
complaint including roughly 95 million dollars of
additional fraudulent transfers made to SSB.  (Am. Cmpl. ¶
1359.)

     This Court has not addressed Claim 31.  However, this
Court on June 17, 2008 addressed the Bankruptcy Claims in
the Amended Complaint.[19]  Adelphia Recovery Trust, 390 B.R.
at 80.  Many of the claims addressed in the June 17, 2008
order were brought based on 11 U.S.C. §§ 548 and 550.  This
is the same legal foundation on which Claim 31 is brought.
The Court found ART did not have standing to bring
Bankruptcy Claims on behalf of creditors of the
subsidiaries of Adelphia based on 11 U.S.C. §§ 548 and 550.

     However, the claims addressed in the June 17, 2008
order were factually distinct from Claim 31.  The claims

---

[19] The Bankruptcy Claims addressed in that order included claims 1 to
16, 33, 41 and 42 to 44, and 49 to 52.  Adelphia Recovery Trust, 390
B.R. at 84.

addressed in the June 17, 2008 order sought recovery of monies (on behalf of creditors) which had been paid by obligor debtors (subsidiaries of Adelphia).  Id.  In contrast, Claim 31 seeks to recover monies on behalf of the creditors of Adelphia itself (not Adelphia subsidiaries). This distinction is fundamental.  The Joint Plan of Bankruptcy extinguished claims of the creditors of subsidiaries of Adelphia (collectively, the "Obligor Debtor Creditors") by deeming them 'paid in full'.  Joint Plan of Bankruptcy § 5.2.  The June 17, 2008 order held, because the Obligor Debtor Creditors were deemed to be 'paid in full' the Obligor Debtors Creditors no longer had an injury on which basis they could recover.  "It is therefore impossible to see how any recovery by the ART could result in any benefit, direct or indirect, to the creditors of the Obligor Debtors."  Adelphia Recovery Trust, 390 B.R. at 97. In contrast, the creditors of Adelphia (on whose behalf Claim 31 is brought) were not subject to a release and ART has standing to bring a claim on their behalf.

**ii. SSB Moves For Dismissal of Claim 31 on the Basis it is Untimely**

The Amended Complaint adds 95 million dollars of allegedly fraudulent transfer payments to the existing

fraudulent transfers pled in the Creditors Complaint.[20]  The
Defendants argue the addition of the 95 million dollars in
fraudulent transfers is time-barred because it was added
after the tolling agreement expired.

However, the addition of fraudulent transfer claims is
not time-barred if the claims 'relate back' to claims made
in earlier pleadings.  "Under Rule 15(c)(2), an amended
pleading relates back to an earlier pleading if the amended
pleading sets forth claims arising out of the same conduct,
transaction or occurrence set forth or attempted to be set
forth in the original pleading." In re 360networks (USA)
Inc., 367 B.R. 428, 433 (Bkrtcy. S.D.N.Y. 2007); Fama v.
Comm'r of Corr. Servs., 235 F.3d 804, 816 (2d Cir. 2000).
"[T]he purpose of Rule 15 is to provide maximum opportunity
for each claim to be decided on its merits rather than on
procedural technicalities;" however, a court must not
"undermine the purpose of repose for which statutes of
limitations were designed." Enron Corp. v. J.P. Morgan Sec.

---

[20] Adelphia filed its voluntary petition for bankruptcy on June 26, 2002
(the statute of limitations would have expired on June 25, 2004).Under
the Bankruptcy Code, Section 548 avoidance actions are governed by a
two year statute of limitations which begins to run upon the entry of
an order for relief 11 U.S.C § 546(a).  The filing of a Chapter 11
petition constitutes such an order of relief 11 U.S.C. § 301(b).  The
parties entered into a tolling agreement on June 24, 2004 which expired
on June 1, 2007.  The Amended Complaints addition of 95 million dollars
in alleged fraudulent transfers to SSB was added five months after the
tolling agreement expired.

<u>Inc.</u>, 357 B.R. 257, 263 (Bankr. S.D.N.Y. 2006) (citations and quotations omitted).

The newly alleged fraudulent transfers relate back to the Creditor Complaint and are not time barred.  The new margin loan payments in the Amended Complaint arise out of the same Co-Borrowing Facility transactions as those pled in the Creditors Complaint.  The newly alleged margin loan payments occurred during the same time period as those alleged in the Creditors Complaint.

SSB was on notice that additional margin loan payments might be pled.  "One test that many courts have employed in order to determine whether an amendment to pleadings will relate back is to determine whether the initial complaint put the defendants ... on notice of what must be defended against in the amended pleadings. This test does not require that the prior complaint put the defendants on notice of new or additional legal theories that the plaintiffs seek to assert against the defendants, but it must inform the defendants of the facts that support those new claims." <u>Barr v. Charterhouse Group Int'l, Inc.</u>, 238 B.R. 558, 573-74 (Bankr. S.D.N.Y. 1999) (citations omitted).  SSB was placed on notice in the original complaint because the Creditors Complaint listed roughly 84 million dollars in loan payments to SSB.  The Creditors

Complaint also pled that ART was seeking repayment of monies related to the margin loans broadly.  (C.C. ¶ 462.)

Courts hold the addition of new fraudulent transfers to a complaint 'relates back' if the fraudulent transfers arise from the same course of conduct as the original alleged fraudulent transfers.  In Gerardo Leasing, Inc., the court held that an amendment alleging additional fraudulent payments would relate back where the timing and amount of the payments suggested that they were "part of the common scheme or pattern of fraudulent conduct." In re Gerardo Leasing, Inc., 173 B.R. 379, 390-391 (Bkrtcy. N.D. Ill. 1994).  "In the context of preference or fraudulent transfer actions, courts have found the existence of a factual nexus (i.e., transactions arising from the same pattern of conduct), and thus allowed relation back." In re Circle Y of Yoakum, Texas, 354 B.R. 349, 357 (Bkrtcy. D.Del. 2006).  The fraudulent transfers in this case are similar to those in Gerardo Leasing and Circle Y.  The newly pled fraudulent transfers in the Amended Complaint and those pled in the Creditors Complaint arose out of the same conduct, at the same time, and involved the same Co-Borrowing Facilities.

The Defendants argue there is no relation back because "for fraudulent transfer and preference claims, each

transfer is a separate and distinct event." Investment. B. Mem. at 23. The Defendants cite Metzeler to support the proposition that fraudulent transfers cannot relate back. Metzeler v. Bouchard Transp. Co., Inc., 66 B.R. 977, 983, 984 (Bankr.S.D.N.Y.1986). However, the facts in Metzeler involve fraudulent transfers which arose out of different transactions. Id. The facts in Metzeler are distinguishable from this case. In this case all the fraudulent transfers were related to the Co-Borrowing Facilities. Courts have recognized that where fraudulent transfers arise out of the same conduct and transaction there is a relation back. "[P]reference actions stand in contrast to actions to avoid fraudulent transfers, which often involve a common scheme to defraud which provides a nexus for relation back." In re Austin Driveway Services, Inc., 179 B.R. 390, 398 (Bkrtcy. D.Conn. 1995).

### iii. Goldman Sachs Moves for Dismissal of Claim 31 on the Basis That It Had Not Been Plead With Particularity

Goldman Sachs moves for dismissal of Claim 31 on two bases. First, Adelphia did not have any intent to defraud creditors in making the margin loan payments to Goldman Sachs. Second, Adelphia did not plead fraud with the necessary particularity.

**iv. Adelphia Had the Intent to Defraud Creditors through Margin Loan Payments.**

Goldman Sachs argues that Claim 31 should be dismissed (as to Goldman Sachs) since Adelphia did not have the requisite fraudulent intent when it made margin loan payments to Goldman Sachs.  Under 11 U.S.C. §§ 548 and 550, the payments which the parties are seeking to have avoided or recovered must have been made with the intent to defraud creditors.  Goldman Sachs argues that because they did not structure the Co-Borrowing Facilities, the margin loan payments which were made to them were not related to any intent to defraud creditors.  "[T]hose creditors knew and approved, of such uses of the Co-Borrowing Facilities by the Rigas Family and that the Rigas Family used those funds not with intent to defraud creditors. . ."  Goldman Mem. at 2.  Goldman Sachs argues any payments which they received were not made with the intent to defraud creditors.  This is in contrast to "[s]uch assertions [made in the amended complaint] that the various lenders under the Co-Borrowing Facilities were allegedly complicit in the Rigas Family's [sic] personal financial arrangements are fully understandable in context of plaintiff's many claims against those lenders."  Goldman Mem. at 2.  Goldman Sachs

draws a distinction between it and the other lenders who were given margin loan payments.

In the Second Circuit, "[d]ue to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." In re Sharp Intern. Corp., 403 F.3d 43, 56 (2d Cir. 2005) (citing Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529 (N.Y. 1st Dep't 1999)0.  These badges of fraud which supply fraudulent intent for the purposes of a fraudulent conveyance by a party include, "(1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance." Scantek Medical, Inc. v. Sabella, 583 F.Supp.2d 477, 497 (S.D.N.Y. 2008) (citing In re Sharp, 403 F.3d at 56).

The Amended Complaint pleads badges of fraud which are sufficient to allege 'intent to hinder, delay or defraud creditors.' Id.  It is plausible that the Rigas family

made payments on the margin loans in order to prolong their
fraud and further enrich themselves at the expense of their
creditors.  The Amended Complaint alleges the payments on
the margin loans were used to keep the margin lending
facilities open.  (Am. Cmpl. ¶ 990.)

The Amended Complaint pleads the margin lenders
continued to accept payments on the margin loans after they
had reason to believe that Adelphia was insolvent.  On
March 27, 2002, Adelphia disclosed that it had fraudulently
concealed the true amount of liability under the Co-
Borrowing Facilities.  Despite the disclosure the margin
lenders accepted 194 million dollars in margin loan
payments after March 27, 2002.  (Am. Cmpl. ¶ 991.)
According to the Amended Complaint roughly 30 million
dollars was transferred to Goldman Sachs after March 27,
2002.  (Am. Cmpl. ¶ 992.)  The fact that Adelphia had
disclosed huge liabilities on March 27, 2002 was a strong
indicium that the transferor was insolvent at the time it
was transferring tens of million of dollars to Goldman
Sachs.  Scantek Medical, Inc., 583 F.Supp.2d at 497.  The
pleadings are enough at this stage of the proceedings to
plead fraudulent intent with regards to the margin loan
payments to Goldman Sachs.

**v. The Amended Complaint Alleges Claim 31 with the
Necessary Particularity**

Goldman Sachs alleges that the Amended Complaint is
deficient as to the basic particulars of the alleged fraud
and fails to meet Rule 9(b).  Goldman. Mem. at 12.  As a
rule, "allegations supporting claims for intentional
fraudulent transfers are subject to the heightened pleading
requirements of Rule 9(b)."  In re Allou Distributors,
Inc., 387 B.R. 365, 400 (Bkrtcy. E.D.N.Y. 2008) (citing
Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 251
(2d Cir.1987)).  The courts have explained that the
requirements for pleading under Rule 9(b) include that
"[t]he party asserting an intentional fraudulent transfer
claim must 'specify the property that was allegedly
conveyed, the timing and frequency of those allegedly
fraudulent conveyances, [and] the consideration paid.'" In
re M. Fabrikant & Sons, Inc., 394 B.R. 721, 733 (Bkrtcy.
S.D.N.Y. 2008) (quoting United Feature Syndicate, Inc. v.
Miller Features Syndicate, Inc., 216 F.Supp.2d 198, 221
(S.D.N.Y. 2002)).

The Amended Complaint pleads details regarding Claim
31.  The Amended Complaint alleges money was paid to make
payments on margin loans owed by the members of the Rigas
family on personal margin accounts maintained by "BofA,

SSB, Deutsche Bank Securities, and Goldman Sachs." (Am. Cmpl. ¶ 990.)  The Amended Complaint provides the timing of the payments, frequency of the payments, and the amounts of the payments to Goldman Sachs.  (Am. Cmpl. ¶ 1359.)  The Amended Complaint alleges consideration for the margin payments.  (Am. Cmpl. ¶¶ 1358, 1360, 1361.)

## 6. Order

For the foregoing reasons, Defendants' 12(b)(6) motions for dismissal are GRANTED as to Claim 54. Defendants' 12(b)(6) motions are DENIED as to Claims 31, 37, and 38.  Defendants' 12(b)(6) motions are GRANTED as to Claim 55 ¶ 1572(i), (ii), (iii) as to the Agent Banks, (v), (vi), (vii), (viii); ¶ 1573(iii), (iv), (vi).  Defendants' 12(b)(6) motions are DENIED as to Claim 55 ¶ 1572(iii) as to the Investment Banks, (iv), (ix); ¶ 1573(i), (ii), (v).


SO ORDERED.

Dated: May 4 , 2009

_____

Lawrence M. McKenna
U.S.D.J.

110