# Exhibit B

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADELPHIA RECOVERY TRUST, | No. 05 Civ. 9050 (LMM) |
| Plaintiff, | |
| -against- | |
| BANK OF AMERICA, N.A., *et al.*, | |
| Defendants. | |

# Expert Report of Steven L. Schwarcz

# November 18, 2009

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

# EXPERT REPORT OF STEVEN L. SCHWARCZ

## 1. INTRODUCTION AND QUALIFICATIONS

1.1.    I am the Stanley A. Star Professor of Law & Business at Duke University School of Law and Founding Director of Duke University's Global Capital Markets Center. I have been retained as an expert witness in this matter by Simpson Thacher & Bartlett LLP, counsel for Wachovia Bank, National Association, and Wachovia Capital Markets, LLC (f/k/a Wachovia Securities, Inc.); by Mayer Brown LLP, counsel for Bank of Montreal and BMO Capital Markets Corp. (f/k/a BMO Nesbitt Burns Corp.); and by Haynes and Boone, LLP, counsel for Bank of America, N.A. on behalf of the financial-institution defendants in this case (collectively referenced herein as the "Banks").

1.2.    I have been involved in the fields of commercial law, finance, and bankruptcy since 1974, when I received my Juris Doctor degree from Columbia Law School. From 1974 until 1989, I was an associate and then a partner at the law firm of Shearman & Sterling, practicing in these areas. From 1989 through June 1996, I was a partner and structured-finance practice group head at Kaye Scholer, also practicing in these areas. In these capacities, I helped (primarily on behalf of banks) to document and sometimes also to structure hundreds if not thousands of financing transactions, including numerous secured and unsecured lending facilities (some of which were for companies in the cable industry), and have issued and/or reviewed legal opinions relating to most of these transactions and agreements. I also have consulted and advised on a wide range of issues concerning these types of transactions and agreements.

1.3.    I also have taught courses on commercial law, finance, and bankruptcy since 1984, first at Benjamin N. Cardozo School of Law, during the 1990s at the Yale and Columbia Law Schools, and since 1996 at Duke Law School. Additionally, I am a Fellow (and, since 2008, also a Regent) of the American College of Commercial Finance

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

Lawyers, was recently selected as a Fellow of the American College of Bankruptcy, and was Business Law Advisor to the American Bar Association Section on Business Law for the 2008-09 term (and, since then, Continuing Business Law Advisor).

1.4.    From July 1996 through the date of this Report I have taught at Duke University School of Law, first as Professor of Law and Adjunct Professor of Business Administration and, since July 2004, as the Stanley A. Star Professor of Law & Business. In these capacities, besides teaching courses (as indicated above) on commercial law, finance, and bankruptcy, I have engaged actively in research and writing in these areas, including on the subject of legal opinions.

1.5.    My full curriculum vitae is contained in Appendix A to this Report. Appendix B lists the cases in which I have given expert trial or deposition testimony in the past four years.

1.6.    I have been asked to address a number of different questions related to the three co-borrowing loan credit facilities at issue in this case (the "Adelphia-Related Facilities"[1]) involving subsidiaries of Adelphia Communications Corporation (Adelphia

---

[1] These are (i) the Credit Agreement, dated as of May 6, 1999, among Hilton Head Communications, L.P., UCA Corp., UCA LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P., Tele-Media Company of Hopewell-Prince George, and Certain Other Persons, as the Borrowers, Various Financial Institutions, as the Lenders, First Union National Bank, as the Administrative Agent, Bank of Montreal, as the Documentation Agent, and PNC Bank, National Association, as the Syndication Agent (the "UCA-HHC Facility") (Universal Exhibit 1, ACC 0000001-422); (ii) the $2,250,000,000 Credit Agreement, dated as of April 14, 2000, among Century Cable Holdings, LLC, Ft. Myers Cablevision, LLC, and Highland Prestige Georgia, Inc., as Restricted Borrowers, Banc of America Securities LLC and Chase Securities Inc., as Joint Lead Arrangers and Joint Book Managers, Bank of America, N.A. and The Chase Manhattan Bank, as Co-Administrative Agents, Toronto Dominion (Texas), Inc., as Syndication Agent, CIBC World Markets Corp., as Documentation Agent, Barclays Bank PLC, as Arranging Agent, and the Managing Agents defined herein and the Lenders Named Herein (the "CCH Facility") (Universal Exhibit 2, ACC0001187-1605)); and (iii) the $2,030,000,000 Credit Agreement, dated as of September 28, 2001, among Olympus Cable Holdings, LLC, Adelphia Company of Western Connecticut, Highland Video Associates, L.P., Coudersport Television Cable

Communications Corporation with its subsidiaries and affiliates referred to collectively as "Adelphia" unless the context indicates otherwise), the Banks, and certain other entities owned and/or controlled by members of the Rigas family (such other entities hereinafter referred to as "Rigas Family Entities" or "RFE"s). First, I have been asked to discuss the business reasons why Adelphia's subsidiaries and other companies enter into co-borrowing facilities, which are loan credit facilities on which multiple borrowers can draw, each borrower being jointly and severally liable for repayment of the facility. Second, I have been asked to assess whether the Adelphia-Related Facilities appeared to have had a valid business purpose at the time they were entered into in light of Adelphia's corporate structure and financing history. Third, I have been asked to assess whether lenders should have been concerned about the structure or terms of the Adelphia-Related Facilities or the provisions therein relating to monitoring and uses of proceeds.

1.7.    I also have been asked to review and comment on the Expert Reports of Michael J. Doyle (the "Doyle Report") and Roy D. Simon, Jr. (the "Simon Report"), insofar as these Reports address the matters referenced in paragraph 1.6 above. The Doyle Report claims, among other things, that the Banks did not follow prudent banking practices in underwriting and monitoring the Adelphia-Related Facilities. The Simon Report claims that the Banks could not reasonably have relied on the legal opinions rendered by Adelphia's outside counsel, Buchanan Ingersoll, under the Adelphia-Related Facilities for purposes of assessing compliance with laws governing related party transactions.

1.8.    My report is structured as follows. Part 2 of the Report provides background on Adelphia and its relationship with the Rigas family. Part 3 of the Report discusses the business purposes for co-borrowing facilities, including the business purposes for the Adelphia-Related Facilities. Part 4 of the Report examines the structure and terms of co-

---

Company, and Adelphia Holdings 2001, LLC, as Borrowers, First Union Securities, Inc. and The Bank of Nova Scotia, as Joint Lead Arrangers and Joint Book Runners, Bank of Montreal, as Administrative Agent, First Union National Bank and The Bank of Nova Scotia, as Syndication Agents, Fleet National Bank and The Bank of New York, as Documentation Agents, and The Managing Agents defined herein and The Lenders Named Herein (the "Olympus Facility") (Universal Exhibit 3, ACC0000423-749).

borrowing facilities, including the structure and terms of the Adelphia-Related Facilities. Part 4 also addresses the Simon Report. Part 5 of the Report discusses provisions in co-borrowing facilities and in the Adelphia-Related Facilities related to monitoring and uses of proceeds. Part 6 of the Report analyzes several claims in the Doyle Report related to the terms of the Adelphia-Related Facilities and co-borrowing facilities more generally.

1.9.   I conclude that there are valid business purposes for co-borrowing facilities generally, that the Adelphia-Related Facilities appeared to have valid business purposes, and that lenders would generally view co-borrowing facilities, including the Adelphia-Related Facilities, as being commercially reasonable in the circumstances discussed. I also conclude that the other structural features and terms of the Adelphia-Related Facilities and the provisions therein relating to monitoring and uses of proceeds were similarly commercially reasonable.

1.10.   In preparing this Report, I have relied on my general knowledge, training, experience, and other expertise. I have also reviewed documents related to this case. Appendix C lists the materials that I relied upon in the preparation of this Report. Employees of Analysis Group, Inc., an economic and financial consulting firm, have assisted me in this assignment, working under my guidance. My work on this matter is ongoing, and I may review additional materials or conduct further analysis. I reserve the right to update, refine, or revise my opinions as appropriate.

1.11.   I am being compensated for my time in this matter at my normal billing rate of $1,000 per hour. This compensation is not contingent upon the nature of my findings or on the outcome of this litigation.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

## 2.   BACKGROUND ON ADELPHIA AND ITS RELATIONSHIP WITH THE RIGAS FAMILY

2.1.    The Rigas family owned a controlling interest in Adelphia from the time of the company's founding until it entered bankruptcy in 2002.[2] By 1999, the family's direct and indirect equity interests in Adelphia were worth $1.73 billion,[3] and indeed, Adelphia stock accounted for a large proportion of the value of the Rigas family's assets.[4] Thus, the economic interests of the Rigas family were closely aligned with the fortunes of Adelphia.[5] Moreover, the members of the Rigas family who owned the largest equity interests in Adelphia, John Rigas, Timothy Rigas, and Michael Rigas, were also the key managers of Adelphia.[6]

2.2.    According to their credit approval memoranda, the Banks viewed this alignment of economic interests favorably.[7] That view was prudent and justifiable because the

---

[2] *See* Expert Report of Ronald J. Gilson (the "Gilson Report") for a more complete discussion of the Rigas family's ownership and control of Adelphia.

[3] Robert J. DiBella, "Analysis of RFP Advance Impairment by Entity," Exhibit 21265, at 42.

[4] *See, e.g.,* Dean Marshall Dep. 792:18-793:12, Volume III, March 4, 2009: "Q. In connection with the Rigas family assets, was it your understanding that the majority of the Rigas family's personal wealth was invested in Adelphia securities? . . . A. I had a general understanding that their net worth was tied generally to Adelphia and their personal cable holdings. Q. …Was the lion's share of that personal wealth attributable to the Adelphia subsidiaries as opposed to the private cable entities? . . . A. Yes, at one time, yes, for sure. Q. Was that true in 2001? A. Yes." Michael Rigas also testified that Adelphia stock was a significant portion of his personal wealth. Michael Rigas Dep. 515:20-22, Volume II, July 22, 2009.

[5] *Cf.* D.S. Shapiro, M.E. Benevento, & M.L. Savner, *Adelphia Communications, "You've come a long way, baby!,"* Deutsche Banc Alex. Brown Equity Research, August 20, 1999, at 11 (observing as an equity-investment positive for Adelphia that "Management's interests are closely aligned with those of the public [share]holders").

[6] These three family members had the largest individual shareholdings and were most actively involved in management of Adelphia (*see* Gilson Report, *supra* note 2, Exhibits 1b and 2).

[7] *See, e.g.*, Rabobank credit approval memorandum for the CCH Facility, March 24, 2000, at 9 (RABO 00002297) ("With 68% of the voting power in Adelphia, management's interests are closely aligned with public security holders and this is further evidenced by the fact that the Rigas family has consistently purchased stock in Adelphia

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

alignment of economic interests should have reduced the "agency problems" that inevitably arise out of the inherent conflict of interest between a firm and its non-owner managers. For example, whereas creditors want management to run a firm in a way that assures they will be repaid,[8] members of management might—absent effective alignment of economic interests—want to run the firm in a way that also maximizes their personal interests.

2.3.    It is, indeed, fundamental textbook doctrine that agency problems can be reduced by providing appropriate incentives that align management's interests with the interests of the firm.[9] The high level of ownership of Adelphia stock by members of the Rigas family, especially by those who were Adelphia's key managers, should have been expected to provide this alignment.

2.4.    The alignment of economic interests was not limited to Rigas-family ownership of Adelphia stock. I understand that some members of the Rigas family may also have invested in convertible debt issued by Adelphia,[10] invested in notes issued by Adelphia

---

in every offering since the IPO to maintain their majority control."); Royal Bank of Scotland Application for Facilities Requiring Bank Credit Committee Approval for the Olympus Facility, August 31, 2001 (RBS000725) ("Adelphia's management is incentivized through their ownership of approximately 30% of Adelphia's equity and approximately 73% voting power"); and Societé Générale Credit Application Document for the Olympus Facility, August 17, 2001, at 10 (SG0000123) ("In addition to the strong operating team, the Rigas family has continued to invest the bulk of their net worth in ACC. Thus, the aggressive role of active management in the Company is further evidenced by the vested financial interest of the Rigas family.").

[8] Although the classic example of an agency problem is a conflict between the interests of shareholders and management, the problem broadly includes conflicts between the interests of any investors in the firm and management.

[9] *See* Stephen A. Ross, Randolph W. Westerfield & Jeffrey Jaffe, Corporate Finance 13-15 (8th Edition 2008); Jonathan Berk & Peter DeMarzo, Corporate Finance 904-07 (2007). *Cf.* section VII.A. of Gilson Report, *supra* note 2.

[10] "ACC Public Offerings From 1998-Present," Government Exhibit 11650, at 3.

Business Solutions,[11] guaranteed certain Adelphia credit facilities or notes,[12] or even entered into joint ventures with Adelphia.[13]

2.5.   Following the initial public offering of Adelphia in 1986, the Rigas family—in addition to its controlling interest in Adelphia—retained private ownership (through RFEs) of some cable systems.[14] These RFEs were managed by Adelphia, in return for a management fee, in a manner indistinguishable from its own cable systems as if they were under common ownership.[15] This further consolidated and aligned Adelphia and Rigas family interests.[16]

---

[11] The Rigas family acquired its interest in the Adelphia Business Solutions notes through its Highland Holdings partnership. *See* Adelphia Form 10-K/A, for the fiscal year ending December 31, 1999, at 12.

[12] *See, e.g.*, Adelphia Form S-1 Registration Statement, July 2, 1986, Exhibit 10.06 at 13; Adelphia Form 8-K, filed January 13, 1987, at 2-3; Adelphia Form 8-K, filed December 4, 1987, at 2; Adelphia Form 8-K, filed October 20, 1988, at 2-3, 218, & 290.

[13] Examples are South Dade Cablevision (Adelphia Form 8-K, filed December 1, 1986, at 2) and Syracuse Hilton Head Holdings (Adelphia Form 10-K for the fiscal year ending March 31, 1994, at 39).

[14] Some have speculated that this shared ownership structure was driven primarily by tax considerations. *See, e.g.*, Arnhold & S. Bleichroeder, Inc., *Adelphia Communications, "Making a Cleaner Balance Sheet,"* Jan. 14, 2002, at 18 ("There has been much speculation over the years as to why the Rigas family keeps a material amount of Adelphia paper as well as cable subscribers outside the public company in a separate entity owned and controlled by the family (Highland Holdings). Although we can't say for sure, we believe that the reason may simply be tax and estate planning, especially given the tax benefits afforded to family limited partnerships in certain situations."). The deposition testimony of James Rigas cites difficulties rolling up some private entities and concerns by John Rigas about his companies being public as reasons for the family retaining private ownership of some systems. James Rigas Dep. 99:10-100:5, Volume I, July 8, 2009.

[15] *See* Adelphia Accounting Department, ISSUES SUMMARIES, AUDIT ISSUES FOR RESTATEMENT OF FINANCIAL STATEMENTS FOR 1999, 2000, 2001 AND 2002, Vol. 1 of 2, at AREST 0000282 (observing that Rigas-owned cable operations did business as Adelphia and operated in a manner indistinguishable from Adelphia from the perspective of employees, customers and suppliers). *Cf.* Citibank Global Loans Approval Memorandum for the CCH Facility, February 25, 2000, at 4 (2004D253748) (indicating that Adelphia manages RFE cable systems with the same benefits as operating its own cable systems).

[16] Although the ownership of some of these RFEs changed over time, as Adelphia acquired them from the Rigas family (*see, e.g.*, Adelphia Form 8-K, filed May 26, 1988, at 2-3), that does not change my views in the text above.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

2.6.    Adelphia's management of these RFEs included management of their financing activities.[17] Thus, the Adelphia-Related Facilities, *including any RFE borrowings thereunder that plaintiffs allege ultimately harmed Adelphia*, were effectively authorized and approved by Adelphia itself.

## 3.  THE BUSINESS PURPOSES FOR CO-BORROWING FACILITIES (INCLUDING THE ADELPHIA-RELATED FACILITIES)

3.1.    Firms have a wide variety of options for meeting their financing needs. Loan credit facilities are highly customized according to those needs and, indeed, "remain one of the most customized credit products in the capital markets, with highly negotiated . . . structural elements."[18] It therefore is not unusual for credit facilities, especially those having sophisticated parties and large borrowing availability, to have unusual structures. Borrowers weigh alternative structures to determine the one that best fits their financing needs.

3.2.    Co-borrowing loan credit facilities provide borrowers with valuable financing flexibility, such as the flexibility to deploy capital where most needed. This is especially valuable in industries, like the cable industry, where operating assets are dispersed among multiple companies.[19] Co-borrowing facilities also can improve credit terms for members of the borrowing group. This is because making all borrowers jointly and severally

---

[17] Adelphia itself through members of its finance team (Timothy Rigas, James Brown, and Dean Marshall) centrally managed and thus controlled the borrowings under the Adelphia-Related Facilities. *See, e.g.,* James Rigas Dep. 521:23-523:7, Volume II, July 9, 2009: "Q. Apart from the mechanics of the cash management system, was the board aware that . . . Adelphia management manage[d] the finances of the RFE cable companies? A. Yes, I believe they were. . . . I mean the board understood that [the RFEs] didn't have their own corporate staff doing things, that everything was being done by Adelphia staff."

[18] Barry Bobrow, Mercedes Tech, & Linda Redding, *An Introduction to the Primary Market* in THE HANDBOOK OF LOAN SYNDICATIONS & TRADING 157 (2007) (Allison Taylor & Alicia Sansone, eds.).

[19] *See, e.g.*, Société Générale Credit Application Reviewing Officer's Comments, August 22, 2001, at 1 (SG0000102) (observing that "the proposed credit agreement [co-borrowing] structure is a relatively conventional one" for this industry).

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

responsible for repayment reduces lender risk, thereby reducing the cost of credit.[20] Furthermore, the economy of scale of co-borrowing facilities—only one credit agreement is needed for multiple borrowers—can lower transaction and administrative costs.

3.3.    Adelphia appeared to have the same types of business reasons for requesting a co-borrowing structure from potential lenders and eventually entering into the Adelphia-Related Facilities. Recall that the cable operating assets were dispersed among Adelphia and the RFEs. I understand that the ownership of some of these RFEs changed over time as Adelphia acquired them from the Rigas family.[21] Given this complex and fluid corporate structure, it would not appear odd or unreasonable that Adelphia's management would seek flexible financing arrangements, such as the Adelphia-Related Facilities, that would allow it to deploy capital where dictated by its operational needs.[22]

3.4.    Furthermore, *Adelphia itself* needed the financing flexibility provided by the Adelphia-Related Facilities. Adelphia, like other large cable companies, operated through a multitude of corporate entities organized principally on the basis of geography and lines of business.[23] The Adelphia-Related Facilities provided needed financing flexibility for these entities, again enabling them to deploy capital where most needed for successful cable operations.

3.5.    The Adelphia-Related Facilities generally were expected to lower transaction and administrative costs for Adelphia by reducing the number of credit facilities

---

[20] *See, e.g.,* R. GLENN HUBBARD, MONEY, THE FINANCIAL SYSTEM, AND THE ECONOMY 291-92 (2008) (observing that the cost of lending is proportional to the risk).

[21] *See supra* note 16.

[22] The Adelphia-Related Facilities also appeared to provide the RFEs with a cost-effective means of financing capital expenditures and acquisitions. Adelphia would benefit from potential economies of scale as well as from any increased management fees resulting from increases in RFE revenues. *See* David Lucas Dep. 206:16-207:8, Volume I, April 2, 2009; Michael Rigas Dep. 85:16-86:23, Volume I, July 21, 2009; Erland Kailbourne Dep. 259:7-17, Volume I, Sept. 30, 2009.

[23] Expert Report of Harold W. Furchtgott-Roth (the "Furchtgott-Roth Report"), Section IV.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

outstanding.[24] Management of Adelphia informed at least some of the Banks that combining credit facilities would "simplify reporting, legal, etc. and reduce the administrative burden that multiple facilities create."[25] The manner in which Adelphia and the RFEs were jointly operated, as if they were commonly owned, is also consistent with the use of co-borrowing facilities.[26]

3.6.     The discussion above pertains to the inclusion of both Adelphia and RFEs in co-borrowing groups under the Adelphia-Related Facilities. In that context, I note that the RFE co-borrowers were private companies. From the Banks' perspective, however, there is nothing inherently wrong with a co-borrowing facility including both public and non-public companies.[27] Lenders focus on getting repaid, with interest, and public and non-public companies are equally legally responsible for repaying their loans. I also note that Adelphia and the RFEs were, in many ways, operated as a single entity. I have already mentioned, for example, that the RFEs were managed by Adelphia in a manner indistinguishable from its own cable systems as if they were under common ownership.[28]

---

[24] CIBC credit approval memorandum for the UCA-HHC Facility, March 1999, at 10 (CIBC0020233A) (observing that consolidating its credit facilities would minimize the overall administrative burden on Adelphia); Dean Marshall Dep. 158:7-160:13, Volume I, March 2, 2009 (observing that because Adelphia personnel managed both the RFE and Adelphia financings, there were practical limits on their ability to arrange multiple bank financings at the same time). *Cf.* Thomas Labergere Dep. 44:8-45:15, Volume I, April 29, 2009 (speculating that the marginal cost of entering into specific credit facilities dedicated to the RFEs would be extremely costly and an administrative burden for Adelphia).

[25] First Union credit approval memorandum for Parnassos, LP Credit Facility, Oct. 15, 1998, at 7 (WACH0031321). *See also* Mark K. Misenheimer Dep. 697:9-15, Volume II, May 28, 2009 (observing rationale for participation of RFE co-borrowers provided by James Brown of Adelphia).

[26] Geoffrey Brooks Dep. 150:3-151:2, January 21, 2009: "[T]he fact that systems under common management were being financed together wouldn't strike us as odd. The fact that Rigas Family-owned entities were under common management with Adelphia-owned entities . . . operating management . . . would not have struck us as odd . . . ."

[27] *See infra* paragraph 4.4.

[28] *See supra* paragraph 2.5.

3.7.     Moreover, the inclusion of both public and non-public borrowers as co-borrowers in the Adelphia-Related Facilities reflected the nature and evolution of Adelphia's extensive financing history, or, in other words, had path-dependent justifications. Adelphia had a long history of using co-borrowing facilities, and many of the Banks participating in the Adelphia-Related Facilities had served as agent banks or participants on multiple prior co-borrowing facilities.[29] For example, excluding the Adelphia-Related Facilities, of the ten co-borrowing facilities that Adelphia entered into between its initial public offering in July 1986 and March 2002, only four (ACTV-UCA, Chauncey, ACP 1989, and UCA) included wholly-owned Adelphia subsidiaries as the sole co-borrowers. The co-borrowing groups for four facilities (ACP 1995, Northeast-Robinson, Chelsea, and Arahova) included Adelphia subsidiaries and co-borrowers that were joint ventures in which unrelated parties held interests of between 15 and 50 percent. Another co-borrowing group (HVA/TALP) included Adelphia subsidiaries, RFEs, and joint-venture co-borrowers. And yet another co-borrowing group (South Dade-Lorain-MCTV) included Adelphia subsidiaries and RFEs as co-borrowers.[30]

3.8.     The Adelphia-Related Facilities were thus not created in a vacuum but reflected prior Adelphia co-borrowing facilities with which the Banks had experience and were comfortable. Bankers with a longstanding relationship of working with Adelphia therefore would have been familiar with its co-borrowing loan structures, some of which involved public and private co-borrowers. There do not appear to have been repayment or covenant compliance problems with any of these co-borrowing facilities.[31] And the co-borrowing nature of these facilities (and of the Adelphia-Related Facilities), including the

---

[29] *See* Exhibit 1.

[30] *See* Exhibit 2.

[31] Yvonne Bos Dep. 91:25-93:5, April. 28, 2009: "We gained comfort on various levels before entering into these co-borrowing arrangements. At that point in time, we had already had a long-standing relationship going back a number of years with Adelphia, Adelphia entities, Rigas entities. All of these loans performed as expected. They were all in compliance during that entire period of time. Projections, to the best of my knowledge, were pretty close to being met as presented. We had a reasonable comfort level based on the track record that had been established previously by both Adelphia entities and Rigas entities."

identities of all co-borrowers and the loan commitment amounts, was publicly disclosed.[32]

3.9.   Furthermore, the process by which the Adelphia-Related Facilities were structured was itself path dependent. These Facilities "evolved naturally" from prior co-borrowing credit facilities.[33] For example, the UCA-HHC Facility refinanced the Hilton Head Communications Credit Facility (the HHC Facility) and another credit facility. HHC, a Rigas Family Entity, was the sole borrower under the HHC Facility but its indebtedness thereunder was guaranteed by three HHC subsidiaries and also by an HHC "deemed" subsidiary.[34] HHC's interest in the "deemed" subsidiary was subsequently transferred to one of those HHC guaranteeing subsidiaries,[35] and later that guaranteeing subsidiary and a second HHC guaranteeing subsidiary were transferred to the Olympus joint venture or a subsidiary thereof or to Adelphia in an effort to consolidate Adelphia's ownership of clustered cable operations.[36] The result of these amendments and the

---

[32] The Banks and other investors had public information about how Adelphia had utilized co-borrowing and other loan structures to meet its particular financing needs in the past, and all of the co-borrowing credit agreements evidencing these facilities and the Adelphia-Related Facilities—which included the joint and several nature of the Adelphia-Related Facilities, the identities of all co-borrowers thereunder, and the loan commitment amounts—were publicly disclosed in SEC filings.

[33] Memorandum from Eric A. Hirsch of Fried, Frank, Harris, Shriver, & Jacobson, "Adelphia/May 14, 2002 Interview with Dean Marshall," dated May 21, 2002, at 3 (Exhibit 20197, ACI 393970).

[34] *See* Hilton Head Communications, L.P., $350,000,000 Revolving Credit Facility with Canadian Imperial Bank of Commerce and The Toronto-Dominion Bank as Managing Agents, Canadian Imperial Bank of Commerce as Documentation Agent, The Toronto-Dominion Bank as Syndication Agent, First Union National Bank of North Carolina and Société Générale as Agents, Credit Lyonnais as Co-Agent, and Canadian Imperial Bank of Commerce as Administrative Agent, dated as of December 27, 1994 (CIBC0247368-473; A13156068 et seq.).

[35] *See* Purchase and Sale Agreement by and among NCAA Holdings, Inc. et al., dated December 23, 1997 (ACC 0210838-88), at 1-2 (ACC 0210841-42); Olympus Communications, L.P. Form 10-K for the year ended December 31, 1997, at 7.

[36] Amendment dated as of December 31, 1996, to the HHC Facility (BMO AB 004947-66); Amendment, dated as of September 1, 1998, to the HHC Facility (BIPC 1778676-82). *Cf.* Letter dated August 28, 1998 from Michael C. Mulcahey to Michele Roller re "Hilton Head Communications, L.P. ('HHC') Revolving Credit Facility ('Credit

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

associated consolidation of ownership was that subsidiaries of Olympus and of Adelphia were jointly and severally liable for repayment of the HHC Facility.[37] The UCA-HHC Facility therefore did not suddenly result in the creation of a novel and unique loan structure in which RFEs and Adelphia subsidiaries were jointly and severally obligated, but instead refinanced the HHC Facility in which such a repayment structure was already in place.[38]

3.10.    Similarly, the Olympus Facility refinanced four different earlier credit facilities, including the HVA/TALP co-borrowing credit facility (the "HVA/TALP Facility") under which RFE and Adelphia entities were already jointly and severally liable.[39] Banks noted that the refinancings under the Olympus and UCA-HHC Facilities would simplify Adelphia's existing financing structure.[40] Although the CCH Facility may not have refinanced a prior co-borrowing credit facility, it appears to have partly financed the joint acquisition of Prestige Communications by an RFE and Adelphia.[41] Similarly, the term

---

Facility')" (discussing transfer to Adelphia of SVHH Cable Acquisition, L.P. and Tele-Media Company of Hopewell/Prince George) (BMO AB 005196).

[37] Olympus Communications, L.P. Form 10-K for the fiscal year ending December 31, 1998 at 27-28. *Cf.* Application for Corporate Credit dated April 10, 1997 (CIBC application for HHC) at CIBC0014463A (stating that after NCAA's transfer to Olympus, "NCAA will provide a guaranty for all of HHC's obligations under the [HHC] Bank Facility").

[38] Indeed, the UCA-HHC Facility improved the position of the Olympus and Adelphia subsidiaries that guaranteed the HHC Facility by enabling them to draw down funds.

[39] *See* Bank of America "Credit Approval Memorandum" for Olympus, August 1, 2001, at 8 (BAS 002293). The other three credit facilities refinanced by the Olympus Facility were co-borrowing agreements that included Adelphia entities and entities with at least partial outside ownership. *See* Exhibit 2.

[40] *See, e.g.*, Bank of Nova Scotia "Credit Presentation" for UCA-HHC, April 23, 1999, at 3 (BNS-A 034737); Fuji Bank "Notice of Preliminary Approval" for Olympus, August 27, 2001, at MIZ-0003512.

[41] *See* Michael Rigas Dep. 98:4-99:8, Volume I, July 21, 2009 (indicating also that the Rigas family facilitated that acquisition by acquiring the Georgia cable assets of Prestige, allowing Adelphia to acquire the mid-Atlantic cable assets that were close to its existing cable system cluster).

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

sheets for each of the Adelphia-Related Facilities were marked up from term sheets of prior deals, which used co-borrowing structures.[42]

3.11.   Conclusion: The Adelphia-Related Facilities appeared to have had valid business purposes and to have been commercially reasonable in light of Adelphia's corporate structure, financing history, and joint management with the RFEs. Credit facilities are ordinarily customized to meet the specific needs of borrowers. The fact that credit facilities are uniquely tailored is not unusual.

## 4.  THE STRUCTURE AND TERMS OF CO-BORROWING FACILITES (INCLUDING THE ADELPHIA-RELATED FACILITIES)

4.1.     Although co-borrowing facilities are uniquely tailored to meet the specific needs of the borrowers, that does not mean that the documentation for these facilities has to be conceptually complex or difficult to analyze. In the case of the Adelphia-Related Facilities, the co-borrowing structure appears to have been designed to meet the specific needs of Adelphia and the RFEs, but the other terms of the Adelphia-Related Facilities were generally standard and straightforward and in my experience appear to be within the range of provisions found in other commercial credit agreements.

4.2.     Lenders focus primarily on getting repaid, with interest.[43] Prior to making loans, lenders analyze the potential credit risk associated with a borrower and specific loan-based criteria such as cash-flow projections and other sources of repayment, reputation of the borrower, and the borrower's sensitivity to business and market cycles.[44] In

---

[42] Memorandum from Robert E. Brown of Fried, Frank, Harris, Shriver, & Jacobson, entitled "Adelphia/April 9, 2002 Interview with Dean Marshall," dated April 23, 2002, at 1 (ACI 393836) (stating that "Marshall used the exact same term sheets that were used in previous deals[, making changes to] attempt to improve flexibility and create greater financing capacity." For a discussion of the relationship between term sheets and credit agreements, *see infra* paragraph 4.13.

[43] *See* HUBBARD, *supra* note 20, at 290.

[44] *See* TIMOTHY W. KOCH & S. SCOTT MACDONALD, BANK MANAGEMENT 558-60 (7th ed. 2010).

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

structuring a deal, lenders seek to ensure repayment, such as through borrower cash-flow capacity, restrictive covenants, and collateral,[45] and lenders generally presume that a borrower will follow its internal controls to the extent necessary to comply with these contractual obligations.[46] Borrowers, on the other hand, typically want flexibility and looser covenants to meet their operating goals and to ensure the availability of funding. The ultimate loan structure and terms strike a balance between the borrower's and lenders' objectives based on negotiating power and pricing.[47]

4.3.   All of the co-borrowers in Adelphia were jointly and severally liable for repayment of their respective Adelphia-Related Facilities.[48] Thus the amounts drawn by specific borrowers under the Facilities would not be relevant to the Banks unless the joint and several liability of the borrowers was limited in some manner or could be released. The Adelphia-Related Facilities protected against any such release of liability by including representations and warranties, required to be made (or deemed made) as a condition precedent to each borrowing, that each of the Adelphia co-borrowers under the relevant facility would, at the time of each borrowing and after giving effect thereto, be solvent, able to pay its debts, and have adequate capital. Furthermore, the Banks monitored the financial condition of the co-borrowing groups through covenants, including the receipt of detailed compliance certificates.

4.4.   From a lender's perspective, the fact that a co-borrowing facility would include both public and non-public companies should be irrelevant. Lenders focus on getting

---

[45] At the end of the day, though, no practical amount of due diligence can change the fact that "bad borrowers have better information regarding their ability to repay loans than their bankers do," and that banks "often cannot distinguish between bad borrowers and good borrowers, as all borrowers try to convince lenders that they are good credit risks." Jonathan R. Macey & Geoffrey P. Miller, *Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan, and the United States*, 48 STAN. L. REV. 73, 90 (1995).

[46] If a lender discovers these controls are lacking or not being followed, it is unlikely to have further dealings with a borrower.

[47] Expert Report of Nabil N. El-Hage, at 29-30.

[48] In my experience, it is normal for co-borrowers to be jointly and severally liable for repayment.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

repaid, with interest, and public and non-public companies are equally legally responsible for repaying their loans.[49]


4.5.    Because lenders focus on getting repaid, and a loan made knowingly to facilitate criminal activity may not be repayable, legitimate lenders do not want to become involved in criminal activity. Nonetheless, lenders do not typically presume the existence of criminal activity or expect sophisticated corporate customers to be committing fraud. To the contrary, in my experience sophisticated lending institutions, such as the Banks, do not expect their sophisticated corporate customers, such as Adelphia, to be committing fraud. Companies—especially large public companies with established ongoing business relationships such as Adelphia and the Banks—must, and typically do,[50] operate on the basis of mutual trust.[51] Adelphia had a good reputation in its industry and, as a public company, filed publicly available and independently certified financial statements. Furthermore, credit approval memoranda indicate that many of the Banks expressed a high level of regard for the management capabilities of the Rigas family and thus viewed Rigas family involvement in Adelphia as positive.[52] For many of the Banks, these views

---

[49] *See supra* paragraph 3.6.

[50] There is, for example, a significant legal literature on relational contracting, in which parties with ongoing business relationships deal on the basis of trust. Dealing on the basis of trust also has been studied in the business context, such as the work done by Volery and Mensik in examining intercorporate alliances—defined as repeated contacts between firms over a period of time in order to coordinate their activities in one or several fields— among Swiss firms. They found that trust plays a crucial role in creating and managing alliances because it reduces complex realities far more quickly and economically than prediction, authority or bargaining. T. Volery & S. Mensik, *The Role of Trust in Creating Effective Alliances: A Managerial Perspective*, 17 J. BUS. ETHICS 987 (1998). For a more general discussion of dealings based on trust, *see* B. Klein & K. Leffler, *The Role of Market Forces in Assuring Contractual Performance,* 89 J. POL. ECON. 615, 616 (1981); L.G. Telser, *A Theory of Self-Enforcing Agreements*, 53 J. BUS. 27, 28 (1980).

[51] This was particularly the case for the Adelphia-Related Facilities, all of which were entered into prior to the discovery of Enron and other high profile corporate frauds.

[52] *See, e.g.,* Citibank "Global Loans Approval Memorandum," October 30, 2000, at 9 (2004E007431) (observing that "The senior management team of Adelphia is highly regarded in the industry for its excellent track record and has a strong reputation as an efficient operator. . . . Despite the significant acquisition activity over its history, Adelphia management has consistently achieved operating margins among the highest of all MSOs."); First Union Capital Markets, "Adelphia Communications - Hilton

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

were cemented by long-standing relationships with the Rigas family.[53] Moreover, the Furchtgott-Roth Report illustrates how positively the cable industry viewed the Rigas family.[54]

4.6.    Credit agreements usually contain a section in which the borrower makes "representations and warranties" at the time of closing of the credit agreement and, in many cases, also prior to a draw on the facility. One fundamental purpose of representations and warranties is to reduce the information asymmetry between the borrower, which knows a lot about its business, and the lender, which knows less about the borrower's business. Thus, representations and warranties will confirm important factual matters about the borrower's business and the loan.

4.7.    It therefore is not unusual—indeed, it is commonplace—to include representations and warranties by a borrower in a credit agreement that the lender cannot, or that would be costly for the lender to, independently verify. In these cases, the lender relies on the truthfulness of the borrower in making those representations and

---

Head/UCA - $700MM Senior Credit Facility," March 29, 1999, at 11 (WACH0250594) (observing that "John Rigas has been in the cable business for over 40 years and is extremely well regarded. Additionally, Adelphia demonstrates both depth and continuity of management as John Rigas's three sons are also involved in the business, holding senior management positions."); Credit Suisse First Boston, "Adelphia Communications (UCA Corp and Hilton Head Communications) $700,000,000 Senior Credit Facilities - Credit Committee Memo," February 23, 1999, § 6 (CSFBNYB007634-35) (observing under the heading "Strong Management Team" that "John Rigas, CEO, is one of the pioneers of the cable television business, having built his first cable system in 1952. The management team has an in-depth knowledge of the markets in which the partnership will operate, and is noted for achieving the highest operating margin of any major MSO . . . . Our experience with Adelphia has shown its management team to be one that consistently meets or exceeds projections.").

[53] *Cf.* HUBBARD, *supra* note 20, at 293: "One of the best ways for a bank to gather information about a borrower's prospects or to monitor a borrower's activities is for the bank to have a long-term relationship with the borrower. By observing the borrower over time—through checking account activity and loan repayments—the bank can significantly reduce problems of asymmetric information by reducing its information-gathering and monitoring costs."

[54] Furchtgott-Roth Report, *supra* note 23, Section V.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

warranties.[55] The borrower has strong motivation to be truthful because making an incorrect representation or warranty can constitute an event of default, accelerating the maturity of the loan and potentially triggering so-called cross-default provisions[56] in the borrower's other credit agreements.

4.8.    Representations and warranties also are used to shift risk between the borrower and the lender even as to factually uncertain matters. For example, it is commonplace for a borrower to represent and warrant that, at the time of each future draw under its credit agreement, there will have been no material adverse change in the borrower's financial condition or results of operations since a prior reference date. This shifts risk from the lender to the borrower because, if the borrower's financial condition or results of operations does materially adversely change by a future date on which the borrower wishes to draw on the facility, the borrower will be unable to "bring down" (i.e., re-make) those representations and warranties on that future date, and thus will be unable to borrow.

4.9.    Each of the Adelphia-Related Facilities similarly contains a section in which the borrowers make representations and warranties at the time of closing of the Facility and also prior to a draw on the Facility, and these representations and warranties appear to confirm important factual matters about the borrowers' business and the loans being made under the Facility. To the extent the Banks could not, or would find it costly to, independently verify these representations and warranties, it would be commercially reasonable for them to rely on the truthfulness of the borrowers in making those representations and warranties. If any of such representations or warranties were incorrect in any material respect when made or deemed made, there would be an event of default

---

[55] Officer certificates of compliance and legal opinions delivered at the closing by counsel for the borrower also help to reduce information asymmetry as to factual matters (in the case of the officer certificates) and legal matters (in the case of the legal opinions).

[56] These are provisions that make it an event of default under one credit agreement of the borrower if there is an event of default under any other, even unrelated, credit agreement of the borrower (or, sometimes, of the borrower or any of its affiliates).

under the applicable Adelphia-Related Facility and a potential to cross-default to other Adelphia credit facilities.

4.10.    I note that the Adelphia-Related Facilities contained covenants that restricted members of borrowing groups from entering into material transactions with affiliates.[57] These covenants would not appear to prevent Adelphia or the RFEs from jointly entering into the Adelphia-Related Facilities because such covenants explicitly did not apply to transactions between or among co-borrowers under those Facilities. I also understand that Adelphia's bond indentures required Adelphia's related-party transactions to be approved by Adelphia's outside directors.[58] Although I have not independently examined these indentures, I observe that the opinion letters received from legal counsel at the closings of the Adelphia-Related Facilities concluded that the execution, delivery, and performance by Adelphia and the RFE borrowers under such Facilities would not violate material contractual provisions to which Adelphia or the RFEs were subject. These types of conclusions in opinion letters are the standard and customary means by which lenders achieve comfort that, by entering into a lender's credit agreement, the borrower will not thereby breach other agreements to which it is a party.[59] The Banks therefore would have been reasonable in believing that inclusion of RFE borrowers in the Adelphia-Related Facilities would not violate any material contractual restrictions of Adelphia or the RFE borrowers.

4.11.    I note also that the Adelphia-Related Facilities contained covenants that under certain circumstances restrict the right of the borrowers thereunder to make investments, loans, or other payments outside of the relevant borrowing group unless, for example, the leverage ratio of the group's borrowers on a combined basis is less than a specified ratio (and no actual or incipient event of default exists or would occur as a result of the investment, loan, or other payment). To the extent investments, loans, or other payments

---

[57] *See* UCA-HHC Facility, § 7.2.10; CCH Facility, § 9.14; Olympus Facility, § 8.13.

[58] Gilson Report, *supra* note 2, at paragraph 80.

[59] *See, e.g.*, RICHARD WIGHT, THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE 171-172 (2009). The Simon Report does not purport to challenge the Banks' reliance on these types of legal opinions, challenging only compliance-with-law opinions.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

are permitted to, and in fact do, go outside of the relevant borrowing group, these covenants do not appear to restrict further use of such investments, loans, or other payments. Thus, to the extent proceeds of the Adelphia-Related Facilities are permitted, by such Facilities, to be invested outside of the relevant borrowing group and in fact are so invested, these covenants do not appear to restrict further use of such proceeds.

4.12.    The joint-liability nature of the Adelphia-Related Facilities is also consistent, in my experience, with the joint liability often found in even non-co-borrower credit facilities involving multiple affiliated companies. For example, I have often seen lenders extend credit to a single borrower, such as a holding company, which then has discretion to advance all or a portion of such monies to its affiliated companies.[60] At the closing, each affiliated company—whether or not it expects to be advanced money—executes a guarantee of all credit extended. This type of credit facility is substantively similar to a co-borrowing facility because the guarantees make the affiliated companies jointly and severally liable for repayment of the entire facility.[61]

---

[60] This structure is not inconsistent with my observation, *infra* paragraph 4.17, that it is always prudent, if there is a choice, to lend to an operating company rather than its holding company. The lender in the structure described in the text above does not have to make a choice because, as discussed above, each affiliated company guarantees the credit extended to the holding company. Lenders generally may proceed on a guarantee exactly as they would if the guarantor were a primary borrower. Steven L. Schwarcz & Gabe Shawn Varges, *Guaranties and Other Third-Party Credit Supports*, Chapter 16 in COMMERCIAL LOAN DOCUMENTATION GUIDE (1988).

[61] *See, e.g*., WIGHT, *supra* note 59, at 163 (observing that "[t]here is little practical legal difference between having a single borrower supported by guarantees and having a co-borrower structure"). Buchanan Ingersoll reached a similar conclusion in an analysis conducted for Adelphia's board of directors. *See* Letter from George L. Cass to Adelphia Communications Corp., "Nature of Obligations of 'Restricted Borrowers' as defined in the Credit Agreement dated as of April 14, 2000 among Century Cable Holdings, LLC, Ft. Myers Cablevision, LLC and Highland Prestige Georgia, Inc., Restricted Borrowers, and Bank of America Securities, LLC et. al. (the 'Credit Agreement')," May 6, 2002 (BIPC 2666103-111); and Letter from George L. Cass to Adelphia Communications Corp., May 6, 2002 (Exhibit 20276, DT00945014-19). Sometimes a given affiliated company's guarantee will be limited in amount in order to ensure that such company, by reason of making the guarantee, does not become insolvent, unable to pay its debts as they come due, or inadequately capitalized. The Adelphia-Related Facilities addressed these concerns through representations and warranties. *See supra* paragraph 4.3.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

4.13.    The process by which, in my experience, virtually all credit facilities are documented is also of relevance in this case. Documentation typically begins with a term sheet, outlining proposed credit terms and conditions for discussion. This discussion typically will lead to negotiation of these terms and conditions. If the lender and borrower eventually agree on terms and conditions, the borrower will present the revised term sheet to its board of directors for approval. If the board approves that term sheet, the lender typically will authorize its lawyers to draft a credit agreement that parallels the provisions in the term sheet. When that draft is completed, the lender and the borrower (and their counsel) will customarily negotiate the final language of the credit agreement. Because this negotiation is a dynamic process and the term sheet is merely an outline, the final terms and conditions of the executed credit agreement often vary to some extent from the term sheet. When that occurs, the credit agreement, being the final signed documentation of the credit facility, will govern.

4.14.    This proposition—that the executed credit agreement will govern to any extent it varies from the term sheet—applies even if the lender and borrower had legally agreed to the terms and conditions of the term sheet.[62] This is because those initially-agreed terms and conditions are merged into and superseded by the subsequently executed credit agreement.[63] To the extent the Adelphia-Related Facilities were documented along the lines indicated in the prior paragraph, the final executed version of each such Facility should supersede the initial terms thereof outlined in the relevant term sheet.

4.15.    I therefore conclude that lenders would generally view co-borrowing facilities with the foregoing structure and terms as being commercially reasonable in the circumstances discussed, and that the Banks would have been justified in viewing the

---

[62] This typically occurs where the lender and borrower execute a so-called commitment letter agreeing to those terms and conditions, which are usually evidenced by attaching the term sheet.

[63] *Cf.* RESTATEMENT (SECOND) CONTRACTS §§ 213-216, including cmt. b to § 216 ("Terms of prior agreements are superseded to the extent they are inconsistent with an integrated agreement").

structure and terms of the Adelphia-Related Facilities as being commercially reasonable in those circumstances.

4.16.    I understand that Plaintiffs allege in their complaint that the fact that the Banks syndicated and sold down portions of their credit exposure under the Adelphia-Related Facilities is somehow evidence of fraud. I see no basis for this allegation. Banks commonly syndicate and/or sell down credit exposures in order to reduce, diversify, or otherwise manage credit risk.[64] This is commercially reasonable and does not indicate the likelihood of fraud.[65]

4.17.    I understand that Plaintiffs also allege in their complaint that the fact that the Adelphia-Related Facilities were entered into at the Adelphia operating-company level rather than the parent holding-company level supports their fraud claims. Again, I see no basis for this allegation. Where there is a choice, it is always prudent for lenders to make loans to an operating company which owns equipment, inventory, accounts receivable, and other operating assets, rather than to its holding company which owns shares of stock in the operating company. Lending to the operating company avoids the "structural subordination"[66] that corporation and bankruptcy law would impose on a lender to the

---

[64] For example, a borrower may ask a bank to make available an $X credit facility, but the bank may decide that it does not want to take credit risk on this borrower of more than 1/3 $X. One way to accomplish this is for the bank to enter into the facility along with two other banks, each agreeing to extend credit up to 1/3 $X. This is called syndication. Another way to accomplish this is for the bank to enter into the facility to extend credit up to $X but thereafter to sell off credit exposure of 2/3 $X to other banks. This is often accomplished through the sale of so-called loan participations in the credit facility. *See, e.g.,* Steven L. Schwarcz, *Intermediary Risk in a Global Economy*, 50 DUKE L.J. 1541, 1557-61 (2001) (explaining sales of loan participations). There are also other ways for banks to sell down portions of their credit exposure under credit facilities, but they are conceptually similar to sales of loan participations. Banks commonly, in my experience, use a combination of syndication and sales of loan participations to reduce, diversify, or otherwise manage credit risk. As stated in the text above, this is commercially reasonable and does not indicate the likelihood of fraud.

[65] *Cf.* HUBBARD, *supra* note 20, at 298-299 (discussing loan sales).

[66] In my experience, structural subordination occurs, for example, when a loan is made to a "holding" company—i.e., a direct or indirect owner of the equity in one or more other companies that own the operating assets. The lender's right to repayment from the

holding company.[67] Such a lender could not claim against the operating company's assets until creditors of the operating company were paid in full.[68] If the operating company is insolvent, a lender to the holding company could recover nothing. Lending to the operating company rather than the holding company is, in my experience, standard banking procedure and in no way suggests fraudulent intent on the part of borrowers or concerns about fraud on the part of lenders. Indeed, credit rating agencies rated the Adelphia-Related Facilities at least one and at times two notches higher than Adelphia's holding company debt, reflecting the latter's structural subordination.[69]

4.18.   Nor do my conclusions change because Buchanan Ingersoll PC ("Buchanan Ingersoll"), the law firm issuing most of the relevant opinion letters, was counsel for Adelphia, the RFEs, and the Rigas family. It is not uncommon, in my experience, for a law firm, with knowledge and consent of all the clients, to represent multiple clients on one side of a commercial financing transaction (such as a credit facility) even though the interests of the clients may not be identical. Using a single law firm saves lawyer fees, and, vis-à-vis the Banks, Buchanan Ingersoll's clients had a common interest in negotiating terms that generally benefited the borrowing group. Furthermore, a law firm, especially one as nationally prominent as Buchanan Ingersoll, has reputational capital at risk[70] and therefore should perform with integrity notwithstanding the multiple clients.[71]

---

operating assets would then be effectively subordinate to the rights of the creditors of those other companies to be repaid from those assets.

[67] *Cf.* Barclays, Minutes of a Meeting of the Group Credit Committee, for the Olympus Facility, September 18, 2001 (BAR-EDOCS_000639) (observing that "Adelphia's structure of bank debt at separate operating restricted borrower groups with all other debt structurally subordinated, is common in the cable industry and has been utilized for years").

[68] *See, e.g.,* 11 U.S.C. § 726(a)(6) (providing that only after a debtor's claims are paid in full will any remaining assets go to "the debtor," meaning the debtor's equity owners, i.e., shareholders).

[69] *See, e.g.*, Moody's Investors Service, Inc., *Moody's Lowers All Ratings Of Adelphia Communications & Subsidiaries Except For Sr Implied Rating; New Century Holdings Bank Debt Rated Ba3*, August 15, 2000.

[70] *Cf.* Steven L. Schwarcz, *Explaining the Value of Transactional Lawyering*, 12 STAN. J. L. BUS. & FIN. 11 (2007) (observing that a "high-reputation law firm not only has expertise but, more importantly, bonds itself to good performance; it would lose at least part of its reputation if it failed to perform well").

Moreover, joint representation of clients by a single law firm should be especially understandable where a client has its own in-house counsel involved in the transaction, as was the case for the Adelphia-Related Facilities.[72]

4.19.    The Simon Report nonetheless argues that because Buchanan Ingersoll represented both Adelphia and the RFEs, the Banks could not reasonably have relied on the legal opinions rendered by Buchanan Ingersoll under the Adelphia-Related Facilities for purposes of assessing compliance with laws governing related party transactions. However, the focus of the Simon Report on legal ethics and rules of professional conduct is inapposite to the specific question Mr. Simon addresses—that of *the Banks'* reasonableness in relying. The Banks, not being lawyers, were not subject to legal ethics or rules of professional legal conduct. There is no reason the Banks should have been, and I am unaware of any evidence that they in fact were, aware of those ethics or rules; nor is there anything in any of the Buchanan Ingersoll legal opinions putting the Banks on notice of a problem.[73] To the extent legal ethics or professional conduct rules were breached,[74] Buchanan Ingersoll (and not the Banks) was at fault.

---

[71] *See id.*

[72] *See* Dean R. Marshall Dep., Volume I, March 2, 2009, at 162:9-23 (observing that "Colin Higgin was very involved in the . . . legal structure and the documentation phase of the process") and at 201:11-18 & 233:20-25 (stating that Higgin was likely involved in drafting term sheets before sending them to prospective lenders). *See also* James Rigas Dep. 159:8-21, Volume I, July 8, 2009 ("[Higgin] was kind of the internal attorney who dealt with all of the internal acquisition and financing documents.  He would review all of them and, you know, I wouldn't say the company was relying primarily on his expertise in any way, but he was certainly reviewing them and was responsible for, you know, helping to make sure the process moved along and got done.").

[73] Indeed, a central reason that lenders ask for legal opinions from borrowers' counsel is to gain comfort that "nothing legally problematic lurks beneath the transaction's surface." Steven L. Schwarcz, *The Limits of Lawyering: Legal Opinions in Structured Finance*, 84 TEX. L. REV. 1, 10 (2005). *See also* sources cited therein at 10 n. 52 (observing, among other things, that such a legal opinion presumably "will warn the recipient of any potential problems which may arise from the transaction").

[74] Because the analysis in the Simon Report is (as mentioned above) not relevant to the question presented therein, I have not independently examined the substantive merits of that analysis.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

## 5.   CO-BORROWING FACILITY PROVISIONS (INCLUDING PROVISIONS IN THE ADELPHIA-RELATED FACILITIES) RELATED TO MONITORING AND USES OF PROCEEDS

5.1.     Lenders monitor their credit facilities to provide early warning of financial distress that could threaten loan repayment. They do this primarily through covenants, and to some extent also through representations and warranties (which, as discussed, can restrict future draws on facilities) and events of default (which do not provide early warning necessarily).

5.2.     Monitoring of the combined borrowing group's (rather than of individual borrower's) financial statements was consistent with the focus on getting repaid because the co-borrowers were jointly and severally liable on each of their Adelphia-Related Facilities.[75] This monitoring was clearly intended to provide early warning of financial problems. Although the Banks did perform that monitoring—and indeed compliance certificates received by the Banks indicated that all of the Adelphia-Related Facilities were in compliance with covenants until April 2002—Adelphia had falsified the reporting in some cases to mislead the Banks by understating leverage ratios.[76]

5.3.     In connection with the foregoing discussion of monitoring the combined borrowing group (rather than monitoring individual borrowers within the group), I have been asked to assess whether the leverage ratio covenant in each of the term sheets for the Adelphia-Related Facilities provided to Adelphia's Board of Directors—which leverage ratio covenant is calculated with respect to the combined borrowing group (and not with respect to individual borrowers within the group)—was accurately documented in the

---

[75] *Cf.* Expert Report of John M. Lacey, Part V (explaining why monitoring the combined borrowing group's financial statements was also consistent with generally accepted accounting principles).

[76] *See* James Brown Trial Tr. *United States of America v. John J. Rigas, Timothy J. Rigas, Michael J. Rigas, Michael C. Mulcahey, Defendants*,  6349:19-6355:1, Southern District of New York, May 5, 2004.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

executed credit agreements for the Adelphia-Related Facilities. I conclude that it was, and that it was commercially reasonable for such covenant to be so measured.[77]

---

[77] It is clear, for example, that the UCA – Hilton Head Summary Terms and Conditions (Defendant's Exhibit 10010, A22340761-76) contemplated that the leverage ratio would be calculated on a combined basis for the co-borrowers. The definition of "Leverage Ratio," on p. 3, references "Borrowers' [i.e., plural] ratio." The leverage ratio covenant itself, on p. 6, references only one ratio number for any given time period, which would make little sense if the covenant were intended to be customized to each co-borrower. The definition of "Total Funded Debt," on p. 16—which is the numerator of the Leverage Ratio—is calculated by reference to "all indebtedness of the Borrowers." The denominator of the Leverage Ratio is calculated by reference to "Annualized Operating Cash Flow" which is based on "Operating Cash Flow" which is calculated on a combined basis for the co-borrowers.  Furthermore, the other financial covenants in this term sheet appear to be calculated likewise on a combined basis for all the co-borrowers.  And the co-borrower reporting of financial statements is, per p. 10, provided on the basis of "combined statements of the Borrowers."  Similarly, it is clear that the CCH Summary of Proposed Terms and Conditions (Defendant's Exhibit 20041, ACC 0001920-9) contemplated that the leverage ratio would be calculated on a combined basis for the co-borrowers.  The definition of "Leverage Ratio," on p. 3, references "Borrowers' [i.e., plural] ratio." The leverage ratio covenant itself, on p. 4, references only one ratio number for any given time period, which would make little sense if the covenant were intended to be customized to each co-borrower. The numerator of the Leverage Ratio is calculated by reference to "the sum of Senior Debt" for the co-borrowers. The denominator of the Leverage Ratio is calculated by reference to "Annualized Operating Cash Flow" which is based on "Operating Cash Flow" which is calculated on a combined basis for the co-borrowers. Furthermore, the other financial covenants in this term sheet appear to be calculated likewise on a combined basis for all the co-borrowers. And the co-borrower reporting of financial statements is, per p. 7, provided on the basis of "combined statements of the Restricted Borrowers." And finally, it is likewise clear that the Olympus Summary of Proposed Terms and Conditions (Defendant's Exhibit 20361, CGK 010891-902) contemplated that the leverage ratio would be calculated on a combined basis for the co-borrowers. The definition of "Leverage Ratio," on p. 3, references "Borrowers' [i.e., plural] ratio." The leverage ratio covenant itself, on p. 4, references only one ratio number for any given time period, which would make little sense if the covenant were intended to be customized to each co-borrower. The numerator of the Leverage Ratio is calculated by reference to "the Restricted Borrowers'… Senior Debt." The denominator of the Leverage Ratio is calculated by reference to "Annualized Operating Cash Flow" which is based on "Operating Cash Flow" which is calculated on a combined basis for the co-borrowers. Furthermore, the other financial covenants in this term sheet appear to be calculated likewise on a combined basis for all the co-borrowers. And the co-borrower reporting of financial statements is, per p. 6, provided on the basis of "combined statements of the Restricted Borrowers." Mr. Doyle appears to agree with this analysis; he notes that the term sheets did not incorporate any pro rata limits on the co-borrowers. *See* Doyle Report at 39 n. 26.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

5.4.     Although I understand that at least one of the earlier Adelphia/RFE co-borrowing facilities, unlike the Adelphia-Related Facilities, included individual company borrowing limits, inclusion of such limits would have been more the concern of the borrowers than of the Banks. So long as lenders have enforceable joint and several claims against borrowers, they would not necessarily benefit from the existence of limits. And lenders have no duty to impose limits for the benefit of their borrowers: lenders are not general corporate governance monitors of their borrowers, nor are they generally considered to owe a fiduciary duty to borrowers.

> The implied covenant of good faith should not be confused with the question of whether a lender owes a fiduciary duty to the borrower. New York law generally provides that the usual relationship between a borrower and a lender is purely contractual (that of debtor and creditor) and does not give rise to a fiduciary relationship between the lender and the borrower (or any guarantors). . . . Courts have held this to be the rule even if an entity has borrowed money from the same lender for several years. If the rule were otherwise and a lender were deemed a fiduciary in a lending relationship, it would radically alter the borrower-lender relationship. . . . Were a lender a fiduciary, its ability to demand payment of a loan after default and to exercise remedies might be limited by what is best for the borrower rather than what is appropriate for the lender, and thus severely constrain the lender's exercise of its carefully negotiated rights.[78]

5.5.     Indeed, the inclusion of limits on individual co-borrowers may even increase risks for lenders, which might provide funding by mistake to an individual co-borrower in excess of its borrowing limit, while providing a lender with little if any additional assurance of repayment.[79] To the extent that borrowers prefer to limit the amount that

---

[78] WIGHT, supra note 59, at 578-79. *Cf.* Macey & Miller, *supra* note 45 (questioning the extent to which banks should be monitoring their borrowers). Judge Gerber has held that "[u]nder Pennsylvania law, a lender is not ordinarily the fiduciary of a borrower." *In re Adelphia Communications Corp.*, 365 B.R. 24, 63 (Bankr. S.D.N.Y. 2007) (citing *Bohm v. Commerce Union Bank of Tennessee*, 794 F. Supp. 158, 164 (W.D. Pa.1992)).

[79] Co-borrowing facilities therefore typically impose joint and several liability and do not apportion responsibility for how individual co-borrowers will repay the debt. Co-borrowers can, of course, agree *among themselves* regarding any limitations on borrowing or how liability will be apportioned. I have been informed that in several previous instances, including the HVA/TALP Facility, Adelphia and RFEs or Rigas

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

individual borrowers can draw on a co-borrowing facility, they may well prefer to set these limits outside the credit agreement. This would give the borrowers flexibility to change the individual borrowing limits without the associated costs of obtaining a waiver from the lenders. Such limits would have no bearing on the likelihood of lender repayment because the borrowers would remain jointly and severally liable regardless of any limits the borrowers might agree to among themselves.[80]

5.6.     Once lenders sign a credit agreement, they are generally obligated until the term of the credit commitment expires to provide the funding (i.e., to make the loans) contemplated by the agreement's terms. The only defense to that obligation is, typically, the existence of either of the following: (i) the occurrence and continuance of an actual or incipient event of default;[81] (ii) the borrower's inability to bring down the representations and warranties as of the date of funding.[82] This is precisely how the Adelphia-Related Facilities worked.

5.7.     I conclude that the provisions of the Adelphia-Related Facilities were appropriately focused on ensuring the banks would be repaid.

---

family members agreed among themselves as to how co-borrower liability under credit agreements would be apportioned; and that the co-borrowers in each of the Adelphia-Related Facilities similarly agreed among themselves (albeit post-closing and post-March 27) as to how liability would be apportioned.

[80] It also should be noted that a co-borrower that repays a lender under a co-borrowing facility should thereafter have recourse for proportional reimbursement to all of the other co-borrowers who are jointly and severally obligated on the facility.

[81] An incipient event of default is a default that with the giving of notice or the passing of time, or both, would become an event of default. For example, if the borrower breaches a financial covenant but such breach would not constitute an event of default until it continues un-remedied (often called "uncured") for at least 30 days, the breach would nonetheless constitute an incipient event of default preventing the borrower from borrowing more money until the breach is cured. The rationale for this distinction is that an actual event of default enables the lender to accelerate payment of the loan, which can have the practical effect of driving the borrower into bankruptcy, whereas an incipient event of default merely preserves the lending status quo (i.e., no new borrowing) until it is cured or turns into an event of default.

[82] *See supra* paragraph 4.8.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

5.8.   Nor is my conclusion changed by the fact that significant amounts of borrowings under the UCA-HHC Facility are alleged to have indirectly facilitated purchases of Adelphia stock by Rigas family members.[83] Once loan proceeds are used in compliance with credit agreements, lenders have no control over their subsequent use.

5.9.   I also confirm my conclusion notwithstanding that the Adelphia-Related Facilities involved companies that were all directly or indirectly controlled by members of a single family—the Rigases. As noted, the Rigas family was highly regarded and also held ownership interests in Adelphia that strongly aligned the family's interest with the interests of Adelphia shareholders. Furthermore, the Banks had a long and successful history of relationships with the Rigas family and with Adelphia. Any lending relationship, of course, involves risk because of the asymmetric information between the lender and the borrower.[84] I believe that, under the circumstances, the Banks took commercially reasonable steps to try to reduce this information asymmetry.

## 6. OBSERVATIONS REGARDING THE DOYLE REPORT

6.1.   The Doyle Report attempts to paint the Adelphia-Related Facilities as "unique and unprecedented for Adelphia"[85] by comparing the terms of those Facilities with the terms of the HVA/TALP Facility. Mr. Doyle's comparison, however, contains several factual errors:

- Mr. Doyle claims that all prior lending facilities to the RFEs and Adelphia, other than the HVA/TALP Facility, were separate.[86] Paragraphs 3.7 et seq. of this Report show that is incorrect.

---

[83] Plaintiffs have alleged that in the case of the UCA-HHC Facility, the RFE co-borrower made a dividend distribution to Rigas family shareholders, who in turn used some or all of the distribution to purchase Adelphia stock. *Adelphia Recovery Trust v. Bank of America, N.A., et al.*, Case No. 05 Civ. 9050 (LMM), Second Amended Complaint, S.D.N.Y., Feb. 29, 2008, at paragraphs 862-63.

[84] *See supra* paragraph 4.6 (discussing this asymmetric information and how to reduce it).

[85] Doyle Report at 34.

[86] Doyle Report at 34-35.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

- Mr. Doyle claims the UCA-HHC Facility created a new debt obligation for Adelphia when it refinanced the Hilton Head Communications (HHC) credit facility.[87] To the contrary, as discussed in Paragraph 3.9, subsidiaries of Adelphia and of its Olympus Communications joint venture were jointly and severally liable for repayment of the HHC facility.

- While Mr. Doyle is correct that the HVA/TALP Facility included a fixed charge coverage ratio covenant while the Adelphia-Related Facilities did not,[88] he fails to note that all three of the Adelphia-Related Facilities included a debt service coverage ratio covenant.[89] I note, without independent analysis, that at least one of the Banks appears to indicate that this is a closely related cash flow covenant that made the fixed charge coverage ratio covenant redundant.[90]

6.2.    Mr. Doyle also makes a number of claims about how banks that engage in "prudent lending practices" would have structured or monitored the Adelphia-Related Facilities. The activities of these "prudent" institutions are drawn in sharp contrast with the actions of the Banks. I next test Mr. Doyle's claims by examining the co-borrowing lending activities of Firstar Corporation ("Firstar") and U.S. Bancorp, banks for which Mr. Doyle served in senior credit positions.[91] To this end, staff of Analysis Group,

---

[87] Doyle Report at 47.

[88] Doyle Report at 54-55.

[89] See UCA-HHC Facility, §7.2.4; CCH Facility, §9.28; Olympus Facility, §9.28.

[90] See Memorandum from Naghmeh Hashemifard, Associate, to Allegra Griffiths, Director, re Hilton Head Communications, L.P., et al. (May 4, 1999) (BMO AB 005123), noting that "the elimination of the fixed charge coverage ratio covenant does not have a significant impact on the controls available to the lenders. The [debt service coverage] covenant is an earlier predictor of the company's ability to service its debt than the fixed charge coverage ratio covenant since it calculates the following year's debt servicing requirements based on the current year's cash flow. In addition, the other factors which are captured in the fixed charge coverage ratio and not in the [debt service coverage] ratio (capex and cash taxes) are not significant for this company . . . . Therefore, as the fixed charge coverage ratio is somewhat redundant with the [debt service coverage] covenant, we feel comfortable with its removal."

[91] According to the Doyle Report, Mr. Doyle served as Executive Vice President and Chief Approval Officer of Firstar from July 1999 to March 2001. In March 2001, he became Executive Vice President and Senior Credit Officer of U.S. Bancorp. He then

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

working at my direction, used neutral methodology to identify all of the co-borrowing agreements for which U.S. Bancorp, Firstar, or a subsidiary of either served as an agent bank in some capacity during Mr. Doyle's tenure as a senior credit officer at U.S. Bancorp and Firstar.[92] Forty-three co-borrowing agreements were identified, of which twenty-two included only U.S. co-borrowers and twenty-one included both U.S. and foreign co-borrowers. For comparability with the Adelphia-Related Facilities, which included only U.S. co-borrowers, I will focus on the twenty-two identified agreements that included only U.S. co-borrowers (hereinafter, the "Identified Agreements").[93]

6.3.    Not all of the so-called prudent banking practices identified by Mr. Doyle can easily be tested by examining publicly available co-borrowing credit agreements. I have therefore focused on two sets of information: first, information about co-borrowing agreements among borrowers that are not wholly-owned by a common parent; second, specific provisions of the Adelphia-Related Facilities that Mr. Doyle has identified as unusual.

6.4.    With regard to co-borrowing facilities among borrowers that are not wholly-owned by a common parent, Mr. Doyle argues[94] that "it is prudent banking practice to structure the transaction to reflect the legal distinctness of the borrowing entities," imposing specific co-borrowing limitations and performance-based covenants keyed to

---

[92] Analysis Group staff inform me that they searched the Lexis.com database of SEC public filings for two separate time periods—March 1, 2001 through December 31, 2007, representing Mr. Doyle's approximate tenure as Senior or Chief Credit Officer at U.S. Bancorp; and November 1, 1998 through June 30, 2001, representing Mr. Doyle's approximate tenure at Firstar. Their search criteria were intended to identify all credit or loan agreements that included multiple borrowers and on which U.S. Bancorp, Firstar, or subsidiaries of either played an agent role. Forty-three such credit agreements were found (after eliminating duplicate documents).

[93] *See* Exhibit 3. *See also* Analysis Group, U.S. Bancorp and Firstar Credit Facilities with Co-Borrowers.

[94] Mr. Doyle inconsistently appears to argue, however, that co-borrowers should not be joint and several obligors at all if they are not wholly-owned by a common parent. Doyle Report at 38.

each separately owned co-borrower.[95] Although only two Identified Agreements appear to include co-borrowers that are not wholly-owned by a common parent,[96] they contradict Mr. Doyle's arguments. Those agreements place no limits on the ability of different co-borrowers to draw on the facility and include financial covenants based solely on the combined financials of the co-borrowing group. They also make the co-borrowers jointly and severally liable for repayment.

6.5.    Turning next to specific provisions of the Adelphia-Related Facilities that Mr. Doyle has identified as unusual, he argues among other things that (as noted in paragraph 6.1) the failure to include a "fixed charge coverage" ratio covenant represented unusually lax credit standards.[97] And he claims that it was atypical that the Adelphia-Related Facilities did not require periodic financial statements for each individual co-borrower.[98] Again, the Identified Agreements contradict Mr. Doyle's opinions. Seven of the Identified Agreements do not include a fixed charge ratio covenant, and thirteen of the Identified Agreements require only combined financial disclosures.

6.6.    Indeed, Mr. Doyle's underlying claim that the Banks engaged in imprudent lending practices in the Adelphia-Related Facilities is inconsistent with the very fact that numerous leading banking institutions, including many of the largest U.S. and foreign banks, participated in those Facilities. It is difficult to understand why so many prominent banks were involved in the Adelphia-Related Facilities if in fact "[n]o banker could have approved of the Coborrowing Facilities without deviating from fundamental underwriting principles and practices."[99]

---

[95] Doyle Report at 16-17.

[96] These are the two Macerich Co. Facilities referenced in Exhibit 3, which Analysis Group informs me (based on publicly available information) each includes at least one co-borrower that is not wholly-owned by a common parent. *See* Analysis Group, The Macerich Company: Ownership Structure of Co-Borrowing Credit Facilities at July 26, 2002.

[97] Doyle Report at 54-55.

[98] Doyle Report at 55.

[99] Doyle Report at 36.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

6.7.    Finally, the Doyle Report asserts that bankers must assure that co-borrowers receive adequate consideration for incurring joint and several liability.[100] The reason bankers sometimes want this, however, is legal: a borrower that does not receive "adequate consideration" for incurring an obligation to repay a co-borrower's loan might be able to avoid that obligation if, at the time of incurring the obligation or after giving effect thereto, the borrower is either insolvent, unable to pay its debts, or has inadequate capital.[101] In the Adelphia-Related Facilities, the need for "adequate consideration" is obviated by the requirement that at the time of each borrowing (by any co-borrower) and after giving effect thereto, all of the co-borrowers are solvent, able to pay their debts, and have adequate capital.[102] In my experience, this alternative to the need for adequate consideration is commonplace. (It might be the case that the Doyle Report's assertion that bankers must assure that co-borrowers receive adequate consideration for incurring joint and several liability refers merely to contract-law consideration. Contract-law consideration is provided by something as trivial as a "peppercorn." That consideration would be abundantly provided by each co-borrower's access to capital.)

## 7.   OVERALL CONCLUSIONS

7.1.    Credit agreements are ordinarily customized to meet the specific needs of different borrowers and co-borrowing facilities are one way in which agreements are structured to meet those needs. Co-borrowing facilities in general are not inherently fraudulent.

7.2.    The Adelphia-Related Facilities were not inherently fraudulent. To the contrary, they had valid business purposes. The Adelphia-Related Facilities also appeared to be

---

[100] Doyle Report at 18-19.

[101] The Uniform Fraudulent Transfer Act adopts this formulation, using the phrase "adequate consideration." The Bankruptcy Code has a similar formulation, using the phrase "reasonably equivalent value." *See* 11 U.S.C. § 548. These phrases generally have the same meaning. *See* Schwarcz & Varges, *supra* note 60.

[102] *See supra* paragraph 4.3.

commercially reasonable given their terms, the path-dependent way in which they were originated, and Adelphia's corporate structure, operations, and financing history.

7.3.     The Banks properly focused on getting repaid, with interest. Lenders are not general corporate governance monitors of their borrowers. If companies make a business decision to borrow through a co-borrowing facility under which a lender reasonably expects to be repaid, the lender has no duty to second-guess that business decision.

7.4.     Each of the Adelphia-Related Facilities had provisions and monitoring intended to ensure that the respective borrowing group could repay its loans to the Banks.

7.5.     The fact that the Adelphia-Related Facilities included both Adelphia and non-public companies does not change my conclusions.

7.6.     Neither the location of the Adelphia-Related Facilities at the operating company level nor the fact that the Banks syndicated and sold down portions of their credit exposure under such Facilities should have indicated fraudulent activity or concerns about fraud.

7.7.     The leverage ratio covenant in each of the term sheets for the Adelphia-Related Facilities provided to Adelphia's Board of Directors was accurately documented in the executed credit agreements for the Adelphia-Related Facilities, and it was commercially reasonable for such covenant to be determined by reference to the co-borrowing group—rather than for individual co-borrowers—under each of the Facilities.

7.8.     The Banks therefore would have been justified in viewing the Adelphia-Related Facilities as being commercially reasonable in Adelphia's circumstances.

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

Steven L. Schwarcz

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

**Exhibit 1:  History of Defendant Bank[1] Participation[2] in Adelphia-Related Co-Borrowing Facilities**

| Date / Bank \ Agreement | 11/19/87 South Dade-Lorain-MCTV | 3/14/89 ACTV-UCA | 12/19/89 ACP 1989 | 8/6/91 Chauncey | 3/15/95 UCA | 5/12/95 ACP 1995 | 10/27/95 Northeast-Robinson | 3/29/96 HVA/TALP | 4/12/96 Chelsea | 5/6/99 UCA-HHC | 4/14/00 CCH | 1/3/01 Arahova | 9/28/01 Olympus |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ABN AMRO[3] | | | | | | P | | | P | P | A | | |
| Bank of America[4] | | | P | A | P | A, P | | P | A, P | P | A | A | A |
| Bank of Montreal[5] | | | | | | P | | A | P | A | A | | A |
| Bank of New York[6] | | | | | | P | | | | P | A | | A |
| Bank of Nova Scotia[7] | | P | P | | P | A | | A | A | P | A | | |
| Barclays Bank[8] | | | | | | | | | | P | A | | |
| Chase Manhattan[9] | | | | | | A | A | A | A, P | P | A | | A |
| CIBC[10] | | | P | | | A | | P | A | P | A, P | | P |
| Citibank / Citicorp[11] | | | | | | | | | | P | A | A | A |
| Credit Lyonnais[12] | | | P | A | A | A | | | P | P | A | | A |
| Credit Suisse First Boston[13] | | | | | | | | | | P | A | | A |
| Deutsche Bank[14] | | | | | | | | | | | | | A |
| DLJ Capital Funding[15] | | | | | | | | | | | P | | |
| Fleet National[16] | | | P | | | A | | P | P | | A | | A |
| Fuji Bank[17] | | | | | | P | | | P | P | P | | A |
| Merrill Lynch[18] | | | | | | | | | P | | A | | P |
| Mitsubishi Trust[19] | | | | | P | | | | P | P | A | | |
| Morgan Stanley[20] | | | | | | | | | | | A | | |
| PNC Bank[21] | | | | | A, P | P | | | P | A | | | |
| Rabobank[22] | | | | | | | | | P | | P | | |
| Royal Bank of Scotland[23] | | | | | | | | | P | | | | A |
| Société Générale[24] | | | | | A | A | | | P | P | P | | A |
| SunTrust[25] | | | | | | | | | P | | A | | |
| Toronto Dominion[26] | A | | A, P | A | | A | | P | A | P | A | | A, P |
| Wachovia (First Union)[27] | | A, P | | | A, P | A | | | P | A | A | | A |

\*  "A" and "P" denote the role of the bank in the facility: A for Agent Bank, P for Participant Bank.

▇ Adelphia-Related Facilities

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

**Exhibit 1:  History of Defendant Bank[1] Participation[2] in Adelphia-Related Co-Borrowing Facilities**

Notes

1. Agent Banks as listed in the Second Amended Complaint, paragraphs 24 to 73. Defendant bank histories reflect bank acquisitions taking place prior to September 28, 2001, the date of the Olympus Facility.
2. Bank participation means that banks were agents or participants in publicly disclosed credit agreements.  Refer to Appendix C for a complete reference to each credit agreement.
3. ABN AMRO N.V. (CCH, UCA-HHC, ACP 1995); ABN AMRO Pittsburgh (Chelsea).
4. Bank of America (Olympus, Arahova, CCH); Banc of America Securities (Arahova, CCH); Nationsbank[a] (UCA-HHC); Bank of America Illinois (Chelsea); Bank of America National Trust (Chelsea, ACP 1995); NationsBank of Texas (Chelsea, HVA/TALP, ACP 1995, UCA); NCNB Texas[b] (Chauncey, ACP 1989).
5. Bank of Montreal (Olympus, CCH, UCA-HHC, HVA/TALP, ACP 1995); BMO, Chicago (Chelsea).
6. The Bank of New York (Olympus, CCH, UCA-HHC, ACP 1995).
7. The Bank of Nova Scotia (Olympus, CCH, UCA-HHC, Chelsea, HVA/TALP, ACP 1995, UCA, ACP 1989, ACTV-UCA).
8. Barclays Bank (CCH, UCA-HHC).
9. The Chase Manhattan Bank (Olympus, CCH, UCA-HHC); Chase Securities (CCH); Chemical Bank[c] (Chelsea, HVA/TALP, Northeast-Robinson, ACP 1995); CHL High Yield[d] (Chelsea).
10. CIBC Inc. (Olympus, CCH, UCA-HHC, Chelsea, HVA/TALP, ACP 1995); CIBC World Markets (CCH); Canadian Imperial Bank of Commerce (ACP 1989).
11. CitiCorp USA (Olympus, Arahova); Salomon Smith Barney[e] (Arahova); Citibank (CCH); Salomon Brothers Holding[e] (UCA-HHC).
12. Credit Lyonnais New York (Olympus, CCH, UCA-HHC); Credit Lyonnais Cayman Island (Chelsea, ACP 1995, UCA, Chauncey, ACP 1989).
13. Credit Suisse First Boston (Olympus, CCH, UCA-HHC).
14. Bankers Trust Company[f] (Olympus).
15. DLJ Capital Funding (CCH).
16. Fleet National Bank (Olympus, CCH, Chelsea, HVA/TALP); Fleet Bank (ACP 1995); Bank of New England[g] (ACP 1989).
17. The Fuji Bank (Olympus); The Dai-Ichi Kangyo Bank[h] (CCH); The Industrial Bank of Japan[h] (CCH, UCA-HHC, Chelsea); The Fuji Bank, New York (ACP 1995).
18. Merrill Lynch Rate Fund (Olympus, Chelsea); Merrill Lynch Capital (CCH).
19. Mitsubishi Trust and Banking[i] (CCH); Bank of Tokyo - Mitsubishi Trust Company[k] (UCA-HHC, Chelsea); Union Bank of California[j] (Chelsea); The Bank of Tokyo Trust[k] (UCA).
20. Morgan Stanley Senior Funding (CCH).
21. PNC Bank (UCA-HHC, Chelsea, ACP 1995, UCA); Midlantic Bank[l] (UCA).
22. Rabobank (CCH, UCA-HHC).
23. The Royal Bank of Scotland (Olympus); Natwest Bank[m] (Chelsea).
24. Société Générale (Olympus, CCH, UCA-HHC, Chelsea, ACP 1995, UCA).
25. Suntrust Bank (CCH); Crestar Bank[n] (Chelsea).
26. The Toronto-Dominion Bank (Olympus, Chauncey); TD (Texas) (Olympus, CCH, UCA-HHC, Chelsea, HVA/TALP, ACP 1995); The TD Bank Trust (ACP 1989); TD Bank, Cayman Islands (ACP 1989, South Dade-Lorain-MCTV), TD Bank, Cayman Islands was the sole signatory bank under the South Dade-Lorain-MCTV Facility; Toronto Dominion Securities (ACP 1995).
27. First Union National Bank[o] (Olympus, CCH, UCA-HHC); First Union Securities[o] (Olympus); Corestates Bank[p] (HVA/TALP, UCA); First Union of North Carolina[o] (ACP 1995, UCA, ACTV-UCA); First Pennsylvania Bank[q] (ACTV-UCA).

**Exhibit 1:  History of Defendant Bank[1] Participation[2] in Adelphia-Related Co-Borrowing Facilities**

<u>Sources for Mergers and Acquisitions</u>

a.  Nationsbank acquired Bank of America in 1998.  (Harrington, Jeff, "NationsBank Chief Discusses Mergers with Shareholders," *Knight Ridder/Tribune Business News,* April 27, 1998. )

b.  NCNB changed its name to Nationsbank in 1992.  (Clark, Kim, "Nationsbank's Baltimore Roots City Native Gave N.C. Bank its Aggressive Culture," *The Baltimore Sun,* July 19, 1992. )

c.  In 1996, Chase Manhattan Corp merged with Chemical Banking Corp. ("The History of our Firm," available at <http://www.jpmorganchase.com>, accessed November 10, 2009.)

d.  CHL High Yield formed in 1994 as a separate unit of Chemical Bank. ( "Milestones," available at <http://www.octagoncredit.com>, accessed November 10, 2009.)

e.  In 1997, Smith Barney (a wholly-owned subsidiary of Travelers Group) and Salomon Brothers merged to form Salomon Smith Barney; in 1998 Travelers Group and CitiCorp merged to become CitiGroup. ("Citi's History," available at <http://www.citigroup.com>, accessed November 10, 2009.)

f.  Deutsche Bank acquired Bankers Trust Company on June 4, 1999. ("Acquisition of Bankers Trust Successfully Closed; Deutsche Bank Expands in U.S.A.," *PR Newswire,* June 4, 1999.)

g.  Fleet acquired Bank of New England in July of 1991. ("Fleet/Norstar, Bank Of New England Mortgage Units Merge," *Dow Jones News Service - Ticker*, July 16, 1991.)

h.  On September 29, 2000, The Fuji Bank, The Dai-Ichi Kanhgo Bank and The Industrial Bank of Japan merged to form Mizuho. (Hildebrand, Richard and Walter Schroeder, "Industrial Bank of Japan (Canada)," November 31, 2000, available at <http://www.dbrs.com>, accessed on November 11, 2009.)

i.  Bank of Tokyo-Mitsubishi, Mitsubishi Trust Bank and Nippon Trust Bank established Mitsubishi Tokyo Financial Group on April 2, 2001. (Bank of Toyko Form 20-F, for the fiscal year ending March 31, 2002, Item 4(a) "History and Development of the Company.")

j.  Union Bank of California was a majority-owned subsidiary of The Bank of Tokyo - Mitsubishi at the time of the agreement. (UnionBanCal Form 10-Q, for the quarterly period ending June 30, 1996, Note 2 to the Condensed Consolidated Financial Statements.)

k.  The Bank of Tokyo merged with Mitsubishi Bank on April 2, 1996. (WuDunn, Sheryl, "Opening Day for the Biggest Bank in the World," *The New York Times*, April 2, 1996.)

l.  PNC merged with Midlantic Corporation in 1995. ("Corporate History," available at <https://www.pnc.com>, accessed November 10, 2009.)

m.  The Royal Bank of Scotland Group acquired NatWest in March of 2000. ("About Us," available at <http://www.natwest.com>, accessed on November 10, 2009.)

n.  SunTrust acquired Crestar Financial Corp. on December 31, 1998. ("SunTrust Banks, Inc. Historical Highlights," *SunTrust Corporate Communications,* October 2004, available at <https://www.suntrust.com>, accessed on November 10, 2009.)

o.  Wachovia acquired First Union on September 1, 2001. ("2002 First Union and Wachovia Merger Press Releases," April 19, 2002, available at <www.wachovia.com>, accessed on November 9, 2009.)

p.  In April 1998, CoreStates Financial Corporation merged with First Union. ("CoreStates," available at <http://www.corestates.com>, accessed on November 10, 2009.)

q.  CoreStates acquired First Pennsylvania Corp. in 1990. ("Corestates and First Pennsylvania to Merge," *The New York Times,* September 19, 1989.)

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

**Exhibit 2:**

# Ownership of Co-Borrowers in Adelphia-Related Co-Borrowing Facilities[1]

### Facilities Entered Into Between Adelphia's IPO and March 2002

| | |
|---|---|
| **Adelphia Subsidiaries[2] Only:** | ACTV-UCA (March 1989)<br>ACP 1989 (December 1989)[3]<br>Chauncey (August 1991)<br>UCA (March 1995) |

| | |
|---|---|
| **Adephia Subsidiaries and RFEs:** | South Dade-Lorain-MCTV (November 1987)[4]<br>CCH (April 2000)[5] |

| | |
|---|---|
| **Adelphia Subsidiaries and Borrowers with Outside Ownership:** | ACP 1995 (May 1995)[6]<br>Northeast-Robinson (October 1995)[7]<br>Chelsea (April 1996)[8]<br>Arahova (January 2001)[9] |

| | |
|---|---|
| **Adelphia Subsidiaries, RFEs, and Borrowers with Outside Ownership:** | HVA/TALP (March 1996)[10]<br>UCA-HHC (May 1999)[11]<br>Olympus (September 2001)[12] |

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

**Exhibit 2: Notes and Sources**

1. Refer to Appendix C for a complete reference to each credit facility included in this exhibit.

2. Subsidiaries were wholly-owned at the time of the agreement unless otherwise noted.

3. One of the co-borrowers, Adelphia Cable Partners, was a partnership subsidiary of Olympus. As of December 31, 1989, Adelphia controlled 99.97% of the voting interest in Olympus.  On January 31, 1990 Adelphia's voting interest was reduced to 49.97%.  See Adelphia Form 10-K, for the fiscal year ending March 31, 1990, p. 62.

4. Eleven of the co-borrowers were RFEs.  See Adelphia Form 8-K, filed December 4, 1987, Item 2, p. 2, and Exhibit 4.05 "Joint and Several Guaranty," pp. 7-9, 11.

   South Dade Cablevision, a co-borrower, was a joint venture between Adelphia and the Rigas family; the Rigas family owned 19.9%. See Adelphia Form 10-K, for the fiscal year ending March 31, 1989, p. 4.

5. Highland Prestige Georgia, one of the co-borrowers, was an RFE.  See Universal Exhibit 104, CCH Request for Proposal, February 17, 2000 (ACC 0090372).

6. As of 1995, Olympus, a joint venture in which FPL Group indirectly had 50% voting interest, owned 99.98% of Adelphia Cable Partners, L.P. and 99.9% of West Boca Acquisition Limited Partnership, two of the co-borrowers.  See Adelphia Form 10-K, for the fiscal year ending December 31, 2000, "Affiliates;" ACP 1995 Credit Agreement, Schedule 3.14 "Capital Securities of Borrowers and Subsidiaries."

   The third co-borrower, Southeast Florida Cable, Inc., was a wholly-owned subsidiary of Adelphia Cable Partners, L.P.  See ACP 1995 Credit Agreement, Schedule 3.14 "Capital Securities of Borrowers and Subsidiaries."

7. The Gans Family owned 15% of the co-borrower, Northeast Cable, Inc.  See Adelphia Form 10-K, for the fiscal year ending March 31, 1996, Item 7 and Exhibit 21.01.

   Co-borrower, Robinson/Plum Cablevision L.P., is a limited partnership among Northeast Cable Inc. and Plato Communications Inc., a wholly-owned subsidiary of Adelphia.  See Adelphia Form 8-K, filed December 7, 1995, Exhibit  B, § 4.

   Robert E. Tudek and Everett I. Mundy owned 49.9% of the co-borrower, Martha's Vineyard Cablevision, L.P. (MV).  See Adelphia Form 10-K, for the fiscal year ending March 31, 1996, Exhibit 21.01.

8. The Gans Family owned shares of the co-borrower, Northeast Cable, Inc.  Another co-borrower, Robinson/Plum Cablevision, L.P. was a joint venture between Northeast Cable and Kittanning Cablevision, Inc., a wholly-owned subsidiary of Adelphia.  See Chelsea 1996 Credit Agreement, Schedule 4.14 "Subsidiaries," pp. 2 and 4 (ACC 0268377, ACC 0268379).

9. Tele-Media indirectly owned a minority equity position in Adelphia Company of Western Connecticut. See Adelphia Form 10-K, for the fiscal year ending March 31, 1996, Item 7.

10. Olympus, a joint venture in which FPL Group indirectly had 50% voting interest, held 99.99% general partnership interests in the co-borrower, Telesat Acquisition Limited Partnership.  See Adelphia Form 10-K, for the fiscal year ending March 31, 1996, Item 1 "Business;" Note 1 "The Partnership and Basis of Presentation," and Exhibit 21.01 "List of Subsidiaries of Adelphia Communications Corporation."

    Another co-borrower, Highland Video Associates, L.P., was an RFE.  See Universal Exhibit 94, Bank of Nova Scotia, Confidential Information Memorandum for HVA Facility, January 1996, (BNS-A 019500).

11. Tele-Media Management indirectly had ownership interest in one of the co-borrowers, Tele-Media Company of Hopewell-Prince George.  See UCA/HHC Group $700,000,000 Senior Credit Facilities Confidential Information Memorandum, April 1999, (ACC 0001875).

    Hilton Head Communications, another co-borrower, was an RFE.  See Universal Exhibit 103, UCA-HHC Request for Proposal, undated, (BOA-020-01607).

12. Tele-Media owned 25% of Adelphia Company of Western Connecticut, one of the co-borrowers.  Two of the co-borrowers, Highland Video Associates, L.P. and Coudersport Television Cable Company, were RFEs. See Defendant's Exhibit 20231 (BNS-A004799-80); Olympus CIM (ACC 0002137).

Confidential Discovery Material Pursuant to August 11, 2008 Court Order

**Exhibit 3:**

**Domestic Co-Borrowing Facilities on which US Bancorp and Firstar Corporation Served as Agents**

**Agreements Entered Into Between 11/1/98 and 7/1/07**

| Agreement | Agreement Date | Amount of Facility ($MM) | Common Ownership of Borrowers[2] | Use of Proceeds Defined on a Combined Basis for All Borrowers or Individual Borrowers — All Borrowers | — Individual Borrowers | Limits on Amounts Drawn by Each Borrower | Not All Borrowers Jointly and Severally Liable | Financial Disclosures Combined | Financial Disclosures Individual | Financial Disclosures Both | Financial Covenants Combined | Financial Covenants Individual | Financial Covenants Both | Fixed Charges Coverage Ratio is Included |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Home Mortgage Investment Corp. | August 30, 2004 | $600 | X | X | | | | | | X | X | | | |
| Biomed Realty Trust | August 11, 2004 | $100 | X | X | | | | X | | | X | | | X |
| CNL Retirement | May 31, 2002 | $24 | X | X | | X[3] | | | X | | | | | |
| Commercial Vehicle Group | August 10, 2004 | $26 | X | X | | | | X | | | X | | | X |
| Family Dollar Stores Inc. | August 24, 2006 | $350 | X | X | | | | X | | | X | | | X |
| Farmland Industries Inc. | February 7, 2002 | $500 | X[4] | X | | | | | | X | X | | | X |
| Golfsmith International | October 15, 2002 | $10 | X | X | | | | | | X | X | | | |
| Handleman Co. | April 30, 2007 | $110 | X | X | | | | | | X | X | | | X |
| Longview Fibre Co. | December 23, 2005 | $400 | X | X | | | | X | | | X | | | |
| Macerich Co. - Interim[5] | July 26, 2002 | $380 | | X | | | | | | X[6] | X[7] | | | X |
| Macerich Co. - Revolving[5] | July 26, 2002 | $425 | | X | | | | | | X[6] | X[7] | | | X |
| Metal Management Inc. | June 28, 2004 | $200 | X | X | | | | X | | | X | | | X |
| Milacron Inc. | June 10, 2004 | $75 | X | X | | | | | | X | X | | | X |
| Municipal Mortgage | November 12, 2004 | $250 | X | X | | | | X | | | X | | | |
| Northwestern Corp. | August 30, 2002 | $20 | X | X | | | | X | | | X | | | X |
| Reliance Steel & Aluminum Co. | October 24, 2001 | $335 | X | X | | | | X | | | X | | | |
| Resource America | July 31, 2006 | $150 | X | X | | | | X | | | | | X | |
| Sun Healthcare Group | February 28, 2002 | $20 | X | X | | | | X | | | X | | | X |
| TBC Corp | June 17, 2005 | $325 | X | X | | | | X | | | X | | | X |
| Valmont Industries | May 4, 2004 | $50 | X | X | | | | X | | | X | | | X |
| Von Hoffman Holdings | March 26, 2002 | $90 | X | X | | | | X | | | X | | | X |
| Zoltek Companies Inc.[8] | November 19, 1999 | $54 | X | X | | | | | | X | X | | | X |
| **Totals** | | | **20** | **22** | **0** | **1** | **0** | **13** | **1** | **8** | **20** | **0** | **1** | **15** |

**Notes:**

1. An "X" indicates that a given agreement contains the specified provision.  Refer to Appendix C for a complete reference to each credit agreement.

2. Co-borrowers were wholly-owned at the time of the agreement unless otherwise noted.

3. The total amount of the loan is "allocated among the individual Borrowers and by site set forth in attached Schedule 'A.'" (See CNL Retirement Facility, p. 3. Schedule A was not filed with the agreement.)

4. Although one of the co-borrowers was 99% owned, it is treated as wholly-owned for the purposes of this analysis.  (See Farmland Industries Inc., Form 10-K, for the fiscal year ending August 31, 2002, Exhibit 21 and Note 8 to the Consolidated Financial Statements.)

5. One of the co-borrowers, the Macerich Partnership, was 77% owned by The Macerich Company with the remainder owned by Macerich's executive officers and directors.  (See The Macerich Company Schedule 14A, dated April 1, 2002, p. 3.) Another co-borrower, Macerich Galahad GP Corp., was wholly-owned by The Macerich Company.  (See Exhibit 2.1, "Agreement and Plan of Merger by and among Westcor Realty Limited Partnership, Macerich Galahad LP and the Macerich Partnership, L.P. dated as of May 30, 2002, p. 7," The Macerich Company Form S-3 Registration Statement, June 5, 2002.)  See also, Analysis Group, "The Macerich Company: Ownership Structire of Co-Borrowing Credit Facilities (July 26, 2002)."

6. § 7.1(1) of both the The Macerich Company's Interim and Revolving Facilities establish the requirement for combined financial disclosures: "...within (90) days after the close of each fiscal year of [The Macerich Company], the consolidated balance sheet of [The Macerich Company] and its subsidiaries...and the related consolidated statements of income, stockholders' equity and cash flow [shall be provided]." § 7.1(4) of both The Macerich Company's Interim and Revolving Facilities provide for the delivery of individual financial disclosures upon request: "To the extent not otherwise delivered pursuant to this Section 7.1 [Financial Statements], copies of all financial statements and financial information delivered by the Borrowers, MAC and the Westcor Principal Entities (or, upon Administrative Agent's request, any Subsidiaries of such Persons) from time to time to the holders of any Indebtedness for borrowed money of such Persons...."

7. Financials covenants must be met on a consolidated basis for the Westcor borrowers as well as on a consolidated basis for all borrowers.  See Macerich Co. Interim Facility and Macerich Co. Revolving Facility, § 8.12-13.

8. Firstar Bank, a predecessor to U.S. Bank, was the Documentation Agent for this facility.

**Appendix A**

**STEVEN L. SCHWARCZ CURRICULUM VITAE**

**STEVEN L. SCHWARCZ**
Duke Law School
Box 90360
Durham, N.C. 27708
(919) 613-7060
(919) 613-7231 (fax)
e-mail: schwarcz@law.duke.edu

## LAW TEACHING

Stanley A. Star Professor of Law & Business, Duke University School of Law, since 2004; Professor of Law, 1996-2004 (teaching courses in commercial law, bankruptcy, corporate reorganization, securitization, finance and international capital markets).

Founding Director, Duke University Global Capital Markets Center; Faculty Director, 1997- 2002 and Co-Academic Director since 2006.

Professor of Business Administration (Adjunct), Fuqua School of Business, Duke University, January 2001-August 2004; Stanley A. Star Professor of Law & Business since that date.

Visiting Professor, University of Geneva Faculty of Law, 2001-2009 (May-June), teaching advanced U.S. business law courses in the Master of Advanced Studies in Business Law Programme.

Senior Fellow, The University of Melbourne Law School, spring 2004.

Visiting Lecturer, Yale Law School, 1992-96, teaching courses in commercial law, bankruptcy and finance.

Lecturer in Law, Columbia Law School, 1993-96, teaching courses in corporate reorganization, bankruptcy and structured finance.

Adjunct Professor of Law, Benjamin N. Cardozo School of Law, Yeshiva University,  1983-92, teaching seminars in bankruptcy and corporate reorganization.

Teaching Fellow in Property Law, Columbia Law School, 1974.

## LAW PRACTICE

Partner and Chairman of Structured Finance Practice Group, Kaye, Scholer, Fierman, Hays & Handler (now Kaye Scholer LLP), New York, 1989-96,

concentrating in asset securitization, structured and corporate finance, bankruptcy and corporate reorganization, and secured lending. Also partner in charge of the firm's training program in domestic and international finance. Special Counsel July 1996-May 2004; Special Consultant June 2004 through June 2007.

Partner, Shearman & Sterling,  New York, 1983-89, concentrating in corporate finance, securitization, bankruptcy, corporate reorganization, commercial transactions and secured lending; associate, 1974-82.


**EDUCATION**

Columbia University School of Law, 1974, J.D.

> Research Assistant, Legislative Drafting Research Fund, 1972-74; Chairman, Environmental Law Council, 1973-74.

New York University School of Engineering and Science, 1971, B.S., <u>Summa Cum Laude</u>, Aeronautics and Astronautics.

> Graduated number one in class (3.94/4.00).  First prize, 1971, Sandham Public Speaking Contest (the University's public speaking contest). George Granger Brown Scholar.  Tau Beta Pi (national engineering honor society—engineering equivalent of Phi Beta Kappa in liberal arts).  Sigma Gamma Tau (national aeronautical engineering honor society).

> Ranked number one in high school.  Skipped senior year to begin college early on full academic scholarship.  Declined invitation to begin college after sophomore year.  While in high school, co-founded an "amateur rocket society" which built and launched the first non-governmental satellite, memorabilia of which were acquired by the Smithsonian National Air and Space Museum in Washington, D.C. (these rocket exploits were featured on American Public Media's "The Story," Jan. 9, 2008; program archived at http://thestory.org/archive/the_story_424_Rocket_Boys.mp3/view), and rebroadcast on Aug. 12, 2008, in a "Best of The Story" series.


**PROFESSIONAL HONORS**

Fellow, American College of Bankruptcy.

Fellow (and, since 2008, also a Regent), American College of Commercial Finance Lawyers.

Founding Member, International Insolvency Institute.

Keynote Plenary Address, 2010 Annual Conference, Corporate Law Teachers' Association of Australia, New Zealand, and the Pacific Islands (scheduled for February 8, 2010).

Keynote Speaker, New York Law School Law Review symposium on Fear, Fraud, and the Future of Financial Regulation (April 24, 2009).

In the July 11, 2009 THE ATLANTIC (http://correspondents.theatlantic.com/richard_posner/2009/07/the_role_of_the_law_schools_in_the_recovery_from_the_current_depression.php), Judge Richard Posner said (emphasis added) that "with a few notable exceptions, such as Lucian Bebchuk, Edward Morrison, and *Steven Schwarcz*, academic lawyers (and Bebchuk and Morrison have Ph.Ds in economics, as well as law degrees) have not made a contribution to the understanding and resolution of the current economic crisis, even though it bristles with legal questions."

Keynote Speaker, New York University School of Law and Journal of Law and Business, Symposium on Modernizing Financial Regulatory Structure (February 20, 2009).

"Featured Speaker," ABA Section on Business Law Annual Leadership Meeting (January 17, 2009).

Inaugural Georgetown Law Journal Author Lecture (November 3, 2008).

Keynote Speaker, University of South Carolina, Law Review symposium on the subprime mortgage crisis (October 24, 2008).

2008 Roy R. Ray Lecture, Southern Methodist University, Dedman School of Law.

Distinguished Speaker (in Series), Corporate Governance Center, The University of Tennessee, 2008.

Business Law Advisor to the American Bar Association Section on Business Law, 2008-09; Continuing Advisor since 2009. Also, member of ABA Business Law Section Coordinating Task Force on Financial Markets and Institutions (since 2009).

Academic Advisor to the U.S. Federal Reserve Bank of Cleveland on the subprime mortgage crisis (2007).

Keynote Speaker, 2004 Annual Conference, Corporate Law Teachers' Association of Australia and New Zealand.

Senior Fellow, The University of Melbourne Law School (spring 2004).

Parsons Visitor, University of Sydney Law Faculty (spring 2004).

Keynote Speaker, Asian Securitisation Forum (2004, New Delhi)

4th AIIFL Distinguished Public Lecture, "Intermediary Risk in Global Financial Markets," The University of Hong Kong (2002).

Keynote Speaker, Moody's Corporation Annual Global Management Offsite (2002).

Keynote Speaker, National Economics Research Association (NERA) annual meeting (2002).

1996 Benjamin Weintraub Distinguished Professorship Lecture, Hofstra University School of Law.


## FACULTY WORKSHOPS AND OTHER SCHOLARLY PRESENTATIONS

Have presented faculty workshops at Yale Law School, University of Pennsylvania Law School, University of Michigan Law School, The University of Chicago Law School, Harvard Law School, Georgetown University Law Center, Vanderbilt University Law School, Washington University School of Law (St. Louis), Boston College Law School, Temple University, James E. Beasley School of Law, University of North Carolina School of Law, Chapel Hill, University of Illinois College of Law, Washington and Lee University School of Law, The University of Georgia School of Law, American University—Washington College of Law, The University of Melbourne Law School, the University of Sydney Faculty of Law, Monash University Law School, National University of Singapore, Victoria University Centre for International Corporate Governance Research, The University of Tennessee College of Law and College of Business Administration, George Mason University School of Law, Wake Forest University (School of Law and Babcock School of Management), The University of Richmond School of Law, University of Utah S.J. Quinney College of Law, William & Mary, Emory Law School, Notre Dame Law School, Southern Methodist University Dedman School of Law, The University of Hong Kong, Faculté de droit de l'Université de Genève (through the Centre for Banking & Financial Law), Georgia State University School of Law, Western Ontario University Faculty of Law, and Duke University (numerous School of Law faculty workshops; Fuqua School of Business Finance Workshops; Duke Finance & Law Workshop; Globalization, Equity & Democratic Governance University Seminar; and Global Capital Markets Center Interdisciplinary Workshops).

Have lectured or chaired scholarly and policy-oriented programs at the Centre for Corporate and Commercial Law of the University of Cambridge, the Centre for Commercial Law Studies of the University of London, Australian National University, The University of Melbourne, the University of Sydney, The University of Tokyo, Catholic University of Chile (co-sponsored by the Ministry of Finance of Chile), The University of Auckland Research Centre for Business Law, National University of Singapore Centre for Commercial Law Studies, Asia Institute of International Financial Law (Distinguished Visitor), the Asia-America Institute in Transnational Law at The University of Hong Kong, the American Securitization Forum, the Asian Securitisation Forum, University of Delhi Faculty of Management Studies, Georgetown University School of Law, The George Washington University Law School, The Aspen Institute Business and Society Program, the American Conference Institute, the American Law and Economics Association, University of Connecticut, The Federalist Society, The Association of the Bar of the City of New York, the Heyman Center on Corporate Governance at Cardozo Law School, the United Nations Commission on International Trade Law, the U.S. Department of State, the University of Oxford Banking Forum, the National Conference of Bankruptcy Judges, the University of Cincinnati, New York Law School, Temple University School of Law, The Institute for Law and Economics of the University of Pennsylvania, the Judge Business School (Cambridge University), University of South Carolina School of Law, the University of Illinois College of Law-American Bankruptcy Institute 2008 "Debt" Conference, Humboldt Universität zu Berlin, The University of Hong Kong Faculty of Law (Distinguished Public Lecture series), University of Utah S.J. Quinney College of Law, New York University School of Law, Yale Law School, and The World Bank.

## GOVERNMENT TESTIMONY

Committee on Governmental Affairs of the U.S. Senate, on "Rating the Raters: Enron and the Credit Rating Agencies," Mar. 20, 2002 (written and oral testimony at Committee's request).

Committee on the Judiciary of the U.S. Senate, on proposed Section 912 (true sales in securitization transactions) of the Bankruptcy Reform Act of 2001 (S.420/H.R.333), Feb. 26, 2002 (written testimony at Committee's request).

Securities and Exchange Commission, on "Hearing on Credit Rating Agencies," Nov. 21, 2002 (oral testimony at Commission's request).

Committee on Financial Services of the U.S. House of Representatives, on H.R. 2990 (Credit Rating Agency Duopoly Relief Act of 2005) (declined invitation to testify on Nov. 29, 2005 due to conflicting schedule, but commented by telephone to Committee staff).

Committee on Financial Services of the U.S. House of Representatives, on "Systemic Risk: Examining Regulators' Ability to Respond to Threats to the Financial System," Oct. 2, 2007 (written and oral testimony at Committee's request), available at http://www.house.gov/apps/list/hearing/financialsvcs_dem/ht1002072.shtml.

U.S. Federal Reserve Bank of Cleveland, on "Structured Finance and Loan Modification," Nov. 20, 2007.

Committee on Banking, Housing, and Urban Affairs of the U.S. Senate, June 2008 (oral advice on structured finance to Counsel for the Committee, Andrew Olmem, at his request).

U.K. High Court of Justice, Chancery Division, expert testimony (with duty to the Court), July 3, 2008, on legal issues relating to tension between indenture-trustee duties to senior and subordinated investors and desire of seniors to foreclose on undervalued collateral (in Bank of New York v. Montana Bd. of Investments, decided at [2008] E.W.H.C. 1594 (Ch.)).

Committee on Homeland Security and Governmental Affairs of the U.S. Senate, Jan. 9, 2009 (oral advice on financial regulatory reform to Ryan McCormick, Counsel and Legislative Assistant for Economic Policy, and other Committee staff Seth Grossman, Jonathan Trayton, and Mary Beth Schulz, at their request).

High Court of New Zealand, expert testimony (with duty to the Court), May 7, 2009, on the norms of international finance (in BNZ Investments Ltd. v. Comm'r of Inland Revenue, CIV 2006-485-1028, Wellington Registry).

Subcommittee on Domestic Policy (of the Committee on Oversight and Government Reform) of the U.S. House of Representatives, July 14, 2009 (oral advice on bank bailouts to Subcommittee staff member, Daryn Burke, at his request).


**OTHER PROFESSIONAL ACTIVITIES**
Founder and first Faculty Director, Duke University Global Capital Markets Center.

Member, The American Law Institute (Member of Consultative Groups on Uniform Commercial Code, Suretyship, and Transnational Insolvency).

Member of Expert Advisory Group to United Nations Commission on International Trade Law (UNCITRAL) regarding its International Receivables Financing Convention and proposals for an international insolvency convention.

Member, U.S. Secretary of State's Advisory Committee on Private International Law (since 1999).

Member, Academic Advisory Board, The University of Hong Kong Faculty of Law's Asian Institute of International Financial Law (since 2001).

Member, Academic Advisory Committee, Fudan [University] Civil & Commercial Law Review (since 2001).

Member, Editorial Advisory Board, Cambridge University Series on Economics, Finance and Law (since 2007).

Member, Editorial Advisory Board, American Securitization (since 2006).

Associate Editor, The Journal of Restructuring Finance (since 2002).

Senior Consultant, International Law Center for Inter-American Free Trade's Mexican Securitization Project (1997-99).

Member, American Law and Economics Association.

Member, Advisory Board, The Securitization Conduit (since 2000).

Member, Duke University Academic Council, 1999-2000; 2002-2003.

Member, North Carolina General Statutes Commission Drafting Committee to review revised Uniform Commercial Code Article 9, 1998-99.

The Association of the Bar of the City of New York:  Chairman of Committee on Science and Law, 1987-90; Chairman of Causation Subcommittee, 1985-86; member, Committee on Uniform State Laws, 1993-96.

The New York Academy of Sciences:  Directed major Academy study on public participation in the allocation of funds for scientific research, and Vice Chairman of the Section on Science and Public Policy, 1974-78.

Founded and directed Friends of the Eldridge Street Synagogue, 1978-84, the organization that first recognized the historic, religious and architectural significance of this synagogue; represented the synagogue in obtaining National and New York City Landmark status; and laid the foundation for the national fundraising effort.

Special Master, Bank of America, N.A. v. Patriarch Partners, LLC, U.S. District Court, W.D.N.C., Case # 3:01CV547-MU (2002).


**MEDIA AND PUBLICITY**
Have been extensively quoted, referenced, and interviewed in numerous media including The New York Times, The Wall Street Journal, The Economist, The Washington Post, The New Yorker, Time Magazine, Forbes, International Herald Tribune, Euromoney,

The Atlantic, The Huffington Post, Bloomberg Law (Podcast), public radio's
Marketplace and The State of Things, The Joan Hamburg Show, Reuters, CNN, and
various television news shows.

## PUBLICATIONS

REGULATING FINANCIAL SYSTEMS: THE CRISIS AND BEYOND (Oxford University Press,
forthcoming 2010) (with Kenneth Anderson).

"Busting Nemo Dat: Intermediary Risk and the Consequences of Distorting Legal
Concepts for Business Ends" (work-in-progress).

"A Theory of Damages for Economic Loss" (work-in-progress with Francis McGovern).

"Correlations and Consequences—The Great Depression, LTCM, Enron, and the Global
Financial Crisis" (work-in-progress with Iman Anabtawi, advancing and expanding the
analysis of the Keynote Speech referenced below).

"Keynote Address: Correlations and Consequences—The Global Financial Crisis and the
Role of Lawyers," forthcoming in special edition of the Australian Journal of Corporate
Law (Keynote Address at 2010 Conference of the Corporate Law Teachers' Association
of Australia, New Zealand, and the Asia-Pacific Region).

"Fiduciaries With Conflicting Obligations," forthcoming 94 Minn. L. Rev. issue no 6
(June 2010), available at http://ssrn.com/abstract=1441225 (under earlier title, "Fiduciary
Conflicts").

"Regulating Complexity in Financial Markets," forthcoming  87 Wash. U. L. Rev., Issue
2 (2009-10), available at http://ssrn.com/abstract_id=1240863.

"Too Big To Fail?: Recasting the Financial Safety Net," forthcoming chapter in THE
PANIC OF 2008 (George Washington University symposium-based book), available at
http://ssrn.com/abstract=1352563.

"Keynote Address: The Conflicted Trustee Dilemma," forthcoming 54 N.Y.L. Sch. L.
Rev. (2010) (Keynote Address at law review symposium on "Fear, Fraud, and the Future
of Financial Regulation").

"The 'Principles' Paradox," 10 European Bus. Org. L. Rev. 175 (issue no. 2, June 2009,
Cambridge University symposium issue on Principles v. Rules in Financial Regulation),
available at http://ssrn.com/abstract_id=1121454. This article is also forthcoming as a
chapter in KERN ALEXANDER, THE RESEARCH HANDBOOK OF INTERNATIONAL FINANCIAL
REGULATION (Dec. 2009).

"Conflicts and Financial Collapse: The Problem of Secondary-Management Agency
Costs," 26 Yale J. on Reg. 457 (Summer 2009) (symposium issue on the future of

financial regulation), available at http://ssrn.com/abstract_id=1322536. A redacted version of this article is forthcoming in LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE  (Robert W. Kolb, ed. 2010).

"The Case for a Market Liquidity Provider of Last Resort," 5 NYU J. Law & Bus. 346 (2009) (Keynote Address at law review symposium on modernizing the financial regulatory structure), available at http:/ssrn.com/abstract_id=1346542.

"The Future of Securitization," 41 Conn. L. Rev. 1313 (2009) (symposium issue on the subprime crisis: going forward), available at http://ssrn.com/abstract_id=1300928. A redacted version of this article is forthcoming in LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE (Robert W. Kolb, ed. 2010).

"Keynote Address: Understanding the Subprime Financial Crisis," 60 S. C. L. Rev. 549 (2009) (keynote address at law review symposium on the subprime mortgage crisis), available at http://ssrn.com/abstract_id=1288687. A redacted and modified version of this article, delivered at the ABA Section on Business Law's 2009 annual leadership meeting, was republished as *Perspectives on the Subprime Financial Crisis* in the ABA Section on Business Law's E-source (Feb. 2009). Redacted versions of this article are forthcoming in LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE (Robert W. Kolb, ed. 2010) and also in 18 NORTON J. BANKR. L & PRAC. 495 (2009).

"Disclosure's Failure in the Subprime Mortgage Crisis," 2008 Utah. L. Rev. 1109 (symposium issue on the subprime mortgage meltdown), available at http://ssrn.com/abstract_id=1113034. A redacted version of this article is forthcoming in LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE (Robert W. Kolb, ed. 2010).

"Majority Bondholder Governance, Conflicts of Interest, and the Rise of Distressed-Bond Investing" (work-in-progress, with Francisco Benzoni).

"Corporations As Debt Slaves: A Fundamental Inquiry Into Waiving Bankruptcy-Filing Protection" (work-in-progress).

"Bankruptcy Extralegal Norms" (work-in-progress, with Shane Tintle).

"Beyond the Bailout," Commentary in Forbes.com (posted October 8, 2008).

"Protecting Financial Markets: Lessons from the Subprime Mortgage Meltdown," 93 Minnesota L. Rev. 373 (2008), available at http://ssrn.com/abstract_id=1107444. This article is being republished in The Journal of Management Science; in MORTGAGE LAWS—GLOBAL PERSPECTIVES (S. Ravi, ed.) (Amicus Books, ICFAI University Press); and also in ENRON AND OTHER CORPORATE FIASCOS: THE CORPORATE SCANDAL READER (Nancy B. Rapoport et al., eds.) (2d ed. 2009). This article also is being translated into Mandarin by Professor Xinhao Miao of Southwest University of Political Science and

Law, China, and is expected to be published in China's <u>Journal of International Economic Law</u>.

"Systemic Risk," 97 <u>Georgetown Law Journal</u> 193 (2008), available at http://ssrn.com/abstract_id=1008326. I was selected to give the first of The Georgetown Law Journal Author Lectures (scheduled for November 2008) on this article. Certain ideas from this article were published as Op-Ed articles in The Baltimore Sun ("Protecting Against Economic Shocks," Sept. 17, 2007) and The [Newark] Star-Ledger ("Fed Must Also Guard Financial Markets," Sept. 17, 2007), and republished in the Raleigh News & Observer (Sept. 18, 2007) and the Pittsburgh Post-Gazette ("Private Sector: Fed Could Counter Economic Shocks By Becoming Lender of Last Resort," Sept. 18, 2007). Ideas from this article also were "blogged" in The Huffington Post ("Markets, Systemic Risk, and the Subprime Mortgage Meltdown," posted March 18, 2008) and published as a Commentary in <u>Forbes.com</u> ("Systemic Risk Meets Subprime Mortgages," posted May 1, 2008). A redacted and modified version of this article is also being published by <u>The Georgetown Law Journal</u>, under the title "Systemic Risk: Revisiting Theory from the Perspective of the 'Subprime' Financial Crisis," in its Legal Workshop Website. A redacted version of this article is forthcoming in LESSONS FROM THE FINANCIAL CRISIS: CAUSES, CONSEQUENCES, AND OUR ECONOMIC FUTURE (Robert W. Kolb, ed. 2010).

Thought piece, as one of three experts "asked [by The New York Times] to offer their thoughts about the administration's actions" regarding the then-proposed $700 billion financial bailout legislation, in "How Three Economists View a Financial Rescue Plan," <u>N.Y. Times</u>, Sept. 22, 2008, at C4, available at http://www.nytimes.com/2008/09/22/business/22economists.html?scp=1&sq=Schwarcz &st=cse.

"Markets, Systemic Risk, and the Subprime Mortgage Crisis," 61 <u>SMU L. Rev</u>. 209 (2008 Roy R. Ray Lecture at SMU Law School), available at http://ssrn.com/abstract_id=1102326. Republished in NORTON ANNUAL REVIEW OF INTERNATIONAL INSOLVENCY (2009 ed.).

"Bond Defaults and the Dilemma of the Indenture Trustee," 59 <u>Ala. L. Rev</u>. 1037 (2008) (with Gregory M. Sergi).

"To Make or to Buy: In-House Lawyering and Value Creation," 33 <u>J. Corp. L</u>. 497 (2008).

"Explaining the Value of Transactional Lawyering," 12 <u>Stan. J. L. Bus. & Fin.</u> 486 (2007).

"Substantive Consolidation of Corporate Groups in Insolvency Situations" and "Delaware Limited Liability Companies in the Zone of Insolvency," 81 <u>Australian L. J.</u> 15 (in *Overseas Law, Recent Developments in United States Insolvency Law*, Ross Buckley, ed.) (Jan. 2007).

"Automatic Perfection of Sales of Payment Intangibles: A Trap for the Unwary," 68 Ohio St. L.J. 273 (2007) (symposium issue of essays on "Commercial Calamities," sponsored by the Association of American Law Schools).

"Financial Information Failure and Lawyer Responsibility," 31 J. Corp. L. 1097 (2006).

"The Public Responsibility of Structured Finance Lawyers," 1 Capital Markets Law Journal 6 (Oxford University Press 2006), available at http://cmlj.oxfordjournals.org/cgi/reprint/1/1/6?ijkey=b5E6BhZydNsFibq&keytype=ref

"Ohio Supreme Court Decision Jeopardizes the Financeability of Government Receivables," 59 U.C.C. Bulletin 1 (Sept. 2006) (with Eric Marcus).

"We Are All Saying Much the Same Thing: A Rejoinder to the Comments of Professors Coffee, Macey, and Simon," 84 Texas L. Rev. 93 (2005).

"The Limits of Lawyering: Legal Opinions in Structured Finance," 84 Texas L. Rev. 1 (2005) (featured article, with commentaries by Professors John Coffee, Jonathan Macey, and William Simon). Columbia Law School's Center on Corporate Governance also held a symposium on this article in March 2005. This article was republished in 4 ICFAI JOURNAL OF BANKING LAW Issue no. 3, at 22 (July 2006).

"The Confused U.S. Framework for Foreign Bank Insolvency: An Open Research Agenda," 1 REV. L. & ECON. 81 (2005), issue no. 1, article no. 6, http://www.bepress.com/rle/vol1/iss1/art6 (republished 3 ICFAI JOURNAL OF BANKING LAW Issue no. 3, at 55 (July 2005)).

"Temporal Perspectives: Resolving the Conflict Between Current and Future Investors," 89 Minnesota L. Rev. 1044 (2005); forthcoming in Chinese translation through the School of Civil, Commercial and Economic Law of the China University of Politics and Law; republished in 3 ICFAI JOURNAL OF CORPORATE & SECURITIES LAW 49 (Feb. 2006). (This article also was selected by the Executive Committee of the Association of American Law Schools (AALS) Section on Securities Regulation for presentation at the AALS 2005 Annual Meeting.)

"'Looking Forward: 2005-2010' A Sovereign Debt Restructuring Reverie," 6 U. Chicago J. Int'l L. 381 (2005) (Symposium on Sovereign Debt Restructuring).

"Collapsing Corporate Structures: Resolving the Tension Between Form and Substance," 60 Bus. Law. 109 (Nov. 2004).

"Subnational Debt Restructuring and the Rule of Law," 1 J. Restructuring Finance 129 (2004).

"Securitization Post-Enron," 25 Cardozo Law Review 1539 (2004) (symposium issue on "Threats to Asset-Based Finance") (republished in 10 THE FINANCIER 46 (2003) and in 46 CORPORATE PRACTICE COMMENTATOR 963 (2004)).

"'Idiot's Guide' to Sovereign Debt Restructuring," 53 Emory L. J. 1189 (2004) (Georgetown Law School symposium on sovereign debt restructuring, published in special edition of Emory L.J.).

"Is Securitization Legitimate?," in INT'L FINANCIAL L. REV. 2004 GUIDE TO STRUCTURED FINANCE 115 (2004).

"Rethinking the Disclosure Paradigm in a World of Complexity," 2004 U. Illinois L. Rev. 1 (2004) (republished in SECURITIES LAW REVIEW 28 (2006, Donald C. Langevoort, ed.); and discussed by Malcolm Gladwell in "Open Secrets: Enron, Intelligence, and the Perils of Too Much Information," NEW YORKER (Jan. 8, 2007)).

SECURITIZATION, STRUCTURED FINANCE, AND CAPITAL MARKETS (2004) (with Bruce A. Markell and Lissa Lamkin Broome); Japanese edition forthcoming.

"Commercial Trusts as Business Organization: An Invitation to Comparatists," 13 Duke J. Comp. & Int'l L. 321 (2003) (special symposium issue in memory of Professor Herbert Bernstein); republished (in Chinese) in 2004 Fudan University Civil & Commercial Law Review, issue 12.

"Commercial Trusts as Business Organizations: Unraveling the Mystery," 58 Bus. Law. 559 (2003) (also translated into Chinese and republished in Nan Jing University Law Review (Spring 2006)).

"Cross-Border Collateral: Legal Risks and the Conflict of Laws," 2003 Canadian Bus. L. J./ Revue Canadienne du droit de commerce 150 (Feb. 2003) (book review).

"Taking Charge: Authorizing Most Credit-Rating Agencies Could Increase Economic Efficiency," 116 L.A. Daily J. 6 (Mar. 13, 2003) (OpEd).

"Private Ordering," 97 Nw. U. L. REV. 319 (2002).

Essays on the topics of securitization, credit rating agencies, and intermediary risk in ENCYCLOPEDIA OF FINANCIAL ENGINEERING AND RISK MANAGEMENT (forthcoming 2003 by Fitzroy Dearborn Publishers).

"Enron and the Use and Abuse of Special Purpose Entities in Corporate Structures," 70 U. Cin. L. Rev. 1309 (2002) (symposium issue on "Corporate Bankruptcy in the New Millennium") (republished in 9 THE FINANCIER 23 (2002); AEI-Brookings Joint Center for Regulatory Studies in Joint Center Update 02-10-03); __ SECURITIZATION CONDUIT __ (2004); and 1 INT'L J. FIN. EDUC. 7 (2005)).

"Global Decentralization and the Subnational Debt Problem," 51 Duke L. J. 1179 (2002); republished in redacted form as "Restructuring Subnational Debt," 23 Mun. Fin. J. 1 (Fall 2002). Also republished in Journal of International Business Law (a publication of the Institute of Chartered Financial Analysts of India).

"Private Ordering of Public Markets: The Rating Agency Paradox," 2002 U. Illinois L. Rev. 1 (2002) (republished by the AEI-Brookings Joint Center for Regulatory Studies in Joint Center Update 02-9).

"The Universal Language of International Securitization," 12 Duke J. Comparative & Int'l Law 285 (2002) (introduction to symposium issue on "International Securitization and Structured Finance").

"The Impact of Bankruptcy Reform on 'True Sale' Determination in Securitization Transactions," 7 Fordham J. Corp. & Fin. Law 353 (Spring 2002 symposium issue based on papers presented at the 2001 Eugene Murphy Conference on Corporate Law at Fordham University School of Law).

STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION (3d ed. 2002 & supplements); republished in Spanish translation by Univerdidad Finis Terrae Facultad de Derecho, as GUIA SOBRE LOS PRINCIPIOS DE SECURITIZACION DE ACTIVOS (Nov. 2002); republished in Korean translation by Maekyung (2003) and in Chinese translation by Tsinghua University Publishing House (2003).

"Intermediary Risk in a Global Economy," 50 Duke L. J. 1541 (2001); republished in redacted form as "Indirectly Held Securities and Intermediary Risk" in 6 Uniform Law Review/ Revue de droit uniforme 283 (2001) and also in 54 UCC Bulletin (Oct. & Nov. 2004 issues).

"The Role of Rating Agencies in Global Market Regulation," in REGULATING FINANCIAL SERVICES AND MARKETS IN THE 21ST CENTURY 297 (Eilís Ferran & Charles Goodhart eds., 2001).

"Sovereign Debt Restructuring: A Bankruptcy Reorganization Approach," 85 Cornell L. Rev. 956 (2000) (republished by the University of Oxford Banking Forum as part of the proceedings of its September 14, 2000 conference on "The Future of Global Financial Regulation in the Digital Era").

"Judgment Proofing: A Rejoinder," 52 Stanford L. Rev. 77 (1999).

"The Inherent Irrationality of Judgment Proofing," 52 Stanford L. Rev. 1 (1999) (featured article, with commentaries by Professors Lynn LoPucki and Charles W. Mooney).

"Towards a Centralized Perfection System for Cross-Border Receivables Financing," 20 U. Penn. J. Int'l Econ. L. 455 (Fall 1999) (Symposium on Cross-Border Secured Transactions).

"The Impact on Securitization of Revised UCC Article 9," 74 Chicago-Kent L. Rev. 947 (1999) (Symposium on Revised Uniform Commercial Code Article 9), republished in 45 UCC Bulletin 1 (December 2001).

"Rethinking Freedom of Contract: A Bankruptcy Paradigm," 77 Texas L. Rev.  515 (1999).

"The Universal Language of Cross-Border Finance," 8 Duke J. Comparative & Int'l Law 235 (1998) (Symposium on International Issues in Cross-Border Securitization and Structured Finance), republished in 2 The Securitization Conduit 8 (Spring 1999); distributed by the U.S. Department of State as Document # ACPIL 49/G/3 at the May 10-11, 1999 meeting of the Secretary of State's Advisory Committee on Private International Law; translated into Chinese and republished in 2001 Contemporary Law Studies Issue No. 4, at 27 (Fudan University 2001).

"The Attraction of Law and Economics: Is Law An Autonomous Discipline?," 21 Harvard J. Law & Pub. Policy 85 (1998) (Symposium on Law and Economics and the Rule of Law).

"The Easy Case for the Priority of Secured Claims in Bankruptcy," 47 Duke L. J. 425 (1997), republished in installment in 35 UCC Bulletin 1 (July, August, September & October issues) (1998).

"Protecting Rights, Preventing Windfalls: A Model for Harmonizing State and Federal Laws on Floating Liens," 75 North Carolina L. Rev. 403 (1997), republished in installments in 34 UCC Bulletin 1 (May, June, July, & August issues) (1997).

"Rethinking the Role of Recourse in the Sale of Financial Assets," 52 Business Lawyer 159 (1996) [co-author].

"Rethinking A Corporation's Obligations to Creditors," 17 Cardozo L. Rev. 647 (1996).

"Law and Economics of Securitization," New Business Law issues 580 & 581 (1995) (in Japanese).

"A Fundamental Inquiry Into the Statutory Rulemaking Process of Private Legislatures," 29 Ga. L. Rev. 909 (1995).

"The Global Alchemy of Asset Securitization," 14 International Financial Law Review 30 (May 1995) (based on the Stanford article, but revised for an international audience).

"The Alchemy of Asset Securitization," 1 Stanford J. Law, Bus. & Finance 133 (1994). Republished in 1 The Financier 53 (December 1994), 32 UCC Bulletin 1 (August 1995), and 37 Corp. Prac. Commentator 783 (1996); translated into German and republished in

50 <u>Der Betrieb</u> 1289 (1997); translated into Chinese and republished in 2001 <u>Fudan [University] Civil & Commercial L. Rev</u>.310 (2001).

"A New Theory of Recourse in Structured Finance," 1994 <u>Asset Sales Report</u> 8 (February 14, 1994).

PEB Commentary No. 14 on Uniform Commercial Code Section 9-102(1)(b) [draftsman of the Commentary].

"Civil Forfeiture: A Higher Form of Commercial Law?" 62 <u>Fordham L. Rev.</u> 287 (1993) [with A. Rothman].  Republished in both 8 <u>White-Collar Crime Reporter</u> 1 (January 1994) and 31 <u>UCC Bulletin</u> 1 (April 1994), and also was the subject of a "Viewpoints" editorial in <u>The New York Times</u> (Sunday Business Section) 11 (April 3, 1994).

"The Parts Are Greater Than The Whole: How Securitization of Divisible Interests Can Revolutionize Structured Finance and Open the Capital Markets to Middle-Market Companies," 1993 <u>Columbia Bus. L. Rev.</u> 139 (1993).

"'Octagon Gas' Ruling Creates Turmoil for Commercial and Asset-Based Finance," 210 <u>New York L.J.</u> 1 (Aug. 4, 1993).

STRUCTURED FINANCE, A GUIDE TO THE PRINCIPLES OF ASSET SECURITIZATION (2d ed. 1993).

"Credit Lyonnais Case Clarifies ABS Issues In Bankruptcy," 1992 <u>Asset Sales Rep.</u> 1 (Oct. 12, 1992).

"Structuring and Legal Issues of Asset Securitization in the United States," Chapter 2 in <u>Asset Securitization:  International Financial and Legal Perspectives</u> (Basil Blackwell, 1991).

STRUCTURED FINANCE, A GUIDE TO THE FUNDAMENTALS OF ASSET SECURITIZATION (1990).

"Structured Finance: The New Way to Securitize Assets," 11 <u>Cardozo L. Rev.</u> 607 (1990).

"Guaranties and Other Third-Party Credit Supports," Chapter 16 in <u>Commercial Loan Documentation Guide</u> (1988 Matthew Bender) [with Gabe Shawn Varges].

"Sharing of Research Results in a Federally Sponsored Gene Mapping Project," 1987 Report to the Office of Technology Assessment in Congress by the Committee on Science and Law of The Association of the Bar of the City of New York, chaired by Schwarcz.

"The Impact of Fraudulent Conveyance Law on Future Advances Supported by Upstream Guaranties and Security Interests," 9 Cardozo L. Rev. 729 (1987).

"Basics of Business Reorganization in Bankruptcy," 68 J. Commercial Bank Lending 36 (1985), updated and republished November 1987; translated into Chinese and republished in 2 Grad. Stud. J. Issue No. 3, at 59 (Fudan University 2001).

"An Analysis of Proposed Changes in Substantive and Procedural Law in Response to Perceived Difficulties in Establishing Whether or Not Causation Exists in Mass Toxic Tort Litigation," 41 The Record 905, The Association of the Bar of the City of New York (December 1986) (was Chairman of Subcommittee that produced this Report).

"Leveraged Buyouts in Bankruptcy," 20 Ga. L. Rev. 73 (1985) (wrote this article jointly with Prof. David Gray Carlson, but withdrew my name prior to publication at request of my law firm).

"Repurchase Agreements and Bankruptcy Changes," National Law Journal, September 10, 1984, at 18 et seq.

"A Disturbing Decision," Scott Report (Dec. 1983) [an analysis of the effect of the Twistcap case on letters of credit].

"Dealing with Problems Faced in Bankruptcies, National Law Journal, November 7, 1983, at 15 et seq.

"Resolving Conflicts in Technological Disputes," 19 Jurimetrics Journal 424 (1979).

Peer Review Study, published in The Record (1975 New York Academy of Sciences) (was Chairman of Committee that produced the Study).

The Automobile and the Regulation of its Impact on the Environment (1975 Univ. of Oklahoma Press) (was Research Assistant).

Issues of Financial Protection in Nuclear Activities (1973 Columbia University) (was Research Assistant).

**EXPERT TESTIMONY, CONSULTING, MEDIATION AND OTHER DISPUTE RESOLUTION**
List of representative transactions and references available upon request.

**MISCELLANEOUS**
Chevalier, Confrerie de la Chaine des Rotisseurs
Commandeur, La Commanderie de Bordeaux

**Appendix B**

**RELEVANT STEVEN L. SCHWARCZ TESTIMONY**

**Appendix B:**
**RELEVANT STEVEN L. SCHWARCZ TESTIMONY**

Expert Witness and Expert Report, 2009, for Bank of New Zealand in Bank of New Zealand and Commissioner of Inland Revenue (High Court of New Zealand, Wellington Registry).

Expert Deposition Testimony and Expert Report, 2009, for Bank of America in In re SemGroup (SemCrude), bankruptcy litigation in U.S. Bankruptcy Court for the District of Delaware.

Expert Witness and Expert Report, 2008, for subordinated investors, in The Bank of New York and Montana Board of Investments (U.K. High Court of Justice, Chancery Division).  The resulting court opinion is Bank of New York v. Montana Bd. of Investments, [2008] E.W.H.C. 1594 (Ch.).

Expert Deposition Testimony and Expert Report, 2008, for Citigroup in Parmalat State Court Litigation (N.J.)

Expert Deposition Testimony and Expert Report, 2007, for Citigroup in Parmalat Securities Litigation (S.D.N.Y.)

Expert Deposition Testimony and Expert Report, 2006, for Vinson & Elkins LLP in Enron (Newby class action).

Expert Deposition Testimony and Expert and Supplementary Expert Reports, 2006, for Indenture Trustees in United Airlines make-whole litigation.

**Appendix C**

**DOCUMENTS RELIED UPON**

**Appendix C:**
**Documents Relied Upon**

**Adelphia-Related Facilities – Credit Agreements and Related Documents**

**UCA/HHC**

UCA/HHC Facility, Universal Exhibit 1, ACC 0000001-422.

Bank of Nova Scotia "Credit Presentation [for UCA-HHC]," April 23, 1999, BNS-A 034735-59.

CIBC credit approval memorandum for the UCA-HHC Credit Facility, March 1999, CIBC0020216A-62A.

Credit Suisse First Boston, "Adelphia Communications (UCA Corp and Hilton Head Communications) $700,000,000 Senior Credit Facilities - Credit Committee Memo," February 23, 1999, CSFBNY007621-75.

UCA – Hilton Head Summary Terms and Conditions (Defendant's Exhibit 10010, A22340761-76).

First Union Capital Markets, "Adelphia Communications - Hilton Head/UCA - $700MM Senior Credit Facility," March 29, 1999, WACH0250584-597.

Memorandum from Naghmeh Hashemifard, Associate, to Allegra Griffiths, Director, re Hilton Head Communications, L.P., et al. (May 4, 1999) (BMO AB 005123)

UCA/HHC Group $700,000,000 Senior Credit Facilities Confidential Information Memorandum, April 1999, ACC 0001822-93.

**CCH**

CCH Facility, Universal Exhibit 2, ACC0001187-1605.

Citibank Global Loans Approval Memorandum for the CCH Credit Facility, February 25, 2000, 2004D253743-802.

CCH Summary of Proposed Terms and Conditions (Defendant's Exhibit 20041, ACC 0001920-9).

Rabobank Credit Approval Memorandum for the CCH Credit Facility, March 24, 2000, RABO 00002280-315.

**Olympus**

Olympus Facility, Universal Exhibit 3, ACC0000423-749.

Bank of America "Credit Approval Memorandum [for Olympus]," August 1, 2001, BAS 002286-309.

Barclays, Minutes of a Meeting of the Group Credit Committee, for the Olympus Credit Facility, September 18, 2001, BAR-EDOCS_000638-40.

Olympus Summary of Proposed Terms and Conditions (Defendant's Exhibit 20361, CGK 010891-902).

Email from Dean Marshall to Jose Carlos of Scotiabank Group, "Re: Olympus Cable," August 14, 2001, Exhibit 20231, BNS-A004799-80.

Fuji Bank "Notice of Preliminary Approval [for Olympus]," August 27, 2001, MIZ-0003508-26.

Olympus Confidential Information Memorandum, August 2001, ACC 0002115-225.

Royal Bank of Scotland Application for Facilities Requiring Bank Credit Committee Approval for the Olympus Credit Facility, August 31, 2001, RBS000720-30.

Societé Générale Credit Application Document for the Olympus Credit Facility, August 17, 2001, SG0000114-68.

Societé Générale Credit Application Reviewing Officer's Comments, August 22, 2001, SG0000102-106.

**Other Adelphia-Related Credit Facilities**

South Dade-Lorain-MCTV Facility (Demand Notes of South Dade Cablevision, Lorain Cable Television Inc., Multi-Channel T.V. Cable Company, Campbell Communications, Inc., Upper St. Clair Cablevision, Inc., Mt. Lebanon Cablevision, Inc., Rigpal Communications, Inc., Van Buren County Cablevision, Inc., Hoosick Cablevision, Inc., South Shore Cablevision, Inc., Harbor Vue Cable TV, Inc., Chautauqua County Cable Vision, Inc., Adelphia Cablevision Associates, L.P., and Chelsea Communications, Inc.; Guaranty of Adelphia to the Toronto Dominion Bank; Joint and Several Guaranty; Guaranty of John J. Rigas, dated as of November 19, 1987, filed as Exhibits 4.01, 4.02, 4.03, 4.04, 4.05, 4.10, and 4.11 to Adelphia Form 8-K, filed December 4, 1987).

ACTV-UCA Facility (Credit Agreement, dated as of March 14, 1989, by and between UCA Corp. and Adelphia Cable T.V., Inc., as the Borrowers, First Union National Bank of North Carolina, The Bank of Nova Scotia, and First Pennsylvania Bank, N.A., as the Banks, and First Union National Bank of North Carolina as the Agent, filed as Exhibit 10.31 to Adelphia Form 10-K, for the fiscal year ending March 31, 1989).

ACP 1989 Facility (Loan Agreement, dated as of December 19, 1989, among Adelphia Cable Partners, L.P., CCTC Acquisition, Inc., Southeast Florida Cable, Inc., The Banks Whose Names

Are Set Forth on the Signature Pages Hereof, The Toronto-Dominion Bank Trust Company, as the Agent, filed as Exhibit 10.28 to Adelphia Form 10-K, for the fiscal year ending March 31, 1990).

Chauncey Facility ($105,000,000 Credit Agreement, dated as of August 6, 1991, among Chauncey Communications Corporation, Clear Cablevision, Inc., and International Cablevision, Inc., as the Borrowers, NCNB Texas National Bank and The Toronto-Dominion Bank, as the Co-Agents, Credit Lyonnais Cayman island Branch, as the Lead Underwriter, and The Banks Listed herein, filed as Exhibit 10.01 to Adelphia Form 10-Q, for the quarterly period ending September 30, 1991).

HHC Facility (Hilton Head Communications, L.P., $350,000,000 Revolving Credit Facility with Canadian Imperial Bank of Commerce and The Toronto-Dominion Bank as Managing Agents, Canadian Imperial Bank of Commerce as Documentation Agent, The Toronto-Dominion Bank as Syndication Agent, First Union National Bank of North Carolina and Société Générale as Agents, Credit Lyonnais as Co-Agent, and Canadian Imperial Bank of Commerce as Administrative Agent, dated as of December 27, 1994 (CIBC0247368-473; A13156068 et seq.).

Amendment dated as of December 31, 1996, to the HHC Facility (BMO AB 004947-66).

Application for Corporate Credit dated April 10, 1997 (CIBC application for HHC) (CIBC0014455A-65A).

Purchase and Sale Agreement by and among NCAA Holdings, Inc. et al., dated December 23, 1997 (ACC 0210838-88).

Amendment, dated as of September 1, 1998, to the HHC Facility (BIPC 1778676-82).

Letter dated August 28, 1998 from Michael C. Mulcahey to Michele Roller, re "Hilton Head Communications, L.P. ('HHC') Revolving Credit Facility ('Credit Facility')," (BMO AB 005196).

UCA Facility (Credit, Security and Guaranty Agreement, dated as of March 15, 1995, among UCA Corp., Adelphia Cable Television, Inc., Multi-Channel T.V. Cable Company of Virginia, Van Buren County Cablevision, Inc., Ultracom of Montgomery County, Inc., as the Borrowers, The Subsidiaries of the Borrowers Named Herein, as the Guarantors, The Lenders Referred to Herein, Société Générale, PNC Bank, National Association, First Union National Bank of North Carolina, and Credit Lyonnais Cayman Island Branch, as the Managing Agents, Société Générale, as the Structuring Agent, PNC Bank, National Association, as the Syndication Agent, Credit Lyonnais Cayman Island Branch, as the Documentation Agent, and First union National Bank of North Carolina, as the Administrative Agent, PNCACP01063-01163).

ACP 1995 Facility ($475,000,000 Revolving Credit Facility, dated as of May 12, 1995, among Adelphia Cable Partners, L.P., Southeast Florida Cable, Inc., and West Boca Acquisition Limited Partnership, The Lenders From Time to Time Parties Hereto, Toronto Dominion (Texas), Inc., Nationsbank of Texas, N.A., The Bank of Nova Scotia, and Société Générale, as the Managing

Agents, Nationsbank of Texas, N.A., as the Documentation Agent, Toronto-Dominion Securities (USA), Inc., as the Syndication Agent, Chemical Bank, CIBC, Inc., Credit Lyonnais Cayman Island Branch, and First Union National Bank of North Carolina, as the Agents, Compagnie Financiere De CIC et de L'union Europeenne, Fleet Bank, and LTCB Trust Company, as the Co-Agents, The Bank of Nova Scotia, as the Co-Administrative Agent, and Toronto Dominion (Texas), Inc., as the Administrative Agent, filed as Exhibit 10 to Adelphia Form 10-K, for the fiscal year ending March 31, 1995).

Northeast-Robinson Facility (Credit Agreement, dated as of October 27, 1995, among Plato Communications, Inc., Northeast Cable, Inc., Robinson/Plum Cablevision L.P., the Several Other Banks and Other Financial Institutions From Time to Time Parties to This Agreement and Chemical Bank, as Administrative Agent, filed as Exhibit 10.35 to Adelphia Form 8-K, filed December 7, 1995).

Bank of Nova Scotia, Confidential Information Memorandum for HVA Facility, January 1996, Universal Exhibit 94, BNS-A 019500.

HVA/TALP Facility ($200,000,000 Amended and Restated Credit Agreement, dated as of March 29, 1996 (Amending and Restating the Credit Agreement, dated as of February 29, 1996), among Highland Video Associates, L.P, Telesat Acquisition Limited Partnership, and Global Acquisition Partners, L.P., as the Borrowers, Various Financial Institutions, as the Lenders, Bank of Montreal, as the Syndication Agent, Chemical Bank, as Documentation Agent, and The Bank of Nova Scotia, as the Administrative Agent for the Lenders, ACC 0172541-673.)

Chelsea Facility ($690,000,000 Credit Agreement, dated as of April 12, 1996, among Chelsea Communications, Inc., Northeast Cable, Inc., Kittanning Cablevision, Inc., and Robinson/Plum Cablevision, L.P., as the Borrowers, The Several Lenders From Time to Time Parties Hereto, Toronto Dominion (Texas), Inc., Nationsbank of Texas, N.A., Chemical Bank, The Bank of Nova Scotia, and CIBC Inc., as the Managing Agents, Nationsbank of Texas, N.A., as the Documentation Agent, Chemical Bank, as the Syndication Agent, and Toronto Dominion (Texas), Inc., as the Administrative Agent, ACC 0267954-8406).

First Union credit approval memorandum for Parnassos, LP Credit Facility, October 15, 1998, (WACH0031308-96).

Arahova Facility ($1,300,000,000 Credit Agreement, dated as of January 3, 2001, among Arahova Holdings, LLC, and Adelphia Company of Western Connecticut, as the Borrowers, Banc of America Securities LLC and Salomon Smith Barney Inc., as the Joint Lead Arrangers and Joint Bookrunners, Bank of America, N.A. and Citicorp USA, Inc., as the Co-Administrative Agents, and the Lenders Named Herein, as the Lenders, BIPC 2021111-1197).

Citibank "Global Loans Approval Memorandum [for Arahova]," October 30, 2000, 2004E007423-36.

**Other Adelphia-Related Documents**

"ACC Public Offerings From 1998-Present," Government Exhibit 11650.

Adelphia Accounting Department, ISSUES SUMMARIES, AUDIT ISSUES FOR RESTATEMENT OF FINANCIAL STATEMENTS FOR 1999, 2000, 2001, AND 2002, Vol. 1 of 2, AREST 0000001-288.

Letter from George L. Cass to Adelphia Communications Corp., "Nature of Obligations of 'Restricted Borrowers' as defined in the Credit Agreement dated as of April 14, 2000 among Century Cable Holdings, LLC, Ft. Myers Cablevision, LLC and Highland Prestige Georgia, Inc., Restricted Borrowers, and Bank of America Securities, LLC et. al. (the 'Credit Agreement')," May 6, 2002 (BIPC 2666103-11).

Letter from George L. Cass to Adelphia Communications Corp., May 6, 2002 (Exhibit 20276, DT00945014-19).

Memorandum from Eric A. Hirsch of Fried, Frank, Harris, Shriver, & Jacobson, "Adelphia/May 14, 2002 Interview with Dean Marshall," May 21, 2002, Exhibit 20197, ACI 393968-89.

Memorandum from Robert E. Brown of Fried, Frank, Harris, Shriver, & Jacobson, entitled "Adelphia/April 9, 2002 Interview with Dean Marshall," April 23, 2002, Exhibit 20195, ACI 393836-42.

Robert J. Dibella, "Analysis of RFP Advance Impairment by Entity," Exhibit 21265, AREST 0160842-89.

**SEC Filings**

Adelphia Communications Corporation:
Form S-1 Registration Statement, July 2, 1986.
Form 8-K, filed December 1, 1986.
Form 8-K, filed January 13, 1987.
Form 8-K, filed December 4, 1987.
Form 8-K, filed May 26, 1988.
Form 8-K, filed October 20, 1988.
Form 10-K, for the fiscal year ending March 31, 1989.
Form 10-K, for the fiscal year ending March 31, 1990.
Form 10-K, for the fiscal year ending March 31, 1994.
Form 8-K, filed December 7, 1995.
Form 10-K, for the fiscal year ending March 31, 1996, Universal Exhibit 262.
Form 10-K/A, for the fiscal year ending December 31, 1999, Universal Exhibit 307.
Form 10-K, for the fiscal year ending December 31, 2000, Universal Exhibit 340.

Olympus Communications LP:
Form 10-K, for the fiscal year ending December 31, 1997.
Form 10-K, for the fiscal year ending December 31, 1998.

Form 10-K, for the fiscal year ending December 31, 1999.

Bank of Tokyo:
Form 20-F, for the fiscal year ending March 31, 2002.

Farmland Industries, Inc.:
Form 10-K, for the fiscal year ending August 31, 2002, Exhibit 21.

UnionBanCal:
Form 10-Q, for the fiscal quarter ending June 30, 1996.

**Deposition Transcripts**

In re: Adelphia Recovery Trust v. Bank of America, N.A. *et al.*:
Bos, Yvonne, April 28, 2009.
Brooks, Geoffrey, January 21, 2009.
Kailbourne, Erland, Volume I, Sept. 30, 2009.
Marshall, Dean, Volume I, March 2, 2009.
Marshall, Dean, Volume III, March 4, 2009.
Misenheimer, Mark, Volume I, May 28, 2009.
Labergere, Thomas, Volume I, April 29, 2009.
Lucas, David, Volume I, April 2, 2009.
Rigas, James, Volume I, July 8, 2009.
Rigas, James, Volume II, July 9, 2009.
Rigas, Michael, Volume I, July 21, 2009.
Rigas, Michael, Volume II, July 22, 2009.

**Trial Transcripts**
In re: *United States of America v. John J. Rigas, Timothy J. Rigas, Michael J. Rigas, Michael C. Mulcahey*, Southern District of New York, Trial Transcript of James Brown, April 29, 2004.

**Other Court Documents**

*Adelphia Recovery Trust v. Bank of America, N.A., et al.*, Case No. 05 Civ. 9050 (LMM), Second Amended Complaint, S.D.N.Y., Feb. 29, 2008.

In re: *Adelphia Communications Corp v. Bank of America, N.A., et al*, Case No. 365 B.R. 24, S. D. N. Y., June 11, 2007.

United States Bankruptcy Code: Title 11.

**Plaintiff Expert Reports**
Expert Report of Michael J. Doyle, October 16, 2009.
Expert Report of Roy D. Simon, Jr. October 16, 2009

**Defendant Expert Reports**
Expert Report of Ronald J. Gilson, November 18, 2009.

Expert Report of Harold W. Furchtgott-Roth, November 18, 2009.
Expert Report of John M. Lacey, November 18, 2009.
Expert Report of Nabil N. El-Hage, November 18, 2009.

**Journal Articles**

Klein, B. and K. Leffler, *The Role of Market Forces in Assuring Contractual Performance,* 89 J. POL. ECON.  (1981).

Macey, Jonathan R. and Geoffrey P. Miller, *Corporate Governance and Commercial Banking: A Comparative Examination of Germany, Japan, and the United States*, 48 STAN. L. REV. (1995).

Telser, L.G., *A Theory of Self-Enforcing Agreements*, 53 J. BUS. (1980).

Schwarcz, Steven L., *Intermediary Risk in a Global Economy*, 50 DUKE L.J., (2001).

Schwarcz, Steven L., *Explaining the Value of Transactional Lawyering*, 12 STAN. J. L. BUS. & FIN. (2007).

Steven L. Schwarcz, *The Limits of Lawyering: Legal Opinions in Structured Finance*, 84 TEX. L. REV. (2005).

Volery T. and S. Mensik, *The Role of Trust in Creating Effective Alliances: A Managerial Perspective*, 17 J. BUS. ETHICS (1998).

**Books**

The Restatement (Second) of the Law of Contracts (1981).

BERK, JONATHAN & PETER DEMARZO, CORPORATE FINANCE 904-07 (2007).

Bobrow, Barry, Mercedes Tech, & Linda Redding, *An Introduction to the Primary Market* in THE HANDBOOK OF LOAN SYNDICATIONS & TRADING 157 (2007) (Allison Taylor & Alicia Sansone, eds.).

FIELD, ARTHUR NORMAN, LEGAL OPINIONS IN BUSINESS TRANSACTIONS § 1:5, at 1-5–1-6 n.8 (2004).

FITZGIBBON, SCOTT  & DONALD W. GLAZER, FITZGIBBON AND GLAZER ON LEGAL OPINIONS § 1.1, at 1 (1992).

HUBBARD, R. GLENN, MONEY, THE FINANCIAL SYSTEM, AND THE ECONOMY 290-293, 298-299 (2008).

KOCH, TIMOTHY W. & S. SCOTT MACDONALD, BANK MANAGEMENT 558-560 (7th ed. 2010).

MACEY, JONATHAN R., THIRD PARTY LEGAL OPINIONS: EVALUATION AND ANALYSIS 6 (1995).

ROSS, STEPHEN A., RANDOLPH W. WESTERFIELD & JEFFREY JAFFE, CORPORATE FINANCE 13-15 (8th Edition 2008).

Schwarcz, Steven L. & Gabe Shawn Varges, *Guaranties and Other Third-Party Credit Supports*, Chapter 16 in COMMERCIAL LOAN DOCUMENTATION GUIDE (1988).

WIGHT, RICHARD, THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE 163, 171-172, 578-579 (2009).

**Analyst and Credit Rating Agency Reports**

Arnhold & S. Bleichroeder, Inc., *Adelphia Communications*, *"Making a Cleaner Balance Sheet,"* January 14, 2002.

D.S. Shapiro, M.E. Benevento, & M.L. Savner, *Adelphia Communications, "You've come a long way, baby!,"* DEUTSCHE BANC ALEX. BROWN EQUITY RESEARCH, August 20, 1999.

Moody's Investors Service, Inc., *Moody's Lowers All Ratings Of Adelphia Communications & Subsidiaries Except For Sr Implied Rating; New Century Holdings Bank Debt Rated Ba3*, August 15, 2000.

**News and Periodicals**

"Acquisition of Bankers Trust Successfully Closed; Deutsche Bank Expands in U.S.A.," *PR Newswire*, June 4, 1999.

Clark, Kim, "Nationsbank's Baltimore Roots City Native Gave N.C. Bank its Aggressive Culture," *The Baltimore Sun*, July 19, 1992.

"Corestates and First Pennsylvania to Merge," *The New York Times*, September 19, 1989.

"Fleet/Norstar, Bank Of New England Mortgage Units Merge," *Dow Jones News Service – Ticker*, July 16, 1991.

Harrington, Jeff, "NationsBank Chief Discusses Mergers with Shareholders," *Knight Ridder/Tribune Business News*, April 27, 1998.

WuDunn, Sheryl, "Opening Day for the Biggest Bank in the World," *The New York Times*, April 2, 1996.

**Websites**

"2002 First Union and Wachovia Merger Press Releases," April 19, 2002, available at <www.wachovia.com>, accessed on November 9, 2009.

"About Us," available at <http://www.natwest.com >, accessed on November 10, 2009.

"Citi's History," available at <http://www.citigroup.com >, accessed November 10, 2009.

"CoreStates," available at <http://www.corestates.com>, accessed on November 10, 2009.

"Corporate History," available at <https://www.pnc.com >, accessed November 10, 2009.

Hildebrand, Richard and Walter Schroeder, "Industrial Bank of Japan (Canada)," November 30, 2000, available at <http://www.dbrs.com>, accessed on November 11, 2009.

"Milestones," available at <http://www.octagoncredit.com >, accessed November 10, 2009.

"SunTrust Banks, Inc. Historical Highlights," SunTrust Corporate Communications, October 2004, available at <https://www.suntrust.com >, accessed on November 10, 2009.

 "The History of our Firm," available at <http://www.jpmorganchase.com>, accessed November 10, 2009.

**Macerich Ownership Structure Analysis**

Analysis Group, The Macerich Company: Ownership Structure of Co-Borrowing Credit Facilities at July 26, 2002.

**The Macerich Company: Ownership Structure Backup**

Schedule 14(a) Proxy Statement, April 1, 2002.
Form S-3 Registration Statement, June 5, 2002, Exhibit 2.1.
Form 10-Q, for the quarterly period ending June 30, 2002, Exhibit 10.1.
Form 8-K, filed August 9, 2002, Exhibit 2.2.
Form 10-K, for the fiscal year ending December 31, 2002.

**U.S. Bank/Firstar Analysis**

Analysis Group, U.S. Bank and Firstar Credit Facilities with Co-Borrowers.

American Home Mortgage Investment Corp. Facility (Credit Agreement, dated as of August 30, 2004, among American Home Mortgage Servicing, Inc., American Home Mortgage Corp., and American Home Mortgage Acceptance, Inc., as the Borrowers, Bank Of America, N.A., as Administrative Agent and Swing Line Lender, and the Other Lenders Party Hereto,  Calyon and Deutsche Bank  Securities, as Co-Syndication Agents ABN AMRO Bank N.V., Citibank, N.A.,

and U.S. Bank National Association, as Co-Documentation Agents Banc Of America Securities LLC, Sole Lead Arranger and Sole Book Manager, filed as Exhibit 10.1 to American Home Mortgage Investment Corp. Form 8-K, filed September 3, 2004).

Biomed Realty Trust Facility (Revolving Loan Agreement, dated as of August 11, 2004, this Revolving Loan Agreement ("Agreement") is entered into by and among Biomed Realty Trust, Inc., a Maryland corporation ("Parent"), Biomed Realty,L.P., a Maryland limited partnership ("Operating Partnership"), the other borrowers whose names are set forth on the signature pages of this Agreement (the "Other Existing Borrowers"), each other Wholly-Owned Subsidiary of the Operating Partnership which may hereafter become a party to this Agreement as a borrower pursuant to Section 5.13 (collectively, with Parent, Operating Partnership and the Other Existing Borrowers, the "Borrowers," all on a joint and several basis); each bank whose name is set forth on the signature pages of this Agreement, and each lender which may hereafter become a party to this Agreement pursuant to Section 2.8 or Section 11.8 (collectively, the "Banks" and, individually, a "Bank"); U.S. Bank National Association, as Administrative Agent, U.S. Bank National Association, as Lead Arranger and as Swing Loan Bank, Keybank National Association, as Syndication Agent, and Royal Bank Of Canada, as Documentation Agent, filed as Exhibit 10.24 to Biomed Realty Trust, Inc. Form 10-Q, for the quarterly period ending June 30, 2004).

CNL Retirement Facility (Loan Agreement between Five Pack Retirement 2002, LLC, Lender, and CNL Retirement Clayton OH, LP, CNL Retirement Laguna Creek CA, LP, CNL Retirement Camarillo CA, LP, CNL Retirement Dartmouth MA, LP, CNL Retirement Towson MD, LP, Borrowers, and U.S. Bank, National Association, Collateral Agent, relating to the Brighton Gardens of Camarillo - Camarillo, California; Brighton Gardens of Towson - Towson, Maryland; Marriott Maple Ridge of Clayton - Clayton, Ohio; Marriott Maple Ridge of Dartmouth - Dartmouth, Massachusetts; and Marriott Maple Ridge of Laguna Creek - Elk Grove, California Loan Agreement between Five Pack Retirement 2002, LLC, a Delaware limited liability company ("Lender") and CNL Retirement Clayton OH, LP, a Delaware limited partnership CNL Retirement Laguna Creek CA, LP, a Delaware limited partnership CNL Retirement Camarillo CA, LP, a Delaware limited partnership CNL Retirement Dartmouth MA, LP, a Delaware limited partnership CNL Retirement Towson MD, LP, a Delaware limited partnership ("Borrowers") and U.S. Bank, National Association, a national banking association ("Collateral Agent"), filed as Exhibit 10.31 to CNL Retirement Properties Inc. Post-Effective Amendment No. Two to Form S-11, filed September 24, 2002).

Commercial Vehicle Group Facility (Revolving Credit and Term Loan Agreement, dated as of August 10, 2004, among Commercial Vehicle Group, Inc., as the Company, the Subsidiary Borrowers from time to time parties hereto, the Foreign Currency Borrowers from time to time parties hereto, the Banks from time to time parties hereto, U.S. Bank National Association, as Administrative Agent, and Comerica Bank,  as Syndication Agent, filed as Exhibit 10.1 to Commercial Vehicle Group, Inc. Form 10-Q, for the quarterly period ending June 30, 2004).

Family Dollar Stores Inc. Facility ($350,000,000 Credit Agreement, dated as of August 24, 2006, by and among Family Dollar Stores, Inc., and Family Dollar, Inc., as Borrowers, the Lenders referred to herein, Branch Banking and Trust Company , as Syndication Agent, Regions Bank,

10

as Documentation Agent, U.S. Bank National Association, as Documentation Agent, and Wachovia Bank, National Association, as Administrative Agent, Swingline Lender and Fronting Bank, Wachovia Capital Markets, LLC as Sole Lead Arranger and Sole Book Manager, filed as Exhibit 10 to Family Dollar Stores, Inc. Form 8-K, filed August 28, 2006).

Farmland Industries Inc. Facility (Farmland Industries, Inc., Farmland Foods, Inc., Credit Agreement, this Credit Agreement is dated as of February 7, 2002, and entered into by and among Farmland Industries, Inc., a Kansas Cooperative Corporation ("Company"), Farmland Foods, Inc, a Kansas Corporation ("Foods"), and together with Company, Jointly and Severally, the "Borrowers", the Financial Institutions party hereto (each individually referred to herein as a "Lender" and collectively as "Lenders"), Cobank, ACB ("Cobank"), and Cooperatieve CentraleRaiffeisen-Boerenleenbank B.A. "Rabobank International", New York Branch ("Rabobank"), as Co-Syndication Agents for Lenders (in such Capacity, "Co-Syndication Agents"), Harris Trust & Savings Bank, and U.S. Bank National Association, as Co-Documentation Agents for Lenders (in such capacity, "Co-Documentation Agents"), and Bankers Trust Company ("BTCO"), as Administrative Agent for Lenders (in such capacity, "Agent"), filed as Exhibit 4(ii) to Farmland Industries, Inc. Form 10-Q, for the quarterly period ending February 28, 2002).

Golfsmith International Facility (Credit Agreement, dated as of October 15, 2002, by and among Golfsmith International, L.P., Golfsmith Nu, L.L.C., and Golfsmith USA, L.L.C., as Borrowers, and the other persons party hereto that are designated as Credit Parties, and General Electric Capital Corporation as Agent, L/C Issuer and a Lender, and the other Financial Institutions party hereto, filed as Exhibit 10.5 to Golfsmith International Holdings, Inc. Form S4/A, filed April 4, 2003).

Handleman Co. Facility (Credit Agreement, dated as of April 30, 2007, among Handleman Company, as Parent Guarantor, Handleman Entertainment Resources L.L.C., and certain other Domestic Subsidiaries of Handleman Company, as Borrowers, Handleman Company of Canada, Limited, Handleman UK Limited and certain other Subsidiaries of Handleman Company signatory hereto as Credit Parties, the Lenders signatory hereto from time to time, as Lenders, General Electric Capital Corporation, as Administrative Agent, Agent and Lender, and GE Capital Markets, Inc., as Lead Arranger, filed as Exhibit 10.2 to Handleman Company Form 8-K, filed May 1, 2007).

Longview Fibre Co. (Credit Agreement, dated as of December 23, 2005, among Longview Fibre Company, and Longview Fibre Paper and Packaging, Inc., as Borrowers, certain subsidiaries of Longview Fibre Company, from time to time party hereto as Guarantors, the Lenders party hereto and Bank Of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, Banc Of America Securities LLC as Joint Lead Arranger and Joint Book Manager, Wells Fargo Bank, N.A. as Joint Lead Arranger, Joint Book Manager, and Co-Syndication Agent, Goldman Sachs Credit Partners L.P. as Joint Lead Arranger, Joint Book Manager, and Co-Syndication Agent, the Bank of Nova Scotia as Co-Documentation Agent, U.S. Bank National Association as Co-Documentation Agent, filed as Exhibit 99.1 to Longview Fibre Company Form 8-K, filed December 30, 2005).

Macerich Co. Interim Facility ($380,000,000 Interim Facility Credit Agreement, dated as of July 26, 2002, by and among, The Macerich Partnership, L.P., Macerich Galahad GP Corp., Macerich Galahad LP, Macerich WRLP Corp., Macerich WRLP LLC, Macerich TWC II Corp., and Macerich TWC II LLC, as the Borrowers, The Macerich Company, and the entities from time to time party hereto as Guarantors, Duetsche Bank Trust Company Americas, J.P. Morgan Chase Bank, and the institutions from time to time party hereto as Lenders, Deutsche Bank Trust Company Americas, as the Administrative Agent and the Collateral Agent for the Lenders, Deutsche Bank Securities Inc., and J.P. Morgan Securities Inc., as the Co-Lead Arrangers, J.P. Morgan Chase Bank and Dresdner Bank AG, New York and Grand Cayman Branches, as the Co-Syndication Agents, Wells Fargo Bank, National Association and Commerzbank AG, New York and Grand Cayman Branches as the Co-Documentation Agents, filed as Exhibit 10.2 to The Macerich Company Form 10-Q, for the quarterly period ending June 30, 2002).

Macerich Co. Revolving Facility ($425,000,000 Revolving Loan Facility Credit Agreement, dated as of July 26, 2002,, by and among The Macerich Partnership, L.P., Macerich Galahad GP Corp., Macerich Galahad LP, Macerich WRLP Corp., Macerich WRLP LLC, Macerich TWC II Corp., and Macerich TWC II LLC, as the Borrowers, The Macerich Company and the entities from time to time party hereto as Guarantors, Deutsche Bank Trust Company Americas, J.P. Morgan Chase Bank, and the Institutions from time to time party hereto as Lenders, Deutsche Bank Trust Company Americas, as the Administrative Agent and the Collateral Agent for the Lenders, Deutsche Bank Securities Inc. and J.P. Morgan Securities Inc., as the Co-Lead Arrangers J.P. Morgan Chase Bank, and Wells Fargo Bank, National Association, as the Co-Syndication Agents, Dresdner Bank AG, New York and Grand Cayman Branches, and Bank One, N.A., as the Co-Documentation Agents, Fleet National Bank, ING Capital LLC, and Commerzbank AG, as the Senior Managing Agents, filed as Exhibit 10.3 to The Macerich Company Form 10-Q, for the quarterly period ending June 30, 2002).

Metal Management Inc. Facility (Credit Agreement, dated as of June 28, 2004, among Metal Management, Inc., and those of its Subsidiaries parties hereto as Borrowers, the Financial Institutions from time to time parties hereto as Lenders, Metal Management, Inc., as Funds Administrator, and LaSalle Bank National Association as Agent, with PNC Bank National Association as Co-Syndication Agent, U.S. Bank, National Association as Co-Syndication Agent, Sovereign Bank as Co-Documentation Agent, National City Bank of the Midwest as Co-Documentation Agent, filed as Exhibit 4.1 to Metal Management, Inc. Form 8-K, filed July 1, 2004).

Milacron Inc. Facility (Financing Agreement, dated as of June 10, 2004, by and among Milacron Inc., and Certain Subsidiaries of Milacron Inc., listed as a Borrower on the signature pages hereto, as Borrowers, certain Subsidiaries of Milacron Inc. listed as a Guarantor on the signature pages hereto, as Guarantors, the Lenders from time to time party hereto, as Lenders, J.P. Morgan Chase Bank, as Administrative Agent and Collateral Agent, Wells Fargo Foothill, LLC, as Documentation Agent and J.P. Morgan Business Credit Corp., as Sole Lead Arranger and Book Manager, filed as Exhibit 10.36 to Milacron Inc. Form S-1 Registration Statement, June 25, 2004).

Municipal Mortgage Facility (Credit Agreement, dated as of November 12, 2004, among Munimae Tei Holdings, LLC, MMA Construction Finance, LLC, and Midland Mortgage

Investment Corporation, as the Borrowers, Municipal Mortgage & Equity, LLC, as the Guarantor, Bank Of America, N.A., as the Administrative Agent, U.S. Bank National Association, RBC Capital Markets, Citicorp USA, Inc., as Co-Syndication Agents, the other Lenders party hereto and Banc of America Securities LLC, as Sole Lead Arranger and Sole Book Manager, filed as Exhibit 10.1 to Municipal Mortgage & Equity LLC Form 8-K, filed November 17, 2004).

Northwestern Corp. Facility (Financing Agreement, dated as of August 30, 2002, by and among Blue Dot Services, Inc., the Borrowers listed on the signature pages hereof, and U.S. Bank, National Association, and various other Financial Institutions listed on the signature pages hereof, and U.S. Bank, National Association, as Agent, filed as Exhibit 10.4(a) to Northwestern Corporation Form 10-K, for the fiscal year ending December 31, 2002).

Reliance Steel & Aluminum Co. Facility (Credit Agreement, dated as of October 24, 2001, among Reliance Steel & Aluminum Co., RSAC Management Corp., Bank Of America, N.A., as Administrative Agent and Letter Of Credit Issuing Lender, First Union National Bank, as Syndication Agent, Credit Suisse First Boston, The Chase Manhattan Bank, and U.S. Bank National Association as Managing Agents, and the other Financial Institutions party hereto, arranged by Banc Of America Securities LLC, filed as Exhibit 10.10 to Reliance Steel & Aluminum Co. Form 10-Q, for the quarterly period ending September 30, 2001).

Resource America Facility (Credit Agreement, dated July 31, 2006, by and among Leaf Financial Corporation, and Leaf Funding, Inc., as the Borrowers, various Financial Institutions and other persons from time to time parties hereto, as the Lenders, and National City Bank, as the Agent for the Lenders, filed as Exhibit 10.1 to Resource America, Inc. Form 8-K, filed August 4, 2006).

Sun Healthcare Group Facility (Term Loan and Note Purchase Agreement, dated as of February 28, 2002, among Sun Healthcare Group, Inc., and each other person listed on Schedule 1A hereto, Borrowers, U.S. Bank National Association, Administrative Agent, and the Lenders and Purchasers named herein, Holders, $20,000,000 Term Loan, $23,675,000 Stated Principal Amount of Discount Notes, filed as Exhibit 10.2 to Sun Healthcare Group, Inc. Form 10-K, for the fiscal year ending December 31, 2001).

TBC Corp. Facility ($325,000,000 Credit Agreement, dated as of June 17, 2005, among TBC Corporation, and TBC Private Brands, Inc., as Borrowers, the Lenders party hereto, U.S. Bank National Association, and Regions Bank, each as a Documentation Agent, Suntrust Bank as Syndication Agent, First Tennessee Bank National Association as Administrative Agent, and J.P. Morgan Chase Bank, N.A. as Co-Administrative Agent, J.P. Morgan Securities Inc. as Advisor, Lead Arranger and Bookrunner, Suntrust Robinson Humphrey, a division of Suntrust Capital Markets, Inc., as Arranger, filed as Exhibit 4.1 to TBC Corp. Form 8-K, filed June 23, 2005).

Valmont Industries Inc. Facility (Credit Agreement, dated as of May 4, 2004, by and among Valmont Industries, Inc., the Subsidiary Borrowers party hereto, the Lenders party hereto, and the Bank of New York, as Issuing Bank, as Swing Line Lender and as Administrative Agent, Wachovia Bank, National Association, as Issuing Bank and Wachovia Capital Markets, LLC, as Syndication Agent, and LaSalle Bank National Association, Cooperatieve CentraleRaiffeisen-

13

Boerenleenbank B.A., "Rabobank International," New York Branch, and U.S. Bank National Association, as Co-Documentation Agents with BNY Capital Markets, Inc. and Wachovia Capital Markets, LLC, as Co-Lead Arrangers, filed as Exhibit 10.3 to Valmont Industries, Inc. Form 10-Q, for the quarterly period ending March 27, 2004).

Von Hoffman Holdings Facility (Credit Agreement, dated as of March 26, 2002, among Von Hoffmann Holdings Inc., Von Hoffmann Corporation, H&S Graphics, Inc., Precision Offset Printing Company, Inc., Preface, Inc., One Thousand Realty & Investment Company, and certain other Subsidiaries of Von Hoffmann Corporation, as the Borrowers, various Financial Institutions from time to time parties hereto, as the Lenders, the CIT Group/Business Credit, Inc., as the Administrative Agent for the lenders, Credit Suisse First Boston, Cayman Islands Branch, as the Syndication Agent for the Lenders, and U.S. Bank National Association, as the Documentation Agent for the Lenders, Credit Suisse First Boston, Cayman Islands Branch, as Sole Lead Arranger and Sole Book Running Manager, filed as Exhibit 10.4 to Von Hoffmann Holdings, Inc. Form S-1 Registration Statement, filed June 21, 2002).

Zoltek Companies Inc. Facility (U.S. $54,125,000 Credit Agreement, dated as of November 19, 1999, and amended and restated as of May 31, 2000, among Zoltek Companies, Inc., Zoltek Corporation, Zoltek Intermediates Corporation, Zoltek Properties, Inc., Cape Composites, Inc., and Engineering Technology Corporation, as the Borrowers, the Lenders and any other Lenders hereafter becoming a party to this Agreement and Firstar Bank Missouri, N. A., formerly known as Mercantile Bank National Association, as Agent, filed as Exhibit 10 to Zoltek Companies, Inc. Form 10-Q, for the quarterly period ending June 30, 2000).

## U.S. Bank and Firstar Credit Facilities with Co-Borrowers Backup

Agilysys Inc. (Credit Agreement, dated as of October 18, 2005, among Agilysys, Inc.,  as a US Borrower, the other US Borrowers named herein, and the Foreign Borrowers named herein, collectively, as Borrowers, the Lenders named herein, as Lenders, and LaSalle Bank National Association, as Lead Arranger, Book Runner and Administrative Agent, National City Bank, as Syndication Agent, Harris N.A., as Co-Documentation Agent, Charter One Bank, N.A., as Co-Documentation Agent and U.S. Bank National Association, as Managing Agent, filed as Exhibit 10.1 to Agilysys Inc. Form 8-K, filed October 21, 2005.)

Andrew Corp. (Credit Agreement, dated as of September 29, 2005, among Andrew Corporation and Designated Subsidiaries of Andrew Corporation, as Borrowers, and certain Commercial Lending Institutions, as the Lenders, and Bank Of America, N.A., as the Administrative Agent, Swing Line Lender, Foreign Swing Line Lender and L/C Issuer, and Citicorp North America, Inc., as Syndication Agent, and Fifth Third Bank (Chicago), Harris N.A., U.S. Bank National Association and Wells Fargo Bank, N.A., as Co-Documentation Agents and Banc Of America Securities LLC, and Citigroup Global Markets Inc., as Joint Lead Arrangers and Sole Book Managers, filed as Exhibit 99.2 to Andrew Corporation Form 8-K, filed October 5, 2005.)

Applied Industrial Technologies (Credit Agreement, dated as of October 31, 2003, among Applied Industrial Technologies, Inc., and the Canadian Borrowers named herein, as Borrowers, the Financial Institutions named herein, as Lenders, Keybank National  Association, as Lead Arranger, Book Runner and Administrative Agent, and U.S. Bank National Association, as

14

Syndication Agent, filed as Exhibit 4(e) to Applied Industrial Technologies, Inc. Form 10-Q, for the quarterly period ending December 31, 2003.)

Applied Industrial Technologies (Credit Agreement, dated as of June 3, 2005, among Applied Industrial Technologies, Inc., and the Canadian Borrowers named herein, as Borrowers, the Lenders named herein, as Lenders, Keybank National Association, as Lead Arranger, Book Runner and Administrative Agent, and U.S. Bank National Association, as Syndication Agent, filed as Exhibit 4 to Applied Industrial Technologies, Inc. Form 8-K, filed June 9, 2005.)

Brown Tom Inc. ([Canadian Revolving Credit Agreement], Credit Agreement, dated as of June 27, 2003, among Tom Brown Resources Funding Corp., Tom Brown Resources Ltd., the Lenders party hereto, the other Agents party hereto, National Bank Of Canada as Canadian Revolving Documentation Agent, J.P. Morgan Chase Bank, Toronto Branch as Canadian Administrative Agent, and J.P. Morgan Chase Bank, as Global Administrative Agent, J.P. Morgan Securities Inc., as Sole Lead Arranger and Bookrunner, filed as Exhibit 10.2 to Brown Tom Inc. Form 10-Q, for the quarterly period ending June 30, 2003.)

Fiserv Inc. (Credit Agreement, dated as of March 24, 2006, among Fiserv, Inc. the Foreign Subsidiary Borrowers party hereto, the Lenders party hereto and J.P. Morgan Chase Bank, National Association, as Administrative Agent, The Bank Of New York as Syndication Agent, and Suntrust Bank, U.S. Bank National Association, and Bank Of America, N.A. as Documentation Agents, J.P. Morgan Securities Inc. and BNY Capital Markets, Inc., as Joint Bookrunners and Joint Lead Arrangers, filed as Exhibit 4 to Fiserv Inc. Form 8-K, filed March 29, 2006.)

Flir Systems Inc. (Credit Agreement, dated as of October 6, 2006, among Flir Systems, Inc. and Certain Subsidiaries Of Flir Systems, Inc. identified herein, as the Borrowers, certain Subsidiaries of Flir Systems, Inc. identified herein, as the Subsidiary Guarantors, Bank Of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, Union Bank Of California, N.A., as Syndication Agent, U.S. Bank National Association, as Documentation Agent, and the other Lenders party hereto, Arranged By: Banc Of America Securities LLC, as Sole Lead Arranger and Book Manager, filed as Exhibit 10.1 to Flir Systems, Inc. Form 8-K, filed October 12, 2006.)

International Multifoods Corp. ($450,000,000 Credit Agreement, dated as of September 28, 2001, among International Multifoods Corporation, as U.S. Borrower, Robin Hood  Multifoods Inc. as Canadian Borrower, the Several Lenders from time to time parties hereto, Rabobank International, as Documentation Agent, U.S. Bank National Association and UBS Warburg LLC, as Syndication Agents, and Canadian Imperial Bank Of Commerce, as U.S. Administrative Agent, and Canadian Administrative Agent, CIBC World Markets Corp., as Sole Lead Arranger and Sole Book Runner, filed as Exhibit 4.1 to International Multifoods Corp. Form 10-Q, for the quarterly period ending December 1, 2001.)

Kelly Services Inc. (Kelly Services, Inc., the Foreign Subsidiary Borrowers, Loan Agreement, dated as of November 30, 2005, J.P. Morgan Chase Bank, N.A., as Agent, Keybank National Association, as Syndication Agent, PNC Bank, National Association, as Syndication Agent,

Comerica Bank, as Documentation Agent, U.S. Bank National Association, as Documentation Agent, and the Lenders party hereto, J.P. Morgan Securities Inc., as Arranger, filed as Exhibit 10.1 to Kelly Services Inc. Form 8-K, filed December 5, 2005.)

Manitowoc Co. Inc. ($300,000,000 Credit Agreement, dated as of June 10, 2005, among the Manitowoc Company, Inc., the Subsidiary Borrowers party hereto, the Lenders party hereto, Bank Of America, N.A., as Syndication Agent, Deutsche Bank AG New York Branch, BNP Paribas and U.S. Bank, National Association, as Documentation Agents and J.P. Morgan Chase Bank, N.A., as Administrative Agent, J.P. Morgan Securities Inc., Sole Bookrunner and Sole Lead Arranger, filed as Exhibit 99.1 to Manitowoc Co. Inc. Form 8-K, filed June 14, 2005.)

Milacron Inc. (Credit Agreement, dated as of December 19, 2006, by and among Milacron Inc. and each of the other Borrowers signatory hereto, as Borrowers, certain other Subsidiaries of Milacron Inc. signatory hereto, as Credit Parties, the Lenders signatory hereto from time to time, as Lenders, and General Electric Capital Corporation, as Administrative Agent, and GE Capital Markets, Inc., as Lead Arranger, filed as Exhibit 10.1 to Milacron Inc. form 8-K, filed December 22, 2006.)

Pioneer-Standard Electronics (Five-Year Credit Agreement, dated as of September 15, 2000, among Pioneer-Standard Electronics, Inc., the Foreign Subsidiary Borrowers, the Lenders, and Bank One, Michigan as Agent, Banc One Capital Markets, Inc. as Lead Arranger, and Sole Book Runner, Keybank National Association, as Syndication Agent, and ABN AMRO Bank N.V., as Documentation Agent, filed as Exhibit 10.4 to Agilysys Inc. Form 10-Q, for the quarterly period ending September 30, 2000.

Plains All American Pipeline (Credit Agreement [US/Canada Facilities], dated as of November 2, 2004,  Plains All American Pipeline, L.P., as US Borrower, PMC (Nova Scotia) Company and Plains Marketing Canada, L.P., as Canadian Borrowers, Bank Of America, N.A., as Administrative Agent, Bank Of America, N.A., acting through its Canada Branch, as Canadian Administrative Agent, Wachovia Bank, National Association and Bank One, NA, as Co-Syndication Agents, Fortis Capital Corp., Citibank, N.A. and BNP Paribas, as Co-Documentation Agents, and certain Financial Institutions, as Lenders $750,000,000 Revolving Credit Facility Banc Of America Securities LLC and Wachovia Capital Markets, LLC, as Joint Lead Arrangers and Joint Book Managers, filed as Exhibit 10.1 to Plains All American Pipeline LP Form 10-Q, for the quarterly period ending September 30, 2004.

Plains All American Pipeline (Credit Agreement [US/Canada Facilities], dated as of November 21, 2003, Plains All American Pipeline, L.P., as US Borrower, PMC (Nova Scotia) Company, as Canadian Borrower, Plains All American Pipeline, L.P., as Guarantor, Fleet National Bank, as Administrative Agent, and certain Financial Institutions, as US Lenders $425,000,000 Revolving Credit Facility, $170,000,000 Revolving Credit Facility, Plains Marketing Canada, L.P., as Canadian Working Capital Borrower, Plains All American Pipeline, L.P., as Guarantor, The Bank of Nova Scotia, as Canadian Administrative Agent, and certain Financial Institutions, as Canadian Lenders $30,000,000 Canadian Revolving Credit Facility, Fleet Securities, Inc., as Lead Arranger and Book Manager, Wachovia Bank, National Association and Bank One, NA as Co-Syndication Agents, and Bank Of America, N.A. and Fortis Capital Corp., as Co-

Documentation Agents, filed as Exhibit 10.22 to Plains All American Pipeline LP Form 10-K, for the fiscal year ending December 31, 2003.

Plexus Corp. (Credit Agreement, dated as of October 25, 2000, among Plexus Corp., the Subsidiary Borrowers from time to time parties hereto, the Institutions from time to time parties hereto as Lenders, ABN AMRO Bank N.V., as Syndication Agent, Firstar Bank, N.A., as Documentation Agent, and Bank One, NA, (Having Its Principal Office In Chicago, Illinois), as Administrative Agent, Banc One Capital Markets, Inc., as Lead Arranger and Sole Bookrunner, filed as Exhibit 10.6(a) to Plexus Corp. Form 10-K405, for the fiscal year ending September 30, 2000.)

Quiksilver Inc. (Credit Agreement, dated as of June 27, 2003, among Quiksilver, Inc., NA Pali, S.A.S., Quiksilver Japan K.K., UG Manufacturing Co. Pty Ltd., as Borrowers, the Lenders party hereto, and J.P. Morgan Chase Bank, as Administrative Agent, Union Bank Of California, N.A., as Syndication Agent, and Joint Lead Arranger, Fleet National Bank, Bank Of America, N.A. as Syndication Agents, U.S. Bank National Association, as Documentation Agent, J.P. Morgan Securities Inc., as Sole Bookrunner and Joint Lead Arranger, filed as Exhibit 10.1 to Quiksilver Inc. Form 10-Q, for the quarterly period ending July 31, 2003.)

S&C Resale ($550,000,000 Credit Agreement, dated as of September 19, 2002, among Swift & Company, S&C Australia HoldCo Pty. Ltd. (Acn: 101 767 851), Australia Meat Holdings Pty. Limited (Acn: 011 062 338), as Borrowers, S&C Holdco 3, Inc. as Holdings, and the Lenders and Issuers party hereto, and Citicorp Usa, Inc., as Administrative Agent, Australian Agent, and Collateral Agent, and J.P. Morgan Chase Bank as Syndication Agent, and Citi Securities Limited (Acn: 008 489 610), as Australian Collateral Trustee and General Electric Capital Corporation, U.S. Bank National Association, and Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A., "Rabobank International", New York Branch as Co-Documentation Agents, Salomon Smith Barney Inc. and J.P. Morgan Securities Inc. as Joint Lead Arrangers and Joint Book Managers, filed as Exhibit 10.1 to S&C Resale Co. Form S-4 "Registration Statement," October 24, 2002.)

Safeway Inc. ($1,600,000,000 Credit Agreement, dated as of June 1, 2005, among Safeway Inc., and Canada Safeway Limited, as Borrowers, Banc Of America Securities LLC and J.P. Morgan Securities Inc., as Joint Lead Arrangers, Deutsche Bank AG New York Branch, as Administrative Agent, J.P. Morgan Chase Bank, National Association, Bank Of America, N.A., Citicorp USA, Inc., And BNP Paribas as Co-Syndication Agents, U.S. Bank National Association, as Documentation Agent, and the Lenders listed herein, as Lenders, filed as Exhibit 10.1 to Safeway Inc. Form 8-K, filed June 7, 2005.)

Toro Co. (Multi-Year Credit Agreement, dated as of February 22, 2002, among the Toro Company, the Subsidiary Borrowers, and Toro Credit Company, as Borrowers, Bank Of America, N.A., as Administrative Agent, Swing Line Bank, Letter Of Credit Issuing Bank and Bank, and the other Financial Institutions party hereto, and U.S. Bank National Association, and Suntrust Bank, as Co-Syndication Agents, and Harris Trust and Savings Bank, and Wells Fargo Bank, National Association as Co-Documentation Agents, and Banc Of America Securities LLC as Sole Lead Arranger and Sole Book Manager, filed as Exhibit 10(n) to Toro Co. Form 10-Q, for the quarterly period ending August 1, 2003.)

Toro Co. (Credit Agreement, dated as of September 8, 2004, among the Toro Company, Toro Credit Company, Toro Manufacturing LLC, Exmark Manufacturing Company Incorporated, Toro International Company, Tover Overseas B.V., and Toro Factoring Company Limited, as Borrowers, Bank Of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, and the other Lenders party hereto Banc Of America Securities LLC, as Sole Lead Arranger and Sole Book Manager, filed as Exhibit 10(A) to Toro Co. Form 8-K, filed September 9, 2004.)

Verisign Inc. ($500,000,000 Credit Agreement, dated as of June 7, 2006, among Verisign, Inc., and certain Subsidiaries as Borrowers, Bank Of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, and the other Lenders party hereto, Citibank, N.A., as Syndication Agent J.P. Morgan Chase Bank, N.A., Keybank National Association and U.S. Bank National Association, as Co-Documentation Agents, Banc Of America Securities LLC and Citigroup Global Markets Inc., as Joint Lead Arrangers and Joint Book Managers, filed as Exhibit 10.1 to Verisign Inc. Form 8-K, filed June 7, 2006.)