UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
                                   :
ADELPHIA RECOVERY TRUST,           :
                                   :
                   Plaintiff,      :
                                   :    05 Civ. 9050 (LMM)
          - against -              : (related to 03 MDL 1529)
                                   :
BANK OF AMERICA, N.A. et al.,      :    MEMORANDUM AND ORDER
                                   :
          Defendants.              :
                                   :
----------------------------------x

McKENNA, D.J.

          The Investment Banks[1] move, pursuant to Federal

Rule of Civil Procedure 56, for an order of summary

judgment dismissing Claim 36 (breach of fiduciary duty) and

Claim 40 (gross negligence) of the Second Amended Complaint

("SAC").

          Plaintiff Adelphia Recovery Trust ("ART") moves

pursuant to Federal Rule of Civil Procedure 54(b) for this

Court to reinstate Claim 39 (gross negligence) of the SAC

against the Agent Banks[2] and Claim 40 (gross negligence) of

the SAC against SSB and BAS.  These claims were dismissed

---

[1] See Notice of Investment Banks' Motion for Summary Judgment on
Claims 36 & 40, November 18, 2009, at 1-2, identifying the moving
parties, which are referred in the parties' papers associated with the
present motions and herein as the "Investment Banks"; see also Defs.'
Mem. at 1 n.1, 3 n.6 (explaining that the moving parties are the same
"Investment Banks" as defined in the Second Amended Complaint (see SAC
¶ 25), with the exception of Salomon Smith Barney Holdings Inc. ("SSB")
and Banc of America Securities LLC ("BAS")).
[2] See SAC ¶ 24, identifying the Agent Banks.

by Judge Robert E. Gerber of the United States Bankruptcy Court for the Southern District of New York on June 11, 2007.  See In re Adelphia Commc'ns Corp., 365 B.R. 24, 66-67 (Bankr. S.D.N.Y. 2007) (the "Bankruptcy Court Decision").

### BACKGROUND

This case arises out of the bankruptcy of Adelphia Communications Corporation and its subsidiaries (collectively, "Adelphia").[3]  Familiarity with the facts, terminology, and extensive history of this case is presumed.  See, e.g., Adelphia Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292 (S.D.N.Y. 2009) (the "May 6, 2009 Decision").  The present motions primarily relate to alleged actions by the Investment Banks and the Agent Banks in connection with the Co-Borrowing Facilities.

### DISCUSSION

I.   **Motion for Summary Judgment**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as

---

[3] In their papers on the present motions, the parties use the term "Adelphia" to refer collectively to Adelphia Communications Corporation and its relevant subsidiaries, without distinguishing among them.  (See Investment Banks' Mem. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") 1 n.3; ART's Mem. (1) in Opp'n to Investment Banks' Mot. for Summ. J. and (2) in Supp. of ART's Mot. to Reinstate ("Pl.'s Mem.") 1 n.4.)  The Court shall do the same, except when such distinctions are pertinent.

to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "'An issue of fact is <u>genuine</u> if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'"; "'[a] fact is <u>material</u> if it might affect the outcome of the suit under the governing law.'" <u>Fincher v. Depository Trust and Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010) (emphasis added) (quoting <u>Roe v. City of Waterbury</u>, 542 F.3d 31, 35 (2d Cir. 2008)).

     "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." <u>Dallas Aerospace, Inc. v. CIS Air Corp.</u>, 352 F.3d 775, 780 (2d Cir. 2003) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). However, "[i]n the language of . . . Rule [56], the nonmoving party must come forward with 'specific facts showing that there is a <u>genuine issue for trial</u>.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." <u>Davis v. State of</u>

<u>New York</u>, 316 F.3d 93, 100 (2d Cir. 2002) (citations omitted).

"The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" <u>Metito (Overseas) Ltd. v. Gen. Elec. Co.</u>, No. 05 Civ. 9478(GEL), 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009) (quoting <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 122 (2d Cir. 2004)). "However, the 'mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient' to withstand a motion for summary judgment." <u>Id.</u> (quoting <u>Anderson</u>, 477 U.S. at 255).

ART submitted a response to the Investment Banks' Statement Pursuant to Local Rule 56.1 of Material Facts as to which there is no Genuine Issue, along with a Statement of Additional Material Facts Pursuant to Local Rule 56.1 ("Pl.'s SOAF").

### A. Claim 36 (breach of fiduciary duty)

The Investment Banks argue that Claim 36 should be dismissed because of certain prior findings by this Court. (<u>See</u> Defs.' Mem. 3-4, 7-8 (discussing the May 6, 2009 Decision).)

ART does not oppose the Investment Banks' motion for summary judgment on Claim 36.  Specifically, ART states:  "This Court has ruled in dismissing Claim 54 (Fraudulent Concealment) that, as a matter of law, the Investment Banks do not owe a fiduciary duty to Adelphia. While [ART] reserves its right to appeal that ruling after final judgment has been entered, [ART] recognizes this Court's decision on that narrow issue is dispositive on Claim 36."  (Pl.'s Mem. at 1 n. 3 (citing the May 6, 2009 Decision, 624 F. Supp. 2d at 324).)

Accordingly, the Investment Banks' motion for summary judgment is granted with respect to Claim 36.

**B. Claim 40 (gross negligence)**

In support of their motion for summary judgment on Claim 40 (gross negligence), the Investment Banks argue that certain findings by Judge Gerber in the Bankruptcy Court Decision, together with this Court's finding that the Investment Banks did not owe fiduciary duties to Adelphia,[4] support granting summary judgment on Claim 40.  (Defs.' Mem. at 7-8.)

The Investment Banks argue that "the Bankruptcy Court held . . . that the ART's claim for gross negligence

---

[4] To clarify, in the May 6, 2009 Decision, this Court used the term "Adelphia" to refer to the parent corporation, Adelphia Communications Corporation.  See 624 F. Supp. 2d at 297.

is predicated on the same purported fiduciary relationship upon which its breach of fiduciary duty claim rests." (Id. at 7 (citing the Bankruptcy Court Decision, 365 B.R. at 66).)  The Bankruptcy Court stated that each of Claim 39 (against the Agent Banks for gross negligence) and Claim 40 (against the Investment Banks for gross negligence) "starts with the assumption that the relevant defendant group had a fiduciary duty to the Debtors,[5] and/or a special relationship and/or superior knowledge with respect to the Debtors which the Court can only regard as euphemisms for the same thing."  Bankruptcy Court Decision, 365 B.R. at 66.  "Claim 40 goes on to allege breaches of the previously pleaded duty by Investment Banks in a similar fashion, though instead of making reference to participating in and funding the Co-Borrowing Facilities, it speaks of the Investment Bank's role in underwriting securities offerings."  Id. at 67.  The Bankruptcy Court explained further:

> Though in the strictest sense, one might
> argue that the fiduciary duty alleged to
> exist in Claim 36 is not quite the same as
> the duty alleged to exist and underlie the
> gross negligence claims alleged in Claim 39,

---

[5] In the complaint, "Debtors" refers to Adelphia Communications Corporation and its direct and indirect subsidiaries, although the list of such subsidiaries changed from the complaint filed by ART's predecessor, the Official Committee of Unsecured Creditors (the "Creditors Committee" or "CC"), which was before the Bankruptcy Court, to the SAC.  (See CC Compl. ¶ 20; SAC ¶ 23.)

> any differences are, in this Court's view,
> immaterial.  And the Creditors' Committee
> has failed to allege or argue any basis in
> negligence law for the duties that must
> underlie any negligence claim other than the
> arguments that the Court already has
> considered.

Id.

The Investment Banks argue that "the law of the case -- establishing unequivocally that (a) the Investment Banks did not owe fiduciary duties to Adelphia and (b) the ART's claim of gross negligence alleges no duty other than a potential fiduciary duty -- mandates granting the Investment Banks' motion for summary judgment." (Defs.' Mem. at 8.)

ART counters that it can prevail on its gross negligence claim against the Investment Banks without showing the existence, or breach, of any fiduciary or similar duty.  Rather, ART argues that, under Pennsylvania law, such a claim can succeed based on a breach of a duty of care.  (Pl.'s Mem. at 1, 15-18.)

This is a shift from ART's (and the Creditors Committee's) prior arguments regarding the basis for the Investment Banks' alleged duty to Adelphia.  Specifically, Claim 40 in the Creditors Committee complaint filed in 2003 stated, and Claim 40 of the SAC continues to state:  "By virtue of its fiduciary duty, special relationship and/or

<u>superior knowledge with respect to the Debtors</u>, each of the Investment Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as underwriters and/or financial advisors, and (ii) to the keep the Debtors fully informed of all material facts concerning its services."  (CC Compl. ¶ 886; SAC ¶ 1444 (emphasis added).)  Also, as previously discussed, the Bankruptcy Court found that the Creditors Committee failed to argue a basis for a duty underlying the negligence claims distinct from the plaintiffs' fiduciary duty claims and thus applied the same analysis to each.

This Court rejects the Investment Banks' argument that the law of the case requires dismissing Claim 40. Although this Court shall not disturb certain previously unchallenged Bankruptcy Court holdings, as discussed below, the Court considers ART's new argument that the Investment Banks had, and breached, a duty of care to Adelphia.

The language in Claim 40 appears broad enough to encompass such an argument, even though ART's predecessor failed to persuade the Bankruptcy Court (or perhaps even argue) that its gross negligence claims were based on duties other than fiduciary duties or the equivalent thereof.  Claim 40 states "[b]y virtue of its fiduciary duty, special relationship and/or superior knowledge with

respect to the Debtors . . ." (SAC ¶ 1444), which suggests that even if there is no fiduciary duty, there may be another type of duty at issue.  Additionally, Claim 40 states that "each of the Investment Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as underwriters and/or financial advisors, and (ii) to the keep the Debtors fully informed of all material facts concerning its services." (SAC ¶ 1444 (emphasis added).)

The Investment Banks have been on notice regarding the gross negligence claim and the underlying allegations since the Creditors Committee filed its complaint in 2003 (with one addition to Claim 40, in 2007, noted below), even though ART now argues that the duty breached was a duty of care.  (See Defs.' Reply Mem. at 2 n.4 (acknowledging that "[t]he allegations in the gross negligence claims in the Second Amended Complaint remain unchanged" from the Creditors Committee complaint filed in 2003).)  ART notes that it made one revision to Claim 40 in the First Amended Complaint (the "FAC") filed in 2007 -- adding "allegations that the Investment Banks breached their duties by 'structuring and/or syndicating the Co-Borrowing Facilities.'"  (Pl.'s Reply Mem. at 1 n.1

(quoting FAC ¶ 1445).)  Overall, this Court sees no basis
for rejecting ART's new argument without due consideration.

## II.  **Gross Negligence**[6] **under Pennsylvania Law**

Whether Claim 40 survives the Investment Banks'
motion for summary judgment turns on questions of
Pennsylvania law, which governs.  The parties have not
identified a controlling decision squarely addressing the
present question (whether a sophisticated company can
prevail on a gross negligence claim against an investment
bank based on a breach of a duty of care), nor has the
Court's research revealed any.

"In the absence of a controlling decision by the
Pennsylvania Supreme Court, a federal court applying that
state's substantive law must predict how Pennsylvania's
highest court would decide th[e] case."  Berrier v.
Simplicity Mfg., 563 F.3d 38, 45-46 (3d Cir. 2009); accord
Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184,
199 (2d Cir. 2003) (stating that "'[w]here the substantive

---

[6] ART argues that "[g]ross negligence is simply one form of
negligence, distinguished from ordinary negligence only by the degree
to which the defendant's conduct deviated from the ordinary standard of
care."  (Pl.'s Mem. at 17 (citing Jordan v. City of Philadelphia, 66 F.
Supp. 2d 638, 644-645 (E.D. Pa. 1999); Neuchatel Ins. v. ADT Sec. Sys.,
Inc., No. Civ. A. 96-5396, 1998 WL 966080, at *7 (E.D. Pa. Nov. 5,
1998); see also id. at 25-27 (arguing that a finder of fact could
conclude that the conduct of the Investment Banks constituted gross
negligence under Pennsylvania law).)  Regardless, this Court predicts
that the Pennsylvania Supreme Court would find that Claim 40 fails as a
matter of law before reaching the fact-specific question whether such a
duty was breached (or the degree of said breach).

law of the forum state is uncertain or ambiguous, the job
of the federal courts is carefully to predict how the
highest court of the forum state would resolve the
uncertainty or ambiguity.'") (quoting Travelers Ins. Co. v.
633 Third Assocs., 14 F.3d 114, 119 (2d Cir. 1994)).  To
predict how a state's highest court would rule, a district
court "must 'carefully review available resources,'
including, inter alia, . . . federal decisions construing
state law, and lower state court rulings."  Bischoff v.
Boar's Head Provisions Co., 436 F. Supp. 2d 626, 629
(S.D.N.Y. 2006) (quoting Travelers Ins. Co., 14 F.3d at
119).

### A. Pennsylvania's economic loss doctrine

When applying Pennsylvania law, this Court defers
to decisions by the Third Circuit Court of Appeals, absent
clear signals by the Pennsylvania Supreme Court pointing to
another conclusion.[7]  A recent Third Circuit decision, Azur

---

[7] See, e.g., May 6, 2009 Decision, 624 F. Supp. 2d at 309-10;
Adelphia Recovery Trust v. Bank of Am., N.A., 390 B.R. 64, 77-78
(S.D.N.Y. 2008).  The Second Circuit Court of Appeals has stated:
"Where . . . the pertinent court of appeals has essayed its own
prediction of the course of state law on a question of first impression
within that state, the federal courts of other circuits should defer to
that holding, perhaps always, and at least in all situations except the
rare instance when it can be said with conviction that the pertinent
court of appeals has disregarded clear signals emanating from the
state's highest court pointing toward a different rule."  Factors Etc.,
Inc. v. Pro Arts, Inc., 652 F.2d 278, 283 (2d Cir. 1981).  In certain
diversity cases, the Second Circuit has applied this rule by
conclusively deferring to rulings by other courts of appeals regarding
state law questions.  See, e.g., Official Comm. of Unsecured Creditors
of Color Tile, Inc. v. Coopers & Lybrand, LLP, 322 F.3d 147, 156-57 &

v. Chase Bank, USA, Nat. Ass'n, strongly suggests that

Claim 40 would be barred by Pennsylvania's economic loss

doctrine, which "'provides that no cause of action exists

for negligence that results solely in economic damages

unaccompanied by physical or property damage.'"  601 F.3d

212, 222 (3d Cir. 2010) (quoting Sovereign Bank v. BJ's

Wholesale Club, Inc., 533 F.3d 162, 175 (3d Cir. 2008)).

        The Azur court considered, inter alia, a common

law negligence claim by a credit card account holder

against the issuing bank relating to repeated fraudulent

use of the credit card by the account holder's employee.

Id. at 214-15, 222-24.  The court discussed, in particular,

two Pennsylvania Supreme Court decisions:  Bilt-Rite

Contractors, Inc. v. Architectural Studio, 866 A.2d 270

(Pa. 2005), a decision heavily relied upon by ART and

discussed in further detail below, and Excavation Techs.,

---

n.4 (2d Cir. 2003); Booking v. Gen. Star Mgmt. Co., 254 F.3d 414, 421
(2d Cir. 2001); Factors, 652 F.2d at 283; see also Desiano v. Warner-
Lambert & Co., 467 F.3d 85, 89-92 (2d Cir. 2006) (discussing when such
conclusive deference is -- and is not -- appropriate, based on
Factors).
     Although the present case comes before this Court as a result of
a bankruptcy withdrawal, rather than based on diversity jurisdiction,
this Court believes the same deference to a court of appeals regarding
the law of a state within its circuit is appropriate, absent clear
signals by the state's highest court to the contrary.  Cf. Cadles of
Grassy Meadows II, LLC v. Moore, 298 Fed. Appx. 109, 110 (2d Cir. 2008)
(In a bankruptcy appeal, the Second Circuit followed a Fifth Circuit
opinion, which "harmonize[d]" certain Texas Supreme Court decisions,
and thereby "compl[ied] with [the Second Circuit's] own precedent to
'defer conclusively to another circuit's judgment . . . when that court
of appeals' decision addressed questions of state law from a state
within that circuit.'") (quoting Desiano, 467 F.3d at 90).

Inc. v. Columbia Gas Co. of Pennsylvania, 985 A.2d 840 (Pa. 2009).  The Azur court explained that, in Bilt-Rite, the Pennsylvania Supreme Court set forth a narrow exception to Pennsylvania's economic loss doctrine for negligent misrepresentation claims against those who are in the business of providing information for pecuniary gain. Azur, 601 F.3d at 223.

In Bilt-Rite, the Pennsylvania Supreme Court considered whether an architectural design firm owed a duty to a building contractor that would support a claim for negligent misrepresentation.  866 A.2d at 272.  A majority of the court adopted Section 552(1) and (2) of the Restatement (Second) of Torts (1977) -- titled "Information Negligently Supplied for the Guidance of Others" -- "as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information."[8]  The court explained that:

---

[8] Bilt-Rite, 866 A.2d at 287; see also id. at 273 n.1 (noting that subsection (3), regarding the liability of one who is under a public duty to provide information, was not at issue, and the court "offer[ed] no view on whether it has any place in Pennsylvania law").

> Section 552 sets forth the parameters of a
> duty owed when one supplies information to
> others, for one's own pecuniary gain, where
> one intends or knows that the information
> will be used by others in the course of
> their own business activities.  The tort is
> narrowly tailored, as it applies only to
> those businesses which provide services
> and/or information that they know will be
> relied upon by third parties in their
> business endeavors, and it includes a
> foreseeability requirement, thereby
> reasonably restricting the class of
> potential plaintiffs.

Id. at 285-86.  The court discussed the importance of

expert suppliers of information in the business world and

emphasized that it viewed its adoption of Section 552 "as

clarifying the contours of the [common law] tort [of

negligent misrepresentation] as it applies to those in the

business of providing information to others."  Id. at 286-

87.

The Third Circuit found this to be a limited

exception to Pennsylvania's economic loss doctrine not

applicable in Azur, stating:

> The Pennsylvania Supreme Court emphasized
> the narrow scope of the Bilt-Rite exception
> in Excavation Techs., where an excavator
> filed a negligent misrepresentation claim
> against a utility company pursuant to § 552
> after the excavator sustained economic
> damages because the utility company erred in
> marking the locations of some of the gas
> lines.  In applying the economic loss
> doctrine, the court distinguished the case
> from Bilt-Rite on the grounds that, unlike
> architects, a facility owner does not engage

14

>           in supplying information to others for
>           pecuniary gain.  Therefore, § 552(1) and (2)
>           do not apply . . . .

601 F.3d at 223 (quotations and citations omitted).  The

Azur court found that (a) the plaintiff credit card

holder's "economic damages [we]re unaccompanied by physical

or property damage," and (b) the issuing bank "[wa]s not in

the business of providing [plaintiff] with information for

pecuniary gain."  Id. at 223-24.  The Azur court thus

predicted "that the Pennsylvania Supreme Court would likely

hold that the economic loss doctrine bars [plaintiff]'s

negligence claim" and held accordingly.  Id.

        Claim 40 against the Investment Banks for gross

negligence similarly involves economic damages

unaccompanied by physical or property damage.  It also is

not a negligent misrepresentation claim against an expert

supplier of information as in Bilt-Rite.  Accordingly, like

the Azur court, this Court predicts that the Pennsylvania

Supreme Court would find Claim 40 barred by Pennsylvania's

economic loss doctrine.  Therefore, the Investment Banks'

motion for summary judgment is granted with respect to

Claim 40.

**B. Pennsylvania law regarding negligence and the duty of care**

        In case the Pennsylvania Supreme Court would not dismiss Claim 40 outright based on Pennsylvania's economic loss doctrine, this Court considers how the Pennsylvania Supreme Court would analyze the gross negligence claim on the present summary judgment motion.  The Pennsylvania Supreme Court has neither explicitly recognized that investment banks owe a duty of care to their clients, nor foreclosed the possibility that such a duty may arise; therefore, this Court must predict whether the Pennsylvania Supreme Court would find such a duty in the present case. Applying this alternative analysis, as set forth below, this Court predicts the same result.

        "To prevail in a negligence action, a plaintiff 'must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage.'" Berrier, 563 F.3d at 61 (quoting Phillips v. Cricket Lighters, 841 A.2d 1000, 1008 (Pa. 2003)).

        "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." Althaus v. Cohen, 756 A.2d 1166, 1168 (Pa.

2000) (citation omitted).  "Whether a defendant owes a duty
of care to a plaintiff is a question of law in
Pennsylvania."  Berrier, 563 F.3d 38, 61 (citation
omitted); accord R.W. v. Manzek, 888 A.2d 740, 746 (Pa.
2005).

        ART argues that this Court should find that the
Investment Banks owed a duty of care to Adelphia using the
analysis set forth by the Pennsylvania Supreme Court in
Althaus v. Cohen (Pl.'s Mem. at 15-25), which analysis is
discussed in further detail below.  Several cases cited by
ART involve facts and issues too far removed from those
before this Court to offer meaningful guidance on this
issue.  For example, in Althaus, the Pennsylvania Supreme
Court considered "whether a therapist who treats a child
for alleged parental sexual abuse owes a duty of care to
the child's parents in a therapeutic treatment situation
where the child allegedly has been abused by the parents."
756 A.2d at 1167.  The Althaus court found that the
therapist's professional obligations and legal duties were
owed exclusively to the patient herself, not to her
parents.  Id. at 1168-71; see also R.W. v. Manzek, 888 A.2d
at 751 (parents of ten-year-old student who was raped while
engaging in fundraising activities stated cause of action
for negligence against fundraising company); Sharpe v. St.

17

Luke's Hosp., 821 A.2d 1215, 1221 (Pa. 2003) (hospital owed
duty of reasonable care with regard to collection and
handling of plaintiff's urine specimen in employment-
related drug testing).

Other cases indicate that the Althaus analysis
applies in a relatively broad range of circumstances,
however, such as the Pennsylvania Supreme Court decision in
Bilt-Rite, 866 A.2d 270, discussed above, and the Third
Circuit decision in Berrier, 563 F.3d 38.  Although these
cases are also distinguishable, as discussed below, this
Court predicts that if the Pennsylvania Supreme Court were
to consider the question whether the Investment Banks owed
a duty of care to Adelphia, it would apply the Althaus
test.

In Bilt-Rite, a school construction case, the
Pennsylvania Supreme Court applied the Althaus analysis to
determine whether an architectural design firm owed a duty
to a building contractor to support a negligent
misrepresentation claim.  866 A.2d at 272.  Accepting the
allegations in the complaint as true, the majority
determined that:  (a) the architectural firm "provided
plans and specifications for the school project to the
school district with full knowledge that those plans and
specifications would be included in a bid package supplied

18

to prospective bidders [for the construction contract], and relied upon by those bidders"; and (b) the plaintiff contractor received the plans, relied upon them in calculating its bid; and "suffer[ed] economic damage as a result of alleged misrepresentations in the plans." Id. at 288.

In Berrier, the Third Circuit Court of Appeals considered whether a manufacturer of riding lawnmowers owed a duty to a child whose leg was backed over by one of its mowers with its blades engaged. 563 F.3d at 61-68. In predicting whether the Pennsylvania Supreme Court would find such a duty, the Berrier court closely followed the Pennsylvania Supreme Court's analysis in a prior products liability negligence case. See id., 563 F.3d at 41, 61-68 (citing, inter alia, Phillips, 841 A.2d at 1008-10). The Berrier court reversed summary judgment on the negligence claim after finding that four of the five Althaus factors weighed in favor of finding a duty and that there was a genuine issue of material fact whether an alternative design would have prevented her injuries. Id. at 68.

Although Berrier involved distinguishable facts and considerations, the Third Circuit explained the appropriate analysis under Pennsylvania law:

In Pennsylvania, the determination of whether a duty of care is owed is a policy decision that requires the trial court to apply the Althaus test.  That inquiry requires that the court consider:  (1) the relationship between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution.

Although these factors guide the court's inquiry in determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered.  Thus, the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society.

563 F.3d at 61-62 (footnote and quotations omitted); accord Bilt-Rite, 866 A.2d at 280-81.

C. **Whether Pennsylvania recognizes a general duty of care owed by banks to their customers**

ART argues that "[a]pplying [the Althaus] test, Pennsylvania courts consistently have held that a bank owes its customers a duty of care to act in accordance with the standard protocols of industry or the internal policies of an organization -- and that a bank's failure to conduct itself in accordance with standard banking practices can support negligence-based claims."  (Pl.'s Mem. at 16.)  In

20

support, ART cites Owens v. Mazzei, 847 A.2d 700 (Pa.
Super. 2004), Clark Motor Co. v. Mfrs. and Traders Trust,
Co., No. 07 CV 856, 2007 WL 2155528 (M.D. Pa. July 26,
2007), and Victory Clothing Co. v. Wachovia Bank, N.A., No.
1937, 2006 WL 773020 (Pa. Com. Pl. Mar. 21, 2006).

        ART makes this argument in a brief (a) in
opposition to the Investment Banks' motion for summary
judgment on Claim 40 and (b) in support of its motion to
reinstate Claim 39 against the Agent Banks and Claim 40
against SSB and BAS.  (See Pl.'s Mem. at 16-17.)  It is
therefore unclear whether ART is arguing that such a rule
would apply both to the Agent Banks and also the Investment
Banks.  Regardless, it is questionable whether these cases
support ART's characterization of Pennsylvania case law.
Moreover, these cases are distinguishable and offer limited
guidance regarding whether the Pennsylvania Supreme Court
would find that the Investment Banks owed Adelphia a duty
of care.

        In Owens, two savings bank employees, a branch
manager and assistant manager, opened an account for a
customer to hold the bulk of his assets, naming the
employees as sole beneficiaries of the account.  847 A.2d
at 703-04.  After the customer died, the employees
transferred the funds to accounts in their own names.  Id.

at 704.   The trial court held the employees and the bank

jointly and severally liable to the customer's estate,

finding the bank liable under a theory of <u>respondeat</u>

<u>superior</u> and liable directly for negligent supervision; the

Superior Court of Pennsylvania affirmed.   <u>Id.</u> at 703, 713.

        The bank "argue[d] that its relationship with the

decedent was . . . contractual in nature and that it owed

him no special duty to prevent the acts that the trial

court found [the banks' employees] had committed."   <u>Id.</u> at

706.   The bank also argued that "the relationship between

Decedent and [the bank] was nothing more than the kind of

business relationship that one would expect between a small

community bank and its customer."   <u>Id.</u> at 710.   However,

the Superior Court found that "the evidence demonstrated

that the decedent, in a state of precipitous mental

decline, reposed extraordinary trust and reliance in [the

bank manager and assistant manager], wholly consistent with

the formation of a confidential relationship."[9]

Additionally, the court found that "the evidence

_____

[9] <u>Owens</u>, 847 A.2d at 710.  According to the <u>Owens</u> court, "[a]
confidential relationship appears when the circumstances make it
certain the parties do not deal on equal terms, but, on the one side
there is an overmastering influence, or, on the other, weakness,
dependence or trust, justifiably reposed."  <u>Id.</u> at 709 (quotations
omitted).  ART is not arguing that Claim 40 is based on such a
confidential relationship between Adelphia and the Investment Banks,
however.  (<u>See</u> Pl.'s Mem. at 15-18 (arguing that although a fiduciary
duty or similar heightened duty may be necessary for claims other than
negligence-based claims, its gross negligence claims require only a
breach of a duty of care).)

established that [the bank's] senior management knew
precisely what [the branch manager and assistant manager]
were doing even as they did it," and, the bank president,
despite having concerns, gave no instructions to the branch
manager.  Id. at 713.

The Superior Court found "no merit in [the
Bank's] assertion that the Administrator's failure to show
that the Bank violated some law, regulation, or written
industry standard should somehow insulate it from liability
for negligence."  Id.  Rather, the court affirmed the trial
court's findings and conclusions, including "that [the
Bank] negligently allowed the [decedent's new a]ccount to
be created, and then negligently permitted [the employees]
to dissipate assets."  Id.

If ART is suggesting that Owens indicates, under
Pennsylvania law, either that (a) as a general rule, "a
bank owes its customers a duty of care to act in accordance
with the standard protocols of industry or the internal
policies of an organization" (Pl.'s Mem. at 16) or (b) by
itself, "a bank's failure to conduct itself in accordance
with standard banking practices can support negligence-
based claims" (id.), then this Court disagrees.[10]  The facts

_____

[10] ART also appears to offer Owens as support for its statement
that:  "In several of the cases the Investment Banks cite, the courts
refused to dismiss negligence-based claims despite dismissing fiduciary

in Owens were extreme, and the Superior Court did not even
go so far as to state that all small community banks owe a
duty of care to individuals with personal accounts.  The
court was not considering whether the bank negligently
supervised its employees in a vacuum; rather, the court
already had found sufficient facts to indicate a
confidential relationship with that particular customer.
Additionally, the bank in Owens did not simply "fail to
conduct itself in accordance with standard banking
practices" or its internal policies.  Rather, the Superior
Court quoted the trial court's conclusion that:

> Negligence and inconsistency permeate
> the bank's environment.
>
> Throughout the trial, the [trial c]ourt
> heard evidence of the Bank's selective
> application of account opening policies and
> procedures, and unwritten exceptions or
> modifications to nearly every Bank policy
> applicable to the transactions and documents
> at issue.  Both [the branch manager and
> assistant manager] exploited this
> procedurally liquid environment.  The Bank's
> environment, and lack of meaningful controls
> proved fertile soil for the undue influence
> at issue.

Owens, 847 A.2d at 705 (emphasis added) (quoting the trial
court's opinion) (alterations omitted).  Also, as mentioned

_____

duty claims."  (See Pl.'s Mem. at 17-18. (emphasis added) (citing one
case and signaling to the reader "see also" Owens).)  But the Superior
Court in Owens did not dismiss a fiduciary duty claim; rather, as
discussed above, the court considered whether the bank employees had a
"confidential relationship" with the decedent and found that there was
sufficient evidence to indicate that they did.

previously, senior management was aware of, and even
concerned about, the actions being taken by the employees
with regard to the decedent, yet did not take any steps.
Ultimately, this Court is not convinced that Owens
indicates a broad rule of Pennsylvania law beyond the
specific facts of that case or that it offers any guidance
on the present issues.

ART also cites Clark Motor Co., in which a
Pennsylvania District Court considered a motion to dismiss,
inter alia, a claim of negligence against a commercial bank
by a family-owned automobile dealership.  2007 WL 2155528,
at *2, *7-8.  Plaintiffs (the dealership and two owners
thereof who were personally exposed to its debts) alleged
that an office manager falsified inventory and financial
records so that the dealership would receive additional
financing, which she then took for her personal use.  Id.
at 2-3.  Plaintiffs alleged that, meanwhile, the bank
provided financing without verifying collateral or
documentation.  Id. at 3.  In addition to contract claims
alleging that the bank had violated the parties' loan
agreements, the complaint alleged that the bank had
violated banking protocols and state statutes (although the
particular protocols and statutes were not specified).  Id.
at *3, *6, *8.  The court explained that plaintiffs

25

"alleged that when a lending institution provides floor-plan financing to an automobile dealer, it has certain duties imposed not by the contract, but by law, to require loans to be done by written request and with documentation of the vehicles financed and to not provide financing in excess of the certain limits." Id. at 8.  Based on these allegations, the court found that defendant did owe plaintiffs certain duties that were not imposed by the contract and therefore denied the defendant's motion to dismiss with respect to plaintiffs' negligence claim.  Id.

Again, this Court is not persuaded that Clark represents a broad rule of Pennsylvania law or that the decision should be given deference here.  First, Clark was decided at an early stage of the case, where the court found that very general statements alleged non-contractual duties sufficiently to survive a motion to dismiss.  See id. at *6 (stating that "it [was] too early to determine whether plaintiffs' tort claims [we]re inextricably intertwined with the contract claim," and "although plaintiff's complaint does not specify exactly what protocols or statutes defendant allegedly violated, plaintiffs' complaint does allege that defendant's actions violated 'standard banking protocols' and 'state

statute[s]' and has thus alleged a breach of a duty that was not imposed by the contract") (citations omitted).

Second, the Clark decision appears to have been cited only twice by other courts -- both times by district courts of other states, and only once, critically, on the relevant point.  See LaSalle Bank Nat'l Assoc. v. Paramont Props., 588 F. Supp. 2d 840, 853 (N.D. Ill. 2008); see also Court-Appointed Receiver of Lancer Mgmt. Grp. LLC v. Lauer, No. 05-60584-CIV, 2008 WL 906274, at *4 (S.D. Fla. Mar. 31, 2008) (considering whether Pennsylvania would recognize a claim for aiding and abetting breach of fiduciary duty). In LaSalle, an Illinois district court considered, as an issue of first impression under Illinois law, whether there is a general duty of care between lenders and borrowers. 588 F. Supp. 2d at 852-53.  The LaSalle court looked to decisions of other states and found only Clark recognizing such a duty.  Id.  The court stated that it "[wa]s not persuaded by that case, which cited no precedent and provided no reasoning in support of its conclusion." Id. at 853.  If the Clark court, in fact, suggests such a broad rule, then this Court agrees with the LaSalle court that it should not be followed.[11]

_____

[11] Cf. Holmes v. Grubman, 568 F.3d 329, 340 (2d Cir. 2009) (discussing that, although, "under certain circumstances, it may be appropriate to accord some measure of deference to a federal district

The third case ART cites to show that
Pennsylvania courts consistently hold that banks owe their
customers a duty of care is <u>Victory Clothing Co.</u>, 2006 WL
773020.  In that decision, the Court of Common Pleas of
Pennsylvania held that a defendant depository bank was
comparatively negligent with a corporate account holder in
a double forgery situation, because the bank repeatedly
permitted checks, which were made out to a business, to be
deposited into a personal account.  <u>Id.</u> at *1, *8.  The
court found that the bank was negligent in violating its
own rules and standard bank procedures (based on an expert
report).  <u>Id.</u> at *8.  The court concluded that the bank
"failed to exercise ordinary care, and that failure
substantially contributed to [plaintiff]'s loss resulting
from the fraud," such that the bank was seventy percent
liable for the losses.  <u>Id.</u>

In <u>Victory</u>, unlike Claim 40 before this Court,
there was a statutory basis for imposing a duty of ordinary
care upon the depository bank under Pennsylvania law.[12]  At

---

court's interpretation of the laws of the state in which the court is
located," deference was not appropriate to a Georgia district court
decision that (i) cited only one case, which did not apply Georgia law,
and (ii) had not been cited by any court "as an authoritative
interpretation of Georgia law").

[12] Similarly, as discussed above, the negligence claim before the
<u>Clark</u> court included allegations that the bank violated state statutes,
which the court mentioned in its finding that the bank owed extra-
contractual duties (even though no specific statutes were specified in
the complaint).  2007 WL 2155528, at *6-8.

the Victory bench trial, the claim was asserted under
Pennsylvania Commercial Code Section 3405 (Employer's
responsibility for fraudulent indorsement by employee); the
court also considered Section 3404 (Impostors; fictitious
payees), and the corresponding sections of the Uniform
Commercial Code ("UCC").  See id. at *1, *4-7 (discussing
13 Pa. Cons. Stat. §§ 3404 and 3405 and UCC §§ 3-404 and 3-
405, including pertinent revisions to the UCC).  These
sections each provide (with small changes to the text
between the provisions for fraud versus payment of
financial instruments) that if a person paying or taking
for value the applicable type of instrument "fails to
exercise ordinary care . . . and that failure substantially
contributes to . . . [the] resulting [loss], the person
bearing the loss may recover from the person failing to
exercise ordinary care to the extent the failure to
exercise ordinary care contributed to the loss."  13 Pa.
Cons. Stat. Ann. §§ 3404(d), 3405(b); UCC §§ 3-404(d), 3-
405(b).[13]

---

[13] The Victory court also found persuasive the reasoning by the
Virginia Supreme Court for allowing a cause of action against a
depository bank in a similar double forgery situation, in which the
Virginia Supreme Court stated:  "'The concept of comparative negligence
introduced in the revised sections [UCC §§ 3-404 and 3-405] reflects a
determination that all participants in the process have a duty to
exercise ordinary care in the drawing and handling of instruments and
that the failure to exercise that duty will result in liability to the
person sustaining the loss.'"  2006 WL 773020, at *5 (emphasis added)

Countering ART's characterization of Pennsylvania law regarding a duty of care owed by banks to their customers, the Investment Banks cite <u>Berry v. First Nat'l Bank of Mercer County</u>, 892 F. Supp. 127, 128 (W.D. Pa. 1994).  <u>Berry</u>, a decision by a Pennsylvania district court, suggests that the cases cited by ART discussed above are exceptions, rather than indications of a general rule under Pennsylvania law.  In <u>Berry</u>, a guarantor of a construction loan alleged that the lending bank "negligently failed to ensure that the signatures of the other guarantors were legal and accurate."  892 F. Supp. at 128 (citation and quotation marks omitted).  The court granted summary judgment on the negligence claim in favor of the defendant bank upon finding that the bank owed no duty to the guarantor.  <u>Id.</u> at 128-29.  Notably, the court found that "[g]enerally, courts have not found a duty running from a lender to a guarantor or to a debtor, unless the lender assumes such a duty."  892 F. Supp. 127, 128 (W.D. Pa. 1994).

ART counters that "[t]he <u>Berry</u> case, however, predates the <u>Althaus</u> decision and does not apply the relevant five factor analysis."  (Pl.'s Reply Mem. at 11

---

(quoting <u>Gina Chin & Assocs., Inc. v. First Union Bank</u>, 500 S.E.2d 516, 517-18 (Va. 1998)).

n.5.)  This Court is not persuaded that _Althaus_ necessarily

undermines _Berry_ or other cases that predate it.  Rather,

it appears that in _Althaus_ the Pennsylvania Supreme Court

clarified considerations already established in the law for

determining whether a defendant owes a plaintiff a duty of

care.[14]

Based on a review of Pennsylvania case law,

Pennsylvania courts have not indicated a general duty of

care by all banks or investment banks owing to their

customers.  This Court believes finding that the Investment

Banks owed a duty of care to Adelphia would be an

extraordinary finding under Pennsylvania law, rather than

the application of a broad rule or a logical extension of a

line of cases.  However, this Court also believes that if

the Pennsylvania Supreme Court were to reach this question

(if the economic loss doctrine did not completely bar the

claim), it likely would apply the analysis set forth in

_Althaus_.  This Court therefore shall attempt to do the same

---

[14] _See_ _Bilt-Rite_, 866 A.2d at 287 (stating that (i) "[t]he _Althaus_
Court further summarized the traditional considerations of public
policy involved in any assessment of the existence of a duty of care as
follows . . ." and (ii) "[t]he factors utilized in determining the
existence of a duty are well-settled," and followed that statement with
the excerpted list of factors from _Althaus_); _see also_ _Berrier_, 563 F.3d
at 59 n.31, 61 n.35 (recognizing that the _Althaus_ "inquiry is very
similar to the inquiry suggested by the 'Wade factors,'" described by
Dean John Wade for conducting a risk utility analysis) (citing John
Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.
L.J. 825, 837-38 (1973)).

in order to predict how the Pennsylvania Supreme Court
would decide.

### D. The <u>Althaus</u> analysis

ART frequently cites two cases applying the
<u>Althaus</u> analysis that it argues this Court should follow:
<u>Bilt-Rite</u>, the Pennsylvania Supreme Court decision
discussed to some extent above, and <u>Reilly</u>, a decision by a
Court of Common Pleas of Pennsylvania.  <u>Reilly v. Ernst &
Young, LLP</u>, No. Civ. DIV. AD 97-1002, 2003 WL 22761810 (Pa.
Com. Pl. 2003) ("<u>Reilly I</u>"), <u>rev'd on other grounds</u>, 929
A.2d 1193 (Pa. Super. 2007) ("<u>Reilly II</u>").  These cases are
distinguishable from the present case in significant ways,
however.

Unlike ART's gross negligence claim against the
Investment Banks, <u>Bilt-Rite</u> involved a negligent
misrepresentation claim against an architectural firm that
entered into a contract with a school district to provide
services, including preparation of plans and specifications
to be sent to prospective contractors.  866 A.2d at 272.
The architectural firm was hired specifically to provide
certain information, expressly did so, and such information
was relied upon by contractors submitting bids -- as was
foreseeable.  <u>See</u> <u>id.</u> at 286-88.  By contrast, the only
allegations by ART regarding information that Adelphia

engaged the Investment Banks to provide appears to be the "advisory services" allegations, which, as discussed below, provide no support for ART's gross negligence claim.

In Reilly I, a Pennsylvania trial court held that an accounting firm owed, and breached, a duty to plaintiff shareholders -- whom the Court found to be the intended beneficiaries of information provided by the firm even though they lacked privity of contract with the defendant. 2003 WL 22761810, at *14-19.  The trial court found that the firm was hired to perform all necessary accounting services for the debtors, including assembling and reviewing the debtors' books and records and compiling relevant financial information for the purpose of preparing the debtors' statements of affairs and schedules of assets and liabilities.  Id. at *3.  The firm also gave financial opinions and information to attorneys to be used in the preparation of the debtors' bankruptcy petitions.  Id.

It is questionable whether the trial court's decision in Reilly I indicates a rule of Pennsylvania law. Although the decision received some intermediate appellate review, the Superior Court of Pennsylvania did not address the merits; rather, it vacated the judgment and remanded for a new trial after finding "inappropriate and unwarranted" the discovery sanctions imposed by the trial

court (which had, as a result of defendant accounting
firm's noncompliance with a discovery order, deemed
admitted by defendant all matters in plaintiff's Request
for Admissions).  See Reilly II, 929 A.2d at 1198-1202.

Only one other court appears to have cited the
substantive holding by the Reilly I trial court that no
privity was required for the plaintiff shareholders to
prevail on a negligence claim against the accounting firm,
and that court declined to follow Reilly I.  In Tredennick
v. Bone, a Pennsylvania district court considered a
negligence claim by a primary shareholder against an
accounting firm (which was also characterized as a
professional negligence claim and an accountant malpractice
claim).  647 F. Supp. 2d 495, 499-500 (W.D.Pa. 2007).  The
Tredennick court considered Reilly I, yet was not persuaded
"to abandon the strict privity requirement necessary to
maintain a professional negligence claim in Pennsylvania,"
which requirement it found to be "well-settled."  Id. at
500 (citations omitted).  The court stated further that to
maintain a malpractice action based on negligence, "a
specific undertaking to perform a specific service for a
plaintiff is required," id. (citing Guy v. Liederbach, 459
A.2d 744, 750 (Pa. 1983)), and concluded that "no exception

34

to the privity requirement [was] warranted" in <u>Tredennick</u>.
<u>Id.</u>

   <u>Reilly I</u> is also distinguishable from the case at
hand.  First, although that involved a claim for
negligence, rather than negligent misrepresentation as in
<u>Bilt-Rite</u>, the accounting firm in <u>Reilly I</u> similarly was
hired to prepare certain information and expressly did so.
<u>See</u> <u>Reilly I</u>, 2003 WL 22761810, at *3.  This does not fit
with ART's allegations regarding gross negligence by the
Investment Banks.  Second, investment banks are not
accountants, yet the <u>Reilly</u> trial court based its decision
on the particular role of accountants, stating:

> The services of accounting firms are
> utilized for a variety of reasons, including
> the review of financial records and the
> providing of accurate and reliable
> information.  Further, it has become
> increasingly clear over the past few years,
> the significant role that accounting firms
> play in the decision-making processes of
> business.  These services are highly
> specialized, and are often used to make
> important financial decisions.
> Unfortunately, acts by these same accounting
> firms have resulted in poor business
> decisions, subsequently leading to
> significant financial loss by many.
> Consequently, this Court holds that
> accounting firms have a duty to act in a
> responsible manner and maintain constant
> consideration of those that are intended
> beneficiaries of their work.  For this Court
> to find otherwise would be to establish a
> dangerous precedent by which accounting

firms could escape liability for their
tortious acts.

Id. at *12.  The Reilly I court also found that (a) the
defendant was a member of the American Institute of
Certified Public Accountants ("AICPA"), and (b) AICPA
Professional Standards and Generally Accepted Auditing
Standards "establish rules of professional responsibility
for certified public accountants."  Id. at *4.  The court
concluded that the defendant had a duty to conform to these
standards, breached that duty, and was therefore negligent.
Id. at *18-19.

### 1) The relationship between the parties

ART argues that some or all of the Investment
Banks:  (a) were directly involved, or even took lead
roles, in structuring and syndicating the Co-Borrowing
Facilities, including procuring their affiliated Agent
Banks' participation in the transactions, maintaining a
primary relationship with Adelphia management relative to
their Agent Banks (with the Investment Banks' roles
sometimes indistinguishable from their affiliated Agent
Banks), underwriting, reviewing, approving, and/or
recommending their Agent Banks' participation in the Co-
Borrowing Facilities in an interest to secure more business
from Adelphia; (b) knew of problems with the structure of

36

the Co-Borrowing Facilities such that "no lender could have approved them without deviating from fundamental underwriting principles and practices"; (c) were aware that the loans exceeded the lending limits of their affiliated Agent Banks, yet advocated that these limits be increased or exceeded by their affiliates; and (d) provided advisory services to Adelphia.  (Pl.'s Mem. at 3-13.)

As an initial matter, ART's "advisory services" argument fails.  Specifically, ART argues that "a handful of the Investment Banks –- [the Investment Banking Group at Credit Suisse Securities (USA) LLC ("Credit Suisse FB")], SSB, and BAS, also provided advisory services to Adelphia Communications Corporation unrelated to the Co-Borrowing Facilities."  (Pl.'s Mem. at 21.)  However, because Claim 40 has been dismissed with respect to SSB and BAS, and the Court shall not reinstate those claims, as discussed below, ART's allegations relating to SSB and BAS are irrelevant.

ART's other allegations regarding advisory services relate to Adelphia's engagement of Credit Suisse FB "as an advisor to Adelphia after Adelphia made its public disclosure of off-balance sheet debt in March 2002." (See Pl.'s SOAF ¶¶ 297-302.)  Even if this engagement created an extra-contractual duty of care under Pennsylvania law, which appears doubtful, ART does not

explain how a duty of care arising at that time -- after
the Co-Borrowing Facilities had been in effect for some
time and Adelphia's off-balance sheet debt had been
publicly disclosed -- could relate to the alleged breaches
in Claim 40.  "[D]uty is predicated on the relationship
that exists between the parties at the relevant time."
R.W. v. Manzek, 888 A.2d at 747.  Finally, the engagement
letter with Credit Suisse First Boston Corporation ("CSFB")
referenced by ART concerns the engagement of CSFB to act as
financial adviser (which CSFB was permitted to do through
one or more of its affiliates) to Adelphia Communications
Corporation (the parent company) and expressly states that
CSFB has not been engaged "as an adviser to or agent of any
other person."  (See Pl.'s SOAF ¶ 298; Connell Decl., Ex.
151, at 1, 3)  ART lacks standing to pursue the tort
claims, including Claim 40, on behalf of Adelphia
Communications Corporation, however.  See Adelphia Recovery
Trust v. Bank of Am., N.A., No. 05 Civ. 9050, 2009 WL
5061747, modified on reconsideration, 2010 WL 2077214.

        Even construing the facts in the light most
favorable to ART and resolving ambiguities and drawing
reasonable inferences in its favor (including, for example,
that certain Investment Banks acted as primary contacts
for, or appeared to be indistinguishable from, their

affiliate Agent Banks), the Investment Banks and Adelphia nevertheless were sophisticated business counterparties engaged in corporate transactions (with relationships akin to those between an underwriter and issuer or a lender and borrower).  Taken as true, allegations that the Investment Banks structured and syndicated the facilities, drafted documents, and directly interacted with Adelphia management also are consistent with these types of arm's-length relationships.

In the light most favorable to ART, some or all of the Investment Banks strongly encouraged or enticed their affiliated Agent Banks and/or Adelphia to enter into the Co-Borrowing Facilities.  Absent a special relationship or overmastering influence, this Court cannot see how such conduct would form a basis for a negligence claim under Pennsylvania law.  Perhaps suggesting the opposite, albeit under very different facts, in Yania v. Bigan, the Pennsylvania Supreme Court considered whether a defendant was negligent:  (1) "by urging, enticing, taunting and inveigling [decedent] to jump into the water"; (2) "by failing to warn [decedent] of a dangerous condition on the land"; and (3) "by failing to go to [decedent]'s rescue after he had jumped into the water."  155 A.2d 343, 344-45 (Pa. 1959).  On the first point, the Yania court stated:

> Had [decedent] been a child of tender years
> or a person mentally deficient then it is
> conceivable that taunting and enticement
> could constitute actionable negligence if it
> resulted in harm.  However, to contend that
> such conduct directed to an adult in full
> possession of all his mental faculties
> constitutes actionable negligence is not
> only without precedent but completely
> without merit.

Id. at 345.  Interestingly, the court also found that the only condition of defendant's land that could have contributed to decedent's death "was as obvious and apparent to [decedent] as to [defendant]."  Id. at 346.  Finally, because defendant was not otherwise legally responsible, he had no legal duty to rescue the decedent.  Id. at 346 (citing, inter alia, Restatement (First) of Torts § 314 (1934)).  Although Yania involved physical harm, it appears even less likely that a duty could arise from the Investment Banks' actions for purely economic harm that may have resulted.  Cf. Stupka v. Peoples Cab Co., 264 A.2d 373, 373-74 (Pa. 1970) (discussing Yania and certain steps taken to impose affirmative duties, such as duties for common carriers, but explaining that those duties were limited to physical harms, whereas financial harms generally were "not of sufficient weight to overcome the traditional judicial reluctance to impose affirmative duties").

If the Investment Banks acted as intermediaries (e.g., by approving and recommending the Co-Borrowing Facilities to their affiliated Agent Banks or requesting that Adelphia engage both them and their affiliated Agent Banks for services), this also does not mean that they owed a duty of care to Adelphia under Pennsylvania law.  Again, perhaps indicating the opposite by analogy, the Pennsylvania Superior Court applied Althaus when considering whether insurance brokers have a duty to their customers to inspect their customers' business properties for purposes of offering insurance in Wisniski v. Brown & Brown Ins. Co., 906 A.2d 571 (Pa. Super. Ct. 2006).  The court found that the broker "would act as a middleman and use its discretion to select an insurance company/policy for the [plaintiffs]"; "[i]n doing so, the [broker] would also offer advice on the scope of coverage to some extent"; "[plaintiffs] put trust in the [broker]'s judgment about the scope of coverage"; yet the decision to bind plaintiffs to a particular insurance contract "remained exclusively with [plaintiffs]."  Id. at 578.

On the first Althaus factor (relationship of the parties), the Wisniski court considered the three categories of relationships between contracting parties that are recognized by Pennsylvania law:  (i) "an ordinary,

41

arm's-length relationship," (ii) "an agency relationship,"
and (iii) "a confidential relationship."  Id. at 577
(citing Basile v. H & R Block, Inc., 761 A.2d 1115, 1120
(2000)).  The court concluded "that for ordinary negligence
purposes, the relationship between an insurance broker and
client is an arm's-length business relationship."  Id. at
578-79.  Ultimately, the court found that the defendant
broker did not have a duty of care and thus affirmed
summary judgment in favor of the broker.

Similarly, the relationship between the
Investment Banks and Adelphia, as sophisticated business
counterparties engaged in corporate transactions, weighs
against imposing a duty of care.

**2) The social utility of the defendants' conduct**

This factor involves considering the social
utility of an actor's conduct generally and how that
utility would be affected by imposing a duty of care.  See,
e.g., Berrier, 563 F.3d at 62-66 (considering, on a
negligence claim against a lawnmower manufacturer, whether
certain features would increase the safety of a riding
lawnmower without defeating its utility); see also Althaus,
756 A.2d at 1170 (finding that "therapists who treat
sexually abused children perform a valuable and useful
activity to society," and "social utility disfavors

42

expanding therapists' duty of care to non-patients, especially where the non-patients are the accused victimizers").

ART argues that "[l]ike the architectural design firm in <u>Bilt-Rite</u> and the accounting firm in <u>Reilly</u>, the Investment Banks perform professional services with considerable social utility, but also with the potential to inflict substantial damage if they fall short of their professional standard of care." (Pl.'s Mem. at 23.)  ART also contends:  "The social utility of investment banks does not justify insulating them from liability for gross negligence.  On the contrary, the significant role that investment banks play in business transactions argues for the social utility of imposing a duty on them." (Pl.'s Mem. at 23.)

ART does not explain in what way investment banks provide social utility nor whether/how that utility might be affected by imposing upon them a duty of care to their customers.  Instead, ART essentially argues that there is no reason not to impose a duty on investment banks, because they are like the architectural firm in <u>Bilt-Rite</u> and the accounting firm in <u>Reilly</u>.  This Court sees significant differences, however.

First, Bilt-Rite involved a school construction
project.  It is readily apparent that architects are
essential to construction of schools, and building schools
provides social utility.  Imposing a duty of care upon
architects engaged to prepare construction plans, upon
which prospective contractors are intended to rely when
submitting their bids, does not appear to be much of a
burden.

Second, as discussed above, the Reilly trial
court based its analysis on the special role of
accountants.  It is apparent that accounting firms offer
social utility.  See, e.g., Official Comm. of Unsecured
Creditors of Allegheny Health Educ. and Research Found. v.
PriceWaterhouseCoopers, LLP, 989 A.2d 313, 332 (Pa.
Feb. 10, 2010) (recognizing "the special -- and crucial --
role assumed by independent auditors as a check against
potential management abuses," citing United States v.
Arthur Young & Co., 465 U.S. 805, 817-18, (1984), yet
taking into account that when there are multiple levels of
auditor review, the specific responsibility of an auditor
in any given undertaking generally will depend on the terms
of the retention").  This Court sees no indication that
Pennsylvania law views investment banks or commercial banks
engaging in corporate transactions in a similar light.

44

Rather than like the professional suppliers of information engaged specifically to provide information as in Bilt-Rite and Reilly, this Court speculates that the utility provided by investment banks primarily flows to their clients. An investment bank's client -- particularly a sophisticated corporate counterparty -- presumably can negotiate the services for which it wishes to engage the investment bank; the parties can thus define the nature and scope of the engagement and allocate risk and responsibility between the parties by contract. ART's allegations regarding "advisory services," although irrelevant to the present motion (as discussed above), demonstrate that if a company wants such services it can contract for them. Imposing extra-contractual duties on investment banks would supplant the parties' judgments and limit their ability to define and customize their relationships by contract as warranted under particular circumstances.

Unlike a products liability case such as Berrier, where the cost to the manufacturer (which presumably would be passed on to the consumer) was weighed against the safety of others, here ART is arguing for a duty of care owed by investment banks to their clients. Thus, if a client, given a choice, would choose not to pay an

investment bank for a duty of care, it appears that the utility provided by the investment bank to that client would decrease if such a duty were imposed by law (for which, the client likely would bear the cost).   Moreover, this Court is not certain that investment banks, as a rule, are better suited than their sophisticated corporate clients to determine what is in their clients' business interests.

Perhaps most importantly, it is not entirely clear what ART is proposing.  Claim 40 alleges that "each of the Investment Banks owed a duty to the Debtors (i) to act with reasonable care in the course of its duties and responsibilities as underwriters and/or financial advisors, and (ii) to the keep the Debtors fully informed of all material facts concerning its services."  (SAC ¶ 1444.) The second part suggests a duty to speak, which this Court already has considered and held that the Investment Banks did not have.  See May 6, 2009 Decision, 624 F. Supp. 2d at 321-24.  The first part is far from specific, but ART appears to argue that investment banks should be required to adhere to banking standard practices and/or their own policies and procedures (or those of their affiliates).[15]

_____

[15] See, e.g., Pl.'s Mem. at 23-24 (stating that "[h]ere, the nature of the risk imposed by the Co-Borrowing Facilities and the foreseeability that Investment Banks' failure to comply with standard

By contrast, on the second Althaus factor, the Berrier court considered whether a lawnmower manufacturer could have incorporated certain specific safety features (at an average cost of $9 per mower) to prevent a back-over injury like the one that occurred and found a genuine issue of material fact whether an alternative design would have prevented the plaintiff's injuries.  563 F.3d at 62-68.

Pennsylvania statutes may impose certain extra-contractual duties upon banks, as suggested by Clark and Victory, and there are written AICPA Professional Standards and Generally Accepted Auditing Standards applicable to public accountants, as noted in Reilly I.  By contrast, ART does not point to -- and this Court is not aware of -- Pennsylvania statutes, a regulatory or quasi-regulatory body, or a professional association setting forth the appropriate standards for the professional activities of investment banks.  Rather, ART proffers opinions of Mr. Doyle regarding commercial lending practices and describes the Investment Banks' knowledge of the Agent Banks' lending limits.  (See, e.g., Pl.'s Mem. at 9-13, 26.)

---

practice or their own policies and procedures in underwriting, structuring, approving, and facilitating their Agent Banks' participation in those facilities could harm their customer Adelphia supports imposing a duty of care on the Investment Banks") (citations omitted).

Finding that investment banks owe a duty of care to their clients would impose an uncertain (and therefore costly) burden, without some measure of certainty regarding what would be required.  For the above reasons, the second Althaus factor also appears to weigh against finding a duty of care here.

### 3) The nature of the risk imposed and foreseeability of the harm incurred

This factor balances the social utility of imposing a duty of care against the extent and foreseeability of the harm that would result in its absence.  See Berrier, 563 F.3d at 66.  ART describes what some or all of the Investment Banks knew regarding the Co-Borrowing Facilities and the loan lending limits of their affiliated Agent Banks.  (Pl.'s Mem. at 9-13.)  ART argues:

> Here, the nature of the risk imposed by the
> Co-Borrowing Facilities and the
> foreseeability that Investment Banks'
> failure to comply with standard practice or
> their own policies and procedures in
> underwriting, structuring, approving, and
> facilitating their Agent Banks'
> participation in those facilities could harm
> their customer Adelphia supports imposing a
> duty of care on the Investment Banks.

(Id. at 23-24.)

In essence, the risk at issue appears to be that the following would occur:  (a) that the Agent Banks would provide loans to a joint and several borrowing group,

including both what are known as the Obligor Debtors
(direct and indirect subsidiaries of Adelphia
Communications Corporation) and privately-owned entities
(the "Rigas Family Entities"), (b) that the Rigases or the
Rigas Family Entities would use borrowed funds not
otherwise available to them for their own benefit or
improper purposes, and (c) that the Rigas Family Entities
would fail to repay the funds they borrowed, thereby (i)
leaving the Obligor Debtors liable and/or (ii) leaving the
Agent Banks unpaid.  It is apparent that these risks
involved the intervening acts of others not within the
control of the Investment Banks, however.

When the Obligor Debtors entered into the Co-
Borrowing Facilities, it was not necessarily foreseeable
that events would unfold as they did.  However, ART argues
that its commercial lending expert, Mr. Michael Doyle,
identified "obvious and substantial problems," including
structural red flags and statements that certain funds
would be used for the benefit of Rigas Family Entities or
the Rigases.   (Pl.'s Mem. at 9-12.)  ART also states that
Doyle "opined that the Co-Borrowing Facilities deviated
from fundamental lending principles in a number of
substantial and obvious ways that created the potential for
the Rigas family to abuse the facilities at Adelphia's

49

expense." (Id. at 26 (citing Pl.'s SOAF ¶¶ 249-51, 259, 273, 280).)

If so, then it stands to reason that the risks also could have been foreseen by others reviewing the relevant documents, including the parties to the transactions and their agents and advisors. Such facts are distinguishable from Pennsylvania cases finding a duty of care where a defendant was a single source of information upon which others were expected, and intended, to rely. ART has not presented facts indicating that the Investment Banks were in a better position to evaluate the transactions and determine what was in the best interest of Adelphia than was Adelphia itself. Accordingly, neither the nature of the risk (direct financial harm to the Obligor Debtors and/or the Agent Banks) nor the foreseeability of such harm support finding that the Investment Banks owed a duty of care to Adelphia. Therefore, the third Althaus factor also appears to weigh against finding a duty of care.

**4) The consequences of imposing a duty upon the defendant.**

As previously discussed, in both Bilt-Rite and Reilly, it was the defendants' role to provide the relevant information, and they were in the very best position to do

so.  The architectural firm in Bilt-Rite and the accounting
firm in Reilly each appear to have been the primary, and
perhaps the only, source of the relevant information.
Under such circumstances, imposing a duty to provide
accurate information, limited to the intended beneficiaries
of the information, appears to be a particularly minor
burden as compared with the social utility of others
receiving accurate information upon which they can
reasonably rely.  Similarly, in Berrier, the Third Circuit
agreed with the district court's acknowledgment "that the
average cost of $9.00 per mower of incorporating a [no mow
in reverse] device was minimal."  563 F.3d at 67.  The
court therefore concluded on the fourth Althaus factor:
"Given the minimal cost of adding an alternative design,
and the potentially monumental financial and human cost of
not doing so, this factor clearly weighs heavily in favor
of a duty."  Id.

        By contrast, one might expect that investment
banks acting as counterparties to a sophisticated group of
companies would act in what they perceive to be their own
business interests, subject to limitations defined by
contract or otherwise under the law.  Finding that
investment banks owe a general duty of care to their
customer counterparties would place an abstract and costly

duty upon parties who (a) did not contract for it (and, in some cases, demonstrated an attempt explicitly to disclaim extra-contractual duties), and (b) do not appear better suited than their customers to determine what is in their customers' business interests.  Such a finding also might have ripple effects upon the investment banking profession as a whole.[16]  Accordingly, the fourth <u>Althaus</u> factor also appears to weigh against finding a duty of care.

### 5) The overall public interest in the proposed solution

When applying the fifth <u>Althaus</u> factor, a court should consider the implications of imposing a duty of care beyond the interests of the parties themselves.  For example, when considering "the public interest in imposing a duty upon butane lighter manufacturers to produce a lighter with child safety features," the Pennsylvania Supreme Court stated:

> We find that there is a strong public interest in minimizing fires started as a result of children playing with butane

---

[16] <u>Cf. Allegheny</u>, 989 A.2d at 328-332 (discussing <u>in pari delicto</u> and auditor liability cases, and finding that the "[t]he ripple effects of . . . decisions [relating to auditor liability] also merit consideration, including those developed by [defendant's] <u>amici</u>: the growing prevalence of breathtaking malpractice claims against auditors in the corporate insolvency setting; the corresponding litigation burden; and the resultant impact on the profession as a whole, as well as those they serve").  The defendant's <u>amici</u> argued, <u>inter alia</u>, that allowing a client who perpetrated a fraud to shift responsibility to an outside auditor would lead to more expansive and prohibitively expensive audits and auditors rejecting smaller clients that lack the best risk management and oversight systems.  <u>Id.</u> at 326-27.

> lighters.  Such fires have catastrophic
> effects on human beings as well as property.
> Avoidance of them would be an unquestionable
> boon to society.  Thus, this factor weighs
> in favor of finding a duty.

Phillips, 841 A.2d at 1010.

Events leading up to and including the bankruptcy
of Adelphia appear to have had significant effects,
including harms to creditors of the parent public company
and holders of its securities.  It seems to be in the
overall public interest to mitigate or prevent such
occurrences.  However, as this Court has mentioned
previously, there was a long, and attenuated, chain of
events from entry into the Co-Borrowing Facilities by the
Agent Banks and the Obligor Debtors to certain harms that
ART alleges Adelphia suffered.  Adelphia Recovery Trust v.
Bank of Am., N.A., No. 05 Civ. 9050, 2010 WL 2077214 at *7,
*11.  This chain of events involved independent actions by
many different parties (some of whom had certain duties by
law or contract).  It is therefore far from clear that
ART's proposal -- finding that investment banks owe a duty
of care to their customers -- is an appropriate solution or
in the overall public interest.

Certain determinations regarding the public
interest are best left to the legislature.  In Atcovitz v.
Gulph Mills Tennis Club, Inc., the Pennsylvania Supreme

Court declined to impose a duty upon a tennis club to maintain a defibrillator on its premises primarily based upon the fifth Althaus factor.  812 A.2d 1218, 1223 (2002). The court found that the acquisition, maintenance, and use of the defibrillators was highly regulated yet the legislature had not imposed such a duty.  Id. at 1223-24. The Atcovitz court stated the following rule:  "Where our lawmakers have so thoroughly considered the statewide application and implications of a subject, th[e] Pennsylvania Supreme Court must refrain from imposing additional requirements upon that legislation."  Id. at 1223; see also Excavation Techs., 985 A.2d at 844 (stating: "We recognize an excavator's breach of gas lines causes delay in completing projects, but if utility companies are exposed to liability for excavators' economic losses, such costs would inevitably be passed on to the consumer; if this is to be done, the legislature will say so specifically.  Until that day, we decline to afford heightened protection to the private interests of entities who are fully capable of protecting themselves, at the public's expense.")

This Court is not aware whether the Pennsylvania legislature already has thoroughly considered the statewide application and implications of the activities of

investment banks.  However, there are securities laws in
place to protect the public from certain harms like those
that resulted from the events leading up to the bankruptcy
of Adelphia.  Given the poor fit of the present facts with
any Pennsylvania court decisions finding a duty of care,
rather than finding that the Investment Banks owed a duty
of care to Adelphia at the relevant time, it is perhaps
best left to the Pennsylvania legislature to consider
whether to impose, and define, such a duty upon investment
banks going forward.

### 6) The End Result of the Balancing

Even viewed in the light most favorable to ART,
as the nonmoving party, four of the five Althaus factors
appear to weigh against finding that the Investment Banks
owed Adelphia a duty of care.  The fifth factor, the
overall public interest, seems to weigh in favor of finding
accountable at least some actor(s) in the chain of
causation from entry by the Obligor Debtors and the Agent
Banks into the Co-Borrowing Facilities to certain far-
reaching harms that ultimately occurred.  Even so, finding
that the Investment Banks owed a duty of care to Adelphia
does not logically follow.

As discussed above, Pennsylvania courts have
considered whether there is a duty of care for certain

industries and under particular circumstances.  It is apparent that Pennsylvania courts do not haphazardly impose duties of care, however, nor do they start with the assumption that a defendant owes a duty of care unless there is a reason that the defendant should not.  Rather, they consider whether imposing liability would place a duty on one who is best suited for it.

In _Excavation Techs._, the Pennsylvania Supreme Court declined to impose liability for negligent misrepresentation on a utility company that provided incorrect information regarding the locations of gas lines around a work site.  985 A.2d at 843-44.  In addition to distinguishing the defendant from the architectural firm in _Bilt-Rite_ and applying the economic loss doctrine, the court also found:  "[P]ublic policy weighs against imposing liability here.  Permitting recovery would shift the burden from excavators, who are in the best position to employ prudent techniques on job sites to prevent facility breaches."  _Id._ at 844.

Similarly, in _Azur_, the Third Circuit predicted that the economic loss doctrine barred a negligent misrepresentation claim against a credit card company, finding, _inter alia_, that "like _Excavation_, . . . Pennsylvania public policy weighs against imposing

liability because cardholders, and not card issuers, are in the best position to prevent employees with access to security information from committing fraud." Azur, 601 F.3d at 223; see also Sharpe, 821 A.2d at 1220 (concluding that a hospital owed a duty of reasonable care with regard to collection and handling of plaintiff's urine specimen after finding that the hospital "is in the best position to ensure the non-negligent collection and handling of the specimen, and thus, it possesses the ability to limit its liability by acting reasonably with respect to employee drug screening") (citation omitted).

Whereas the utility company in Excavation Techs. had no other interest or relationship to the parties involved in the construction project, viewing the facts in the light most favorable to ART, the Investment Banks had interests in the transactions based on their relationships with Adelphia and the Agent Banks. On the other hand, the Investment Banks also were not professional information providers engaged to provide specific information like the architectural firm in Bilt-Rite or the accounting firm in Reilly, and Adelphia had its own advisors to review and evaluate the relevant transactions.

The Investment Banks were (or their affiliated Agent Banks were) counterparties to Adelphia -- a

sophisticated group of companies with their own officers
and directors to determine what was in its best interests
from a business perspective, legal representation to
prepare and review relevant documents and offer advice, and
professional auditors.  Of course, there is risk in many
types of corporate transactions, and parties are generally
left to negotiate and allocate those risks.  ART has not
shown that the Investment Banks were better suited than
Adelphia itself to evaluate Adelphia's risks and business
interests.  Similarly, taking as true ART's allegations
regarding the Investment Banks' interactions with their
affiliated Agent Banks (including knowledge of lending
limits and advocating that they be increased or exceeded),
this does not put the Investment Banks in a better position
than the Agent Banks to determine the Agent Banks' own
risks and business interests.

Based on the Althaus factors, this Court predicts
that the Pennsylvania Supreme Court would not find that the
Investment Banks owed a duty of care to Adelphia.  In the
absence of a duty owed by the Investment Banks to Adelphia,
ART's gross negligence claim fails.  Accordingly, even if
Pennsylvania's economic loss doctrine does not bar Claim 40
outright, this Court grants summary judgment in favor of
the Investment Banks on this alternative basis.

**III. Motion by ART for Reinstatement of Dismissed Claims**

ART also moves pursuant to Fed. R. Civ. P. 54(b) to reinstate Claim 39 (gross negligence) of the SAC against the Agent Banks and Claim 40 (gross negligence) of the SAC against SSB and BAS (collectively, the "Dismissed Claims"), which the Bankruptcy Court dismissed on June 11, 2007. As ART acknowledges: "[ART] did not appeal Judge Gerber's ruling on Claims 39 and 40. Instead, [ART] included those claims in its Second Amended Complaint and preserved its right to appeal Judge Gerber's dismissal upon issuance of a final judgment." (ART's Mot. to Reinstate Claim 39 against Agent Banks and Claim 40 against SSB and BAS ("Pl.'s Mot. to Reinstate") ¶ 2.) To illustrate, when ART filed the FAC with this Court on or about October 31, 2007, and the SAC, on or about March 4, 2008, it noted each time that the Dismissed Claims were included "to preserve the claim[s] for appeal." (See FAC pmbl. to ¶¶ 1434, 1443; SAC pmbl. to ¶¶ 1434, 1443.)

Nevertheless, ART now argues that this Court should reinstate the Dismissed Claims because of alleged errors by the Bankruptcy Court, based on ART's new argument that the duty required to state a claim for gross negligence under Pennsylvania law is a duty of care. (Pl.'s Mot. to Reinstate ¶¶ 4-5.) ART also explains that,

following the Bankruptcy Court Decision, the FAC added to
Claim 40 "allegations that the Investment Banks breached
their duties by 'structuring and/or syndicating the Co-
Borrowing Facilities,'" and these allegations remain in the
SAC.  (Pl.'s Reply Mem. at 1 n.1, 7 (quoting FAC ¶ 1445;
SAC ¶ 1445).)  ART therefore argues that "[b]ecause the
Bankruptcy Court did not address Claim 40 as amended, its
decision should have no preclusive effect."  (Id. at 7.)

     ART also argues that the Dismissed Claims should
be reinstated by this Court in the interest of judicial
economy and that the applicable defendants would not be
prejudiced by such reinstatement.  (See id. at 5-7, 8.)
Notably, ART has not explained why the Creditors Committee
did not timely seek leave to appeal the Bankruptcy Court
Decision, as a number of the defendants did.  See Adelphia
Recovery Trust v. Bank of Am., N.A., No. 05 Civ. 9050, 2007
WL 2585065, at *1 (S.D.N.Y. Sept. 5, 2007).  ART also fails
to justify delaying until this point in the proceedings to
reverse its prior decision to "include[] those claims in
its Second Amended Complaint and preserve[] its right to
appeal Judge Gerber's dismissal upon issuance of a final
judgment."  (Pl.'s Mot. to Reinstate ¶ 2 (emphasis added).)

     Under these circumstances, the Court is not
persuaded to disturb the Bankruptcy Court Decision, or that

it is in the interest of judicial economy to reinstate the Dismissed Claims, or that the applicable defendants would not be prejudiced by such reinstatement.

**CONCLUSION**

This Court predicts that the Pennsylvania Supreme Court would grant summary judgment on Claim 40 in favor of the Investment Banks based on Pennsylvania's economic loss doctrine.  Alternatively, this Court predicts that the Pennsylvania Supreme Court would find that the Investment Banks owed no duty of care to Adelphia and therefore would grant summary judgment on that basis.  Because this Court predicts, on two separate grounds, that the Pennsylvania Supreme Court would hold that Claim 40 fails as a matter of law, no fact-specific issues are reached.  Accordingly, there is no genuine issue as to any material fact that would preclude granting summary judgment.

For the reasons set forth above, the Investment Banks' motion for summary judgment on Claims 36 & 40 is GRANTED in its entirety.

ART's motion to reinstate Claim 39 against the Agent Banks and Claim 40 against SSB and BAS is DENIED in its entirety.[17]

SO ORDERED.

Dated: August 17, 2010

_____
Lawrence M. McKenna
U.S.D.J.

---

[17] Confidential information is contained in this Memorandum and Order.  To preserve confidentiality, it will be filed under seal.  The Court requests that the parties identify to the Court by letter those portions of the Memorandum and Order to be redacted within ten days of the date of this Memorandum and Order, after which a redacted version will be filed in the open file.  Additionally, by letter dated February 16, 2010, ART's counsel indicates that they are consulting with the defendants to determine whether certain material should remain under seal pursuant to the Confidentiality Stipulation and Protective Order, so ordered by this Court on August 11, 2008.  (See Dkt. No. 05-cv-9050, entry no. 898.)  The Court would appreciate an update in this regard.