UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
                                  :
ADELPHIA RECOVERY TRUST,          :
                                  :
                Plaintiff,        :
                                  :   05 Civ. 9050 (LMM)
         - against -              : (related to 03 MDL 1529)
                                  :
BANK OF AMERICA, N.A. et al.,     :   MEMORANDUM AND ORDER
                                  :
           Defendants.            :
                                  :
---------------------------------x

McKENNA, D.J.

**1.**

    This case arises out of the bankruptcies of
Adelphia Communications Corporation ("ACC") and its direct
and indirect subsidiaries.  Familiarity with the facts,
terminology, and extensive history of this case is
presumed.  See, e.g., Adelphia Recovery Trust v. Bank of
Am., N.A., 624 F. Supp. 2d 292 (S.D.N.Y. 2009).

**2.**

    The Bank Defendants[1] move, pursuant to Fed. R.
Civ. P. 56, for summary judgment on the following claims in
the Second Amended Complaint:  Claim 36 (breach of
fiduciary duty), Claim 37 (aiding and abetting breach of
fiduciary duty), Claim 38 (aiding and abetting fraud),

---

[1] See Notice of the Bank Defendants' Motion for Summary Judgment
on in pari delicto grounds, November 18, 2009, at 1-2, identifying the
Bank Defendants.

Claim 40 (gross negligence), Claim 53 (negligence), and Claim 55 (fraud).

Since this motion was filed, this Court held that ART lacks standing to pursue these claims on behalf of ACC, Arahova Corporation and Adelphia Cablevision Corporation. Adelphia Recovery Trust v. Bank of Am., N.A., No. 05 Civ. 9050, 2009 WL 5061747 (S.D.N.Y. Dec. 21, 2009), modified on reconsideration, 2010 WL 2077214 (S.D.N.Y. May 14, 2010). Nevertheless, ART may pursue certain of these claims standing in the shoes of what are known as the Obligor Debtors (direct and indirect subsidiaries of ACC).  ART was standing in the shoes of ACC with respect to Claim 53 (negligence against Salomon Smith Barney Holdings Inc.), however; Claim 53 is therefore moot.[2]  Additionally, this Court granted summary judgment in favor of the applicable defendants on Claims 36 and 40, via a Memorandum and Order, dated August 17, 2010 (the "August 17, 2010 Decision"), Dkt. No. 05-cv-9050, Entry No. 1350.  Accordingly, the only claims still at issue for purposes of the present motion

---

[2] See Decl. of Nora K. Abularch, March 13, 2010, Ex. 1 (Plaintiff's Responses and Objections to Defendants' Set of Interrogatories to Plaintiff per the Court's July 20, 2009 Order), Ex. A at 7, Dkt. No. 05-cv-9050, Entry No. 1284-2 (identifying ART as standing in the shoes of ACC for purposes of Claim 53); see also Letter from Edmund Polubinski III to Hon. Lawrence M. McKenna (August 17, 2010) at 1 & Attach. at 1 n.2, Dkt. No. 05-cv-9050, Entry No. 1351 (listing fully submitted motions pending before the Court, as agreed by the parties, and recognizing that "Claim 53 was obviated by the Court's December 21, 2009 and May 14, 2010 decisions").

are Claims 37, 38, and 55 (collectively, the "Tort Claims").

This motion raises the question whether the doctrine of in pari delicto[3] forecloses the Adelphia Recovery Trust ("ART") from prevailing against the Bank Defendants on the Tort Claims.

**3.**

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'"; "'[a] fact is material if it might affect the outcome of the suit under the governing law.'" Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (emphasis added) (quoting Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008)).

---

[3] See generally Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 306-18 (1985) (discussing the common law in pari delicto defense -- which "derives from the Latin, in pari delicto potior est conditio defendentis: 'In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one.'") (alterations in original) (quoting Black's Law Dictionary 711 (5th ed. 1979)). "The defense is grounded on two premises:  first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality." Id. at 306 (footnotes omitted).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).  However, "[i]n the language of . . . Rule [56], the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002) (citations omitted).

"The court 'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" Metito (Overseas) Ltd. v. Gen. Elec. Co., No. 05 Civ. 9478(GEL), 2009 WL 399221, at *7 (S.D.N.Y. Feb. 18, 2009) (quoting Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 122 (2d Cir. 2004)).

4

"However, the 'mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient' to withstand a motion for summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

In support of their motion for summary judgment, the Bank Defendants submitted a Statement of Undisputed Material Facts pursuant to Local Rule 56.1(a) ("Defs.' 56.1 Statement"). ART, in turn, submitted a Response and Counterstatement to Defs.' 56.1 Statement pursuant to Local Rule 56.1(b) ("Pl.'s 56.1 Statement").

**4.**

The Bank Defendants primarily present three arguments. First, they argue that the Rigases' misconduct[4] is imputable to ACC and its direct and indirect subsidiaries (together with ACC, "Adelphia"). (Defs.' Mem. at 1-2, 8-14; see also id. at 1 n.3 (stating that "[b]ecause many, if not all, of these distinct entities [ACC and its 265 direct and indirect subsidiaries] shared overlapping management and boards of directors, the arguments set forth in this motion apply with equal force

---

[4] See, e.g., Defs.' 56.1 Statement ¶¶ 8-25 (describing certain criminal proceedings, including convictions and a guilty plea, of members of the Rigas family relating to their roles as Adelphia managers and directors); Pl.'s 56.1 Statement ¶¶ 8-25 (same, but disputing or adding details in response to many of the corresponding paragraphs of Defs.' 56.1 Statement).

to each of ACC and its direct and indirect subsidiaries").)[5]

Second, the Bank Defendants argue that:

> Adelphia itself -- through its non-Rigas
> senior management and its non-Rigas, or
> outside, directors ("Outside Directors"), as
> well as through its public filings - is
> charged as a matter of law with knowledge
> of, at a minimum, the very same alleged
> facts concerning the structure and/or uses
> of the three co-borrowing facilities [at
> issue -- UCA/HHC, CCH, and Olympus (the "Co-
> Borrowing Facilities")] that the ART now
> contends the Bank Defendants knew.

(Id. at 2-3 (footnote omitted); see also id. at 3-5, 14-
35.)  The Bank Defendants argue that, on either of these
grounds, the doctrine of in pari delicto bars ART's torts
claims.  Third, the Bank Defendants address ART's argument
"that in pari delicto is not applicable here because the
ART is an 'innocent successor' to Adelphia due to the pre-
bankruptcy petition removal of the Rigas family,
the perpetrators of the alleged fraud and breach of
fiduciary duty."  (Id. at 35 (footnote and citation
omitted); see also id. at 35-39.)

**5.**

The present motion turns on questions of
Pennsylvania law, which governs, and recent Pennsylvania
court decisions clarify the pertinent issues.  Shortly

---

[5] As mentioned previously, ART lacks standing to pursue the Tort
Claims on behalf of ACC, Arahova Corporation and Adelphia Cablevision
Corporation.  See Adelphia Recovery Trust v. Bank of Am., N.A., 2009 WL
5061747, modified on reconsideration, 2010 WL 2077214.

after ART submitted its opposition papers, the Pennsylvania Supreme Court issued a significant opinion, Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Foundation v. PriceWaterhouseCoopers, LLP, 989 A.2d 313 (Pa. 2010) ("Allegheny II"), in response to certified questions from the Third Circuit Court of Appeals.[6]   See Official Comm. of Unsecured Creditors of Allegheny Health Educ. and Research Foundation v. PriceWaterhouseCoopers, LLP, No. 07-1397, 2008 WL 3895559 (3d Cir. July 1, 2008) ("Allegheny I") (certifying questions to the Pennsylvania Supreme Court).

On May 28, 2010, the Third Circuit issued an opinion, Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP, 607 F.3d 346 (3d Cir. 2010) ("Allegheny III"), incorporating the guidance from the Pennsylvania Supreme Court's Allegheny II opinion.  When applying Pennsylvania law, this Court defers to decisions by the Third Circuit Court of Appeals, absent clear signals by the Pennsylvania Supreme Court pointing to another conclusion.  See August

---

[6] ART's counsel submitted a supplemental letter in this regard. See Letter from Andrew Weissmann to The Honorable Lawrence M. McKenna, dated February 22, 2010 (discussing Allegheny II).  In their reply papers, the Bank Defendants, unsurprisingly, provided a very different interpretation of Allegheny II.  (See Defs.' Reply Mem. at 4-8.)

17, 2010 Decision, at 11-12 n.7 (describing the Court's reasoning in this regard).

**6.**

The Third Circuit explained:  "Because the underlying purpose of imputation is fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations, the [Pennsylvania Supreme] Court drew a sharp distinction between those who deal in good faith with the principal-corporation in material matters and those who do not."  Allegheny III, 607 F.3d at 352 (alterations and internal quotation marks omitted) (quoting Allegheny II, 989 A.2d at 335).  "This 'sharp distinction' led the [Pennsylvania Supreme] Court to reach different policy outcomes for imputation in the negligence context versus the collusion context."  Id.  In response to the first certified question, the Pennsylvania Supreme Court stated:

> The proper test to determine the
> availability of defensive imputation in
> scenarios involving non-innocents depends on
> whether or not the defendant dealt with the
> principal in good faith.  While one of the
> primary justifications for imputation lies
> in the protection of innocents, in
> Pennsylvania, it may extend to scenarios
> involving auditor negligence, subject to an
> adverse-interest exception, as well as other
> limits arising out of the underlying
> justifications supporting imputation.
> Imputation does not apply, however, where

8

> the defendant materially has not dealt in
> good faith with the principal.

Allegheny II, 989 A.2d at 339.

If a third party has dealt with a principal
corporation in good faith (as in the negligence context),
then the "third party would generally be able to impute an
agent's bad acts to the principal corporation if they
benefit the corporation," with certain exceptions.
Allegheny III, 607 F.3d at 352 (emphasis added) (citing
Allegheny II, 989 A.2d at 333).  "[T]he [Pennsylvania
Supreme] Court did not specify a minimum quantum of
benefit"; instead, it "maintained the 'traditional, liberal
test for corporate benefit.'"  Id. (quoting Allegheny II,
989 A.2d at 336).  However, "a third party would not be
able to impute an agent's bad acts to the principal
corporation if those bad acts were only in the agent's
self-interest and conferred benefits only to the agent, not
the corporation."  Id. (citing Allegheny II, 989 A.2d at
333-34).  "This is the 'adverse interest' exception to
imputation."  Id.  The Pennsylvania Supreme Court stated:

> In terms of the parties' differences
> regarding whether benefit should be assessed
> according to the subjective intent of the
> agent, we believe it is most consistent with
> agency principles to evaluate benefit in
> light of the reasonable perspective of a
> third party in its dealings with the agent.
> That is, the question generally should be

>     whether there is sufficient lack of benefit
>     (or apparent adversity) such that it is fair
>     to charge the third party with notice that
>     the agent is not acting with the principal's
>     authority.

Allegheny II, 989 A.2d at 338 (citations omitted).

        However, the Pennsylvania Supreme Court "took a
different approach to secretive, collusive conduct between
corporate agents and third parties that was 'overwhelmingly
adverse to the corporation' even if the collusion provided
'a peppercorn of benefit.'"  Allegheny III, 607 F.3d at 352
(quoting Allegheny II, 989 A.2d at 334-35).  "This is
because 'imputation rules justly operate to protect third
parties on account of their reliance on an agent's actual
or apparent authority,' but there can be no justifiable
reliance on the agent's authority when 'both the agent and
the third party know very well that the agent's conduct
goes unsanctioned by one or more tiers of corporate
governance.'"  Id. at 352-53 (quoting Allegheny II, 989
A.2d at 336).[7]

---

[7] The Pennsylvania Supreme Court explained further:  "As noted,
the justification for imputation has also been stated in terms of the
recognition that it is the principal which has empowered the agent;
accordingly, the principal rightly bears the risk of agent malfeasance.
This rationale, however, also does not support imputation in the
collusive-auditor scenario.  The underlying assumption that an agent
will communicate all material information to his principal does not
logically pertain to instances in which there is collusion to withhold
information from corporate governance."  Allegheny II, 989 A.2d at 337
(footnote and citation omitted).

**7.**

Accordingly, to determine whether the bad acts of
certain agents of the Obligor Debtors should be imputed to
the Obligor Debtors, this Court starts with the question
whether the Bank Defendants dealt in good faith with the
Obligor Debtors.  See Allegheny III, 607 F.3d at 348 ("With
the benefit of a much-appreciated clarifying opinion from
the Supreme Court of Pennsylvania, we now hold that
Pennsylvania law requires an inquiry into whether the third
party dealt with the principal in good faith.  Because the
District Court did not have the benefit of this clarifying
opinion and did not conduct such an inquiry, we remand for
further proceedings.").  As noted above, ART only has
standing to pursue the Tort Claims on behalf of the Obligor
Debtors; nevertheless, the Bank Defendants' dealings with
ACC are also pertinent, because the Obligor Debtors were
(directly or indirectly) wholly-owned subsidiaries of ACC
with significantly overlapping management and directors --
over which ACC appears to have exercised significant, or
even total, control (such as directing the Obligor Debtors
to enter into the Co-Borrowing Facilities).

After the Allegheny II decision, the Bank
Defendants argued:

> To be sure, the [Allegheny II] court
> did hold that "in scenarios involving
> secretive, collusive conduct between
> corporate agents and third parties," the <u>in
> pari delicto</u> defense is not available.  But
> the [<u>Allegheny II</u>] court also made clear
> that <u>in pari delicto</u> is available where the
> third-party defendants did not engage in
> such intentional, knowing collusion and, at
> worst, can be faulted for not discovering
> the same misconduct that the company's own
> directors allegedly failed to discover.

(Defs.' Reply Mem. at 5. (citations omitted).)  The Bank
Defendants argue that:  (a) there is no evidence that they
secretly colluded with the Rigases (<u>id.</u> at 6-7); and
(b) ACC's SEC filings publicly disclosed all relevant
information regarding the Co-Borrowing Facilities -- with
such public disclosure demonstrating "by definition, [that]
the Bank Defendants could not have conspired or colluded
with Adelphia management to 'actively and intentionally'
prevent Adelphia or its Outside Directors from knowing the
true nature of the Co-Borrowing Facilities."  (<u>Id.</u> at 6.)
On this basis, the Bank Defendants argue that this Court
should proceed to the next step of the imputation analysis
-- and then find that the "adverse interest" exception does
not apply because the Co-Borrowing Facilities provided a
tangible benefit to the Obligor Debtors in the form of
billions of dollars of capital.  (<u>Id.</u> at 7-8.)

The Court disagrees with this characterization of the threshold question.  The Pennsylvania Supreme Court stated:  "The proper test to determine the availability of defensive imputation in scenarios involving non-innocents depends on whether or not the defendant dealt with the principal in good faith . . . subject to an adverse-interest exception, as well as other limits arising out of the underlying justifications supporting imputation." Allegheny II, 989 A.2d at 339.  "Imputation does not apply, however, where the defendant materially has not dealt in good faith with the principal."  Id.  The recent Allegheny decisions make it clear that if a third party engages in secretive, collusive dealings with the principal's agent, then the third party is not dealing with the principal in good faith, and the agents' actions cannot be imputed to the principal.  See Allegheny III, 607 F.3d at 352-53; Allegheny II, 989 A.2d at 336-37.

However, it does not follow, as the Bank Defendants appear to be arguing, that if there is no showing that a third party engaged in "secretive, collusive dealings" with the agents, then the third party dealt in good faith with the principal.[8]  In response to the second

---

[8] As a matter of formal logic, it would be the fallacy of denying the antecedent to start with the proposition (i) "If there are secretive, collusive dealings, then there is no good faith," and

certified question,[9] the Pennsylvania Supreme Court
answered:

> The in pari delicto defense may be
> available in its classic form in the
> auditor-liability setting, subject to
> ordinary requirements of pleading and proof
> (including special ones related to averments
> of fraud where relevant), and consideration
> of competing policy concerns.  However, as
> noted, imputation is unavailable relative to
> an auditor which has not dealt materially in
> good faith with the client-principal.  This
> effectively forecloses an in pari delicto
> defense for scenarios involving secretive
> collusion between officers and auditors to
> misstate corporate finances to the
> corporation's ultimate detriment.

Allegheny II, 989 A.2d at 339.  "Good faith" remains the

threshold inquiry.  See Allegheny III, 607 F.3d at 348

(remanding to the district court with instructions to

conduct an inquiry regarding whether the third party dealt

with the principal in good faith).

Construing the facts in ART's favor and drawing

all reasonable inferences against the Bank Defendants, this

---

therefore conclude (ii) "If there are no secretive collusive dealings,
then there is good faith."

[9] See Allegheny III, 607 F.3d at 353 ("The second question we
certified to the Supreme Court of Pennsylvania concerned the
availability of the in pari delicto defense to a particular auditor-
liability scenario.  We asked: 'Does the doctrine of in pari delicto
prevent a corporation from recovering against its accountants for
breach of contract, professional negligence, or aiding and abetting a
breach of fiduciary duty, if those accountants conspired with officers
of the corporation to misstate the corporation's finances to the
corporation's ultimate detriment?'") (emphasis added) (quoting
Allegheny I, 2008 WL 3895559, at *6).  Additionally, the Pennsylvania
Supreme Court explicitly stated:  "[I]t will be our practice to confine
ourselves as closely as possible to the certified questions, including
in our treatment only subsidiary legal matters fairly subsumed within
those certified issues." Allegheny II, 989 A.2d at 328.

Court cannot make a finding on the present motion for summary judgment that the Bank Defendants dealt in good faith with ACC and its subsidiaries, including the Obligor Debtors.  Whether such dealings were in good faith calls for a legal conclusion that this Court cannot make at this stage; rather, such a conclusion can be reached only after the fact-finder has considered all the evidence in light of credibility assessments that are not appropriate on a motion for summary judgment.

**8.**

Even if the Bank Defendants dealt with ACC and its subsidiaries in good faith, such a finding would not end the imputation analysis.  Imputation would still be "subject to an adverse-interest exception, as well as other limits arising out of the underlying justifications supporting imputation."  Allegheny II, 989 A.2d at 339. Here, whether the adverse interest exception is applicable turns on whether there was a corporate benefit to the Obligor Debtors to enter into the Co-Borrowing Facilities.[10]

---

[10] See Allegheny III, 607 F.3d at 352 (describing the "adverse interest" exception to imputation).  As the Pennsylvania Supreme Court recognized:  "In close cases, adverse interest and the associated inquiry into benefit may be questions steeped in fact and open to legitimate differences among reasonable minds."  Allegheny II, 989 A.2d at 337 (citation omitted).  The court continued:  "Nevertheless, in the collusion scenario -- as a matter of law -- we regard it to be in the best interests of a corporation for the governing structure to have accurate (or at the very least honest) financial information.  Thus, like other courts, in settings involving auditors who have not

15

As demonstrated by the parties' recent oral arguments regarding other summary judgment motions pending in this case, the question of corporate benefit is also strongly disputed and would require full consideration of the evidence, including pertinent expert testimony.  Notably, Pennsylvania law applies an objective standard,[11] and therefore determining whether ACC's Board of Directors and management <u>believed</u> the transactions to be beneficial (<u>see, e.g.</u>, Defs.'s 56.1 Statement ¶¶ 121-123; Pl.'s 56.1 Statement ¶¶ 121-123) is largely irrelevant to this issue.

**9.**

The Bank Defendants' second argument is that, even without imputation of the Rigases' conduct, summary judgment should be granted on <u>in pari delicto</u> grounds. (<u>See</u> Defs.' Reply Mem. at 11 ("The [<u>Allegheny II</u>] court explained that 'there may be independent grounds (other than mere imputation) for liability on the part of the principals on either side of the transaction, such as when

---

proceeded in material good faith relative to a principal-corporation, we decline to consider a knowing, secretive, fraudulent misstatement of corporate financial information to be of benefit to a company." <u>Id.</u> at 338.

      [11] <u>See</u> Allegheny III, 607 F.3d at 353 ("The [Pennsylvania] Supreme Court concluded its discussion of imputation by looking to what a reasonable third party should glean from its dealings with a corporate agent.  The touchstone of the availability of an imputed defense for [defendant] is 'whether there is sufficient lack of benefit (or apparent adversity) such that it is fair to charge the third party [defendant] with notice that the agent [the officer group] is not acting with the principal's . . . authority.'") (quoting <u>Allegheny II</u>, 989 A.2d at 338).

there is proven negligence or <u>acquiescence at the
supervisory level</u>; and, in such circumstances, a principal
may be regarded in different stead.'") (quoting <u>Allegheny
II</u>, 989 A.2d at 339 n.37)).  The Bank Defendants argue:

> The principal-corporation, Adelphia --
> through its own agreements and public
> filings, as well as the undisputed knowledge
> of its Outside Directors -- acquiesced, and
> indeed participated, in the Co-Borrowing
> Facilities with at least the same knowledge
> as the Bank Defendants.  This renders
> Adelphia, at a minimum, <u>in pari delicto</u> with
> the Bank Defendants and requires dismissal
> of the ART's Tort Claims on that ground --
> wholly independent of any knowledge or
> conduct of the Rigases.

(<u>Id.</u> at 11-12 (footnote omitted).)[12]

This argument appears to conflate relative
knowledge of the parties with their relative culpability.
This Court does not read footnote 37 of the Pennsylvania
Supreme Court's decision, <u>Allegheny II</u>, 989 A.2d at 339
n.37, to suggest this.  In any event, construing the facts
in the light most favorable to ART, the Bank Defendants may
have had additional information not known by ACC's Outside
Directors at the time they authorized entry by the Obligor

---

[12] Specifically, the Bank Defendants argue that:  (a) because the
Obligor Debtors themselves signed the relevant credit agreements, they
are charged with knowledge of their terms (<u>id.</u> at 2, 13-14);
(b) because ACC described the material terms of the Co-Borrowing
Facilities in its public filings to the Securities and Exchange
Commission and also attached the agreements to its filings, it is
charged with knowledge of the relevant terms (<u>id.</u> at 2-3, 12-18.); and
(c) Adelphia, including ACC's Outside Directors, knew as much or more
than the Bank Defendants about Adelphia's off-balance-sheet debt and
the alleged misuses of co-borrowed funds (<u>id.</u> at 3, 19-24).

Debtors into the Co-Borrowing Facilities (such as regarding
the intended uses of co-borrowed funds for the benefit of
the Rigases or the Rigas Family Entities).

### 10.

On the present motion for summary judgment, this
Court is not persuaded by either of the Bank Defendants'
arguments described above.  However, it is worth noting
that even if this Court were to find either that (a) the
Rigases conduct is properly imputed to the Obligor Debtors
or (b) that Adelphia and its Outside Directors and/or the
Obligor Debtors "acquiesced, and indeed participated, in
the Co-Borrowing Facilities with at least the same
knowledge as the Bank Defendants," this would not end the
in pari delicto analysis.  Before finding that the in pari
delicto defense applies, Pennsylvania law requires a court
to consider both (a) the relative culpability of the
parties and (b) public policy considerations.

"Pennsylvania requires the plaintiff be an
active, voluntary participant in the wrongful conduct or
transaction(s) for which it seeks redress, and bear
'substantially equal [or greater] responsibility for the
underlying illegality' as compared to the defendant."
Allegheny II, 989 A.2d at 329 (quoting Bateman, 472 U.S. at
306-07) (footnote omitted).  The Pennsylvania Supreme Court

also stated:  "[n]otably, some courts apparently have dispensed with the requirement that the relative degrees of fault, as between the plaintiff and defendant, must be indistinguishable (or the plaintiff's responsibility is clearly greater)."  Id. at 329 n.19 (citing Bateman, 472 U.S. at 307).  "Pennsylvania law, however, has not followed a similar path".  Id. (citation omitted); see also id. at 335-36 ("In terms of other important policy concerns, we do not believe it undermines the objectives of our tort and contract schemes to deny recovery to one whose agents have acted for the benefit of the corporation with culpability exceeding that of the defendant.") (emphasis added) (citation omitted).  Determining relative culpability requires yet another fact-specific inquiry.[13]

        Furthermore, even if a plaintiff's culpability is equal to or greater than the defendant's, a court applying Pennsylvania law should consider matters of public policy under particular circumstances rather than "woodenly" applying the in pari delicto doctrine.  See Allegheny III,

---

[13] Cf. Global Crossing Estate Representative v. Winnick, No. 04 Civ. 2558(GEL), 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006) (discussing, inter alia, that the application of in pari delicto "may hinge on certain fact-based considerations that cannot be addressed at the pleadings stage, for instance, the relative culpability of defendants and [the company]'s management") (citing Ross v. Bolton, 904 F.2d 819, 824 (2d Cir.1990)).  Although the present motion is for summary judgment, there are disputed facts that must be resolved, with credibility assessments, in order to determine whether the Bank Defendants are culpable -- and, if so, only then can relative culpability be assessed.

607 F.3d at 354-55; Allegheny II, 989 A.2d at 330-32 & nn.21-22.

**11.**

ART argues that the Bank Defendants' in pari delicto defense is barred under the Bankruptcy Code and Pennsylvania law because ART is an innocent successor to ACC and its subsidiaries.  (Pl.'s Mem. at 4-12.)  First, and somewhat surprisingly, ART states:

> As this Court has already held, Defendants' effort to impute the conduct of the Rigas Insiders[14] to the victim of their looting and then to the [ART] is squarely foreclosed by Bankruptcy Code section 541 because the Rigas Insiders were removed from any position of authority prior to the June 25, 2002 Petition Date.

(Id. at 1. (footnote and citation omitted); see also id. at 5 (stating that "this Court denied the Banks' previous motion to dismiss on in pari delicto grounds -- holding as a matter of law that in pari delicto cannot apply because 'here, the wrongdoers were removed from Adelphia's management pre-petition.'") (citation omitted)).  But this Court held no such thing; rather, as the Bank Defendants properly note, this Court found that the removal of the

---

[14] ART defines the "Rigas Insiders" as including:  "John Rigas and his three sons, Timothy, Michael and James, and certain other ACC employees (including James Brown, Michael Mulcahey, and Dean Marshall) who were believed complicit in the fraud."  (Pl.'s Mem. at 1 n.2.)  The Bank Defendants argue that this is inconsistent with ART's prior responses to interrogatories, which did not include Mr. Marshall, because his knowledge is detrimental to ART with respect to in pari delicto.  (Defs.' Reply Mem. at 8 n.7.)

Rigases in 2002 was a pre-petition event that this Court could consider.  See Adelphia Recovery Trust v. Bank of America, N.A., 390 B.R. 64, 79 (S.D.N.Y. 2008), adhered to on reconsideration, Nos. 05 Civ. 9050 & 03 MDL 1529, 2008 WL 1959542, at *2 (S.D.N.Y. May 5, 2008).  The Bank Defendants proffer considerable authority "that a bankruptcy trustee's status as a purported 'innocent successor' has no effect on an in pari delicto analysis." (Defs.' Reply Mem. at 8-9. (listing cases).)  Additionally, the Bank Defendants argue that wrongful acts should be imputed to a corporation when the acts occurred, and, under Bankruptcy Code § 541, ART has the same claims -- subject to the same defenses -- as the debtors.  (Id. at 9-10.) This Court agrees.[15]

        Second, ART argues that Pennsylvania law yields the same outcome, because "the equitable doctrines of

---

[15] In Allegheny II, the Pennsylvania Supreme Court mentioned such an innocent successor argument, but it does not appear to have had any effect on the court's analysis (and it was not part of the certified questions).  See 989 A.2d at 325 ("PwC argues the Committee cannot be treated as an 'innocent successor,' because it voluntarily stepped into [Allegheny Health Education and Research Foundation]'s shoes to bring its claims.")  Federal courts generally appear to reject similar innocent successor arguments.  See, e.g., Global Crossing, 2006 WL 2212776, at *16 n.21 (considering decisions by circuit courts, including by the Second and Third Circuits, and stating:  "The Court agrees with those courts holding the Wagoner and "in pari delicto" rules applicable; whatever appeal [Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995)] may have in the receivership context, the Estate Representative, like a normal bankruptcy trustee, succeeded to [the company]'s rights, and unless specifically authorized by the Bankruptcy Code, does not enjoy greater rights than [the company] simply due to the happenstance of bankruptcy.  Therefore, if [the company] would have been subject to these rules, the Estate Representative is as well.").

imputation and <u>in pari delicto</u> cannot be invoked by a wrongdoer against an innocent party." (Pl.'s Mem. at 1; <u>see also</u> <u>id.</u> at 7-12.) However, as discussed above, this Court finds that wrongful acts are imputed to a corporation (if at all) when the acts occurred, and ART stands in the shoes of the Obligor Debtors with respect to the Tort Claims. Although ART's argument that it is an innocent party does not bar the <u>in pari delicto</u> defense outright at this stage, as previously mentioned, this Court nevertheless can consider the removal of the Rigases in 2002 -- a pre-petition event. Such a factor may be relevant if and when this Court considers competing public policy concerns to determine whether the Bank Defendants' <u>in pari delicto</u> defense is appropriate. But, to reach this question, genuine issues of material fact must be resolved, and, therefore, summary judgment is not appropriate.

12.

For the reasons set forth above, the Bank Defendants' motion for summary judgment of the Tort Claims on in pari delicto grounds is DENIED in its entirety.[16]

SO ORDERED.

Dated: August 25, 2010

Lawrence M. McKenna
U.S.D.J.

---

[16] Confidential information is contained in this Memorandum and Order. To preserve confidentiality, it will be filed under seal. The Court requests that the parties identify to the Court by letter those portions of the Memorandum and Order to be redacted within ten days of the date of this Memorandum and Order, after which a redacted version will be filed in the open file. Additionally, by letter dated February 16, 2010, ART's counsel indicates that they are consulting with the defendants to determine whether certain material should remain under seal pursuant to the Confidentiality Stipulation and Protective Order, so ordered by this Court on August 11, 2008. (See Dkt. No. 05-cv-9050, Entry No. 898.) The Court would appreciate an update in this regard.